**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| Old Carco LLC | ) | Appeal from Bankr. Case |
| (f/k/a Chrysler LLC), *et al.*, | ) | No. 09-50002 (AJG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

--------------------------------------------------------x

| | | |
|---|---|---|
| Island Jeep, Inc., *et al.*, | ) | |
| | ) | |
| Appellants, | ) | Case No. 1:10-cv-02493 (AKH) |
| v. | ) | (ECF Case) |
| | ) | |
| Old Carco Liquidation Trust, | ) | |
| | ) | |
| Appellee. | ) | |

--------------------------------------------------------x

## BRIEF OF APPELLEE OLD CARCO LIQUIDATION TRUST

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman
Brett J. Berlin

JONES DAY
325 John H. McConnell Blvd
Suite 600
Columbus, Ohio  43215
Telephone:  (614) 469-3939
Facsimile:  (614) 461-4198
Jeffrey J. Jones

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
Kevyn D. Orr

Attorneys for Appellee
Old Carco Liquidation Trust

# TABLE OF CONTENTS

ISSUES PRESENTED..........................................................................................................1

STANDARD OF REVIEW ...............................................................................................2

STATEMENT OF THE CASE...........................................................................................3

    A. Background Regarding the Debtors and Their Chapter 11 Cases ................................4

    B. The Debtors' Prepetition Dealer Network .................................................................5

    C. The Fiat Transaction, as Approved in the Sale Order and the Sale Opinion,
       Included the Assignment of Only Some Dealer Agreements ........................................5

       1. The Sale Hearing ..............................................................................................7

       2. The Dealer Rejection Hearing ...........................................................................9

ARGUMENT ...................................................................................................................11

I. THE BANKRUPTCY COURT CORRECTLY HELD THAT NO "FRAUD ON
   THE COURT" HAD OCCURRED WARRANTING RECONSIDERATION .................11

    A. Footnote 21 of the Dealer Rejection Opinion Is an Accurate Restatement of
       Mr. Altavilla's Testimony .......................................................................................11

    B. The Appellants Are Wrong; New Chrysler Would Not Have Consummated the
       Fiat Transaction Without a Restructuring of the Dealer Network...............................13

    C. The Appellants' Entire Argument Turns on an Incorrect and Artificial
       Limitation of the Business Judgment Standard .........................................................15

    D. The Debtors Were Authorized to Reject the Rejected Dealer Agreements
       Whether or Not Fiat or Any Other Party Demanded the Rejections ...........................16

II. THE BANKRUPTCY COURT CORRECTLY HELD THAT THE
    RECONSIDERATION MOTION WAS UNTIMELY .....................................................17

    A. The So-Called "Fraud" the Appellants Complain of Did Not Excuse Their
       Failure to File a Timely Appeal................................................................................18

    B. Appellants Have No Excuse for Waiting Six Months to Argue "Mistake." ...............20

III. THE BANKRUPTCY COURT CORRECTLY HELD THAT NO MISTAKE OR
     OMISSION HAD OCCURRED TO WARRANT RECONSIDERATION......................21

IV. THE BANKRUPTCY COURT WAS WITHIN ITS DISCRETION IN
     DECLINING TO EXERCISE "INHERENT POWER" TO RECONSIDER THE
     DEALER REJECTION ORDER...............................................................................22

V. THE DEBTORS' COUNSEL ARE NOT GUILTY OF FALSEHOOD OR FRAUD .......23

CONCLUSION..............................................................................................................25

**Page**

CASES

COR Route 5 Company, LLC v. The Penn Traffic Co.
(In re The PennTraffic Co.), 524 F.3d 373 (2d Cir. 2008) ...............................................16, 17

Duse v. IBM Corp.,
212 F.R.D. 58 (D. Conn. 2002).............................................................................................3

Hazel-Atlas Glass v. Hartford Empire Co.,
322 U.S. 238 (1944), overruled on other grounds by Standard Oil of Cal. v. United
States, 429 U.S. 17 (1976) ...............................................................................................18, 19

In re Boyer,
328 Fed. Appx. 711 (2d Cir. 2009) ...................................................................................12, 15

In re Chrysler LLC,
405 B.R. 84 (Bankr. S.D.N.Y.) (the "Sale Opinion") .................................................... passim

In re Delphi Corp.,
No. 06-cv-863, 2006 WL 1470929 (S.D.N.Y. May 30, 2006) ...................................................2

In re Health Mgmt. Sys. Inc. Sec. Litig.,
113 F. Supp. 2d 613 (S.D.N.Y. 2000)...................................................................................3, 4

In re Helm,
335 B.R. 528 (Bankr. S.D.N.Y. 2006) ....................................................................................16

In re Ionosphere Clubs, Inc.,
922 F.2d 984 (2d Cir. 1990)..............................................................................................12, 15

In re M.T.G., Inc.,
366 B.R. 730 (E.D. Mich. 2009) .............................................................................................12

In re Old Carco, LLC,
406 B.R. 180 (Bankr. S.D.N.Y. 2009) (the "Dealer Rejection Opinion") ...................... passim

In re Old Carco, LLC,
423 B.R. 40 (Bankr. S.D.N.Y. 2009) (the "Reconsideration Opinion") ......................... passim

Int'l Controls v. Vesco,
556 F.2d 665 (2d Cir. 1977)....................................................................................................21

James v. U.S.,
603 F. Supp. 2d 472 (E.D.N.Y. 2009) ....................................................................................12

McCormack v. Schindler (In re Orbitec Corp.),
    392 F. Supp. 633 (S.D.N.Y. 1975) ............................................................................................3

O'Connor v. Pan Am Corp.,
    5 Fed. Appx. 48 (2d Cir. 2001) ................................................................................................2

Olsen v. 419 Apartment Corp. (In re Olsen),
    No. 06-cv-4004 (RJS), 2008 WL 4298586 (S.D.N.Y. Sept. 19, 2008) ................................2, 4

Salsberg v. Trico Marine Servs.,
    360 B.R. 53 (S.D.N.Y 2006) ..................................................................................................12

Texlon v. Manufacturers Hanover Comm. Co. (In re Texlon Corp.),
    596 F.2d 1092 (2d Cir. 1979) ............................................................................................21, 22

Unsecured Claims Estate Representative of Teligent, Inc. v. Cigna Healthcare, Inc.
    (In re Teligent, Inc.), 326 B.R. 219 (S.D.N.Y. 2005) ..............................................................2

Workman v. Bell,
    245 F.3d 849 (6th Cir. 2001) .............................................................................................12, 13

**STATUTES**

11 U.S.C. § 365 ..............................................................................................................................6, 17

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 8002 ......................................................................................................................20

Fed. R. Bankr. P. 9024 ........................................................................................................................1

Fed. R. Civ. P. 25 ...............................................................................................................................1

Fed. R. Civ. P. 60 ....................................................................................................................... passim

# ISSUES PRESENTED

This appeal arises out of the chapter 11 cases of Old Carco LLC f/k/a Chrysler LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors").[1] On June 9, 2009, the Bankruptcy Court (through the Honorable Chief Judge Arthur J. Gonzalez) entered an order authorizing the Debtors to reject the executory contracts and unexpired leases associated with 789 of their approximately 3,200 dealerships (Docket No. 3802) (the "Dealer Rejection Order"). The rejection of these dealership contracts was directly related to, and necessitated by, the substantially contemporaneous sale of substantially all of the Debtors' assets to Chrysler Group LLC ("New Chrysler"), which sale was approved by an order of the Bankruptcy Court dated June 1, 2009 (Docket No. 3232) (the "Sale Order") and closed on June 10, 2009.

Six months later, in December 2009, 20 of the Debtors' former dealers (later joined by another 55) who are the appellants here (collectively, the "Appellants") — virtually all of whom appeared and opposed the Dealer Rejection Order and the Sale Order, and none of whom opted to appeal those decisions — brought a motion (Docket No. 6132)[2] (the "Reconsideration Motion") under Rule 60 of the Civil Rules[3] seeking the Bankruptcy Court's reconsideration of the Dealer Rejection Order. They argued, among other things, that Judge Gonzalez himself

---

[1]     By an order entered on April 23, 2010 (Docket No. 6875) (the "Confirmation Order"), the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") confirmed the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified, which was attached to the Confirmation Order as Annex I (without exhibits thereto) and as further modified by the Order of the Bankruptcy Court dated April 28, 2010 (Docket No. 6923) (collectively and including all exhibits thereto, the "Plan of Liquidation"). On April 30, 2010, the Plan of Liquidation became effective in accordance with its terms and (a) the relevant Debtor-Appellees were dissolved and (b) Old Carco Liquidation Trust succeeded to their interests. As a result, the Old Carco Liquidation Trust is substituted for the Debtor-Appellees in this Appeal, consistent with Rule 25 of the Federal Rules of Civil Procedure (the "Civil Rules").

[2]     Unless otherwise indicated, all citations to a "Docket No." refer to the Bankruptcy Court docket. In the interests of brevity, full titles of Bankruptcy Court filings are not restated herein.

[3]     Civil Rule 60 is applicable in bankruptcy cases under Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

committed a "fraud on the court" in his written opinion supporting the Dealer Rejection Order, <u>In re Old Carco, LLC</u>, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) (the "<u>Dealer Rejection Opinion</u>"), by supposedly "changing" certain testimony from the hearing. The overarching issue here is whether the Bankruptcy Court erred in denying the Reconsideration Motion. <u>See</u> <u>In re Old Carco, LLC</u>, 423 B.R. 40 (Bankr. S.D.N.Y. 2009) (the "<u>Reconsideration Opinion</u>").[4]

<b><u>STANDARD OF REVIEW</u></b>

"[W]ith respect to the denial of a [Civil] Rule 60 motion, the decision by the Bankruptcy Court is reversed only for an abuse of discretion." <u>Unsecured Claims Estate Representative of Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)</u>, 326 B.R. 219, 224 (S.D.N.Y. 2005) <u>accord</u> <u>O'Connor v. Pan Am Corp.</u>, 5 Fed. Appx. 48, 51-52 (2d Cir. 2001) (affirming, under an abuse of discretion standard, a bankruptcy court's denial of a motion for reconsideration); <u>Olsen v. 419 Apartment Corp. (In re Olsen)</u>, No. 06-cv-4004 (RJS), 2008 WL 4298586, at *5 (S.D.N.Y. Sept. 19, 2008) (same). An abuse of discretion may be found "only . . . where (1) the decision was based on an erroneous conclusion of law; (2) the record contains no evidence on which the judge could have based his decision; or (3) supposed facts found are erroneous as found." <u>In re Delphi Corp.</u>, No. 06-cv-863, 2006 WL 1470929, at *3 (S.D.N.Y. May 30, 2006) (<u>citing</u> <u>In re Integrated Resources, Inc.</u>, 157 B.R. 66, 72 (Bankr. S.D.N.Y. 1993)).

With respect to the Bankruptcy Court's analysis of the Reconsideration Motion, "the standard for granting . . . reconsideration 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked . . . that might reasonably be expected to alter the conclusion reached by the court.'" <u>Olsen</u>,

---

[4]      In their Designation of Record on Appeal and Statement of Issues To Be Presented, the Appellants stated six separately numbered issues. In the Appellants' Brief, they neither restated these issues nor labeled any specific section(s) of their argument as being organized according to the issues.

2008 WL 4298586, at *5 (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)); see also In re Health Mgmt. Sys. Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) ("reconsideration . . . is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources") (internal quotes omitted).

The Appellants purport to reserve rights to bring an "independent action" under Civil Rule 60(d)(3), separate from this appeal. See Br. at 4. The Debtors object to this attempted reservation of rights.[5]

## STATEMENT OF THE CASE

By design, most, but not all, of the Debtors' dealer contracts were transferred to, and accepted by, New Chrysler as part of its purchase of substantially all of the Debtors' assets. The Appellants are former dealers whose agreements New Chrysler declined to accept; thus, these agreements were rejected by the Debtors. In the Bankruptcy Court, nearly all of the Appellants opposed that treatment and sought to force their agreements upon New Chrysler. They were unsuccessful in obtaining this result, but they opted not to appeal the Dealer Rejection Order.

Instead, six months later, and after a series of material intervening events in the chapter 11 cases that were premised on, among other things, the finality of the Dealer Rejection Order, the Appellants resurfaced with their Reconsideration Motion. Their arguments therein were a thinly veiled appeal, saying nothing the Appellants could not have said six months earlier.

---

[5] Under Civil Rule 60(b), motions for reconsideration and independent actions are alternative — not cumulative — remedies. See McCormack v. Schindler (In re Orbitec Corp.), 392 F. Supp. 633, 635 (S.D.N.Y. 1975) (dismissing with prejudice an independent action brought after denial of a motion for relief from judgment; stating that the motion and independent action "are modes of alternative relief; they are not cumulative"); see also Duse v. IBM Corp., 212 F.R.D. 58, 62 (D. Conn. 2002) (stating that independent actions under Civil Rule 60(d)(3) are "barred where plaintiff had ample opportunity to or, in fact, did raise the alleged fraud in the underlying action") (citing M.W. Zack Metal Co. v. Int'l Navigation Corp. of Monrovia, 675 F.2d 525, 529 (2d Cir. 1982)). By the Reconsideration Motion and this appeal, the Appellants have had ample opportunity to assert their arguments and request relief. The law does not permit the Appellants more bites at the apple through another "independent action."

Nor did they reveal any controlling decisions or data that were not in the record before the Bankruptcy Court and that might reasonably be expected to have altered the Bankruptcy Court's conclusion, which was the Appellants' burden to show. See Olsen, 2008 WL 4298586, at *5; Health Mgmt. Sys. Inc. Sec. Litig., 113 F. Supp. at 614.

**A.      Background Regarding the Debtors and Their Chapter 11 Cases.**

Before commencing their bankruptcy cases, the Debtors and their nondebtor affiliates comprised one of the world's largest manufacturers and distributors of motor vehicles, employing approximately 55,000 employees and operating 32 manufacturing facilities worldwide. See In re Chrysler LLC, 405 B.R. 84, 88 (Bankr. S.D.N.Y.) (the "Sale Opinion"). In the 12 months ending December 31, 2008, the Debtors recorded a net loss of approximately $16.8 billion (id. at 89) and confronted a severe liquidity crisis, the magnitude of which forced them to seek emergency financial aid from the United States government (the "U.S. Government"). See id. at 90. Following months of deepening losses, a prolonged search for a merger partner, billions of dollars in financing from the U.S. Government, a failed effort to complete an out-of-court restructuring and an extended analysis, the Debtors determined that the sole option to maintain the viability of their businesses and to preserve their value was to sell substantially all of their assets to New Chrysler, an entity partially owned and formed by Fiat S.p.A. ("Fiat"), and to consummate certain related, court-approved transactions (collectively with the sale, the "Fiat Transaction") under authority provided for in title 11 of the United States Code (the "Bankruptcy Code"). See id. at 92-93.

Thus, 25 of the Debtors (collectively, the "Original Debtors") commenced their bankruptcy cases on April 30, 2009 (the "Petition Date")[6] and requested approval of the Fiat

---

[6]      The one remaining Debtor commenced its chapter 11 case on May 19, 2009.

Transaction on an expedited basis to avoid a "fire sale" liquidation. See id. at 96. Such a liquidation would substantially have diminished the value of the Debtors' estates and caused catastrophic job losses, not only for the Debtors, but also for their suppliers, dealers and other business partners. See id. at 96-97.

**B.    The Debtors' Prepetition Dealer Network.**

As of the Petition Date, the Debtors maintained a domestic network of approximately 3,200 dealers authorized to sell and service new vehicles through one or more Sales and Service Agreements or Direct Dealer Agreements (collectively with any ancillary agreements for each dealership, the "Dealer Agreements"). See Dealer Rejection Op., 406 B.R. at 188. Each Appellant was a party to at least one Dealer Agreement with one of the Debtors.

As early as 2001, the Debtors recognized the need to streamline and strengthen their dealer network substantially. See id. at 193. The fragmented nature of the network, with many dealers selling fewer than all three brands of Chrysler vehicles, placed the Debtors at a competitive disadvantage. See id. at 193-94. Indeed, many dealers were poor performers. In fact, empirically, the Debtors' dealers sold far fewer vehicles on average than did many of the Debtors' competitors' dealers. See id. at 193. In addition, automotive manufacturers incur greater monitoring and oversight costs as the number of their dealers increases. See id. at 194. Thus, it had been plain to the Debtors for years that their dealer network needed to be downsized.

**C.    The Fiat Transaction, as Approved in the Sale Order and the Sale Opinion, Included the Assignment of Only Some Dealer Agreements.**

On May 3, 2009, the Original Debtors filed a motion to approve the Fiat Transaction (Docket No. 190) (the "Sale Motion"). Central to New Chrysler's agreement to purchase the Debtors' assets was its bargained-for right to take assignment of certain Dealer Agreements but

not others — thereby resulting in the acquisition of a smaller, more efficient and more profitable dealer network.  See Dealer Rejection Op., 406 B.R. at 194-95; Sale Order at 19.

The Fiat Transaction is governed by the Master Transaction Agreement among the Debtors, New Chrysler and Fiat, dated as of April 30, 2009 (the "MTA" and, together with the related agreements, "Purchase Agreement").[7]  The Purchase Agreement provided that New Chrysler would have up to 30 days after closing to designate Dealer Agreements either (a) as "Assumed Contracts" that would be assumed and assigned to New Chrysler or (b) as "Excluded Contracts" that New Chrysler would not accept.  See MTA at § 2.10; Order dated May 8, 2009, at ¶ 19(c) (Docket No. 492) (the "Bidding Procedures Order").  With respect to the Dealer Agreements with the 789 rejected dealers (collectively, the "Rejected Dealer Agreements"), New Chrysler expressly designated these agreements as Excluded Contracts — thereby precluding the Debtors from assigning them to New Chrysler — before the closing of the Fiat Transaction and before the hearings on and issuance of the Dealer Rejection Order and the Dealer Rejection Opinion.  See Debtors' objection to the Reconsideration Motion (Docket No. 6216) (the "Reconsideration Objection") at 18-19; Debtors' Notice of [New Chrysler's] Designation of Excluded Contracts, Annex 1 (June 3, 2009) (Docket No. 3478) (the "Dealer Excluded Contracts Notice").  Having no further business operations, the Debtors had no need for the Rejected Dealer Agreements and no ability to perform under them, resulting in the determination to seek rejection of these agreements under section 365 of the Bankruptcy Code.[8]

---

[7]     A copy of the MTA was attached as Exhibit A to the Sale Order.

[8]     Section 365 of the Bankruptcy Code grants a debtor the right to reject executory contracts, subject to court approval.  A debtor's "rejection" of an executory contract "constitutes a breach of such contract," which the Bankruptcy Code deems to have occurred "immediately before the date of the filing of the petition."  Id. at § 365(g).  The nondebtor counterparty is left with a prepetition damage claim based on breach of contract. Id. § 502(g).  See generally Sale Op., 405 B.R. at 98-99 (discussing the law of rejection).

Hundreds of dealers, either directly or by way of committees or other groups of dealers, filed objections to the Sale Motion (see Sale Order at 13-16) and/or the Debtors' motion to reject the Rejected Dealer Agreements filed on May 14, 2009 (Docket No. 780) (the "Dealer Rejection Motion"). See Dealer Rejection Op. at 187. As for the Appellants, all but two of them (John Hine Pontiac and Wilson Dodge Nissan) objected to the Dealer Rejection Motion and all but eight of them (Bruce Campbell Dodge Inc.; Jim Fiore Motors; John Hine Pontiac; M&M Dodge Inc.; Mt Clemens Dodge Inc.; Russo Group Enterprises Inc.; SNOW, LLC; and Wilson Dodge Nissan) objected to the Sale Motion. All of the Appellants, including the few who chose not to object, had notice and an opportunity to object to these motions.[9]

### 1. The Sale Hearing.

Beginning on May 27, 2009, the Bankruptcy Court conducted a three-day hearing (the "Sale Hearing") to consider the Fiat Transaction. See Sale Op., 405 B.R. at 93. During the Sale Hearing, 21 witnesses testified live or by deposition. Among the in-person witnesses was Mr. Peter Grady, who at the time was the Debtors' Director of Dealer Operations. He testified regarding the need to reduce the Debtors' dealer network, eliminate poorly performing dealers and restructure the network as part of the Fiat Transaction. See Hr'g Tr., May 28, 2009, at 427-542. Mr. Grady testified about the development of a restructuring plan to assume and assign about 75% of the Debtors' Dealer Agreements to New Chrysler and reject the rest. See id.

---

[9] See Sale Op., 405 B.R. at 93 ("[T]he Court determines that notice of the Sale Hearing is proper and adequate."); Dealer Rejection Op., 406 B.R. at 207-08 ("The Court concludes that notice of the [Rejection] Motion and opportunity to be heard was adequate . . . ."); see also Aff. of Serv. dated May 3, 2009 (Docket No. 195) (certifying that the Sale Motion and related memorandum of law were served on May 3, 2009); Supplemental Aff. of Serv. dated May 14, 2009 (Docket No. 842) (certifying that a supplemental service of the Sale Motion and related memorandum of law were made on May 4, 2009); Aff. of Serv. dated May 15, 2009 (Docket No. 930) (certifying that the Notice of Hearing for the Sale Motion was served on May 11, 2009); Aff. of Serv. dated May 21, 2009 (Docket No. 1588) (certifying that the Dealer Rejection Motion and the Amended Notice of Hearing for Dealer Rejection Motion were served on, among others, all dealers affected by the Dealer Rejection Motion on May 14, 2009).

at 447-48.  He also testified that the analysis on which Dealer Agreements should be assigned or rejected was shared with Fiat, and that Fiat would not participate in the Fiat Transaction without a reduction of the dealer network.  See Hr'g Tr., May 28, 2009, at 477 (stating that the Debtors were required to transfer a robust dealer network and that Fiat agreed to "a restructuring of the dealer network"); 496-97 (stating, with respect to taking the "opportunity to accelerate [dealer network restructuring] as a result of bankruptcy," that "Fiat and their dealer development people . . . signed off on the process.  They agreed with it."); 539 (confirming that the Debtors showed the dealer assignment list to Fiat, discussed the underlying methodology for it and obtained Fiat's approval of which Dealer Agreements were selected for assignment); id. (stating that, absent rejection of the Rejected Dealer Agreements, Fiat would not have proceeded with the Fiat Transaction).

Another key witness was Fiat executive Mr. Alfredo Altavilla.  Among other things, he testified regarding Fiat's desire for a dealer network restructuring.  See, e.g., Hr'g Tr., May 27, 2009, at 350 (stating that the Fiat Transaction term sheet contained a "provision . . . calling for a restructuring of the existing dealer network"); 351 (stating that Fiat "requested a restructuring of the dealer network"); 352 (stating that "a restructure needs to occur").

Various dealers presented live testimony of fact witnesses at the Sale Hearing and argued, among other things, that the Rejected Dealer Agreements that were not being assigned to New Chrysler should nevertheless be imposed upon New Chrysler as if they had been assigned. See Hr'g Tr., May 29, 2009, at 58-108, 280-93.  Their witnesses conceded on cross-examination, however, that the dealer network needed to be downsized.  See id. at 72-74, 89-93, 102-06.

On May 31, 2009, the Bankruptcy Court issued its Sale Opinion overruling the various objections — including those of the objecting dealers — approving the Fiat Transaction and

explaining these decisions.  See Sale Op. at 113.  The Bankruptcy Court recognized the essential elements of the sale:  "As in any case, the potential purchaser, New Chrysler, identified the assets it desired to purchase, which of necessity dictated the contracts that the Debtor would assume."  Sale Op. at 98.  "Obviously," the Bankruptcy Court added, "the value that New Chrysler would agree to pay for the assets has to be impacted by the inclusion or exclusion of certain contracts."  Id. at 99.  New Chrysler appropriately "decid[ed] to assume certain contracts but not others" and took such steps that occur "[i]n every bankruptcy case involving the sale of substantially all of a debtor's assets."  Id.  The Court specifically held that "the procedures utilized . . . to determine which contracts would be assumed and assigned to the purchaser was a reasonable exercise of the Debtors' business judgment."  Id. at 96.

On June 1, 2009, and consistent with the Sale Opinion, the Bankruptcy Court entered the Sale Order authorizing the Fiat Transaction.  The Fiat Transaction closed on June 10, 2009.

### 2. The Dealer Rejection Hearing.

Next, the Bankruptcy Court conducted hearings on the Dealer Rejection Motion on June 4 and June 9, 2009.  Dealer Rejection Op., 406 B.R. at 187.  Fifteen witnesses testified live and 66 witnesses submitted declarations.  See id.  At the hearings, the main factual argument underpinning this Appeal— i.e., that Mr. Altavilla's testimony somehow compelled a finding that Fiat was indifferent to including a dealer restructuring in connection with the Fiat Transaction — was argued by counsel to no fewer than three separate dealer factions.  See Hr'g Tr., May 29, 2009, at 282-83 (argument of Stephen D. Lerner, counsel to the "Committee of Chrysler Affected Dealers"); 294 (argument of Eric Snyder, counsel to 31 dealers); Hr'g Tr., June 9, 2009, at 69-70 (argument of Michael J. Connolly, counsel to Palmer Chrysler Dealership).

On June 9, 2009, the Bankruptcy Court entered the Dealer Rejection Order, overruling these and other objections.  On June 19, 2009, the Bankruptcy Court issued the Dealer Rejection

Opinion.  See Dealer Rejection Op., 406 B.R. at 212-13.  Consistent with the Sale Opinion, the Bankruptcy Court found that New Chrysler would not have agreed to the Fiat Transaction without the option to select the assets and liabilities that it wished to purchase, including to pick and choose dealer contracts to achieve a smaller and stronger dealer network.  See, e.g., id. at 195.  "The Debtors determined, and New Chrysler agreed, that rejection of the Rejected Agreements was necessary and appropriate for implementing" Chrysler's business plan for recovery, "by enabling the Debtor to consummate the Fiat Transaction and transfer to New Chrysler a smaller, more effective, and more profitable dealer network without disruption while limiting the Debtors' potential postpetition obligations to the Affected Dealers."  Id. The Bankruptcy Court emphasized that making a debtor more attractive to its buyer is an appropriate reason to reject a contract.  Dealer Rejection Op. at 192 n.10 (citing In re G Survivor Corp., 171 B.R. 755, 759 (Bankr. S.D.N.Y. 1994)); see id. at 194.

None of the Appellants appealed the Dealer Rejection Order.  Yet, having failed in their various efforts in Bankruptcy Court to oppose the sale and the rejection of their Dealer Agreements, the Appellants now seek to unravel these key elements of the chapter 11 cases and have their Dealer Agreements treated as if the sale and rejection process had not occurred.

## **ARGUMENT**

I.  **THE BANKRUPTCY COURT CORRECTLY HELD THAT NO "FRAUD ON THE COURT" HAD OCCURRED WARRANTING RECONSIDERATION.**

### A.  **Footnote 21 of the Dealer Rejection Opinion Is an Accurate Restatement of Mr. Altavilla's Testimony.**

The Appellants' central argument is the remarkable theory that the Bankruptcy Court somehow committed a fraud upon itself by summarizing the live testimony of Mr. Altavilla in a manner that, according to the Appellants, constitutes "judicial ventriloquism" and "mocks the purpose of justice," among other indictments.  Br. at 7.  In particular, the Appellants take issue

with footnote 21 to the Dealer Rejection Opinion ("Footnote 21").  See Br. at 6.  They accuse the

Bankruptcy Court of committing "intentional fraud" by including, in Footnote 21, Mr. Altavilla's

statement that a dealer network restructuring "needs to occur," without also including his

statement, "whether it occurs before or after the closing of the deal is not a material difference."

Id.  The latter statement appeared in an earlier footnote; footnote 18.  The Appellants contend

that this division of the testimony between two footnotes is cause for reconsideration under Civil

Rule 60(d)(3).  For the reasons set forth below, however, this theory has no basis in fact or law.

First, Footnote 21 is a fair and honest summary of the part of Mr. Altavilla's testimony

that was relevant to the Bankruptcy Court's point.[10]  Chief Judge Gonzalez used Footnote 21 in

connection with finding that, for the purposes of the business judgment standard, it was

"immaterial whether Fiat required the Debtors to reject the *number* of agreements [they]

rejected."  See Dealer Rejection Op. at 197 (emphasis added).  The Bankruptcy Court's point was

that Fiat's direct participation in selecting the *number* of dealers to reject was immaterial.  See id.

Footnote 21 further supports the Bankruptcy Court's finding that the *process* for selecting the

Dealer Agreements to accept was neither foreign nor unacceptable to Fiat, even if it primarily

was executed by the Debtors.  Id.  The Bankruptcy Court found Mr. Altavilla's testimony to

mean that, notwithstanding issues of methodology, Fiat agreed that "a restructure [of the dealer

network] needed to occur."  Thus, the degree to which Mr. Altavilla's testimony expressed

---

[10]     Footnote 21 states, in full: "Altavilla testified that although Fiat did not indicate the size of the restructuring of the dealership network, the number of dealers involved in the restructuring came out of the application of the Debtors' selection methodology.  Altavilla also responded affirmatively to a question regarding whether a dealership network needed to be restructured for the Fiat Transaction to close, stating that a 'restructuring needs to occur.'"  Dealer Rejection Op. at 197.

indifference to the timing of the rejections (*i.e.*, "before or after the closing") simply was not important to the purpose of Footnote 21.[11]

Second, of course, it is axiomatic that Chief Judge Gonzalez was the finder of fact in this matter and, therefore, was entitled to evaluate and weigh the evidence presented to him. In re Boyer, 328 Fed. Appx. 711, 714 (2d Cir. 2009) (stating that an appellate court must accept a bankruptcy court's findings of fact unless clearly erroneous); In re Ionosphere Clubs, Inc., 922 F.2d 984, 988-89 (2d Cir. 1990) (same). It is not extraordinary — and certainly is not "fraud" or "error" — for the Bankruptcy Court to determine that certain testimony best exemplifies the point being made in one footnote of a written opinion without quoting other excerpts in the same footnote. While the Appellants disagree with the way the Bankruptcy Court described, interpreted and utilized the testimony, such disagreement should have been raised solely through an appeal — a right the Appellants chose not to exercise.

Third, although the very premise of this Appeal depends on it, the Appellants' Brief is devoid of any precedent showing that a court's own fact-finding can constitute "fraud" within the meaning of Civil Rule 60. The primary authority the Appellants offer, Workman v. Bell, 245 F.3d 849, 851-52 (6th Cir. 2001), involves fraud *by counsel*, not by a court. Id. at 851-52 (explaining that the "fraud on the court" argument was based on statements to the court by lawyers).[12] The very language of Civil Rule 60 confirms that only fraud by an opposing party is addressed by the rule. See Civil Rule 60(b)(3) (providing that the court may provide relief from

---

[11] Footnote 18, by contrast, involved an element of timing. Thus, Mr. Altavilla's testimony as to timing was relevant for footnote 18 and was quoted therein, whereas, in Footnote 21, it was irrelevant.

[12] Indeed, all of the other authority offered by the Appellants in their briefing for the Bankruptcy Court suffered from the same flaw. See, e.g., Salsberg v. Trico Marine Servs., 360 B.R. 53, 60 (S.D.N.Y 2006) (involving the alleged perjury of a witness); James v. U.S., 603 F. Supp. 2d 472, 485-86 (E.D.N.Y. 2009) (involving an allegedly misleading statement by lawyers for the government at closing argument and the introduction of testimony that was false or misleading); In re M.T.G., Inc., 366 B.R. 730, 748-53 (E.D. Mich. 2009) (involving a trustee's failure to disclose a conflict of interest).

a final judgment "based upon fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an *opposing party*") (emphasis added).

Even applying the factors the Appellants cite from <u>Workman v. Bell</u> is of no help to them. Those factors define "fraud on the court" for Civil Rule 60 purposes as "conduct: (a) on the part of an officer of the court; (b) that is directed to the judicial machinery itself; (c) that is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; (d) that is a positive averment or a concealment when one is under a duty to disclose; and (e) that deceives the court." 245 F.3d at 852. Here, however, (a) Chief Judge Gonzalez made no "positive averment or a concealment" about the testimony, as shown above; (b) Chief Judge Gonzalez was not under any "duty to disclose" the testimony; (c) there was no deception of the Bankruptcy Court by the Bankruptcy Court or by any party or witness; and (d) the actual treatment of the testimony in the Dealer Rejection Opinion was not "reckless," but instead was fair and logical.

Accordingly, for all of these reasons, there was no "fraud on the court" under Civil Rule 60(d)(3) to provide a basis for vacating the Dealer Rejection Order and the Dealer Rejection Opinion, and the Court should affirm the Reconsideration Opinion.

### B. The Appellants Are Wrong; New Chrysler Would *Not* Have Consummated the Fiat Transaction Without a Restructuring of the Dealer Network.

Resorting ironically to the same parsing of testimony that they attribute to Chief Judge Gonzalez, the Appellants twist Mr. Altavilla's words to an opposite extreme to try to argue that Fiat would have accepted the Fiat Transaction without a restructuring of the dealer network. In particular, the Appellants argue that the testimony establishes that "Fiat would have gone through with the [Fiat Transaction] without [any dealers] having lost their dealerships." Br. at 6. The record, however, affirmatively and specifically disproves this notion.

Mr. Altavilla stated outright that "a restructure needs to occur." Hr'g Tr., May 27, 2009, at 352. The Appellants have not even tried to explain how this clear statement on Fiat's behalf could coexist with their theory that Fiat did not want a dealer network restructuring and would have proceeded without one. No such explanation is possible, as the two positions are irreconcilable; yet, only one of them — the fact that Fiat expected a restructuring — has record support.

By way of further example: (a) the Fiat Transaction term sheet expressly "stat[ed] that a [re]structuring was required," <u>see</u> Hr'g Tr., May 27, 2009, at 351; (b) when questioned by Mr. Russell McRory, counsel for certain dealers, regarding whether Fiat requested a restructuring of the dealer network, Mr. Altavilla reconfirmed, "as I said, [Fiat] requested a restructuring of the dealer network without indicating the size of that restructuring," <u>see</u> Hr'g Tr., May 27, 2009, at 351; (c) in addition, the Debtors' debtor-in-possession financing, as provided by the U.S. Government and Export Development Canada, contemplated a reduction of the dealer network, <u>see</u> <u>Dealer Rejection Op.</u> at 197; and (d) the "Alliance Viability Plan" (<u>i.e.</u>, the plan the Debtors presented to the United States Department of the Treasury (the "<u>U.S. Treasury</u>") to demonstrate the positive synergies from an alliance with Fiat) required a reduced dealer network, <u>see</u> <u>Dealer Rejection Op.</u> at 196. New Chrysler also provided an express notice of its designation of the Rejected Dealer Agreements as Excluded Contracts, indicating that New Chrysler was not willing to accept an assignment of these agreements. <u>See</u> Notice of Filing Designation of Excluded Contracts (Docket No. 3478). Thus, the Appellant's theory that Fiat

would have "gone through with the purchase" without the Appellants' Dealer Agreements being rejected is no more than a baseless, self-serving wish; not fact.[13]

### C. The Appellants' Entire Argument Turns on an Incorrect and Artificial Limitation of the Business Judgment Standard.

The Appellants claim that the testimony Chief Judge Gonzalez allegedly altered was an "erroneous finding of fact and *the only fact upon which Judge Gonzalez could have relied* to claim that the business judgment standard was met." Br. at 6 (emphasis added). The Appellants, however, have no legal or factual support for this conclusion. <u>First</u>, Judge Gonzalez's description of Mr. Altavilla's testimony was not an "erroneous finding of fact" but, rather, was a sound and well supported summary of testimony in harmony with the rest of the record. As explained above, as the finder of fact in this matter, Chief Judge Gonzalez was well within his discretion and the record to draw his conclusions from Mr. Altavilla's testimony. <u>See</u> <u>Boyer</u>, 328 Fed. Appx. at 714; <u>Ionosphere Clubs</u>, 922 F.2d at 988-89.

<u>Second</u>, apart from Mr. Altavilla's testimony, the record supports many other, distinct findings and conclusions, all of which also supported the holding that the Debtors had satisfied the business judgment standard to reject the Rejected Dealer Agreements. For example, among other things, the Bankruptcy Court found that: (a) after the closing of the Fiat Transaction, the Debtors would no longer be in the car manufacturing business and would not have the necessary intellectual property rights to permit the dealers to be authorized dealers; (b) the rejections

---

[13] The closest the evidence ever comes to the Appellants' baseless theory is to indicate that Fiat was willing to be somewhat flexible in the timing of the dealer rejections — a contention that Chief Judge Gonzalez specifically acknowledged. <u>See</u> <u>Dealer Rejection Op.</u> at 195 n.18. Fiat's indifference on this timing issue, however, merely was a recognition that the negotiated procedures for reducing the dealer network contemplated that the process could occur or continue after the Fiat Transaction closing date. As noted earlier, the Sale Order provided New Chrysler with a 30-day post-closing window to designate Dealer Agreements for assumption and assignment or rejection. <u>See</u> Purchase Agr. at § 2.10; Bidding Procedures Order at ¶ 19(c). As also noted, New Chrysler provided the Debtors with written notice, after Mr. Altavilla's testimony but before the sale closing, of its affirmative designation of the agreements as Excluded Contracts. <u>See</u> Reconsideration Obj. at 8-9; Dealer Excluded Contracts Notice.

supported the Fiat Transaction, the only alternative to which was liquidation of the Debtors' assets; and (c) in accelerating the reduction of the dealer network, the Debtors were acting within the limits of their U.S. Government funding.  See Dealer Rejection Op. at 196-197.  In fact, correctly applying the law, the Bankruptcy Court made clear that Fiat's input on the details of the dealer rejections was not particularly relevant to whether the Debtors had satisfied the applicable legal standard.  Id. at 197 ("It is immaterial whether Fiat required the Debtors to reject the number of agreements it rejected.").  Thus, despite the Appellants' claims that Mr. Altavilla's testimony was the *only* fact upon which Chief Judge Gonzalez relied and could have relied, there were many other, more legally relevant justifications for the rejection of the Rejected Dealer Agreements.  See Dealer Rejection Op. at 196-197.  Applicable Second Circuit law provides that a debtor need only show a benefit to the estate — a showing that the Bankruptcy Court determined was satisfied.  Id.[14]

### D. The Debtors Were Authorized to Reject the Rejected Dealer Agreements Whether or Not Fiat or Any Other Party Demanded the Rejections.

The Appellants assert that there "is absolutely no evidence whatsoever in the record of the case indicating that Fiat, or any other faction of New Chrysler (including the US Government, the Canadian Government or the United Auto Workers) ever requested that the [dealers'] contracts be rejected."  Br. at 13.  This assertion is legally misplaced.  First, as already noted, the record contains ample proof of New Chrysler's expectation of receiving a restructured dealer network as part of the Fiat Transaction.  And with respect to the U.S. and Canadian governments, as the Bankruptcy Court understood, the Debtors' government-funded postpetition financing contemplated the rejection of the Rejected Dealer Agreements (i.e., no funding was

---

[14]    See, e.g., COR Route 5 Company, LLC v. The Penn Traffic Co. (In re The PennTraffic Co.), 524 F.3d 373, 383 (2d Cir. 2008) (stating this standard) (citing In re Orion Pictures Corp., 4 F.3d 1095, 1098 (2d Cir. 1993)); In re Helm, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) (same).

provided for ongoing dealer relationships).  <u>See</u> <u>Dealer Rejection Op.</u> at 196-197.  While New

Chrysler and the U.S. Government may not formally have "requested" the rejections, (a) New

Chrysler's clear exclusion of the agreements from the Fiat Transaction made it clear that they

would not be assumed and assigned to New Chrysler and (b) the U.S. and Canadian

governments' funding of the Debtors' bankruptcy cases assumed that the rejections would occur.

     <u>Second</u>, ultimately, as a matter of law, whether anyone "requested" the rejections of the

Rejected Dealer Agreements is irrelevant for purposes of applying section 365 of the Bankruptcy

Code.  The decision is the Debtors' to make and it is solely the Debtors' business judgment that is

critical in evaluating the request to reject these agreements. <u>See</u> <u>Penn Traffic</u>, 524 F.3d at 383

(collecting cases).  The rejections were authorized because the Bankruptcy Court correctly

concluded, bases on an ample record, that the Debtors — the only party with the ability to

exercise the right of rejection — had exercised sound business judgment in doing so.  Whether

other parties agreed, disagreed or acquiesced is of little consequence.  Thus, the Dealer Rejection

Opinion was legally sound, and there is no basis for reconsidering it, much less vacating it.

## II.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THE RECONSIDERATION MOTION WAS UNTIMELY.

     Under Civil Rule 60(c), reconsideration must be sought "within a reasonable time."  For a

motion under Civil Rule 60(b)(1), (2) or (3), a reasonable time is limited to "no more than a year

after the entry of the judgment or order."[15]  <u>See</u> Civil Rule 60(c).  The Bankruptcy Court found

that the Appellants' choice not to file a timely appeal of the Dealer Rejection Order both

(a) doomed their "fraud on the court" argument under Civil Rule 60(d), because the Appellants

should have asserted that argument through appeal instead; and (b) underscored the unreasonable

---

[15]     By the Reconsideration Motion, the Appellants requested reconsideration under Civil Rule 60(b)(1) (including, among other grounds, "mistake") and Civil Rule 60(d) ("fraud on the court").

lateness of their "mistake" argument under Civil Rule 60(b)(1), because the Appellants also should have asserted that argument through a timely appeal.  See Reconsideration Op. at 43.

### A.     The So-Called "Fraud" the Appellants Complain of Did Not Excuse Their Failure to File a Timely Appeal.

The Appellants argue that the Bankruptcy Court erred in holding that they should have appealed to assert their "fraud on the court" argument about Footnote 21.  See Br. at 10. The Bankruptcy Court's correct reasoning on this issue was that a party who alleges fraud on the court must show that the fraud "precluded [the party] from fully and fairly representing its case," but that the Appellants could not make such a showing.  Reconsideration Op. at 40.

The Appellants' first contention against this reasoning is that the Bankruptcy Court supposedly cited no support for it.  See Br. at 10.  But the Reconsideration Opinion did in fact cite authority.  See Reconsideration Op. at 52-53 (citing, among other cases, United States v. Smiley, 553 F.3d 1137, 1142 (8th Cir. 2009); State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d. Cir. 2004); Kupferman v. Consol. Research & Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir. 1972)).  And under this authority, to ensure that Civil Rule 60(d)(3) does not gut the time limitations of Civil Rule 60(c) and the deadline for filing appeals, "the boundaries of the concept of 'fraud upon the court' are strict."  See id. at 52 (citing Kupferman, 459 F.2d 1072 (other citation omitted)).  The Bankruptcy Court correctly followed controlling precedent by noting that "the standard applied to allegations of [Civil] Rule 60(b)(3) fraud also applies in the context of a [Civil] Rule 60(d)(3) motion for fraud on the court." See Reconsideration Opinion, 423 B.R. at 53 (citing State Street Bank, 374 F.3d at 176).

Next, the Appellants place heavy reliance on Hazel-Atlas Glass v. Hartford Empire Co., 322 U.S. 238 (1944), overruled on other grounds by Standard Oil of Cal. v. United States, 429 U.S. 17 (1976), to argue that "fraud on the court" can be raised long after the expiration of

the appeal period.  See Br. at 12-13.  The situation in Hazel-Atlas, however, is distinguishable.

In Hazel-Atlas, attorneys in a patent case arranged for journal publication of a favorable article

on a glass-blowing process as part of a scheme to obtain a patent for the process.  See Hazel-

Atlas, 322 U.S. at 240-42.  Several years after the appeals in the patent case were exhausted, the

fact that the article had been "planted" came to light in an unrelated antitrust case, which led to

an action being filed to vacate the patent.  See Hazel-Atlas, 322 U.S. at 244.  The Supreme Court

subsequently vacated the patent because the Third Circuit appeared to have relied on the planted

article in originally approving the patent.  See Hazel-Atlas, 322 U.S. at 246-47.

Here, in contrast to the long-undetected fraud by counsel outside of the court room in

Hazel-Atlas, and unknown to the court and opposing counsel during the original action, the

alleged "fraud on the court" was only Footnote 21 of the Bankruptcy Court's own Dealer

Rejection Opinion (see Br. at 7), issued mere days after the Dealer Rejection Order, explaining

the Bankruptcy Court's interpretation of testimony elicited in open court, on cross-examination,

during an adversarial process in which nearly all of the Appellants participated directly.  The

Dealer Rejection Opinion itself is a public document that was available immediately upon

issuance, not discovered months later.  The Bankruptcy Court's weighing and description of the

evidence in a post-hearing published opinion cannot possibly have prevented the Appellants

from "fully and fairly presenting their case" during the proceeding.[16]

Nor, contrary to the Appellants' argument (see Br. at 16) did the June 19, 2009 issuance

date of the Dealer Rejection Opinion (ten days after the June 9, 2009, entry of the Dealer

---

[16]     Indeed, the Appellants cite no apposite authority for their theory.  The Bankruptcy Court issued the Dealer
Rejection Order and the Dealer Rejection Opinion after reviewing the Debtors' opening and reply briefs,
over 200 objections or other responses to the motion and testimony from 15 live witnesses during two days
of hearings, plus 66 witness declarations.  See Dealer Rejection Op. at 187.

Rejection Order) prevent them from timely exercising their appeal rights by June 19, 2009.[17]
From the day the Bankruptcy Court entered the Dealer Rejection Order, the Appellants were on notice of the Bankruptcy Court's decision. <u>See</u> Dealer Rejection Order at 2. If the Appellants disagreed with that decision, they could and should have filed a timely notice of appeal or motion for reconsideration, regardless of the fact that the Bankruptcy Court issued a supporting legal opinion ten days later. <u>See</u> <u>Reconsideration Op.</u> at 54.[18]

Even if, for the sake of argument only, there were merit in the Appellants' specious argument that they could not have known they had grounds to appeal the Dealer Rejection Order until they saw the Dealer Rejection Opinion, they could still have filed a timely notice of appeal by June 29, 2009 — ten days after the issuance of the Dealer Rejection Opinion — because the Tarbox notice of appeal created a ten day extension of the appeal period under the version of Bankruptcy Rule 8002(a) in effect at the time. The Bankruptcy Court recognized this point. <u>See</u> <u>Reconsideration Op.</u> at 55. In addition, as the Bankruptcy Court also noted, the Appellants could have moved to extend the appeal deadline, but they did not. <u>See</u> <u>id.</u> The Bankruptcy Court correctly perceived that "the Reconsideration Motion is untimely because the asserted basis upon which the motion was filed was available to the [Appellants] upon issuance of the [Dealer] Rejection Order and the [Dealer Rejection] Opinion." <u>Id.</u> This holding is a correct application of the proper legal standards and should be affirmed.

**B. Appellants Have No Excuse for Waiting Six Months to Argue "Mistake."**

The Appellants maintain that the Reconsideration Motion was filed timely for purposes of asserting that the Bankruptcy Court had committed "mistake," by supposedly overlooking

---

[17] Although Bankruptcy Rule 8002(a) provides now for 14 days to appeal following entry of an order or judgment, the version of the rule in effect in June 2009 provided only ten days to appeal.

[18] Indeed, two dealers who are not Appellants — Tarbox Motors, Inc. and Tarbox Chrysler Jeep, LLC — both timely appealed (Notice of Appeal (Docket No. 4150)), but withdrew the appeal before any briefing. <u>Id.</u>

facts and law, because it was filed within one year. See Br. at 21. But the Appellants ignore Civil Rule 60(c)(1)'s crystal clear statement that one year is not timely *per se*; rather, it is the longest possible limit on what a "reasonable" time period could be. Second Circuit law has recognized over and over again that the reasonable time for seeking reconsideration must in all but extraordinary cases be very prompt to avoid rendering meaningless the deadline for filing appeals. See, e.g., Texlon v. Manufacturers Hanover Comm. Co. (In re Texlon Corp.), 596 F.2d 1092, 1100 (2d Cir. 1979) (noting that motions to reconsider judgments for judicial mistake generally should be filed within the appeal period); Int'l Controls v. Vesco, 556 F.2d 665, 670 (2d Cir. 1977) ("a motion for relief from such judicial mistakes under [Civil] Rule 60(b)(1) may not be made after the time for appeal has elapsed").

The Second Circuit's opinion in Texlon highlights the lateness of the Reconsideration Motion. Texlon involved an *ex parte* financing order entered on the first day of a bankruptcy case. See Texlon, 596 F.2d at 1094. Some two and a half months later, a trustee was appointed, and he promptly filed a request for reconsideration of the financing order. See id. at 1095. Despite the *ex parte* nature of the financing order and the trustee's relative swiftness in moving for reconsideration only six days after his appointment, the Second Circuit held that the reconsideration request was not timely because the appeal period had run prior to the trustee's appointment. See id. at 1094-95. Here, even after the Debtors raised the timeliness objection, the Appellants offered the Bankruptcy Court no legitimate excuse, either for their choice not to appeal in the first place, or for their lengthy delay in seeking reconsideration.

## III. THE BANKRUPTCY COURT CORRECTLY HELD THAT NO MISTAKE OR OMISSION HAD OCCURRED TO WARRANT RECONSIDERATION.

The Appellants assert that they identified many material points of law and fact in the Reconsideration Motion that Chief Judge Gonzalez supposedly "overlooked" or ignored when

issuing the Dealer Rejection Order and the Dealer Rejection Opinion.  <u>See</u> Br. at 23.  On appeal, the Appellants offer no detail to specify these alleged omissions, nor any explanation of how these alleged omissions would have precluded the Bankruptcy Court's conclusion that it was appropriate for the Debtors to reject the Rejected Dealer Agreements.  In the proceedings below, the Debtors showed, and the Bankruptcy Court agreed in a sound exercise of its discretion, that no judicial omission had occurred because the arguments in the Reconsideration Motion were substantively identical to ones directly presented by the Appellants themselves and/or various other dealers in the litigation leading up to the entry of the Dealer Rejection Order and the Dealer Rejection Opinion.  <u>See</u> Reconsideration Obj. at 15-16.  Thus, the Bankruptcy Court was well within its discretion in ruling that no "mistake" or oversight warranted reconsideration of the Dealer Rejection Order, and this Court should affirm.

## IV.  THE BANKRUPTCY COURT WAS WITHIN ITS DISCRETION IN DECLINING TO EXERCISE "INHERENT POWER" TO RECONSIDER THE DEALER REJECTION ORDER.

The Appellants ask that the Bankruptcy Court be directed to reconsider the Dealer Rejection Order as an exercise of the Bankruptcy Court's "inherent powers" to reverse judgments obtained by fraud.  <u>See</u> Br. at 24.  Repeating their misguided mantra, the Appellants claim that "error" in Footnote 21 compels the Bankruptcy Court to exercise these powers.  <u>See</u> <u>id.</u>  In this vein, the Appellants further claim that "[n]either the Court nor the Debtor have forwarded any reason why, by granting [Appellants'] Motion to reconsider, intervening rights — as defined by the Court in <u>Texlon</u> — will be prejudiced."  <u>Id.</u> at 25.

The assertion that the Debtors have not identified any intervening rights that would be prejudiced if the Dealer Rejection Order were to become undone is false.  As the Debtors noted in their briefing below, (a) rejecting the Rejected Dealer Agreements allowed them to avoid the potential administrative liabilities that would have been generated by nonperformance; and (b) in

reliance on the finality of the Dealer Rejection Order and the avoidance of these claims, the Debtors, among other things, (i) negotiated a winddown budget with the U.S. and Canadian governments, (ii) formulated, obtained confirmation and begun implementation of the Plan of Liquidation and (iii) have litigated successfully against dealers to enforce the Dealer Rejection Order.  See Reconsideration Obj. at 8-9.  The Bankruptcy Court accordingly recognized, in the Reconsideration Opinion, the prejudicial results of undoing the dealership rejections. Reconsideration Op. at 56-57.  This reasoning shows that the Bankruptcy Court was well aware that vacating the Dealer Rejection Order at this late juncture would cause significant harm to the Debtors' estates, making it inappropriate to exercise "inherent powers" to vacate the Dealer Rejection Order on reconsideration.  Thus, this Court should affirm.

## V.     THE DEBTORS' COUNSEL ARE NOT GUILTY OF FALSEHOOD OR FRAUD.

The Appellants accuse the Debtors' counsel of committing intentional fraud on the Bankruptcy Court in the Reconsideration Objection (see Br. at 16-20) — an accusation they also made in their reply brief below (Docket No. 6270) (the "Reconsideration Reply").  See Reconsideration Reply at 2.  As a threshold matter of logic, the Bankruptcy Court correctly pointed out that any allegedly fraudulent representation in the reconsideration briefing could not possibly have influenced the Bankruptcy Court's original decision to authorize rejection of the Rejected Dealer Agreements many months before that briefing occurred.  Reconsideration Op. at 57 n.13.  Of course, the Appellants cite no authority for their argument.  See Br. at 20.

To the extent the Appellants may be arguing that alleged fraud by the Debtors' counsel clouded the Bankruptcy Court's consideration of the Reconsideration Motion itself, this argument is nonsensical too.  First, because the Appellants already raised this allegation in the reply brief below before the Bankruptcy Court ruled, the Bankruptcy Court was able to consider the allegations at the time.  It found them to be meritless.  See Reconsideration Op. at 57 n.13

(finding that the "characterizations do not rise to the level of fraud on the Court").  Second, the Appellants' Civil Rule 60(d)(3) challenge applies to the Dealer Rejection Opinion, not the Reconsideration Opinion.  Thus, the issue of whether "fraud on the court" clouded the reconsideration analysis is irrelevant and not properly before this Court.

One of the Appellants' allegations concerns the Debtors' use of citations to the Dealer Rejection Opinion in their briefing, which is characterized as somehow inappropriate.  Br. at 16 (alleging that the Debtors' counsel committed fraud on the Bankruptcy Court by citing to the "Rejection Opinion to challenge [the Appellants'] argument that the Rejection Opinion contains a fraudulent assertion").  Of course, the Debtors' citations to the Dealer Rejection Opinion are not at all inappropriate when the Appellants argued that the Dealer Rejection Opinion itself mischaracterized witness testimony.  The Debtors naturally cited to the Dealer Rejection Opinion to reveal the Appellants' sophistry and to show that the Bankruptcy Court considered closely Mr. Altavilla's testimony.  See, e.g., Reconsideration Obj. at 26 (citing to the Dealer Rejection Opinion to show that the Bankruptcy Court was aware of the disputed portion of testimony).  Where appropriate, the Debtors did not hesitate to cite directly to hearing transcripts, notwithstanding the Appellants' allegation to the contrary.  See, e.g., Reconsideration Obj. at 18 n.23 (citing directly to hearing testimony of Alfredo Altavilla and Peter M. Grady).

The Appellants also allege that the Debtors' counsel fabricated testimony of Mr. Grady.  Br. at 18.  But the cited testimony of Mr. Grady comes directly from the transcript and was not fabricated.  A mere typographical error in the Debtors' citation to the testimony — arising from differing page numbering between the preliminary, electronic copy and the final, filed copy of the transcript — is the innocent explanation for what the Appellants would call "a blatant lie." Br. at 17.  The Debtors cited to the following testimony of Mr. Grady:

> Debtors' counsel:    Would [Fiat] have done this deal without doing the assumption and rejection?
>
> Mr. Grady:    My understanding is that they would not have done it.

Hr'g Tr., May 28, 2009, at 539 (testimony of Peter M. Grady).[19]  Although the Debtors' cited to page 488 of the transcript for this excerpt (based on the page numbering of their electronic copy of the Transcript), this quotation actually occurs on page 539 of the filed transcript.

Thus, the statement clearly exists in the record, despite the Appellants' bold (and obviously not fact-checked) allegation that "the fictional statement attributed to Mr. Grady does not exist anywhere in the record."  Br. at 18.  Accordingly, the record reflects neither evidence of intentionally fraudulent representations by the Debtors' counsel[20] nor any proceeding that was allegedly derailed by such representations.

## CONCLUSION

For the foregoing reasons, Old Carco Liquidation Trust respectfully requests that this Court affirm the Reconsideration Opinion.

Dated:  May 17, 2010

Respectfully submitted,

/s/ Corinne Ball
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball

---

[19]    Although not remarked upon by the Appellants, this inadvertent error in page pinpointing was repeated throughout footnote 23 of the Reconsideration Objection.

[20]    Despite the record of testimony of Messrs. Grady and Altavilla, the Appellants attack the Debtors' counsel with unrestrained and wrongful accusations, including that the Debtors' counsel:  "created new fraudulent facts out of thin air" (Br. at 16); "mysteriously supplemented the record" (Br. at 17); lied blatantly (Br. at 17); fabricated testimony (Br. at 17-19); put words "into a witness's mouth" (Br. at 18); and provided fraudulent citations (Br. at 19).  Given the comprehensive support for the Debtors' arguments throughout the record and the absence of evidence of intent to defraud, such *ad hominem* allegations are unfounded and improper.  The Debtor's counsel reserves all of their rights with respect thereto.

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman
Brett J. Berlin

JONES DAY
325 John H. McConnell Blvd
Suite 600
Columbus, Ohio  43215
Telephone:  (614) 469-3939
Facsimile:  (614) 461-4198
Jeffrey J. Jones

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
Kevyn D. Orr

Attorneys for Appellee
Old Carco Liquidation Trust

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2010, a true and correct copy of the foregoing BRIEF OF APPELLEE OLD CARCO LIQUIDATION TRUST and APPENDIX were electronically filed with the Clerk of the Court through the Court's CM/ECF system, which will send notification of such filing to the attorneys of record.

Dated:  May 17, 2010                    /s/ Jeffrey B. Ellman
                                        Jeffrey B. Ellman