# APPENDIX 11

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 09-50002
- - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:

CHRYSLER LLC, et al.


          Debtors.
- - - - - - - - - - - - - - - - - - - - - -x

          United States Bankruptcy Court
          One Bowling Green
          New York, New York

          May 28, 2009
          10:00 AM


B E F O R E :
HON. ARTHUR J. GONZALEZ
U.S. BANKRUPTCY JUDGE

1
2    HEARING re Motion of Debtors and Debtors in Possession,
3    Pursuant to Section 366 of the Bankruptcy Code, for Interim and
4    Final Orders: (A) Prohibiting Utilities from Altering, Refusing
5    or Discontinuing Services to, or Discriminating Against, the
6    Debtors on Account of Prepetition Invoices; (B) Determining
7    that the Utilities are Adequately Assured of Future Payment;
8    (C) Establishing Procedures for Determining Requests for
9    Additional Assurance; and (D) Permitting Utility Companies to
10   Opt Out of the Procedures Established Herein
11
12   HEARING re Motion of Debtors and Debtors in Possession,
13   Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code
14   and Bankruptcy Rules 2002, 6004 and 6006, for (I) An Order (A)
15   Approving Bidding Procedures and Bidder Protections for the
16   Sale of Substantially All of the Debtors' Assets and (B)
17   Scheduling a Final Sale Hearing and Approving the Form and
18   Manner of Notice Thereof; and (II) an Order (A) Authorizing the
19   Sale of Substantially All of the Debtors' Assets, Free and
20   Clear of Liens, Claims, Interests and Encumbrances, (B)
21   Authorizing the Assumption and Assignment of Certain Executory
22   Contracts and Unexpired Leases in Connection Therewith and
23   Related Procedures and (C) Granting Certain Related Relief
24
25   Transcribed by:  Lisa Bar-Leib
                                                              2

1
2    JONES DAY
3        Attorneys for Debtors and Debtors-in-Possession
4        1420 Peachtree Street, N.E.
5        Suite 800
6        Atlanta, Georgia 30309
7
8    BY:  JEFFREY B. ELLMAN, ESQ.
9
10   TOGUT, SEGAL & SEGAL LLP
11       Conflicts Counsel
12       One Penn Plaza
13       New York, NY 10119
14
15   BY:  ALBERT TOGUT, ESQ.
16       FRANK A. OSWALD, ESQ.
17       SCOTT RATNER, ESQ.
18
19
20
21
22
23
24
25
                                                              4

1
2        A P P E A R A N C E S :
3    JONES DAY
4        Attorneys for Debtors and Debtors-in-Possession
5        222 East 41st Street
6        New York, NY 10017
7
8    BY:  CORRINE BALL, ESQ.
9        GEOFFREY S. STEWART, ESQ.
10       LEE A. ARMSTRONG, ESQ.
11
12   JONES DAY
13       Attorneys for Debtors and Debtors-in-Possession
14       51 Louisiana Avenue, N.W.
15       Washington, DC 20001
16
17   BY:  THOMAS F. CULLEN, JR., ESQ.
18       KEVYN D. ORR, ESQ.
19
20
21
22
23
24
25
                                                              3

1
2    KRAMER LEVIN NAFTALIS & FRANKEL LLP
3        Attorneys for Official Committee of Unsecured Creditors
4        1177 Avenue of the Americas
5        New York, NY 10036
6
7    BY:  THOMAS M. MAYER, ESQ.
8        ROBERT T. SCHMIDT, ESQ.
9        ADAM C. ROGOFF, ESQ.
10
11   U.S. DEPARTMENT OF JUSTICE
12       United States Attorney's Office
13       Southern District of New York
14       86 Chambers Street
15       New York, NY 10007
16
17   BY:  JEANNETTE A. VARGAS, AUSA
18       TARA LA MORTE, AUSA
19
20
21
22
23
24
25
                                                              5

U.S. DEPARTMENT OF JUSTICE
   Office of the United States Trustee
   33 Whitehall Street
   Suite 2100
   New York, NY 10004

BY: TRACY HOPE DAVIS, AUST
    BRIAN MASUMOTO, ESQ.

ALLARD & FISH, P.C.
   Attorneys for Mayco International, LLC
   2600 Buhl Building
   535 Griswold
   Detroit, MI 48226

BY: DEBORAH L. FISH, ESQ.

ARENT FOX LLP
   Attorneys for The Timken Company, Superior Industries and
   Harman
   1675 Broadway
   New York, NY 10019

BY: JAMES M. SULLIVAN, ESQ.

6

ARENT FOX PLLC
   Attorneys for JJF Management Services, Inc.
   1050 Connecticut Avenue, NW
   Washington, DC 20036

BY: MARY J. DOWD, ESQ.
    CAROLINE T. ENGLISH, ESQ.

ARMSTRONG TEASDALE LLP
   Attorneys for County of St. Louis
   One Metropolitan Square
   Suite 2600
   St. Louis, MO 63102

BY: STEVEN N. COUSINS, ESQ.

ARNOLD & PORTER LLP
   Attorneys for Chrysler National Dealer Council
   555 Twelfth Street, NW
   Washington, DC 20004

BY: MICHAEL L. BERNSTEIN, ESQ.

7

BELLAVIA GENTILE ASSOCIATES, LLP
   Attorneys for Certain Affected Dealers
   200 Old Country Road
   Mineola, NY 11501

BY: LEONARD A. BELLAVIA, ESQ.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
   Attorneys for United Auto Workers and David Curson
   One Liberty Plaza
   New York, NY 10006

BY: JAMES L. BROMLEY, ESQ.
    DEBORAH M. BUELL, ESQ.

COHEN, WEISS & SIMON LLP
   Attorneys for United Auto Workers
   330 West 42nd Street
   New York, NY 10036

BY: BABETTE CECCOTTI, ESQ.

8

DLA PIPER US LLP
   Attorneys for Wisconsin Electric Power Company and
   Wisconsin Gas LLC d/b/a WE Energies
   The Marbury Building
   6225 Smith Avenue
   Baltimore, MD 21209

BY: DALE K. CATHELL, ESQ.

DEWEY & LEBOEUF LLP
   Attorneys for Chrysler Financial Services Americas LLC
   1301 Avenue of the Americas
   New York, NY 10019

BY: MARTIN J. BIENENSTOCK, ESQ.
    JUDY G.Z. LIU, ESQ.
    PHIL ABELSON, ESQ.

9

FOLEY & LARDNER LLP
   Attorneys for Getrag Transmission Mfg., Tower Auto and
    Meridian Auto
   One Detroit Center
   500 Woodward Avenue
   Suite 2700
   Detroit, MI 48226

BY: SCOTT T. SEABOLT, ESQ.

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   Attorneys for The Center for Auto Safety, Limited
    Objectors
   Embarcadero Center West
   275 Battery Street
   Suite 3000
   San Francisco, CA 94111

BY: SCOTT P. NEALEY, ESQ.

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
   Attorneys for the Class Representatives of International
   Union, UAW, et al. v. Chrysler, LLC, Case No. 07-cv-14310
   (E.D. Mich.)(Southern Division)
   1350 Broadway
   Suite 501
   New York, NY 10018

BY: EDWARD J. LOBELLO, ESQ.

PENSION BENEFIT GUARANTY CORPORATION
   1200 K Street NW
   Washington, DC 20005

BY: KIMBERLY E. NEUREITER, ESQ.

ROBINSON BROG LEINWALD GREENE GENOVESE & GLUCK P.C.
   Attorneys for Performance Dodge, et al.
   1345 Avenue of the Americas
   New York, NY 10105

BY: FRED B. RINGEL, ESQ.
    RUSSELL P. MCRORY, ESQ.

SCHNADER HARRISON SEGAL & LEWIS LLP
   Attorneys for Ad Hoc Committee of Chrysler Victims
   1000 Market Street
   Suite 3600
   Philadelphia, PA 19103

BY: BARRY E. BRESSLER, ESQ.
    RICHARD A. BARKASY, ESQ.

SILLER WILK LLP
   Attorneys for Certain Affected Dealers
   675 Third Avenue
   New York, NY 10017

BY: ERIC J. SNYDER, ESQ.

SIMPSON THACHER & BARTLETT LLP
   Attorneys for JPMorgan Chase Bank, as Agent
   425 Lexington Avenue
   New York, NY 10017

BY: DAVID MACK, ESQ.
    PETER V. PANTALEO, ESQ.

SONNENSCHEIN NATH & ROSENTHAL LLP
   Attorneys for PBGC
   1221 Avenue of the Americas
   New York, NY 10020

BY: CAROLE NEVILLE, ESQ.

SQUIRE, SANDERS & DEMPSEY L.L.P.
   Attorneys for Committee of Chrysler Affected Dealers
   221 East Fourth Street
   Suite 2900
   Cincinnati, OH 45202

BY: STEPHEN D. LERNER, ESQ.
    AMY L. BROWN, ESQ.
    ROBERT A. WOLF, ESQ.
    P. CASEY COSTON, ESQ. (TELEPHONICALLY)
    MARK RUEHLMANN, ESQ. (TELEPHONICALLY)

STEMBER FEINSTEIN DOYLE & PAYNE, LLC
    Attorneys for the Class Representatives of International
    Union, UAW, et al. v. Chrysler, LLC, Case No. 07-cv-14310
    (E.D. Mich.)(Southern Division)
    1007 Mt. Royal Blvd.
    Pittsburgh, PA 15223

BY:  WILLIAM T. PAYNE, ESQ.

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.
    Attorneys for Unsecured Committee Member Patricia
    Pasquale, Tort Creditor
    2323 Bryan Street
    Suite 2200
    Dallas, TX 75201

BY:  SANDER L. ESSERMAN, ESQ.

SULLIVAN & CROMWELL LLP
    Attorneys for Fiat and Purchaser
    1888 Century Park East
    Los Angeles, CA 90067

BY:  HYDEE R. FELDSTEIN, ESQ.

14

SULLIVAN & CROMWELL LLP
    Attorneys for Fiat and Purchaser
    125 Broad Street
    New York, NY 10004

BY:  JOHN L. WARDEN, ESQ.

SUNSHINE, SLOTT & SUNSHINE, P.C.
    Attorneys for CDJ LLC of Little Rock, AR Objecting
    Creditors
    150 West 25th Street
    Suite 503
    New York, NY 10001

BY:  DONALD M. SUNSHINE, ESQ.

VEDDER PRICE P.C.
    Attorneys for Export Development Canada (EDC)
    1633 Broadway
    47th Floor
    New York, NY 10019

BY:  ERIN ZAVALKOFF-BABEJ, ESQ.

15

WHITE & CASE LLP
    Attorneys for the Indiana State Teachers Retirement Fund,
    Indiana State Police Pension Trust, and Indiana Major
    Moves Construction Fund
    1155 Avenue of the Americas
    New York, NY 10036

BY:  GLENN M. KURTZ, ESQ.
    IAN J. SILVERBRAND, ESQ. (TELEPHONICALLY)

WHITE & CASE LLP
    Attorneys for the Indiana State Teachers Retirement Fund,
    Indiana State Police Pension Trust, and Indiana Major
    Moves Construction Fund
    Wachovia Financial Center
    Suite 4900
    200 South Biscayne Boulevard
    Miami, FL 33131

BY:  THOMAS E. LAURIA, ESQ.
    JASON N. ZAKIA, ESQ.
    STEPHEN M. CORSE, ESQ. (TELEPHONICALLY)

16

WHITE & CASE LLP
    Attorneys for the Indiana State Teachers Retirement Fund,
    Indiana State Police Pension Trust, and Indiana Major
    Moves Construction Fund
    633 West Fifth Street
    Suite 1900
    Los Angeles, CA 90071

BY:  RONALD K. GORSICH, ESQ.
    (TELEPHONICALLY)

ARNALL, GOLDEN & GREGORY, LLP
    Attorneys for Verizon Communications, Inc.
    171 17th Street NW
    Suite 2100
    Atlanta, GA 30363

BY:  DARRYL S. LADDIN, ESQ.
    (TELEPHONICALLY)

17

VERITEXT REPORTING COMPANY

212-267-6868                                           516-608-2400

**Page 18**

BODMAN LLP
    Attorneys for Comerica Bank, et al.
    6th Floor at Ford Field
    1901 South Antoine Street
    Detroit, MI 48226

BY:  RALPH MCDOWELL, ESQ.
    (TELEPHONICALLY)

BUSH SEYFERTH & PAIGE PLLC
    Attorneys for Automotive Components Holdings
    3001 West Big Beaver Road
    Suite 600
    Troy, MI 48084

BY:  KYLA K. STEPP, ESQ.
    (TELEPHONICALLY)

**Page 19**

DAVIS POLK & WARDWELL
    Attorneys for Ford Motor Company
    450 Lexington Avenue
    New York, NY 10017

BY:  DARREN S. KLEIN, ESQ.
    (TELEPHONICALLY)

FROST BROWN TODD, LLC
    Attorneys for AK Steele
    Lexington Financial Center
    250 West Main Street
    Suite 2800
    Lexington, KY 40507

BY:  ROBERT V. SARTIN, ESQ.
    (TELEPHONICALLY)

**Page 20**

GORDON SILVER, ATTORNEYS AT LAW
    Attorneys for FT Automotive II, LLC and FT Automotive
    IV, LLC
    3960 Howard Hughes Parkway
    Ninth Floor
    Las Vegas, NV 89169

BY:  WILLIAM M. NOALL, ESQ.
    (TELEPHONICALLY)

GOULSTON & STORRS P.C.
    Attorneys for Bellembert, LLC
    400 Atlantic Avenue
    Boston, MA 02110

BY:  CHRISTINE D. LYNCH, ESQ.
    (TELEPHONICALLY)

**Page 21**

HONIGMAN MILLER SCHWARTZ & COHEN LLP
    Attorneys for Valeo, Inc. and WeBridge
    2290 First National Building
    660 Woodward Avenue
    Detroit, MI 48226

BY:  E. TODD SABLE, ESQ.
    (TELEPHONICALLY)

LAW OFFICE OF ROBERT N. BASSEL
    Attorneys for Eberspaecher
    201 West Big Beaver Road
    Suite 60
    Troy, MI 48084

BY:  ROBERT N. BASSEL, ESQ.
    (TELEPHONICALLY)

MCCARTHY & WHITE, PLLC
   Attorneys for Delmarva Power & Light Company and Pepco
   Holdings, Inc.
   1751 Pinnacle Drive
   Suite 1115
   McLean, VA 22102

BY:  WILLIAM D. WHITE, ESQ.
   (TELEPHONICALLY)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
   1285 Avenue of the Americas
   New York, NY 10019

BY:  MATTHEW R. SCHECK, ESQ.
   (TELEPHONICALLY)

22

---

SCHIFF HARDIN LLP
   Attorneys for KGF Trading
   233 South Wacker Drive
   Suite 6600
   Chicago, IL 60606

BY:  JASON M. TORF, ESQ.
   (TELEPHONICALLY)

STATE OF CONNECTICUT ATTORNEY GENERAL'S OFFICE
   Attorneys for the State of Connecticut
   Office of the Attorney General
   55 Elm Street
   Hartford, CT 06106

BY:  MATTHEW FITZSIMMONS, AUSA
   (TELEPHONICALLY)

23

---

VORYS, SATER, SEYMOUR & PEASE LLP
   Attorneys for Worthington Industries
   52 East Gray Street
   Columbus, OH 43216

BY:  TIFFANY S. COBB, ESQ.
   (TELEPHONICALLY)

WARNER NORCROSS & JUDD LLP
   Attorneys for Robert Bosch LLC
   900 Fifth Third Center
   111 Lyon Street NW
   Grand Rapids, MI 49503

BY:  STEPHEN B. GROW
   (TELEPHONICALLY)

24

---

P R O C E E D I N G S

   THE COURT:  Please be seated.  All right.  Excuse me.
Before we begin, a couple of announcements.  The rooms that
were made available yesterday, 606, 607, 622, will be available
again today.  But I ask that any of the parties using them
please try to clean up as much as you can before you leave
because at least a few of them were left with a great deal of
rubbish, et cetera, left behind.

   And I think we begin the utilities motion first this
morning?

   MR. OSWALD:  Yes, Your Honor.

   MS. BALL:  Mr. Togut.

   THE COURT:  Mr. Togut.

   MR. OSWALD:  Good morning, Your Honor.  I'm going to
be very brief today.  We have today on the -- Frank Oswald,
Togut Segal & Segal.  This is on the utilities motion, Your
Honor, an entry of the final order.  The few unresolved
objections that we addressed at the interim hearing have all
been resolved.  We have a separate stipulation I know was
submitted to the Court, I think, earlier today with the
Delmarva/Pepco entities, was reviewed with the creditors'
committee counsel.  And that takes care of that item.

   With respect to the Verizon objection, and I think I
heard Mr. Laddin make an appearance earlier, we've agreed to
preserve the Verizon rights to make an adequate assurance

25

VERITEXT REPORTING COMPANY

212-267-6868    516-608-2400

1 request in the event that the Verizon contract which has been
2 designated as an assumed contract is not ultimately assumed,
3 assuming the sale is approved and closed.
4     With respect to the other objections, Your Honor,
5 agreements were reached in terms of the adequate assurance
6 deposits, all with the consent and in consultation with the
7 creditors' committee. One item which has not been papered yet
8 is the Kokomo Gas and we agreed that we would carry this to the
9 next omnibus hearing date which, I understand, is June 18th.
10 But we do believe that we'll have that papered probably in the
11 next few days so that would be for holding purposes only.
12     There was one additional adequate assurance request
13 made upon serving the interim order. That was by First Energy.
14 And that adequate assurance request was resolved earlier this
15 week.
16     Unless the Court has any questions, we would ask that
17 the final order in the form that was previously submitted with
18 the motion be approved.
19     THE COURT: Does anyone else wish to be heard? All
20 right. No further comment being heard, I'll grant the relief
21 as modified.
22     MR. OSWALD: We'll submit that order.
23     THE COURT: All right. I saw an order come in this
24 morning.
25     MR. OSWALD: Oh, okay.

26

1     THE COURT: Is that the most recent version?
2     MR. OSWALD: Yes. That's the one.
3     THE COURT: All right.
4     MR. OSWALD: Thank you, Your Honor.
5     THE COURT: Thank you. All right. Then let's --
6 it's a few minutes early but I think we can get started with
7 respect to the next witness.
8     MR. CULLEN: Yes, Your Honor. Our next witness will
9 be Jim Chapman. My partner, Geoffrey Stewart, will be
10 presenting Mr. Chapman.
11     MR. STEWART: Good morning, Your Honor.
12     THE COURT: All right. Good morning. As Mr. Chapman
13 takes the witness stand, what is the debtors' schedule in terms
14 of presentation of witnesses today?
15     MR. STEWART: Your Honor, we plan to put on Mr.
16 Chapman. We've agreed to the UAW's request to put on Mr.
17 Curson next. And then we will put on Mr. Nardelli followed by
18 Mr. Grady.
19     THE COURT: All right.
20     (Witness duly sworn)
21     MR. STEWART: Your Honor, I need to have an exhibit
22 marked. I thought maybe I'd do it now so we don't have to
23 interrupt the examination --
24     THE COURT: Fine.
25     MR. STEWART: -- if that were possible.

27

1     (Debtors' Exhibit 35, papers relating to PBGC settlement, was
2 hereby marked for identification as of this date.)
3     MR. KURTZ: Your Honor, could I be furnished with a
4 copy of whatever exhibit was just marked and put in front of
5 the witness?
6     MR. STEWART: We're trying to get that. I can give
7 you -- we have an extra copy but we're trying to get one as
8 well so that the Court can follow along. I represent, Your
9 Honor, we have marked for identification Defense Exhibit --
10 Debtors' Exhibit 35, which are the papers relating to the
11 hearing on the motion for entry of an order authorizing what is
12 known as the PBGC or the Pension Benefit Guaranty Corporation
13 settlement. And we'll be referring to documents within that.
14 The exhibit itself, of course, is already in the court file.
15 DIRECT EXAMINATION
16 BY MR. STEWART:
17 Q. Good morning, Mr. Chapman.
18 A. Good morning.
19 Q. First of all, could you just give us your full name and
20 your address?
21 A. Full name, James Norris Chapman, and I live at 14 Alpine
22 Road, Greenwich, Connecticut, United States.
23 Q. Okay. Are you a member of the board of managers at
24 Chrysler, LLC?
25 A. Yes.

28

1 Q. Okay. Now, the board of managers is equivalent of a board
2 of directors, is that correct?
3 A. Yes.
4 Q. Okay. And --
5     THE COURT: One second. Would you take the
6 microphone and either move yourself closer to it or move it
7 closer to you?
8     THE WITNESS: Yeah. It's a little tight in here.
9 All right. Is that better?
10     THE COURT: Now just bend it down a bit.
11     THE WITNESS: How's that.
12     THE COURT: All right. Go ahead.
13     MR. STEWART: All right. Thank you, Your Honor.
14 Q. When did you join Chrysler's board of managers?
15 A. Shortly after the Cerberus acquisition, so it would be the
16 fall of 2007.
17 Q. Okay. Are you what's known as an independent manager?
18 A. Yes.
19 Q. What is an independent manager?
20 A. I have no -- I'm impartial. I have no relationship with
21 any of the interested parties, Daimler or Cerberus.
22 Q. Okay. So you're independent of Daimler and Cerberus?
23 A. Correct.
24 Q. Are you the only independent manager?
25 A. No. There are two other independent managers.

29

**Page 30**

1  Q.  How many members are there of the board altogether?
2  A.  Roughly fifteen, I guess.
3  Q.  Are there standing committees of the board?
4  A.  Yes, there are.
5  Q.  Do you serve on any of those committees?
6  A.  Yes.  I serve as chairperson of the audit committee.
7  Q.  Of the audit committee?  What's the role of the audit
8  committee.
9  A.  The audit committee's mandate is to work in conjunction
10  with our external auditors, in this case, KPMG, to review the
11  financial statements, both quarterly and annual, as well other
12  obligations as per our chart.
13  Q.  Okay.  Actually, it would help me if you would speak up
14  and also maybe if you could also slow down.
15  A.  Okay.
16  Q.  People are trying to take notes of this.  Have you served
17  on the board of other corporations before?
18  A.  Yes.
19  Q.  In the past ten years, how many corporate boards have you
20  served on?
21  A.  Roughly twenty.
22  Q.  Twenty?  Any of them as large as Chrysler?
23  A.  No, sir.
24  Q.  Have any of these twenty companies been in or gone through
25  bankruptcy proceedings?

**Page 31**

1  A.  Yes.
2  Q.  Have any of them been in or been involved in a Section 363
3  sale process?
4  A.  Yes.
5  Q.  Let me return, if I could, to the Chrysler board for a
6  minute.  You said you'd served on the board since the fall of
7  2007?
8  A.  Yes.
9  Q.  Has it been the practice of the board in that time to have
10  regular meetings?
11  A.  Yes.
12  Q.  And special meetings?
13  A.  Yes.
14  Q.  And you mentioned you're on the audit committee?
15  A.  Yes.
16  Q.  Are there regular meetings of the audit committee?
17  A.  Yes.
18  Q.  And special meetings?
19  A.  Absolutely.
20  Q.  In addition to that, have there been special meetings just
21  of the independent directors?
22  A.  There have been.
23  Q.  Just for the year 2008, can you tell us how many meetings
24  you attended of the board or committees of the board?
25  A.  Well, 2008 was all meetings.  So roughly twenty in 2008.

**Page 32**

1  Q.  Okay.  And in 2009?
2  A.  Year to date as of Wednesday, twenty-seven.
3  Q.  So fifty, fifty-five meetings in the past year and a half?
4  How many of those meetings have you missed?
5  A.  None.
6  Q.  Let me ask you some questions about how the board goes
7  about its business.  Did I ask you how many members the board
8  has?
9  A.  Yeah.  Roughly fifteen.
10  Q.  Fifteen.  And we've talked about the meetings.  What
11  notice is given to the board members of the board meetings?
12  A.  There's always proper notice provided by the company's
13  general counsel.
14  Q.  Okay.  And as a member of the board, what have you done or
15  what is your practice in terms of informing yourself about the
16  matters that are being brought before the board?
17  A.  We reviewed all materials that were provided as part of
18  the notice period.
19  Q.  Okay.  And where do the materials come from?
20  A.  From the company, generally.
21  Q.  Okay.  How voluminous are these materials?
22  A.  Quite voluminous.
23  Q.  Okay.  And does it happen from time to time that people
24  who are not members of the board are asked to come to the board
25  meetings?

**Page 33**

1  A.  Yes, there are.
2  Q.  And can you tell us why that is done?
3  A.  Generally, in circumstances we'd have expert counsel
4  and/or investment banking advisors or other consultants invited
5  to the board.
6  Q.  Okay.  Now, in terms of your own work on the board, what
7  degree of freedom do you have, Mr. Chapman, to contact people
8  within Chrysler --
9  A.  Full and open --
10  Q.  -- to learn facts and to educate yourself about the
11  company's business?
12  A.  I have full and open access to all parties.
13  Q.  And have you taken advantage of that?
14  A.  Yes.
15  Q.  Okay.  Now, have you heard the term before "fiduciary
16  duty"?
17  A.  Yes.
18  Q.  Now you're not a lawyer, are you?
19  A.  No.
20  Q.  Do you have a degree from college and from business
21  school?
22  A.  Yes.
23  Q.  And fiduciary duty's a legal term, correct?
24  A.  My understanding is yes.
25  Q.  Okay.  And without getting into specifics, how did you

**34**

```
 1   learn about the notion of and the meaning of the term
 2   "fiduciary duty"?
 3   A.  Via my extensive board experiences.
 4   Q.  Okay.  And can you tell us what you understand the term
 5   "fiduciary duty" to mean?
 6   A.  That my obligation is first and foremost to the
 7   corporation and its constituents represented by the
 8   shareholders, the creditors, employees and the like.
 9   Q.  Okay.  Let's break that down a little bit.  Your first and
10   foremost is to the corporation.
11   A.  Correct.
12   Q.  And the corporation has constituencies.  And you said
13   shareholders, creditors and others?
14   A.  Yes.
15   Q.  Okay.  Is it also the case, Mr. Chapman, that in December
16   of 2008, you requested that the board have a meeting where
17   outside counsel would come and brief the board members on their
18   fiduciary duties?
19   A.  That's correct.
20   Q.  And was that done?
21   A.  Yes, it was done.
22   Q.  And in addition to that, Mr. Chapman, is it the case that
23   the independent directors of the board at some point hired
24   their own lawyer?
25   A.  That is also correct.
```

**35**

```
 1   Q.  And that was to advise them of their fiduciary duties.
 2   A.  Correct.
 3   Q.  And who was the lawyer or law firm hired by the
 4   independent directors?
 5   A.  The law firm was KL Gordon (ph.).  And the particular
 6   partner was Steve Green.
 7   Q.  Is Mr. Green to my right?
 8   A.  Yep.
 9   Q.  Okay.  Have you heard the term "zone of insolvency"?
10   A.  Yes.
11   Q.  What is the zone of insolvency for a corporation?
12        MR. KURTZ:  Objection.  Legal conclusion.
13   Q.  Let me rephrase it.  What is your understanding of the
14   meaning of the term "zone of insolvency"?
15   A.  When a company entity can no longer meet its debts when
16   due in a timely fashion.
17   Q.  Do you have an understanding of what happens, if anything,
18   to the fiduciary duties of the members of the board when a
19   corporation enters the zone of insolvency?
20   A.  Well, depending on the facts and circumstances, my
21   obligation tends to move up the right-hand side of the balance
22   sheet from the shareholders to the different creditor classes,
23   again, subject to the facts and circumstances.
24   Q.  Did there come a time when, in your judgment, Chrysler
25   entered the zone of insolvency?
```

**36**

```
 1   A.  Yes.
 2   Q.  When was that?
 3   A.  I would say November, December of 2008.
 4   Q.  And how did you know?  How did you reach that
 5   determination that Chrysler had entered the zone of insolvency?
 6   A.  Again, the company's cash liquidity.
 7   Q.  How did you keep yourself apprised of the company's cash
 8   liquidity?
 9   A.  Both the formal reports submitted by the CFO as well as I
10   get a daily report on cash liquidity since I joined the board.
11   Q.  Okay.  Since you joined the board, how did these daily
12   cash reports come about?  Were they already there or was it
13   something that --
14   A.  I think the company --
15   Q.  -- started with you?
16   A.  -- had them.  But I requested specifically in terms of my
17   role as director as well as audit committee chairman.  I get
18   them daily by e-mail.
19   Q.  So every day since you've joined the board, you've had the
20   company e-mail you a report on its cash position?
21   A.  It may have been shortly after when I requested it from
22   the first board meeting, but yes.
23   Q.  Okay.
24        (Pause)
25        MR. STEWART:  Sorry for the delay.  Has it been
```

**37**

```
 1   marked, Kevyn?  Let me, if I may, approach the clerk to have
 2   the next exhibit marked as Debtors' Exhibit 36.  It's a
 3   declaration of Mr. Chapman.
 4        THE COURT:  All right.  Go ahead.
 5        MR. STEWART:  For the record --
 6   (Debtor's Exhibit 36, declaration of Mr. Chapman, was hereby
 7   marked for identification as of this date.)
 8   Q.  Mr. Chapman, the reporter has marked for identification
 9   and I've placed before you an exhibit marked Debtors' Exhibit
10   36.  And I'm going to come to that in just a moment.  I believe
11   you've testified there were frequent meetings of the board of
12   directors in 2008 and in 2009?
13   A.  Yes.
14   Q.  How important were the matters facing the board in the
15   last months of 2008 and so far in 2009?
16   A.  Extremely important.
17   Q.  Have you prepared a declaration describing or summarizing
18   the work of the board for the months November 2008 through
19   April 2009?
20   A.  Yes, I did, in conjunction with counsel.
21   Q.  Okay.  And is that the document that is before you as
22   Debtors' Exhibit 36?
23   A.  Yes.
24   Q.  If you could, can you turn to the last page of the
25   document?
```

A. Yes.

Q. Is that your signature?

A. Yes, it is.

Q. And you've sworn to this declaration under oath?

A. Yes, I did.

Q. Is Exhibit 36 a truthful summary of certain of the actions facing the -- actions taken by the board in the months from November 2008 through April of 2009?

A. Yes.

Q. Now, I'm going to offer this declaration into evidence, Mr. Chapman. But before I do, are there any changes or corrections that you would wish to make to it?

A. No. There are none.

MR. STEWART: Your Honor, I would move into evidence Debtors' Exhibit 36, which is the declaration of Mr. Chapman?

THE COURT: Any objections?

MR. KURTZ: Your Honor, we object on hearsay grounds, same grounds we discussed yesterday.

THE COURT: All right. And as yesterday, I overruled the objection. Identify yourself, though, first.

MR. KURTZ: Glenn Kurtz, White & Case, on behalf of the Indiana Pensioners.

THE COURT: All right. Same ruling as yesterday with respect to the understanding the parties had prior to the commencement of the hearing about these declarations. It's so

38

admitted.

(Debtors' Exhibit 36, declaration of Mr. Chapman, was hereby received into evidence as of this date.)

Q. Mr. Chapman, we spoke earlier about the zone of insolvency?

A. Yes.

Q. And I believe, if I remember, you testified that you determined that Chrysler entered that zone at the very end of 2008 or in early 2009.

A. Yes. In my judgment, yes.

Q. And we spoke about the monitoring you did of Chrysler's cash position during that time.

A. Yes.

Q. Why did you monitor Chrysler's position in those months?

A. Because the company did not have access to third party capital. Therefore, the only liquidity it has was its cash balances.

Q. Okay. And once again, I'd ask you, if you could slow down a little bit because everyone is taking notes here. And I think you're wearing them out.

How interested was the board in these months in raising cash for Chrysler?

A. Extremely engaged.

Q. And how closely did the board follow the cash position of the company?

39

A. Daily.

Q. How often in board meetings did the subject of the company's cash position arise?

A. It was a priority.

Q. Now, during those months, how many people showed up offering cash to Chrysler?

A. To my knowledge, none.

Q. How many banks offered money to Chrysler?

A. Notwithstanding frequent requests, none.

Q. During those months, was there any entity anywhere that was prepared to provide long term liquidity to the company?

A. No.

Q. Now, Mr. Chapman, I'm going to ask you a few questions about some board meetings that occurred in the last -- about a little over a month ago in April 2009. First of all, are you familiar with a matter that goes by the general name of PBGC settlement?

A. Yes.

Q. And PBGC is an abbreviation for the Pension Benefit Guaranty Corporation?

A. That's correct.

Q. And that's an instrumentality of the United States government?

MR. KURTZ: Your Honor, could we have less leading? Objection.

40

THE COURT: Not in this. These are preliminary matters. I think we all know what the PBGC stands for. So it's for the record. So let's not waste time with objections that really don't advance the process. Go ahead.

Q. Could you just generally describe to us what the nature was of the PBGC settlement?

A. In 2007, when Cerberus acquired Chrysler from Daimler, the PBGC was involved related to the existing pension liability that Chrysler had here in the States and was very focused on the ability to service that obligation in the future. At that time, Daimler entered into a billion dollar guaranty over five years which was satisfactory to the PBGC to permit the transaction to go forward, the transaction being serviced as acquisition of Chrysler from Daimler.

Q. Okay. That was in '07?

A. Correct.

Q. Okay. And then did there come a time when that became an issue in '09?

A. Yes, there was.

Q. How did it become an issue?

A. As it relates to the contemplated transaction would be deemed a change in control.

Q. And let me stop you there. The contemplated transaction is the one we've been talking about here in court for two days?

A. That's correct.

41

1    Q.  Is it fair to just characterize that as the Fiat
2  transaction?
3    A.  Fair enough.
4    Q.  Okay.  So you're saying the Fiat transaction is affected
5  by this 2007 arrangement between Cerberus and the PBGC?
6    A.  Yes.  On a change of control, the guaranty would go away.
7    Q.  Okay.  So the Fiat transaction is a change of control,
8  correct?
9    A.  Correct.
10    Q.  And that makes what go away?
11    A.  The billion dollar guaranty that Daimler provided for the
12  benefit of the pension fund.
13    Q.  Okay.  And what's the effect -- why does that affect the
14  Fiat transaction?
15    A.  Because that -- given -- particularly given the market
16  dislocation, the pension funds for Chrysler are underfunded.
17    Q.  And so, did there come a time when there was a need to
18  resolved this situation in connection with the Fiat
19  transaction?
20    A.  Yes.
21    Q.  Okay.  And tell, if you could, when discussions began
22  about resolving it?
23    A.  I would -- recollection March and April.
24    Q.  Okay.  And who were the parties to the discussions?
25    A.  PBGC along with Cerberus and Daimler.

42

1    Q.  Okay.  And did there come a time when general terms of a
2  settlement were agreed upon?
3    A.  Yeah.  There was a term sheet brought to the board.
4    Q.  Okay.  And if you can turn to -- I think it's Exhibit B
5  within the document.  And I'm referring now to Debtors' Exhibit
6  35.  And I think that's found at the numbered tab 2 we had put
7  in there for your convenience.  Do you see Exhibit B in there?
8    A.  Yes, I do.
9    Q.  What is Exhibit B?
10    A.  It's the execution copy of a binding term sheet.
11    Q.  The one you mentioned a moment ago?
12    A.  It appears to be the case, yes.
13    Q.  Now, as a general matter, in the settlement, what did
14  Daimler agree to do with respect to loans it to with the
15  company?
16    A.  Well, Daimler had 1.5 billion dollars of second lien
17  financing to the company.  And as part of this settlement
18  agreement, they would forgive that loan?
19    Q.  Was there a condition on that?
20    A.  Yes, there was a condition.
21    Q.  What was the condition?
22    A.  There was a condition of their release.
23    Q.  Okay.  Now was there also indebtedness to Cerberus of
24  about a half a billion dollars?
25    A.  Yes.  It was at the same facility.

43

1    Q.  Okay.  And what's the relationship in the settlement
2  between Daimler forgiving its loan and this half billion dollar
3  Cerberus loan?
4    A.  My understanding, they're linked primarily because
5  Cerberus also had actions, potential actions against Daimler.
6    Q.  Okay.  Had Daimler -- and I apologize if you covered this.
7  Did Daimler condition its forgiveness for the 1.5 billion
8  dollars on Cerberus doing something?
9    A.  Yes, they did.
10    Q.  What did Cerberus have to do?
11    A.  Cerberus had to waive -- there was a prospective or
12  potential litigation from the purchase agreement back in 2007,
13  Cerberus against Daimler.
14    Q.  Okay.  And has Cerberus asked for a release?
15    A.  They asked for a corporate release to my understanding.
16    Q.  Okay.  And has that release -- has a determination been
17  made by the corporation whether or not to give that release?
18    A.  The board determined to give the release to Cerberus and
19  to Daimler as part of this agreement.
20    Q.  Okay.  And can you tell me, in general terms, why the
21  board made that determination?
22    A.  Because it was very, very important relative to the PBGC
23  that the PBGC let the transaction move forward and not declare
24  a termination event of the pension fund.
25    Q.  Okay.  Now, if I may, direct your attention to other parts

44

1  of this Debtors' Exhibit 35 and we'll be very quick.  If you
2  could move -- I believe it's to tab -- the numbered tab 4.  And
3  behind that is something called Exhibit D.  Could you just tell
4  us what Exhibit D is?
5    A.  It appears to be the PBGC settlement agreement.
6    Q.  Okay.  And then if we could go one further back, there is
7  a tab for Exhibit E.  And could you tell us what is Exhibit E?
8    A.  Exhibit E is the guaranty.
9    Q.  Okay.  And a guaranty by who?
10    A.  It would be a guaranty of Daimler to a certain portion of
11  funds for the benefit of the PBGC.
12    A.  So Daimler is guaranteeing something to PBGC.  And then
13  finally, if you could look at the numbered tab -- I think it's
14  3.  And within that is something called Exhibit C.  Do you see
15  that?
16    A.  Yes.
17    Q.  Could you tell us what Exhibit C is?
18    A.  It's an execution copy of a contribution agreement.
19        MR. STEWART:  Your Honor, I would move into evidence
20  inside of Debtors' Exhibit 35, Exhibits B, C, D and E, I think
21  it was.
22        THE COURT:  Any objections?
23        MR. MAYER:  Your Honor, a question.  Tom Mayer,
24  creditors' committee counsel.  We've been -- we filed a
25  pleading relative to this particular proceeding and I have yet

45

1 to receive a final copy of the settlement agreement. If that's
2 being moved into evidence -- okay? Guess not. Okay. If I was
3 under the impression that might be one of the things --
4 documents that was being offered, I withdraw my question.
5      THE COURT: Mr. Kurtz?
6      MR. KURTZ: No objection, Judge.
7      THE COURT: Thank you. All right. It's so admitted.
8 Just for the record, B, C, D and E of Exhibit 35?
9      MR. STEWART: I believe so, yes, Your Honor.
10      THE COURT: All right.
11 (Exhibits B, C, D and E of Debtor's Exhibit 35 were hereby
12 received into evidence as of this date.)
13 Q. Mr. Chapman --
14      MR. KURTZ: Your Honor, just logistically, so there's
15 an Exhibit 35 that's not in evidence that will be in the record
16 and then some part of Exhibit 35 will be --
17      MR. STEWART: We might want to clear that up later
18 calling it 35B, 35D. We thought this was the best way to
19 approach the examination because of the way they were
20 organized.
21      MR. KURTZ: Okay.
22      MR. STEWART: But I agree. We might want to make the
23 record more straightforward.
24 Q. Mr. Chapman, before I finish, there's another area I'd
25 like to cover. Obviously, we're here today because Chrysler is

46

1 seeking approval from the Court to enter into transactions by
2 which it would transfer certain assets and liabilities to a
3 company sometimes known as New Chrysler, is that right?
4 A. That's correct.
5 Q. Okay. And in this transaction, in addition to
6 transferring liabilities to New Chrysler, Chrysler LLC would
7 receive a cash payment of two billion dollars, is that right?
8 A. That is correct.
9 Q. Okay. And this Fiat transaction, as we know, involves
10 Chrysler, Fiat and the U.S. Treasury and perhaps others?
11 A. Correct.
12 Q. Okay. How closely did the board of managers follow
13 developments over the past few months with regard to the Fiat
14 transaction?
15 A. Extreme closely.
16 Q. Did there come a time when the board was asked to vote to
17 approve the transaction?
18 A. Yes.
19 Q. When was that?
20 A. That would be in mid to late April.
21 Q. Are you familiar with the term "fairness opinion"?
22 A. Yes.
23 Q. Could you tell us what is a "fairness opinion"?
24 A. Fairness opinion is a review of the consideration provided
25 on its transaction by an independent impartial third party.

47

1 Q. How familiar are you with fairness opinions?
2 A. I'm quite familiar.
3 Q. Okay. In fact, you've seen them in other boards you've
4 served on?
5 A. Yes.
6 Q. And do I understand correctly, you yourself even have
7 written fairness opinions at various times in your career?
8 A. Yeah. In earlier parts of my career, correct.
9 Q. And can you tell us what the importance is, if any, of a
10 fairness opinion to the deliberations of the board of
11 directors?
12 A. It provides a very impartial review of the consideration
13 provided and the facts and circumstances presented, in this
14 case, the consideration provided by NewCo to OldCo.
15 Q. Did there come a time when the board of managers of
16 Chrysler retained someone to deliver to them a fairness opinion
17 with respect to the Fiat transaction?
18 A. Yes.
19 Q. When was that?
20 A. That was in March.
21 Q. And who did the board retain?
22 A. It was Greenhill & Company.
23 Q. What is Greenhill & Company?
24 A. Greenhill is an investment banking boutique formed by Bob
25 Greenhill many years ago.

48

1 Q. Okay. And had you heard of him before?
2 A. Yes.
3 Q. Do you know of the reputation Greenhill has in the
4 financial committee?
5 A. Yes. Excellent.
6 Q. Okay. And did Greenhill and Company, in fact, deliver a
7 fairness opinion to the board?
8 A. Yes.
9 Q. When was that?
10 A. That would have been in the late April time frame.
11 Q. And who from Greenhill came to the board to deliver the
12 opinion?
13 A. The speaker was the managing director, Bradley Robins.
14 Q. Okay. Let me, if I could, give you documents previously
15 marked as Debtors' Exhibits 14 and 15.
16      MR. STEWART: May I approach the witness, Your Honor?
17      THE COURT: Go ahead.
18      THE WITNESS: Thank you.
19      MR. KURTZ: Your Honor, before we proceed --
20      THE COURT: Excuse me?
21      MR. KURTZ: Before we proceed, counsel has put before
22 the witness Greenhill materials including a fairness opinion.
23 We do not believe that the opinion is admissible in the absence
24 of testimony from Greenhill. We raised this with the Court
25 yesterday. And we raise the objection again today. This is

49

| | |
|---|---|
| 1   the first time that anybody has made some effort to introduce<br>2   the evidence. And it is inadmissible hearsay.<br>3       MR. STEWART: Your Honor, well, first of all, I<br>4   intend to lay a foundation for the admissibility of it. But<br>5   more fundamentally, if for no other reason, there has been a<br>6   challenge here in the objector's papers to the -- how well the<br>7   board abided by its fiduciary duties which goes to the subject<br>8   of good faith and their state of information. Leaving to one<br>9   side any hearsay objection, and I think we can surmount that,<br>10  there's no question that the document is certainly admissible<br>11  to rebut arguments made by the objectors as to the board's --<br>12  allegations they made about the board's failure to abide by its<br>13  duties.<br>14      THE COURT: All right. Just clarify for me. What<br>15  are you seeking to get it admitted for.<br>16      MR. STEWART: Admitted for the purpose of showing<br>17  Your Honor that the board of directors, board of managers of<br>18  Chrysler, made sure they were fully informed as to the<br>19  transaction, hired outside experts to look at it, had an<br>20  analysis done and, before they made their vote, relied upon the<br>21  expertise of Greenhill & Co. to assure that the transaction was<br>22  fair to the corporation from a financial point of view.<br>23      THE COURT: All right. Mr. Kurtz?<br>24      MR. KURTZ: Well, in the first place, Your Honor,<br>25  there's no exception to the hearsay rule for -- because there's<br><div align="right">50</div> | 1   party in issuing a fairness report. That's what they did.<br>2   That's, in part, what you have raised as a challenge to their<br>3   conduct. So it is admitted for that purpose.<br>4      MR. KURTZ: Your Honor, just as a clarification. So<br>5   it's admitted to show what the board considered but it is not<br>6   admitted for the content, the truth of the content, the truth<br>7   of the fairness and the analysis contained therein?<br>8      THE COURT: To my knowledge, it's not being sought to<br>9   be admitted for those purposes.<br>10     MR. STEWART: Yeah. It's being -- I point out I have<br>11  yet to move its admission but we might as well deal with it<br>12  now. It will be moved as evidence in support of the<br>13  proposition board was fully informed or informed, retained<br>14  experts and that the analysis, leaving to one side the<br>15  substance of it, was a detailed, thoughtful and careful<br>16  analysis as opposed to something that would not meet those<br>17  standards. And so, we may well, although I don't intend to in<br>18  this examination, go into some of the detail Greenhill & Co.<br>19  did. But it's not for the point --<br>20     THE COURT: So it's this witness' belief that it's a<br>21  detailed --<br>22     MR. STEWART: Exactly.<br>23     THE COURT: -- full and comprehensive analysis?<br>24     MR. STEWART: Yes, Your Honor. And has good faith --<br>25  has basis in good faith to rely upon it, which is required of<br><div align="right">52</div> |
| 1   some question as to whether or not the Greenhill evaluation and<br>2   fairness opinion was complete. The last part of what counsel<br>3   said was it would be offered to show that they relied on the<br>4   fairness of the transaction. And that is precisely the<br>5   problem. If you want to show fairness through an analysis that<br>6   was performed by experts, you need to bring those experts into<br>7   court and have them testify to their analysis. You can't back<br>8   door that analysis by bringing in a board member that said I'm<br>9   aware of it. It's certainly not admissible.<br>10     THE COURT: Well, he didn't quite say he's aware of<br>11  it. He said he considered it.<br>12     MR. KURTZ: Okay. Well, he can say -- same answer,<br>13  Judge. He certainly can't -- you can't back door an expert<br>14  opinion through a witness saying they considered the expert<br>15  opinion. If you want an expert opinion in evidence, you got to<br>16  bring the expert in and the expert has to testify as to the<br>17  content.<br>18     THE COURT: Well, if the challenge is to whether or<br>19  not the witness took steps consistent with his fiduciary duties<br>20  then it seems to me that it could be admitted for what the<br>21  witness did and the board members to fulfill those duties. It<br>22  doesn't go to whether this report -- the basis of the report,<br>23  the soundness of the report, the credibility of the report.<br>24  None of that, I think, is at issue. It's what did the board<br>25  do. The board considered this report made by an independent<br><div align="right">51</div> | 1   him, of course, as a fiduciary.<br>2     THE COURT: You can lay the foundation for that. Go<br>3   ahead.<br>4   BY MR. STEWART:<br>5   Q. Now, I believe you testified that Bradley Robins of<br>6   Greenhill & Co. was the representative who dealt with the board<br>7   on the subject of the fairness opinion. Is that correct?<br>8   A. Yes.<br>9   Q. And did there come a time when you met Mr. Robins?<br>10  A. Yes.<br>11  Q. And when was that?<br>12  A. That was -- again, there were two sessions toward the end<br>13  of April.<br>14  Q. Let's talk about the first session. Now what happened in<br>15  the first session?<br>16  A. Greenhill was invited to present to the board the process<br>17  that they undertook to work towards delivering an opinion.<br>18  Q. And what did they tell you?<br>19  A. That -- provided a very fulsome review of the diligence<br>20  they undertook as it relates to the transaction that's<br>21  contemplated and the various assessments they had made as part<br>22  of that undertaking.<br>23  Q. Okay. At that time or at another time, did Mr. Robins or<br>24  anyone else from Greenhill give you or show to you a<br>25  presentation --<br><div align="right">53</div> |

**54**

1　A. Yes.
2　Q. -- in writing what they did?
3　A. Yes. There was a presentation, yes.
4　Q. May I direct your attention to Debtors' Exhibit 14. Do
5　you have it before you?
6　A. Yes.
7　Q. Can you tell me what Debtors' Exhibit 14 is?
8　A. It's the presentation materials entitled "Project
9　Capital". That's the code board they used, discussion
10　materials, dated April 30th.
11　Q. Okay. And this is -- I don't know how many pages long but
12　it's a detailed -- describing Greenhill's work, correct?
13　A. Roughly twenty-nine pages, yes.
14　Q. Twenty-nine --
15　　　　MR. STEWART: I would move into evidence for the
16　purposes of -- limited purposes, Your Honor, that counsel
17　raised -- objected to earlier and that we discussed, Exhibit 14
18　which is the presentation made by Greenhill & Co.
19　　　　THE COURT: Any objections?
20　　　　MR. KURTZ: I just reiterate the objections that I
21　already raised, Judge.
22　　　　THE COURT: All right. Thank you. It's overruled
23　and so admitted for the purposes as stated.
24　(Debtor's Exhibit 14, presentation made by Greenhill & Co. to
25　the board of managers of Chrysler, was hereby received into

**55**

1　evidence as of this date.)
2　Q. And then did there come a time when Mr. Robins of
3　Greenhill did, in fact, deliver to the board the fairness
4　opinion of Greenhill & Co.?
5　A. Yes.
6　Q. When was that?
7　A. It's dated April 30th. It was at a board meeting.
8　Q. And has this happened at a meeting of the board?
9　A. Yes, it did.
10　Q. And were you given a copy at that time of the fairness
11　opinion?
12　A. Yes. Via e-mail but yes.
13　Q. Okay. And did you review it?
14　A. Yes.
15　Q. What work did you, by the way, in terms of reviewing the
16　presentation materials that we already looked at which is
17　Debtors' Exhibit 14, to satisfy yourself that Greenhill's work
18　had been thorough?
19　A. One, based on my own experience having undertaken fairness
20　opinions. And, two, the review of the materials that I would
21　do for any board meeting --
22　Q. Okay.
23　A. -- made me very prepared for the discussion with Bradley
24　Robins.
25　Q. Okay. And as to the fairness opinion itself, which is

**56**

1　Debtors' Exhibit 13, you read it when you got it?
2　A. Correct.
3　Q. And you looked at its analysis?
4　A. Correct.
5　Q. And what did the fairness opinion say? What was the
6　conclusion?
7　A. It said from a fairness perspective, the transaction and
8　consideration offered was fair.
9　Q. Fair to --
10　A. To the company.
11　Q. And was that something that you thought was appropriate?
12　A. Yes.
13　Q. How consistent was it with the backup that Greenhill had
14　showed you?
15　A. Consistent.
16　Q. Okay.
17　　　　MR. STEWART: To the extent it has not yet been moved
18　into evidence, Your Honor, I will move Debtors' Exhibit 13 into
19　evidence.
20　　　　THE COURT: Any objections?
21　　　　MR. KURTZ: Same objection, Judge.
22　　　　THE COURT: All right. To the extent it's -- now
23　13 --
24　　　　MR. STEWART: That's the fairness opinion itself,
25　Your Honor.

**57**

1　　　　THE COURT: All right. To the extent it represents
2　what the witness relied upon and the board relied upon, it is
3　so admitted.
4　　　　MR. STEWART: Okay.
5　(Debtor's Exhibit 13, fairness opinion of Greenhill & Co., was
6　hereby received into evidence as of this date.)
7　Q. And if I may, before leaving this area, Mr. Chapman, what
8　reliance, if any, did the board of managers of Chrysler place
9　upon the fairness opinion from Greenhill & Co.?
10　A. Given its impartial and third party, tremendous reliance.
11　Q. Okay. Before I wrap up, we've obviously talked about the
12　Fiat transaction. Is the Fiat transaction the transaction that
13　the Chrysler board of managers preferred over all other
14　options?
15　A. Up until the government determination that our stand alone
16　plan that we filed in February was not viable, the primary
17　approach was to remain a stand alone, a company out of
18　bankruptcy.
19　Q. Stand alone meaning Chrysler would remain its own company
20　and not go through bankruptcy?
21　A. Correct.
22　Q. That turned out not to be possible?
23　A. That's correct.
24　Q. Why not?
25　A. Because, unfortunately, the company could not attract the

1 capital and liquidity it needed to get the government support
2 for a viable stand alone plan.
3 Q. Now, before entering into the Fiat transaction, did the
4 board also consider other alternatives to the Fiat transaction?
5 A. The company consistently, over an extensive period of
6 time, was considering a number of other strategic options.
7 Q. Was one of those options simply liquidating the company?
8 A. Yes.
9 Q. And did the board analyze which option would maximize the
10 return to the company's constituencies?
11 A. Absolutely.
12 Q. And what did they determine with respect to a liquidation?
13 A. Liquidation would not result in a recovery that was
14 comparable to the transaction put forth -- the Fiat
15 transaction.
16 Q. So do I understand correctly that the board of managers,
17 in reviewing the company's options, determined with the Fiat
18 transaction, although not the board's first choice --
19      MR. KURTZ: Objection, Your Honor. Leading. And
20 argumentative.
21      THE COURT: Well, it is leading.
22      MR. STEWART: Let me rephrase.
23 Q. And so at the end, what caused the board to decide that
24 the Fiat transaction is the transaction they would pursue?
25 A. Throughout my time on the board, particularly in the time

58

1 frame discussed here, November through April, the company's
2 journey for liquidity was tantamount and ultimately the
3 government made a determination that they would finance the
4 Fiat transaction and reject our ability to be a stand alone
5 viable entity. Therefore, it was the only option.
6 Q. And just to go back to one thing, and why did the board
7 agree to the Fiat transaction instead of opting for a
8 liquidation?
9 A. Because based on all the analytics presented to the board
10 by its experts as well as our review of the materials, it
11 provided the greater recovery for all the constituents.
12      MR. STEWART: Thank you very much. That's all I
13 have, Your Honor.
14      THE COURT: All right. Cross-examination?
15      MR. KURTZ: Yes, Your Honor. Your Honor, I've
16 assembled some exhibits that will be used in the cross-
17 examination. May I approach the witness and the Court?
18      THE COURT: Yes, please. Thank you.
19      MR. KURTZ: May I proceed?
20      THE COURT: Yes.
21 CROSS-EXAMINATION
22 BY MR. KURTZ:
23 Q. Good morning, Mr. Chapman. Glenn Kurtz of White & Case on
24 behalf of the Indiana Pensioners.
25 A. Good morning.

59

1 Q. You testified that the board had concluded that it was a
2 viable way to proceed to have a stand alone reorganization,
3 correct?
4 A. Subject to getting financing.
5 Q. That was the board's decision, though, right? The board
6 preferred a stand alone solution, right?
7 A. Subject to getting adequate financing.
8 Q. From the government, right?
9 A. From any party that would provide financing.
10 Q. Well, were you negotiating with the government for
11 financing?
12 A. We were negotiating with the government as well as
13 reaching out to the first lienholders for financing.
14 Q. Okay. And the government determined that they would not
15 provide the financing for Chrysler to proceed as a stand alone
16 entity, right?
17 A. That's what we were told by the government.
18 Q. Right. And so, that was reported to you as a board member
19 on March 29th of 2009, right?
20 A. That was the day of the board meeting that Nardelli told
21 us, yes.
22 Q. And what would the value have been of the stand alone had
23 the government agreed to provide the financing?
24 A. I don't recall the specifics.
25 Q. What would happen to the senior secured loans if Chrysler

60

1 continued as a stand alone company?
2 A. Subject to the negotiation of the stand alone business.
3 Q. They would have stayed in place?
4 A. Depending on the circumstances in the negotiation.
5 Q. The full 6.9 billion would have stayed in place as a
6 senior secured obligation of the New Chrysler, right?
7 A. Again, it would depend on the ability to get financing.
8 Q. Let's just assume the government financed. Under those
9 circumstances then the senior secured loans would have remained
10 outstanding as senior secured loans with New Chrysler, right?
11 A. Assuming it could get adequate financing relative to the
12 first lienholders' perfected lien.
13 Q. All right. And the government refused to provide that
14 adequate financing, right?
15 A. To my -- they did not provide financing.
16 Q. And were you made aware of the potential for an alliance
17 with GM?
18 A. Yes.
19 Q. And were you made aware that Chrysler's lead financial
20 advisor, Mr. Manzo, was of the opinion that the GM alliance
21 would be the best way to maximize the value of the Chrysler
22 assets?
23 A. I was not aware of that specific.
24 Q. That would be important for you to know?
25 A. But for the fact General Motors' circumstances are far

61

**62**

1　more dire than Chrysler's, yes..

2　Q.　Well, as a board member, as an independent board member,

3　would you have wanted to know that Chrysler's lead financial

4　advisor thought that the best way to achieve the maximum value

5　on Chrysler's assets was through an alliance with GM?

6　A.　Again, I was a party to a meeting ultimately demonstrating

7　that GM was not viable to Chrysler without financing.

8　Q.　Sir, did you hear my question?

9　A.　Rephrase your question.

10　Q.　Yeah.　Please try to answer this question.

11　　　　MR. STEWART:　Objection, Your Honor.

12　Q.　As an independent --

13　　　　THE COURT:　Just a minute.

14　　　　MR. STEWART:　His response --

15　　　　THE COURT:　Just a minute, please.　The objection is

16　overruled.　Just restate the question.

17　Q.　As an independent board member, would you have wanted to

18　be made aware that Chrysler's lead financial advisor thought

19　that the best way to maximize the value of the Chrysler assets

20　was through an alliance with GM?

21　A.　Yes.

22　Q.　Now, the government decided that Chrysler would need to

23　form an alliance with Fiat, correct?

24　A.　I don't know what the government decided.　I just know

25　what I was told.

**63**

1　Q.　Okay.　You were told that the government had decided that

2　Chrysler had to form an alliance with Fiat, right?

3　A.　Yes.

4　Q.　And you were told that the government would loan funds

5　only if Chrysler entered into an alliance with Fiat, right?

6　A.　Correct.

7　Q.　And the government also told Chrysler to file a bankruptcy

8　protection -- file for bankruptcy protection as a means to

9　consummate the deal with Fiat, right?

10　A.　It appears to be the case.

11　Q.　And why would a Chapter 11 filing allow Chrysler to

12　complete a deal with Fiat?　What was your understanding?

13　A.　If it was the sole basis upon which the company would get

14　adequate financing to preserve value.

15　Q.　The consequence of which would be to provide the senior

16　secured lenders with only two billion dollars, right?

17　A.　That was the ultimate result of a negotiation is my

18　understanding.

19　Q.　Right.　And the ultimate result of the negotiation, as you

20　understand it, was to file a bankruptcy petition in order to be

21　able to accomplish a transaction which would take the

22　security -- I'm sorry -- take the assets secured by the first

23　lien facility and transfer it to a New Chrysler, right?

24　A.　Selected the assets, yes, certain of the assets.

25　Q.　Substantially all of the assets, right?

**64**

1　A.　Certain of the assets.

2　Q.　I'm sorry.　I asked substantially all of the assets?

3　A.　What assets were part of the agreement.　I'm not aware of

4　specific facilities but assets were transferred.

5　Q.　Okay.　So you as an independent board member are not aware

6　that, in fact, the 363 sale contemplates the transfer of

7　substantially all of Chrysler's assets --

8　A.　Yes --

9　Q.　-- to New Chrysler?

10　A.　Yes, I am.

11　Q.　Okay.　So substantially all the assets, right?

12　A.　Correct.

13　Q.　And the purpose of doing this through bankruptcy was

14　because otherwise the first lien lenders had a security

15　interest in that collateral that was being transferred to New

16　Chrysler, right?

17　A.　From my perspective, the purpose to do it was to get

18　financing to preserve the estate.

19　Q.　Well, --

20　A.　And the first lienholders were not in a position and were

21　unwilling to provide that financing.

22　Q.　Okay.　So the purpose was that in order to get the money

23　from Treasury, you wanted to have a bankruptcy so that you

24　could transfer all the collateral secured by the first lien

25　facility, right?

**65**

1　A.　To get financing, that was the road to getting the cash.

2　Q.　As dictated by the United States Department of Treasury,

3　correct?

4　A.　It was a proposal to get us financing.

5　Q.　By the United States Department of Treasury, right?

6　A.　Correct.

7　Q.　And that was the only way they'd give you the financing,

8　right?

9　A.　It appears to be the case.

10　Q.　So that, in fact, means that they dictated the form of the

11　transaction, right?

12　A.　That's your term, yeah.

13　Q.　Well, do you agree that the United States Treasury

14　Department would only permit the reorganization of Chrysler to

15　the extent that all the assets were transferred to New Chrysler

16　and the first lien lenders were left with only two billion

17　dollars?

18　A.　We were always open for any consideration for cash

19　alternatives including from the first lenders -- first

20　lienholders.

21　Q.　Put aside -- well, did you get any other alternatives?

22　A.　The answer is absolutely not including first lienholders.

23　Q.　Okay.　So you went with the government, right?

24　A.　I voted to get cash for the estate.

25　Q.　From the government, right?

**66**

1  A. That's correct.
2  Q. Okay. And the government dictated that all of those
3  assets be transferred in connection with the bankruptcy so that
4  they could take the collateral that was secured in the first
5  lien facility and move it over to the New Chrysler, right?
6  A. I made a judgment --
7  Q. No.
8  A. I made a judgment at the point in time that maximize value
9  for the estate was to get the cash that was provided by the
10  government and no other party, including the first lien
11  lenders, which we inquired diligently, would provide that
12  capital.
13  Q. Sir, try to focus on my question. I'm not asking about
14  your judgment. I'm not asking about your options. I'm asking
15  about what's happening. Did the United States Treasury
16  Department direct Chrysler to file a bankruptcy and a 363 sale
17  motion in order to place the collateral secured by the first
18  lien lenders' loans into a New Chrysler.
19  A. The company elected to file bankruptcy to get adequate
20  financing.
21  Q. Not to move -- and to provide adequate financing in order
22  to move all the collateral over to New Chrysler, right?
23  A. To preserve value for the estate.
24  Q. No, no. I've asked you a -- is it to move the collateral
25  over to New Chrysler?

**67**

1  MR. STEWART: Your Honor, he's arguing with the
2  witness.
3  THE COURT: The witness is directed to be responsive
4  to the question. Restate the question.
5  Q. Did the United States Department of Treasury direct
6  Chrysler to enter into bankruptcy and a 363 sale in order to
7  take the collateral secured by the first lien loans and move
8  them over to New Chrysler?
9  A. As a condition to getting financing, that's what happened.
10  Q. And New Chrysler is just a reorganization of Old Chrysler
11  right?
12  A. New Chrysler is the new entity financed by the U.S.
13  government.
14  Q. And it's a reorganization of Old Chrysler, right?
15  A. It's a company acquiring assets out of Old Chrysler.
16  Q. To operate as Chrysler, right?
17  A. Correct.
18  Q. With the same product lines, right?
19  A. Depends on what that board determines to run as the
20  product lines.
21  Q. Is it your understanding New Chrysler will continue to
22  produce Chrysler cars?
23  A. I don't know what their focus is going to be on their
24  cars?
25  Q. You have no understanding as to whether, in fact, New

**68**

1  Chrysler is going to sell cars?
2  A. They will sell cars. I don't know what that board is
3  going to determine which cars they will sell.
4  Q. And you have no understanding that they will continue to
5  sell, for instance, Jeep cars?
6  A. I would expect they would but I don't know exactly what
7  Fiat and that board will have --
8  Q. And do you expect them to sell --
9  MR. STEWART: Can he be allowed --
10  THE COURT: Wait a second. Let him answer the
11  question.
12  MR. KURTZ: Okay.
13  A. Sir, I have no expectation of what Fiat and that new board
14  will undertake as it relates to their model and their fleets.
15  I would expect them to sell Jeep vehicles, yes.
16  Q. Would you expect them to sell the truck line as well, the
17  Chrysler truck line?
18  A. I don't know.
19  Q. Okay. Now, in addition to selling Chrysler cars, do you
20  have an understanding that the new Chrysler will have a
21  workforce from the UAW just as the old Chrysler did?
22  A. Yes.
23  Q. By the way, would there be a reason to have a UAW
24  workforce if they weren't going to continue to produce cars?
25  A. I would expect so.

**69**

1  Q. I ask you to turn to what is tab 5 in your binder --
2  A. Yes.
3  Q. -- which I will have marked as Pensioner Exhibit 13. Now
4  you see the bottom of that first page of the document is an e-
5  mail --
6  A. Yes.
7  Q. -- from you to Mr. Nardelli?
8  A. Yes.
9  Q. And you say in the first paragraph, "Also, I sincerely
10  appreciate all your efforts along with your leadership team.
11  The circumstances are beyond unique in trying whereby words
12  cannot aptly describe the situation although you do a
13  commendable job in that regard as per the updated call. I am
14  severely empathetic of your sitting in a conference room with
15  elected officials and your CEO colleagues from Ford and GM
16  listening to what borders on surreal dialogue." That's what
17  you wrote, right?
18  A. Yes.
19  Q. And the elected officials refer to the Treasury
20  Department, is that right?
21  A. Whoever was there during the testimony.
22  Q. I'm sorry?
23  A. Whoever was attending at the testimony.
24  Q. Which was -- okay. Were there Treasury Department people
25  there?

**70**

1   A. I don't know.
2   Q. And you say towards the bottom, paragraph from the bottom,
3   that "Longwinded, I sincerely struggle with where I am best
4   positioned to discharge my fiduciary obligations." Were you
5   struggling with how you could best discharge your fiduciary
6   obligations?
7   A. It was unclear what the company would get liquidity to
8   maintain the integrity of its franchise.
9   Q. All right. Have you turn to tab 2 which was marked
10   yesterday as Pensioners' Exhibit number 5. That's a breakup
11   valuation performed by Chrysler and Cerberus. Have you ever
12   seen it before?
13   A. I don't recall.
14   Q. Was it ever presented to the board?
15   A. I don't recall. It's dated October. I don't recall.
16   Q. I'll ask you to turn to page 3 where it describes the
17   value of Chrysler on a base case of 17.2 billion and on a high
18   end at 25.7 billion. Did anyone ever make you aware of those
19   valuations for Chrysler?
20   A. Don't recall.
21   Q. Incidentally, do you believe that the Jeep brand has
22   value?
23   A. Yes, I do.
24   Q. Do you believe that the Liberty vehicle, the Compass
25   Patriot vehicle, the Grand Cherokee Commander vehicle have

**71**

1   value?
2   A. The third probably has more value than the first two.
3   Q. The Grand Cherokee has the most of the values?
4   A. It's my opinion.
5   Q. Okay. But do the Liberty and the Compass Patriot also
6   have value?
7   A. Unclear.
8   Q. Does the Dodge Ram truck have value?
9   A. Likely.
10   Q. Is that a truck that's won awards?
11   A. Yes.
12   Q. And does the Dodge Titan -- is the Titan and the Dakota
13   two separate vehicles?
14   A. I didn't know about the Titan but the Dakota certainly.
15   Q. Okay. Does the Dakota have value?
16   A. Probably not, in my opinion.
17   Q. Okay. What about the Durango/Aspen? Is that a vehicle
18   that has value?
19   A. Again, in my opinion, probably not.
20   Q. Okay. What about on the car side? Does the Dodge
21   Challenger have value?
22   A. Yes.
23   Q. Does the Dodge Charger have value?
24   A. Perhaps.
25   Q. Does the Dodge 300 have value?

**72**

1   A. Yes, it does.
2   Q. Does the Dodge Sebring have value?
3   A. No, it does not.
4   Q. Does the Dodge Avenger have value?
5   A. Probably not.
6   Q. Do you know what the value is for the Challenger?
7   A. No, I wouldn't. It's a new product launch, well received.
8   Q. What about a minivan? Does the Caravan/Town and Country
9   have value?
10   A. Yes.
11   Q. Substantial value?
12   A. Unclear.
13   Q. What about the Routan? Does that have value?
14   A. That's the Volkswagen that we produced.
15   Q. Does it have value?
16   A. Unclear.
17   Q. And what about the Journey? Does that have value?
18   A. Unclear.
19   Q. What about Mopar? Does Mopar have value?
20   A. Probably.
21   Q. All right. Can I have you turn to tab 3 which is a draft
22   of the fairness opinion that you testified about. And I would
23   like to ask you if you have ever seen this draft.
24   A. I don't recall.
25   Q. And I ask you to turn to page 40 of the draft.

**73**

1   A. Page -- pardon?
2   Q. 40. 4-0. Do you see Greenhill's conclusion that there is
3   a base case value of 12.6 to 14.6 -- I'm sorry -- 19.6 to 21.5
4   for Chrysler?
5   A. If it's in the bottom left -- it's the Gross Enterprise
6   Value? Or the Implied Enterprise Value?
7   Q. Yeah, the enterprise value. Is it -- base case is
8   19.6 billion to 21.5 billion, right?
9   A. It says pre-debt but yes.
10   Q. Yeah. And then there is on the right side some synergies,
11   correct?
12   A. It appears to be so.
13   Q. And that could go as high as another 6.2 to 6.8 billion in
14   value, right?
15   A. It suggests that, yes.
16   Q. Which would bring those values up to a low of 18.8 and a
17   high of 25.4 billion, correct?
18   A. Yes.
19   Q. And a low end valuation of 18.8 billion is very close to
20   Chrysler's internal breakup value of 17.2 billion, right?
21   MR. STEWART: Objection, Your Honor. This hasn't
22   been authenticated. There's no evidence this witness has ever
23   seen the document before. And actually, isn't this the very
24   same discussion we had twenty minutes ago about the contents of
25   studies except the one we talked about with Greenhill he had

**74**

1  seen whereas this one, he has never seen.  How can be examined
2  over a document he's never seen before?
3       MR. KURTZ:  Your Honor, I'm simply asking the
4  question --
5       MR. STEWART:  He doesn't need the document --
6       THE COURT:  Just a minute.
7       MR. KURTZ:  Excuse me, counsel.  Could I finish?  I'm
8  simply asking --
9       THE COURT:  Direct your comment to me and not to
10  counsel.
11       MR. KURTZ:  I'm simply asking the question whether
12  the witness is aware of these numbers, what the numbers are and
13  I'm asking him if he ever learned about this.
14       MR. STEWART:  Your Honor --
15       MR. KURTZ:  So I'm going to go through what's on here
16  and then find out if the board was ever made aware of this
17  information.  Now, it certainly can't be the case that fairness
18  opinion is admissible but the draft is not.
19       THE COURT:  The fairness opinion was admissible for
20  what he reviewed and relied upon as were other board members
21       MR. KURTZ:  True.
22       THE COURT:  You're asking if he's seen this or heard
23  about these numbers.
24       MR. KURTZ:  Correct.
25       THE COURT:  He said he has never seen it.

**75**

1       MR. KURTZ:  That's right.  Now I'm going to find out
2  if he's heard about the numbers.
3       THE COURT:  You can ask that.
4       MR. KURTZ:  Okay.
5  BY MR. KURTZ:
6  Q.  So, sir, and the --
7  A.  Answer's no.  I haven't seen the numbers.
8  Q.  No, no, no.  But my question is in the low end value --
9       THE COURT:  What, counsel?
10       MR. STEWART:  I would just say the question should be
11  I understand you haven't seen it.  Have these numbers been
12  imparted to you in any way?  And if the answer is yes then we
13  have questions.  And if it's no, we get to move on.
14       MR. KURTZ:  Your Honor, I appreciate the assistance
15  but if I can continue with my cross-examination?
16       THE COURT:  You can start.
17  Q.  So the low end as reflected in the Greenhill analysis of
18  18.8 is close to the low end in the Chrysler breakup valuation
19  of 17.2 billion, right?
20  A.  If you say so.
21  Q.  And the high end of 25.4 billion in the Greenhill draft is
22  very close to the Chrysler of 25.7 billion, right?
23  A.  If you say so.
24  Q.  Does it have to be that I say so?
25  A.  Yeah.  I've --

**76**

1  Q.  Are you unprepared to admit that 25.7 billion is close to
2  25.4 billion?
3       MR. STEWART:  Objection, Your Honor.  I think this is
4  the very thing we raised a minute ago.  He's being questioned
5  about numbers in a report he never saw and it was never
6  described to him, the question comes down to is it the fact
7  that 26 is close to 25.  I thought we were going to have one
8  question for foundation and if there's no foundation, we
9  could move on.
10       MR. KURTZ:  Your Honor, the witness testified that he
11  is an expert.  He has done fairness opinions himself.  And I
12  think I'm entitled to ask him whether he thinks 25.7 is close
13  to 25.4.
14       THE COURT:  You may be but what's the value imparted
15  by that answer?
16       MR. KURTZ:  Well, I'm assuming that this might be
17  important to the board and I'm going to ask him about that.
18       THE COURT:  But if he doesn't know about it.  This is
19  a draft.  Greenhill produced one they actually looked at and
20  relied upon according to the testimony.  What is the relevance
21  of the draft?
22       MR. KURTZ:  The relevance of the draft is that it has
23  much higher valuations that were never shared with the board
24  and I want to inquire about that.  This --
25       THE COURT:  Well, that's why they call it a draft.

**77**

1       MR. KURTZ:  No, Your Honor.  This entire analysis was
2  removed.  None of it's in there.
3       THE COURT:  Well, that's an inference you're drawing
4  that it was removed.
5       MR. KURTZ:  I'm trying to question the witness about
6  this?
7       THE COURT:  Well, if he doesn't know about it --
8       MR. KURTZ:  Your Honor, I'm trying to question the
9  witness about whether he does know about it and whether he'd
10  want to know about it.
11       THE COURT:  He said he doesn't know about it.
12       MR. KURTZ:  He doesn't know about this draft.
13       THE COURT:  Correct.
14       MR. KURTZ:  Can -- Judge, I think I understand what
15  you're saying.  Can I continue and see if there's further
16  objections?
17       THE COURT:  Go ahead.
18       MR. STEWART:  Your Honor, I can remove any doubt
19  about that.
20       THE COURT:  You can sit down, though.  Thank you.
21       MR. STEWART:  I will.
22  Q.  So, Mr. Chapman, were you ever made aware that Greenhill,
23  your financial advisors, had reached any conclusions about
24  value as high as 25.4 billion dollars?
25  A.  No.

1 Q. And did Greenhill ever present or otherwise make you aware
2 that they had conducted a valuation that had produced like 25.4
3 billion dollars?
4 A. No, 'cause if they did I would have questioned it
5 diligently.
6 Q. Okay. And would you have wanted to know that your
7 financial advisors whom Chrysler had paid three million dollars
8 had performed a valuation that produced a number like 25.4
9 billion dollars?
10 A. Yes.
11 Q. And can you confirm that that valuation that's within
12 Exhibit number 4 was removed from the fairness opinion that was
13 ultimately supplied to the board of directors?
14 A. I have no idea. I've never seen this document before.
15 Q. Okay. So therefore it wasn't before the board of
16 directors, right?
17 A. Not to my knowledge.
18 Q. And instead, what was supplied to the board of directors
19 was a liquidation value that was performed by Mr. Manzo, right?
20 A. There were liquidation analyses done by Mr. Manzo.
21 Q. And those numbers were much lower than the numbers that
22 are reflected in the going concern valuations by Greenhill and
23 by Chrysler itself, correct?
24 A. Again, the going concern value pre-assumes that there is
25 liquidity to finance the business.

78

1 Q. Am I correct that the liquidation values that were
2 presented to the board were substantially lower than the
3 valuations reflected in the Greenhill fairness opinion draft
4 and in the internal Chrysler breakup valuation?
5 A. Well, they're certainly lower. This report I've never
6 seen.
7 Q. Okay. You're comfortable saying they were substantially
8 lower?
9 A. They're lower.
10 Q. Not substantially lower?
11 A. They're lower.
12 Q. Okay. So the high end of liquidation valuation was 3.2
13 billion dollars, right?
14 A. Pardon?
15 Q. The high end of the liquidation valuation presented to the
16 board was 3.2 billion dollars, right?
17 A. If that's whichever set analysis you're looking at.
18 Q. Where there were -- there were various liquidation
19 analyses presented to the board that were updated because the
20 market continued to erode.
21 A. Okay. So let's turn -- tab 1 is your declaration. Before
22 you look at it, did you draft that declaration?
23 A. I worked with counsel on drafting the declaration.
24 Q. Okay. So did you actually write the words?
25 A. I worked with counsel to draft the declaration.

79

1 Q. My question is whether you wrote any of the words.
2 A. I edited and redrafted the words.
3 Q. Okay. And you read it carefully?
4 A. Yes, I did.
5 Q. And if I ask you to turn to paragraph 22, now can you
6 confirm that your sworn testimony was that the liquidation
7 value was as high as 3.2 billion dollars?
8 A. It says 2.6.
9 Q. It says "In particular, the plan projected a recovery to
10 the" --
11 A. "On a net present value basis of 2.6."
12     THE COURT: One second. Slow down.
13 Q. The ---
14     THE COURT: Finish the question first
15     MR. KURTZ: Yes.
16     THE COURT: -- before we have the answer.
17 Q. The declaration has the following statement by you, right?
18 "In particular, the plan projected a recovery to the first lien
19 lenders between 929 million and 3.2 billion dollars", right?
20 A. Yes.
21 Q. Now --
22 A. And on a net present value basis, lower.
23 Q. There's no question, sir. Are you comfortable saying that
24 3.2 billion or, as you say, 2.6 billion is substantially less
25 than 27.4 billion --

80

1 A. Yes.
2 Q. -- or 25.4 billion?
3 A. Yes.
4 Q. Were you ever made aware that Greenhill had concluded that
5 the liquidation analysis presented to the board was very
6 conservative?
7 A. No.
8 Q. Were you ever made aware that Greenhill had concluded that
9 the liquidation analysis provided to the board was thin?
10 A. No.
11 Q. Did you, as an expert, who has done fairness opinions in
12 the past, review liquidation analysis yourself and evaluate it?
13     THE COURT: Mr. Kurtz, go back to a couple of
14 questions. You said, you're characterizing the liquidation
15 analysis done by whom?
16     MR. KURTZ: Done by Mr. Manzo.
17     THE COURT: 'Cause I think you said Greenhill.
18     MR. KURTZ: I'm sorry. I thought I said Greenhill
19 criticized -- but let me go back --
20     THE COURT: All right.
21     MR. KURTZ: -- and ask the questions to make sure
22 that it's clear on the record.
23 Q. Are you aware that Greenhill had criticized Mr. Manzo's
24 liquidation valuation as being very conservative?
25 A. No, I was not.

81

1 Q. Are you aware that Greenhill had concluded that Mr.
2 Manzo's liquidation analysis was thin?
3 A. I was not aware.
4 Q. As an independent board member, is that something you
5 would have wanted to have been made aware of?
6 A. Perhaps.
7 Q. And did you analyze the liquidation analysis yourself to
8 ensure that appropriate value is being ascribed to all the
9 relevant assets?
10 A. I did my best on all the analyses that were provided.
11 Q. So does that mean that you did or you didn't independently
12 analyze the liquidation analyses?
13 A. There were a number of independent analyses provided
14 because the market continued to erode.
15 Q. Yeah. Did you analyze the final liquidation analysis that
16 you testified about through your declaration in paragraph 22?
17 A. Yes. I reviewed and analyzed the analysis.
18 Q. And did you perform any study of it?
19 A. I reviewed the analysis.
20 Q. Did you perform any study of it?
21 A. I looked and reviewed the analysis.
22 Q. Okay. But did you do any work? Did you try to figure out
23 what an asset -- did you just accept the numbers? Or did you
24 look to see whether there was other value that had been missed
25 by Mr. Manzo?

82

1 A. I did not see any value that might have been missed.
2 Q. Well, did you look for value that might have been missed?
3 A. I looked at the analysis that was presented to me and
4 asked questions related to it.
5 Q. Okay. So did you look for any value that might be missed?
6 A. I didn't see any.
7 Q. Well, did you notice that no value was ascribed to several
8 of the lines that you described as having value?
9 A. No.
10 Q. Did you notice that the accounts receivable were basically
11 washed out?
12 A. Again, collectibility is an issue, but no.
13 Q. Let me read you something that debtors' counsel said in
14 district court two days ago and ask you whether you agree with
15 it. "They looked at the durable core of assets of this
16 company" -- I'm sorry. "They looked at the durable core of
17 assets that this company had, the trucks and the jeeps and the
18 minivans and the people had always bought. And they thought in
19 what configuration can these durable valuable things go
20 forward." Do you agree with that statement that the durable
21 core assets of the company include the trucks and the jeeps and
22 the minivans and that there's value to those items?
23 A. Yes.
24 Q. Now, you testified about a number of valuation --
25 liquidation valuations you saw. Have you have ever seen one

83

1 that went lower than the high end of the liquidation value
2 being 2.6 billion?
3 A. I don't recall specifics.
4 Q. Was the board ever presented with any new liquidation
5 analysis perhaps created in litigation which reduced the value?
6 A. Again, I don't recall that.
7 Q. Has the board ever been advised that the liquidation value
8 might be more in the range of one and a half to a billion or
9 less?
10 A. Again, I don't recall that.
11 Q. By the way, were you aware that Capstone stood to receive
12 a seventeen million dollar success fee in the event that this
13 363 sale motion is approved?
14 A. I was not aware of the magnitude but I knew they had a
15 success fee.
16 Q. That's a lot of money, isn't it?
17 A. It's a fair amount of money.
18 Q. Were you aware that Mr. Manzo himself will receive ten
19 million dollars to the extent that the 363 sales motion is
20 approved and the -- or might receive that and the transaction
21 closed?
22 A. No. No knowledge.
23 Q. Do you think that's relevant, something you might have
24 wanted somebody to tell you about as an independent board
25 member?

84

1 A. Perhaps.
2 Q. Now, just to talk about the company's performance, you
3 started to talk about the difficulties the company was
4 realizing in 2008, right?
5 A. Towards the end of 2008, yes.
6 Q. Is it fair to say that 2008 was the worst year in the
7 automotive industry?
8 A. Year to date, yes.
9 Q. And is it fair to say that 2008 was the worst year for
10 Chrysler?
11 A. Fair.
12 Q. Is it also fair to say that the financial performance for
13 Chrysler for 2008 does not provide an accurate basis for
14 determining the value of Chrysler's assets?
15 A. Perhaps.
16 Q. In other words, Chrysler's assets are worth more than the
17 2008 performance would indicate, right?
18 A. Assuming there was financing for them, yes.
19 Q. Let me ask you to turn back to your affidavit, this time
20 paragraph 24. Now the last sentence says "Finally, Mr.
21 Nardelli informed the board that the company was monitoring its
22 cash level to ensure the possibility of an orderly liquidation
23 if that became necessary." You see that?
24 A. Yes.
25 Q. That's a truthful statement, right?

85

1  A.  Yes.
2  Q.  And you had talked about the company by that time being
3  within the zone of insolvency, right?
4  A.  Correct.
5  Q.  And you had a firm understanding that you had fiduciary
6  duties to the creditors, right?
7  A.  Correct.
8  Q.  And you certainly had a firm understanding that you had a
9  fiduciary duty to the senior secured lenders, right?
10  A.  Correct.
11  Q.  And you understood that in order to discharge that
12  fiduciary duty, there would need to be sufficient cash to fund
13  the possible orderly liquidation, right?
14  A.  Correct.
15  Q.  Because you'd need, as a fiduciary, to ensure that there
16  was sufficient cash to realize the value on the assets in a
17  liquidation, right?
18  A.  Correct.
19  Q.  And your understanding was senior management would do so,
20  right?
21  A.  Correct.
22  Q.  And you relied on that, right?
23  A.  Yes.
24  Q.  Can I ask you to turn to the fourth tab which has been
25  previously marked as Pensioner Exhibit number 10? I'm going to

---

1  direct your attention to the last line -- the last sentence
2  anyway. Bloom and Feldman -- now you understand that those are
3  the United States Treasury Department representatives, right?
4  A.  Well, Bloom, certainly.
5  Q.  Okay. And I represent to you Feldman is counsel in the
6  Treasury Department as well. Bloom and Feldman said "We only
7  had to leave enough behind to pay severance."
8      MR. STEWART: Objection, Your Honor. Could we have a
9  foundation for this exhibit?
10      MR. KURTZ: This is in evidence, Your Honor.
11      MR. STEWART: Well, that this witness has seen it
12  or -- he's asking him to comment --
13      MR. KURTZ: Your Honor --
14      MR. STEWART: May I finish, please?
15      THE COURT: Just a minute. All right. Step to one
16  side, Mr. Kurtz. I can't hear counsel.
17      MR. STEWART: He is asking the witness about a
18  conversation the witness was not a party to. There's no
19  evidence the witness is aware these statements were made. And
20  he's asking the witness about things that are hearsay to one --
21  as to this witness, in any event. And I think there's a need
22  for a foundation before examining him about them.
23      MR. KURTZ: Your Honor, counsel is premature. I'm
24  just reading the e-mail. Then my questions come.
25      MR. STEWART: Well, Your Honor, I think I'm not

---

1  premature because I object to reading the e-mail at all until a
2  foundation is laid.
3      MR. KURTZ: Your Honor, reading the e-mail is part of
4  the foundation.
5      THE COURT: All right. Read the e-mail.
6  BY MR. KURTZ:
7  Q.  The e-mail says "Bloom and Feldman found another reason to
8  do a 363 even if the banks agree so is likely pat." By the
9  way, did you understand that there'd be a 363 sale irrespective
10  of whether the senior secured lenders consented to the
11  transaction?
12  A.  No. I was not aware of that.
13  Q.  Then he says, "Need to leave as much behind as possible
14  and little cash. Bloom and Feldman said we only have to leave
15  enough behind to pay severance not to fund the liquidation.
16  That was the bank's problem." Now, were you aware that any
17  such statement had been made to senior management or the
18  financial advisor of Chrysler?
19  A.  I'm not aware of any of this. I've never seen this e-
20  mail.
21  Q.  Would you have been concerned about a direction from the
22  United States Department of Treasury that notwithstanding the
23  board's view in its fiduciary duties that there would be enough
24  money left behind to fund a liquidation, that, in fact, Bloom
25  and Feldman were saying don't leave enough money back for that,

---

1  that's the bank's problem? Would that concern you?
2  A.  It's troubling.
3  Q.  Right. That would be completely inconsistent with the
4  fiduciary duties of the company, right?
5  A.  I would agree.
6  Q.  And that would be completely inconsistent with your
7  understanding of how this was going to proceed, right?
8  A.  I don't know how it was being negotiated.
9  Q.  No. What I mean is the idea of not leaving enough
10  liquidity to finance a liquidation would be completely
11  inconsistent with what the board was told, right?
12  A.  Again, it would be troubling to me if this is the way it
13  was being done.
14  Q.  Right. And you agree it's not the bank's problem, right?
15  A.  Again, it's the estate's problem.
16  Q.  It would be Chrysler's obligation as fiduciaries to leave
17  sufficient cash around to fund a liquidation, right?
18  A.  To maximize the residual value of OldCo, yes.
19  Q.  Through a liquidation, right?
20  A.  Likely.
21      MR. KURTZ: I have no further questions, Your Honor.
22      THE COURT: All right. Thank you. Anyone else wish
23  to cross-examine the witness? All right. Mr. Mayer?
24      MR. MAYER: Thank you, Your Honor. Thomas Moers
25  Mayer of Kramer Levin Naftalis & Frankel, counsel to the

official committee of unsecured creditors.
CROSS-EXAMINATION
BY MR. MAYER:
Q. Good morning, Mr. Chapman. I don't believe we ever met.
A. No. Good morning.
Q. I represent the creditors, generally, of Chrysler. You testified about certain releases that Chrysler has been asked to give Daimler and Cerberus, that's correct?
A. The corporate entities, yes.
Q. Correct. Okay. And Chrysler is prepared to give certain releases to Daimler and to Cerberus, correct?
A. Yes.
Q. And just to be -- for completeness sake, when I say Daimler, I mean -- and I'm not going to quiz you on the exact content of the term but Daimler includes Daimler and various affiliates. There are some affiliate entities. There are some people that we would generally call the Daimler released parties.
A. If you say so.
Q. Okay. When I say Daimler, that's what I'm going to refer to. And when I say Cerberus, I'm going to refer to a similar concept. That is, Cerberus and some affiliate entities other than Chrysler and its subsidiaries.
    Has the final form of the release been negotiated, the actual final document?

A. My understanding it's still in negotiation.
Q. Okay. But the board is given some direction in terms of the way that release is to go.
A. Our understand was the corporate releases.
Q. Right. And it's possible the creditors of Chrysler -- and by creditors, I mean, unaffiliated creditors not subsidiaries that haven't had claims against other Chrysler entities but third party unaffiliated creditors, the sort that I represent. Now it's possible that those creditors have their own claims against Daimler or against Cerberus. And I'm going to call those creditor claims. And I'm going to make a further distinction. You're familiar with the concept of a "derivative suit", correct? You've been a director and you know about people getting sued derivatively.
A. Vaguely.
Q. Well, I'm going to refer to two different types of creditor claims. I'm going to refer to direct creditor claims. And those are claims creditors have in their own name against, in this case, Daimler or Cerberus, and derivative claims, which are claims that creditors could assert only through Chrysler.
    Okay. Distinguishing between those two, the release that you've authorized Chrysler to enter into, does it purport to release any direct creditor claims?
A. I don't know.
Q. You don't know whether there's any -- whether Chrysler has

agreed to obtain or not to obtain any release of direct creditor claims?
A. Again, I'm not familiar.
    MR. MAYER: In that case, Your Honor, I will leave this to clarification by counsel.
    THE COURT: All right. Thank you. Anyone else?
    MR. BARKASY: Richard Barkasy from the law firm of Schnader Harrison Segal & Lewis representing the ad hoc of consumer victims of Chrysler.
CROSS-EXAMINATION
BY MR. BARKASY:
Q. Mr. Chapman, do you have an understanding as to how tort claimants are treated under the proposed sale order?
A. No, I don't.
Q. Have you seen any analysis of the amount of pending tort claims against Chrysler?
A. I have not seen that analysis.
Q. Did you participate in any discussions at board meetings as to how tort claimants would be treated under the proposed sale order?
A. No, I did not.
    MR. BARKASY: I don't have any further questions, Your Honor.
    THE COURT: All right. Anyone else? Go ahead.
    MR. SEABOLT: Your Honor, Scott Seabolt on behalf of

Getrag Transmission Manufacturing and its parent company, Getrag KG, a German entity.
CROSS-EXAMINATION
BY MR. SEABOLT:
Q. Mr. Chapman, just a couple of questions. With respect to the release, you understand the corporation is releasing claims that it may have against either the Cerberus entities or the Daimler entities, correct?
A. Correct.
Q. Sir, to your knowledge, has the board undertaken an investigation of the potential claims it may have against the Cerberus parties?
A. No.
Q. To your understanding, sir, has the board undertaken an investigation of the claims it may have against the Daimler entities?
A. No.
    MR. SEABOLT: No further questions, Your Honor.
    THE COURT: All right. Thank you. Anyone else? Any redirect?
    MR. STEWART: Yes, Your Honor, a little bit.
REDIRECT EXAMINATION
BY MR. STEWART:
Q. First of all, you were shown as e-mail during cross-examination -- I think it was at tab -- I think it was tab 5.

Page 94:

1  That was the one about -- it was your e-mail, I believe, that
2  was dated, Mr. Chapman, November 8, 2008. Do you have it in
3  front of you?
4  A. Which tab was it?
5  Q. I believe it was tab number -- that was number 5.
6  A. Yep, okay. I got it.
7  Q. Do you have it there?
8  A. Yes.
9  Q. Now the elected officials there -- are Treasury officials
10 elected?
11 A. No.
12 Q. Okay. Is Congress elected?
13 A. Yes.
14 Q. What elected officials were you referring to here?
15 A. I was referring to the testimony where the three CEOs of
16 the Big Three auto companies were being interviewed --
17 Q. Right.
18 A. -- by the elected officials.
19 Q. This was the well publicized appearance --
20 A. Right.
21 Q. -- before Congress. It wasn't dealings with the U.S.
22 Treasury --
23 A. That's correct.
24 Q. -- is that right? Okay. You were asked about various car
25 lines --

94

Page 95:

1  A. Correct.
2  Q. -- that Chrysler had, I believe, at some length. Is it
3  fair to say that Chrysler has some lines that have been
4  successful?
5  A. Yes, absolutely.
6  Q. And some that have not been successful?
7  A. Correct.
8  Q. Is it the case that Chrysler would have been planning
9  anyway to discontinue certain lines?
10 A. We had already done so and continued to plan to do so.
11 Q. Okay. And why?
12 A. Because the company's production capacity was far greater
13 than its market share.
14 Q. Okay. And meaning, it had to reduce what it produced.
15 A. Correct.
16 Q. All right. Let's go look at your declaration if we could.
17 You were asked, I think, about paragraphs 22 of that and then
18 later, I believe, paragraph 24. Let's start with 22. And I
19 believe on cross, it was pointed out that there was the number
20 in there of 3.2 billion dollars for a liquidation analysis, is
21 that right?
22 A. Correct.
23 Q. Is that the only number in there for liquidation?
24 A. No. There's a significantly lower number, 929, in here.
25 Q. So we're talking about a range?

95

Page 96:

1  A. Correct.
2  Q. The low is 929 and the high is 3.2 billion.
3  A. Correct.
4  Q. Is it fair to say that you can't assume that the highest
5  number is the number that will result in a liquidation?
6  A. Well, I certainly wouldn't.
7  Q. Okay. You would put it somewhere in the middle of the
8  range?
9  A. That would be my approach.
10 Q. Okay. Now -- and then these numbers -- there's a second
11 range below that and there the low is 654 million and the high
12 is 2.6 billion. Do you see that?
13 A. Yes, I do.
14 Q. Why are there two ranges there?
15 A. Because the liquidation required time and that's
16 discounted back to present value basis.
17 Q. Okay. So it's the second range that represents the
18 immediate value, is that right?
19 A. It should be, yes.
20 Q. Now, if the Fiat transaction is approved, is it your
21 understanding that a payment will end up being made to the
22 first lien lenders?
23 A. Yes.
24 Q. Of how much?
25 A. Two billion dollars.

96

Page 97:

1  Q. And how long do they have to wait for that money?
2  A. That should be contemporaneous with closing.
3  Q. Fair to say it's a present value number?
4  A. Well, cash is cash.
5  Q. Okay. And so, in looking at these ranges, what is the
6  most comparable range to the two billion dollars the first lien
7  lenders would get if the Fiat transaction is approved?
8  A. It would be the present value basis.
9  Q. So it would be the second range and --
10 A. Correct.
11 Q. -- and not the first? Now, that second range, the high
12 number there is 2.6 and the low number is 6.54.
13 A. Yes.
14 Q. Once again, is there any reason to believe that the higher
15 number is the more likely number?
16 A. Again, in my experience, no.
17 Q. Now, if you go down in that paragraph, I don't believe you
18 were asked about this. Is it not the case that that study, in
19 fact, did have a most likely number in it?
20 A. Yes.
21 Q. And could you tell us in your declaration what that study
22 found was the most likely net present value number?
23 A. It was certainly lower than the two billion dollars.
24 Q. In fact, it's 1.72 billion dollars --
25 A. Correct.

97

Q. -- correct?

A. Correct.

Q. And this was the analysis done as of last February, right?

A. Correct. In February --

Q. A couple months ago.

A. Yes.

Q. Has the situation gotten better or has it gotten worse for Chrysler since February 17 of this year?

A. It's gotten worse.

Q. So do you think these numbers would be viewed as high to day if we were looking at a liquidation?

    MR. KURTZ: Objection. No foundation.

    MR. STEWART: I believe he asked these questions, Judge.

    THE COURT: No foundation as to what?

    MR. KURTZ: As to performing some form of adjustment to a liquidation analysis right now on the stand.

    MR. STEWART: Don't think that was the question.

    THE COURT: No. The question was whether they would be higher or lower based on what has happened since this was done. And in his view, I think -- in his position as a board member, he could answer that question. You may answer the question.

    THE WITNESS: Thank you. I would expect them to be lower.

Q. Lower than the 1.72? That was the number back in February.

A. Yes.

Q. You were asked on cross about paragraph 24 of your declaration and, in particular, towards the end, the last sentence of that paragraph and that's found on page 10 of the document, I believe. Okay? In a quote, in a sentence I think your attention had been directed to, was "Finally, Mr. Nardelli informed the board that the company was monitoring its cash level to ensure the possibility of an orderly liquidation if it became necessary." Do you see that?

A. Yes, I do.

Q. First of all, what is an orderly liquidation?

A. It's a liquidation that would have the benefit of time to maximize the value -- recovery of the assets.

Q. What's the opposite or what's the alternative to an orderly liquidation?

A. Well, one would call it a free fall, a disorderly liquidation.

Q. Okay. And how do the values compare between an orderly and a free fall liquidation?

A. Well, again, orderly would be certainly much higher than a free fall liquidation.

Q. Why would there be a need to have an adequate cash level for an orderly liquidation?

A. To preserve the most value for the estate.

Q. And so you could buy time and sell things at the optimal time?

A. Correct.

Q. Other things, too?

A. Correct.

Q. Okay. Did you have a number in mind of how much cash Chrysler would have to have on hand in order to have an orderly liquidation?

A. The figure that was developed by management in response to the board's request was 750 million.

Q. Okay. And was it the board's hope that that kind of cash could be maintained?

A. Yes.

Q. Was it within the board's or the company's power to have cash at that level?

A. Yes.

Q. Okay. Now, let me ask a couple of other things. Oh, you were asked on cross-examination about fairness and other points to the first lien lenders. Now the fact is there are a number of those lenders, is that not true?

A. Yes.

Q. And how many of those lenders are objecting, to your knowledge, to the sale?

A. It seems like there's three or four.

Q. Okay. And the total amount of debt outstanding to the first lien lenders is how much?

A. Approximately 6.9 billion.

Q. And the objector's have how much?

A. Forty-six million.

Q. Now is there an agent bank that represents the first lien lenders in these matters?

A. JPMorgan.

Q. Okay. To your knowledge --

    MR. KURTZ: Objection. Relevance.

    THE COURT: Well, it's relevant to why -- you asked some question about fairness. This goes to establishing the record in terms of his view of affairs.

    MR. KURTZ: Your Honor, these -- the fairness has to do with the value of the company not the willingness of constituents, in particular, recipients of TARP funds to take a deal.

    THE COURT: Well, that's an argument you can make. And I assume you will make. But whether in this witness' view it's fair, it is relevant as to whether or not the party on the other side of the transaction is willing to accept it.

    MR. KURTZ: And I also object on foundation to less determining, that that was considered and that had something to do with that this board ever made a fairness determination on that basis.

VERITEXT REPORTING COMPANY

212-267-6868           516-608-2400

## Page 102

```
1        THE COURT:  But you didn't ask him, I don't think,
2   whether -- you asked the witness previously on cross whether he
3   thought it was fair.
4        MR. KURTZ:  Well, I believe what I asked the witness
5   on cross is whether he was made aware that there were certain
6   valuations that weren't presented to the board and whether he
7   thought that was appropriate that he hadn't been made aware of
8   that information.
9        THE COURT:  Well, we're not on that line of
10  questioning.  We're on the line of questioning you pursued
11  which I believe you asked whether or not it was fair an amount
12  for what the senior secured creditors were receiving.  And
13  counsel can pursue that line of questioning.
14       MR. KURTZ:  Okay.
15  BY MR. STEWART:
16  Q.  And I believe we left off, you're aware there was an agent
17  representing the group of first lien lenders, correct?
18  A.  Yes.
19  Q.  Do you know what determination that agent made as to the
20  fairness of this to those lenders?
21  A.  They accepted the offer.
22  Q.  And that represents the overwhelming amount of debt, is
23  that right?
24  A.  Correct.
25  Q.  By the way, did there come a time when Chrysler went into
```

## Page 103

```
1   default under its credit agreements with the first lien
2   lenders?
3   A.  No.
4        MR. STEWART:  Let me just check my notes, Judge, to
5   see if I have anything else.
6   Q.  Oh, you were asked -- let's go to tab 2 -- 3, I'm sorry --
7   of the book put before you.
8        THE COURT:  Can I ask a question.  You mentioned
9   default which calls a minor question that I have.  When were
10  interest payments made or what are the periodic payment dates,
11  do you know?
12       THE WITNESS:  They're monthly.
13       THE COURT:  Monthly payments are made.  And so, if
14  they're not in default, I assume then that the payments were
15  made?
16       THE WITNESS:  To my knowledge, they were made in a
17  timely basis.
18       THE COURT:  All right.  So those payments were made
19  then January, February, March.  I don't know about April.
20       THE WITNESS:  I don't know, either.
21       THE COURT:  You assume that they were made those in
22  January, February and March --
23       THE WITNESS:  Yes.
24       THE COURT:  -- at least?
25       THE WITNESS:  I do recall the second lien waived
```

## Page 104

```
1   their payments.
2        THE COURT:  But the first lienholders, you believe,
3   received their payments?
4        THE WITNESS:  My understanding is that -- yes.
5        THE COURT:  All right.  Go ahead.
6   BY MR. STEWART:
7   Q.  A couple of other things.  Did there come a time when --
8   the company's outside auditors were KPMG?
9   A.  Correct.
10  Q.  Did there come a time when there was an issue with your
11  auditors about whether Chrysler was a going concern?
12  A.  As we worked through developing the annual financial
13  accounts, yes.
14  Q.  Okay.  And they told you they had that concern?
15  A.  Yes, they did.
16  Q.  Okay.  And you were chairman of the audit committee I
17  think you told us?
18  A.  Correct.
19  Q.  And did that mean, at least on the board level, you were
20  the principal point of contact with the auditors?
21  A.  Yes, that's correct.
22  Q.  What did KPMG tell you about its going concern issues?
23  A.  They're concerned the company didn't have adequate
24  liquidity to continue as a going concern.
25  Q.  Okay.  Now am I correct in understanding the 2008
```

## Page 105

```
1   financials have never been issued?
2   A.  They were never issued.
3   Q.  Okay.  Do you know whether or not KPMG's issuance or
4   statement of a qualification would have constituted an event of
5   default with the agreements with the first lien lenders?
6   A.  I don't recall.
7   Q.  Okay.  All right.  Two other things.  Tab 3.  You were
8   shown on cross-examination this draft fairness opinion --
9   A.  Yes.
10  Q.  -- from Greenhill & Co.  Okay?  In your experience with
11  fairness opinions, is it customary to go through drafts and
12  test different scenarios?
13  A.  Oh, absolutely.
14  Q.  Why is that?
15  A.  Just because it's the nature of the process for the
16  provider to get comfortable and, ultimately, the company and
17  the analytics.
18  Q.  And when the board retained Greenhill & Co., did the board
19  say, and, by the way, make sure you give us an opinion saying
20  this is fair?
21  A.  Absolutely not.
22  Q.  Okay.  What did you want?
23  A.  I wanted an impartial input from a third party.
24  Q.  Why did you want it?
25  A.  Because it ultimately inures to my independence that it's
```

**106**

1 an impartial process.
2 Q. And what did you do to make sure you got something that
3 was impartial?
4 A. Again, Greenhill, as well as -- and retaining KL to make
5 sure there was impartiality throughout the process.
6 Q. Okay. So you had Greenhill but you also had your own law
7 firm --
8 A. Correct.
9 Q. -- is that right? Okay. Lastly, you were shown tab 4
10 which is this e-mail from -- it looks like Mr. Kolka to Mr.
11 Manzo?
12 A. Looks like it's Manzo to Kolka. It looks like --
13 Q. Manzo to Kolka or whoever it was?
14 A. Yes.
15 Q. All right. And here, there's this reference to statements
16 made by officials of the treasury. And you were asked about
17 that. Was the board prepared to allow the company's liquidity
18 to go down to zero?
19 A. No. Absolutely not.
20 Q. Why not?
21 A. Because it would not have allowed for an orderly
22 liquidation to preserve value for the estate.
23 Q. And what did you do to make sure the liquidity was kept as
24 high as you could?
25 A. Diligently discussed with the company at every board

**107**

1 meeting and my daily reports on cash to maintain adequacy.
2 Q. Okay. And who did you approach over time to try to obtain
3 additional liquidity for the company?
4 A. Among the parties, JPMorgan, in particular.
5 Q. Okay. And in the whole universe of potential funders, who
6 was it who in the end was the only source of funding?
7 A. United States government.
8 Q. Now there were questions about terms and conditions
9 imposed by the government. Do you remember being asked that?
10 A. Yes.
11 Q. Were you happy with those terms and conditions?
12 A. If I got the cash, it was the right thing for the estate.
13 Q. What was your alternative to accepting the terms and
14 conditions?
15 A. None. Liquidation.
16 Q. And in prior experience, have you found that companies in
17 distress sometimes are required to take terms and conditions
18 they don't like?
19 A. Unfortunately, yes.
20 Q. Okay. And in the end, from the standpoint of the benefit
21 of the estate, what was the wisest thing to do?
22 A. Take the liquidity provided by the government.
23 Q. Okay. And that's what you chose to do?
24 A. Correct.
25     MR. STEWART: Thank you very much. That's all I

**108**

1 have. Thank you.
2     THE COURT: Any recross?
3     MR. KURTZ: Yes, Judge.
4 RECROSS-EXAMINATION
5 BY MR. KURTZ:
6 Q. Mr. Chapman, you were asked some questions about liquidity
7 and maintain -- and the efforts made to maintain liquidity.
8 What was the company's liquidity on April 30th, the day of the
9 bankruptcy filing?
10 A. I don't re -- might have been -- well, depends on what the
11 jurisdictionally, it may have been a billion and a half
12 dollars. A billion six, I think.
13 Q. All right.
14 A. I don't recall specifically.
15 Q. Counsel asked you about some intention by Chrysler to
16 discontinue lines. Do you recall those questions?
17 A. Yes.
18 Q. And so what car lines did Chrysler intend to discontinue?
19 A. It was never reached a definitive determination.
20 Q. What car lines did Chrysler consider terminating?
21 A. There was consideration of some of the Jeep products as
22 well as -- I'm trying to remember -- Sebring was certainly
23 discussed.
24 Q. So the Sebring and what Jeep product?
25 A. Again, I think there were multiple platforms, one of a

**109**

1 different names. It could have Compass versus Liberty.
2 Q. Can you identify any Jeep product that was being
3 considered for elimination?
4 A. Again, it was just discussions as it relates to the number
5 of platforms. So it would have been Compass versus Liberty.
6 But no definitive determination was reached to my knowledge.
7 Q. I'm sorry. Did you say Compass versus Liberty or --
8 A. Yes.
9 Q. In other words, going forward with one and not the other?
10 A. Again, that was -- I recall discussions about that.
11 Q. Okay. And it's fair to say that there never was a
12 conclusion reached that any of the car lines would be
13 discontinued?
14 A. Not to my knowledge.
15 Q. All right. And there had never been a determination that
16 those car lines had no value and, therefore, should be
17 discontinued, right?
18 A. No.
19 Q. I'm correct?
20 A. No. There had not been reached a determination.
21 Q. Okay. And you were asked some questions about the
22 liquidity analysis. Now where you fall in the range of the
23 liquidity value, of course, depends on the accuracy of the
24 liquidity valuation, right? I'm sorry, liquidation. You were
25 asked some questions about the liquidation valuation, right?

1   A. Yes.

2   Q. You were asked about where you fell in the range of

3   liquidation analysis, right?

4   A. Yes.

5   Q. And you took guidance on that -- you were asked what the

6   most likely scenario was. That came from Mr. Mango, right?

7   A. The analysis was provided by Mr. Manzo.

8   Q. Including the most likely scenario, right?

9   A. Correct.

10   Q. And you were unaware, of course, that he was going to

11   receive personally ten million dollars if this deal happened,

12   right?

13   A. I was not aware of it.

14   Q. And the accuracy of that potential liquidation value, of

15   course, depends therefore on the accuracy of all of the

16   assumptions and the work that was performed by Mr. Manzo,

17   right?

18   A. Correct.

19   Q. And --

20   A. And his team, yes.

21   Q. And wouldn't you agree that Mr. Manzo should have ascribed

22   value for some of the other car lines in addition to just

23   Wrangler and, I think,

24   A. Again, I'm not sure I understand your question.

25   Q. You agree -- well, I'll -- you agreed with me previously,

110

---

1   and I assume you still agree, that there's value in all of the

2   car lines that we discussed before, right?

3   A. Yes. Certain of the ones you discussed, yes.

4   Q. Now you were asked some questions about the consents by

5   the first lien lenders. Now you were aware that the majority

6   of the first lien lenders are recipients of substantial TARP

7   funds?

8   A. If you say so.

9   Q. Oh, I'm asking whether you're aware of it.

10   A. I could be.

11   Q. Do you know whether JPM Morgan [sic] has ever received

12   TARP funds.

13   A. JPMorgan has, certainly.

14   Q. All right. Tens of billions of dollars in TARP funds,

15   right?

16   A. If you say so.

17   Q. Well, do you know that or not?

18   A. I don't know specifics of what JPMorgan got from the TARP.

19   Q. You know they received substantial money from TARP, right?

20   A. Yes.

21   Q. And that would put them in a much more difficult position

22   in terms of resisting the demands of the Treasury Department,

23   correct?

24   MS. VARGAS: Objection.

25   THE COURT: What's your objection?

111

---

1   MS. VARGAS: Lack of foundation as to what's going on

2   in the minds of the bank. Total speculation.

3   THE COURT: All right.

4   MR. KURTZ: Your Honor, the witness can tell us -- he

5   relied on his understanding of consents. And he can tell us

6   what his understanding would be as how those consents were

7   obtained.

8   THE COURT: I think he can answer what his view would

9   be.

10   MR. KURTZ: Yeah.

11   Q. In your opinion, wouldn't it be very difficult for

12   somebody that had received TARP funds to face down the Treasury

13   Department?

14   A. I wouldn't speculate on what Jamie Diamond would do at

15   JPMorgan.

16   Q. Okay. And you're not prepared to -- well, how about -- do

17   you think that when somebody receives billions of dollars in

18   TARP funds that they would have some concerns about irritating

19   the lender?

20   A. It's a slippery slope I'd rather not have to go down.

21   Q. Well, why don't we go down anyway. I mean, don't you

22   think that if you -- well, how about you? You've testified

23   about how desperate Chrysler was for cash, right?

24   A. Yes.

25   Q. And you testified that Treasury was the only source for

112

---

1   funding, right?

2   A. Correct.

3   Q. And so, Treasury was able to dictate terms, right?

4   A. They provided the terms, yes.

5   Q. And Chrysler was very limited in how it could resist the

6   terms dictated by Treasury, right?

7   A. Correct.

8   Q. And so wouldn't JPM Morgan [sic] and the other TARP

9   recipients be in the same position?

10   A. And we asked them to provide financing.

11   Q. Yeah, but -- no, no. Wouldn't others that were depending

12   on financing from the government be in the same position as you

13   in terms of having to take terms?

14   MR. PANTALEO: Objection, Your Honor. This

15   witness -- Peter Pantaleo, Simpson & Thacher. Your Honor, this

16   witness is not competent to testify as to the financial

17   condition of financial institutions who have received TARP

18   money, whether they needed it, whether they asked for it,

19   whether they want to give it back or what effect it had on it.

20   THE COURT: You're assuming a fact not in evidence.

21   MR. KURTZ: Let me rephrase.

22   Q. Is it your understanding that another borrower from

23   Treasury would face the similar kinds of pressures that

24   Chrysler faced in terms of a negotiation?

25   MR. PANTALEO: Objection, Your Honor. The witness is

113

---

## VERITEXT REPORTING COMPANY

212-267-6868                         516-608-2400

1  not competent to testify what --
2  THE COURT: You have to hypothetically establish the
3  other borrower's financial condition. It would have to be in
4  as a dire strait as Chrysler was.
5  MR. KURTZ: Well, Your Honor, the fact that the TARP
6  recipients needed the money to --
7  THE COURT: Well, that's an argument you can make.
8  This witness -- you can make that at argument. That's been
9  your argument since the first day of the case.
10  MR. KURTZ: That's true, Judge.
11  Q. Mr. Chapman, you sit on the audit committee?
12  A. Yes.
13  Q. And you were asked some questions about KPMG, right?
14  A. Yes.
15  Q. KPMG is the auditors -- those are the auditors for
16  Chrysler?
17  A. The external auditors, correct.
18  Q. All right. And can I ask you to turn in your binder to, I
19  think, tab 6 and confirm for me that this is an e-mail from
20  David Quackenbush to Brian Aronson.
21  (Pause)
22  Q. Have you ever seen that e-mail before?
23  A. Nope.
24  MR. STEWART: Your Honor, I think this is beyond the
25  scope of redirect.

---

1  THE COURT: What is this relevant to on redirect?
2  MR. KURTZ: There were questions about KPMG and the
3  auditing functions. And I'd like to make sure that this
4  witness -- whether he was aware or not aware of some of KPMG's
5  observations about Fiat and their auditing.
6  MR. STEWART: Your Honor, the question had --
7  THE COURT: But the questions had to do with KPMG's
8  work in auditing Chrysler.
9  MR. KURTZ: Okay. We'll -- Your Honor, we'll ask Mr.
10  Chapman to stick around and we'll call him in our case-in-
11  chief.
12  THE COURT: You know, you can abuse that privilege.
13  MR. KURTZ: Your Honor, it's pretty rare when you get
14  so much push back for matters in evidence what's within, what's
15  without. I mean, we're all trying to get through one witness
16  at one time. We're trying not to have to bring witnesses back.
17  But I keep getting objections that I'm beyond something or
18  someone else and which just precipitates having to bring the
19  witness back. It seems to me the most expeditious way to
20  proceed is just to get through the material.
21  THE COURT: Well, it would have been expeditious if
22  then you had asked it during cross --
23  MR. KURTZ: But it wasn't till I heard him --
24  THE COURT: -- originally.
25  MR. KURTZ: -- ask questions about KPMG that I

---

1  thought we ought to then hear about KPMG. I wasn't intending
2  to cover this material.
3  THE COURT: All right. Ask the witness the question.
4  BY MR. KURTZ:
5  Q. I'm sorry. I think you said you never saw this e-mail, is
6  that right?
7  A. That's correct.
8  Q. Were you aware of KPMG's conclusion that Fiat had between
9  nine and ten billion euros of off balance sheet obligations
10  which were now transparent?
11  MR. STEWART: Your Honor, may I have a continued
12  objection on scope?
13  A. I was not aware.
14  THE COURT: One second. I mean, the witness can
15  respond to the statement in the e-mail as to whether he was
16  aware. Whether that statement is factual or not --
17  MR. KURTZ: Yeah, okay.
18  THE COURT: -- is not really in the record.
19  MR. KURTZ: Okay.
20  THE COURT: It's a comment made by KPMG in an e-mail.
21  MR. KURTZ: Okay.
22  Q. Mr. Chapman, were you aware of any view by KPMG that off
23  balance sheet investments of JVs without full disclosure is an
24  economic risk and a political risk, how could the Treasury
25  Chrysler get in bed with a shady partner? Were you aware of

---

1  that?
2  A. Nope.
3  Q. Did anybody ever suggest it to you --
4  MR. KURTZ: Well, strike that.
5  Q. Has anyone ever told you that Fiat was a shady partner?
6  A. No.
7  Q. Now you were asked some questions about the fairness
8  opinion and what's customary. Is it customary to charge a
9  company to perform work on a valuation and then to drop that
10  section from the final fairness opinion days before it's
11  provided to the board of directors?
12  MR. STEWART: Objection, Your Honor. I'm not sure
13  he's established it was dropped. He's made that statement
14  twice now. And if he's going to pursue it, I think he has to
15  prove it. I don't think we get counsel's say so on something
16  like that, do we?
17  MR. KURTZ: Your Honor, they admitted the fairness
18  opinion and it is not in there. So --
19  MR. STEWART: Wait, wait -- whoa.
20  THE COURT: So without characterizing it as dropped,
21  you can just ask the question as it's in one and it's not in
22  the other --
23  MR. KURTZ: Right.
24  THE COURT: -- and is that unusual --
25  MR. KURTZ: That's right.

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

| | |
|---|---|
| 1     THE COURT: -- without the characterization.<br>2   Q. Is that unusual?<br>3   A. To my experience, no.<br>4   Q. So you think it was perfectly appropriate to spend<br>5  Chrysler's money up to three million dollars performing a<br>6  valuation in detail and then not advise the board that the<br>7  findings were that the company had a value as high as 25.4<br>8  billion dollars?<br>9     MR. STEWART: Objection, Your Honor.<br>10  Q. Is that something you think is right or wrong?<br>11  A. I think Greenhill's mandate changed as the government's<br>12  determination to provide financing changed.<br>13  Q. Okay. You would have had no interest in understanding<br>14  from Greenhill that they believed Chrysler was worth as much as<br>15  25.4 billion dollars?<br>16  A. It would have been nice to know. But, again, at the end<br>17  of the day, their mandate changed.<br>18  Q. Okay. But it would have been nice to know, right?<br>19  A. Yes.<br>20  Q. You have to speak because --<br>21  A. I said yes.<br>22  Q. -- head nods -- okay.<br>23     MR. KURTZ: No further questions.<br>24     THE COURT: All right. Any further recross? All<br>25  right. You may step down. Thank you. We're going to take a<br><br>118 | 1     MR. BROMLEY: May I approach, Your Honor?<br>2     THE COURT: Yes, please. Thank you.<br>3  Q. Mr. Curson, is that document in front of you a copy of the<br>4  declaration you've submitted?<br>5  A. Yes, it is.<br>6  Q. And did you testify at a deposition on Monday of this<br>7  week?<br>8  A. I did.<br>9  Q. And did you answer questions with respect to this<br>10  declaration at that deposition?<br>11  A. I did.<br>12     MR. BROMLEY: Your Honor, the UAW would move into<br>13  evidence the declaration of David Curson.<br>14     MR. ZAKIA: Your Honor?<br>15     THE COURT: Yes?<br>16     MR. ZAKIA: Jason Zakia of White & Case for the<br>17  Indiana Pensioners. Same objection you discussed with Mr.<br>18  Curson earlier. We'd just like to note it for the record.<br>19     THE COURT: All right. It's overruled. Thank you.<br>20  Q. Mr. Curson, at the UAW, who do you report to?<br>21  A. I report directly to President Ron Gettelfinger.<br>22  Q. And how many people report directly to President<br>23  Gettelfinger?<br>24  A. The four vice presidents, his executive assistant, Gary<br>25  Mason, General Counsel, Dan Sherrick, and myself.<br><br>120 |
| 1  few minute break and then proceed with the next witness.<br>2     (Recess from 11:42 a.m. until 11:59 a.m.)<br>3     THE COURT: Be seated. All right. Go ahead, Mr.<br>4  Bromley.<br>5     MR. BROMLEY: Good afternoon, Your Honor. James<br>6  Bromley of Cleary Gottlieb on behalf of the United Auto<br>7  Workers. The United Auto Workers call Dave Curson to the<br>8  stand.<br>9     THE CLERK: Raise your right hand.<br>10     (Witness duly sworn)<br>11     THE CLERK: Thank you.<br>12     THE COURT: You may proceed.<br>13     MR. BROMLEY: Thank you, Your Honor.<br>14  DIRECT EXAMINATION<br>15  BY MR. BROMLEY:<br>16  Q. Could you state your full name for the Court, please?<br>17  A. David Alan Curson.<br>18  Q. Mr. Curson, who do you work for?<br>19  A. I work for United Auto Workers.<br>20  Q. And what is your position with the United Auto Workers?<br>21  A. I am the director of special projects and economic<br>22  analysis for the UAW.<br>23  Q. Mr. Curson, in connection with this proceeding, did you<br>24  sign a declaration?<br>25  A. I did.<br><br>119 | 1  Q. That's a total of seven direct reports to President<br>2  Gettelfinger?<br>3  A. Yes.<br>4  Q. And you're one of them?<br>5  A. Yes.<br>6  Q. Now, I'll come back in a minute to your duties. But could<br>7  you tell us a little bit about the UAW? What is the UAW?<br>8  A. The UAW is a labor organization that represents workers<br>9  across the country in all different fields. Primarily, we<br>10  represent auto workers, manufacturing workers.<br>11  Q. And how many members does the UAW have?<br>12  A. Between 4 and 500,000 active workers and about half a<br>13  million retired workers.<br>14  Q. So just to be clear, between 4 and 500,000 actives and<br>15  about 500,000 retired?<br>16  A. That is correct.<br>17  Q. So the UAW represents approximately a million Americans?<br>18  A. That is true.<br>19  Q. At Chrysler, how many of Chrysler's workers are<br>20  represented by the UAW?<br>21  A. Approximately 26,000 active workers.<br>22  Q. And how many Chrysler retirees are represented by the UAW?<br>23  A. Approximately 80,000.<br>24  Q. Do you know how many plants Chrysler has in the state of<br>25  Indiana?<br><br>121 |

1 A. Yes. They have four, four separate units.
2 Q. And how many UAW represented employees are employed at
3 those plants, if you know?
4 A. Approximately five thousand hourly employees.
5 Q. Now you mentioned that the UAW has retired members. Why
6 are retired members members of the UAW?
7 A. We make a commitment to our workers through their life
8 that they can remain members of the UAW. Retired members have
9 all rights of active members except that they cannot vote for a
10 strike, they cannot vote to end a strike and they cannot vote
11 for a collective bargaining agreement -- for or against a
12 collective bargaining agreement in the ratification process.
13 And they can't vote for elected representatives that do
14 grievance handling or contract administration. Other than
15 that, they have full membership rights in the UAW.
16 Q. In connection with the UAW's representation of actives and
17 retirees, does the UAW negotiate with respect to retiree
18 benefits?
19 A. We do negotiate with employers for retiree benefits, yes.
20 Q. I'd like to go back to your position as the director of
21 special projects. Could you just briefly describe your duties
22 in that role?
23 A. Primarily, my duties are to do anything that the president
24 requires. Any special thing that comes up, I often get
25 assigned to assist in researching or developing programs around

1 it. I'm responsible for the constitutional -- the UAW
2 constitutional applications including our internal appeal
3 procedure, I oversee. The internal workings of the UAW is a
4 business. I keep track and report to the president on
5 expenditures and those types of things of the organization.
6 And in collective bargaining, I prepare and assist in strategy
7 for collective bargaining, particularly, in Big Three where we
8 pattern bargain. I oversee the pattern to make sure that
9 contract proposals are consistent across all three of the Big
10 Three companies. As negotiation progresses, I keep track on
11 those particular issues that were patterned. I develop
12 strategies during the course of those negotiations to present
13 to the president for his consideration. And normally, in the
14 final days of negotiations, I actively engage in the
15 negotiation process with the companies to accomplish these
16 goals.
17 Q. Now, you mentioned the Big Three. That's Ford, GM and
18 Chrysler?
19 A. That is correct.
20 Q. You also mentioned pattern bargaining. Could you please
21 just describe that a little bit?
22 A. Yes. We have a philosophy in the UAW that if similar
23 employers have the same labor costs, they won't be competing
24 with each other using labor to be more competitive with each
25 other. So if one group had a better labor cost than the other,

1 they would be advantaged. And the others would then target
2 labor to take cost out. So we try to develop agreements that
3 are very similar amongst the Big Three and, at the end result,
4 have a very similar all-in labor cost when the contracts are
5 finalized.
6 Q. Mr. Curson, when did you first become involved in the auto
7 industry?
8 A. Well, I have two brothers that worked for Ford. They
9 arranged an apprenticeship test for me in 1968. I took that
10 test. In the meantime, I went to the Marine Corp. As soon as
11 I returned from Vietnam, I got an early out. I was number one
12 on the list. I was hired in the Ford Motor Company in 1970.
13 When I graduated from my apprentice program, I was appointed to
14 be an apprentice coordinator at my plant. That was my first
15 involvement with the UAW in 1973. Subsequent to that, I was
16 elected to a number of local union offices. I was elected to
17 the national bargaining committee which negotiates contracts
18 with the international union, with Ford Motor Company. And in
19 1984, after serving on that committee for two different
20 negotiation sessions, I was asked to come on international
21 union staff, an appointed job, which I took. I came on in
22 January of 1985. I've held numerous positions primarily in the
23 Ford department. In 1999, I was asked by then President
24 Stephen P. Yokich to become his executive assistant. I served
25 in that role until his retirement in 2002. In 2002, when our

1 new administration under President Ron Gettelfinger came in, I
2 was assigned to the special projects director position.
3 Q. So since 1999, you've been working in the office of the
4 president at the UAW?
5 A. Yes, I have.
6 Q. And over the course of your career, have you been involved
7 in negotiating Big Three collective bargaining agreements?
8 A. Yes. I have had a prominent position in every Big Three
9 negotiating session since 1982.
10 Q. And how many of those CBAs or collective bargaining
11 agreements have you been involved in?
12 A. That's at least a dozen national agreement sessions. In
13 the latter years, in the last four or five contracts, I've
14 participated in all of Chrysler's, General Motors' and Ford's.
15 So it's a multitude of contracts.
16 Q. So it's fair to say that you're familiar with the
17 collective bargaining process for Big Three automakers?
18 A. Yes, I am.
19 Q. And how many with respect to Chrysler of that group?
20 A. At least four national agreements.
21 Q. With respect to negotiating a Big Three collective
22 bargaining agreement, what kind of process does the UAW go
23 through?
24 A. We have a collective bargaining convention every four
25 years. And that sets the overall standards of our labor

**126**

1   agreements. And all UAW members participate in that to the
2   delegate system.
3       When we're preparing for a Big Three bargaining session,
4   when contracts are about to expire, we call in the local union
5   counsels which create a national counsel. And General Motors,
6   Ford and Chrysler each have their own separate counsel. They
7   develop their own specific proposals for contract negotiations
8   that are pretty much parochial to their own companies. And
9   then we, in the international union, we develop proposals that
10  we want to pattern, maybe a health care proposal or a wage
11  proposal or a cost of living proposal. And we develop those,
12  the local -- the national counsel from the local unions adopt
13  that strategy and then we engage in negotiations with all three
14  companies. We sort out who is advancing our causes. And then
15  we normally go to that company to lead in negotiations. When
16  we settle with that company, we pattern that agreement to the
17  other two. That's the standard process that we use.
18  Q.  So once you reach a tentative agreement, how does that
19  agreement go from the negotiation table to approval?
20  A.  When the negotiating committee reaches a tentative
21  agreement, we, by constitution, have to bring the counsels back
22  in that represent the local unions and present it to them.
23  They adopt it or they don't adopt it. It has to be presented
24  to them. After that process is completed, we take it to the
25  membership and the individual members have a vote to either

**127**

1   ratify the agreement or to not ratify the agreement. During
2   that process, we set up individual explanatory meetings at
3   every single local union. We send somebody knowledgeable,
4   either from the national bargaining committee or from the
5   international union, into those locations to explain the
6   changes in the agreement. Any new items in the agreement, we
7   try to have total transparency in what is changed and what has
8   new. And then the locals cast their votes and either give us a
9   ratification or a rejection.
10  Q.  Now were you involved in the negotiation of the collective
11  bargaining agreement with Chrysler that was put in place prior
12  to the one that is in existence right now?
13  A.  Yes. That would have been in 2007.
14  Q.  And were you involved in the ratification of that
15  agreement?
16  A.  I was.
17  Q.  And were you involved in the ratification of the current
18  collective bargaining agreement?
19  A.  I was.
20  Q.  Are you familiar with the terms of the 2007 collective
21  bargaining agreement?
22  A.  I am.
23  Q.  Now did that collective bargaining agreement change
24  anything with respect to retiree medical benefits?
25  A.  A tremendous change. We removed the obligation of retiree

**128**

1   health care from the company and put it into a VEBA.
2   Q.  And was that taking the retiree obligations off of
3   Chrysler's balance sheet? Is that the intention of it?
4   A.  That is correct, to take it off their books.
5   Q.  Now was it a challenge to get the 2007 collective
6   bargaining agreement ratified?
7   A.  It was one of the most difficult that I've ever
8   participated in.
9   Q.  And why was that?
10  A.  Because retiree health care in our union is a major, major
11  issue. People were very unknowledgeable of the VEBA. It was
12  something brand new. In order for the VEBA to be successful,
13  there was a payment schedule and things that our membership
14  just simply didn't understand. And there wasn't trust that it
15  could actually carry out the huge task of providing health care
16  benefits for our retirees. It got great debate in the
17  ratification process. And that agreement only passed by one or
18  two percentage points in ratification, one of the closest ones
19  I've ever been involved in.
20  Q.  Was it the union's idea to create the VEBA?
21  A.  The VEBAs were created in around 2004. Ford Motor Company
22  and General Motors came to us and wanted to eliminate retiree
23  health care. They said that carrying that huge obligation on
24  their books would ultimately force them to bankruptcy, that
25  they couldn't pay, they didn't have cash to run their

**129**

1   operations because of this huge obligation. We told them that
2   we wouldn't eliminate it. They came with a suggestion to
3   transfer to a VEBA. They had, at the time, an internal VEBA.
4   They wanted to transfer all of those obligations out off their
5   books into an external VEBA. We didn't know what a VEBA was.
6   We hired experts from New York to come in first to go through
7   the books to ensure that General Motors and Ford were telling
8   us the truth about their liquidity, about their ability to
9   survive. Our experts told us that either company would make it
10  if they had to continue carrying this liability on their books
11  and suggested that the VEBA, under the right payment schedule,
12  could survive and could provide a level of benefits that would
13  be acceptable to us and our retirees.
14      So in 2005, we initiated that process with Ford and
15  General Motors. At the time, Chrysler was still Daimler
16  Chrysler. They came to us and wanted the same deal under the
17  guise of pattern bargaining. But Daimler refused to let our
18  hired consultants review their books. And absent our ability
19  to know that they were seriously in financial trouble, we
20  refused to negotiate. And then, finally, in 2007, Chrysler
21  opened their books to us. We did a similar review with them,
22  determined they, too, were in just as dire straits as the other
23  companies. And we agreed to negotiate the VEBA in the 2007
24  negotiations.
25  Q.  So is it fair to say that agreeing to allow the health

1 care obligations to be transferred was a concession on the part
2 of the union?
3 A. It was a huge concession. It was the first time ever that
4 we had asked our retirees to pay any substantial co-pays on
5 their health care benefits.
6 Q. And prior to the VEBA discussions, all of the health care
7 obligations were obligations of the companies, is that right?
8 A. That is correct.
9 Q. Were you involved -- shifting gears a little bit, bringing
10 us into 2009. Mr. Curson, have you been involved in
11 negotiations with respect to the collective bargaining
12 agreements with Chrysler since January of 2009?
13 A. I have.
14 Q. Could you describe that involvement?
15 A. I've played a prominent role in the negotiations of
16 Chrysler and Ford and General Motors collective bargaining
17 agreements since the government came out with terms for the
18 loan agreement, a bridge loan agreement, that demanded that the
19 companies' labor agreements be competitive with the transplants
20 in the United States.
21 Q. So let's -- focusing first on the January and February
22 time frame, could you describe your involvements in any
23 negotiations relating to collective bargaining agreements?
24 A. Yes. As I just said, the term requirements for the bridge
25 loans to General Motors and to Chrysler stated targets,

130

1 established targets, that they had to meet in order to present
2 a viability plan to the government by February 17th that
3 established that their labor agreements were competitive with
4 the active workforce with the foreign transplants that -- in
5 the U.S. operations. So that was a blend of Toyota, Nissan and
6 Honda, foreign operations that are operating in the United
7 States.
8     So internally, we developed our strategies in what
9 particular areas of the collective bargaining agreement that --
10 where we could reduce cost, provide concessions and still
11 maintain our central principles of the agreement.
12     We did that. We engaged in negotiations first at Ford.
13 And we made concessions at Ford that brought our agreements
14 competitive in our mind with the transplants and complied with
15 the targets set forth in the loan agreement terms. When we
16 completed with Ford and set the pattern, then we took the
17 pattern to General Motors and Chrysler and negotiated around
18 that pattern to complete a deal that we thought the labor
19 agreement complied with the terms of the loan agreement.
20 Q. Now, those targets in the loan agreement that you
21 referenced, was it the first time that the UAW had heard about
22 those desires? Was it from the government?
23 A. The first time was when Chrysler and General Motors
24 received those documents. They forwarded them to us and told
25 us that they had to engage in negotiations in order to

131

1 accomplish the necessary loans to keep their companies viable.
2 Q. But is it fair to say that those companies were also
3 looking for those concessions over the prior negotiations with
4 respect to collective bargaining agreements?
5 A. Those companies were looking for those concessions since
6 I've been involved in the business.
7 Q. So with respect to the February 17th submission to the
8 government, did the UAW reach a tentative agreement with
9 Chrysler?
10 A. We did. We reached a tentative agreement just prior to
11 the February 17th date after a long and difficult bargaining.
12 As I said earlier, I believe -- we believed that it met the
13 standards called for by the terms of the loan agreement. And
14 we initialed off that particular agreement. Chrysler also
15 agreed that we met those terms.
16 Q. And so there were concessions given in connection with the
17 collective bargaining agreement then?
18 A. There was.
19 Q. And were there concessions given with respect to the VEBA
20 as well?
21 A. There was.
22 Q. And were both the concessions with respect to the VEBA and
23 the collective bargaining agreement tied together?
24 A. Oh, unquestionably. They were both required components of
25 a collective bargaining agreement that we had to have before we

132

1 would present it to the membership.
2 Q. So in February of 2009, when you reached a tentative
3 agreement with Chrysler on the collective bargaining agreement,
4 is it fair to say that you required also there to be a
5 satisfactory agreement with respect to the VEBA?
6 A. Without a question.
7 Q. Now did that tentative agreement get taken to the
8 membership for ratification?
9 A. It did not.
10 Q. And why was that?
11 A. It wasn't taken because we were not sure that the
12 government would accept that labor agreement as we did as being
13 competitive and meeting the terms. We were waiting until that
14 tentative agreement was folded into Chrysler's viability plan
15 that they submitted to the federal government. And rather than
16 take it to ratification, either get a ratification or a
17 rejection and then have the government say well, you still have
18 to do more, we waited until the government made their
19 declaration before we took it to the membership.
20 Q. And the government's declaration, that was with respect to
21 the overall viability plan, is that right?
22 A. That is correct.
23 Q. Now, in connection with the January and February
24 negotiations, who was the UAW negotiating with?
25 A. With Chrysler.

133

1  Q.  And who at Chrysler in particular?
2  A.  I'm sorry?
3  Q.  Who at Chrysler in particular?  Who was the person at --
4  A.  Who at Chrysler?  Who did we face off with?
5  Q.  Yes.
6  A.  Al Icabelli (ph.) led their negotiations, his staff, his
7  research people.  The same people that we normally deal with.
8  Tom LaSorda made some appearances on some issues.  It was
9  pretty much the standard negotiations that we've engaged in
10  many times.
11  Q.  An were there representatives of the U.S. government in
12  those negotiations?
13  A.  None.
14  Q.  Now, after you heard that the auto task force had rejected
15  Chrysler's sustainability plan, did the UAW reopen labor
16  negotiations with Chrysler?
17  A.  We did.
18  Q.  And when did that occur?
19  A.  Soon after March the 30th.
20  Q.  And were you involved in those negotiations?
21  A.  I was.
22  Q.  Could you describe that involvement, please?
23  A.  We were summoned to Washington, D.C.  We, at the time,
24  still believed that our involvement, that the agreement that we
25  had settled in February, met the target set forth by the

134

1  government.  When we got to Washington, we were told that there
2  was a serious suitor -- it was Fiat -- to be a partner with
3  Chrysler, that Fiat had some requirements in the collective
4  bargaining agreement that weren't acceptable, that if they were
5  going to be a partner, we would have to address those issues.
6  There was some question about if we were competitive with the
7  foreign transplants.  We had basically targeted what's called
8  the northern band of transplants.  It's the most northern
9  transplant location that pay higher rates than their more
10  southern transplant locations.  There was -- we were told to be
11  competitive.  We had to even take more costs out of our rates.
12  So we engaged in intense bargaining in a very small group of
13  trying to comply with those requests.  And at the same time, we
14  had a VEBA team that was engaged in trying to renegotiate the
15  VEBA.
16  Q.  So in the small team relating to the collective bargaining
17  agreements, you mentioned that there were certain requirements
18  announced by Fiat.  Who was representing Fiat in connection
19  with this?
20  A.  There was two ladies that worked for Case New Holland in
21  the United States.  It's a wholly owned subsidiary of Fiat.  I
22  can recall their names other than Linda and Anna.  I'd have to
23  look my records up to find their last names.  They represented
24  Fiat at the negotiating table.  And Al Icabelli, again from
25  Chrysler, represented Chrysler.

135

1  Q.  So you mentioned the name Case New Holland.  What is Case
2  New Holland?
3  A.  Case New Holland makes tractors and other agricultural
4  implements.  I believe they're located in Wisconsin.  We do
5  represent their workforce.  And it's a wholly owned subsidiary
6  of Fiat.
7  Q.  In those small group sessions, was there anyone from the
8  United States government participating?
9  A.  Never.
10  Q.  And who for the UAW was in that small group session?
11  A.  General Holiefield, who is the vice president of the UAW
12  assigned over the Chrysler department; Gary Mason, who is
13  President Gettelfinger's executive assistant, and myself.
14  Q.  Now you also mentioned that there was a team working on
15  the VEBA.  Who was involved in that team?
16  A.  Our president, President Gettelfinger, our general
17  counsel, Dan Sherrick, and a team that was brought in from an
18  outside consultant named Lazard.  And there was some lawyers
19  from Clearly that was involved.  I'm not quite sure what their
20  role was.
21  Q.  Very important, I'm sure.
22  A.  Yeah.  It must have been.
23      THE COURT:  Was that a question?
24      MR. BROMLEY:  It's an aspirational statement, Your
25  Honor.

136

1  A.  And that was our VEBA team.  And we negotiated
2  simultaneously.
3  Q.  Mr. Curson, was the collective bargaining team and the
4  VEBA team talking to each other during this period?
5  A.  Certainly.  We talked about progress and where we were at
6  and where we needed to go.
7  Q.  So in connection with negotiation the collective
8  bargaining agreement, were you also concerned about the
9  negotiations with respect to the VEBA?
10  A.  Without a question.  Both components had to be there for
11  us to have an agreement.
12  Q.  Now, the VEBA relates to retiree medical benefits.  Why
13  are they important to the UAW?
14  A.  Well, again, it's our long term tradition that we have
15  always tried to take care of our retirees' health care.  Our
16  actives, we believe, would not endorse or ratify an agreement
17  that didn't provide a certain level of retiree health care
18  because each of our actives will one day be a retiree.  Those
19  benefits directly impact their own lives, their own futures.
20  Q.  So when the -- but the collective bargaining agreements
21  when they're brought out to the membership, I think you said
22  they're not voted on by the retirees, is that true?
23  A.  The retirees cannot vote on a collective bargaining
24  agreement.
25  Q.  But nevertheless, it's important for the 26,000 actives

137

**138**

1　that retirees are taken care of?
2　A. Without a question.
3　Q. Now you mentioned that you wouldn't have recommended
4　approval of a collective bargaining agreement if there wasn't
5　retiree medical benefits also taken care of. Now what do you
6　mean by that?
7　A. In the ratification process, the international executive
8　board also has to adopt the agreement before it's presented to
9　the membership. And in my own personal view, I don't
10　believe any member of our international union would have
11　recommended to the board or to the membership a ratification
12　vote of an agreement that did not provide a certain level of
13　benefits for our retired workers.
14　　　MR. ZAKIA: Your Honor, can I just ask for a point of
15　clarification from the Court?
16　　　THE COURT: Go ahead.
17　　　MR. ZAKIA: We'd make an objection to this testimony
18　to the extent it's being offered for the truth of any of the
19　matters asserted with regard to what his opinion is. To the
20　extent it's simply he's explaining his basis for his
21　recommendation, we don't object. But from the scope of the
22　testimony, it wasn't clear if he was offering -- 'cause in the
23　declaration, there's testimony about what would or would not
24　have happened and how others would or would not have reacted.
25　And we would object to his ability to testify as to what others

**139**

1　would have done.
2　　　THE COURT: All right.
3　　　MR. BROMLEY: Well, Your Honor, we think it's
4　appropriate that, in light of his forty years with the UAW,
5　that his view of what would happen is appropriate. And that's
6　all we're offering.
7　　　THE COURT: Well, to the extent he's in a position to
8　make a judgment as to what gets presented to the membership, he
9　certainly is competent to testify about how he thinks they
10　would react to any presentation because that's part of his
11　role. Now whether they would, in fact, react that way, I don't
12　think is really relevant. But it certainly is relevant as to
13　what he would propose.
14　Q. And, Mr. Curson, it is within the scope of your
15　responsibilities to recommend whether or not to take a
16　collective bargaining agreement to ratification?
17　A. Yes. And on that point on the recommendation, that's also
18　one of my responsibilities is to try to establish how our
19　membership will react to certain issues. There are some things
20　in collective bargaining we can't do that maybe we would like
21　to do because we know it would not get a ratification. Those
22　issues are discussed amongst the board and amongst President
23　Gettelfinger and his confidante. And this, clearly, it was one
24　of those issues. And none of us believed we could obtain a
25　ratification with agreement that did not provide that level of

**140**

1　benefit.
2　Q. So did there come a time in April of 2009 that an
3　agreement was reached, a tentative agreement, between the UAW
4　and Chrysler with respect to both the level of retiree benefits
5　and with respect to the collective bargaining agreements?
6　A. There was.
7　Q. And did the UAW leadership take that to the membership for
8　ratification?
9　A. We did.
10　Q. And were you involved in that?
11　A. I was.
12　Q. What particularly did you do in connection with that
13　ratification process?
14　A. Initially, I spoke -- as I said earlier, we bring in
15　leadership from -- elected leadership from any local in the
16　system and we present the agreement there first. I spoke at
17　that ratification -- at that leadership meeting. It's called a
18　National Chrysler Council. And I explained portions of the
19　agreement and took questions on the agreement. And then some
20　of the larger important locals -- during the ratification
21　process, I went to those locals and did the same for the
22　membership. I explained the agreement and took questions
23　before they vote to ratify or reject the tentative agreement.
24　Q. And which, in particular, locals did you go visit, do you
25　recall?

**141**

1　A. I did the Detroit axle location. And I did the Kokomo
2　complex locations.
3　Q. That's Kokomo, Indiana?
4　A. That is.
5　Q. And why did you pick those two?
6　A. Actually, I was asked to go to those two because they're a
7　volatile membership. In our business, we have a lot of outside
8　influences that use the internet anti-union influences. Kokomo
9　has websites and those types of things that were attacking the
10　agreement. So, again, in an effort for transparency, I went to
11　present those agreements as someone that was first-hand there
12　that knew the intent and the meanings of all the different
13　things that we negotiated and to answer any questions that
14　those members may have. And that's one of the reasons I went
15　to Kokomo.
16　Q. In your experience, with respect to all of the Big Three
17　collective bargaining agreements that you've been involved in,
18　has the union leadership ever taken to a membership vote
19　collective bargaining agreement that did not provide for
20　retiree medical benefits?
21　A. Never in the Big Three.
22　Q. And if the collective bargaining agreement here for
23　Chrysler was not ratified, what would have happened next?
24　A. If it was not ratified, there's a likelihood we would have
25　struck.

1  Q. Now, how -- with respect to the possibility of a strike,
2  is that the union's first choice or the last choice?
3  A. It's the last choice. It's if all else fails. Nobody
4  actually wins in a strike but it's the only piece of leverage
5  that we have left if we can't accomplish what we needed to
6  accomplish in negotiations. They are thought through
7  tremendously before we engage in a strike.
8  Q. In connection with the new collective bargaining
9  agreement, is there a provision that deals with strikes?
10  A. There is a provision that we cannot strike. That is true.
11  Q. And for how long does that no-strike provision last?
12  A. Until 2015.
13  Q. So that's six years?
14  A. That's six years, yes.
15  Q. And how often, in your experience at the UAW, has the UAW
16  agreed in a Big Three collective bargaining agreement to a six
17  year no-strike clause?
18  A. Never.
19  Q. So you'd say that that's an extraordinary concession on
20  the part of the UAW?
21  A. Very.
22  Q. Mr. Curson, in connection with the VEBA and the
23  obligations with respect to the VEBA of New Chrysler, did you
24  draft any of the documentation relating to that?
25  A. Did I --

                                                              142

1  Q. Did you draft any of the documentation relating to that?
2  A. I did not.
3  Q. And are you a lawyer?
4  A. I am not.
5  Q. Okay. What was your major concern in connection with
6  recommending the collective bargaining agreement as it related
7  to the VEBA?
8  A. The major concern was the level of benefits it provided
9  and the hardships that resulted in giving to our retirees.
10  Q. And, ultimately, you were told that the UAW was
11  comfortable with that?
12  A. Comfort's not a good word. We believed that it was a
13  necessary component both for the company to survive and for us
14  to get a ratification.
15  Q. And, ultimately, I think you mentioned there was a
16  ratification. Do you recall the percentages of voting in
17  favor?
18  A. It was somewhere around eighty percent.
19  Q. And this approval or ratification of the amended
20  collective bargaining agreement, was it happening on the
21  regularly scheduled renegotiation or was this a mid-term
22  modification, so to speak?
23  A. No. This was the mid-term modification. The actual 2007
24  agreement expires in September of 2011.
25  Q. And over the past four months, how much of your time has

                                                              143

1  been involved in renegotiating collective bargaining agreements
2  for Ford, Chrysler and GM?
3  A. Many, many hours. Almost exclusively seven days a week
4  since sometime in December.
5      MR. BROMLEY: Your Honor, we pass the witness.
6      THE COURT: All right. Any cross-examination?
7      MR. ZAKIA: Yes, Your Honor. Your Honor, Jason Zakia
8  of White & Case for the Indiana Pensioners. May I proceed?
9      THE COURT: Go ahead.
10      MR. ZAKIA: Thank you, Your Honor.
11      THE COURT: You're welcome.
12  CROSS-EXAMINATION
13  BY MR. ZAKIA:
14  Q. Mr. Curson, good afternoon. First, I just want to clarify
15  a couple of points from your direct examination. You testified
16  that there was a collective bargaining team and a VEBA team,
17  two separate teams for the UAW in their negotiations, right?
18  A. We were all one team with different responsibilities.
19  Q. And in order to accomplish those responsibilities, you
20  broke up into different groups for purposes of negotiating the
21  specific portions of the various agreements, right?
22  A. That is true.
23  Q. And your personal involvement centered on the collective
24  bargaining side rather than the VEBA side of the negotiations,
25  true?

                                                              144

1  A. My personal involvement -- yes, although we all
2  collectively kept track of where each other was and made
3  suggestions on certain issues. And so we interfaced
4  constantly. But the majority of our time was directed in two
5  different efforts, that is correct.
6  Q. But with respect to that interface, you interfaced
7  internally among the UAW --
8  A. Well, correct.
9  Q. Right.
10  A. Absolutely. That's correct.
11  Q. My question is focused with regard with meetings and
12  discussions that you personally had with third parties such as
13  Chrysler. You testified on direct examination about
14  negotiations that you entered into with Mr. Icabelli, I
15  believe, of Chrysler.
16  A. Yes. That is correct.
17  Q. And I just want to clarify that those discussions and
18  negotiations that you testified about in which you personally
19  participated, those were not related to the VEBA portion of the
20  agreements, correct?
21  A. That is correct.
22  Q. Okay. You personally did not participate in any
23  negotiations with Chrysler, the U.S. government, with anybody
24  with respect to the VEBA portion of the various agreements,
25  right?

                                                              145

1    A. I sat in actually two VEBA meetings that was just between
2 Chrysler and the UAW. And I sat in one meeting that -- where
3 VEBA was mentioned and it was a very huge meeting with all of
4 the key Fiat players, with the Treasury, with all the key
5 Chrysler players and with all the key UAW players. It was more
6 of a labor costing development. But VEBA was mentioned so I
7 don't want to mislead anybody. I was in that meeting. The
8 terms of the VEBA was not negotiated in that meeting at all.
9 But it was brought up a time or two.
10    Q. Okay. And I appreciate that, sir. Thank you. I just --
11 to be clear, if I understand your testimony, there were only
12 two meetings in which you personally participated with third
13 parties in which the issue of the VEBA was discussed.
14    A. That is correct.
15    Q. Okay. And at fifty percent of those meetings, the United
16 States government was, in fact, represented, right?
17    A. In the one meeting, they were there, yes. In the big
18 meeting, they were there.
19    Q. Right, which is one out of the two that you personally
20 participated.
21    A. That's correct.
22    Q. Thank you. Now, I'd like to also talk about some of your
23 testimony concerning a strike. You testified that absent an
24 agreement with respect to retiree health care, your
25 recommendation would have been that the union strike?

146

1    MR. BROMLEY: Objection, Your Honor.
2 Mischaracterizes his testimony.
3    THE COURT: That wasn't the testimony.
4    MR. ZAKIA: Okay.
5    THE COURT: It wasn't that it was his personal
6 recommendation.
7    Q. Well, let me ask you this. If there had not been an
8 agreement that you considered with respect to retiree health
9 care, would you have recommended a strike to the members?
10    A. I may have. There's more to it than a simple decision.
11 First, I would have definitely not recommended to our board
12 that we adopt that agreement to present to the membership. We
13 would have asked at that time for strike authorization which,
14 in order for us to call a strike, we have to go to our members
15 and take a strike vote. The majority of our membership under
16 that agreement has to give us permission. At that point, if we
17 get strike authorization, it gives us tremendous leverage and
18 we go back to whomever we're negotiating with and try to
19 negotiate again. All those steps would have had to have been
20 in place. If, at the end of that rainbow, if we couldn't -- if
21 we did not have an agreement, that the only offers that came
22 from Chrysler were an agreement without health care for our
23 retirees, yes, sir, I would have recommended that we strike.
24    Q. Okay. And let me break that up because I appreciate the
25 clarification and now I see where I went wrong on my last

147

1 question.
2    You testified on direct -- let me just ask it this way.
3 If there would not have been an acceptable agreement with
4 respect to retiree health care, your recommendation would have
5 been that the members not ratify the collective bargaining
6 agreement, right?
7    A. That is correct.
8    Q. Okay. And then I think --
9    A. I would have recommended that we not present it to the
10 membership.
11    Q. And if it weren't presented, it wouldn't have been
12 ratified.
13    A. That's correct.
14    Q. Okay. And I think you testified on direct that if there
15 had not been a new collective bargaining agreement that,
16 likely, the next step would have been a strike. Did I get that
17 right?
18    A. At the end of that long process, yes.
19    Q. Okay. And it's your understanding that if there had been
20 a strike at Chrysler, that could have forced the liquidation of
21 the company at that time, right?
22    A. That is correct.
23    Q. Okay. And I just want to be clear with respect to your
24 position at least, here as a senior member of the UAW, that you
25 would have been prepared to see a strike occur even if it

148

1 forced and ran the risk of forcing a liquidation of Chrysler,
2 right?
3    A. That is true because in the wings, we had 350,000 retirees
4 at General Motors that we knew that we would be negotiating
5 with. And behind them, another hundred thousand retirees at
6 Ford that we knew that we'd have to be dealing with. So we're
7 talking about a half million retirees, stripping their health
8 care from them. You're exactly right. We would have
9 recommended a strike at Chrysler to try to stop the bleeding.
10    Q. Right. And so, with respect to that -- I mean, we've
11 heard a lot -- and you're aware of a number of very negative
12 consequences that could follow from a liquidation of Chrysler,
13 right?
14    A. Without a doubt.
15    Q. Okay. And layoffs of, I think -- the 26,000 workers that
16 you talked about, were those Chrysler workers or is that --
17 that's just Chrysler UAW workers, right?
18    A. Those are Chrysler UAW-represented workers.
19    Q. Okay. And so they would have lost their jobs in a
20 strike -- or in a liquidation?
21    A. I can only assume that they would have, yes.
22    Q. Okay. And you're aware that suppliers, the economy --
23 there would have been negative consequences for all sorts of
24 different interest groups as a result of a liquidation, right?
25    MR. BROMLEY: Objection, Your Honor.

149

1      THE COURT: What's your objection?

2      MR. BROMLEY: He says -- he's asking for speculation.

3      MR. ZAKIA: Your Honor -- I'm sorry, Your Honor.

4      THE COURT: Go ahead.

5      MR. ZAKIA: Your Honor, the witness did testify on

6 direct with regard to recommendations that he or union

7 leadership would or would not have made. I'm just trying to

8 find out what the bases of those various recommendations would

9 have been and what information would or would not have been

10 considered. I'm trying to find out what's in his head when he

11 makes these decisions, not necessarily for the truth of what

12 these facts are.

13      THE WITNESS: Well, I'm comfortable answering that

14 question, Your Honor.

15      THE COURT: Your level of comfortability is not

16 really relevant. All right. He can answer the question.

17 A. We would only hope at that stage that a strike would bring

18 reality to the situation. And that whomever we were

19 negotiating with would realize that they would have to deliver

20 an agreement that provides health care for our retirees before

21 we would accept an agreement. Again, a strike is the very last

22 alternative but it's important to us, to our tradition and to a

23 million people that we represent that we prevail in providing

24 health care for our retired workers. We would have clearly

25 considered calling a strike if any agreement, any final

150

---

1 agreement came that didn't offer those benefits.

2 Q. It's a point of leverage, negotiating leverage for the

3 UAW.

4 A. It's a reality of leverage.

5 Q. A reality of leverage. And just to be clear, so if there

6 was not an agreement reached with respect to retiree health

7 care, in your view, with respect to your role, you would have

8 been prepared to recommend that the UAW use that leverage even

9 if it ran the risk of a liquidation of Chrysler regardless of

10 what other consequences may have followed from that to other

11 stakeholders, right?

12 A. I would have.

13 Q. Okay. Now, Mr. Curson, with respect to the

14 ratification -- you testified that the collective bargaining

15 agreement was ratified by the union membership, correct?

16 A. That is correct.

17 Q. And in connection with that ratification, the UAW

18 distributed information to its members concerning the terms of

19 that agreement, right?

20 A. We did.

21 Q. And you personally participated in the preparation of

22 those materials, right?

23 A. I did.

24      MR. ZAKIA: Okay. May I approach?

25      THE COURT: Go ahead.

151

---

1      MR. ZAKIA: Thank you. Counsel? Your Honor, may I

2 ask that Pensioners' Exhibit 11 be marked for identification?

3      THE COURT: All right.

4      MR. ZAKIA: Thank you.

5 (Pensioners' Exhibit 11, document prepared by UAW for

6 distribution to its membership relating to the CBA entered into

7 with Chrysler dated April 2009, was hereby marked for

8 identification as of this date.)

9 Q. Mr. Curson, I've handed you what's been marked for

10 identification as Pensioners' Exhibit 11. This is a document

11 that was prepared by the UAW for distribution to its members in

12 connection with the ratification process, right?

13 A. That is correct.

14 Q. Okay. And this was prepared by -- well, you were

15 responsible for overseeing the preparation of this document,

16 correct?

17 A. My responsibility is the final sign-off. As it's put

18 together, I -- when everybody else says it's completed -- a

19 number of experts are involved in preparing the actual pieces.

20 I go through it and make sure it's constitutionally and

21 contractually correct and then I sign off on it. And I'm the

22 final sign-off on this summary.

23 Q. And as the person with the final sign-off, it's important

24 to you that everything in this document be true and accurate,

25 right?

152

---

1 A. That is correct.

2 Q. And this document is meant to be distributed by the UAW to

3 tens of thousands of members, right?

4 A. That is correct.

5 Q. And when you prepare the document, it's your intent that

6 the document accurately and clearly reflect the truth, right?

7 A. That is true.

8 Q. Because the UAW wants to make sure that its workers have

9 an accurate understanding of the information that it's trying

10 to convey.

11 A. Yes, sir.

12 Q. And when you personally, as the person with the final

13 sign-off on this document, before you signed off on this

14 document that was distributed, you did what you could to make

15 sure that that was the case, right?

16 A. That is correct.

17 Q. Okay. And this document was prepared by people that work

18 for the UAW?

19 A. Yes. Our PR department and our international reps that

20 specialized in certain aspects of the agreement.

21 Q. Okay. And the document is dated April of 2009. It was

22 prepared in April of 2009, right?

23 A. That is correct.

24 Q. And the people that prepared that document for the UAW,

25 they knew what they were talking about when they wrote the

153

---

**VERITEXT REPORTING COMPANY**

212-267-6868                        516-608-2400

1 sections that they wrote, right?
2 A. Yes, sir.
3 Q. Okay. And they did that in the course of their business
4 for the UAW?
5 A. Yes, sir.
6 MR. ZAKIA: Your Honor, we'd offer at this
7 Pensioners' Exhibit 11 into evidence.
8 THE COURT: Any objection? None heard; so admitted.
9 MR. ZAKIA: Thank you.
10 (Pensioners' Exhibit 11, document prepared by UAW for
11 distribution to its membership relating to the CBA entered into
12 with Chrysler dated April 2009, was hereby received into
13 evidence as of this date.)
14 Q. Mr. Curson, I'd like to direct your attention just to two
15 quick sections of the document. On the first page, if you look
16 down, the last sentence of the fourth paragraph: "Fiat's
17 investment in Chrysler's operations and new U.S. jobs is
18 expected to exceed eight billion dollars." See that?
19 A. Yes, sir.
20 Q. Okay. I just want to clarify, that eight billion dollar
21 is a number that you were given by Chrysler, right?
22 A. Chrysler and Fiat offered that up, yes.
23 Q. Yeah. That's not the UAW's number?
24 A. No. We did no calculations on that number.
25 Q. And as you sit here today, you're not in any position to

154

1 tell me one way or the other whether that number is accurate or
2 inaccurate?
3 A. I cannot.
4 Q. If you'll turn, please, to page 8 of the document --
5 there's the Bates number, UAW-50 --
6 A. Okay.
7 Q. -- it's entitled "Addendum Voluntary Employee Benefit
8 Association Agreement"?
9 A. Yes, sir.
10 Q. Okay. And the purpose of this page of the document was to
11 inform union members about the terms on which changes were
12 being made to the VEBA agreement?
13 A. That is correct.
14 Q. Okay. And I think you testified on direct examination
15 that those changes were an extraordinary concession on the part
16 of the UAW.
17 A. The -- I think that was on the first VEBA in 2007. But,
18 yes, it is both there and here an extraordinary concession.
19 Q. Okay. So in your view, the changes made in connection
20 with these negotiations to the VEBA was a concession on the
21 part of the UAW?
22 A. That is correct.
23 Q. Okay.
24 Q. And part of that involved a restructuring of Chrysler's
25 payment obligations to the VEBA, right?

155

1 A. Yes, sir.
2 Q. Okay. And if you look in the second section entitled
3 "Tentative Agreement Restructures Future VEBA Funding
4 Obligations", do you see that?
5 A. I do.
6 Q. Is the purpose of that section to give the UAW members who
7 would be receiving this document an accurate and clear, and I
8 think your word was transparent, understanding of what the
9 terms of that agreement were?
10 A. That is correct.
11 Q. Okay. Now, sir, I understand that you are not a lawyer.
12 I understand that you did not come up with these numbers. What
13 I'm going to -- I'm just going to ask you a few questions about
14 what this document for which you were the final sign-off says
15 and what it communicated to the members. Okay? And in that
16 connection, I want to direct your attention to the first
17 paragraph of that section. It says that there would be a new
18 5.87 [sic] billion dollar note. Do you see that?
19 A. A new 4.587 --
20 Q. Sorry. 4.587 --
21 A. -- billion dollar note.
22 Q. -- billion note.
23 A. Yes. I do see that.
24 Q. Okay. And then it says, the second paragraph, "VEBA to
25 own significant stock".

156

1 A. I see that.
2 Q. Okay. And in that section, it identifies -- it says that
3 "VEBA will receive fifty-five percent of the stock in
4 restructured Chrysler." Do you see that?
5 A. I do.
6 Q. Okay. And these are the two, at least as identified in
7 this document, these are two things of value that VEBA would be
8 receiving in consideration for the concessions that it was
9 making with respect to the pre-existing VEBA payment
10 obligations, right?
11 A. These are the terms of the new VEBA. I don't know how you
12 characterize them as -- this is different -- a different
13 payment structure than the original VEBA, I do know that. But
14 I don't know what the resulting terminology to use. This
15 wasn't more concessions or less concessions. This was the
16 payment schedule to get to this level of benefits that was
17 accepted by our bargaining team.
18 Q. I just want to make sure I understand. I mean, it was
19 your understanding that VEBA was making concessions -- sorry --
20 that concessions were being made with respect to the VEBA
21 obligation, right?
22 A. I can say that the concessions was the delivery of health
23 care to our retired members. We no longer -- the new VEBA
24 being negotiated no longer could fund the health care we
25 provided in 2007 VEBA. So there wasn't enough money to

157

**158**

1  continue those same health care obligations.  The concessions,
2  as I refer to our concessions, are the health care that no
3  longer is being provided under this agreement that was provided
4  under the previous agreement.
5  Q.  Okay.
6  A.  The funding isn't an issue to me how we get there or how
7  it got there.  It's the final result of what it can deliver.
8  Q.  No.  I appreciate that, sir.  I just want to clarify.  I
9  mean, it is your understanding that the reason that the levels
10  of health care that were going to be provided under the
11  renegotiated agreement were because Chrysler didn't have
12  sufficient funding to fund at the old levels, right?
13  A.  That Chrysler could not -- right -- could not fund the
14  VEBA to the levels to provide those -- that level of
15  benefits --
16  Q.  Okay.  And --
17  A.  -- that is correct.
18  Q.  And so, Chrysler was asking the UAW to restructure the way
19  in which that obligation was going to be met by Chrysler,
20  right?
21  A.  Chrysler asked to restructure to what they could afford.
22  Q.  Okay.  And that's the concession that you were referring
23  to on your direct examination?  That's one of the concessions?
24  A.  The concession, again, that I referred to is a delivery of
25  benefits to my members.

**159**

1  Q.  And you do appreciate the fact that there is a connection
2  between the amount of funding from Chrysler and the amount of
3  benefits that can be provided to the members, right?
4  A.  The amount of funding and the performance, yes, of the
5  funding.
6  Q.  Okay.  And I'm not asking you to calculate what those
7  levels were.  I just want to make clear that there is a
8  connection --
9  A.  Because I wouldn't know.
10  Q.  And that's fine.  Either would I.  But I just want to make
11  clear you're aware that there is a connection between the
12  money coming in from Chrysler on the one end and the benefits
13  that you testified about coming out on the other.
14  A.  Absolutely.  I understand that.
15  Q.  Okay.  And with respect, if we look at the words written
16  on this page, if you look at the second paragraph, "VEBA to Own
17  Significant Stock", I'll just read the first two sentences:
18  "Another requirement of the Treasury Department loans was that
19  half of the value received by the VEBA be in the form of stock.
20  To meet that requirement, the VEBA will receive fifty-five
21  percent of the stock restructured in Chrysler."  Do you see
22  that?
23  A.  I do see that.
24  Q.  Okay.  And the purpose of this paragraph would convey to
25  the union members that receive this document that one-half of

**160**

1  the value to be received by the VEBA was in the form of stock
2  and one-half was in the form of the note that was mentioned in
3  the first paragraph, right?
4      MR. BROMLEY:  Objection, Your Honor.
5      THE COURT:  What's your objection?  Excuse me.
6      MR. BROMLEY:  Well, I guess my objection is to
7  reading this document out loud and having the witness confirm
8  or deny every single statement in it.  He's already stated --
9  it's admitted into evidence.  We haven't contested that.  He's
10  already said that he read it.  He was responsible for it.  He
11  believes it's true and correct.  I mean, what we're trying to
12  do here is to actually reorganize to get this company out of
13  bankruptcy quickly and to move this fast.  And we're sitting
14  here today going through and reading documents out loud.  I
15  think the document speaks for itself.
16      MR. ZAKIA:  All right.  If I could briefly?
17      THE COURT:  Go ahead.  Respond.
18      MR. ZAKIA:  Your Honor, just to respond on the time
19  point, I do not believe that I've taken unduly long with the
20  witness.  I'm almost done with the witness.  So I don't know
21  that --
22      THE COURT:  All right.  But what's the point of the
23  line of questioning?
24      MR. ZAKIA:  Well, Your Honor, the witness was offered
25  by the UAW to testify.

**161**

1      THE COURT:  No.  What's the point of your line of
2  questioning in this regard?
3      MR. ZAKIA:  Oh.  With respect to this, I'm trying to
4  determine, as shown in this document, what concession.  The
5  witness testified about concessions.  I'm trying to determine
6  what two of the elements that the UAW or the VEBA received in
7  exchange for those concessions so that we can determine if the
8  witness is talking about the effects of changes to the
9  agreement and whether or not if this had been removed there
10  would have been a strike that could have caused the liquidation
11  of the company.  I'm just trying to explore the different
12  elements of that testimony.
13      THE COURT:  All right.  Go ahead for a little while.
14  I think it's pretty evident from what he said already.
15      MR. ZAKIA:  And I agree with that, Your Honor.  I
16  just want to be clear because there's been some dispute, I
17  believe, on this point.  And I have -- this could be my last
18  question if I have this right.
19  Q.  And sir, we went through this with your deposition and I
20  just want to make sure the way you read this document, and I
21  understand you didn't write the underlying agreement so I'm
22  just talking about what was communicated to the members as this
23  document.  Would be that the total value to be received by the
24  VEBA, under the terms of this agreement; would be two times the
25  value of the 4.587 billion dollar note, that's what this

1　document said to the UAW members, right?
2　A.　That is correct.
3　Q.　And that would be just over nine billion dollars?
4　A.　If you do the math that would be just over nine million --
5　nine billion dollars.
6　Q.　Thank you very much, Mr. Curson.
7　　　MR. ZAKIA:　Your Honor, no further questions.
8　(Pause)
9　　　MR. LERNER:　Good afternoon, Your Honor.　Stephen
10　Lerner of Squire Sanders & Dempsey on behalf of the committee
11　of Chrysler affected dealers.
12　CROSS-EXAMINATION
13　BY MR. LERNER:
14　Q.　Good afternoon, Mr. Curson.
15　A.　Good afternoon.
16　Q.　I represent a committee which is supported by over 340
17　dealers that Chrysler is seeking to reject.　You testified on
18　direct examination that you participated, I think, in every Big
19　Three CBA negotiation since the early 1980s, is that right?
20　A.　That is correct.
21　Q.　Okay.　And about how many negotiations would that
22　encompass, would you say?
23　A.　With every three years and then it went to every four
24　years; it's at least a dozen.
25　Q.　Okay.　And I believe you testified that there were certain

162

1　aspects of this particular negotiation to modify the 2007 CBA
2　and to deal with the VEBA issues that were unique, is that
3　right?
4　A.　That is correct.
5　Q.　Okay.　And one of the things that was unique was the
6　contracting away the right to strike for a lengthy period of
7　time?
8　A.　That is correct.
9　Q.　Okay.　And one of the other things that was unique was the
10　modification of the VEBA, is that correct?
11　A.　The VEBA itself, yes.
12　　　MR. ZAKIA:　Excuse me.　I'd just like to interpose an
13　objection.　Mr. Lerner said that he represents or is supported
14　by over 300 members.　I believe the amended 2019 had been filed
15　as only seven members for the record, Your Honor.
16　　　MR. LERNER:　Your Honor, I chose my words carefully.
17　Our amended 2019 statement is correct; there are seven members
18　of our committee.　The committee is supported; they're not
19　members of the committee, by over 340 dealers who have
20　contributed to the financial support of the committee.　We are
21　representing the collective interests of --
22　　　THE COURT:　If they contributed to the financial
23　support of the committee they're supposed to be named in a
24　2019.
25　　　MR. LERNER:　Your Honor, the structure of the

163

1　committee, like an official committee although we're not,
2　although we did request the same from the Office of the United
3　States Trustee which was denied, is that it's --
4　administratively it's unworkable to have a client base of 340.
5　We are happy, if it's deemed relevant, to consider the others
6　as members.　We have identified, by the way.　I mean, we've
7　listed them in every pleading that we filed there's an exhibit
8　which identifies all 340 or so --
9　　　THE COURT:　You should amend the 2019.
10　　　MR. LERNER:　Okay.
11　　　THE COURT:　Before you can stand and represent that
12　they're part of your group or if not part of your group they
13　support it.
14　　　MR. LERNER:　That's fair.　We have not tried to hide
15　any.　As I've said, we've identified every single person who is
16　supporting the committee's effort.
17　　　MR. ORR:　Just for the record, Your Honor, they're
18　not on the 2019.
19　　　THE COURT:　All right.　Go ahead.
20　BY MR. LERNER:
21　Q.　Mr. Curson, I was asking you about some of the unique
22　features of this particular negotiation.　Has it ever been the
23　case in any of your negotiations with the UAW that the
24　negotiation was with the backdrop of a bankruptcy filing and a
25　sale to another party in your experience?

164

1　A.　In the Big Three?
2　Q.　Yes.
3　Q.　No.
4　Q.　Okay.　And is it fair to say that, as part of any prior
5　negotiation in which you were involved that, as part of the
6　negotiation the outcome would involve an equity stake to be
7　held by the UAW in the company?
8　A.　That's not my expertise and so I don't know that part of
9　the involvement in any other negotiations.　To my knowledge,
10　no.
11　Q.　Okay.　So in all of the negotiations in which you've
12　personally participated the outcome did not include the UAW or
13　retirees or anyone on whose behalf the UAW is negotiating
14　receiving equity in the entity with which you're bargaining?
15　A.　I don't believe so.
16　Q.　Okay.　Is it fair to say that in the absence of the Fiat
17　transaction and the proposed sale, that the modifications to
18　the CBA and to the VEBA would not have been conducted?
19　A.　I don't know that.　Absent Fiat participation?
20　Q.　Absent the proposed sale.　Meaning that this proposed --
21　the modifications which you negotiated to both the CBA and the
22　VEBA were negotiated specifically in the context of the
23　proposed Fiat transaction.
24　A.　I don't know that to be true.
25　Q.　Well, let me refer you to the exhibit that other counsel

165

**166**

1   showed you, the Pensioners' Exhibit 11, that's the document
2   that's entitled UAW Chrysler and it's a message to UAW Chrysler
3   workers.
4   A. Yeah.
5   Q. Okay. Doesn't it say in the third paragraph --
6   A. Which pages, first?
7   Q. Of the first page; sorry. That "In April 2009 Chrysler
8   and Fiat reached a partnership agreement in exchange for an
9   initial twenty percent equity stake in Chrysler. Fiat has
10   agreed to share all its product platforms," and it goes on to
11   describe the particular Fiat transaction that the Court is
12   being asked to approve, is that correct?
13   A. Yes, it does.
14   Q. Okay. And that if you turn to page 4 of the document
15   there's a box in the upper right-hand corner that's entitled
16   Fiat Investment and Product Commitment, do you see that?
17   A. Yes, I do.
18   Q. Okay. And the first sentence there says, "Your UAW
19   leadership has been in intense negotiations with
20   representatives of Fiat and Chrysler over the past several
21   months to arrive at a partnership agreement that will secure
22   Chrysler's long-term viability." Do you see that?
23   A. I do.
24   Q. Okay. Are you one of the people that is encompassed by
25   your UAW leadership?

**167**

1   A. I am.
2   Q. Okay. And so doesn't this reflect the fact that the
3   particular transaction and modifications from which you are
4   seeking ratification of your members was specifically in
5   connection with the Fiat transaction in which you intensely
6   negotiated for several months?
7   A. It is a result of having a collective bargaining
8   agreement. I couldn't say that if Fiat wasn't a player that
9   name wouldn't be replaced with Nissan or General Motors or some
10   other suitor. This is just reflecting the reality of this
11   agreement.
12   Q. Okay. So it was the context, however, of a sale. You're
13   saying that --
14   A. It's in the context of explaining to our members exactly
15   what happened.
16   Q. Okay. And clearly the modifications to the VEBA that
17   resulted were purely unique to this transaction because of the
18   stock, for example, that the VEBA will hold, is that correct?
19   A. I can't say that. I don't know.
20   Q. Okay. And you say that because you didn't negotiate --
21   you weren't involved in the VEBA negotiation?
22   A. I can say that -- yeah, I can say I don't know -- I know
23   that absent the level of benefits being provided there would
24   have been no collective bargaining agreement, if that's what
25   you mean.

**168**

1   Q. No, what I mean is that you understand that the VEBA
2   portion of the transaction is the conversion of obligations by
3   Old Chrysler to the VEBA into fifty-five percent of the stock
4   of New Chrysler and a 4.6 plus billion dollar note, right?
5   A. I do know that's the reality of what happened but I also
6   can say had the health care been funded by some other vehicle,
7   I don't know that that fifty-five percent was important, is
8   important. If that's -- how it gets there isn't -- isn't our
9   interest. Our interest is at the end of the line when we sign
10   on the dotted line and put in a collective bargaining agreement
11   that that agreement provides a level of benefits to our retired
12   workers.
13   Q. I see.
14   A. I don't know about all those vehicles, how it's paid for
15   if you cashed back or whatever you did.
16   Q. Okay. So you don't know how we got to where we are today
17   with the transaction but you do understand the transaction the
18   way I described it with the note and the stock?
19   A. I do understand there is a portion of stock in the
20   transaction, yes.
21   Q. Okay. If you would turn, please, to page 8 and that's the
22   addendum to the voluntary employee beneficiary association
23   agreement.
24   A. Okay.
25   Q. Do you see that?

**169**

1   A. Yeah.
2   Q. Okay. And the second large heading is Tentative Agreement
3   Restructures Future of VEBA Funding Obligations.
4   A. Okay.
5   Q. Okay. And then the third paragraph down, it's just two
6   sentences in the paragraph, "The VEBA will have the right to
7   designate a member of Chrysler's board of directors with UAW
8   consent." Do you see that?
9   A. I do.
10   Q. Okay. Do you know of any other situation in which the UAW
11   was permitted to designate a member of a board of directors of
12   a company with which it has a collective bargaining agreement?
13   A. We sat on the board with DaimlerChrysler. Yes, there are
14   some companies that we have either seats on the boards or
15   designates to the board. None of the Big Three, though.
16   Q. Okay.
17   A. Other than the former Chrysler board.
18   Q. Okay.
19       MR. LERNER: I have nothing further, Your Honor.
20       THE COURT: All right. Thank you. Anyone else?
21       MS. BALL: Yes, Your Honor.
22   CROSS-EXAMINATION
23   BY MS. BALL:
24   Q. Good afternoon, Mr. Curson.
25   A. Good afternoon.

**170**

1  Q. I'm Corrine Ball representing Chrysler in these matters.
2  Mr. Curson, did there come a time when President Gettelfinger
3  testified before the Senate Finance Committee?
4  A. There was in December of 2008.
5  Q. Did President Gettelfinger also testify before the House
6  Banking Committee?
7  A. He did, in the same month.
8  Q. Do you know if during that testimony President
9  Gettelfinger expressed the commitment of the UAW to work with
10  the Detroit Big Three?
11  A. He did.
12  Q. Are you aware that Chrysler first obtained a loan from the
13  U.S. Treasury in January of 2009?
14  A. I am.
15  Q. Are you aware that that loan required Chrysler to submit a
16  plan to the U.S. Treasury on February 17, 2009?
17  A. I do.
18  Q. Are you also aware that that loan agreement required
19  Chrysler and the UAW to agree on labor modifications as part of
20  that February 17th plan?
21  A. It actually required Chrysler to provide a labor agreement
22  that was competitive. There was no requirement on the UAW to
23  participate. The requirement was on Chrysler to provide a
24  labor agreement that was competitive with the transplants.
25  Q. So are you aware that Chrysler initiated discussions with

**171**

1  the UAW shortly after obtaining that loan?
2  A. Very aware.
3  Q. And that was before you ever heard of Fiat?
4  A. That was.
5  Q. Mr. Curson, do the UAW members also enjoy a defined
6  benefit pension plan with Chrysler?
7  A. They do.
8  Q. What's going to happen to that plan under the proposed
9  Fiat transaction?
10  A. It will remain intact.
11  Q. Do you have any understanding that if that plan were to be
12  terminated in a Chrysler liquidation what might happen to your
13  workers or the claim that might arise?
14  A. We do.
15  Q. And what is that understanding?
16  A. That -- that the pension would be transferred to the
17  government held pension plan.
18  Q. The PBGC do you mean?
19  A. That is correct.
20  Q. Do you have any idea of how big a claim they might have as
21  a result of a Chrysler liquidation?
22  A. I can't quote that claim. I know it would be large.
23  Q. Would you think it would be close to ten billion?
24  A. I don't know the amount; I just know it would be large.
25  Q. Thank you, Mr. Curson.

**172**

1  THE COURT: Anyone else? All right. I have one
2  question then before -- will there be redirect? I just want to
3  ask this question before.
4  MR. BROMLEY: Sure. Absolutely.
5  THE COURT: Okay. Going back to page 8 and the
6  reference to the new 4.587 billion dollar note.
7  THE WITNESS: Yes, sir.
8  THE COURT: Do you know whether there's interest on
9  that note? If you don't --
10  THE WITNESS: I know that -- I don't know. To answer
11  the question, I don't know.
12  THE COURT: Okay. Thank you.
13  MR. BROMLEY: I just have one or two questions.
14  THE COURT: Go ahead.
15  REDIRECT EXAMINATION
16  BY MR. BROMLEY:
17  Q. Mr. Curson, at the time that the collective bargaining
18  agreement was taken to the membership for ratification did you
19  know that Chrysler was going to file for Chapter 11?
20  A. I did not.
21  MR. BROMLEY: Thank you, Your Honor. That's it.
22  THE COURT: Any recross?
23  MR. ZAKIA: No, Your Honor.
24  THE COURT: All right. Thank you. The witness may
25  step down. Thank you.

**173**

1  THE WITNESS: Thank you.
2  THE COURT: You're welcome. Before we take a break
3  for lunch just give me an idea of how we're proceeding this
4  afternoon from the debtor's standpoint in presenting the case.
5  MR. CULLEN: Yes, Your Honor. We're going to be
6  putting on Mr. Nardelli directly after lunch and then Mr.
7  Grady.
8  THE COURT: All right. And then what?
9  MR. CULLEN: And then I think we're going to move in
10  some -- there are cross deposition designations that we're
11  going to attempt to move in. I think that we're going to
12  discuss at that point whether and at what time Mr. Lauria wants
13  Mr. Kolka but I think they've designated his entire deposition
14  now, along with some others.
15  THE COURT: Now, I'm under the impression that Mr.
16  Lauria still wants an opportunity to cross examine Mr. Kolka,
17  is that correct?
18  MR. LAURIA: Yes.
19  THE COURT: All right. He should be available
20  tonight if we get there.
21  MR. LAURIA: All right.
22  THE COURT: All right. And I anticipate going to at
23  least 10:00, or maybe longer, to get as much of this done as
24  possible.
25  MR. CULLEN: Yes, Your Honor.

| | |
|---|---|

**Page 174**

```
 1        THE COURT:  All right.  Thank you.  Come back and
 2   2:15 and we'll reconvene at that time.
 3        (Recess from 1:15 p.m. until 2:18 p.m.)
 4        THE COURT:  Please be seated.  All right.
 5        MR. ARMSTRONG:  Mr. Nardelli, good afternoon.
 6        MR. NARDELLI:  Good afternoon.
 7        MR. ARMSTRONG:  Could you state your full name for
 8   the record and if you could just pull the -- get up closer to
 9   the mic for us.
10        THE COURT:  All right.  I'm also going to have to
11   swear him in first.
12        (Witness duly sworn)
13   DIRECT EXAMINATION
14   BY MR. ARMSTRONG:
15   Q.  Okay.  Good afternoon.
16   A.  Good afternoon.
17   Q.  Can you state your full name for the record?
18   A.  It's Robert L. Nardelli.
19   Q.  And who do you work for?
20   A.  Chrysler LLC.
21   Q.  And what's your title?
22   A.  Chairman and CEO.
23   Q.  When did you join Chrysler?
24   A.  In August of 2007.
25   Q.  And have you worked at Chrysler steadily since that date?
```
174

**Page 175**

```
 1   A.  Yes, I have.
 2   Q.  And have your responsibilities for the most part, just in
 3   a general way, remained pretty much the same?
 4   A.  Yes, they have.
 5   Q.  Can you give us just a little flavor, a little idea of
 6   what you do for Chrysler?
 7   A.  Well as the chairman and CEO my role is to provide
 8   strategic direction, chair the board and provide operational
 9   direction for the company working with the office of the
10   chairman.
11   Q.  Okay.  And the last -- you mentioned an office of the
12   chairman, what is that?
13   A.  The office of the chairman is a structure that we put in
14   place back in August of '07 because we thought it would be a
15   very effective way to try and run the company.  It's made up of
16   four of us, primarily Tom LaSorda, who is a vice-chairman and
17   president.  Tom was the prior CEO of Chrysler when it was part
18   of the Daimler Corporation.  And Tom brought a tremendous
19   amount of continuity and experience and knowledge of Chrysler
20   had tremendous loyal following within the organization and so
21   he had all of the operational responsibilities, mergers,
22   acquisitions, so forth.
23   Q.  And he was on right from the beginning?
24   A.  He was there at the beginning.
25   Q.  And who else?
```
175

**Page 176**

```
 1   A.  And then we hired, recruited and hired, a gentleman by the
 2   name of Jim Press (ph.).  Jim has -- previous to this was, I
 3   think over thirty years with Toyota and was really attributed
 4   with the success Toyota has had here in the United States.  So
 5   we reached out to Jim because of his tremendous relationship
 6   with the dealers, highly regarded, respected marketing and
 7   sales experience.
 8        And then the fourth person in that organization was Ron
 9   Kolka who, again, was there at the time and served as our chief
10   financial officer.
11   Q.  And what is the function of the office of the chairman?
12   A.  Well, the office of the chairman provides, again,
13   oversight and direction both at a strategic and operational
14   basis.  We would put together, working obviously with a lot of
15   members of the staff, our annual operating plan.  We'd put
16   together our three year strategic plan.  We would have a formal
17   review on product development, capital expenditures, human
18   resource issues, basically many of the strategic directions and
19   decisions that had to be made we'd come together in a
20   formalized manner to review those proposals from members of the
21   staff --
22   Q.  Okay.
23   A.  -- and then render an opinion.
24   Q.  And you say render an opinion, render an opinion to whom?
25   A.  Well, two ways really.  We would provide feedback to, you
```
176

**Page 177**

```
 1   know, the individuals at the functional level presenting
 2   whatever -- whatever the topic might be.  And then we would
 3   present to the board of directors.
 4   Q.  And what is the function of the board of directors?
 5   A.  Well, the board of directors has an overall fiduciary
 6   responsibility to review matters that relate to Chrysler LLC,
 7   certainly to ask questions to make sure that they have good
 8   transparency to the issues.  And then, I think as the records
 9   would show, proposals would be put forth, resolutions and they
10   would vote upon them.
11   Q.  And over the course of time that you've been CEO and
12   you've dealt with your board, can you describe for us your
13   confidence level in them?
14   A.  I have a tremendous amount of confidence in our board.  It
15   has a number of individuals with really some tremendous
16   experience, both in the auto industry and finance industry,
17   etcetera.  So over the course of -- from August '07 certainly
18   to date I've gotten to know them better and we really function,
19   I think, extremely well as a board.  They've been very
20   supportive, very accommodating.  Certainly the five to six
21   months with the number and the frequency of meetings we've had
22   to call.
23   Q.  And very engaged at all times and solicitous of different
24   information, is that fair?
25   A.  Yeah, I think that would be a fair statement.
```
177

1    Q.  Okay.  And so you get to Chrysler in August of 2007; can
2    you give us some sort of idea of what's going on at the company
3    at that time in terms of financial health, products on the
4    horizon.  Did you do any sort of assessment?
5    A.  Yeah.  I think, you know, having -- having done this
6    probably thirteen times before in my career that you develop a
7    little bit of a pattern.  I think it was really an exciting
8    time for Chrysler.  It was the first independent car company,
9    privately held car company in fifty years.  I think there was a
10   lot of excitement about the independence as a result of the
11   separation from Daimler to really regain that independence,
12   that identity, reestablishing the pentastar as one of the
13   logos, one of the iconic brands within the auto industry.
14       And then set about, for me, going through -- I have this
15   process I call new manager assimilation where I spend an
16   extensive amount of time with each member of my staff.  We go
17   through a process of what do you know about me, what do I know
18   about them.
19   Q.  Uh-huh.
20   A.  Then we went through a financial review, where are we as a
21   result of the de-merger; where do we stand relative to our
22   product line; where do we stand relative to our operational
23   issues, our challenges.  Really going down the entire list of
24   what normal businesses -- what a normal business person would
25   review.

1    Q.  And as a result of that assessment did you formulate or
2    implement any sort of business plans?
3    A.  We did.
4    Q.  What'd you do?
5    A.  Well first of all there was in -- in 2007 there was a pro
6    forma developed as part of the separation and acquisition.
7    That was done by Cerberus and Daimler, the eighty and twenty
8    percent owners.  So there was a pro forma that was in place.
9        We looked at the day-to-day operations.  We looked at
10   where we were strategically against that pro forma and
11   determined our ability to basically implement and deliver on
12   those commitments.
13   Q.  So if I could stop you there for a second.  So by pro
14   forma you mean projections in a variety?
15   A.  Yeah, it would be a standard financial pro forma.  It had
16   both quantitative and qualitative objectives in it.
17   Q.  Okay.  And it covered what period of time?  Is it the stub
18   period, the August 2007 to December 2007 period?
19   A.  Yeah, that's primarily what we were focused on when we
20   took over as to, you know, what were the commitment that were
21   made and our ability to deliver on those commitments, certainly
22   through August -- August through December of '07 and then there
23   were projections going forward.
24   Q.  Did you implement any -- you said before that you assessed
25   the product line; did you come to any conclusions as to what

1    you should do in the future with respect to the product line?
2    A.  Well, as we looked at it, again, we knew that there were
3    some holes in the product line relative to the total lineup.
4    Holes meaning we didn't have some critical product platforms.
5    Certainly if you looked at the smaller platforms, what we would
6    call A, Bs and Cs, it's the smaller, compact, mini-type
7    vehicles that you might be familiar with.  Part of that was the
8    result of the de-merger.  There were vehicles, you know,
9    basically that were part of a combined that as a result of the
10   de-merger were no longer there.
11       So we looked at that.  We looked at where we were on
12   quality.  We quickly -- one of the first things I and the staff
13   did is we made -- reviewed the product quality.  I think we
14   approved, I don't know, something like 4- or 500 line items at
15   the proving grounds one day because we wanted to quickly
16   reestablish a quality image, a reliability, a durability image
17   with our customers because it was woefully absent if you looked
18   at JD Powers or Consumer Report.  We knew that we had to really
19   focus on that.  We knew we had to reestablish our brand.  We
20   had to reestablish our product quality, our customer loyalty as
21   we moved forward.
22   Q.  And did you try to address those issues in the second half
23   of 2007?
24   A.  We did.
25   Q.  And how did that -- your actual performance against the

1    projections, how'd you guys do?
2    A.  Well, I think the team did very well considering the
3    trauma that they had been through of -- earlier in that year
4    all options were put on the table.  There was a tremendous
5    amount of due diligence that went on at the headquarters and
6    around, a lot of people going through a lot of questions.  So
7    all those things could have caused a lot of distraction but
8    quite honestly we met or exceeded all of the targets that were
9    put in place, including we repaid the first lien debt holders
10   three billion dollars in that first year.
11   Q.  Okay.  And as 2007 came to a close did you and your team
12   start to assess what 2007 might look like?
13   A.  We did.  And again, I was relatively new to the business,
14   to the auto industry, but I've been blessed to be in a variety
15   of different industries so you tend, again, to develop a level
16   of questions and indices that you use as indicators for the
17   future.  So for me, I saw some real storm clouds on the
18   horizon.
19   Q.  Like what?
20   A.  Well, we started to see housing starting to pull back.  We
21   started to see a dip in consumer confidence.  We started to see
22   some unemployment numbers.  So if you look at some of the major
23   indicators out there, for me in looking at the correlation of
24   those against the SAR level, which is the seasonally adjusted
25   auto rate number that we use in the U.S., I felt very strongly

**182**

1  that we should break from the traditional every year is going
2  to be bigger than the last year.
3  Q. Right.
4  A. And we were coming off a SAR level of sixteen, seventeen
5  million units in the U.S. So you can imagine, as a new guy, I
6  got a lot of pushback. I said I really think it's going to be
7  more like 15.5 million units. And we were the most aggressive,
8  meaning on the conservative side.
9  Q. Conservative side with respect to projections about SAR?
10  A. Yes.
11  Q. Okay.
12  A. Yeah. So a lot of the -- a lot of the other auto
13  manufacturers in Detroit were still using 16, 16.5, 16.7 but in
14  November we put together a plan based on a 15.5, kind of a hold
15  share strategy because we knew we had some product gaps. And
16  so we didn't have -- we felt we wouldn't have any pricing
17  authority, again looking into 2008. And I think, quite
18  honestly, it served us well because we immediately set about
19  some restructuring. We eliminated some nameplates early on in
20  the process.
21  Q. And by that you mean?
22  A. We eliminated some brands, some nameplates like Pacifica,
23  for example, was one of the vehicles that we eliminated. And
24  as we went through the balance of November, December put
25  together and started to implement some pretty aggressive plans.

**183**

1  Now one of the things I like to do is to make sure that
2  our exit rate of the year matches the requirements of the
3  entrance rate for 2008. So if you had to take fixed cost out -
4  -
5  Q. Right.
6  A. -- I wanted to really go through the reductions in '07 and
7  get a jump on this for '08 rather than lag or linger going into
8  '08 because it's always gut wrenching decisions. These are
9  always tough decisions to make.
10  So we started a rigor. We had this RTP, return to
11  profitability, ever Monday. We'd meet for four to six hours,
12  each of the functional heads. We'd go through a room like
13  this, standup meeting. We'd go around the wall and look at
14  each of the metrics to make sure that we were adhering to the
15  plan or if not what did we have to do to get there.
16  Q. Right. And so you were forecasting that it wasn't going
17  to be such a rosy year in 2008, fair?
18  A. Yeah. We knew, again -- I think the term I like is we saw
19  some storm clouds on the horizon.
20  Q. And then you -- were you proactive about implementing
21  specifically cost-cutting mechanisms?
22  A. Yes. We were very aggressive on that.
23  Q. And how did that -- now, just take us through 2008, how
24  did you make out?
25  A. Well, interestingly through the first half of 2008 I think

**184**

1  setting a very conservative plan and having a very aggressive
2  implementation of that plan served us well. We, again, through
3  the first half I should say that we were meeting or beating all
4  of those -- all of the metrics. And that plan was presented to
5  the board in late 2007, obviously we do every year is present
6  an operating plan to the board. They approve the operating
7  plan. By charter they have to approve the overall capital
8  expenditure levels.
9  Q. Right.
10  A. And then if there's any deviation from that we have to go
11  back to the board and approve it, get approval. So through the
12  first half, quite honestly, in spite of the downward pressure
13  we saw in the economy, the downward pressure we saw in the auto
14  industry we were still performing fairly well against that plan
15  and we were somewhere around nine plus billion dollars in cash
16  after we had paid three billion dollars back to the first lien
17  lenders.
18  Q. So then what wound up happening in 2008 --
19  A. Well --
20  Q. -- turning that around?
21  A. Well, I fast forward, and the roof fell in or the bottom
22  fell in. Either way it was almost like somebody flipped a
23  switch. And I think if you look back on it we saw -- we saw
24  tremendous downward pressure in the economy. We saw housing
25  starts, we saw mortgage defaults, we saw a financial meltdown

**185**

1  relative to the ability to get liquidity. We saw an industry
2  that was going from seventeen million units a year on its way
3  down to thirteen, twelve. And of course now we're looking at
4  ten something with a build rate of nine. So we --
5  Q. This is all -- excuse me, this is all during what period
6  of time?
7  A. It really -- it really started to happen at an
8  unprecedented rate, I mean there was just a death spiral
9  starting somewhere past June, July timeframe of 2008.
10  Q. And during this period of time, with all of this going on,
11  does Chrysler start -- were you having cash flow difficulties
12  at that point?
13  A. Well, through the first half we were okay.
14  Q. The first half of 2008?
15  A. Of 2008 we were okay. In the back half we started to burn
16  cash. I think we burned somewhere around six to seven billion
17  dollars just trying to resize our business. I mean, this is a
18  very complex business but it's a pretty simple business when
19  you think about what generates cash.
20  For example, a consumer could no longer get a loan. So
21  where they were able to qualify at 6.20 or 6.30 FICA, that
22  number went up to 7.60, 7.80. So consumers, immediately, were
23  having trouble getting access to liquidity to buy a car.
24  Q. And if I could stop you there for a second, is there
25  something different or unique about the demographics when it

**186**

```
 1   comes to the FICA scores of your typical customers?
 2   A.  Yeah.  I mean, our customers -- our customers are more of
 3   your grass roots, hard working, you know, traditional car
 4   buyer.  We certainly are not -- we don't have the benefit, if
 5   you will, of a Rolls Royce.  You know, we aren't the Mercedes
 6   Benz.  We aren't the BMW type of customer.
 7   Q.  Right.
 8   A.  You know, we're more of the heartland customers of the
 9   country.  So these are the individuals that, I think, probably
10   were impacted most severely when they were trying to go in and
11   qualify for a loan.
12       So again, the simplicity of the business is if we're not
13   moving retail the dealers don't order wholesale.  If they don't
14   order wholesale we don't run our factories.  If you don't run
15   factories you don't generate cash.  So we were having to idle
16   factories, furlough employees and basically started to see a
17   real burn on our cash in the second half of 2008.
18   Q.  And what did you do to try to, if anything, to try to
19   address the cash burn?
20   A.  Well, you know, we went -- we went flat out.  In 2008 in
21   the back half we took fixed costs down better than three
22   billion dollars.  Unfortunately, the worst part of this job is
23   the gut wrenching decisions.  We had to furlough somewhere over
24   30,000 employees, which means we furloughed 30,000 families.
25       We took 1.2, 1.3 billion units of capacity out.  We ended
```

**187**

```
 1   up having to close -- we idled some and had to permanently
 2   close some of our factories as a result of, again, continuing
 3   to take out some of our nameplates like the Aspen and the
 4   Durango which ended up idling the Newark facility.  We had to
 5   close our St. Louis south facility because the demand for
 6   minivans just went away and so forth.
 7   Q.  And that quickly, just in a couple months?
 8   A.  Just in a couple of months.  I mean, the volume just
 9   evaporated.
10   Q.  And did you -- so although you had implemented these cost-
11   cutting mechanisms, I take it, it wasn't overcoming your need
12   for cash?
13   A.  I think one of the ways you look at it is what's your
14   overall fixed cost in dollars per unit.  And with all of these
15   unprecedented aggressive actions and I think, again not to be
16   self-serving, a credit to the team I mean we were leading the
17   industry in resizing and trying to get ourselves right-sized
18   for an industry that was just unprecedentedly falling.  I mean,
19   we're talking back to, like, World War II levels of volume.
20   Q.  Right.
21   A.  And if you did a population adjustment it was even worse.
22   That's assume -- that takes into consideration the population
23   growth.  So these were just unbelievable times.  People that
24   have been in the industry who I counseled, you know Lee Iacocca
25   and, you know, people who have been in this thing for a long
```

**188**

```
 1   Q.  And did you search for a financing source?
 2   A.  Yeah.  Well, fortunately our owner, Cerberus, we had a two
 3   billion dollar draw that we were able to pull down on which
 4   provided, you know, support and gave us some lifeline.
 5   Q.  When was that?
 6   A.  That was in the back half of 2008.  So we pulled down and
 7   even with the two billion draw we still continued to burn at
 8   unprecedented rates.  And so we went back and we talked to
 9   current lenders.  First lien were not in a position to give us
10   any additional funds.
11   Q.  Did you ask?
12   A.  Yes.  We, of course, the second lien we were able to draw
13   down two billion dollars from the second lien which was really
14   Cerberus and Daimler.  And obviously not being a publicly
15   traded company we could not go issue more shares of stock so we
16   really found ourselves in a very tough situation of liquidity,
17   the ability to maintain enough liquidity to keep the doors
18   open.
19   Q.  And so can you tell us then when you first, and other car
20   companies, approached the government for possible assistance?
21   A.  Yeah.  So towards the end of 2008 we agreed that we were
22   going to have to approach the government and we worked with the
23   Secretary of Treasury at that time.  We worked with the
24   Secretary of Commerce at that time.  And that's when the
25   Secretary of Treasury started -- came up with the TARP (ph.)
```

**189**

```
 1   funds where it was introducing the concept of TARP funding.  So
 2   the three manufacturers in Detroit, Ford, GM and Chrysler, got
 3   together and decided we would go collectively and ask for
 4   support.
 5   Q.  And how much did Chrysler specifically apply for?
 6   A.  We -- we originally applied for seven billion dollars in
 7   our first request.
 8   Q.  And what ultimately, at that point in time, did the
 9   government agree to lend?
10   A.  Well, after extensive discussions and analysis and
11   document exchange and a lot of sessions, I believe it was the
12   early part of January; everybody worked through the entire
13   holidays non-stop answering questions, providing information.
14   The first tranche that we received was four billion dollars,
15   and that was basically to carry us through the first quarter of
16   '09.
17   Q.  That was my question.
18   A.  I'm sorry.
19   Q.  And did the government as of anything from you in the way
20   of submitting some sort of plan or something of that nature?
21   A.  Yes, they did.  And we submitted a plan.  We submitted an
22   operating plan.  And again, after what I felt was pretty
23   thorough review by the prior administration, they awarded us
24   the four billion dollars.
25   Q.  And then going forward, obviously you're familiar with the
```

**190**

1 February 17, 2009 viability plan, correct?

2 A. Yes, I am.

3 Q. Okay. So in connection with obtaining the four billion

4 that you just spoke of, the government requested that you put

5 in an additional plan, correct?

6 A. Yeah, they -- they were very clear. The new

7 administration was very clear and said we need a very robust, a

8 very detailed operating plan and we need it by February 17th.

9 And that's, of course, after we've had -- we had two

10 congressional hearings in Washington where the three

11 manufacturers and the UAW were called on two occasions and had

12 to present to both the House and the Senate committees.

13 Q. And the viability plan that you ultimately submitted

14 called for three different or spelled out three different

15 scenarios?

16 A. It did.

17 Q. Could you just tell us, in broad strokes, what those were?

18 A. Well, the first one was a plan that said here's what it

19 would look like on a standalone basis. Second was here's what

20 it would look like if we were to develop an alliance. And then

21 a third was, unfortunately, we had to present a plan of here's

22 what bankruptcy liquidation would look like.

23 Q. Now, in assembling those scenarios and doing the work --

24 let's do it this way, who did the work on the viability plan?

25 A. Hundreds of people.

**191**

1 Q. Could you tell us just a little bit more about that

2 effort, the different disciplines, the different people?

3 A. Well, the plan was broken up as into business -- you know,

4 into business modules. First of all we would look at what's

5 the industry; what was the industry forecast; what was our

6 share, what were the products; what was the pricing. Then we

7 looked at suppliers. We looked at the dealers. We looked at

8 our labor. We looked at all of our debt, our ability to

9 service the debt. So it was almost a line by line analysis of

10 income statement balance sheet that we went through. And, I

11 mean, I couldn't begin to estimate the number of hours but

12 hundreds of people involved from all of the disciplines to help

13 us put that together.

14 Q. Did the alliance scenario that you spoke of actually

15 mention Fiat?

16 A. It mentioned Fiat and it also mentioned numerous other

17 potential alliance partners that Tom had been working on since

18 I got there. I mean, in August of '07, just as I joined, there

19 was a memorandum of understanding an LOI, letter of intent,

20 that Tom had signed with Cherry, which is a manufacturer in

21 China with the sole purpose of trying to secure from them,

22 again, some of these product line gaps I talked about, some

23 small compact vehicles.

24 Q. And did -- the government didn't introduce you or suggest

25 to you that you initially consider Fiat, correct?

**192**

1 A. No, the history on that, as I recall, is Tom flew over to

2 Italy and had the first engagement in Italy with Fiat and set

3 the stage for me. I then flew over probably in the late May,

4 June timeframe, if I recall, to Turin, and met with Sergio

5 met with Alfredo at their headquarters. We spent a couple of

6 days there. We went through their product lineup. We went

7 through what they had, what they had on the drawing board.

8 Talk to them about some of their technology, some of their

9 powertrain technology, some of the benefits that they have that

10 would be critically important to us to meet the cafe standards.

11 Those, as a matter of fact, that were just reintroduced a

12 couple of weeks ago in DC when President Obama talked about

13 consistent -- one standard across the country now.

14 Q. Right. So you submit the plan and then you wait to hear

15 back, right?

16 A. Well, we submitted the plan and no, we didn't wait. I

17 mean, there was a lot of discussion back and forth. At that

18 time the new administration was putting in place the Auto Czar

19 and the auto task force. And as those individuals were coming

20 on board we entered into dialogue with each of those at various

21 points; Steve Rattner, the Ron Bloom, et cetera. So there was

22 quite a bit of dialogue back and forth.

23 Q. And then at the end of March you heard back from the

24 government -- you received the government's reaction to the

25 plan?

**193**

1 A. Well, in between there I wouldn't want to -- I wouldn't

2 want to leave out the fact that there was quite a bit, again,

3 of discussions.

4 Q. Right.

5 A. You know, they came to Detroit and visited with us. We

6 had further explanation about the plan and made a couple of

7 more presentations trying to clear up if there was any

8 misunderstanding or misconceptions about our plan, the

9 viability of a standalone plan.

10 Q. Which was your -- you personally, which was your preferred

11 scenario at that time?

12 A. Well, I believe I certainly was strongly supporting the

13 standalone viability plan.

14 Q. And why is that?

15 A. Well, I think for a lot of reasons. One is, we believed

16 in it. Two, it was consistent with the original charter of

17 maintaining our independence while at the same time reaching

18 out to develop some product alliances. You know, we had talked

19 to Cherry, we talked to Nissan. We talked to Fiat. We talked

20 to a whole hose of potential manufacturers, Mitsubishi, et

21 cetera. So we thought that if we could continue to run our

22 business and we could supplement on the product side to

23 increase the viability of our dealers, in other words broaden

24 their platform, get more customer traffic that, you know, we

25 could be standalone. We felt that the actions that we had

1  proposed in there, relative to concessions, certainly met the
2  objectives that were given to us in our February 17th
3  submission.  We were required to have concessions from the UAW,
4  etcetera; a lot of those mandates came out of the congressional
5  hearings.  They were summarized and part of the overall
6  guidelines that we got from the Speaker and certainly the
7  Senate.
8  Q.  What was the government's ultimate conclusion with respect
9  to that plan?
10 A.  Well, the conclusion was disappointing to me and certainly
11 members of the staff in that they deemed, I think President
12 Obama announced that they deemed our standalone viability plan
13 as not viable.  And that for -- we had thirty days to forge an
14 alliance with Fiat or any other potential partner and to come
15 back in thirty days.  That we -- while we presented an
16 aggressive plan it wasn't aggressive enough.
17 Q.  Uh-huh.
18 A.  I don't recall his exact words but he said it's going to
19 require significantly more sacrifice on the part of the
20 constituents, that we were going to have to go back and in
21 thirty days put together another submission because the first
22 one just didn't make it.
23 Q.  And during the thirty days -- now the time period -- this
24 is April, right?
25 A.  Yes.

194

1  Q.  So the bankruptcy filing is the end of April, April 30th,
2  correct?
3  A.  Yes.
4  Q.  So between March 30th and April 30th can you give us some
5  idea of what you guys are doing, some of the efforts and who's
6  talking to whom and things of that nature.
7  A.  So again, we organized into a logical work flow and work
8  streams.  For example on both sides, on the revenue side and
9  the cost side, for example we said Jim Press we need you to go
10 back and work with the dealer network and talk about what are
11 the concessions, what can we agree to, what can we submit as
12 evidence of our response.  Tom LaSorda had long, you know,
13 third or four generation in operations, we asked him to go back
14 and work with the UAW, CAW.  We asked him to work with the
15 supplier network.  We asked, you know, Ron Kolka to take the
16 lead on the financial parts.
17    So each of us went back, both at an operating level and a
18 concessionary level and we were tracking that almost
19 continuously throughout those thirty days in trying to put a
20 plan together.  At the same time, again, when you looked out
21 there as to who was a viable alliance partner the only one, at
22 the time, that we had ongoing dialogues or any potential
23 success was with Fiat.  So we moved very aggressively with our
24 owners, Cerberus, to come up with a term sheet, a non-binding
25 term sheet, as evidence of our ability to be responsive to the

195

1  request, if you will, or the direction that we got from the
2  United States Treasury and the auto task force.
3  Q.  So you had your team working toward getting these
4  concessions, correct?
5  A.  Correct.
6  Q.  And at the end, towards the end of April, April 29th,
7  April 30th, were you able to get it all done?
8  A.  Man, we were almost there.  We were almost there.  We --
9  you know, the dealers certainly responded in kind.  We met the
10 mandate of -- we were told that fifty percent of the VEBA from
11 the UAW had to be a commitment to convert that to equity.  The
12 UAW had to meet the hourly rate of the transplant, that was a
13 request by -- Senator Corker wanted that in place.
14    So if you went down the entire list, we were very close
15 except for a few of the first lien lenders.
16 Q.  And as a result of that was your lender, your proposed
17 lender at the time the government, willing to fund the Fiat
18 alliance?
19 A.  Well, it was very clear that if we couldn't come up with
20 all of the concessions, including a term sheet with Fiat, that
21 they were not going to put money -- they weren't going to
22 provide DIP money, the debtor-in-possession funding.  They
23 weren't going to provide exit funding.  They weren't going to
24 do anything.
25 Q.  Okay.  And did you -- with respect to the decision to

196

1  actually file bankruptcy in this court, did you convene the
2  board of managers?
3  A.  Almost continuously throughout the process.
4  Q.  But the ultimate determination to actually file you guys
5  met, correct?
6  A.  We did.  Yeah.
7  Q.  All right.
8  A.  It was a decision that had to be taken by the board.
9  Q.  Okay.  Are you aware if there are minutes of that meeting?
10 A.  Yes, I am.
11    MR. ARMSTRONG:  Your Honor, may I approach?
12    THE COURT:  Go ahead.
13    (Pause)
14 Q.  Okay.  What I've handed you, Mr. Nardelli, is a document
15 that's entitled Meeting of the Board of Managers, April 30,
16 2009, marked Exhibit 38.  Are you familiar with this document?
17 A.  Yes.
18 Q.  What is it?
19 A.  This is the minutes of our board meeting that took place
20 on April 30, 2009.
21 Q.  And does it reflect, as you look at the minutes, where you
22 guys were in the process?  Had you already received the
23 government's decision on funding -- on agreeing to fund the
24 loan?
25 A.  Or the fact that we may not receive the loan.

197

**198**

1  Q. Exactly.
2  A. Yes.
3  Q. Okay. Do you see -- do you remember attending this
4  meeting?
5  A. It was a telephonic meeting, yes.
6  Q. And do you see down at the bottom of the first page
7  it says, "Opinion of Greenhill"?
8  A. Yes.
9  Q. And who is Greenhill?
10  A. Greenhill was a company that was retained to provide a
11  fairness opinion. We started off with another company and they
12  withdrew in the process and then we went to Greenhill.
13  Q. And could you read for us into the record the statement
14  under Opinion of Greenhill?
15  A. Yes. "Mr. Robbins reviewed the presentation material
16  distributed to the board in advance of the meeting. He noted
17  that Greenhill utilized Capstone's liquidation analysis for
18  purposes of its opinion. He concluded his presentation by
19  stating that subject to certain assumptions and limitations, as
20  of April 30, 2009, the consideration to be received by the
21  company in the proposed transactions, pursuant to the master
22  transaction agreement with Fiat, was fair from a financial
23  point of view to the company."
24  Q. Okay. And you as the CEO and being present at this
25  meeting, did you actually hear that part of the presentation?

**199**

1  A. Yes, all of the -- yes and all the board did.
2  Q. Okay. Do you see then, directly under where you just
3  finished, there's a heading that says "Capstone's Liquidation
4  Analysis"?
5  A. Yes.
6  Q. Okay. And if we look at that, there's a discussion there
7  about the first lien lenders, correct?
8  A. Yes.
9  Q. And can you tell us, just by looking at that, what's going
10  on? What was the discussion about?
11  A. This is after countless discussions that took place
12  between United States Treasury and the first-lien lenders.
13  This was the current offer on the table to the first-lien
14  lenders, the two billion dollars.
15  Q. So the two billion dollars was the current offer, that's
16  as of April 30th to the first lien lenders?
17  A. Correct.
18  Q. Okay. And what was -- Mr. Manzo, who is he?
19  A. Mr. Manzo worked for a company that we retained by the
20  name of Capstone.
21  Q. And according to this Mr. Manzo provided an analysis of
22  the possible range of liquidation values?
23  A. Yes, as it's stated here 1.7 billion recovery.
24  Q. Okay. And then underneath that, apparently he shared with
25  you for your own analysis, his opinion on whether that amount,

**200**

1  at this point in time, was higher or lower. Do you see that?
2  A. Yes.
3  Q. Okay. What was he telling you?
4  A. Well the fact is, if I could just step back, you know we
5  had -- one of the things we were trying to do to generate cash
6  was selling idle or nonearning assets. And in '07 we had some
7  success. As we continued to try and sell some of those assets,
8  we saw a vanishing market out there for those assets.
9  Q. Right.
10  A. And basically we're not able to hit what we thought we
11  would be able to achieve in cash generation. So the analysis
12  that was done here was -- you know, from his standpoint and
13  presented to us, what he thought was a fair and equitable
14  presentation on what the recovery value might be in a
15  liquidation.
16  Q. Now, the Indiana Pensioners, these are their lawyers here.
17  A. Yes.
18  Q. They contend that the liquidation of the company, the
19  value thereof, would be higher. And what I want to ask you is
20  did you have discussions with them or do you know of
21  discussions with anybody representing the first lien lenders
22  around this time about liquidation value analysis?
23  A. Well, here's, if I can, some of the background. Early on
24  in these discussions, when again our viability plan was deemed
25  to be not viable and that we were going to have to go back and

**201**

1  get more aggressive and more concessions, we brought Capstone
2  on and looked at a liquidation analysis.
3      In some of the discussions with the first-lien lenders we
4  presented our liquidation analysis and it was -- we asked the
5  first-lien lenders what was their point of view.
6  Q. When was this about?
7  A. This would have been in the first quarter of '09, as we
8  were getting into the process. They said they were going to
9  retain someone to do an independent liquidation analysis.
10      MR. LAURIA: Your Honor, I object.
11      THE COURT: What's your objection?
12      MR. LAURIA: Hearsay.
13      THE COURT: All right. Counsel?
14      MR. ARMSTRONG: Yes, Your Honor. It's not offered
15  for the truth. Mr. Nardelli and the board of managers'
16  business judgment is being challenged. The purpose of this is
17  to show the information that was provided and not provided to
18  management.
19      THE WITNESS: Well, I can --
20      THE COURT: Just a minute.
21      MR. ARMSTRONG: He has to rule on it.
22      THE COURT: All right.
23      MR. LAURIA: Your Honor, the witness clearly started
24  to testify about things that other people had told him. And
25  without some establishment of a foundation for this line of

1 questioning, I object.
2 THE COURT: All right. It can be brought in for the
3 purposes of how he formed his opinion and the action he took,
4 not for the truth of the matters.
5 BY MR. ARMSTRONG:
6 Q. Okay. Mr. Nardelli, you were asking the banks whether
7 they had a liquidation analysis, correct?
8 A. Yeah, let me give you -- let me, I guess, respond to that
9 is specifically there was a meeting called in Washington, in
10 the Treasury building. Steve Rattner was there; Ron Bloom was
11 there; the four large banks; the agent --
12 Q. When is this?
13 A. This is probably in the middle of -- let's see it would
14 have been March -- April -- April timeframe.
15 Q. Okay.
16 A. I'm not exactly sure of the date; sorry, but I think we
17 could find it. It was a session that was held in the Treasury
18 building. Steve Rattner was there. Ron Bloom was there. If I
19 recall, JPMorgan was in the room. Morgan Stanley was in the
20 room. Goldman Sachs was in the room and Citi was in the room
21 So the four large and agent banks were there along with Fiat
22 and ourselves.
23 And the purpose of that was two-fold. One was, they
24 wanted to hear from Fiat and Chrysler what the plan was going
25 forward so that they could make a determination about the

202

1 viability of that plan.
2 We also talked, in that room, about liquidation.
3 Q. Right.
4 A. And I could tell you specifically, we presented our
5 liquidation analysis and it was asked, again, had they
6 performed a liquidation analysis and we were told no it wasn't
7 ready yet. So in my personal experience with them, I never saw
8 their proposal on liquidation or did we ever get a number of
9 what they thought the liquidation would be.
10 Q. Never at any point prior to bankruptcy?
11 A. No, sir.
12 Q. Okay. And who expressed -- who answered that question
13 about whether they would perform an analysis, a share analysis
14 Who was that?
15 A. The lead agent bank, JPMorgan.
16 Q. Okay. If you turn to page -- the last part of this
17 document, turn a few pages in to page 5.
18 A. Okay.
19 Q. Now remember, Mr. Nardelli, this is April 30th, okay.
20 A. Okay.
21 Q. And if you look here, there's a general discussion. Do
22 you see under there there's a discussion about the liquidation
23 analysis.
24 A. Okay. Yeah. Well there it is.
25 Q. Yeah.

203

1 A. Sorry.
2 Q. That's okay. It says here, "Mr. Manzo informed the board
3 that the company's first-lien lenders had advised Mr. Rattner
4 of the Presidential Task Force on the Auto Industry that their
5 liquidation analysis had not been prepared and shared with the
6 company but was in process." Does that comport with your
7 memory?
8 A. Yes, it does.
9 Q. Okay. "He indicated that the agent banks" -- continuing
10 from the documents. "He indicated that the agent banks for the
11 first-lien lenders had not responded to the company's request
12 for comment on the Capstone liquidation analysis." Does that
13 comport with your memory
14 A. Yes, sir.
15 Q. Okay. Do you know, at any time prior to bankruptcy,
16 whether any of the first lien lenders ever commented on
17 Capstone's liquidation analysis?
18 A. In that meeting they certainly said they were not willing
19 to accept that liquidation analysis.
20 Q. Anything else?
21 A. No, I think that's -- that's to the best of my
22 recollection.
23 Q. Okay. So ultimately, according to these minutes, it was
24 decided -- Chrysler's board of managers decided to file
25 bankruptcy, correct?

204

1 A. Unfortunately, yes.
2 Q. And can you tell us why it made that decision?
3 A. Well, it got down to either file for bankruptcy or through
4 a restructuring plan or liquidate the company. And I can't
5 imagine, you know, using business judgment that liquidating a
6 company and impacting some 60,000 employees, over 3,000 dealers
7 that employ about 140,000 suppliers. I mean, it would have
8 been just a cataclysmic impact, I think, on the industry and on
9 the economy.
10 Q. During the thirty days prior to that or sixty days prior
11 to that, did you at least -- you and the management team at
12 least consider that you might have to liquidate the company?
13 A. Yeah. I mean, it was a real -- unfortunately, a real
14 threat.
15 Q. And did you plan for that?
16 A. I mean, it was a reality. Absolutely. When we went in
17 and as we were working through this process the fact that if we
18 were not successful we would have to go from Chapter 11 to
19 Chapter 7 pretty quickly, we felt and the board agreed that we
20 needed to retain a level of cash that would allow for an
21 orderly and efficient liquidation because we had a
22 responsibility to protect the assets. So that as we
23 decommissioned those assets and we secured those assets so we
24 were, I think, very vigilant and responsible saying that when
25 we reached a certain level of cash in the U.S. if in fact we

205

**206**

1  had to go into liquidation, a level of cash that we would need
2  and that discussion took place with the first-lien lenders
3  also.
4  Q.  Do you remember what the amount was about?
5  A.  We were targeting about 750 million dollars.
6  Q.  And when you did file did you still have about that much
7  cash?
8  A.  Yes.
9  Q.  And you said you shared that with the first-lien lenders
10  as well, correct?
11  A.  We did.
12  Q.  Did you share, prior to filing for bankruptcy; did you
13  share additional information with the first-lien lenders?  You
14  mentioned before the business plan, did you share financial
15  information, cash information, things of that nature?
16  A.  I think any time they requested information and what was
17  our -- you know, what was our -- during that period we went to
18  a daily cash call.  We started to review not only commitments
19  but releases of expenditures.  All the things that I think you
20  would do when you reached this particular time in your
21  business.  And so not only me but there were others who were
22  communicating with the first-lien lenders about the dire
23  straights we were in and the cash consumption and the things
24  that we were trying to do to salvage the company.
25  Q.  The objectors, the Indiana Pensioners, have claimed

**207**

1  repeatedly that the government coerced Chrysler into entering
2  into the deal; it dictated the terms or things of that nature,
3  what's your reaction to that?
4  A.  I would not agree with that.  They were the only lenders
5  out there who were willing to invest in saving this iconic
6  brand.  They were shoulder to shoulder with us working through
7  a broad range of negotiations and discussions.  I felt that
8  they were -- they were, as we were, trying to come out with the
9  best alternative to avoid liquidation.
10  Q.  But they did make certain requests of you and wanted
11  certain concessions and things done.  Did you see that as
12  coercion?
13  A.  No.  I mean, it's -- I've been in business thirty-eight
14  years and some of their requests were nothing abnormal that I
15  hadn't had before from other lending institutions.
16  Q.  You're also being criticized because perhaps you should
17  have done something else like sold off product lines, Jeep,
18  Dodge, something like that.  What's your reaction to that?
19  A.  Well, you know, it's -- it -- those are always, kind of,
20  cocktail discussions and, you know, things that people want to
21  talk about.  So we looked at that and it wasn't something I
22  looked at, you know, for the first time ever.  I think the
23  company had looked at that previously.  So we asked some folks
24  in the organization to take a look at that and to do an
25  analysis.  And the fact is, the do-ability, if I can say it

**208**

1  that way, of separating these brands we did not believe was
2  feasible.
3  Q.  Why?
4  A.  For example, you have mixed production in our Belvedere
5  plant.  You produce a small, compact Dodge and two Jeeps, our
6  Patriot and our Compass.  In our Brampton facility you produce
7  a Chrysler 300; you produce a Challenger and a Charger.  So the
8  ability to sell the brands did not line up, first of all, with
9  the facilities.  Second of all, it didn't line up with our
10  engineering and our tech center.  You judge where we try to get
11  leverage by putting engineers together on platform versus
12  brand.  So you couldn't just -- you just couldn't swipe off and
13  say okay you engineers go over here because they were working
14  on multiple platforms and multiple powertrains, transmissions,
15  et cetera.
16      So it, you know, on paper I could understand the analysis.
17  But the ability to do that and the ability, then, to go to the
18  market and try to sell that was just not feasible.
19  Q.  The interconnectedness you just described didn't apply,
20  say, to the Connor Avenue facility which manufactured Viper,
21  correct?
22  A.  That was one facility that we did -- we went out and
23  tested.  We brought on an investment banking firm to do the
24  analysis.  They put together a very good document, put together
25  a good book, had quite an extensive list, as I recall.  I don't

**209**

1  know, maybe fifty potential buyers, not that they had expressed
2  interest but buyers that they were going to go to target.  If I
3  recall, the valuation on that, that they put on it, was 100 to
4  150 million dollars.  And Fast Forward, let's see, that would
5  have been in the middle of '08 so almost fast forward a year
6  and I think we got -- we got some offers but were never really
7  able to validate the ability of the buyer to pay somewhere
8  around ten million dollars.  That's for the entire factory, all
9  the tooling, the people, the intellectual property, et cetera.
10  Q.  So they were offering ten million dollars to buy the
11  entire plant facility?
12  A.  Yeah.  And part of the problem with that is the powertrain
13  in the Viper is common.  There's a lot of commonality in the
14  engine and the powertrain, the transmissions, the axles.  So
15  again, the difficulty is that they would have to be comfortable
16  in a service agreement with Chrysler to buy that technology on
17  a going forward basis.  So they wouldn't -- you know, they
18  would have to continue to buy engines from Chrysler.
19  Q.  Right.  Another criticism, Mr. Nardelli, is that you
20  really didn't pay enough attention to the Indiana Pensioners'
21  interest.  Can you tell us what efforts you made, if any, on
22  behalf of the first-lien lenders to get them more money?
23  A.  Well, you know, there were -- the initial discussion we
24  had with the first-lien lenders we presented a recommended
25  approach relative to dollars and some equity, is kind of where

we started. And we were told, by the first-lien lenders, on no
uncertain terms that they had no intentions of negotiating with
us. That they were first-lien secured. They were in the money
and that if there were any discussions that were to take place
they would have to take place with the United States Treasury
not us.

Q. And what was the offer at that time?

A. The offer at the time, again there was a whole series of
these but, you know, it was a couple of billion dollars and
they were going to get equity. Again, a variety of different
scenarios but the response I got was look we heard your
proposal; we don't intend to respond to it and we're a first-
lien secured, we're in the money and if there's any discussions
that will take place, that will take place between the United
States Treasury and the first-lien lenders.

Q. Wouldn't talk to you?

A. No, sir.

Q. Can you tell us, just before April 30th, did you try one
last time --

A. Desperately.

Q. -- to see if you could bridge this gap?

A. Desperately. I mean, the last thing I and our team wanted
was to file. So we were all in Washington. We were trying to
wrap up the term sheet with Fiat. And I'm not sure of the
exact time but some time around 4 or 5:00 we put some calls

210

into the agent bank and asked if we could get all the banks on
a call and allow me to try and present the rationale that this
is a better deal than liquidation, financially, morally, from
an overall economic standpoint, impact on this country, et
cetera. I wanted to go through, personally, what I was
experiencing and what our team was experiencing in the level of
trepidation and gut wrenching that we were going through.

I was told no and so I wanted to make sure that my request
was on record. So I asked an e-mail be sent to the banks
formally asking for a meeting. As I understand now,
concurrently, the United States Treasury contacted the first-
lien lenders and -- whom I was in discussion with -- and said
can we please try one more time to get this thing resolved so
that we did not have to go into bankruptcy.

It's my understanding that they put an offer on the table;
the United States Treasury put an offer on the table to the
bank taking it from two billion in cash to 2.250. I was told
that they had two hours to assemble and make the decision and
if they didn't get consensus then the 250 million dollars would
come off the table.

I was desperately hopeful that the opportunity to
increase, you know, the offer, the cash offer, money in hand,
would be enough inducement for them to make that decision.

Q. What happened?

A. Unfortunately they were not able to get agreement and so

211

the 250 came off the table and went back to the original two
billion dollar offer without agreement -- without -- I should
say it the other way, with more than a significant number
agreeing and unfortunately a very small modest number not
agreeing.

Q. Finally Mr. Nardelli, you and your team are being
challenged on your business judgment for pursuing this path,
filing and seeking the sale. Do you have a response to
everyone on that subject?

A. Well, look I've been in the business now, as I said, as
you asked me, from August and I have grown to really
appreciate, you know, the passion, the commitment, the hard
work, the importance of this business to the overall economy,
to the auto industry and to communities across this country.
There isn't a community that isn't touched by a dealer, that
isn't touched by a supplier or one of our massive and large
manufacturing facilities, and that's all the first tier.
There's the second tier transporters, there's the third tier.
And for me in looking at -- while it's a simple math model it's
a very complex business relative to the interdependencies and
at any point in time you could pick a single fact and say based
on that fact would you make another decision. But
unfortunately or fortunately, I think for Chrysler, I took the
responsibility along with the board and the management team to
look at it in its broadest form and to make sure that we were

212

making the best business decision using our best business
judgment and that's why we came out with this decision that we
had one organization willing to lend us money. They said that
your standalone plan was not viable. They said you would have
to form an alliance with either Fiat or someone else. You
would have to go back and get major concessions, beyond what
you put in your first round, which we were able to do. And I
would tell you, Judge, that without us, you know, kind of
blazing the trail with some of those concessions, the other
major manufacturer in town would not have the benefit of those
already being negotiated for them.

So we made the best decision, I think, on balance taking
all those things into consideration to avoid liquidating
Chrysler impacting 60,000 employees, dealers, employees of
dealers, suppliers, large mass transportation, railroads,
communities and tax bases across this country. So I feel that
we turned every stone, we exhausted every amount of energy and
intellect we could. We got independent advisors, outside
counsel, board of directors and as painful as this was, I would
tell you, Judge, this is -- in thirty-eight years, the first
time I've ever had to go into bankruptcy. It's not something I
want to get good at but it was a decision, I think, that best
served all of the constituents.

Q. Okay. Give me one second, please.

(Pause)

213

1  Q. Just one last thing.
2     (Pause)
3        MR. ARMSTRONG: May I approach, Judge?
4        THE COURT: Yes.
5     (Pause)
6        MR. ARMSTRONG: Okay. We've placed before the
7  witness what we've marked as Debtors' Exhibit 33.
8  Q. Do you recognize that document?
9  A. Yes, I do. Yes, sir.
10 Q. What is it?
11 A. This is a -- this is my declaration which I read, put
12 together and have signed and attested to.
13 Q. And is what's contained in here true and accurate to the
14 best of your knowledge?
15 A. Yes, sir. It is.
16       MR. ARMSTRONG: Your Honor, we would move for the
17 admission into evidence of the declaration and -- we could do
18 it one at a time because I see Mr. Lauria standing.
19       THE COURT: All right. Mr. Lauria?
20       MR. LAURIA: Your Honor, I'm going to make the same
21 objection that we've made to the other declarations that have
22 been offered.
23       THE COURT: All right. I'll overrule the objection.
24 Go ahead.
25 (Debtors' Exhibit 33, declaration of Mr. Nardelli, was hereby

1  received into evidence as of this date.)
2        MR. ARMSTRONG: And previously I showed the witness a
3  document, the minutes of the board. I'd like to move that into
4  evidence as well.
5        MR. LAURIA: Your Honor, I object on a couple of
6  grounds. Number one, the declaration represents that it has
7  attached to it at least two sets of minutes, I think we've only
8  got one. There are none attached to the declaration that I've
9  received.
10       THE COURT: One second. You're referring to the
11 declaration, let's just focus on -- you're talking about DX
12 Exhibit 38?
13       MR. LAURIA: No. No, I'm talking about -- well,
14 let's talk about the Exhibit 38 which is an unsigned document.
15 It has a signature page which is blank on the last page. And
16 if it's an original it's -- the document that's signed, that's
17 one that ought to go in.
18       THE COURT: All right.
19       MR. ARMSTRONG: Your Honor, I'm told that the Indiana
20 Pensioners themselves have requested that this document be
21 moved into evidence.
22       MR. LAURIA: I do not know if we've seen this
23 document without a signature on it and I don't know if this is
24 the same document that we've seen before. All I know is that
25 this is a blank signature page. It's supposed to have

1  signatures on it.
2        THE COURT: Well, we'll get one with a signature
3  page, all right, and that will be the one put into evidence.
4  (Debtors' Exhibit 38, minutes of board meeting dated April 30,
5  2009, was hereby received into evidence as of this date.)
6        MR. ARMSTRONG: That's fine.
7        MR. CULLEN: Your Honor, if I may clarify.
8        THE COURT: Go ahead.
9        MR. CULLEN: This is just on the evidentiary matter.
10       THE COURT: Wait a minute; let's stick to the same
11 rules.
12       MR. CULLEN: Okay.
13       THE COURT: Counsel handling the witness can clarify.
14       MR. CULLEN: I think I can clarify this with Mr.
15 Lauria.
16       THE COURT: Well --
17       MR. ARMSTRONG: Okay. No further questions.
18       THE COURT: Mr. Lauria?
19 CROSS-EXAMINATION
20 BY MR. LAURIA:
21 Q. Good afternoon, Mr. Nardelli.
22 A. Good afternoon.
23 Q. I believe you testified about the sequence of events that
24 immediately proceeded the Chapter 11 filing just a few minutes
25 ago. And in particular you testified about your awareness of

1  efforts that were made by the United States Treasury office to
2  reach a deal on the eve of the Chapter 11 filing, is that
3  correct?
4  A. Yes.
5  Q. Were there a couple of things you left out there?
6  A. I'm not sure what your question is.
7  Q. Well, were you aware of any other offers or negotiations
8  that were going on at the eleventh hour?
9  A. My recollection is the two points I made. One is, I was
10 trying to reach the first-lien lenders and asked for a
11 conference call. And I later became aware that the United
12 States Treasury had extended an offer to the first-lien lenders
13 that took it to 2.250 billion dollars of cash.
14 Q. Well, let's take a step back for a moment, just to clarify
15 a couple of things. First of all, when you were told that the
16 first-lien lenders wouldn't negotiate, that was JPMorgan Chase
17 that told you that, is that correct?
18 A. That is correct.
19 Q. You never had a single conversation with any of my three
20 clients, did you Mr. Nardelli?
21 A. No, I did not.
22 Q. Did you ever have a single conversation with any of the
23 first-lien lenders who didn't consent to the deal?
24 A. Say that again, please.
25 Q. Did you ever have a single conversation with any of the

218

1 first lien lenders who did not consent to the deal?
2 A. At what point in time?
3 Q. When the two billion dollar offer was on the table at the
4 eleventh hour.
5 A. Well, at that point it is my understanding that the
6 majority of the first-lien lenders did agree.
7 Q. That's not the question I asked.
8 A. I'm trying to understand your question
9 Q. I'm asking, did you have a single conversation with any of
10 the first-lien lenders who did not consent to the deal?
11 A. No, that's why I was trying to get on the call to talk to
12 all of the first-lien lenders.
13 Q. And who was it who said that you couldn't have such a
14 call?
15 A. The agent bank.
16 Q. That's JPMorgan Chase again?
17 A. Yes.
18 Q. Now were you also aware of an effort by the nonconsenting
19 first-lien lenders to find a settlement?
20 A. I'm not aware.
21 Q. All right. Could you open the book that's on the ledge
22 there and turn to tab 13, please?
23    (Pause)
24 A. Tab 13?
25 Q. Tab 13.

218

1 A. Okay.
2    (Pause)
3 A. Okay.
4 Q. That's an e-mail from Matt Feldman at U.S. Treasury to
5 Robert Manzo. Do you know both of those people?
6 A. Yes, I do.
7 Q. Who is Mr. Feldman?
8 A. Mr. Feldman is a member of the auto task force and is
9 providing the legal counsel to the auto task force.
10 Q. And who was Mr. Manzo?
11 A. Mr. Manzo is a member of Capstone who we retained.
12 Q. Do you want to take a minute to read the e-mail here?
13 Start at the bottom.
14 A. I'm sorry; the bottom of -- the one from Robert Manzo to
15 Bloom and Feldman?
16 Q. Yes, that's correct.
17    (Pause)
18 Q. Just let me know when you're through.
19    (Pause)
20 A. Okay.
21 Q. Was Mr. Manzo speaking for the company when he indicated
22 that we can easily find 250 million dollars of savings to help
23 fund this last piece, we have other ideas as well?
24 A. He would not have been in the position to speak for the
25 company on that matter.

219

1 Q. So this was an unauthorized statement by Mr. Manzo?
2 A. Well, he would not have been in a position to offer that,
3 to my knowledge.
4 Q. So he had never communicated about this situation to you?
5 A. I don't think I'm on this distribution.
6 Q. Well let me ask you, in the CC line who is
7 RLN43@chrysler.com?
8 A. Oh, I'm sorry. Yes, I see that. Yeah, that is me.
9 Q. All right. Did you tell him to cease and desist?
10 A. No, I did not.
11 Q. So maybe you were aware of this proposal?
12 A. Yes, I'm sorry. I see that I was on here and obviously I
13 would have read this.
14 Q. So did you support the proposal that Mr. Manzo was
15 discussing?
16 A. Well, what I supported was if the United States Treasury
17 in fact could reach a resolution. I was very supportive of the
18 last minute offer that they made.
19 Q. That's not what I asked you, sir. I asked, did you
20 support the proposal that Mr. Manzo was suggesting here?
21 A. I was not in the position to support offering 500 million
22 dollars.
23 Q. So as CEO of the company you were on this e-mail where Mr.
24 Manzo made a proposal. You didn't support it but you didn't
25 communicate to him that you didn't support it, is that what

220

1 we're to understand?
2    MR. ARMSTRONG: Objection, Your Honor.
3    THE COURT: What's the objection?
4    MR. ARMSTRONG: It mischaracterizes the document as a
5 proposal. This document talks about savings and it talks about
6 something that the first-lien lenders might want. It says, "If
7 I understand it correctly, they want two billion shared pro
8 rata." Later on Mr. Manzo, in the section that Mr. Lauria is
9 obsessing on, says "We can easily find 250 million dollars of
10 savings." It's not a proposal.
11    THE COURT: Restate your question then, Mr. Lauria.
12 Q. You were aware of this communication, that is correct
13 right?
14 A. Yes, sir. I see that now.
15 Q. And you did not communicate to Mr. Manzo to discontinue
16 this communication?
17 A. No, I -- I'm not sure what you're asking about discontinue
18 a communication.
19 Q. Well let me ask you, does it sound to you like he's trying
20 to open a dialogue to find a solution to a problem here?
21 A. Yeah, I think we were all trying to find solutions to
22 resolve this problem.
23 Q. All right. And what I'm trying to get at is first, I
24 think we agreed that you were aware of this communication.
25 A. Yes, I see that.

221

1  Q.  All right.  And you didn't tell Mr. Manzo that you didn't
2  have 500 million dollars to spend?
3  A.  Well again, I don't think this was in the form of a formal
4  proposal.  I think we were all looking for any ideas or
5  solutions we could come up with to try and get an acceptable
6  answer.  But this would have required -- I mean, we didn't have
7  500 million dollars.  We didn't have 250 million dollars to
8  contribute to this.
9  Q.  Well, earlier you testified that you understood that the
10  Treasury had in fact increased their proposal to 2.25 billion
11  dollars, is that correct?
12  A.  Yes, the night before we filed.
13  Q.  Well, --
14  A.  That much would have come from the United States Treasury.
15  Q.  Could you look at the timing of this one that we
16  you were copied on from Mr. Manzo to Mr. Bloom?
17  A.  It looks like it's 4/30 at 3:54 a.m.
18  Q.  No.  If you would go down to the one we were looking at,
19  please.
20  A.  Oh, I see; the 29th, is that it?
21  Q.  At what time, please?
22  A.  Wednesday, April 29th at 22:44.
23  Q.  So what time would that be in regular time?
24  A.  That would be 10:44, almost 11:00.
25  Q.  Would that be the night before?

222

1  A.  The night before?
2  Q.  You filed.
3  A.  Yes.
4  Q.  Would that be, also -- is that the same time you were
5  saying that the U.S. Treasury had put an offer of 2.25 billion
6  dollars on the table?
7  A.  It is not the same time.
8  Q.  What time did the U.S. Treasury put their 2.25 billion
9  dollar on the table?
10  A.  My understanding it was some time around 6:00 in the
11  evening, which would have been 18:00.
12  Q.  So at 22:00 that offer was off the table and so the gap
13  was not 250 million dollars as Mr. Manzo suggests but rather
14  was 500 million?
15  A.  Well, I think what he is saying here -- I think it says
16  here an additional 500 million shared only among their holdout
17  groups.  So if I read this what I would read is that the
18  majority of the first-lien lenders were accepting a two billion
19  dollar offer but it was the holdouts, if I read this now, is
20  that the two billion dollar pro rata would go to -- and then
21  there was another 500 million dollars that was to go to only
22  the holdouts to try and get them to sign up, isn't that what
23  that says?  That they want two billion shared pro rata and an
24  additional 500 shared only among the holdouts.
25  Q.  So how much is two billion plus 500 add up to?

223

1  A.  2.5 billion.
2  Q.  And the last offer that had been on the table from the
3  United States Treasury was how much again?
4  A.  To my knowledge, the last one I was aware of was 2.250.
5  Q.  Okay.  And so the difference between those two numbers is?
6  A.  250 million.
7  Q.  All right.  And did it -- does it sound like Mr. Manzo was
8  trying to find a solution to that 250 million in this e-mail?
9       MR. PANTALOS:  Objection, Your Honor.
10       THE COURT:  What's your objection?
11       MR. PANTALOS:  The question assumes a fact that's not
12  in evidence which is this, comparability between the 2.25
13  proposal which was to be shared with syndicate members and an
14  additional incremental half a billion dollars which was not to
15  be shared with syndicate members.
16       MR. LAURIA:  Your Honor, I think this is just
17  argument.
18       THE COURT:  What else is new?
19       MR. PANTALOS:  Your Honor, I'm just trying to --
20       THE COURT:  No, I understand that.  I also don't -- I
21  think if we want the record clear we should really understand
22  your question and the witness needs to understand your question
23  in context.
24       MR. LAURIA:  Well, the e-mail is in the record and it
25  says what it says.  I'm really not --

224

1       THE COURT:  Yeah, but you're assuming that the 2.25
2  million is still on the table and you're saying that Mr. Manzo
3  meant that he could bridge the gap between 2.25 and 2.5.
4       MR. LAURIA:  Your Honor, I'm not making any such
5  assumptions.  I'm just trying to ask some questions of this
6  witness to understand what the witness understood at the time.
7       THE COURT:  All right.  Try again then.
8       MR. LAURIA:  I'm going to move on.
9  BY MR. LAURIA:
10  Q.  By the way, what was the government's reaction to Mr.
11  Manzo's conversation here?  Let's go through it in sequence,
12  what's the first reaction from Mr. Feldman?
13  A.  You're referring to the top of this document?
14  Q.  No, I'm referring to the responsive e-mail, April 29 at
15  22:46.
16       MS. VARGAS:  Objection, Your Honor.
17       THE COURT:  What's your objection?
18       MS. VARGAS:  Jeannette Vargas for the government.
19  The witness wasn't on that subsequent e-mail chain so there's
20  no foundation.
21       MR. LAURIA:  Your Honor, I'm just asking the witness
22  to read the response.
23       THE COURT:  All right.  The witness can read the
24  response and answer the question.
25       (Pause)

225

Q. So I just want to make sure what you're asking me to
respond to. Is it "Sorry I didn't mean to say," is that what
you're talking about?

Q. No, I'm one response below. The one from Matthew Feldman
at the U.S. Treasury, and I'd like you to just read it for us.

A. "I'm now not talking to you. You went where you
shouldn't."

Q. Pretty strong reaction, isn't it?

A. I don't know. I mean, I'm not sure what he's referring
to.

Q. You don't think he's referring to the e-mail that this is
an answer to?

MS. VARGAS: Objection, Your Honor.

A. You mean the 250 --

THE COURT: One second. Don't answer it. Objection
overruled. Let the witness answer the question.

A. You mean the 250 million of savings?

Q. I mean the e-mail that Mr. Manzo sent to Mr. Bloom and Mr.
Feldman at 22:44 on Wednesday, April 29th.

A. Okay.

Q. The response was "I'm now not talking to you. You went
where you shouldn't."

A. I don't know, you'd have to ask Matt.

Q. Okay. I'd have to ask Matt what?

A. What he meant by that.

226

Q. Well, do you have any interpretation of what that means?

A. I don't think it was -- my interpretation would not be
relevant.

Q. Your interpretation would not be relevant?

A. Of a conversation between Matt Feldman and Bob Manzo, sir.

Q. Let me just get something clear. You indicated that it
was very important to the company to try to avoid filing for
Chapter 11 protection, is that correct?

A. Yes, sir.

Q. So you would have been very anxious for there to have been
a resolution of this problem, correct?

A. Yeah. And I was very actively involved in trying to get
that done.

Q. But you were not involved in this dialogue?

A. No, sir.

Q. And you were not aware of this dialogue?

A. Well, I became aware of it at 10:44 on the 29th, according
to this.

Q. Did you ever ask Manzo if there was a follow up or a
response?

A. No, not to my recollection.

Q. Can you tell us why?

A. Well, it looks like, you know, what I heard back from
Treasury is that there was not a response and therefore the
offer was taken off the table.

227

Q. Well, we're talking about the 2.25 offer, correct?

A. The 2.250 offer.

Q. We're not -- you didn't hear any response to this
conversation and you didn't ever ask Mr. Manzo if he got a
response?

A. No, at this point -- at this point I don't even remember
when I may have opened this e-mail and read it, to be honest
with you.

Q. You may not have looked at it the night of the 29th?

A. Not at 11:00, I may not have.

Q. Where do you think you might have been at 11:00 on the
29th?

A. I was in Washington. I don't remember exactly where I
would have been.

Q. And you don't have access to your e-mails when you travel?

A. Yes, I do.

Q. So were you otherwise looking at your e-mails on the
evening of the 29th?

A. I don't know. I mean, I don't -- you're asking me to
recall this. I don't recall, you know, if I read this or if I
responded to it. I do know that Treasury took the offer off
the table within the two hour window that I understood they
gave them.

Q. Okay. Let me just ask you about the top response. I'd
like you to read that for me and let me know when you've read

228

it.

(Pause)

A. Yes, sir.

Q. Does it sound like it was a futile effort to you?

A. What was a futile effort?

Q. To continue negotiating.

A. You're asking me to interpret from this statement that?

Q. I'm asking your impression. Yes, do you think it was a
futile effort to continue negotiating?

A. Again, you're asking me to make an assumption. I know for
a fact that the offer was pulled off the table.

Q. I'm not asking you about the 2.25 billion dollar offer at
this point.

A. Uh-huh.

Q. I'm asking you if based on a statement from a
representative of the Department of Treasury it's over, the
president doesn't negotiate second rounds; we've given and lent
billions of dollars to your team so your team could manage this
properly. I've protected your management and board and now
you're telling me you're going to try to put me in a position
to have to bend to a terrorist-like Lauria, that's BS. And I'm
asking you if that indicates that further negotiation was
futile?

A. If I was to interpret this when it says it's over, to me
it would mean it's over.

229

**230**

1 Q. So it's futile?
2 A. Well, it's over.
3 Q. Can you parse the difference between futile and over for
4 me?
5 A. I don't know. I understand it's over.
6 Q. Do you understand the word futile?
7 A. Yeah, I do.
8 Q. Can you tell me the difference between futile and over
9 since you're choosing to find a difference between futile and
10 over?
11 A. I can read from here it's over. Futile, is you're asking
12 me to interpret what's said in the e-mail, sir.
13 Q. All right. Let's go back to the top. You started with
14 Chrysler in August of 2007, is that correct?
15 A. Yes.
16 Q. And prior to that you had been with Home Depot, is that
17 right?
18 A. Prior to that I worked for Cerberus.
19 Q. What position did you hold with Cerberus?
20 A. I was an independent contractor and advisor.
21 Q. Were you one of their so-called bench executives?
22 A. I haven't heard that term but I was there to help advise
23 on various deals or strategy or what have you.
24 Q. And in that capacity, had you worked with any other
25 companies?

**231**

1 A. Did I work with other companies while I was at Cerberus?
2 Q. Yes.
3 A. Did I look at other companies?
4 Q. Did you work at any other companies while you were at
5 Cerberus?
6 A. No, I did not.
7 Q. Did you advise any other companies while you were at
8 Cerberus?
9 A. I did not.
10 Q. Can you tell us what you did while you were at Cerberus?
11 A. Yeah, I looked at -- they have a portfolio -- maybe I
12 misunderstood your question. They have about fifty or sixty
13 companies, Blue Links, Traxis, New Page, Remington. So my job
14 was to take a look, as part of -- asked to participate in a
15 section of Cerberus called Coax, which is their operational
16 team. It had, like, 150 analysts in it with all different
17 types of skills. So what they had asked me to do is look at
18 some of the operating plans, sit in on some of the business
19 reviews and see if there was anywhere where I could help them
20 out based on my experience and knowledge.
21 Q. How long were you with Cerberus?
22 A. I was with Cerberus from July through August, the
23 beginning of August.
24 Q. For one month?
25 A. Yes.

**232**

1 Q. Now Cerberus was the owner or still is the owner of
2 Chrysler, is that correct?
3 A. They own eighty percent of Chrysler.
4 Q. Right. And so how is it that you came to be the CEO of
5 Chrysler?
6 A. Well, they asked me to look at Chrysler and to take a look
7 at some of the pro forma, look at some of the operating plans,
8 to sit in on some of the business reviews in New York. And
9 subsequently asked me if I would be interested in running
10 Chrysler for them.
11 Q. And they was Cerberus?
12 A. Yes.
13 Q. And this was in July when they asked you to do this?
14 A. Yes.
15 Q. And so in approximately a month you then started with
16 Chrysler?
17 A. That's correct.
18 Q. And before you went to work for Cerberus in July you
19 worked for Home Depot, is that right?
20 A. Correct.
21 Q. And how long were you at Home Depot?
22 A. Almost six years, I think.
23 Q. All right. And before that?
24 A. General Electric.
25 Q. Had you ever worked in the auto industry before August of

**233**

1 2007?
2 A. No, I had not.
3 Q. Are you going to continue with the company after the
4 restructuring is completed?
5 A. No, I announced, I think, at the end of April that I would
6 stay with the company until we got through this process. And
7 then I thought it would be best to transition, the new team
8 really need to -- had to have a much closer intimacy with Fiat
9 operations to make sure that they were able to maximize the
10 products, the technologies and the synergies that were part of
11 that term sheet and part of the consolidated performance.
12 Q. So when do you expect to leave the company?
13 A. When this transaction's complete.
14 Q. When do you expect that to be?
15 A. Tomorrow.
16 Q. Tomorrow? You expect the transaction to close tomorrow?
17 A. That's the plan.
18 Q. Are there any regulatory approvals that have to be
19 achieved for the closing to occur?
20 A. Yes, there are.
21 Q. And have they been achieved?
22 A. A number of them have and some of the secondary, for
23 example some of the international ones and so forth, we'll
24 probably do a second close on those.
25 Q. So you'll close without regulatory approval?

**234**

1    A. No, that's not what I said. We would obviously get

2 regulatory approval and then there will be some secondary where

3 we have an indication of approval but just haven't secured the

4 finalization of it. For example in the U.K., Germany and

5 Russia.

6    Q. So what will you do there? I'm not sure I understand the

7 answer.

8    A. What is it you don't understand?

9    Q. You're going to close but you're not going to have

10 regulatory approval or you're going to wait till you get

11 regulatory approvals to close?

12    A. No, we'll have regulatory approval certainly here in the

13 U.S.

14    Q. Do you currently have regulatory approval in the U.S.?

15    A. I think that's well on its way right now.

16    Q. When do you expect to get it?

17    A. Well, we would need it before we close.

18    Q. Do you have an expectation of when you'll get it?

19    A. Hopefully we'll have it done by tomorrow.

20    Q. Do you have some indication that you're going to have it

21 tomorrow?

22    A. Yes.

23    Q. Can you tell me what that indication is, please?

24    A. From counsel.

25    Q. From counsel?

---

**235**

1    A. Legal counsel.

2    Q. Your counsel?

3    MR. ARMSTRONG: Hold on one second, please. Thank

4 you. I have an objection, Your Honor. First, we've had

5 several questions relating to this so the objection is to this

6 line of questioning as to the relevance. And secondly, Mr.

7 Nardelli, please don't divulge communications that you've had

8 with your counsel relating to the transaction.

9    THE WITNESS: Okay.

10    MR. ARMSTRONG: Sorry.

11    THE COURT: All right. Mr. Lauria, what is the

12 relevance of this?

13    MR. LAURIA: Well, Your Honor, among other things the

14 debtor is going to be asked -- has asked for relief under 6004

15 to shorten the automatic stay with respect to the sale order.

16 And I'm trying to understand, realistically, when a closing

17 might occur, which I think is relevant to that issue.

18    THE COURT: All right. I think you got -- you have

19 the information that I think is necessary to that what the

20 witness believes when this regulatory approval will take place.

21 And he was informed of that by counsel.

22    MR. LAURIA: Well Your Honor, I did have a few other

23 questions on the topic. We've been talking generally about

24 regulatory approval, I wanted to ask the witness what

25 regulatory approval he's talking about.

---

**236**

1    THE COURT: All right.

2 BY MR. LAURIA:

3    Q. When you say regulatory approval, what approvals are you

4 talking about?

5    A. Well, the regulatory approval would be anti-trust here in

6 the United States.

7    Q. Do you know if that application has been made?

8    A. Yes, I'm aware that that application has been made.

9    Q. And do you have any awareness of the statutory waiting

10 period for that application to be granted?

11    A. I don't know the exact time.

12    Q. Are there any other regulatory approvals that are required

13 in the United States?

14    A. No, I think that's the one that's been brought to my

15 attention as the, you know, the most significant one.

16    Q. You mentioned that when the board met on April 29th, I

17 believe it was, that you made the decision to file Chapter 11,

18 is that right?

19    A. I don't know. Do you have the document?

20    Q. Your counsel gave you the minutes from the board meeting.

21    A. That was April 30.

22    Q. All right, April 30th.

23    A. You said the 29th.

24    Q. I'm sorry then. At the board meeting on April 30th you

25 made a decision to file Chapter 11, is that correct?

---

**237**

1    A. That is correct.

2    Q. And earlier you testified that at the time you had two

3 choices, either to pursue a restructuring plan or to liquidate,

4 is that correct?

5    A. Well, we had three alternatives that were submitted; the

6 standalone plan, is that your question?

7    Q. No.

8    A. No.

9    Q. I'm going back over your testimony where you were

10 characterizing what your options were at the April 30th board

11 meeting where you testified that you had two choices, to pursue

12 a restructuring plan or to liquidate. And I just want to make

13 sure I got that right.

14    A. That's correct.

15    Q. And you chose the restructuring plan, is that correct?

16    A. Yes, we did.

17    Q. You chose not to liquidate?

18    A. We chose not to liquidate.

19    Q. And a restructuring plan is what we're talking about

20 today, is that correct?

21    A. Well, we're covering a lot of subjects. I'm not sure.

22    Q. Is that the motion that's before the Court today?

23    A. The restructuring plan?

24    Q. Yes.

25    A. I thought it was an objection to the restructuring plan.

**238**

1   Q. What are you going to do after you discontinue your
2   employment with the company?
3   A. I announced at the time, about a month ago when I elected
4   to announce that I would be leaving after the completion of
5   this, is that I would return to Cerberus as an advisor.
6   Q. So when are you going to start at Cerberus?
7   A. When we complete this transaction.
8   Q. All right. Immediately?
9   A. Yes, sir.
10  Q. So if the transaction completes tomorrow on Monday you'll
11  be working for Cerberus?
12  A. If the transaction -- that would be the plan.
13  Q. All right. And have you worked out your compensation with
14  Cerberus?
15  A. I have not.
16  Q. You're going to do that over the weekend?
17  A. We would not have a discussion about that until the deal
18  is closed.
19  Q. So if the deal closes on Friday and you're going to start
20  work on Monday, when are you going to have that discussion?
21  A. Sometime next week.
22  Q. After you start work there?
23  A. Sure.
24  Q. Do you still have an office there?
25  A. I do not.

**239**

1   Q. So do you have to make any arrangements to go -- starting
2   to work at Cerberus?
3   A. Cerberus is -- you know, it isn't that level of formality.
4   You know, a conference room -- it's a pretty flexible
5   environment. I could be on the road visiting some portfolio
6   companies so it's not a structured environment.
7   Q. While you've been working at Chrysler have you had an
8   ongoing relationship with Cerberus?
9   A. Well, they're our owners and so yes I've had discussions
10  with Cerberus.
11  Q. I mean in any kind of employment or consulting capacity.
12  A. Oh no, I have not.
13  Q. When was the last time you worked for Cerberus?
14  A. The last time I worked directly for Cerberus would have
15  been in July.
16  Q. Are you aware of whether or not Cerberus is going to
17  realize any benefits as a consequence of this transaction?
18  A. My understanding is they will get no benefit; they
19  surrendered all of their equity. They relinquished all
20  entitlement to their second lien loan and notes and basically
21  have -- will get nothing out of this.
22  Q. Are you aware if they're getting any releases?
23  A. I'm aware that -- I'm aware that in a settlement agreement
24  there are releases -- there are releases being requested.
25  Q. Do you know what those releases apply to?

**240**

1   A. I don't. If you're referencing the settlement agreement,
2   is that what you're referencing?
3   Q. I'm referencing what you're telling us about.
4   A. Okay. Why don't you tell us which releases you understand
5   and know about?
6   A. I'm only aware that as part of a global settlement between
7   Daimler, Cerberus and Chrysler and the settlement was
8   negotiated by the United States Treasury, there were releases
9   in that document.
10  Q. Do you know what those releases apply to?
11  A. No, I don't.
12  Q. Do you know if they have any value?
13  A. No, sir.
14  Q. Well, somebody asks for a release it usually has some
15  value to the person asking for relief, is that correct?
16  A. Well, in my experience there's either a value or a release
17  about future liabilities or indemnification, has been my
18  experience.
19  Q. So the person who wants to get a release thinks they're
20  getting some value for the release, correct?
21  A. Or some comfort.
22  Q. Comfort, value, the same thing?
23  A. Well, I think one is monetary and the other is peace of
24  mind.
25  Q. Does Cerberus also own FinCo?

**241**

1   A. Yes, they do.
2   Q. And are you aware of what's happening to FinCo as a
3   consequence of this transaction?
4   A. My understanding on FinCo is that there was a negotiation
5   between the United States Treasury, Fiat, FinCo and GMAC that
6   would allow GMAC to pick up the financing, both retail and
7   wholesale. And FinCo would dissolve itself.
8   Q. Are you aware if Cerberus is getting any releases in
9   connection with that transaction?
10  A. No, I would not be.
11  Q. All right. And who owns GMAC?
12  A. I believe the government.
13  Q. You believe the government owns GMAC?
14  A. I believe that's correct.
15  Q. All right. Do you know if Cerberus has an ownership
16  interest in GMAC?
17  A. I know that Cerberus originally, back in '07, had a
18  majority ownership but I believe that's been diluted to
19  somewhere below ten percent.
20  Q. But that's not zero, right?
21  A. Oh no, no. It's ten percent. But you asked me --
22  Q. So Cerberus does have an ownership interest in GMAC, is
23  that correct?
24  A. Yes, they would have a small -- as I understand it, a
25  small ownership.

1  Q. So your prior answer that it was owned by the government
2  isn't exactly correct?
3  A. Well, the majority of the ownership is the government,
4  correct.
5  Q. Okay. But there's a difference between majority and a
6  hundred percent, right?
7  A. Correct.
8  Q. All right. Now, you've played an integral role in the
9  negotiations of the restructuring of Chrysler; is that correct?
10      MR. ARMSTRONG: Objection, Your Honor, characterizing
11  it as a restructuring of Chrysler when this is a 363 sale.
12      MR. LAURIA: Your Honor, the speaking objections are
13  improper and I think the witness testified on direct that he'd
14  been involved in trying to restructure Chrysler for quite some
15  time and that was what I was asking about. And I really just -
16  -
17      THE COURT: First, I'm going to allow the question.
18  I think the witness referred to at least what his choice was on
19  April 30th, restructuring or liquidation and so he used the
20  term restructuring to describe what's was intended upon the
21  filing or at the filing. So you can continue to use that term
22  in the questioning. Go ahead.
23      MR. LAURIA: Thank you.
24  Q. So have you been intimately involved in the negotiations
25  regarding the restructuring of Chrysler?

                                                          242

1  A. Well, yes I've been involved. I would say a lot of people
2  have been involved in the restructuring.
3  Q. I'm not asking about the other people, I'm asking if you
4  were intimately involved.
5  A. Yeah, I was involved in the restructuring.
6  Q. I'm asking you if you were intimately involved.
7      MR. LAURIA: Your Honor, if the witness isn't going
8  to answer my questions I'm going to have to keep asking them
9  over and over again.
10      THE COURT: I didn't tell you to stop asking. You'll
11  get them answered.
12  A. Yes, I was very involved, if you want to use the word
13  intimately involved. I tend to use intimately in a different
14  context.
15  Q. That I didn't ask.
16      THE COURT: All right. Go ahead.
17  Q. Who else was principally -- did you say very involved, was
18  the word you were comfortable with?
19  A. Very involved is fine.
20  Q. Who else at the -- well, is it true that Mr. Kolka was
21  very involved in these negotiations?
22  A. Yes, he's one that was very involved.
23  Q. And Mr. LaSorda?
24  A. Yes, Mr. LaSorda was involved.
25  Q. And Mr. Press?

                                                          243

1  A. Correct.
2  Q. Anyone else?
3  A. A host of people. I mean, this doesn't happen. We had
4  our chief counsel, we had Treasury, we had engineering, we had
5  the head of operations, our government affair. I mean, you can
6  go down the list, everybody --
7  Q. I'm sure all those people weren't going to all these
8  meetings.
9  A. There was quite a few of those people going to these
10  meetings.
11  Q. And in an advisory capacity, Mr. Manzo was very involved?
12  A. Mr. Manzo participated and was very involved in a variety
13  of meetings.
14  Q. How about Ms. Ball?
15  A. Ms. Ball participated in some of the meetings, as was
16  relevant.
17  Q. But you would not describe her as very involved?
18  A. She was very involved in the aspects that required her
19  involvement. For example, she would not have been involved in
20  the UAW negotiations.
21  Q. Who was the outside counsel that was most involved in the
22  restructuring negotiations?
23  A. Ms. Ball.
24  Q. And what was the board's role?
25  A. The board's role was to be very involved also. I think

                                                          244

1  the minutes would prove that we kept the board very involved,
2  very transparent. We had frequent and open dialogue. I would
3  commend the board for their flexibility and willingness to meet
4  on relatively short notice.
5  Q. All right. And how -- would you describe Cerberus as very
6  involved in the negotiations?
7  A. Cerberus was not involved in certain aspects. They were
8  involved, as I --
9  Q. I'm just asking if you would describe them as being very
10  involved.
11  A. No.
12  Q. At any point in time?
13  A. They were very involved in certain aspects of the
14  negotiations.
15  Q. Which aspects?
16  A. They were very involved, as I said, in the discussions
17  between themselves and Daimler with the United States Treasury
18  Q. What were the discussions between themselves and Daimler
19  and the United States Treasury, if you know?
20  A. The only thing I know is from the settlement agreement
21  where there was agreements on the exchange of equity, second
22  lien notes, I think that's probably, you know, to the limit of
23  what I'd be aware of.
24  Q. Did you say equity and second lien notes?
25  A. In other words, that they -- as you know, Daimler had 19.9

                                                          245

| | |
|---|---|
| 1   percent and Cerberus had eighty percent. | 1   counsel as it relates to this. |
| 2   Q.  All right.  If you would turn to tab 9, please. | 2   Q.  Do you know who that is? |
| 3       (Pause) | 3   A.  I don't. |
| 4   A.  Okay. | 4   Q.  All right.  If you could go to the next e-mail above, the |
| 5   Q.  And if you would turn to the bottom of the e-mail trail. | 5   e-mail from Mr. Presutti.  This is an e-mail from |
| 6   A.  The bottom of the last page? | 6   TWL7@chrysler.com to Ron Bloom and copied to RLN43, I believe |
| 7   Q.  The last page, yes. | 7   that's you, right? |
| 8   A.  Okay. | 8   A.  Yes. |
| 9   Q.  Do you know Richard Presutti? | 9   Q.  All right.  Could you read that e-mail aloud? |
| 10  A.  I do. | 10  A.  The one that says, "Ron, sorry for the delay"? |
| 11  Q.  He worked for a law firm SRZ. | 11  Q.  That's the one. |
| 12  Q.  Who's SRZ?  Is that Schulte Roth & Zabel? | 12  A.  "On the Daimler issues but we have consolidated the list |
| 13  A.  Yes. | 13  and obtained input from Chrysler and Cerberus.  We have a |
| 14  Q.  Is Schulte Roth & Zabel also counsel to Cerberus? | 14  conference call with Daimler on Sunday and Ron and I will work |
| 15  A.  I'm not sure.  You mean overall or on a particular deal? | 15  the list with Chrysler through the weekend, starting tomorrow. |
| 16  Q.  In any capacity. | 16  Our objective is to resolve the issues before Monday.  And if |
| 17  A.  I know they've done work with them.  I'm not aware of | 17  we do, we can call you and cancel the Monday night meeting.  We |
| 18  whether they are their only or primary counsel. | 18  like DC but Michigan is okay too.  Take care.  Tom LaSorda." |
| 19  Q.  All right.  Are they counsel with respect to Cerberus' | 19  Q.  All right.  Is that the Chrysler-Daimler settlement that |
| 20  investment in Chrysler? | 20  we were talking about just a few minutes ago? |
| 21  A.  I believe they were involved in the purchase of Chrysler | 21  A.  My recollection of this discussion is Tom had the lead in |
| 22  from Daimler. | 22  trying to resolve some of the operational issues between |
| 23  Q.  And they are now your counsel, is that right, at Chrysler? | 23  Chrysler and Daimler. |
| 24  A.  No. | 24  Q.  I'm sorry, sir.  I'm just asking if the settlement that's |
| 25  Q.  Schulte Roth is not your counsel at Chrysler? | 25  being referred to here, between Chrysler and Daimler and |
| 246 | 248 |

| | |
|---|---|
| 1   A.  Regarding what?  In regards to -- | 1   Cerberus, is the one that you were talking to earlier. |
| 2   Q.  Let me ask you, is Schulte Roth your counsel in any | 2   A.  No, what I'm trying to clarify for you -- |
| 3   regard? | 3   Q.  If I need clarification I'll ask for it, but I'm just |
| 4   A.  I know they're working on the -- they are working on the | 4   looking for a yes or no answer. |
| 5   master transaction agreement. | 5       MR. ARMSTRONG:  Objection, Your Honor. |
| 6   Q.  Schulte Roth represented the company in negotiating the | 6       THE COURT:  Just a minute.  What's your objection? |
| 7   master transaction agreement? | 7       MR. ARMSTRONG:  Just to let Mr. Nardelli finish his |
| 8   A.  Yes. | 8   sentence. |
| 9   Q.  They were your primary counsel in that agreement? | 9       THE COURT:  All right.  Mr. Lauria, just ask the |
| 10  A.  No, they were -- they were involved in that with Cerberus | 10  question again. |
| 11  in negotiating that with Fiat. | 11  Q.  Is the settlement discussion being referred to in Mr. |
| 12  Q.  They represented Cerberus in connection with the master | 12  LaSorda's e-mail the same settlement that you were previously |
| 13  transaction agreement? | 13  describing for us? |
| 14  A.  I'm not sure.  You're asking me -- they were -- | 14      THE COURT:  Before the witness answers, just identify |
| 15  Q.  I'm just trying to understand if you view the Schulte Roth | 15  the previous settlement. |
| 16  & Zabel people as your counsel such that when you have | 16      MR. LAURIA:  We were previously talking about -- |
| 17  conversations with them you're getting legal advice or if you | 17      THE COURT:  No, I understand.  Just identify it for |
| 18  view them as Cerberus' counsel? | 18  the witness. |
| 19  A.  They were our counsel in -- I understand your question | 19  Q.  A settlement regarding the notes and equity in the |
| 20  now.  They were our counsel in developing the master | 20  company. |
| 21  transaction agreement. | 21  A.  This -- the only way I can answer this, Your Honor, is |
| 22  Q.  Not Cerberus'? | 22  that this was a part of the settlement.  This dealt with some |
| 23  A.  I don't -- I think they -- I'm not sure. | 23  of the operating issues.  It had nothing to do with equity.  It |
| 24  Q.  They might have represented both companies? | 24  had nothing to do with first lien.  This was -- we had some |
| 25  A.  No, I don't think so.  I think Cerberus has separate | 25  service agreements back and forth between Chrysler and Daimler |
| 247 | 249 |

250

They had to provide technology, we had some purchasing agreements. And Tom was most familiar with those because he put them in place when we made the acquisition, when Cerberus made the acquisition from Daimler.

So Ron Bloom had asked Tom, and I agreed, to let him try and negotiate a settlement what would be the most equitable resolution of these issues. It did not get involved, Your Honor, with equity and first-lien loans and so forth.

Q. So is it a yes or a no?

A. It is what I said.

Q. You don't know if it's yes or no?

A. It is what I said, sir. I can't answer a yes or a no.

Q. That's not a yes or no answer to my question.

A. Not that I would feel comfortable giving you on the record.

Q. So this is not part of the Chrysler-Daimler settlement that included resolution of their debt and equity in the company?

A. It is part of it, as I explained.

Q. All right. So let's go up to the response, which was also copied to you. That's on the next page.

A. Okay.

Q. That's from Ron Bloom. Could you read the response, please?

A. It says, "I'm a little more surprised -- a little more

---

251

than surprised that you would consider settling without approval."

Q. All right. Now what did that mean to you?

A. Well, what this means to me is Ron unfortunately thought we were agreeing to a global settlement, back to my earlier discussion with you about equity and first lien loans, etcetera. When we went back and clarified that this was only the elements that he asked us to negotiate and that we would not sign anything until he understood that part of it as it related to a global settlement is what he was reacting to here.

Q. You're response then was a lot shorter then that, wasn't it?

A. Yes.

Q. Could you read your response, please?

A. Yeah. "Ron thought we were helping, how would you like to handle it?"

Q. And his response?

A. "First, by discussing things before you settle."

Q. All right. And then your response?

A. "I guess we can discuss but not settle."

Q. And there's an exclamation point at the end of that e-mail, isn't there?

A. Yeah.

Q. Well, does that exclamation point indicate that you were a

---

252

little surprised at the response you got from Mr. Bloom?

A. No, I think it was as curt as the message I got from him.

Q. Did that have an exclamation point?

A. From him?

Q. Yes.

A. No.

Q. All right. So let's keep going. There's a response from Mr. LaSorda to you and what does that say?

A. "Thanks, Tom. I guess UST is running it." I'd be happy to explain that.

Q. If I ask a question, you can answer it. And if you don't feel like you got to say enough on my question, I'm sure your counsel will help you provide an explanation.

A. Okay.

Q. Is that okay?

A. Sure.

Q. All right. Now, the next response is from Mr. LaSorda back to you and he says?

A. "Twenty-six days and counting."

Q. And twenty-six days and counting was a reference to what?

A. If I look at the date of 4/4, twenty-six days would put us to the 30th.

Q. And what happened on the 30th?

A. On the 30th was the deadline where we had to have a plan resubmitted that would meet the criteria of Treasury.

---

253

Q. Your response to that twenty-six days and counting was what?

A. Amen with an exclamation point.

Q. You were looking forward to getting to April 30th, I take it?

A. Yes, sir.

Q. Let's flip to the next e-mail, the next tab, 10 please.

A. Okay.

(Pause)

Q. If you'd look at the e-mail from Mr. Manzo to you, right at the -- I guess it's the second message in the chain.

A. Yeah.

Q. Could you read the second sentence, please?

A. The one that starts with "Curious"?

Q. Yes.

A. "Curious that they often say we really can't tell you what to do or how to run your business. And yet, on other matters have no issue having authority to approve. Oh well."

Q. And is this continuing to refer to the Chrysler-Daimler settlement, can you tell?

A. I can't tell. My recollection of this would be, again, we felt that we were instructed to try and resolve some of the open operating issues between us -- between Chrysler LLC and Daimler. And when we got the note that said, you know, that Mr. Bloom was surprised we were a little -- reacted negatively

---

1  because we thought we were doing as we were instructed. Once
2  we got that cleared up I think we were in good shape.
3  Q.  All right.  So all I asked was did this refer to the
4  Chrysler-Daimler settlement, that comment?
5  A.  I know.  You've asked that several times and I'm trying to
6  give you an answer that is as accurate as I possibly can give
7  you.
8  Q.  All I'm looking for is a yes or a no.
9  A.  I can't do that in good conscience.
10  Q.  That's becoming apparent.
11  A.  All I can say, Your Honor, is I'm trying to be as
12  transparent and accurate as I can be.  Sorry.
13  Q.  All right.  Who were the key parties that you dealt with
14  at the United States Treasury in these restructuring
15  negotiations?  Was Ron Bloom one of them?
16  A.  Yes, sir.
17  Q.  Steve Rattner?
18  A.  To a lesser degree.
19  Q.  And Matthew Feldman?
20  A.  To some degree.
21  Q.  When was the first time Mr. Feldman became involved, do
22  you recall?
23  A.  I don't remember the date, sir.
24  Q.  Could you flip to tab 7, please?
25  A.  Sure.  Okay.

254

1  Q.  All right.  The bottom e-mail in this chain is from Mr.
2  Manzo to Mr. Feldman, does that appear to be the case here?
3        (Pause)
4  Q.  Did you flip to the third page?
5  A.  The third page?
6        (Pause)
7  A.  This is the one that starts off with "Great"?
8  Q.  That's it.
9  A.  Yes, I see that.
10  Q.  All right.  And what's the date of that e-mail?
11  A.  It's March 17th.
12  Q.  And who is that e-mail from, apparently?
13  A.  It's from Bob Manzo to Matt Feldman.
14  Q.  And the next e-mail is from Matt back to Bob, is that
15  correct?
16  A.  Yes.
17  Q.  And that e-mail was then forwarded to you, is that
18  correct?
19  A.  Yes.
20  Q.  All right.  And what was your response?
21  A.  "I think we're clearly getting more cooks in the kitchen,
22  doesn't sound too good."
23  Q.  So you weren't happy about the addition of Mr. Feldman to
24  the team, is that correct?
25  A.  Well, I didn't know Mr. Feldman and again we were trying

255

1  to work through this.  So it probably was an overreaction on my
2  part.  A lot of hands on the steering wheel.
3  Q.  All right.  So I want to go through the key elements of
4  the deal, okay.  Would you probably view the government
5  financing as the most important element of the deal?
6  A.  Yes.
7  Q.  And what's the amount of the government financing for this
8  transaction?
9  A.  Well, let's see if I can summarize.  The first part was
10  four billion dollars was the first tranche that we received.
11  Then there is --
12  Q.  When was that four billion received?
13  A.  That was received in January of '09.
14  Q.  And you viewed that as part of the financing for this
15  transaction?
16  A.  Well, if we didn't get that we wouldn't have this
17  transaction.
18  Q.  Okay.
19  A.  So I'm just trying to recant --
20  Q.  So you do view it as part of the financing for this
21  transaction?
22  A.  Yeah.  And it, to me, we wouldn't have gotten here without
23  the first four billion.
24  Q.  All right.  Then what came next?
25  A.  Then we received -- we got 4.9 billion in DIP financing.

256

1  Q.  And who provided that?
2  A.  United States Treasury.
3  Q.  And then is there anything else?  Any other financing?
4  A.  Then upon exiting bankruptcy the government will provide
5  six billion dollars.  Two billion dollars, Your Honor, goes to
6  OldCo to pay the first-lien lenders and the other four billion
7  is for exit financing for Chrysler Group LLC which is the NewCo
8  company.
9  Q.  And that is the most important component of this
10  transaction?
11  A.  Which portion of that?
12  Q.  The government financing?
13  A.  I think it's very important.  We wouldn't be here if it
14  wasn't for the government financing.
15  Q.  All right.  And would you characterize the UAW settlement
16  as a very important component of the transaction?
17  A.  Yes, I would.
18  Q.  All right.  And is the new labor contract an important
19  part of that settlement?
20  A.  Yes, it is.
21  Q.  And is the VEBA settlement an important component?
22  A.  Yes.
23  Q.  All right.  And you mentioned getting concessions from the
24  dealers, was that an important component of the deal?
25  A.  Yes, it was.

257

**Page 258**

1    Q.  All right.  And what about dealing with contingent
2    liabilities, was that important also?
3    A.  Contingent liabilities?
4    Q.  Yes.
5    A.  Well, sure they were important but I think you said the
6    primary importance was to really look at the funding and the
7    various constituent's concessions.
8    Q.  No.  My question right now was dealing with contingent
9    liabilities an important component of the transaction?
10   A.  Yes.
11   Q.  And when I say contingent liabilities, would it be fair to
12   say that that includes tort claims?
13   A.  Tort claims?
14   Q.  Yes.
15   A.  Yes.
16   Q.  And what about environmental liabilities?
17   A.  Sure.
18   Q.  So we've got the government financing, the UAW settlement
19   concessions from the dealers and dealing with contingent
20   liabilities.  Are there any other material components to the
21   transaction?
22   A.  Sure.  There's the CAW, the Canadian Auto Workers.
23   Q.  Okay.
24   A.  There were supplier concessions.  There were huge
25   management concessions, wage concessions, benefit concessions.

**Page 259**

1    There was an extensive amount of issues that we had to deal
2    with in putting this together.
3    Q.  Was it also important to get Cerberus to forgive its two
4    billion dollars of second lien debt?
5    A.  It was an important element of it, yes.
6    Q.  And what about resolving the U.S. Treasury's third lien
7    debt, was that also important?
8    A.  Yes, it was.
9    Q.  How is that getting resolved?
10   A.  Well, the first portion, the four billion dollar -- the
11   first tranche is being forgiven.  And it's my understanding
12   that the 4.9 million in DIP financing, to a certain degree,
13   would be forgiven.
14   Q.  To a certain degree?
15   A.  Depends on how much of it is expended, is what I meant.
16   Q.  Okay.  Would any of it not be forgiven?
17   A.  Not to my knowledge.
18   Q.  All of it will be forgiven?
19   A.  If it is entirely spent on DIP financing.
20   Q.  All right.  Now, you're familiar with the master
21   transaction agreement, is that correct?
22   A.  Yes.
23   Q.  And under the agreement Chrysler is selling substantially
24   all of its assets to a company called NewCarCo, is that right?
25   A.  It's the New Chrysler Group.  That's the -- that would be

**Page 260**

1    the new emerging name, yes.
2    Q.  Okay.  And will that company be called Chrysler after the
3    transaction closes?
4    A.  It'll be called Chrysler Group LLC.
5    Q.  All right.  From the public's perspective will it be
6    Chrysler?
7    A.  I don't know what NewCo will do, I mean as far as trying
8    to position the name.
9    Q.  You think they might change their name?
10   A.  No, I think they decided on Chrysler Group LLC as opposed
11   to Chrysler.  I think it marries up with Fiat Group.
12   Q.  You think the cars won't be called Chryslers, they'll be
13   Chrysler Groups?
14   A.  No, they'll be called Chrysler.
15   Q.  Okay.
16   A.  Dodge, Jeep.
17   Q.  Same cars?
18   A.  Yes.
19   Q.  All right.  Could you turn to page 2 of your declaration,
20   that's under tab 3 in the book.
21   A.  Okay.
22   Q.  All right.  I'd like you to read the first sentence of
23   paragraph 2 out loud.
24   A.  "I am authorized to submit this declaration in support of
25   Chrysler's request" --

**Page 261**

1    Q.  No, I'm sorry sir.  The first paragraph of -- the first
2    sentence of paragraph 2.  Sorry.
3         THE COURT:  Now Mr. Lauria, one second.  You're on
4    page 2, right?
5         MR. LAURIA:  Yes.
6         THE COURT:  Of the declaration?
7         MR. LAURIA:  Yes.
8         THE COURT:  Paragraph 2.
9         MR. LAURIA:  I got confused, Your Honor.
10        THE COURT:  Oh, all right.
11   Q.  If you'd please read that sentence.
12   A.  Yeah.  That's what I was reading, I thought.
13   Q.  Yes.
14        MR. LAURIA:  I got confused, Your Honor.
15   A.  Oh, I'm sorry.
16   Q.  I'm sorry.  Go ahead.
17   A.  Okay.  "I am authorized to submit this declaration in
18   support of Chrysler's request that the courts approve the sale
19   of assets to Fiat group.  Except as otherwise indicated, all
20   facts set forth in this" --
21   Q.  Just the first sentence.
22   A.  I'm sorry.
23   Q.  Now, just a moment ago you testified that the assets were
24   being sold to NewCarCo.  Why are you saying that you're selling
25   the assets to Fiat here?

**262**

1 A. I don't know. I know that the NewCo company will be
2 called Chrysler Group LLC.
3 Q. So you're not selling the assets to Fiat Group SPA?
4 A. And that Fiat basically will be provided the funds to make
5 that acquisition, to make that purchase.
6 Q. Fiat will be provided the funds to make that purchase?
7 A. Yes.
8 Q. What funds is Fiat using to make a purchase?
9 A. The six billion dollars.
10 Q. Is that money being advanced to Fiat or to NewCarCo?
11 A. I think it is being advanced -- there's two billion
12 dollars that will go to the first lien lenders and then six
13 billion dollars will be part of the exit financing that will
14 help fund the emergence of NewCarCo, as you say, coming out of
15 bankruptcy.
16 Q. So none of that money is going to Fiat?
17 A. No, none of that money is going to --
18 Q. And Fiat isn't providing any money to make this deal
19 happen, is that correct?
20 A. No, it's not.
21 Q. All right. Are you aware of what the initial ownership of
22 NewCarCo is going to be?
23 A. Yes. To the best of my knowledge it was negotiated by
24 Treasury that the UAW would have fifty-five percent, and the
25 government split between the U.S. and Canada around ten

**263**

1 percent. And that Fiat would have an initial twenty with the
2 opportunity to grow that to thirty-five by accomplishing three
3 specific benchmarks, each of five percent.
4 Q. That only adds up to eighty-five initially, fifty-five,
5 ten and twenty, is that correct?
6 A. Fifty-five, ten and twenty, correct.
7 Q. Right. So while Fiat is at twenty, is it correct to say
8 that the UAW would be at approximately sixty-eight percent and
9 the United States Treasury and Canada would share approximately
10 twelve percent?
11 A. You know, I saw that in an article and I've never looked
12 at it that way. I mean, my knowledge was always fifty-five,
13 thirty-five and ten. I've read that in the article this
14 morning in the paper.
15 Q. Well, if we start out with -- let's just assume that we're
16 going to end up with a hundred shares, okay.
17 A. A hundred percent, yes.
18 Q. Okay?
19 A. Uh-huh.
20 Q. And we've got twenty shares initially going to Fiat.
21 We've got ten going to the United States Treasury and Canada
22 and we've got fifty-five going to the UAW, is that correct?
23 A. That was my recollection of the deal, yeah.
24 Q. So do you have a rough estimate of what percentage fifty-
25 five is of eighty?

**264**

1 A. Fifty-five of eighty?
2 Q. I'm sorry; yes -- fifty-five of eighty-five, I'm sorry.
3 MR. ARMSTRONG: Your Honor?
4 THE COURT: Yes. One second.
5 MR. ARMSTRONG: Objection. I don't know that this is
6 useful exercise of our time, what percentage fifty-five is of
7 eighty-five.
8 THE COURT: Mr. Lauria, why don't you tell him the
9 percentage. He doesn't need to go through the calculation.
10 MR. LAURIA: I told him the percentages and he didn't
11 say he'd never heard of that before.
12 THE COURT: Well, he may not have.
13 MR. LAURIA: I'm trying to help him get there.
14 THE COURT: All right. If Fiat has twenty percent --
15 MR. LAURIA: All right. And the United States
16 Treasury and Canada have ten percent.
17 THE COURT: Then isn't it fifty-five of seventy?
18 MR. LAURIA: Well, I think the percentages -- it
19 starts out at sixty-eight, twelve and twenty. And I think if
20 you use fifty-five, ten and twenty you have eighty-five total.
21 And if you do the math you get to sixty-eight, twelve and
22 twenty.
23 THE COURT: Okay. I'll take your representation for
24 that.
25 MR. LAURIA: All right.

**265**

1 BY MR. LAURIA:
2 Q. So who is the largest shareholder of New Chrysler?
3 A. If I use my fifty-five or your sixty-six it would be the
4 UAW.
5 Q. All right. And Fiat has either twenty or thirty-five, is
6 that correct?
7 A. My understanding of the deal was it was twenty that could
8 grow to thirty-five.
9 Q. All right. So would it be fair to describe New Chrysler,
10 really, as kind of a joint venture between four parties?
11 MR. ARMSTRONG: Objection, Your Honor. Calls for a
12 legal conclusion.
13 MR. LAURIA: I'm asking for a businessman's answer
14 here.
15 THE COURT: He can ask for his understanding.
16 A. No, I would not, in my context of experience, call that a
17 joint venture.
18 Q. What would you call it?
19 A. I would call it a distribution of equity ownership.
20 Q. Okay. Certainly not a sale to Fiat, is it?
21 A. Not a sale to Fiat.
22 Q. Okay. So when did the reorganization of Chrysler become a
23 sale of assets to NewCarCo?
24 A. When does it become?
25 Q. When did it become?

1 A. Well, it won't become an actual sale of assets until the
2 transaction's complete.
3 Q. Well let me ask you, when you submitted the viability
4 report on February 17th, you're familiar with that?
5 A. Yes.
6 Q. Okay. Your vision of a reorganized Chrysler at that point
7 was a standalone reorganization, is that correct?
8     MR. ARMSTRONG: Objection, Your Honor, to counsel's
9 use of the term restructure. Before he made some hay about
10 restructuring, you allowed him to use that word with the
11 witness, not reorganize.
12     THE COURT: You can use -- what's in the report, Mr.
13 Lauria.
14     MR. LAURIA: Why don't we go to the report?
15     THE COURT: Go ahead.
16 Q. That's under tab 2. Can you tell us what's at the bottom
17 of the cover page?
18 A. Chrysler's restructuring plan for long-term viability.
19 Q. Okay. And in this restructuring plan the company proposed
20 that Chrysler restructure as a standalone company, is that
21 correct?
22 A. Can you say it again, please? The government said what?
23 Q. In this restructuring plan Chrysler proposed that it
24 restructure as a standalone company, correct?
25 A. Yes, that was one of the proposals.

266

1 Q. And what was the second proposal?
2 A. The second proposal was to form an alliance with Fiat.
3 Q. Now, when you say the word alliance you don't mean sell
4 your assets to Fiat, right?
5 A. No, the alliance was intended to have an equity
6 participation with Fiat.
7 Q. What does that mean, an equity participation?
8 A. Well, the original discussion that we had with Fiat was
9 similar to what we had with Nissan and others, that we wanted
10 to explore the opportunity, Your Honor, of granting them some
11 equity in the company in exchange for their products and their
12 technology, etcetera, and the helping us.
13 Q. So you wanted to get an equity investment by Fiat into
14 Chrysler?
15 A. They would provide product, platforms, technology, not
16 cash. But they would bring those assets to Chrysler LLC in
17 exchange for some equity.
18 Q. All right. And did you have any discussions regarding how
19 much equity they would get for those things?
20 A. Now this discussion, again, started in the May/June
21 timeframe of '08, similar to our discussions with Nissan at the
22 time. And discussions were somewhere around twenty percent
23 equity.
24 Q. At the time of this report, that is February 17th, 2009,
25 what was the amount of equity under discussion?

267

1 A. The equity at that point had grown -- I could look in here
2 and confirm but I believe it had grown to somewhere around
3 thirty, thirty-five percent.
4 Q. All right. And let's flip forward to tab 6 for a second,
5 okay? Do you recognize tab 6?
6 A. Yes, sir. I do.
7 Q. What is it?
8 A. This is a letter -- let me make sure. This is a letter
9 that I sent to Ron Bloom and Steve Rattner.
10 Q. And what's the date of the letter?
11 A. The date is March 10, 2009.
12 Q. All right. If you could turn to page 3 with me.
13 A. Okay.
14 Q. If we could look at paragraph 3, and I would just ask you
15 to read the first sentence of that paragraph.
16 A. The one that starts with regardless?
17 Q. No, the one that starts when we spoke on the topic of
18 Fiat.
19 A. Not the third paragraph but -- okay. "When we spoke on
20 the topic of Fiat you mentioned that Fiat must make a cash
21 contribution for their thirty-five percent equity stake due to
22 the optics, not the economics, of the deal."
23 Q. All right. So the deal contemplated a thirty-five percent
24 stake for Fiat, is that correct?
25 A. Yes.

268

1 Q. And that thirty-five percent stake was going to be in
2 Chrysler LLC, is that correct?
3 A. Correct.
4 Q. And they were proposing to put in certain technology and
5 platforms, is that correct?
6 A. Correct.
7 Q. But not cash, is that correct?
8 A. They were not putting cash in, that's correct.
9 Q. But you thought that they should, is that correct?
10 A. Well, this is saying when we spoke -- this is referring to
11 Mr. Rattner and Mr. Bloom mentioned that Fiat must make a cash
12 contribution.
13 Q. So you didn't think they needed to make a cash
14 contribution?
15 A. No, the original discussions that we started with Fiat
16 was, as I said, Your Honor, twenty percent for platforms,
17 powertrain, engine technology.
18 Q. Okay. So on February 17th there was going to be an
19 alliance with Fiat. The transaction contemplated an investment
20 by Fiat in Chrysler for which it would receive equity in the
21 company. A noncash investment, is that correct?
22 A. That's correct.
23 Q. And on this -- on the date of this letter, March 10th,
24 that was still the transaction you envisioned with Fiat, is
25 that correct?

269

1    A. That was the point I was trying to make in this note.
2    Q. All right. At what point did the transaction become a
3    sale of assets to a new company in which Fiat would own an
4    interest?
5    A. Well, as we move closer to the date, if you'll recall, at
6    the end of -- this would have been at the end of March, the
7    auto task force and the President of the United States said,
8    one; your standalone viability plan is not viable. Two --
9    Q. Sir, I'm sorry. But we're at March 10th.
10   A. Okay.
11   Q. And I was just asking, at what point -- at what point the
12   transaction envisioned on the February 17th restructuring plan
13   and then again in the March 10th letter, became a sale of
14   assets to a company in which Fiat would get an interest?
15   A. It took place towards the end of March, is my
16   recollection.
17   Q. Do you remember how that topic first came up?
18   A. I really don't.
19   Q. Who did you first hear about it from?
20   A. I'm sure it would have been the auto task force but I
21   don't remember the exact time or date when something like that
22   evolved.
23   Q. But you say you're sure it would have been the auto task
24   force?
25   A. In regards to forming a NewCo company?

270

1    Q. Yes.
2    A. Yes.
3    Q. And you think that was some time at the end of March?
4    A. I don't recall the date, to be honest with you. I know
5    that --
6    Q. Well just help me out, do you think it was before or after
7    the president announced that your standalone restructuring
8    proposal was unacceptable?
9    A. I don't recall. I know there was so many discussions
10   going on about how we might restructure it and what form it
11   might take. I don't want to misrepresent. If the date is in
12   here I'd be happy to look at it.
13   Q. Do you recall what your reaction was when you first heard
14   about it?
15   A. Reaction to?
16   Q. Structuring the transaction as a sale of substantially all
17   of Chrysler's assets to a NewCo in which Fiat would invest?
18   A. I think that if I recall that became -- see if I can frame
19   this for you. One of the things that obviously we had to be
20   prepared for was in fact filing for bankruptcy. That was one
21   of the three alternatives. And as we were going through this
22   the first alternative was turn down, and again I don't recall
23   the answer to your question.
24   Q. You do recall when the first alternative was turned down,
25   correct?

271

1    A. I do.
2    Q. And when was that?
3    A. That's when the president made his announcement. I
4    believe it was at the end of March.
5    Q. Did you get any advance notice of that announcement?
6    A. We were informed the evening before from the auto task
7    force that the president would be making an announcement the
8    next day that said that your plan is not viable. And that you
9    would have to form an alliance with Fiat and/or someone else
10   going forward. And we had thirty days to put that plan
11   together.
12   Q. Who informed you of that?
13   A. Mr. Rattner.
14   Q. Did he do that in person?
15   A. On a phone call.
16   Q. To you?
17   A. Yes.
18   Q. Was anybody else on that phone call?
19   A. Not in my office. I don't know if there was anybody else
20   in the room there.
21   Q. So it was just a one-on-one call between you and Mr.
22   Rattner?
23   A. To my knowledge. Yeah.
24   Q. All right. And you don't recall if by that time you had
25   already had discussions with the auto task force about changing

272

1    the structure of the deal?
2    A. Okay. So I would say some time between that March 10th
3    and that notification there were discussions on how -- what
4    alternatives would be available for restructuring.
5    Q. All right. And did anybody at the auto task force tell
6    you why they thought the transaction should be structured as a
7    transfer of Chrysler's assets to a new company with Fiat
8    investing in that company.
9    Q. Well, part of the answer to that is that they felt by
10   going through a restructuring, particularly a 363, that it
11   would allow us to be able to come out leaner. That it would be
12   a much easier restructuring because you would have a potential
13   buyer that would be funded by the government when we came out
14   of bankruptcy.
15   Q. When you say much leaner, what do you mean?
16   A. Well, that we would be able to get even further
17   restructuring, further liabilities, etcetera. For example,
18   we'd be able to leave behind in OldCo some of our idle
19   facilities that we had already closed like St. Louis and
20   Newark, etcetera.
21   Q. Why would you want to leave those behind?
22   A. Why would we?
23   Q. Yes.
24   A. Well, because they represent a liability and a cost that
25   we would then have to try and service as we came out of

273

|  |  |
|---|---|
| 1  bankruptcy. | 1  A.  Yes. |
| 2  Q.  So by leaving those assets behind you wouldn't have to | 2  Q.  Now, the second sentence says, "Doing anything else in |
| 3  bear that cost? | 3  light of our precarious situation, however, would have been an |
| 4  A.  NewCo would not have to bear that cost and then OldCo | 4  unreasonable exercise of business judgment".  Is that your |
| 5  would do the best they can to liquidate those assets. | 5  statement, sir? |
| 6  Q.  So let me make sure I understand this correctly.  Was the | 6  A.  Yes. |
| 7  auto task force suggesting that an advantage of this structure | 7  Q.  And what did you mean by that? |
| 8  was to be able to not have the company bear certain | 8  A.  Well, as I explained earlier when you were asking me about |
| 9  environmental cleanup liabilities? | 9  the impact of not choosing this alternative versus liquidation. |
| 10  A.  No, that discussion never happened. | 10  Q.  And that was because of your precarious situation, is that |
| 11  Q.  Well, I thought you just said there were costs associated | 11  correct? |
| 12  with some of these shutdown plants, are none of those costs | 12  A.  Yes. |
| 13  environmental related? | 13  Q.  And what was the precarious situation that you were |
| 14  A.  Yeah.  But your question specifically was did the | 14  referring to? |
| 15  government suggest to us that we should leave environmental | 15  A.  Precarious means we were running out of cash to be able to |
| 16  costs behind.  They never had that discussion with me. | 16  keep the company solvent. |
| 17  Q.  All right.  So the costs that were going to get left | 17  Q.  Let me ask you, were you running out of cash on February |
| 18  behind were what? | 18  17th? |
| 19  A.  Well, for sure there was -- well, I shouldn't say for | 19  A.  We were not running out of cash. |
| 20  sure.  As we went through the analysis there were the idle | 20  Q.  You were not running out of cash on February 17th? |
| 21  facilities.  We looked at some other categories of liability. | 21  THE COURT:  One second.  Just let him answer the |
| 22  We looked at other operational issues, other operating segments | 22  first question. |
| 23  that in fact the new company would not need and we could leave | 23  A.  We -- when you say running out, we were burning cash on |
| 24  those in OldCo and then try to liquidate those as best -- as | 24  February 17th.  I had received the first four billion dollars |
| 25  OldCo could. | 25  in January because, as I said earlier, the industry continued |
|  274 |  276 |

|  |  |
|---|---|
| 1  Q.  All right.  And what about dealing with your dealers, did | 1  to spiral downward.  We were forced to continue to idle and |
| 2  you ever have any discussion with the auto task force that | 2  furlough factories.  And when you do that and you continue to |
| 3  being in Chapter 11 and using a 363 sale might help you reduce | 3  pay your suppliers, you continue to make the interest payments |
| 4  your dealer force? | 4  to the first lien lenders, when you continue to pay taxes, |
| 5  A.  Well, there was no question that -- | 5  etcetera, yes you start to burn cash. |
| 6  Q.  Just a yes or no, then you can explain if I ask you to | 6  Q.  All right.  And when did that start again? |
| 7  explain. | 7  A.  Well, geez it's -- we started burning cash in the middle |
| 8  A.  Okay.  Repeat the question. | 8  of '08.  As I indicated, we spent over six billion dollars in |
| 9  Q.  Did you ever have any discussion with the auto task force | 9  '08 as a result of the volume falloff and the cost to idle |
| 10  about whether or not effecting this transaction through Chapter | 10  factories, unfortunately lay people off, furlough people, |
| 11  11 in a 363 sale would facilitate reducing your dealer network? | 11  etcetera.  So I think it was somewhere around six to seven |
| 12  A.  Yes. | 12  billion dollars in restructuring costs. |
| 13  Q.  And that was some time before March 31st? | 13  Q.  Let me ask you, in fact in the second half of '08 you saw |
| 14  A.  Yes. | 14  that you might run out of cash, is that correct? |
| 15  Q.  Was the concept of the assets being sold from OldCo to | 15  A.  That's correct.  And that's why we went to Congress and |
| 16  NewCo only in the context of a 363 sale? | 16  the Treasury and asked for a loan. |
| 17  A.  Yes. | 17  Q.  And didn't you see your situation as precarious at that |
| 18  Q.  So there was never any discussion about using that | 18  time? |
| 19  structure not as part of a bankruptcy transaction? | 19  A.  Yes. |
| 20  A.  Not to my knowledge. | 20  Q.  All right.  Now, when it was precarious at that time, |
| 21  Q.  Okay.  Now I want to go back to your declaration for a | 21  doing anything else but a sale transaction was not an -- the |
| 22  second. | 22  only reasonable exercise of business judgment, is that correct? |
| 23  A.  Okay. | 23  A.  It was the only reasonable -- |
| 24  Q.  That's under tab 3.  I want you to look at paragraph 3 on | 24  Q.  Let's go back to your sentence in paragraph 3 of your |
| 25  page 2. | 25  declaration. |
|  275 |  277 |

| | |
|---|---|
| **278** | **280** |

1   A.  Yes.
2   Q.  Okay. "Doing anything else in light of our precarious
3  situation, however, would have been an unreasonable exercise of
4  business judgment."
5   A.  Yes.
6   Q.  And that was because of your precarious situation?
7   A.  Yes.
8   Q.  All right. And you just testified a moment ago that in
9  late 2008 you were also in a precarious situation, right?
10   A.  Yes.
11   Q.  But you were not pursuing simply a sale transaction at
12  that point in time, were you?
13   A.  No, because the difference between those two dates, as the
14  market continued to get worse, we continued to burn cash. And
15  so when we asked in November, December for funds we asked for,
16  if you'll recall I mentioned we were asking for seven billion.
17  We felt that that would be enough to get us through what we
18  thought was going to be an industry that started to bottom out.
19   Q.  Well let me ask you, when you asked for that cash, when
20  was that?
21   A.  It was in November, December timeframe of '08.
22   Q.  All right.
23   A.  We were awarded it in January.
24   Q.  And if you didn't get it, what would have happened?
25   A.  We would have had to liquidate.

1   A.  I don't know the exact date but during that period.
2   Q.  Sometime in November or December?
3   A.  Yes.
4   Q.  All right. And was there any reason you thought that he
5  would be able to arrange for funds under TARP for Chrysler?
6   A.  I had no idea but it was worth the ask.
7   Q.  Were you aware of the fact that he had appeared before
8  Congress in mid-November and testified that auto companies fall
9  outside the purpose of TARP?
10   A.  We were aware of that and obviously it was a big concern
11  when we were going to make the request.
12   Q.  All right. You said it was a big concern, if the
13  Secretary of the Treasury said that auto companies were outside
14  the purpose of TARP, did it concern you that maybe you wouldn't
15  be able to get a loan?
16   A.  It did.
17   Q.  All right. And were you aware of the fact that an effort
18  was made in the house of representatives to pass a special Auto
19  Act so that financing could be provided to the auto companies?
20   A.  So here's what I recall about that, at the same --
21   Q.  If you would just answer the question I ask then we can --
22      THE COURT: Just a minute. Counsel? Just answer yes
23  or no if you were aware.
24   A.  Okay. Would you ask the question again, please? Sorry.
25   Q.  Were you aware that an effort was made in the house of

| | |
|---|---|
| **279** | **281** |

1   Q.  Would you have filed bankruptcy?
2   A.  Probably.
3   Q.  Were you prepared to file bankruptcy?
4   A.  We were not prepared at that point. We were doing
5  everything we could to convince Treasury to give us the money.
6  But we certainly were thinking about and started to engage
7  outside counsel at that time. We secured Jones Day in that
8  period anticipating that we would need to start planning for
9  bankruptcy.
10   Q.  All right. And you said that you went to the Treasury to
11  see if you could get a loan, is that correct?
12   A.  Yes.
13   Q.  All right. And you were asking for a TARP loan, is that
14  right?
15   A.  Yes.
16   Q.  All right. Now, were you aware of the fact, and didn't
17  you say that you had talked to Mr. Paulson?
18   A.  We spoke to the Secretary Treasurer. We spoke to the
19  Secretary of Commerce --
20   Q.  Was the Secretary of Treasury Mr. Paulson at that time?
21   A.  It was. Yes, sir.
22   Q.  All right. And when you spoke to him about getting -- did
23  you personally speak to him?
24   A.  On one or two occasions.
25   Q.  All right. And when would that have occurred?

1  representatives to pass an Auto Act that would permit providing
2  funding to the auto companies?
3   A.  Yes.
4   Q.  All right. And were you aware of whether or not that law
5  passed the House?
6   A.  My recollection, it did not.
7   Q.  All right. Did that concern you that the financing might
8  not be available?
9   A.  Well --
10      THE WITNESS: -- Your Honor, if I could answer that -
11  -
12      MR. LAURIA: It's a yes or no.
13      THE COURT: Just yes or no. Did it concern you or
14  not?
15      THE WITNESS: Yes.
16   Q.  Now, you're in a situation where you know the company
17  could be running out of money. It's December and you don't
18  have a commitment for new financing. What contingency planning
19  were you doing at that point?
20   A.  We were making sure, again as I mentioned, we retained
21  outside counsel to help plan for bankruptcy. We were having
22  continuous discussions with the Secretary or Treasury,
23  Secretary of Commerce. There were lengthy discussions in
24  place, Your Honor. At the same time there was a department,
25  the DEO money approved of fifty billion dollars. And there

1  were discussions in the house at the time that twenty-five of
2  the fifty billion could be used to support the auto industry.
3  And that was my pause relative to the question about the
4  discussions that were going on in the house.
5      There was considerable discussion about whether that money
6  could be used as opposed to TARP money because -- as was
7  highlighted, the statement about TARP constraints. And then
8  the money would be replenished again, twenty-five of the fifty.
9  So in addition to making that request directly to TARP, we also
10  had the alternative of possibly getting twenty-five billion of
11  the fifty billion that was approved through the Department of
12  Energy to fund us.
13      MR. LAURIA: Your Honor, I'm going to move to strike
14  that. I asked what he was doing. I didn't ask what the rest
15  of the world was doing.
16      THE COURT: Well, I think he answered that this is
17  what he was considering.
18      MR. LAURIA: All right.
19      THE COURT: I think you did ask for more than a yes
20  or no. All right. Mr. Lauria, do you have an estimate?
21      MR. LAURIA: This is going to go on for a long time,
22  Your Honor.
23      THE COURT: No, you've got to give me an estimate
24  because it's not unfettered.
25      MR. LAURIA: Okay. Fair enough. Your Honor, I could

282

1  see another couple hours at the rate we're going here.
2      THE COURT: Well, we're going to take a fifteen
3  minute break. We'll come back and then I'll limit you to an
4  hour and a half and we'll move along at that speed.
5      MR. LAURIA: All right.
6      (Recess from 4:54 p.m. until 5:15 p.m.)
7      THE COURT: All right. Please be seated. The
8  witness take the stand, please. Is the witness back? Okay.
9      MR. ARMSTRONG: We're getting him.
10      THE COURT: All right.
11      (Pause)
12      THE COURT: All right. Go ahead, Mr. Lauria.
13  RESUME CROSS-EXAMINATION
14  BY MR. LAURIA:
15  Q. Earlier you testified that the auto task force first
16  proposed the possibility of effecting this transaction through
17  363 and that it would only, as a sale, that is, to NewCo with
18  an investment by Fiat and that company and that it would only
19  be done as a Section 363 transaction in a Chapter 11 case, is
20  that correct?
21  A. I'm sorry. That was in reference to what? I --
22  Q. Earlier you testified --
23  A. Yes.
24  Q. -- that the first time you heard about structuring the
25  transaction as a sale to NewCo with Fiat investing in NewCo

283

1  instead of Chrysler --
2  A. Yes.
3  Q. -- was from the auto task force, correct?
4  A. Yes. They were suggesting that -- again, I had no
5  previous knowledge on how this transaction -- the sales
6  transaction would work. And so, they basically were outlining
7  this as a possibility of one way to conduct the transaction.
8  Q. And they proposed that that could only be done -- or
9  discussed doing that only in the context of a Chapter 11 case,
10  is that correct?
11  A. I don't recall only. I mean, my understanding, again,
12  that a 363 could only be done under the context of bankruptcy.
13  Q. Okay.
14  A. Yes.
15  Q. Could you go back to tab 7 for me?
16  A. Yes.
17  Q. And I'd like to look at the e-mail on the first page --
18  A. Yes.
19  Q. -- that is to you from Mr. Manzo.
20  A. Yes.
21  Q. If you could -- the first sentence says "While I'd say at
22  least this guy will tell Bloom, Rattner what will work and what
23  won't". "This guy" is referring to Mr. Feldman, is that
24  correct?
25  A. Can I read the rest of this and make sure?

284

1  Q. Sure.
2      (Pause)
3  A. Okay. So the question was --
4  Q. The term "this guy" in the first sentence of Mr. Manzo's
5  e-mail to you refers to Mr. Feldman, is that correct?
6  A. I would -- yes.
7  Q. All right. And then the next sentence says "They need
8  that to figure out a structure."
9  A. Okay.
10  Q. Would it be fair to say that that was a reference to the
11  363?
12  A. Well, I don't know if I could make that leap to 363 but
13  they're looking at various structures of what would work.
14  Q. All right. And then if you could read the next sentence
15  out loud?
16  A. Sure. "Matt told me Jimmy did not go over well. He may
17  have sealed his fate last week and regrettably ours at the same
18  time."
19  Q. Now, do you know who Jimmy is?
20  A. I believe he was referring to Jimmy Lee (ph.) at JPMorgan.
21  Q. Do you know what Jimmy Lee's title is at JPMorgan?
22  A. I don't know his exact title.
23  Q. Very senior at the bank?
24  A. A senior member of the bank, yes, sir.
25  Q. All right. Do you know what he may have been referring to

285

286

1  when he said "He may have sealed his fate last week and
2  regrettably ours at the same time"?
3  A.  Well, if I read on in this e-mail, my recollection is they
4  were asking for a seventeen million dollar fee to get a waiver
5  on some financial statements.  And my guess is he may have been
6  referring to that request for a transaction fee.  And I don't
7  remember in what context but I remember something about them
8  asking for a fee.  The bank was asking for a fee.
9  Q.  Do you recall at that time having the impression that the
10  discussions between the United States Treasury and JPMorgan as
11  agent for the secured lenders were not going well?
12  A.  I wouldn't have any context of whether they're going well
13  or not.  I mean --
14  Q.  You were not involved in those conversations at all?
15  A.  No.  Again, as I stated earlier, we had an initial
16  discussion with JPMorgan and, basically, as I said, Your Honor,
17  that we were told that those discussions would have to take
18  place with the United States Treasury.
19  Q.  Did you make any effort to keep yourself informed of those
20  discussions?
21  A.  I did not other than the one meeting that I said I
22  participated in where the four banks were there, Fiat, Chrysler
23  and Mr. Rattner and Mr. Bloom.
24  Q.  Well, isn't it true that the company couldn't reorganize
25  without some arrangement or treatment for the first lien debt?

286

1  A.  Yeah.  One of the -- obviously, one of the things when we
2  looked at our --
3  Q.  Just yes or no, please.
4  A.  Yes.  We had to look at our first lien debt --
5  Q.  So --
6  A.  -- as part of our restructuring.
7  Q.  So how were you going to accomplish this restructuring if
8  you weren't even keeping tabs on the negotiations regarding the
9  first lien debt?
10  A.  Well, as I tried to say, we made our first attempt at
11  debt.  And we knew that we would have to reduce the service
12  level, that we could not afford to service that level of debt
13  and that the United States -- and we were directed that that
14  discussion would take place between the banks and United States
15  Treasury.
16  Q.  Let me ask you to flip forward to tab 11, please?
17  A.  Okay.
18  Q.  This is an e-mail from you to Mr. Manzo dated April 5th,
19  is that correct?
20  A.  Tab -- did you say tab 11?
21  Q.  Yes, I did.
22  A.  This looks like an e-mail from Bob Manzo to me not me to
23  him.
24  Q.  Well, if you start up at the top of the page, at the very
25  top --

287

1  A.  Yes.
2  Q.  -- it says from RLM 43 at Chrysler.
3  A.  Yeah.  To Manzo, yeah.  Where I say "Thank you"?
4  Q.  Yes.
5  A.  Yes.  Okay.
6  Q.  All right.  Now you're responding to an e-mail from Mr.
7  Manzo to you, is that correct?
8  A.  Yes.  Can I read it or --
9  Q.  Well, we'll get to that.  But I just want to establish
10  that it's an e-mail from Mr. Manzo to you.
11  A.  Yes.
12  Q.  All right.  Now the subject is "UST called discussions
13  with BCG", is that correct?
14  A.  That's the subject, yes.
15  Q.  Who is BCG?
16  A.  Boston Consulting Group.
17  Q.  Were they an advisor of yours?
18  A.  No, they were not our advisor.
19  Q.  Who were they advising?
20  A.  They were retained by the U.S. Treasury.
21  Q.  All right.  And do you know what their assignment was for
22  U.S. Treasury?
23  A.  In the broadest scope, I think they were brought in to
24  provide based on their specialization in the area of the auto
25  industry.  They have a pretty large practice in Detroit.  And I

288

1  think the auto task force, again, wanted to make sure they were
2  bringing together the most talented group of consultants and
3  advisors in making this decision.
4  Q.  All right.  I'd like you to take a look at the fifth
5  paragraph of Mr. Manzo's e-mail to you.  I'm going to read it
6  out loud for you.
7  A.  Okay.
8      MR. ARMSTRONG:  Excuse me.  Your Honor?
9      THE COURT:  Yes?
10      MR. ARMSTRONG:  Now that we seem to be getting to it
11  as counsel put it, could the witness have a chance to actually
12  read the entire e-mail?
13      MR. LAURIA:  Your Honor, I'm asking him about a
14  paragraph here.  I don't know that he needs to read the entire
15  e-mail.
16      MR. ARMSTRONG:  Well, I know your objective is to
17  throw a couple of words out, but I'd like him to at least take
18  a look --
19      MR. LAURIA:  Your Honor, I think the comments of
20  counsel are entirely inappropriate.  If he's got an objection
21  he should address it to the Court.
22      THE COURT:  No, I think they -- just state the
23  objection and direct your comment to the Court.
24      MR. ARMSTRONG:  Yes, sir.
25      THE COURT:  All right.  You know, the witness can

289

1  respond. If the witness can't respond to a particular question
2  because it's out of context, he can say so. Go ahead, ask the
3  question.
4        MR. LAURIA: All right.
5  BY MR. LAURIA:
6  Q. I'm going to read the fifth paragraph here. "The banks
7  are having a call tomorrow to discuss and vote. They only need
8  fifty-one percent, which is just JPM and Citi. So when JPM
9  says we don't have bank group support, that is bullshit. JPM
10 and Citi control decision. They are, as usual, trying to
11 create an illusion of a large unruly group to gain negotiation
12 leverage." Do you recall reading that message?
13 A. I'm sure I must have.
14 Q. Do you recall today what that vote was referring to?
15 A. Let me read through this, please.
16    (Pause)
17 A. Okay. I believe this is tied to the other e-mail. When
18 it says "We sent them a new proposal on the amendment", we
19 needed bank approval on an amendment that we were requesting
20 and I think it ties back into -- the banks wanted seventeen
21 million dollars in fees to be able to change that amendment.
22 And I believe that you only need fifty-one percent of the banks
23 to agree to that amendment as opposed to a majority.
24 Q. So Mr. Manzo didn't seem to think that their position was
25 too legitimate, did he?

290

1  A. No, it would not appear that way from this.
2  Q. All right, let's look at the next two sentences, please.
3  I'm going to read them for you.
4  A. Okay.
5  Q. "Feldman is squarely behind us and, as you see from some
6  e-mails, we saw Rattner is up to speed. Matt said if they
7  don't approve tomorrow, UST will really 'turn up the heat';
8  don't know what exactly that means, but I guess we could
9  speculate." Have you ever heard any reference like that before
10 or since regarding the U.S. Treasury turning up the heat?
11 A. No. I mean, again, I read it here. I must have read it
12 when I received the e-mail.
13 Q. Did they ever turn up the heat on you?
14 A. No, I think we turned the heat up on them to try and get
15 this deal done.
16 Q. On the U.S. Treasury?
17 A. Yeah, I mean, it was very important that we -- there were
18 parts of the negotiations that they were handling.
19 Q. And by letting them handle those negotiations, you turned
20 up the heat on them?
21 A. Well, we certainly wanted to get it done.
22 Q. Is it fair to say that you had numerous meetings and
23 discussions with the United States Treasury regarding the
24 restructuring?
25 A. Yes.

291

1  Q. Would it be fair to say that the U.S. Treasury did not
2  agree with the company's positions on a number of significant
3  issues?
4  A. No, I wouldn't say that.
5  Q. All right. Let's test that a little bit, okay?
6  A. Okay.
7  Q. In the February 17th restructuring plan, the company
8  recommended a standalone restructuring, is that correct?
9  A. Yes.
10 Q. The U.S. Treasury did not agree with that, is that
11 correct?
12 A. Correct.
13 Q. Are you pursuing a standalone restructuring plan?
14 A. Are we pursuing one?
15 Q. That is the question.
16 A. No.
17 Q. Your answer is?
18 A. No.
19 Q. All right. The initial financial request you made to the
20 U.S. Treasury was for seven billion dollars, is that correct?
21 A. Yes.
22 Q. How much did you receive?
23 A. Four.
24 Q. All right. When you were trying to move forward with the
25 Daimler settlement, you were told to discontinue discussions

292

1  and not reach a deal until you had gotten approval from the
2  UST, is that correct?
3  A. Yes, I stated that in the context as it was -- as we had
4  that discussion.
5  Q. In fact, you stated that they were running it, is that
6  correct?
7  A. No, I didn't say that.
8  Q. Okay, let's --
9  A. I don't believe I did.
10 Q. -- let's go back to an e-mail that's at tab 10 -- I'm
11 sorry, tab 9. Your e-mail to Mr. LaSorda?
12 A. Yes.
13 Q. I'm going to read it to you: "Thanks, Tom. I guess the
14 UST is running it." Do you remember that now?
15 A. Yes, and I explained that in the context of that e-mail
16 and the exchange that took place.
17 Q. Now, let's talk about getting a deal done with the non-
18 TARP lenders. Do you remember talking about the negotiations
19 at the eleventh hour?
20 A. Okay, the discussion at the eleventh hour with the non-
21 TARP --
22 Q. Correct.
23 A. -- lenders?
24 Q. Correct.
25 A. The first lien lenders?

293

1　Q. Yes.
2　A. In my attempt to try and have a conversation with them?
3　Q. Right.
4　A. Yes.
5　Q. And you were unable to do that, correct?
6　A. Correct.
7　Q. And when Mr. Manzo, one of your key advisors, tried to
8　press a conversation to find a settlement, was it -- would it
9　be fair to say that he was shut down?
10　A. I'm not sure in what context you're making the statement.
11　As I --
12　Q. Let's go back to tab 13.
13　A. Okay. Yes?
14　Q. In response to Mr. Manzo's e-mail to Bloom and Feldman
15　saying that "[w]e could easily find 250 million in savings to
16　help fund this last piece. We have other ideas as well. I
17　hope you think it's worth giving this one more shot. We will
18　work with you and Matt to get this done. I'm around." The
19　response was, "I'm now not talking to you. You went where you
20　shouldn't." Do you remember that?
21　A. Well, sure, I remember when we reviewed it earlier in the
22　testimony where Matt sent that to Mr. Manzo at 22:46.
23　Q. Let's go to tab 16.
24　A. Okay.
25　Q. The second e-mail on the page is an e-mail from Mr. Manzo

1　to various people at Treasury. I'm going to read to you the
2　third paragraph. It says, "Again, I'm being redundant, I know,
3　but we continue to believe that this is not the best way to
4　maximize the value of these assets." Next paragraph, "We
5　continue to believe that revisiting the combination alliance
6　discussion with GM from the fall of 2008 is the best
7　alternative for all parties." Do you recall this?
8　A. Yes, I do.
9　Q. All right. So the company's view was that the value-
10　maximizing approach was an alliance with GM, is that correct?
11　A. No.
12　Q. No? All right. Let's --
13　A. No, and you need the background of this to be able to --
14　for me to answer that question.
15　Q. You're saying the answer is no?
16　A. Yeah, I'm saying in the context of this discussion that
17　took place, as I recall, is not the inference you're
18　suggesting.
19　Q. I don't think I was making any inference, but let's look
20　at the -- let's look at these two sentences again.
21　A. Okay.
22　Q. Okay. "Again, I'm being redundant, I know, but we
23　continue to believe that this is not the best way to maximize
24　the value of these assets." "We continue to believe that
25　revisiting the combination alliance discussion with GM from the

1　fall of 2008 is the best alternative for all parties." Now,
2　that is a statement made by your advisor Mr. Manzo to the UST
3　on April 14th.
4　A. Yes, it was a sta --
5　Q. Is that a statement with which you agree?
6　A. It was a statement that was made relative to not the
7　transaction we're discussing here today. This was in response
8　to, again, another inquiry, looking at all alternatives, of
9　breaking out segments of Chrysler and potentially selling those
10　to General Motors. So in context of doing that versus a total
11　alliance with General Motors, Mr. Manzo, I believe, was saying
12　that a total alliance would be better than fractionalizing and
13　trying to cherry-pick the Chrysler portfolio, Your Honor.
14　Q. Did the UST agree with the approach you wanted to take?
15　A. Which approach was that?
16　Q. The approach you just described.
17　A. United States Treasury, as I recall this, again, was
18　another scenario about how we might be able to save Chrysler.
19　They asked the -- they asked Boston Consulting to take a look
20　at various alternatives. If you look here, the subject of
21　"jeep, truck and minivan", they were looking at various product
22　lines that might bring value to Chrysler; in other words, save
23　portions of Chrysler by combining them with General Motors.
24　And we had the same issue about the ability to break those off
25　and really effect that change, Your Honor, and that's why we

1　said you're better off doing a total alliance than a fractional
2　alliance or buying these segments.
3　Q. So did they agree with you?
4　A. Ultimately they did agree that they should not try to
5　quarter off pieces of Chrysler and put them into General
6　Motors.
7　Q. All right.
8　A. I'm sorry. I'm just trying to give you the facts.
9　Q. Thank you. Let me ask you to -- let me ask you, you
10　mentioned in your declaration that you had conducted due
11　diligence with respect to Fiat; is that correct?
12　A. Yes.
13　Q. All right. And you asked Capstone to assist in connection
14　with that diligence, correct?
15　A. We had Capstone involved and others.
16　Q. Do you recall ever getting any advice from Capstone with
17　respect to that diligence?
18　A. No. If you have a document, I'd be happy to look at it.
19　Q. Well, let's go to tab 21.
20　A. Okay.
21　Q. I'm sorry, first let's go -- yeah, let's go to tab 21.
22　A. Mine's blank.
23　Q. Yours is blank?
24　A. Yes, sir.
25　Q. All right.

1    MR. ARMSTRONG:  Your Honor, if I may approach?
2    THE COURT:  Go ahead.
3  Q.  Why don't you take a look at this e-mail for a moment?
4  And let me know when you've reviewed it.
5  A.  Okay.
6    (Pause)
7  A.  Okay.
8  Q.  Okay.  Is this a discussion of the status of due diligence
9  regarding Fiat?
10  A.  Yes.
11  Q.  Do you know a Mr. Quackenbush at Capstone?
12  A.  I don't recognize the name.
13  Q.  All right.  Did you ever hear that Fiat had high off-
14  balance-sheet liabilities?
15  A.  I'm trying to see if it said it in here.
16  Q.  Doesn't say it there, sir.
17  A.  Yeah.
18  Q.  I'm just asking if you ever recall hearing that Fiat had
19  high off-balance-sheet liabilities.
20  A.  Boy, not to my recollection.  If there was a document, I'd
21  be happy to look at that.
22  Q.  Do you ever recall hearing that Fiat had a significant
23  presence in a number of high-risk countries for corruption?
24  A.  I recall a concern was raised about some case as it
25  related to corruption.  I called Sergio; he conveyed to me --

298

1  Sergio Marchionne, the CEO of Fiat.  He conveyed and
2  acknowledged yes, that it was -- there was something that
3  someone of his employees did, and they immediately moved to
4  remedy that and whatever penalties were associated.  And that
5  they have a very strong policy in place on corruption, Foreign
6  Corrupt Practice Act, et cetera.
7  Q.  Did you ever recall hearing anybody refer to Fiat as a
8  shady partner?
9  A.  A shady partner?
10  Q.  Shady partner.
11  A.  I don't know.  Not to -- again, if you've got something,
12  I'd be happy to look at it.
13  Q.  All right.  Let's look at tab 19.
14  A.  Okay.  Okay.
15  Q.  Okay.  This is an e-mail that includes a report within
16  Capstone.
17  A.  Am I on the distribution of this?
18  Q.  You are not.
19  A.  Okay.
20  Q.  And if you flip to page 2 --
21  A.  Okay.
22  Q.  -- you'll notice that the team agreed that points to
23  Nardelli are 1, 2, 3 and 4.  If you would look at point 3.
24  Just read it out loud for us.
25  A.  "Off-sheet investments in JV without full disclosure is an

299

1  economic risk and a political risk.  How could
2  Treasury/Chrysler get in bed with a shady partner?"
3  Q.  Do you recall ever receiving that advice?
4  A.  I don't -- I can't put that in context with the overall
5  evaluation of Fiat.
6  Q.  So you never received that advice?
7  A.  I don't recall.  If I did, if there's somewhere you can
8  show me that?
9  Q.  Let's take a look at tab 24.
10  A.  Okay.
11  Q.  Do you recall, shortly before the bankruptcy case was
12  filed, learning of any discussions between the company and the
13  United States Treasury regarding the timing of the transaction?
14  A.  Well, we had a lot of discussions about the timing
15  relative to the end-of-month deadline.
16  Q.  All right.  And how about discussions about the execution
17  of the transaction once the Chapter 11 case was commenced?
18  A.  Well, as we said, you know, when we announced, we wanted
19  to get through this in thirty to sixty days.  Is that your
20  question?
21  Q.  I think that's responsive to my question, yes.
22  A.  Yeah.
23  Q.  Do you recall having any discussion with the United States
24  Treasury about that?
25  A.  Yes because we had to put together a DIP budget, a debtor-

300

1  in-possession budget, and we had to go out thirty, sixty days
2  as to what it would cost while we continued to make payments to
3  suppliers, what were the tax costs, what were the obligatory
4  payments that we would have to make.  So in context of putting
5  together a DIP budget, yeah, we did have discussions about the
6  timing.
7  Q.  Now, you mentioned making payments to suppliers.  Is the
8  company building cars right now?
9  A.  No, sir, we're not.
10  Q.  Are the plants idle?
11  A.  Totally.
12  Q.  So I'm a little confused about why you're paying
13  suppliers.
14  A.  Well, because it's an obligation.  When we went back and
15  talked to our suppliers, we'd gone back and said, based on some
16  new terms and conditions, if you agree to these new terms and
17  conditions, some additional concessions, then I think what
18  we've done so far is agreed to make a partial payment against
19  our liabilities.
20  Q.  So you're continuing to pay outstanding obligations to
21  your suppliers?
22  A.  Yeah, those that were listed as critical suppliers so that
23  we could keep them solvent so that they were in a position to
24  have liquidity when we started the factories to be able to
25  build vehicles.

301

1 Q. Do you happen to recall what the outstanding amount owed
2 to your suppliers was on the date of the bankruptcy case?
3 A. No, sir, I don't remember the exact amount.
4 Q. All right. Would the number 5.3 billion sound like it
5 might be the right number to you?
6 A. Well, it seems like an awful high number for suppliers.
7 Q. All right. If we could --
8 A. I don't know, but --
9 Q. If we could look at tab number 1.
10 A. Okay.
11 Q. This is the affidavit of Ronald Kolka in support of first-
12 day pleadings. You know Mr. Kolka, right?
13 A. Yes, sir.
14 Q. All right. He's your CFO, is that correct?
15 A. Yes, sir.
16 Q. All right. If you could look with me at page 3.
17 A. Tab 1.
18 Q. Yes.
19 A. Page 3?
20 Q. Yes. Last bullet point on the bottom of page 3. You see
21 the reference to 5.3 billion there?
22 A. Yes.
23 Q. Does that refresh your recollection at all on the amount
24 of payables to -- for parts and services?
25 A. Well, in here you also have, in addition to the parts

1 suppliers, you also have service suppliers --
2 Q. Yes --
3 A. -- in addition --
4 Q. -- parts and services.
5 A. Yeah. Yes. So when I -- I'm sorry, when I was
6 referencing the number, I was thinking about the parts
7 suppliers. So I'm sure if this is the number he put in there,
8 I'm sure that it's accurate.
9 Q. And as long as we're here, if you'd go to the second
10 bullet in that section; it references Chrysler's workers and
11 retirees and their surviving spouses will lose over 9.8 billion
12 of health care and other benefits. Is that a reference to the
13 outstanding VEBA obligation?
14 A. I would assume that part of that is VEBA and other ongoing
15 health care benefits to both active and inactive and then non-
16 bargaining unit and bargaining unit salary and management.
17 Q. All right. Now, you, I'm sure, have received a lot of
18 advice about your fiduciary duties as this process has
19 unfolded, is that correct?
20 A. Well, advice on fiduciary -- no. No, but when you say
21 "advice", from who?
22 Q. Well, I'm just asking if you've received any advice
23 regarding your fiduciary duties as this --
24 A. Oh, yes.
25 Q. -- process has unfolded.

1 A. Yes, I mean, as far as what payments are required, what
2 are -- you know, certainly from our bankruptcy counsel, what
3 are some of the obligations, what are some of the payments you
4 are obligated to make. You know, I've had really good counsel
5 working me through this process.
6 MR. ARMSTRONG: Your Honor, if I may just --
7 MR. LAURIA: I'm not going to invade the privilege.
8 MR. ARMSTRONG: I know you're not; I'm just concerned
9 that Mr. Nardelli might. Just remember to keep in mind that
10 you shouldn't divulge the communications that we've had or
11 you've had with your counsel.
12 THE WITNESS: Oh, okay. Sorry. I'm just trying to
13 be responsive.
14 BY MR. LAURIA:
15 Q. You do have an understanding that you owe fiduciary duties
16 to your stakeholders in the zone of insolvency; is that
17 correct?
18 A. Yes.
19 Q. And you're -- you've been very concerned about performing
20 those fiduciary duties as you've gone through this process,
21 correct?
22 A. Yeah, to the best of my ability.
23 Q. Is it your basic understanding that your fiduciary duty
24 requires you to maximize value for your stakeholders?
25 A. Yes.

1 Q. Now, you couldn't perform that duty if you didn't know
2 what your stakeholders were going to get in restructuring,
3 could you?
4 A. Well, I think that part of that is -- you know, part of
5 that is a moving number; it's a new -- you know, as we go
6 through every day trying to resolve what are some of the open
7 issues and the values and so forth.
8 Q. But you did have to form a view as to what your
9 stakeholders were going to recover under various alternatives
10 so that you could pick the course that would maximize the
11 recovery, correct?
12 A. Yes, in its broadest sense, that's what we were doing with
13 the DIP budget to make sure that, again, it started off at 4.1
14 billion; it grew to 4.960 billion because we encountered
15 additional obligations to various stakeholders, tax payments
16 that we discovered we had to make. And so we went back to the
17 United States Treasury and they increased the DIP budget.
18 Q. All right. Now, as we just talked about, you are aware
19 that you had somewhere in the order of 5.3 billion dollars of
20 outstanding trade claims, is that correct?
21 A. Yes, as you've noted here on page 3.
22 Q. And is it your understanding that substantially all of
23 those claims are going to be paid in cash in full pursuant to
24 this transaction?
25 A. No.

**Page 306**

1  Q. No?
2  A. I don't -- I couldn't give you an answer, of that amount,
3  how much of it will be paid in full.
4  Q. Do you have any idea?
5  A. No. We would have to go back -- I'd have to get with Ron
6  and of this amount what portion of it was approved as part of
7  the DIP budget.
8  Q. You'd have to go back to Ron? Who is Ron?
9  A. Ron Kolka.
10  Q. So you don't know if --
11  A. I don't --
12  Q. -- any of your trade claims are getting paid?
13  A. Oh, no, I know some of them are. I -- you asked me
14  specifically is the 5.3 billion being paid in full, and I don't
15  know the exact answer to that.
16  Q. Do you have any idea how much of that's getting paid?
17  A. I wouldn't want to give you a wrong answer.
18  Q. But Ron would be the person who would know?
19  A. I think so.
20  Q. All right. What about warranty obligations and dealer
21  obligations? Do you have any understanding of how those claims
22  are being treated?
23  A. My understanding is that the warranty obligations are
24  being transferred to NewCo.
25  Q. And will be honored?

306

---

**Page 307**

1  A. Yes.
2  Q. All right. What about the pension obligations?
3  A. It depends -- again, my understanding, it depends on which
4  pension.
5  Q. Well, let's talk about, then, in toto, unless you believe
6  that there's going to be different treatments of different
7  pension obligations.
8  A. Well, my understanding, there is. For example, Lee
9  Iacocca lost his pension.
10  Q. All right. He lost his pension?
11  A. Yeah, the unsecured portion is lost and nonrecoverable.
12  Q. How about the pension for the hourly workers?
13  A. I believe the pension for the hourly workers is carried
14  forward, but I'd want to confirm that.
15  Q. All right. You are familiar with the master transaction
16  agreement, right?
17  A. Yes.
18  Q. Would you have any reason to disagree if I told you that,
19  pursuant to Section 2.06(r) and 3.16, the UAW pension
20  obligations, underfunded pension obligations, are being assumed
21  and paid by NewCo?
22  A. I guess. I'd have to look at it to confirm it. But if
23  you're saying that's exactly what's in there, then I'm sure
24  we're abiding by the master transaction agreement.
25  Q. All right. Do you have any understanding of what the

307

---

**Page 308**

1  underfunded pension liability is?
2  A. No. You mean the amount? I don't know --
3  Q. The amount.
4  A. -- no.
5  Q. If I told you it was 3.5 billion, would you have any --
6  does that sound like a familiar number to you?
7  A. No, it wouldn't be a familiar number.
8  Q. All right. Now, what are the -- what is your
9  understanding of what the senior lenders are going to get under
10  the transaction?
11  A. The senior lenders, as I understand it, have agreed to a
12  two billion dollar cash payment.
13  Q. So that's what they're going to get, is that correct?
14  A. That's my understanding.
15  Q. All right. Now, let's talk about the VEBA obligations for
16  a moment, if we could.
17  A. Okay.
18  Q. Is it correct to say that the VEBA is receiving a 4.6
19  billion dollar note and a 55 percent equity stake in the new
20  company?
21  A. The 55 percent is back to my earlier comments, and the 4.6
22  sounds about right of a 10 billion dollar obligation that was
23  negotiated -- a contractual obligation that was negotiated in
24  the 2007 settlement. And what we were -- one of the criteria
25  in our submission plan to the government was that fifty percent

308

---

**Page 309**

1  of that had to be converted to equity, and that was one of the
2  agreements that we had reached with the UAW, along with meeting
3  the -- what they call the transplant wages per hour, Your
4  Honor; that's Toyota and Nissan and so forth.
5  Q. Do you know what the VEBA is?
6  A. What it is?
7  Q. Yes.
8  A. It's a -- it was negotiated in 2007 and was moving the
9  liabilities from the car manufacturers to the union.
10  Q. And do you know what the amount of that liability was?
11  A. I believe the negotiation was somewhere around ten billion
12  dollars.
13  Q. All right. And so the company is obligated to fund that,
14  is that correct?
15  A. Yeah, contractually we were obligated to fund it, and then
16  as part of the submission we were instructed that we had to
17  have a letter -- a memorandum of understanding from the union
18  that they would be willing to convert half of that into equity.
19  Q. Okay. So your understanding is that half of that
20  liability is being satisfied with a note and half of it is
21  being satisfied with equity in the new company, is that
22  correct?
23  A. Yes, sir.
24  Q. All right. And the -- in effect, the contribution to the
25  new company from the VEBA to get the equity is half of the

309

**310**

```
1   claim?
2   A.  Yeah, they basically were willing to exchange half of the
3   claim for an equity contribution.
4   Q.  All right.  Now, do you have a view as to the value of
5   that equity?
6         MR. BROMLEY:  Objection, Your Honor.  Your Honor
7   yesterday we had a little back-and-forth on this with respect
8   to the value of the VEBA, and on that issue yesterday I believe
9   Your Honor ruled that that was not relevant.  So we have an
10  objection on relevance grounds.
11        THE COURT:  Yeah, Mr. Lauria, what is the relevance
12  of the witness's view as to the value?
13        MR. LAURIA:  Well, Your Honor, I think the witness
14  has acknowledged that, in connection with the performance of
15  his fiduciary duties to his stakeholders, he needs to think
16  about what they are getting in the transaction.  And he's
17  testified that the VEBA, which is owed about ten billion
18  dollars, is receiving a note and equity.  And I want to try to
19  understand what that value is so that we can, at some point in
20  time, have an appropriate argument on the record about the
21  performance of fiduciary duties.
22        THE COURT:  All right.
23        You can answer the question.
24  A.  And the question was, please?
25  BY MR. LAURIA:
```

**311**

```
1   Q.  Do you have a view as to the value of the equity?
2   A.
3         I don't.  You know, it's -- it will be -- it's to be
    determined based on the performance and the value of NewCo.
4   Q.  All right.  Did you hire any experts to provide you with a
5   view of the value of the equity?
6   A.  The value of the equity in NewCo?
7   Q.  Yes.
8   A.  I can't recall if we really looked at that in detail.  I
9   know we did due diligence on Fiat. I don't know.  I don't
10  recall.
11  Q.  Do you recall hiring Greenhill for any purpose?
12  A.  Yes.  We did -- we hired Greenhill.  We started with
13  Goldman Sachs and they basically had to pull out of that
14  engagement.  And then we were able to secure Greenhill to go in
15  and help us on due diligence and do a fairness opinion.
16  Q.  All right.  And did you ever have any discussions with
17  anybody at Greenhill regarding the value of the enterprise or
18  the equity?
19  A.  My recollection on Greenhill is we had them make a
20  presentation to the board at one of the board meetings on the
21  fairness opinion.
22  Q.  All right.  And do you recall Greenhill expressing any
23  views regarding value?
24  A.  Of the new company?
25  Q.  Yes.
```

**312**

```
1   A.  I don't recall.
2   Q.  All right.  How about of the old company?
3   A.  Of the old company?
4   Q.  Yes.
5   A.  My recollection in the presentation, they felt that the
6   two billion dollars of cash that the first lien lenders
7   accepted was better than what the liquidation value would have
8   been.
9   Q.  Well, this is a going-concern deal, isn't it?
10  A.  Which one is a going-concern --
11  Q.  The transaction that you've been working so hard to put
12  together here.
13  A.  For NewCo?
14  Q.  Yes.
15  A.  Yes.
16  Q.  All right.  So have you gotten any opinions regarding the
17  going-concern value of NewCo or OldCo?
18  A.  You know, I guess if I was going to be part of the NewCo
19  management I probably would have, you know, gotten involved in
20  that.  But my concern was making sure that, one, we got a
21  fairness opinion in exchange, assets in, cash out, back for,
22  and that Fiat was a viable ongoing potential partner before I
23  entrusted the assets into that transaction --
24  Q.  All right.
25  A.  -- that sale transaction.
```

**313**

```
1   Q.  Can I ask you to take a look at tab number 2?
2   A.  Okay.
3   Q.  This is the Chrysler restructuring plan for long-term
4   viability.
5   A.  Yes.
6   Q.  All right.  And if you could start with me on page 16?
7   A.  Okay.
8   Q.  Have you seen this page before?
9   A.  I'm sure I have.  Let me -- may I refresh myself here?
10  Q.  Sure.
11        (Pause)
12  A.  Okay.
13  Q.  Does this page express the company's view that it should
14  have serviceable total debt of 22.8 billion dollars?
15  A.  Yes.
16  Q.  All right.  And looking at the far right column, you
17  recognize that you owed the first lien lenders 6.9 billion; you
18  wiped out the 2 billion owed to Cerberus and Daimler, is that
19  correct?
20  A.  Yes.
21  Q.  You reflect a third lien to the government of 9.6
22  billion --
23  A.  Yes.
24  Q.  -- is that correct?
25  A.  Yes.
```

1  Q.  You reflect a 5.3 billion dollar obligation to the VEBA --
2  A.  Yes.
3  Q.  -- is that correct?
4  A.  Yeah.
5  Q.  And you reflect a six billion dollar loan from DOE, is
6  that correct?
7  A.  Yes.
8  Q.  So the grand total was 27.8 billion, is that correct?
9  A.  Yes.
10  Q.  All right.  And, now, below that you say "required debt
11  and debt service relief from above creditor groups" --
12  A.  Yes.
13  Q.  -- "five billion"?
14  A.  Yes.
15  Q.  Okay.  So your target was to get the debt down to 22.8
16  billion, is that correct?
17  A.  Yes, and this was rejected.
18  Q.  All right, but you thought that this was reasonable,
19  correct?
20  A.  Yes.
21  Q.  All right.  You believe --
22  A.  We had to get 5 billion more from the 27.8 to get it down
23  to 22.8, and this was a plan that was rejected by the
24  government.
25  Q.  Okay.  And I just would like to take a look -- have you

314

1  take a look at note 2 down at the bottom of the page.  Could
2  you read that for us?
3  A.  Yes.  It says "creditor groups, including the U.S.
4  government, the first lien bank lenders and the UAW/VEBA".
5  Q.  Does that mean that you were looking for this five billion
6  dollars of relief from those three groups?
7  A.  We were looking for any combination of, and when we were
8  having discussions the third lien lenders said no way, we're
9  not going to provide taxpayer money and not get paid back.
10  Q.  Well, let me ask you about that.  Under the transaction
11  we're currently talking about, aren't they forgiving 8.5
12  billion dollars of debt?
13  A.  They are now.  At the time, the answer was no.
14  Q.  Okay.  Not a penny?
15  A.  Not a penny.  It would mean that the VEBA would be cut in
16  half, which means that basically it may not be solvent in its
17  ability to take care of health care costs for its membership.
18  And then the last, obviously, the third area would have been a
19  concession on the part of the first lien lenders.
20  Q.  Did you ever get that DOE loan, by the way?
21  A.  The DOE loan, the twenty-five of the fifty million dollars
22  was approved.  We have turned in requests of about eight
23  billion.
24  Q.  Did you ever get the DOE loan, sir?
25  A.  No, it's not due yet.

315

1  Q.  Did you ever receive the funds?
2  A.  They weren't due yet.  They didn't start until 2011.
3  Q.  So you haven't received the funds?
4  A.  No.
5  Q.  Okay.  So, flipping now to page 17 --
6  A.  Yes.
7  Q.  -- does this page set forth four alternative ways of
8  achieving the five billion in liability service reductions?
9  A.  Yeah, these were some, as I'm reading through here,
10  alternative to preferred stock or a modified -- these were some
11  alternatives that we wanted to surface as a way to try and get
12  our debt structure down.
13  Q.  So you were trying to -- you were thinking of ways that
14  you could induce the first lien banks, the government and/or
15  the VEBA to further reduce their debt under one of these
16  alternatives, is that correct?
17  A.  Yeah, whether it was a PIK, you know, not a -- yes.
18  Q.  All right.  You were not, at this point in time,
19  envisioning outright debt forgiveness, were you?
20  A.  From any of these categories?
21  Q.  Correct.
22  A.  No, we were looking to get five billion from that block of
23  debtors.
24  Q.  And you were looking to compensate that five billion
25  either with common stock, preferred stock, some sort of

316

1  modified debt or cash, is that correct?
2  A.  That's correct.
3  Q.  All right.
4  A.  And, again, this was rejected.
5  Q.  But this was what you recommended?
6  A.  Yes.  These were some alternatives as to how we might get
7  there.
8  Q.  And it's fair to say that the board met and considered
9  this proposal?
10  A.  Yes.
11  Q.  And it engaged in a very careful process, I'm sure, in
12  considering this proposal?
13  A.  We presented this deck to the board.
14  Q.  And the board approved it?
15  A.  Yes.
16  Q.  All right.  Let's go to page 54.
17  A.  Okay.
18  Q.  Now, is it fair to say that if you believe that the
19  company can service 22.8 billion dollars in debt that you
20  believe the company was worth more than that?
21  A.  No.
22  Q.  You were proposing a negative equity balance sheet?
23  A.  We were -- a negative equity balance sheet -- in the
24  current environment, the value of the company certainly would
25  not have been commensurate with that.

317

**318**

1   Q.  Well, let me ask you, doesn't page 54 suggest that the
2   terminal value of the enterprise was twenty-eight billion
3   dollars?
4   A.  Let's see, where are you -- where do you see that?
5   Q.  If you look at -- over the on the left-hand side, you see
6   "terminal value" underlined?
7   A.  Yes, terminal val --
8   Q.  You see EBITDA at 2016, 5.6?
9   A.  I'm on the wrong page, I guess.
10  Q.  Are you on page 54?
11  A.  Yeah, U-54?
12  Q.  U-54.
13  A.  2016. I'm looking at free cash flow of 1.2.
14  Q.  Oh, you're on the right-hand side. If you'd go over to
15  the left-hand side of the page.
16  A.  Yes?
17  Q.  Okay? First you see free --
18  A.  I see the EBITDA 2016 --
19  Q.  Right.
20  A.  -- 5.6, multiple --
21  Q.  Right.
22  A.  Yeah.
23  Q.  5.0 --
24  A.  Yeah.
25  Q.  -- terminal value before debt, twenty-eight billion

**319**

1   dollars?
2   A.  Yes.
3   Q.  Okay. So do you agree that this reflected a terminal
4   value of the enterprise of twenty-eight billion dollars?
5   A.  If you assume you could get a five multiple.
6   Q.  Well, you put the five in here, right?
7   A.  Yes, sir, I did.
8   Q.  So I guess you thought it was reasonable?
9   A.  I did; they didn't.
10  Q.  But you did, correct?
11  A.  Yeah.
12  Q.  And the board did, correct?
13  A.  Yeah.
14  Q.  And management and the board went through a very careful,
15  thorough process in putting these materials together, correct?
16  A.  Yes, we did.
17  Q.  All right. Now, on -- if you could flip with me to tab 6?
18  A.  Yes?
19  Q.  All right. This is your March 10 letter to Treasury
20  urging them to approve your proposal, correct?
21  A.  Yes.
22  Q.  And the proposal that you wanted them to approve is the
23  one that was reflected in the pages we were just looking at,
24  correct?
25  A.  Correct.

**320**

1   Q.  So on March 10th you still believed that you had a company
2   that could service 22.8 billion dollars of debt and had a
3   terminal equity value of 28 billion dollars, correct?
4        MR. ARMSTRONG: Objection, Your Honor.
5        THE COURT: What's your objection?
6        MR. ARMSTRONG: Foundation. The valuation that he
7   showed the witness is a 2016 valuation, not a present-day or
8   not a February 17th valuation.
9        MR. LAURIA: Your Honor, it's a target. I don't even
10  know what the objection is, much less how to respond to it.
11       THE COURT: All right.
12       MR. ARMSTRONG: Maybe I could help clarify, Your
13  Honor?
14       MR. LAURIA: I don't really want a talking objection
15  from counsel, Your Honor.
16       THE COURT: All right, just a second. What are you
17  asking the witness to compare?
18       MR. LAURIA: I'm asking if on March 10th he was still
19  endorsing the same plan he endorsed on February 17th.
20       THE COURT: All right. That question can be
21  answered.
22  A.  So this letter, as a result of a visit that we had --
23  BY MR. LAURIA:
24  Q.  It's a yes-or-no answer, sir.
25  A.  I can't give you a yes or no because --

**321**

1   Q.  You don't know if on March 10th you were endorsing the
2   same plan you were endorsing on February 17th?
3   A.  I was not because we changed the assumptions in this
4   letter.
5   Q.  What did you change?
6   A.  Well, if you read it you'll see where my concern was that
7   we were being compared on an apples-to-apples basis. The point
8   I made in our plan is that we were extremely conservative with
9   SAR starting at 10.1 growing to 12.6. And, yet, I was
10  competing against another manufacturer that was using a 10.5
11  growing to 16.8 SAR. If I used that SAR in my -- held all my
12  other assumptions, I would generate an additional nine billion
13  dollars of cash flow over the six years. So I wanted to be
14  sure, I wanted to make absolutely clear, that we were being
15  evaluated on a comparative basis and that if the plan you
16  referenced, which they turned down because of the cash flow
17  basis, not the terminal value but it was really being evaluated
18  on a cash flow basis, I didn't want to be disadvantaged either
19  on SAR level or pricing assumptions. That's what this letter
20  was about.
21  Q.  You were concerned that they might use a higher SAR than
22  you were using, which would suggest higher value?
23  A.  No, sir. I was suggesting that, as I was competing for
24  funds from the United States Treasury against another
25  manufacturer, I wanted to make sure because my conservative

1  view in the industry wasn't disadvantaging me in their
2  consideration of viability.
3  Q.  They would conclude that you didn't need the money?
4  A.  No.  I just wanted to make sure that when they looked at
5  my cash flow they were not looking at cash flow, which Mr.
6  Rattner and Mr. Bloom were looking at, over the life of that
7  pro forma to 2016 because if I used General Motors' SAR and
8  kept all of my other assumptions constant I would generate nine
9  billion dollars in additional cash.  And I didn't want my plan
10  to be rejected because one company was using that SAR level and
11  I was using a more conservative SAR level.  And the same on
12  pricing.
13  Q.  All right.  On February 17th, you believed the company
14  could service 22.8 billion dollars in debt, is that correct?
15  A.  Yes, on February 17th.
16  Q.  Okay.  And on March 10th?
17  A.  On March 10th, what I was proposing here was, again,
18  please evaluate us on a comparable basis as cash.
19  Q.  Let's close the book and not look at the letter.  I'm just
20  asking on March 10th did you still believe you had a company
21  that could service 22.8 billion dollars in debt?
22  A.  Yes.
23  Q.  All right.  And that company -- the business of that
24  company is largely being transferred to NewCarCo, is that
25  correct?

---

1  A.  Well, the transaction -- the sales transaction is assets
2  are being put in and cash is being delivered.
3  Q.  All right.  And are you putting in substantially all the
4  assets of the business that was going to service 22.8 billion
5  dollars of debt into NewCarCo?
6  A.  A significant amount, yes, sir --
7  Q.  All right.
8  A.  -- we'd transfer.
9  Q.  Are there any valuable assets that you're not putting in?
10  A.  Any valuable assets?  Well, we're putting in -- we're not
11  putting in some of the factories, but I would say the majority
12  of the valuable assets, to assure that the new business is an
13  ongoing enterprise, would be kind of the sales transaction
14  going in for cash out.
15  Q.  And in addition to what you're putting in, Fiat is putting
16  some stuff in too, right?
17  A.  Fiat is putting assets in.
18  Q.  That will make that business even more valuable, is that
19  correct?
20  A.  That's the plan.  That's the hope.
21  Q.  All right.  Now, I think you've testified that you're a
22  pretty experienced businessman, correct?
23  A.  Well, it may be a little self-serving, but yeah, I've been
24  around for --
25  Q.  I'll give that to you.  Thirty-five years, did you say?

---

1  A.  Thirty-eight.
2  Q.  Thirty-eight years.  And you've probably thought about
3  various ways to value a business in different contexts,
4  correct?
5  A.  Yes.
6  Q.  All right.  Would it be fair to say that one way to value
7  a business is to look at the price of the stock and multiply it
8  by the number of shares?
9  A.  Yes.
10  Q.  All right.  So if somebody buys a percentage of a company
11  for a price, you can derive an implied value, correct?
12  A.  That's one way.
13  Q.  Okay.  So, for example, if I buy ten percent of a company
14  for ten dollars, that would suggest that a hundred percent of
15  the equity is worth a hundred dollars --
16  A.  Yes --
17  Q.  -- correct?
18  A.  Yes.
19  Q.  And if I bought 10 percent for 20, 100 percent would be
20  200 dollars, correct?
21  A.  Yes.
22  Q.  Okay.  Now, are you aware of any values that have been
23  attributed to the Fiat contribution to NewCo?
24  A.  Yes.
25  Q.  Why don't you tell us what those values are?

---

1  A.  Well, what we did was we looked at what it would cost
2  Chrysler LLC, for example, to develop an entire new platform, a
3  new top hat, the length of time, the engineering, the ER&D, the
4  tooling capital expenditures, and we used some of our historic
5  actuals in determining, for example, a billion-five to a
6  billion-eight for a launch of a new vehicle; then on top of
7  that what the marketing, advertising, redistribution -- we
8  looked at what it cost us, for example, to develop the new
9  Phoenix engine, the new transmission, six-speed transmission.
10  And we used those experiences from Chrysler to come up with an
11  equivalent value of what Fiat's contribution would be to NewCo.
12  Q.  And, in fact, did you hire some experts to help you with
13  that?
14  A.  I'm not aware of experts in helping us do that.  I think a
15  lot of that was derived from our own historical experiences.
16  Q.  All right.  And your conclusion through that exercise was
17  that the Fiat contribution was worth eight to ten billion
18  dollars; is that correct?
19  A.  Yes.  I recogni -- yes, I remember -- recognize that
20  number.
21  Q.  All right.  So if I pay eight billion dollars for twenty
22  percent of the equity in a company, what does that suggest that
23  a hundred percent of the equity is worth?
24  A.  Well, 8 for 10, it would be 800, wouldn't it?
25  Q.  Eight billion dollars for twenty percent?

---

**326**

1    A. Yeah. So if it's --

2    Q. So eight times five?

3    A. Eight times five.

4    Q. Which is?

5    A. Forty.

6    Q. Forty billion dollars?

7    A. Yeah, if that was a realistic method.

8    Q. Well, we, I think, just said that it was one way you

9    convey a company is you look at what somebody would pay for a

10   percentage and you --

11   A. Yeah, I mean, I've --

12   Q. -- do the math.

13   A. Yeah, I've done a lot of these deals in my career, and,

14   you know, each time it could be a percentage of forward EBITDA

15   you know, that the company selling wants -- usually you want to

16   do it on backward because you have to earn the value out of

17   that company. So you don't want to pay for something that

18   hasn't been earned yet or realized.

19   Q. So, now, do you have an understanding as to whether or not

20   Fiat has placed a value on its investment in the new company?

21   A. I don't know that.

22   Q. You haven't heard that?

23   A. No, sir.

24   Q. All right. So let's just use your eight to ten.

25   A. Okay.

**327**

1    Q. Okay?

2    A. Okay.

3    Q. So if it's ten, then the value of the equity is fifty

4   billion dollars, is that correct?

5    A. Yeah, if you use your approach in the math. I'm not sure

6   that's --

7    Q. I kind of think of it as our approach. We've worked this

8   out together here on the record.

9    A. No, you've given me the numbers and I've agreed with the

10   math.

11   Q. Well, I think before we got to that math you agreed with

12   me on the methodology.

13   A. I said that was one methodology --

14   Q. Yes, yes.

15   A. -- that could be used depending on the circumstance, the

16   environment, the type of company, the industry that it's in. I

17   mean, it is not -- you know, it is not a single-dimension

18   decision.

19   Q. All right. So if we say forty to fifty billion dollars,

20   that's eight to ten, using eight to ten as a range, for the

21   Fiat investment?

22   A. Yeah, that's what you're using.

23   Q. Well, I'm -- that's what I'm asking you to use for

24   purposes of this conversation.

25   A. You said "we", and I agreed that that's the math you're

**328**

1    using.

2    Q. Well, let's just go back again. Are you saying that if I

3   buy 10 percent of the company for 20 dollars that it doesn't

4   suggest that the equity in the company is worth 200?

5    A. Depends. It could be worth nothing, but you think the

6   future value of it, because of technology or the segment it's

7   in, it's a growth situation.

8    Q. So my 10 dollar -- or 20 dollar investment isn't for 10

9   percent of a 200 dollar company now?

10   A. No, it depends. I mean, people will buy stock based on

11   the fact that they think it's going to go up.

12   Q. Yes?

13   A. Yeah. I don't --

14   Q. They don't usually buy because they think it's going to go

15   down, do they?

16   A. Well, there's a lot of people doing that today called

17   short-sellers.

18   Q. Pardon me?

19   A. I said there's a lot of people doing that today called

20   short-sellers.

21   Q. Well, they're actually positioning themselves for the

22   price to go down, correct?

23   A. Yes.

24   Q. All right. If you buy the stock, you're positioned for it

25   to go up.

**329**

1    A. No, I understand the math. I'm just --

2    Q. All right.

3    A. -- trying to be very clear, because I wouldn't want to

4   convey something here that I didn't believe in or that --

5   again, it really depends on the sector. It depends on the

6   position of the company, the future ability to execute plans.

7   I mean, there's a whole host of things that go into these types

8   of transactions.

9    Q. So do you think Fiat is overpaying for their twenty

10   percent?

11   A. No.

12      MR. BIENENSTOCK: Objection, Your Honor.

13      THE COURT: What's the objection?

14      MR. BIENENSTOCK: The objection is that Fiat's

15   transaction with the acquisition vehicle is not before this

16   Court, and how you value the acquisition vehicle is not before

17   this Court. And especially given the time constraints we're

18   under, this is consuming the transcript with completely

19   immaterial and irrelevant things.

20      It's also clear -- second ground for my objection is

21   that, as the witness has said repeatedly, he's approving --

22      MR. LAURIA: Your Honor, is this is a talk --

23      MR. BIENENSTOCK: -- Mr. Lauria's math.

24      MR. LAURIA: Is there an objection? Because I don't

25   think a talking objection is helpful, Your Honor.

| | |
|---|---|
| 1 | THE COURT: One second, Mr. Lauria. Talking louder |
| 2 | doesn't solve the problem. |
| 3 | MR. LAURIA: Well -- |
| 4 | THE COURT: Just a minute. |
| 5 | MR. LAURIA: -- I somehow -- |
| 6 | THE COURT: Mr. Bienenstock -- |
| 7 | MR. BIENENSTOCK: The -- |
| 8 | THE COURT: Just a minute. |
| 9 | MR. BIENENSTOCK: The -- |
| 10 | THE COURT: Wait. |
| 11 | MR. BIENENSTOCK: The -- |
| 12 | THE COURT: Wait -- |
| 13 | MR. BIENENSTOCK: Oh. |
| 14 | THE COURT: -- Mr. Bienenstock. |
| 15 | MR. BIENENSTOCK: Sorry. |
| 16 | THE COURT: Thank you. All right. Let's come back |
| 17 | to Mr. Lauria. You've explored this issue. The witness has |
| 18 | said your method is a method that's used. Beyond that, I don't |
| 19 | see what the value of this is. It is a method. |
| 20 | MR. LAURIA: Well, again, Your Honor, as you know, we |
| 21 | are -- the witness has testified about the importance of |
| 22 | performing his fiduciary duties in connection with this deal. |
| 23 | He's recognized that that is, in large part, reflected by |
| 24 | delivering value to his stakeholders. And one of his largest |
| 25 | stakeholders is getting equity in this company. And I'm trying |

| | |
|---|---|
| 1 | to understand his assessment of his own performance with |
| 2 | respect to that. And I think we -- |
| 3 | THE COURT: I think you're going far afield, though, |
| 4 | with this. I mean, it just doesn't add much anymore. |
| 5 | MR. LAURIA: Well -- |
| 6 | THE COURT: I mean, we could all speculate about this |
| 7 | value. Whatever the UAW did in its agreement, it addressed its |
| 8 | concerns, I assume, and that's it. |
| 9 | MR. LAURIA: Well, the testimony, Your Honor, is |
| 10 | actually very clear that half of the current obligation owed is |
| 11 | being satisfied with this interest in the reorganized company. |
| 12 | And that's been acknowledged by the UAW in their solicitation |
| 13 | materials to their membership. It's been acknowledged by a |
| 14 | number of witnesses on the record. So I don't think we have a |
| 15 | factual issue that we can argue about. What we really have is |
| 16 | counsel winding up here to engage in a legal argument -- |
| 17 | THE COURT: Now wait a minute. Wait a minute. |
| 18 | MR. LAURIA: -- and I really think we ought to save |
| 19 | the legal argument -- |
| 20 | THE COURT: I heard you. |
| 21 | MR. LAURIA: -- for closing. |
| 22 | THE COURT: Stop talking. Enough is enough. You |
| 23 | have the record for what you want. There is records that need |
| 24 | -- the record needs to be amplified on certain issues regarding |
| 25 | your statement as to the value of the VEBA trust and |

| | |
|---|---|
| 1 | contribution because I'm not sure if that note has interest. |
| 2 | And unless you consider whether or not that note has interest, |
| 3 | you may well have to -- if it has no interest, has to present- |
| 4 | value it. And so then we have to talk about apples and apples. |
| 5 | But none of that has come in yet; this witness isn't |
| 6 | going to provide it. And you have enough to make whatever |
| 7 | argument you want to make about fiduciary duties and |
| 8 | stakeholders. It's obvious that the stakeholder that you're a |
| 9 | part of is getting 2 billion dollars of a 6.9 billion dollar |
| 10 | debt. And you can make your arguments accordingly as to |
| 11 | whether or not you think this witness complied with his |
| 12 | fiduciary obligations, taking into consideration other |
| 13 | stakeholders are getting a hundred cents on the dollar, as it |
| 14 | comes out. Now, whether from a bankruptcy standpoint that's |
| 15 | allowable under 363, I'm sure I'll hear a lot of arguments |
| 16 | about it, and I will anxiously await those arguments. |
| 17 | MR. LAURIA: All right. Thank you, Your Honor. |
| 18 | THE COURT: All right? So let's move off this topic. |
| 19 | MR. LAURIA: Thank you. |
| 20 | THE COURT: You're welcome. I won't hold those five |
| 21 | minutes against you. |
| 22 | MR. LAURIA: Thank you, Your Honor. |
| 23 | THE COURT: Okay. |
| 24 | BY MR. LAURIA: |
| 25 | Q. Let me ask you, do you think it's relevant to the |

| | |
|---|---|
| 1 | performance of your fiduciary duties -- do you think it's |
| 2 | relevant to the performance of your fiduciary duties -- if you |
| 3 | have one class of creditors who might be getting more than a |
| 4 | hundred percent of what they're owed, and another class, a |
| 5 | senior class, getting less than a hundred percent? |
| 6 | A. I'm not aware of anyone getting a hundred percent. |
| 7 | Q. I'm not asking that question. |
| 8 | A. Okay. So your -- |
| 9 | Q. Do you think it's relevant to the performance of your |
| 10 | fiduciary duties if one class of creditors, or one group of |
| 11 | creditors, is getting more than a hundred percent of what |
| 12 | they're owed, and another class, a senior class, is getting |
| 13 | less? |
| 14 | A. And I'm not aware of that as part of the decision I make. |
| 15 | Q. Again, that's not the question I'm asking you, sir. I'm |
| 16 | just asking if it's relevant -- if that were the case, would it |
| 17 | be relevant to the performance of your fiduciary duties as you |
| 18 | understand them? |
| 19 | MR. BIENENSTOCK: Objection, Your Honor. The |
| 20 | objection is the form of the question, and it assumes something |
| 21 | not in evidence. When counsel says getting something, getting |
| 22 | it from where? |
| 23 | MR. LAURIA: Your Honor, this is a hypothetical and |
| 24 | I'm just testing -- |
| 25 | THE COURT: Yes, answer the hy -- the witness can |

**334**

answer the hypothetical.

A. Hypothetically, it would depend upon -- it would depend upon the environment and the situation, as far as my fiduciary responsibilities, in trying to make sure I've secured the best value. I do understand that there is a prioritization of creditors.

Q. Well, what I'm trying to get at is the possibility that a creditor is getting paid more than they're owed. Is that okay when you have other creditors that are not getting paid what they're owed, from a fiduciary perspective, as you understand it?

A. Again, it's a hypothetical question. I'm not sure how to answer that other than it would depend on the situation of what was required to make sure you were, again, providing the best value in its entirety.

Q. All right. And it's fair to say that the company hasn't done a valuation of the stock consideration that's going to any of your stakeholders, is that correct?

A. The allocation --

MR. ARMSTRONG: Objection, Your Honor.

THE COURT: Well, he can answer -- I mean, just answer the question: Has your company done an evaluation?

THE WITNESS: No, the -- no, the allocation was basically done, the negotiations, with the United States Treasury and the UAW on the VEBA. And I think I related to you

**335**

how the Fiat discussions ensued and then the balance of it for the United States Treasury.

MR. LAURIA:

Q. What was the basis for giving that balance to the United States Treasury?

A. That was their determination of what they felt they had to have in exchange for their contribution.

Q. All right. And you're aware that every dollar of contribution that the United States Treasury has put in is junior in terms of priority to the first lien loans, is that correct?

A. Well, the money that they had put in, the four billion dollars, was junior. The DIP money, based on the fact that the first lien lenders accepted the two billion dollars, would not be junior. And --

Q. Your testimony today is that the DIP is senior to the money owed to the first lien lenders?

A. Well, the money, as I understand the transaction, is that the two billion dollars will be paid in cash. And, again, part of that is the certainty of cash versus the risk of equity going forward.

Q. Let me try to get this -- at this a different way.

A. Okay.

Q. Let's just suppose that the sale doesn't get approved.

A. Yes?

**336**

Q. All right. Is the DIP senior to or junior to the first lien lenders' claim?

A. Junior.

Q. Junior. So, in fact, every dollar that the U.S. Treasury has lent to the company till today is junior to the 6.9 billion dollars owed to the first lien lenders, correct?

A. That is correct.

Q. All right.

A. That first lien lenders elected not to contribute DIP money.

MR. LAURIA: I'd like to strike the rest of the answer, Your Honor.

THE COURT: All right, strike the rest. Please just answer the question directly.

THE WITNESS: Yes, sir.

THE COURT: Thank you.

(Pause)

BY MR. LAURIA:

Q. Did it come to a point in time when you understood that negotiations with the first lien lenders and the United States Treasury were not progressing well?

A. Yes, it did concern me that there, to my knowledge, were no discussions going on in the first half of that thirty-day period.

Q. The thirty-day period between?

**337**

A. The notification when -- so it would have been through beginning of April to the end of April.

Q. All right. And it was -- was it during that time period when you first heard from the auto task force about the change -- the potential change in structure in the use of the 363?

A. Yes. I think somewhere during that period we were looking at various alternatives, and 363 came up as an alternative to Chapter 11 and then Chapter 7.

Q. So would it be fair to say that the 363 structure may have been, at least in part, a tactic to enhance negotiations with the banks?

A. No, my understanding in the discussions was it was a way to retain viability and be able to, again, put the new company in a position of more viability: less debt, less cost, more restructuring.

Q. More viability. I'm not sure I understand what you mean by that.

A. Well, as opposed to going into bankruptcy and trying to find a lender to fund us in its entirety, coming out of bankruptcy, versus -- the 363 allows us to put good assets in, cash out, and then the remaining assets would stay with OldCo.

Q. But wasn't the problem here that the Treasury was saying to you that they would not advance the funds you wanted unless they got a deal with the senior secured lenders that was

**Page 338**

1  acceptable to them?
2  A. Well, certainly --
3     THE WITNESS: I'm sorry, Your Honor. Should I just
4  say yes or no, or --
5     MR. LAURIA: It would help.
6     THE COURT: Oh, take your choice --
7     THE WITNESS: Okay.
8     MR. LAURIA: -- at this point.
9     THE WITNESS: I'm sorry.
10     THE COURT: No, that's all right. We're all getting
11  tired.
12     THE WITNESS: Yeah.
13  A. 363 was only one option of trying to look at how we could
14  emerge.
15  Q. Okay. I'm just asking you a simple question.
16  A. I'm sorry, yeah. They haven't been very simple.
17  Q. Did you ever hear from the U.S. Treasury that they would
18  only make available to you the funds that you needed to keep
19  running the company if they got a resolution of the first lien
20  debt that was acceptable to them?
21  A. Yes, and other -- and the other concessions.
22  Q. Right. And do you know what resolution they were looking
23  for from the first lien debt?
24  A. The only thing I know --
25     THE WITNESS: If I can answer that? Yeah. Okay,

**Page 339**

1  Your Honor.
2  A. -- the meeting that I referenced earlier, when the four
3  major banks, Fiat and Chrysler were in the room, the first
4  offer that was made to the first lien lenders was one billion
5  dollars.
6  Q. One billion dollars of --
7  A. Cash.
8  Q. Cash or debt?
9  A. My understanding, it was cash.
10  Q. All right.
11  A. I may be wrong, but it --
12  Q. All right.
13  A. -- it was a billion dollars.
14  Q. And what -- do you know what the first lien lenders
15  responded to that?
16  A. They asked to have a private follow-up session with Mr.
17  Rattner and Mr. Bloom.
18  Q. All right. And were you -- did you hear about the course
19  of these negotiations as those discussions went on?
20  A. The only thing I was aware is have we reached a resolution
21  with the first lien lenders yet. But those -- I was not party
22  of, nor -- you know, nor did Mr. Rattner or Mr. Bloom convey to
23  me where those discussions were as they basically went from one
24  billion dollars -- and, again, I'm not sure, but I know that
25  the final was two billion dollar cash.

**Page 340**

1  Q. Well, in the context of there not being an agreement
2  between the first lien lenders and the United States Treasury,
3  is it your understanding that the 363 sale was a way to get the
4  deal done even though you didn't have that agreement?
5  A. Yes, it is a way.
6  Q. I see. Now, when did you conclude that the first lien
7  lenders could only get two billion dollars of value in a
8  Chrysler restructuring?
9  A. My understanding was, again, the 29th -- that evening was
10  when I got the final word that the UST was going to offer two
11  billion dollars cash to the first lien lenders.
12  Q. So that was not your decision?
13  A. That was what the government was willing to fund.
14  Q. Okay. So, now, I'm going to ask the question slightly
15  differently. When did you conclude that the secured lenders
16  should get only two billion dollars of value?
17  A. Well, I don't know about "should get", but when we did the
18  evaluation --
19  Q. Well, that's what I'm asking you is when did you conclude
20  that the first lien lenders should get only two billion dollars
21  of value? And the reason I'm asking is going to back to that
22  concept of your understanding your fiduciary duties. I think
23  you said that maximizing recovery and value for all your
24  stakeholders is what you have to do to perform your fiduciary
25  duties, right?

**Page 341**

1  A. Yes, and it --
2  Q. So let me just ask --
3  A. Sure.
4  Q. -- the question here. So I'm asking you when you thought
5  that's what they should get, to get an understanding of your
6  performance of your fiduciary duty to your first lien lenders.
7  A. Okay, so in exercising my fiduciary responsibility,
8  anything they got above what was a very -- as it turned out to
9  be, a very aggressive liquidation analysis of 1.7 billion. And
10  at the time we closed the transaction, I guess it would have
11  been more like 700 million in liquidation value.
12  Q. Well, you haven't closed the transaction yet, right?
13  A. No, sir.
14  Q. Okay. So we don't know what --
15  A. I'm sorry, I was referring to the transaction that was
16  entered into on the -- I guess, the elements of the transaction
17  that we would close, the offers that are on the table and the
18  banks accepting -- the first lien lenders accepting the two
19  billion dollars in cash.
20  Q. Now, isn't it true that you believe that Chrysler's
21  business has significant value as a going concern? It's just a
22  yes or a no.
23     MR. ARMSTRONG: Objection, Your Honor.
24     THE COURT: What's the objection?
25     MR. ARMSTRONG: Just on the terminology. When he

**342**

1  says "Chrysler's business", is it Old Chrysler, is it New
2  Chrysler?
3      THE COURT: All right, specify.
4      MR. LAURIA: It's current Chrysler's business.
5      THE COURT: All right.
6      MR. LAURIA: It's not Old Chrysler yet.
7      THE COURT: One second, Mr. Lauria. And I'd ask
8  counsel, use the microphone -- I should have told you this a
9  while ago -- to your left that's on the table. And --
10      MR. ARMSTRONG: I will.
11      THE COURT: -- your objections then will probably get
12  heard more quickly.
13      Go ahead.
14  BY MR. LAURIA:
15  Q. I'm talking about the current company.
16  A. The question is that it has tremendous value going
17  forward?
18  Q. Isn't it true that you believe Chrysler's business has
19  significant value as a going concern?
20  A. Yes, I believe that.
21  Q. Okay. And as a going concern, the value substantially
22  exceeds two billion dollars, correct?
23  A. Well, I didn't finish. I think that --
24  Q. You answered the question I asked, which is why I'm asking
25  you another question.

**343**

1  A. Okay.
2  Q. Okay? So as a going concern, the value of Chrysler is
3  substantially in excess of two billion dollars, correct?
4  A. That will deter -- that will be determined upon its
5  ability to perform going forward under NewCo.
6  Q. Well, the business is going forward under NewCo, correct?
7  A. Portions of it are, in addition to significant
8  contributions from Fiat.
9  Q. But it is a going concern, correct?
10  A. We are -- Chrysler, as we know it today, will be
11  liquidat -- will be basically broken up between old assets and
12  new assets.
13  Q. Are those old assets operating assets?
14  A. No, they're not.
15  Q. No, they're not. So all the operating business is going
16  to NewCo, correct?
17  A. Correct.
18  Q. Right. So the income-generating business is going into
19  NewCo?
20  A. Yes.
21  Q. Correct. All right, thank you. So this is a going-
22  concern reorganization, isn't it?
23  A. It's a going concern with significantly more cash, less
24  debt, a different distribution, eight to ten billion dollars of
25  technology and product, intellectual property, being added to

**344**

1  that concern.
2      (Pause)
3  Q. I'd like to turn to tab 15. Recognize this document?
4  A. Let me take a look at it, please.
5  Q. Take as long as you like, as long as the judge doesn't
6  charge me for the time it takes.
7      THE COURT: Well, I may charge you for the time it
8  took you to ask the question.
9      MR. LAURIA: I was trying to eliminate questions,
10  Your Honor.
11  A. Okay.
12      THE COURT: Time well spent.
13  A. Okay.
14  Q. All right. You recognize this document?
15  A. Yes, sir.
16  Q. Can you tell us what it is?
17  A. Yes, this is an exercise that we asked some of the team to
18  look at back in -- this is back in October and, again, as we
19  were looking at a variety of different alternatives to make
20  sure that we were exploring every possible avenue of what we
21  call here is breakup valuation; in other words, if we had to
22  sell a portion of Chrysler to generate funds because we were
23  not able to get funds, what might that be?
24  Q. All right. And so let's look at page 3.
25  A. Yes?

**345**

1  Q. This is a summary of the values that you thought you could
2  realize in a breakup, is that correct?
3  A. No, not that I thought I could realize.
4  Q. Well, who thought they could realize?
5  A. The group that was doing this study at our request.
6  Q. All right.
7  A. If I thought I could get these, I probably would have done
8  it.
9  Q. All right. And is it fair to say that there's an asset
10  value with a low of 9.1 billion and a high of 25.7 billion?
11  A. That was presented in the study.
12  Q. All right. And any of those numbers would have been
13  sufficient to pay the first lien lenders in cash in full,
14  correct?
15  A. If, in fact, you could get that minus the liabilities.
16  Q. Well, the first lien lenders are first in line, aren't
17  they?
18  A. Yes.
19  Q. Okay. If you could turn back to page 2 for a second?
20  A. Yes.
21  Q. Is this a complete list of your business lines back in
22  October of 2008?
23  A. Let me just look here at -- I don't see the Caliber on
24  there. Am I missing -- I don't -- looks like there's a few
25  missing.

1    Q.  All right.  Could you tell me which ones are missing?

2    A.  It looks like Caliber might be missing, now that I

3  look, under car line.  It's the one that's produced in

4  Belvedere along with the Compass and the Patriot.  So they may

5  have just assumed that they were going to drop that line.  I

6  don't recall exactly.  That's one that jumps out at me.

7    Q.  Oh, well, if you'd look at --

8    A.  And I don't --

9    Q.  -- the box --

10   A.  Yeah.

11   Q.  -- on the bottom there.

12   A.  Oh, yeah, okay.  Nitro, Caliber -- okay, so there's --

13  there are eliminations of some of the vehicles.

14   Q.  All right.  So except for those eliminations, this

15  reflects all of the --

16   A.  Yes.

17   Q.  -- business lines at Chrysler?

18   A.  Yeah, I would say so, yes.

19   Q.  Are the current business lines of Chrysler?

20   A.  Everything that's up here -- no, the Durango and the Aspen

21  are gone under "truck".  Do you see that?

22   Q.  Yes.

23   A.  Durango and Aspen gone.  And then you would have to add

24  back Nitro, Caliber.  The PT Cruiser will be gone this year.

25  There -- the Altos -- the Sprinter is still up on top.  So it's

---

1  a little bit of a mix.

2    Q.  All right.  So the company did engage in an exercise to

3  assess breaking itself up, is that correct?

4    A.  Yes, we did.

5    Q.  Did you have any discussions with any third parties about

6  selling any of these lines?

7    A.  The only line we entered into with a third party where we

8  contracted Lazard was on the Viper.  And then we did have Mr.

9  LaSorda -- Mr. LaSorda led some discussions with some of the

10  international car manufacturers as to, for example, would they

11  be interested in picking up the Sebring/Avenger car lines.  And

12  we were never able to consummate a deal that we felt

13  comfortable with on the value on some of these, which is why

14  when I looked at the overall study, this paper study, the

15  reality of being able to attain those values were just not

16  realistic.

17   Q.  So you never pursued this course of action?

18   A.  No.  We looked at it.  The values were way overstated

19  based on the reality of the market and our experience.  And so

20  we did not pursue this, other than what I had mentioned to you.

21   Q.  All right.  If we could go to your declaration, please?

22  That's under tab 3.

23   A.  Okay.  Okay.

24   Q.  If you'd look at paragraph number 5 on page 3.

25   A.  Okay.

---

1    Q.  Okay.  You -- well, why don't you read the first sentence?

2    A.  "The objectors speculate that they personally may have

3  fared better if Chrysler liquidated."

4    Q.  Where did you get that view?

5    A.  That's an assumption I made based upon the objections.

6    Q.  Have you seen that statement in any of the objections?

7    A.  No, but I can only assume, by stopping the deal, that

8  would result in liquidation and the loss of thousands of jobs

9  and so forth that you thought that you would be able to get a

10  better value than the two billion dollar cash that's been

11  accepted --

12   Q.  But you never had a conversation with any of the objectors

13  and haven't seen any statement made by any of the objectors

14  stating this is a position, have you?

15   A.  No, this is the first time you and I have met.  And,

16  again, I made the assumption based on the objection.

17   Q.  So it's actually you who was speculating on this

18  statement, not the objectors, correct?

19   A.  Yeah, it's my interpretation of that.

20   Q.  All right.  Now, in paragraph number 6 --

21   A.  Yes?

22   Q.  -- you say that you were unable to get financing from

23  banks or other traditional sources, correct?

24   A.  Yes.

25   Q.  All right.  And so as a result, and as a last resort,

---

1  Chrysler approached the United States government for financial

2  support --

3   A.  Yes.

4   Q.  -- correct?

5   A.  Yes.

6   Q.  Now, they indicated they would provide it, correct?

7   A.  Given a set of criteria.

8   Q.  Well, they have provided it and have billions so far,

9  right?

10   A.  They provide it for -- in the first tranche.  And then

11  based on -- based upon the agreements that had been reached,

12  assuming that we get closing, they provided the DIP financing.

13   Q.  All right.  So is -- that apparently is not a loan or

14  loans that they expect to have repaid, correct?

15   A.  Well, it's not true as -- when we got the first four, they

16  fully expected that to be repaid.  And originally on the DIP

17  financing, they expected, but subsequently have agreed, to

18  forego that.

19   Q.  Well, do you think there's a reason the market wouldn't

20  provide you any financing?

21   A.  Is there a reason the mark -- I think the market that

22  would say, in traditional means of financing, that we were not

23  viable.

24   Q.  All right, so would it be fair to say that the U.S.

25  government has made loans to advance broader social purposes

---

1 preserving jobs, avoiding harm to the economy, things like
2 that?
3 A. I'm sure that part of that did factor into their
4 consideration.
5 Q. And, in fact, those have been some of the public
6 statements made by the Treasury with respect to the loans,
7 isn't it?
8 A. Yeah, but thankfully they did.
9 Q. All right. Now, in fact, the Treasury and the executive
10 branch have made a fairly large political investment in
11 successfully reorganizing Chrysler, haven't they?
12 A. Well, if we get through this and we close the deal, yes,
13 sir.
14 Q. So, success is important to the government, correct?
15 A. Well, success is important to me and all the people whose
16 livelihood depends on this.
17 Q. Doesn't tell you that you could have said no to some
18 of the UST's demands?
19 A. For example, which demands?
20 Q. For example, that you pay your first lien lenders two
21 billion dollars.
22 A. Well, I guess at any point I could have objected and run
23 the risk that they wouldn't finance and we would liquidate.
24 Q. But that's not risk-free to the UST either, correct?
25 A. No. I think there was -- you know, I'm sure that they

350

1 took all of that into consideration in those negotiations.
2 Q. In fact, you know, the statements have been made that if
3 this transaction isn't done that thousands of jobs will be lost
4 and great harm will be done to the economy; maybe the supply
5 chain will be damaged; maybe General Motors, maybe Ford will
6 also suffer as well, which causes bigger ripples in the pond.
7 Terrible thing, right?
8 A. Cataclysmic compared to the issue --
9 Q. So --
10 A. -- on the table here.
11 Q. So the U.S. government has a pretty high interest, a
12 pretty high need, in making sure that Chrysler stays alive,
13 wouldn't that be right?
14 A. Sure. I think that is correct that they are genuinely
15 interested in saving, you know, not only Chrysler but the
16 supplier base because of the potential domino impact on GM,
17 Ford and other -- you know, other manufacturers.
18 Q. So do you have any understanding of why this restructuring
19 couldn't be done and respect the senior lenders' first position
20 on the assets?
21 A. No, I --
22 MR. BIENENSTOCK: Objection.
23 MR. LAURIA: He can answer the question.
24 MR. BIENENSTOCK: The question --
25 THE COURT: One second.

351

1 Mr. Bienenstock, what are you objection to?
2 MR. LAURIA: No speaking objection please, Your
3 Honor.
4 THE COURT: Just a minute.
5 Mr. Bienen -- what is your objection?
6 MR. BIENENSTOCK: The question assumes facts not in
7 evidence, namely that the transaction doesn't respect the first
8 lenders' position.
9 THE COURT: All right. Well, the question can be
10 asked -- answered. It was asked.
11 Go ahead.
12 A. So the question, I just want to make sure, is -- that you
13 were reading from?
14 Q. Is there any reason why the transaction couldn't be
15 accomplished, taking into account those high interests and
16 needs on the other side of the table, and still respect the
17 first lien lenders' senior position?
18 THE COURT: Why don't you just say "pay the first
19 lien lenders in full"?
20 MR. LAURIA: Pardon me?
21 THE COURT: Why don't you just phrase it as "pay the
22 first lien lenders in full"?
23 MR. LAURIA: Well, in fact, Your Honor, the first
24 lien lenders were willing to take substantially --
25 THE COURT: No, wait, wait, I don't --

352

1 MR. LAURIA: -- less than payment in full.
2 THE COURT: Don't negotiate with me. I'm telling you
3 we can avoid the objection -- the issue that was raised in the
4 objection if you just say "paid in full".
5 BY MR. LAURIA:
6 Q. Paid in full.
7 A. I would assume that the determination was made that
8 putting out 6.9 billion dollars in cash was not an economically
9 acceptable solution to the only person we could find to put
10 money in the deal.
11 Q. Well, you could have left the debt on the balance sheet,
12 or some of it on the balance sheet, right?
13 A. Well, I proposed that and it was rejected, as we
14 discussed.
15 Q. But you thought that that was viable?
16 A. But I wasn't bringing the money to the table.
17 Q. But as the fiduciary for everybody --
18 A. Yes, sir.
19 Q. -- you thought that was viable?
20 A. And I presented that.
21 Q. Right.
22 A. Yes, sir, and the people with the money rejected it.
23 Q. Right, your third lien lenders?
24 A. Call them what you will. They were the only viable source
25 of funding.

353

**Page 354**

1  Q. Well, were they anything but your third lien lender at the
2  time?
3  A. Well, the second lien agreed to go away.
4  Q. Okay, but they were still the third lien lender, correct?
5  A. Yes.
6  Q. Okay.
7  A. They would have been subordinate to the first.
8      THE COURT: Are you almost finished?
9  (Pause)
10     MR. LAURIA: Your Honor, I'll do you one better; I'll
11  say I am finished.
12     THE COURT: Thank you.
13  Is there any --
14  MS. BROWN: Your Honor, I have about thirty --
15  THE COURT: About thirty minutes?
16  MS. BROWN: Yeah.
17  MR. BIENENSTOCK: Your Honor, I have five.
18  UNIDENTIFIED SPEAKER: And I have ten, Your Honor.
19  THE COURT: All right, well, now we're up to forty-
20  five. I think what we'll do is -- I assume there'll be
21  redirect, or not?
22  MR. ARMSTRONG: Just a little.
23  THE COURT: All right, why don't we take -- it seems
24  like people need a break, including myself.
25  Mr. Lauria?

354

**Page 355**

1      MR. LAURIA: Your Honor, Mr. Bienenstock, I don't
2  believe, is an objector, so I don't believe that he would
3  properly be taking cross-examination here. So I think he kind
4  of missed his opportunity if he wanted to elicit testimony in
5  support of the transaction.
6      THE COURT: Did you file an objection, Mr.
7  Bienenstock?
8  MR. BIENENSTOCK: Your Honor, we filed two pleadings
9  last week listing problems we had with the sale transaction,
10  which are tantamount to objections, and we've also been
11  negotiating them constantly. Also, the examination I want to
12  do, which would be done in five minutes, I believe, or less,
13  results from things that came up during Mr. Lauria's cross-
14  examination of the witness.
15  THE COURT: And then it should be conducted in
16  redirect.
17  MR. BIENENSTOCK: That's fine.
18  THE COURT: You --
19  MR. LAURIA: If at all, Your Honor, but in that he
20  didn't participate in the direct, I don't know you get into
21  redirect.
22  THE COURT: What did you file an objection to as
23  well? Did you file -- didn't you file an objection to
24  something?
25  MR. BIENENSTOCK: Yeah, we filed objections having to

355

**Page 356**

1  do with nondebtor SUBs, setoffs, recoupments and other issues
2  going to the mechanics of -- the relief that they're asking in
3  the totality in the sense of the sale free and clear.
4      THE COURT: And that's what you're going to cover in
5  your examination?
6  MR. BIENENSTOCK: I'm going to cover comments that
7  the witness made about Chrysler Financial; that's my only
8  interest.
9  THE COURT: Well, all right, I'll allow it as long as
10  it stays in a very narrow frame about Chrysler Financial. And
11  you can do it after we take the break.
12  MR. BIENENSTOCK: Thank you, Your Honor.
13  MR. BROMLEY: Your Honor, I also have some questions
14  which have to do with the same issue, Your Honor.
15  THE COURT: If you limit it to the comments made
16  about the UAW. And, Mr. Pantaleo, you have --
17  MR. PANTALEO: No. No, Your Honor.
18  THE COURT: You just wanted to stand up?
19  MR. PANTALEO: Just -- I just wanted to stand up.
20  THE COURT: Let's start again at 7:15.
21  (Recess from 6:57 p.m. until 7:15 p.m.)
22  THE COURT: Please be seated. All right, before you
23  begin, I ask that Mr. Bromley and Mr. Bienenstock -- are they
24  back?
25  MR. BIENENSTOCK: Yes, Your Honor.

356

**Page 357**

1      THE COURT: All right. I think structurally it's
2  better that you address your issues on redirect so the
3  objectors have an opportunity to respond to them, because I
4  think you're looking for more clarification points that would
5  be better dealt with that way. So hold off until we get to
6  redirect. And then on recross, to the extent any objector
7  takes issue with whatever questions took place, or answers, it
8  can be done then.
9  Mr. Mayer, would you -- which --
10  MR. MAYER: I'm sorry, Your Honor. When you called
11  the break, I was out with Mr. Hyland (ph.) trying to make sure
12  that I wouldn't have to ask any questions. And we're not quite
13  there, and I would want to put my name in the queue for no more
14  than five minutes.
15  THE COURT: On redirect.
16  MR. MAYER: On either recross or redirect, I don't
17  care.
18  THE COURT: On redirect. It'll give you more time.
19  MR. LAURIA: The committee is here to support the
20  transaction, I presume.
21  MR. MAYER: We have some questions with respect to
22  certain issues that may not be necessary. I don't think I need
23  to answer Mr. Lauria's question.
24  THE COURT: All right. Well, that's the structure.
25  You'll get the last say with questions.

357

1    All right, go ahead.

2    MS. BROWN: Amy Brown --

3    THE COURT: One second.

4    UNIDENTIFIED SPEAKER: Are we still on cross?

5    THE COURT: Yes, we're still on cross-examination.

6    MS. BROWN: Good evening, Your Honor. I'm Amy Brown

7  from Squire Sanders, and I'm here on behalf of the committee of

8  Chrysler affected dealers.

9  CROSS-EXAMINATION

10  BY MS. BROWN:

11  Q. Good evening, Mr. Nardelli.

12  A. Good evening.

13  Q. I'm looking at Debtors' Exhibit 33, which is your

14  declaration, and specifically paragraph 15.

15    THE COURT: All right. Is it the same Exhibit 3 that

16  was used?

17    MS. BROWN: Exhibit 3 --

18    THE COURT: I think it's probably easier for him to

19  access Exhibit 3.

20  A. Okay.

21  Q. Paragraph 15, which is on page 6, looking at the last two

22  sentences, do you see where it says "The sale would strengthen

23  Chrysler for the long term, benefiting all constituents,

24  including U.S. taxpayers, employees, creditors, dealers,

25  suppliers and secured lenders. In the end, our sole aim was to

1  benefit everyone"? Do you see that?

2  A. Yes. Yes, ma'am.

3  Q. And that's your declaration, correct?

4  A. Yes, ma'am.

5  Q. But your aim with this proposed sale is not to benefit the

6  789 dealers whose dealership agreements Chrysler is seeking to

7  reject, right?

8  A. Well, unfortunately --

9  Q. It's a yes-or-no answer.

10    THE WITNESS: I don't know how to answer that yes or

11  no, Your Honor.

12  Q. Mr. Nardelli, you would agree with me that the sale will

13  not benefit the 789 dealers whose dealership agreements that

14  Chrysler is seeking to reject, right?

15  A. Correct.

16  Q. And you're aware, aren't you, that these 789 dealers

17  represented 14 percent of Chrysler's sales last year?

18  A. Correct.

19  Q. So, rejecting these dealers will cut off a revenue source

20  for Chrysler, right?

21  A. No.

22  Q. These dealers are a revenue source for Chrysler, aren't

23  they?

24  A. Yes, but you're assuming that none of the remaining

25  dealers will pick up that revenue.

1  Q. That's not what I'm assuming. I asked if they're a

2  revenue source and you answered yes, correct?

3  A. Yes.

4  Q. And you are seeking to terminate -- or to reject their

5  dealership agreements, correct?

6  A. Yes.

7  Q. Mr. Nardelli, you testified earlier that there isn't a

8  community that isn't touched by a dealer, isn't that right?

9  A. Yes, I did.

10  Q. And, so, rejecting these dealers will have devastating

11  effects not only on the rejected dealers but the dealers'

12  employees and their communities, right?

13  A. Not in total.

14  Q. You understand that some dealerships are going to close,

15  correct?

16  A. Yes.

17  Q. And you understand that some dealers will have to file

18  bankruptcy, correct?

19  A. Yes.

20  Q. And you understand that dealers, on average, employ fifty

21  employees, correct?

22  A. I've heard a range between twenty-five to fifty.

23  Q. And even if it's twenty-five on average, that's tens of

24  thousands of employees who will be impacted by Chrysler's

25  decision to reject 789 dealership agreements, won't they?

1  A. Yes, similar to the 35,000 employees we've had to lay off.

2  Q. Mr. Nardelli, you testified that you made efforts to try

3  to protect Chrysler's workers, correct?

4  A. Yes.

5  Q. What efforts did you make to protect these employees of

6  the 789 dealers that you're seeking to reject?

7  A. Well, what I did was try to make a decision to avoid

8  liquidation that would have affected 140,000 employees of

9  dealers, and unfortunately, as you go through this process,

10  there were dealers and employees of dealers affected; there

11  were employees within Chrysler affected; there were suppliers

12  affected; there were first lien, second lien creditors

13  affected. Unfortunately, the process had negative impact

14  across the board on a lot of constituents.

15  Q. Mr. Nardelli, if I understand your testimony correctly

16  then, you did nothing to protect the employees of these 789

17  dealers, isn't that correct?

18  A. I guess I would not agree with that.

19  Q. And what did you do, then, to protect the employees of the

20  789 dealers that you're -- whose dealership agreements you're

21  seeking to reject?

22  A. Well, we're working very closely with the 789 dealers.

23  The volume of inventory, for example, we started with, Your

24  Honor, was somewhere around 40,000 units; it's down to 36. We

25  have successfully negotiated to place about 15,000 of those

```
 1    units so that they will be compensated.  There are about 125
 2    dealers that have rejected our help in redistributing that.
 3    We've worked with the adjacent dealers to reach out and try to
 4    employ --
 5        MS. BROWN:  Your Honor, I would move to strike Mr.
 6    Nardelli's testimony.
 7        THE COURT:  You asked him what he's done to help
 8    them.
 9        MS. BROWN:  To help the employees of the dealers.
10    A.  I was saying we've asked -- before I was --
11        THE WITNESS:  I'm sorry, may I finish, Your Honor?
12        THE COURT:  Go ahead and finish.
13    A.  We've asked the adjacent dealers to certainly reach out
14    and try to employ the skill trades, the technicians, the
15    salesmen and women in those affected dealerships.  So we're
16    trying to do everything we can to help the 789 dealers.
17    Q.  Are any of the retained dealers obligated to hire any of
18    the employees from the rejected dealers?
19    A.  No, they're not.
20    Q.  Rejecting these 789 dealers will not save Chrysler any
21    direct expenses, will it?
22    A.  Yes, it will.
23    Q.  And what direct expenses will be saved?
24    A.  Well, every dealership -- there are specialty tools that
25    the manufacturer have to supply.  There is service training
```

```
 1    that we provide.  There is dealer support in the local markets
 2    for advertising.  There is incentive payments and spiffs that
 3    we run, those brochures.  I mean, there's a host of expenses
 4    that go into supporting the dealers.
 5    Q.  I would like for you to list every expense that will be
 6    saved by terminating the 789 dealers.
 7    A.  I couldn't do --
 8        MR. ARMSTRONG:  Objection, Your Honor.  I think he
 9    just did that.
10        THE COURT:  It's certainly -- excuse me.  What do you
11    want him to list in addition to what he just did?
12        MS. BROWN:  Mr. Nardelli testified that there are a
13    host of expenses, and I want to understand what that alleged
14    host of expenses are.  If there are none in addition to the
15    four he's listed, that's fine.
16        THE COURT:  All right.
17        THE WITNESS:  Your Honor, I'm sure there's more, and
18    to have a complete list we'd have to go back and either try to
19    find that or provide it.
20    BY MS. BROWN:
21    Q.  Mr. Nardelli, has Chrysler made any effort to quantify the
22    cost savings related to specialty tools for rejecting the
23    dealership agreements for the 789 dealers?
24    A.  I don't have that number available, but I'm sure there was
25    some cost associated with that.
```

```
 1    Q.  My question is has Chrysler made any effort to quantify
 2    the cost savings associated with specialty tools in rejecting
 3    the 789 dealerships' agreements?
 4    A.  I'm not aware that we would look at, going forward, what
 5    the cost of new tools would be that we would not have to incur
 6    with 789 less dealers.
 7    Q.  So it's fair to say, then, that Chrysler has not
 8    quantified the cost savings that it believes it will achieve by
 9    rejecting the 789 dealers with respect to specialty tools?
10    A.  No, I said I wasn't aware of that.  I would assume that
11    Jim Press and the marketing sales organization would have some
12    feel for that.
13    Q.  But you don't know, sitting here today?
14    A.  No.  No, ma'am, I don't.
15    Q.  And how about service training?  Are you aware of any
16    efforts to quantify the cost that will be saved in service
17    training by rejecting the dealership agreements of the 789
18    dealers?
19    A.  Not that I could provide you right now.
20    Q.  And what about dealer support?  Have you made any -- has
21    Chrysler made any effort to quantify the cost savings it will
22    achieve by rejecting the 789 dealers with respect to dealer
23    support?
24    A.  Yes, I'm sure that the advertising associated with dealer
25    support -- again, I don't have that number of what the average
```

```
 1    would be for 789 dealers.
 2    Q.  You testified that you're sure that's been done.
 3    A.  Yes.
 4    Q.  Who did it?
 5    A.  I would say the marketing and sales organization have done
 6    that.
 7    Q.  Do you know for a fact it's been done?
 8    A.  No.  I would assume that it would -- it had been done.
 9    Q.  So you're assuming it's been done?
10    A.  Yes.
11    Q.  But sitting here today, you cannot testify with certainty
12    that it's been done?
13    A.  I have not seen those numbers.
14    Q.  What about incentive payments?  Has Chrysler made any
15    effort to quantify the cost savings with respect to incentive
16    payments for rejecting the 789 dealers?
17    A.  Again, I'm sure that the amount of incentive payments that
18    were made to those dealers can be calculated.
19    Q.  And, again, you're assuming, correct?
20    A.  Yes.
21    Q.  And you don't know for sure whether Chrysler has made any
22    effort to quantify the cost savings it will achieve by
23    rejecting the dealership agreements for the 789 dealers?
24    A.  I think, again, we'd have to get a hold of Jim and the
25    team and see if we can find it.
```

**366**

1   Q. But I'm asking you if you know of it.
2   A. I have not seen that document.
3   Q. Don't dealers pay for specialty tools?
4   A. In some cases they pay for tools and in some cases we
5   provide -- my understanding is we provide some specialty tools
6   I --
7   Q. And don't dealers pay for training?
8   A. In some cases they do and in some cases I know that we
9   have a pretty extensive service agreement to provide training
10   to the dealerships.
11   Q. And don't the dealers reimburse for that service training?
12   A. Not in total.
13   Q. What percentage do they reimburse?
14   A. I don't know. I don't know.
15   Q. Prior to bankruptcy, Chrysler was not considering a mass
16   termination of its dealership agreements, was it?
17   A. Well, prior to bankruptcy, one of the initiatives that was
18   in place when I got there was a rationalization of the dealer
19   network, and Mr. Press advanced that under the plans called
20   Genesis.
21   Q. And under Project Genesis, the dealer network was to be
22   rationalized by 2011, correct?
23   A. I don't remember the exact date, but it was over a period
24   of time through rationalization and elimination that the
25   Genesis program was in place.

**367**

1   Q. So it was over a period of time, correct?
2   A. Yes, it was.
3   Q. And there were no current plans prior to bankruptcy to
4   reject the dealership agreements of 789 dealers, was there?
5   A. No, that 789 was the outgrowth of the Genesis plan;
6   otherwise they would, you know, not have been able to determine
7   the appropriate dealership. So it would be incorrect to say
8   that a lot of those dealers -- I can't attest to everyone, but
9   a lot of those dealerships that were a single brand or may not
10   have been achieving the performance in the MSA may have been
11   part of the Genesis program.
12   Q. But they were not scheduled to be terminated prior to June
13   9th, were they?
14   A. No.
15   Q. In fact, are you aware of whether there was any plan to
16   terminate any one of the 789 dealers that Chrysler is now
17   seeking to reject?
18   A. No, I think the only thing I could -- is I believe there
19   was -- somewhere around 150 dealers had terminated through the
20   first quarter of this year.
21   Q. But my question involved the 789 dealers that Chrysler is
22   now seeking to reject.
23   A. Correct.
24   Q. Is there any plan to terminate any one of their dealership
25   agreements?

**368**

1   A. I don't know if there were performance letters in the mill
2   or being contemplated to be sent to some of those dealers based
3   upon, again, performance criteria.
4   Q. So the answer is you don't know?
5   A. I don't know of the 789 whether any had already been
6   identified as poor performers or redundant facilities in the
7   marketing area.
8   Q. This idea of rejecting dealership agreements first came up
9   when the idea of filing for bankruptcy was raised, correct?
10   A. No, there were discussions, again, as part of the overall
11   initiative as to -- again, as we looked at every area of
12   opportunity and cost and cost elimination. So it was not
13   something that was decided after bankruptcy, if that's your
14   question, after we filed.
15   Q. But was it raised in connection with filing bankruptcy?
16   A. Well, bankruptcy, certainly under the 363 in Bankruptcy
17   Code, allowed us to accelerate the plan.
18   Q. Because there was not a plan to terminate the dealership
19   agreements of the 789 dealers prior to June 9th, was there?
20   A. There may have been some, as I said, on an ongoing basis
21   where there's a dealer review committee that looks at the
22   performance of various dealers across the country.
23   Q. Is it your understanding that if Chrysler sought to
24   terminate a dealership agreement outside of bankruptcy it would
25   have to comply with the state dealer laws?

**369**

1   A. I'm not an expert. I understand there is state franchise
2   laws, which is why, again, you would have a, as I understand
3   it, a performance letter issued to the dealership, and they
4   would have a remedy period to try and correct that situation.
5   Q. But you're not sure if that was in place for any of the
6   789 dealers, correct?
7   A. No.
8   Q. How does the dealer network represent a liability on
9   Chrysler's balance sheet?
10   A. A liability? I'm not sure it does show as a liability.
11   Q. Is there any liabilities associated with the dealer
12   network on Chrysler's balance sheet?
13   A. Well, if you assume the incentive payments that we owe the
14   dealers, we carry those as a liability, as a forward-going
15   liability. And then there's the ongoing operating expense; the
16   marketing support; as I mentioned earlier, the training; the
17   inventory; the floor planning.
18   Q. What do you mean by "the floor planning"?
19   A. Well, there -- again, if you think of -- you know how the
20   system is; we have to pay the -- sometimes we pay subvented
21   rates on retailing of floor-planned items to support the dealer
22   in trying to get a retail transaction. So we would subsidize
23   the dealer by paying FinCo a subvented rate.
24   Q. And were you subsidizing any of the 789 dealers that
25   Chrysler's seeking to reject?

**370**

1    A. Oh, sure. We would have been -- if they -- if the
2    customer took a subvented rate, then we would have subsidized
3    it to the finance companies.
4    Q. And how many dealers were involved with -- I believe it's
5    Chrysler Financial?
6    A. I think about -- I don't recall. I think somewhere around
7    seventy-five to eighty percent of the dealers were either
8    floor-planning or using some form of retail support from
9    Chrysler Financial. Some were using Chase; some were using
10   credit unions; and some were using local banks.
11   Q. And has there been any effort by Chrysler to quantify the
12   cost associated with --
13      MS. BROWN: Strike that.
14   Q. Is there -- has there been any effort by Chrysler to
15   quantify the cost that it will save related to floor-planning
16   with respect to the 789 dealers?
17   A. Well, it'd be more of the subvention that they would look
18   at. But, again, I don't have that -- I don't have that number.
19   Q. You don't know if that's been done?
20   A. No.
21   Q. I believe you testified earlier that you met with the auto
22   task force on March 9th of 2009, is that correct?
23   A. Well, I don't -- what -- are you referencing a particular
24   meeting or --
25   Q. I believe you testified earlier that you discussed

**371**

1    reducing the Chrysler dealer body with the auto task force in
2    March of 2009; is that correct?
3    A. Well, I think what I said was that there were discussions.
4    We looked at every operation, whether it was factories,
5    marketing, sales, et cetera. So I don't know if there was a
6    specific -- if I referenced a specific date or not.
7    Q. Have you ever discussed reducing the dealer body with the
8    auto task force?
9    A. Jim Press would have had that discussion with the auto
10   task force.
11   Q. But were you involved at all in the discussion?
12   A. I don't recall directly being involved in it.
13   Q. So it's fair to say that you never went to the auto task
14   force seeking assistance with respect to Chrysler's dealers, is
15   that correct?
16   A. Well, certainly, in the broadest sense, by keeping the
17   business viable we did save over 3,000 dealers.
18   Q. I'm sorry, can you repeat your answer?
19   A. Yeah, I said certainly by keeping the business viable we
20   saved, you know, 3,000 dealers, or the remaining number of
21   dealers.
22   Q. Aren't the 789 dealers encompassed within the 3,000
23   dealers you saved?
24   A. Yeah, they were part of the dealer network. But, again,
25   it's no different than the 35,000 people, unfortunately, we had

**372**

1    to lay off and 8 -- 6, 7, 8 factories we had to close. I mean,
2    these are gut-wrenching decisions; nobody enjoys them. I
3    certainly haven't enjoyed it.
4    Q. So you really didn't save 3,000 dealers, because you're
5    seeking to reject 789 of them?
6    A. Well, I think -- I don't know the exact number. I think
7    there was 3,600. And so it's around 3,000 that are still
8    retained.
9    Q. Sitting here today, do you know how many dealers Chrysler
10   currently has?
11   A. It was somewhere around over 3,000 dealers.
12   Q. Currently, right now, they have over 3,000 dealers?
13   A. Yes.
14   Q. But you don't know specifically how many?
15   A. No, I don't because, you know, as I said, I think there
16   was somewhere around 150 that terminated in the first quarter.
17   So it's a moving number.
18   Q. And as I understood your testimony, then, you did not
19   specifically approach the auto task force regarding help with
20   respect to the 789 dealers whose dealership agreements you're
21   now seeking to reject?
22   A. Correct.
23   Q. And why not?
24   A. Well, as we looked at, again, all of the -- all the
25   various elements in trying to put together a viable enterprise,

**373**

1    unfortunately we -- it was determined that, you know, we would
2    have to make some tough decisions in the dealer network; we
3    would have to make some tough decisions relative to the hourly
4    workforce, the salary workforce. We laid 5,000 people off --
5    5,000 salaried people off the Wednesday before Thanksgiving in
6    November. So these are all gut-wrenching decisions that we had
7    to make.
8    Q. But if you have not sought to quantify the costs of the
9    dealer network, why -- how is it a tough decision to reject
10   789?
11   A. Well, any time you have to terminate either a dealer or an
12   employee or a supplier, those are always tough decisions if you
13   haven't had to do it before.
14   Q. But you don't even know what they were costing Chrysler,
15   do you?
16   A. I said I didn't know the exact amount.
17   Q. Do you know approximately?
18   A. No, I wouldn't want to -- I wouldn't want to venture a
19   guess at this point.
20   Q. So then on what basis are you seeking to reject the
21   dealers?
22   A. Because we knew that, first of all, we needed to downsize
23   on the dealers so that the remaining dealers would be in a
24   position to be more profitable and therefore more viable so
25   that they would be able to grow their volume, grow their market

**374**

1  share; that the remaining dealers, it was felt, as I understand
2  it, would have a higher prospect of becoming a Genesis dealer
3  because they had liquidity and financial support to expand
4  their dealership to take on Chrysler, Dodge and Jeep under one
5  roof, that it was determined to be the most efficient
6  dealership as opposed to a single-brand dealership.
7  Q.  Since 2001, Chrysler's dealer body has been declining,
8  correct?
9  A.  I've only been there since '07, so I know since August of
10  '07 the dealer body has been declining.
11  Q.  And the dealers aren't getting more --
12      MS. BROWN:  Or strike that.
13  Q.  And Chrysler's market share is not increasing as a result,
14  is it?
15  A.  I would say the contrary is our market share has not
16  deteriorated to the same degree, you know, over forty percent
17  GM and, again, forty percent on Ford.  We've been hovering
18  somewhere around 10 to 10.6, 10.8 percent market share.
19  Q.  Since 2001, Chrysler's market share has decreased,
20  correct?
21  A.  If I recall the number, it's been a modest decrease,
22  somewhere around -- if you go all the way back, if I remember
23  somewhere around eighteen percent in comparison to -- again,
24  the other manufacturers I mentioned, I think, are both around
25  thirty to forty percent share deterioration.

**375**

1  Q.  So the answer to my question, then, is yes?
2  A.  Yes, I said that.
3  Q.  While you were talking to the auto task force in March
4  about restructuring Chrysler, Chrysler was pressuring all
5  dealers to take on additional inventory, wasn't it?
6  A.  We were working very hard to try to balance the inventory
7  levels.  When I got there, the inventory was over 600,000
8  units; we got it down to around 400.  And when we emerge from
9  bankruptcy, the inventory in the field should be somewhere
10  around 270,000 units.  So I think we've made tremendous
11  progress in reducing the burden on the dealers who are paying
12  floor-planning for that inventory that's out there.
13  Q.  In January, February, March, Chrysler was urging its
14  dealers to take on additional inventory, wasn't it?
15  A.  Yeah, we were trying to -- we were trying to match, one
16  for one, one retail/one wholesale so that we could keep our
17  factories open, obviously with no factories open and no revenue
18  generation.  I think I had mentioned in my earlier testimony
19  that we were very concerned about cash and liquidity, so we
20  were trying to keep -- we were trying to keep the company
21  solvent.
22  Q.  And, in fact, in February of this year Mr. Press held a
23  conference call with the dealers regarding taking on additional
24  inventory, didn't he?
25  A.  Yeah, there was a program, an incentive program, that

**376**

1  provided financial incentive to the dealers to help retail the
2  wholesale units that we were taking on.  So I can't explain the
3  exact program, but for dealers that participated to an
4  allocation they could get up to 500 dollars, 750, 1,000 dollars
5  per vehicle.
6  Q.  And were you on that call with Mr. Press?
7  A.  No, I wasn't.
8  Q.  And as a result of Chrysler's urging, over seventy percent
9  of the dealers took on the inventory that they were asked to
10  take on by Chrysler, correct?
11  A.  I'm not sure, when you say seventy percent of the
12  inventory.
13  Q.  Seventy percent of the dealers took on the additional
14  inventory they were asked by Chrysler to take on, correct?
15  A.  I don't know the exact number.  I know that, again, we
16  were trying to balance our inventory with the days available in
17  the dealerships, and that's how the criteria -- so we didn't
18  ask them to take more wholesale units on if, in fact, they
19  already had inventory of Calibers, of 300's.  So we tried to
20  proportion the mix of what was out there at the dealership.
21  The allocation was done in the field.
22  Q.  And the dealers were asked to accept the allocations given
23  to them, correct?
24  A.  There was an allocation issued and they had the option to
25  participate or not participate.  If they elected to

**377**

1  participate, there was an financial incentive to support their
2  taking those units to assure that they would move those at the
3  retail level.
4  Q.  And over seventy percent elected to participate, correct?
5  A.  Again, I -- you asked me that; I don't know the exact
6  number.
7  Q.  But you know a vast majority elected to participate?
8  A.  Yes.
9  Q.  And Chrysler was urging the dealers to participate in
10  order for Chrysler to remain a viable company, right?
11  A.  Well, I would say since I've been there we've been working
12  with dealers to take inventory and to, again, try to make sure
13  we had adequate inventory and that we were pushing inventory so
14  that they were available for retail customers.
15  Q.  And now Chrysler is not repurchasing that inventory from
16  the 789 dealers, correct?
17  A.  Well, we're not repurchasing --
18  Q.  That's a yes or no.
19  A.  The answer is no, we are not.
20      MS. BROWN:  Your Honor, may I approach the witness?
21      THE COURT:  Go ahead.
22      Thank you.
23  Q.  Mr. Nardelli, I've handed you a copy --
24      MR. ARMSTRONG:  Your Honor, I'm sorry.  One moment,
25  please.  Can I just have one second?

THE COURT: All right.

(Pause)

MS. BROWN: We would mark this document Dealer Committee Exhibit 1, please.

(Affected Dealers' Committee's Exhibit 1, e-mail from Mr. Press to Messrs. Nardelli and LaSorda, was hereby marked for identification as of this date.)

MR. ARMSTRONG: Your Honor, I understand from one of my colleagues that there's some sort of confidentiality agreement that relates to certain information that has been discussed with counsel. We don't have an objection to this exhibit. We just want to make it clear that we're not waiving our rights to claim confidentiality.

MS. BROWN: Your Honor, every document, almost, that's been used today has been marked confidential.

MR. ARMSTRONG: I don't have a problem marking it confidential; it's sort of the opposite. We want to make sure we're not waiving anything.

MS. BROWN: I'm not sure I understand. May I proceed forward with using the document?

MR. ARMSTRONG: Yes, the waiver -- I'm sorry, Your Honor. The waiver relates to other documents. By letting this in, it doesn't mean that --

THE COURT: All right.

MR. ARMSTRONG: -- we are agreeing to a waiver as to

other documents. But --

THE COURT: All right.

Go ahead, counsel.

MR. ARMSTRONG: Okay.

BY MS. BROWN:

Q. Mr. Nardelli, Dealer Committee Exhibit 1 is an e-mail from Jim Press to you and Mr. LaSorda, correct?

A. Yes.

Q. And he's forwarding along an e-mail from Peter Fong, correct?

A. Yes.

Q. And Peter Fong is a business center manager, correct?

A. Yes.

Q. And if you -- and what is the date on this document?

A. Looks like it was sent 1/31.

Q. And if you could turn to the second page, please?

A. Yeah.

Q. Mr. Fong is sending a letter to the mid-Atlantic business center dealers, correct?

A. Yes.

Q. And the mid-Atlantic business center is one of eight business centers that Chrysler has, correct?

A. Yes.

Q. And Mr. Fong states, "I would like to offer my personal thanks and recognition to the dealerships listed below. These

dealers committed to their February allocation. These dealers committed once again to the future as Chrysler, Dodge or Jeep dealers. Most of the participating dealers attended our meeting with Jim Press and Steven Landry where we learned that our franchise viability depends on February and March wholesale productions being sold." Do you see that?

A. Yes, I do.

Q. And it's your understanding that Chrysler was urging the dealers to take on inventory because the viability of the company depended on February and March wholesale production, right?

A. Yes, and this is not uncustomary, at least since the time I've been there, to work every month, to work with the dealers to take inventory.

Q. And so letters similar to this were probably sent out to all eight business centers, correct?

A. This looks like it may have been -- I don't know if this is -- I don't know if there's a similar letter that was sent to every business center. I don't know --

Q. But I would be customary to send something similar to this in the normal practice of Chrysler, right?

A. Yeah, the business centers are business leaders who have large geographic area, and there's X number of dealers in their responsibilities. So they communicate with those dealers regularly.

Q. And this would be one of the regular communications --

A. Sure.

Q. -- correct?

A. Sure.

Q. And you see a list attached to the letter?

A. Yes, I do.

Q. And is it your understanding that all of the dealers on this list had committed to take the February allocations that Chrysler was urging them to take?

A. Well, according to the note, that's what -- it appears that that's what he is saying. Most of the participating dealers committed to their February -- these dealers committed to their February allocation, yes.

Q. And he said committed to their future as Chrysler, Dodge and Jeep dealers, didn't he?

A. Yes, he did.

Q. Are you aware that fifty-two dealers on this list are included in the 789 that Chrysler is seeking to reject?

A. No, I'm not.

Q. So the dealers on Exhibit 1 stepped up and helped Chrysler out when Chrysler was in need, but now Chrysler's turning its back on these dealers and seeking to reject their dealership agreements, isn't it?

MR. ARMSTRONG: Objection, Your Honor. Argumentative. No foundation.

**382**

THE COURT: All right, what's the foundation for the question?

MS. BROWN: The foundation is that Mr. Nardelli has testified that Chrysler needed these dealers to take on the inventory to make their February and March wholesale numbers. These dealers did it, and now Chrysler's seeking to reject them.

THE COURT: I understand, but your question was in the form of Chrysler turning their back. I mean, that's a characterization. You want to -- you're asking the witness whether or not he agrees with that characterization?

MS. BROWN: I can rephrase the question, Your Honor.

THE COURT: All right.

BY MS. BROWN:

Q. The dealers listed in Dealer Committee Exhibit 1, would you agree, stepped up and helped out Chrysler when they were asked to?

A. Yes.

Q. And would you also agree that, at least with respect to the fifty-two of the dealers in Exhibit 1 that are also included as one of the 789 that Chrysler's seeking to reject, that Chrysler's now turning its back on them?

A. No.

Q. And why not?

A. Well, as I mentioned, the affected dealers had about

**383**

40,000 units when we announced the 789; about 4,000 of those have been sold off; about 15,000 have already been desig -- alternate dealer designation. So we are making every effort. And I don't know of the 50 on here, whether they represent any of the 120 that have refused help.

Q. Now, you talk about making every effort, but Chrysler has not agreed to repurchase the inventory, correct?

A. We went through this, and we are not repurchasing it but we are working closely with GMAC as a result of the transaction. And GMAC is working very hard to pick up that inventory. And, in fact, there is a cost-sharing should there be any loss on the '08s and '09s to make sure that we have every opportunity to redistribute that inventory and therefore pay those affected dealers the wholesale -- their wholesale rate.

Q. And that's just with respect to the inventory, correct?

A. That's correct.

Q. And there's no guarantee that all inventory will be sold, correct?

A. No, there's no guarantee.

Q. You mentioned the cost-sharing. Does this involve a special purpose vehicle?

A. I'm not sure of what the instrument is of how that was arranged between the companies.

Q. Are you aware of an arrangement where Chrysler put up

**384**

funding to backstop loans made by GMAC to the retained dealers?

A. Yeah, there's a mechanism in place where -- to make sure -- if I recall this right, to make sure that on the '08s and the '09s, and I don't remember the exact amount, it may -- about 2,000 dollars or 4,000 dollars in the transfer of those units to make sure that if they were redistributed --

MR. ARMSTRONG: Sorry. Excuse me, Your Honor. Objection.

UNIDENTIFIED SPEAKER: It's under seal pursuant to the GMAC MAFA --

THE COURT: You know, it would be helpful if you sat down next to each other.

MR. ARMSTRONG: Sorry, Your Honor. I understand that --

UNIDENTIFIED SPEAKER: Excuse me, Your Honor.

MR. ARMSTRONG: -- this testimony is under seal pursuant to an agreement. Sorry.

MS. BROWN: No agreement I'm part of.

THE WITNESS: Sorry if I misspoke, Your Honor.

MR. ARMSTRONG: I understand that the Court has already approved three agreements that state that this precise information is under seal. The three agreements are the GMAC MAFA, Chrysler Financial RSA, and the GMAC MTA.

THE COURT: All right, the information is under seal, all right? So get around this with the witness without these

**385**

specific responses being necessary.

BY MS. BROWN:

Q. So, Mr. Nardelli, if I understand your testimony, Chrysler is at risk for certain losses associated with this inventory, is that correct?

MR. ARMSTRONG: Same objection, Judge.

MS. BROWN: Your Honor, how can we argue about the costs of this if we don't even know what they are?

THE COURT: Well, you should have -- well, quite frankly, when these documents go under seal, you may have articulated an objection at that time. But at this time I'm not hearing it. I mean, your point can be arrived at, I think, without going through this information.

BY MS. BROWN:

Q. Mr. Nardelli, a fund was created with respect to lending by GMAC to the retained dealers, correct?

A. Yes, it's my understanding that there was a fund created.

Q. And Chrysler funded whatever instrument is used to backstop these loans, correct?

A. Yeah, I believe there was a sharing of the funds.

Q. Between Chrysler and whom?

A. I'm not sure I'm at liberty to say that, then.

Q. I don't think your counsel's objecting.

THE COURT: All right. You may answer that question.

MR. ARMSTRONG: I apologize, Your Honor. To the

1 extent that he knows, he can share the existence but, my
2 understanding is, not the mechanism.
3     THE COURT: All right.
4 A. So it's a combination between Chrysler and the finance
5 companies.
6 Q. And what finance companies?
7 A. I think it's a combination of the transition from FinCo
8 into GMAC.
9 Q. Where did Chrysler get the money to fund this vehicle?
10 A. All of our money has come from the government.
11 Q. Was this part of the DIP lending?
12 A. I believe it probably was identified as something within
13 the DIP financing. I don't recall exactly.
14 Q. Did Chrysler ask the government to fund the repurchase of
15 the inventory as part of the DIP loan?
16 A. Not to -- not -- I don't know. I don't know.
17 Q. Were you involved with the DIP budget at all?
18 A. On and off, yes.
19 Q. Did you ever ask the government to fund the repurchase of
20 the inventory from the rejected dealers?
21 A. No, I did not.
22 Q. I believe you testified that if the sale was approved you
23 will not be an employee, director or officer of New Chrysler,
24 correct?
25 A. That's correct.

---

1 Q. And are you aware that, in connection with the sale,
2 Chrysler has filed a motion that seeks to provide you and
3 others with releases?
4 A. Yes, I am.
5 Q. And what does a release have to do with this sale motion?
6 A. With the sale motion?
7 Q. Yes.
8 A. I'm not exactly sure other than I know there are releases
9 involved in the settlement agreements and for all of the
10 directors and the officers of Chrysler in consideration for
11 putting together what we believed was the best alternative
12 using our business judgment.
13 Q. And are those releases then contingent on the sale
14 happening?
15 A. I would think so, and to my knowledge.
16     MS. BROWN: No further questions.
17     THE WITNESS: Thank you.
18     THE COURT: All right, thank you.
19     How many other counsel wish to ask questions?
20     UNIDENTIFIED SPEAKER: Not very many.
21     THE COURT: All right, you don't have to give me --
22 well, I take that back; I do want to know the time. But I just
23 ask all of you try and -- if a number of parties are asking
24 questions from the dealer standpoint, just try not to be
25 repetitive. It's just been brought out by other counsel.

---

1     MR. MCRORY: Yes, Your Honor. Russell McRory,
2 Robinson Brog Leinwand Greene Genovese & Gluck, for Performance
3 Dodge LLC.
4 CROSS-EXAMINATION
5 BY MR. MCRORY:
6 Q. Good evening, Mr. Nardelli.
7 A. Good evening.
8 Q. I'll keep it short. I want to take you back to the days
9 before the filing for bankruptcy. And you testified earlier
10 that --
11     THE COURT: Would you extend the microphone, please?
12     MR. MCRORY: Oh.
13     THE COURT: Thank you.
14 Q. You testified earlier that you were almost there, and
15 the -- you were very close except for a few of the first lien
16 lenders, is that correct?
17 A. Yes.
18 Q. If you had secured a deal with those remaining first lien
19 lenders, do you believe it would have been necessary for
20 Chrysler to file for bankruptcy?
21 A. Well, we were certainly hoping that if we got their
22 agreement we may be able to avoid bankruptcy.
23 Q. What else would have caused Chrysler to file for
24 bankruptcy?
25 A. That was the biggest -- that was the biggest hurdle we had

---

1 to overcome at the time.
2 Q. What other hurdles? Even the smaller ones.
3 A. Well, we had to make sure that we had all of the final
4 agreements, and we had to make sure that the master transaction
5 agreement was agreeable to Fiat in this final deal.
6 Q. Were there any terms still up in the air?
7 A. We were working through the entire evening the 29th up to
8 the 30th, and we were finally able to reach resolution.
9 Q. Now, if Chrysler had not filed for bankruptcy and an
10 alliance with Fiat occurred outside of bankruptcy, isn't it
11 correct that Chrysler would have been bringing approximately
12 3,200 dealers into the alliance?
13 A. Yes. As I mentioned earlier, we would have continued to
14 carry the dealers except for those that would have been on some
15 performance letter.
16 Q. And approximately fifteen days later, on May 14th,
17 Chrysler filed a motion to reject approximately 800 dealers, is
18 that correct?
19 A. That's correct.
20 Q. So prior to -- the deal originally with Fiat would have
21 been Chrysler bringing in 3,200 dealers into the alliance;
22 however, now Chrysler is giving only 2,400 dealers to the Fiat
23 alliance; is that correct?
24 A. That's correct.
25 Q. Who asked for that change?

1  A.  Well, as we looked at filing bankruptcy, and knowing that
2  being over-dealered has been an issue for Chrysler for some
3  time, and it has been a process that was there prior to me in
4  trying to get dealer consolidation, not only in Chrysler but in
5  the industry, it presented an opportunity to accelerate the
6  plan.
7  Q.  Did the UAW ask for this dealer reduction?
8  A.  No.
9  Q.  Did the American government ask for this dealer reduction?
10  A.  No.
11  Q.  Did the Canadian government ask for this dealer reduction?
12  A.  No.
13  Q.  Did Fiat ask for this dealer reduction?
14  A.  No, I don't recall -- again, that -- I don't know if that
15  was an item that was expressly indicated in the agreement or
16  not.
17  Q.  So is it fair to say that Chrysler just offered these
18  dealers up as part of the deal for no extra consideration?
19  A.  Well, no, I think it, again, was part of the -- a plan
20  that was there that was going to be implemented over a period
21  of time, and this presented an opportunity to accelerate that
22  rationalization, dealer rationalization.
23  Q.  What did Chrysler get in return for the acceleration of
24  this rationalization?
25  A.  Chrysler didn't.  It was really the value will be realized

390

1  in NewCo.
2  Q.  But isn't your obligation to the debtors' estate?
3  A.  Yes.
4  Q.  So then why are you worried about what NewCo gets?
5  A.  Well, again, what we were trying to do is make sure that
6  the assets that we were transferring forward were as viable as
7  they could be going forward.  I think that was part of our
8  responsibility:  not to deliver a plan that didn't have
9  viability to it.
10  Q.  But, again, you just testified none of the parties-in-
11  interest to NewCo asked for this.
12  A.  I'm not sure about the Fiat master transaction agreement.
13  Q.  Mr. Nardelli, have you ever seen any studies that address
14  how much it costs Chrysler to maintain its current dealer
15  network?
16  A.  Not in total.
17  Q.  Okay.  Have you seen any studies that it would cost New
18  Chrysler to maintain a smaller dealer body?
19  A.  No, the discussions that basically were around this was
20  the ability to allow the remaining dealers to realize more
21  market share, higher volume and, therefore, become more
22  profitable and also, consistent with the Genesis program,
23  through brand consolidation.
24  Q.  Has that theory even been reduced to a quantifiable report
25  and analysis or anything like that?

391

1  A.  I'm -- I -- again, I would think it would have been.  I
2  can't tell you that I've seen those documents.
3  Q.  Okay.  And I just want to reiterate -- ask another point
4  to what we discussed before that did Chrysler receive any
5  concession or value for accelerating the rationalization
6  program by rejecting almost 800 dealers?
7  A.  Not to my knowledge.
8       MR. MCRORY:  No further questions.
9       THE COURT:  All right.
10       Next person.
11  CROSS-EXAMINATION
12  BY MR. SNYDER:
13  Q.  Mr. Nardelli, good evening.  My name is Eric Snyder.  I'm
14  with Siller Wilk, and we represent thirty-one of the affected
15  dealers.  There's been a lot of testimony this evening about
16  the viability plan, is that correct?
17  A.  Yes.
18  Q.  And I believe you testified that many hours and a great
19  deal of time and energy went into preparing that plan, is that
20  correct?
21  A.  Yes.
22  Q.  And that plan was submitted to the government during
23  February 2009, is that correct?
24  A.  February 17th.
25  Q.  And that plan set forth both the benefits and the burdens

392

1  of going forward with Chrysler with different scenarios, is
2  that correct?
3  A.  Yes.
4  Q.  And is -- anywhere in that report, is there an analysis of
5  what the burden of the dealers were to Chrysler at that time?
6  A.  No, not to my knowledge.
7  Q.  I'm sorry?
8  A.  No, not to my knowledge.
9  Q.  And in March 2009 things changed, is that correct, with
10  discussions regarding Fiat?
11  A.  Yes, a lot of things changed in March.
12  Q.  And it became clear, did it not, Mr. Nardelli, in March
13  that the Fiat deal had to be done through a bankruptcy
14  proceeding?  Is that correct?
15  A.  No.  What -- I think what I testified to is that one of
16  the biggest hurdles to overcome was getting the first lien
17  lenders to agree, which they subsequently have now agreed to is
18  the two billion dollar cash.
19  Q.  Okay, let me rephrase that.  Isn't it true that a
20  condition of the Fiat deal for Fiat was there be a bankruptcy
21  filing, correct?
22  A.  They certainly -- I mean, I think they certainly saw some
23  benefits of a bankruptcy, but it was not --
24  Q.  Mr. Nar --
25  A.  -- a condition of --

393

Q. I apologize. Please finish.

A. -- and I'm not aware that it was a condition precedent before the term sheet could be executed.

Q. So it's your understanding that Fiat could have or would have done the deal that's contemplated today without a bankruptcy?

A. Yeah, I think so.

Q. Okay. And when did -- how do you -- how did you reach that understanding?

A. Well, I don't recall. Again, I'd have to look through the master term agree -- master transaction agreement if there was a specific line item that said, you know, we won't do the deal unless you go through bankruptcy.

Q. Well, do you understand the deal today to be free and clear of liens, claims and interest?

A. Uh --

Q. Do you understand -- let me rephrase that.

MR. SNYDER: Strike that.

Q. Do you understand that Fiat is purchasing free of any of the claims and interests of Old Chrysler?

A. No, I believe some of the claims are transferring over to NewCo.

Q. Okay. But do you understand that some of the claims are staying in Old Chrysler, correct?

A. Yes.

Q. And you understand that was at the assistance of Fiat, correct?

A. Well, I think there was a discussion with the United States Treasury and NewCo about the liabilities that would stay behind and those that would transfer over.

Q. And was there an understanding in those discussions with Treasury and Fiat that the only way that you could pick and choose which liabilities would be going with New Chrysler and which ones would be staying in Old Chrysler would be through a bankruptcy?

A. Yeah, without bankruptcy, my understanding is the liabilities would have transferred.

Q. Okay. And in those conversations -- is that when the conversations came up about, as you put it, rationalizing the dealer network through a bankruptcy proceeding?

A. Yeah, those along with some other liabilities that would be left behind.

Q. And that was during March 2009, correct?

A. I can't recall exactly. It would have been either in March or during the final phases in April when we were forging the final agreement.

Q. And as you, I believe, you testified, but quickly, that was not a requirement of Fiat, correct, that the dealer network be rationalized?

A. I don't -- again, I would have to look at that to give you

a better answer.

Q. Do you have any knowledge that Fiat believed that cutting the dealer network would be profitable to them?

A. I think that, again, they were aware of the -- in their due diligence, that we had a dealer rationalization program called Genesis. So I would be assuming that, if they saw an opportunity --

Q. Mr. Nardelli, excuse me, I'm not asking you to assume.

A. Yeah.

Q. The question is do you believe that Fiat required the dealer network to be reduced?

A. No, I don't believe they required it.

Q. Okay. And do you believe they would have gone forward with the deal that's contemplated today without any of the dealers being rejected or terminated?

A. I don't know how to -- I don't know how to answer that --

Q. Okay.

A. -- hypothetical.

Q. And do you understand that the amount of dealers that are contemplated to be reduced here is approximately twenty-five percent?

A. Well, I heard fourteen percent.

Q. There are 789 dealers being rejected, and 31 --

A. You're talking about the revenue or the percent of dealers?

Q. Percent of dealers is twenty-five percent, correct?

A. Twenty-five percent.

Q. And the percent of the volume is fourteen percent, correct?

A. Correct.

Q. And do you believe in your experience that this is a good time to reduce fourteen percent of volume for Old Chrysler and New Chrysler?

A. Well, we had to take thirty-eight percent of our volume out of our business. We took 1.3 million of its of capacity out.

Q. Okay.

A. So it's certainly fewer vehicles. It gives the dealers much fewer vehicles to retail and to try to be profitable.

Q. Okay, Mr. Nardelli, this is important; it's certainly important to the dealers.

A. Yeah.

Q. We'd like to know when is the first time the discussions came up with Treasury that dealers were going to be terminated and rejected in a bankruptcy proceeding.

A. I don't -- I couldn't give you the specific date.

Q. Well, do you remember when the conversations first started?

A. Somewhere between the March and April timeframe.

Q. Okay. And what was the sum and substance of those

**398**

```
 1   conversations?
 2   A.  Again, as I said, I think that part of the due diligence
 3   Fiat did saw that we had a dealer rationalization plan, which
 4   was publicly communicated, about Genesis and the opportunity
 5   then to accelerate that.
 6   Q.  Okay, so it's your testimony that Fiat is the one that
 7   introduced the notion of reducing the number of dealers?
 8   A.  I don't know that.
 9   Q.  Okay.
10   A.  I don't know whether -- I'm not sure who generated what.
11   I don't recall.  I can't answer the question.
12   Q.  Okay.  Chrysler came up -- did you direct Mr. Landry to
13   prepare a list of dealers that were going to be rejected and
14   terminated?
15   A.  No.  We asked, I think in the discussions that Jim Press
16   had with Fiat and the counterparts, to take a look at the
17   Genesis program and what opportunities that might present.
18   Q.  And when you say "opportunities that might present" --
19   A.  To accelerate the closure.
20   Q.  Is that because in bankruptcy you could do what you could
21   not otherwise do outside of bankruptcy?
22   A.  In bankruptcy you could accelerate the plan of the Genesis
23   program as opposed to outside of bankruptcy.
24   Q.  And you testified a couple of minutes ago that the basis
25   of speeding up the rationalization program, as you put it, is
```

**399**

```
 1   because Chrysler is over-dealered; that's the term you used,
 2   correct?
 3   A.  Yes.
 4   Q.  And what do you mean by that?
 5   A.  I think the analysis would show, if you looked at the
 6   dealer network for some of the most profitable dealers, i.e.,
 7   Toyota, the volume of vehicles per dealer are significantly
 8   higher than the volume of vehicles for our dealerships.
 9   Q.  What analysis would show that?
10   A.  The marketing and sales team would be able to provide that
11   for you.
12   Q.  Okay.  Did the marketing and sales team provide that to
13   you?
14   A.  I recall seeing a study of that at some point long before
15   we got into this situation.
16   Q.  And when you say long before you got into this
17   situation --
18   A.  Probably '07 as part of my, probably, introduction to the
19   business.  It was pretty well known when I got there that
20   Chrysler was over-dealered.
21   Q.  Okay.  But is it your testimony that in the last eighteen
22   months there has been no study regarding the rationalization of
23   Chrysler's dealership network and how that affects profits?
24   A.  There's been extensive studies as a result of the Genesis
25   program, but I --
```

**400**

```
 1   Q.  Mr. Nardelli, the question was has there been any studies
 2   in the last eighteen months with respect to how the
 3   rationalization of the dealer network affects profits?
 4   A.  Not that I've seen.
 5   Q.  Okay.  And one last question.  You seem to equate the tens
 6   of thousands of jobs that are going to be lost at the dealers
 7   with the tens of thousands of jobs that are currently -- the
 8   tens of thousands of jobs with respect to the employees of
 9   Chrysler.  Do you recall that testimony?
10   A.  Yes, I do.
11   Q.  Do you see one being contingent on the other?
12        MR. SNYDER:  Strike that.
13   Q.  Isn't it possible that those people, these employees of
14   Chrysler, can still keep their jobs, and the employees of the
15   dealers that are being rejected could still keep their jobs,
16   and it wouldn't affect the profitability of Chrysler?
17   A.  Absolutely not.
18   Q.  Why is that?
19   A.  Well, we took -- again, one reduction was 5,000 salaried
20   people, and there's no way they could have kept their jobs.
21   And as the market fell from seventeen million units to a build
22   rate of nine, the company was oversized for the volume just
23   like they were over-dealered for that volume.
24   Q.  Okay.  But, again, with respect to the over-dealered for
25   the --
```

**401**

```
 1   A.  The volume fell off forty-eight percent.
 2   Q.  I understand that, Mr. Nardelli, but you also testified
 3   there has been no analysis in the last eighteen months how
 4   reducing the --
 5   A.  It doesn't mean just because I haven't seen it that it
 6   doesn't exist.
 7   Q.  Well, do you know it to exist?
 8   A.  No, I said I did not.
 9   Q.  Okay.  And is there anyone higher than you in Chrysler
10   that would know whether it existed?
11   A.  No.
12   Q.  Okay.
13   A.  There's no one higher.
14   Q.  All right.
15        MR. SNYDER:  Thank you.
16        THE COURT:  Thank you.
17        MR. BRESSLER:  Good evening, Your Honor.  Barry
18   Bressler from Schnader Harrison, for the ad hoc committee of
19   consumer victims of Chrysler.
20   CROSS-EXAMINATION
21   BY MR. BRESSLER:
22   Q.  Good evening, Mr. Nardelli.
23   A.  Good evening.
24   Q.  You've characterized the majority of your customers as
25   grassroots, traditional, blue-collar, American taxpayers, is
```

| | |
|---|---|
| 1    that correct? | 1    Q. And I think you said you had very aggressive discussions |
| 2    A. Yes. | 2    with Fiat? |
| 3    Q. And in your view, the purchase of a Chrysler is the second | 3    A. Yes. |
| 4    most important purchase in most of these people's lives after | 4    Q. And you attempted to reach out also to the first lien |
| 5    only their homes? | 5    lenders? |
| 6    A. I would say that's true. | 6    A. Yes. |
| 7    Q. Do you believe that the consumers who have purchased the | 7    Q. Did you have any discussions with any tort claimants or |
| 8    Chrysler vehicles are important to Chrysler? | 8    any representatives of tort claimants? |
| 9    A. Yes. | 9    A. No. |
| 10    Q. In entering into this Section 363 sale transaction, did | 10    Q. Did you have any discussions or attempt to have any |
| 11    you consider the interests of those owners of Chrysler | 11    discussions with any public interest groups that advocate for |
| 12    vehicles? | 12    tort claimants? |
| 13    A. Yes. | 13    A. No. |
| 14    Q. In what way? | 14    Q. When is the first time that the thought of leaving the |
| 15    A. Well, we wanted to make sure that the warranty costs, the | 15    product liability claims behind in Old Chrysler came up? |
| 16    availability to get service and so forth would continue. | 16    A. Again, I think those were discussions that took place |
| 17    Q. Did you also seek to do anything to protect the rights of | 17    between United States Treasury and Fiat. |
| 18    owners of Chrysler vehicles who are also tort claimants? | 18    Q. And whose idea was it? |
| 19    A. I'm not sure what your question is. | 19    A. I don't know. |
| 20    Q. My question is those who own Chrysler vehicles or who have | 20    Q. Did Chrysler do any studies as to how much money will be |
| 21    owned Chrysler vehicles, who have suffered injuries because of | 21    saved by NewCo by leaving the product liability claims behind? |
| 22    a defect in the vehicle and brought suit, have you done | 22    A. Not Chrysler LLC, to my knowledge. |
| 23    anything to protect their rights? | 23    Q. Based on reports from your risk department, do you have |
| 24    A. If you're referring to, as I -- product liability will | 24    any idea how much in product liability claims Chrysler pays out |
| 25    stay with OldCo. | 25    per year? |
| 402 | 404 |

| | |
|---|---|
| 1    Q. And what kind of recovery would you project for those | 1    A. No, I do not. |
| 2    people? | 2    Q. Do you have any idea how much in product liability claims |
| 3    A. I have no idea. | 3    Chrysler reserves for on its books? |
| 4    Q. What kind of recovery would you project for the entire pot | 4    A. No, I don't. I think Mr. Kolka would certainly know that. |
| 5    for the creditors of OldCo? | 5    Q. Under the proposed MTA, is it correct that millions of |
| 6    A. I don't know how to answer the question. I'm not -- when | 6    owners of Chrysler vehicles may not have any recourse in the |
| 7    you talk about creditors, are you talking about first lien | 7    event that they suffer injuries, even devastating injuries, as |
| 8    creditors and -- | 8    a result of an accident caused by a defect of a Chrysler |
| 9    Q. I'm talking about all the creditors of OldCo. How much | 9    vehicle? |
| 10    money do you think will be left in OldCo after it is | 10    A. Well, I'm not a -- I don't know how to answer that |
| 11    liquidated? | 11    legally. I don't -- I'm sure they would have recourse. |
| 12    A. I'm not sure how to answer the question, is that OldCo | 12    Q. To what? |
| 13    will pay two billion dollars out to the first lien and, as I | 13    A. I'm not sure. I'm not sure what the tort system is. |
| 14    understand it, the liquidation of the assets would then go to | 14    Q. Well, you just told us they have recourse to OldCo -- |
| 15    the government to offset the DIP funding, except for what | 15    A. Yes. |
| 16    remains for some liabilities. But I -- | 16    Q. -- and that OldCo essentially won't have anything left to |
| 17    Q. So, essentially there would be no value left? | 17    pay them with, is that correct? |
| 18    A. I think that's fairly correct. | 18    A. Correct. |
| 19    Q. Is it true that Chrysler had negotiations with the U.S. | 19    Q. Owners that bought Chrysler vehicles six weeks ago -- |
| 20    Treasury in structuring the 363 sale? | 20    that'd be just before the bankruptcy -- and operated them and |
| 21    A. Had discussions with UST? | 21    have had an accident, would they be able to collect from any |
| 22    Q. Yes. | 22    for that accident? |
| 23    A. Yes. | 23    A. I -- |
| 24    Q. And discussions with the UAW? | 24           MR. ARMSTRONG: Objection, Your Honor. Calls for a |
| 25    A. Yes, for sure, as it relates to the VEBA. | 25    legal conclusion. |
| 403 | 405 |

1    MR. BRESSLER: I'll rephrase it, Your Honor.
2    THE COURT: All right. Thank you.
3    Q. Would an owner who bought a vehicle six weeks ago and had
4    an accident two days before the bankruptcy be entitled to
5    collect under the 363 agreement from NewCo?
6    A. I -- again, I don't know how to answer that.
7    THE COURT: I think it's a legal conclusion, I mean,
8    that you're asking the witness. All right.
9    MR. BRESSLER: All right, I'll move on, Your Honor.
10   Q. You're also here as part of the 363 sale, advocating for
11   releases, I think you said?
12   A. Yes.
13   Q. And there would be a release for yourself --
14   THE COURT: One second. I think the motion for the
15   release of the directors and officer is not linked to the 363
16   sale and, I believe, is on later. We're not in June.
17   MR. BRESSLER: Or a separate --
18   THE COURT: We may be in June before this ends, but
19   it's on in June.
20   BY MR. BRESSLER:
21   Q. And you believe that on Monday you'll go back to work for
22   the same company that you worked for before you came to
23   Chrysler and that put you in your position with Chrysler, is
24   that correct?
25   A. Well, if we in fact close.

406

1    MR. BRESSLER: No further questions.
2    THE COURT: Thank you.
3    CROSS-EXAMINATION
4    BY MR. ESSERMAN:
5    Q. Mr. Nardelli, my name is Sandy Esserman. I represent a
6    member of the unsecured creditors' committee, Ms. Patricia
7    Pasquale, whose husband was a bright mechanic and died of
8    mesothelioma, an asbestos-related condition. I don't know if
9    you're familiar with mesothelioma or not.
10   A. Yes, I am.
11   Q. Okay. First I'd like to ask you a few questions about
12   your background. Do you currently serve on any other boards
13   besides Chrysler?
14   A. I serve on one nonprofit board.
15   Q. Okay. You served on boards in the past, however, isn't
16   that correct --
17   A. Yes.
18   Q. -- on public company boards?
19   A. Yes.
20   Q. Approximately how many?
21   A. Two.
22   Q. Okay. Private company boards too --
23   A. No.
24   Q. -- also?
25   A. No.

407

1    Q. Okay. Which two companies were those boards?
2    A. Home Depot and Coke.
3    Q. Okay. Were you also on the board of the New York Stock
4    Exchange?
5    A. No, never.
6    Q. Okay. And what position do you have with Home Depot?
7    A. Did I have?
8    Q. Yes.
9    A. Chairman and CEO.
10   Q. Okay. And Coke?
11   A. I was just a director.
12   Q. Okay. Are any of those companies related to service any
13   way?
14   A. Not to my knowledge.
15   Q. If this 363 transaction closes, has the board discussed
16   any bonuses to be paid to any board members?
17   A. Not that I'm aware of.
18   Q. Do you have any expectation of receiving a bonus should
19   the sale be concluded?
20   A. None.
21   Q. As far as you know, have all fees to be paid been
22   disclosed to this Court, upon a successful completion of the
23   sale?
24   A. To my knowledge.
25   Q. Let's talk about releases. There are releases being given

408

1    in connection with this transaction, are there not, the sale
2    transaction?
3    A. There's a --
4    MR. ARMSTRONG: Objection, Your Honor. We're back
5    into it again.
6    THE COURT: I think we need some clarification.
7    Which specific releases are you talking about?
8    MR. ESSERMAN: Well, let me start at the beginning.
9    We may build up to it a little bit.
10   Q. You're generally familiar with the transaction that we're
11   here today on of the sale to Fiat, is that correct?
12   A. Yes.
13   Q. Are you aware that, in connection with that sale, releases
14   are going to be given by Chrysler?
15   THE COURT: No, we need some clarification; that's my
16   point. Releases to -- what kind of releases?
17   MR. ESSERMAN: Well, I'm asking --
18   THE COURT: To whom?
19   MR. ESSERMAN: I'm asking --
20   THE COURT: So I'm asking you. You're going to have
21   to --
22   MR. ESSERMAN: Well, I'm --
23   THE COURT: We've had discussions of releases earlier
24   today. There were discussion of releases that had to do with
25   the Daimler, Cerberus and PBGC. Are you referring to those

409

1　releases, or are you referring to the releases subject to the
2　motion that is scheduled to be heard in June?
3　　　　MR. ESSERMAN: I'm just referring to releases that
4　would be executed in connection with the sale, and I'm asking
5　him an open question. Your Honor is correct; there's been some
6　discussion of those releases by previous witnesses. I'm asking
7　if this witness is aware of the releases to be given.
8　　　　THE COURT: All right. Go ahead.
9　　　　MR. ESSERMAN: Okay.
10　BY MR. ESSERMAN:
11　Q. Are you aware of releases --
12　A. Yeah, I'm aware that, as part of the settlement agreement
13　that was negotiated between UST, Cerberus and Daimler, that
14　there were releases requested.
15　Q. And there was some discussion previously in this court,
16　you might not have been here, but those releases are still
17　being negotiated; are you aware of that?
18　A. No, I'm not.
19　Q. Okay. Have you ever reviewed drafts of those releases?
20　A. No.
21　Q. Do you know if they exist?
22　A. I know that there's a settlement document, but I have
23　not -- I've not looked at the details of it.
24　Q. You've never read those releases?
25　A. No.

---

1　Q. Have you approved any releases in connection with the sale
2　to Fiat to be given by Chrysler, as a member of the board of
3　directors?
4　A. Well, I don't -- a release to?
5　Q. To anybody.
6　A. I don't know. I'd have to go back. And you have a
7　document that would suggest that?
8　Q. I don't know. I --
9　A. Yeah, I don't --
10　Q. I don't have it in front of me.
11　　　　THE WITNESS: I'm not aware of that, Your Honor. I
12　don't --
13　Q. If you're not aware that any releases are being given,
14　that's fine.
15　A. Yeah.
16　Q. That's an answer.
17　A. Yeah.
18　Q. Is that correct?
19　A. No, I'm aware that there are releases being discussed; I'm
20　not sure where they are and what form or stage those are, and
21　that's for Daimler and Cerberus as part of a settlement
22　agreement in consideration for first lien and equity.
23　Q. Do you think that's important for this Court to consider,
24　prior to the hearing having been commenced, as to whether or
25　not the releases are going to be given in the form of those

---

1　releases?
2　A. I think, as Your Honor said, I think it's part of the --
3　they would take place if -- in the sale trans -- if the sale is
4　completed.
5　Q. But they haven't even been negotiated.
6　A. I don't know what's --
7　　　　MR. ARMSTRONG: Objection, Your Honor. Assumes facts
8　not in evidence.
9　　　　THE COURT: All right. I still -- I'd like the
10　record to be clear. I -- the motion that was filed, I believe,
11　with respect to Daimler, Cerberus, I assume that there were
12　releases; that's set forth in the motion. And parties can --
13　I'm not sure the objection deadline has passed or not, but, I
14　mean, that --
15　　　　MR. ESSERMAN: Your Honor, we've had testimony that
16　those releases are still being negotiated.
17　　　　THE COURT: No, I understand that, but whether
18　they're still being negotiated or not, we're not at the stage
19　where it's even relevant to consider approving them. And at
20　the time that they're approved, and the time that they're put
21　forth to be approved, I assume that that's a very relevant
22　objection that they haven't been finalized.
23　　　　MR. ESSERMAN: As long as the record's clear that
24　there are no releases being given in connection with the 363
25　sale, I have no further questions on this area.

---

1　　　　THE COURT: Well, as far as I know with respect to
2　the sale, but there are releases under consideration and that
3　have been set forth in the motion with respect to at least one
4　of the 9019 settlements, I believe, that's before me at the
5　conclusion of the sale, if the sale were to be approved. I
6　believe that's the schedule. I've asked debtors' counsel to
7　confirm that.
8　　　　MR. ARMSTRONG: Your Honor, I understand they're
9　separate motions, but they're being heard at the same time.
10　　　　UNIDENTIFIED SPEAKER: Same day.
11　　　　MR. ARMSTRONG: Same day.
12　　　　THE COURT: They're being heard the same day, but
13　they're argued after the sale motion.
14　　　　MR. ARMSTRONG: Yes, that's right.
15　　　　THE COURT: All right. And you'd have an opportunity
16　at that point to raise any objection to that settlement.
17　　　　MR. ESSERMAN: Okay, just so I'm clear, the releases
18　are not being approved as part of this 363 transaction, then?
19　They're a separate motion?
20　　　　THE COURT: There's a separate motion, yes.
21　　　　MR. ESSERMAN: But they're not being -- you're not
22　being asked to approve a release in connection with the sale
23　today in connection with this hearing?
24　　　　THE COURT: To my knowledge, no. I don't see it -- I
25　didn't see it in any of the papers.

---

| | |
|---|---|
| 1       MR. ESSERMAN: Okay. | 1   Association of Consumer Advocates; and Public Citizen; and |
| 2       THE COURT: All right? | 2   several tort claimants. Good evening, Your Honor. |
| 3   BY MR. ESSERMAN: | 3       THE COURT: Good evening. |
| 4   Q. The prior questioner, Mr. Nardelli, Mr. Bressler, asked | 4       MR. NEALEY: Thank you very much. I know it's late. |
| 5   you about certain tort claims and how they are dealt with. I | 5   I'll try to keep it short. |
| 6   believe you testified on direct that as a board member you | 6   CROSS-EXAMINATION |
| 7   thought that it was important that Chrysler deal with its | 7   BY MR. NEALEY: |
| 8   contingent liabilities, tort claims being one of them; is that | 8   Q. Chrysler is in the sales business, is that correct? You |
| 9   correct? | 9   sell cars? |
| 10   A. Yeah, I think so. | 10   A. Yes. |
| 11   Q. Okay. And you're aware that asbestos -- that Chrysler has | 11   Q. And New Chrysler is presumably going to sell cars, |
| 12   asbestos claims filed against it, are you not? | 12   correct, sir? |
| 13   A. No, not specifically. | 13   A. Correct. |
| 14   Q. You're not aware of any personal injury lawsuits filed | 14   Q. Okay. And part of your responsibility as the CEO of |
| 15   against the Chrysler Corporation that assert damage as a result | 15   Chrysler is to be knowledgeable on what it takes to sell cars |
| 16   of exposure to asbestos on Chrysler brakes? | 16   to consumers, right, sir? |
| 17   A. I'm not aware of that specific -- | 17   A. Yes. |
| 18   Q. Are you aware of any general allegation of damage as a | 18   Q. Okay. And would you agree with JD Powers (sic) that two |
| 19   result of asbestos exposure in connection with a Chrysler | 19   of the top attributes in causing people to purchase cars are |
| 20   vehicle? | 20   that the car be safe and that it have a high resale value? |
| 21   A. No, I'm not. | 21   A. Yeah, those are two of probably a dozen or more criteria |
| 22   Q. Would Mr. Kolka know that? | 22   that they issue in their reports -- |
| 23   A. No, our general counsel would know that. | 23   Q. Okay. |
| 24   Q. Okay. | 24   A. -- on consumer -- |
| 25       MR. ESSERMAN: Almost done, Your Honor. | 25   Q. And so resale values and safety of cars are core |
| 414 | 416 |
| 1   Q. Have you been promised employment by Cerberus once the | 1   attributes, the things that you need in order to successfully |
| 2   sale of Chrysler has been completed, the 363 sale? | 2   sell cars? |
| 3   A. Yeah, I was offered employment to return to Cerberus as an | 3   A. Well, they are among other core attributes. |
| 4   advisor. | 4   Q. Okay. And, now, current owners of Chrysler vehicles, |
| 5   Q. And have you accepted that offer? | 5   people who've bought Chrysler cars from this afternoon all the |
| 6   A. That certainly is a viable opportunity for me. I mean, | 6   way back in the past, that's going to be a core group of people |
| 7   that's -- I announced when I was -- when I pre-announced that I | 7   to sell cars to for New Chrysler, correct? |
| 8   would be leaving at the end of the transaction, at the time, | 8   A. Yes. |
| 9   that I would return to Cerberus as an advisor. | 9   Q. Okay. And, in fact, current owners of your vehicle in the |
| 10   Q. Okay, so you have accepted that employment? | 10   automobile business is actually your most important customer |
| 11   A. Yes. | 11   base because they're the people most likely to buy a new car |
| 12   Q. Okay. But it hasn't officially started yet, is that | 12   from you, right? |
| 13   correct? | 13   A. Yes. |
| 14   A. No, it has not. | 14   Q. Okay. And, in fact, Chrysler already has one of the worst |
| 15   Q. Okay. And as I understand your testimony, you haven't | 15   customer retention rates in the industry at 32.8 percent, |
| 16   discussed compensation for that arrangement? | 16   right? |
| 17   A. No, absolutely not. | 17   A. Something we're working very hard to improve upon. |
| 18   Q. Okay. | 18   Q. Okay. And because in order for Chrysler to have survived |
| 19       MR. ESSERMAN: Thank you. | 19   and in order for New Chrysler to survive, it's got to increase |
| 20       THE COURT: Thank you. | 20   the percentage of its current customers who buy a new Chrysler, |
| 21       Anyone else? | 21   right? |
| 22       MR. NEALEY: Yes, Your Honor. Scott Nealey from | 22   A. Yes. |
| 23   Lieff Cabraser Heimann & Bernstein, on behalf of limited | 23   Q. Okay. And, in fact, Ford is in the fifties, right? |
| 24   objectors: The Center for Auto Safety; Consumers Action; | 24   A. I don't know what number they're in, but -- |
| 25   Consumers for Auto Reliability and Safety; the National | 25   Q. Okay. But you do know that -- |
| 415 | 417 |

VERITEXT REPORTING COMPANY

212-267-6868            516-608-2400

**418**

1  A. But --

2  Q. -- you're at 32.8 because that's an important figure?

3  A. I know we're below them, below the average.

4  Q. Okay. Now, I understood from your earlier testimony that

5  you do know for anyone who has a tort claim, who's been injured

6  by a Chrysler vehicle, that under the proposed sale free and

7  clear in 363 they can't go after New Chrysler, they have to go

8  after the bankrupt estate which doesn't have any money in it,

9  right?

10  MR. ARMSTRONG: Objection, Your Honor. It's the same

11  ground over and over again.

12  THE COURT: All right. Restate your question because

13  you put a few --

14  MR. NEALEY: Okay. Okay.

15  THE COURT: -- legal conclusions in there.

16  BY MR. NEALEY:

17  Q. Sir, you understand that people will need to pursue their

18  claims against Old Chrysler, which is the bankruptcy estate

19  that's not going to have any money in it, right? It's your

20  understanding?

21  A. Yes.

22  Q. Okay. Now, and, of course, those people who won't have

23  any recourse for their injuries are precisely Chrysler

24  customers that you want in the future, right?

25  A. Yes.

---

**419**

1  Q. Okay. And, of course, you also know, sir, that Chrysler

2  is asking for this sale to be free and clear as to future

3  injuries so that somebody who, for instance, buys a Chrysler

4  car today in a lot someplace in New York and has an injury six

5  months from now, they can't go after New Chrysler, they also

6  would have to go after the Old Chrysler which has no money,

7  right?

8  A. It's my understanding.

9  Q. Okay. Now, so, people who haven't been injured and people

10  who have been injured, none of them will be able to go after,

11  under any kind of way you know of, the New Chrysler if the sale

12  is free and clear under 363, and they have to go after the Old

13  Chrysler. Would you agree that once that information gets out

14  into the public, and our friends and the back row who are

15  blogging this and taking articles for the press, that that is

16  going to make people less likely to want to buy cars, those

17  cars?

18  MR. ARMSTRONG: Your Honor, objection. Calls for

19  speculation and is extremely compound.

20  THE COURT: No, the witness can answer, if you

21  followed the question.

22  THE WITNESS: Yeah, well, I -- as I said before, Your

23  Honor, I mean, certainly that is one criteria; annual operating

24  cost is another; safety ratings, five-star rating, crash test

25  ratings, performance, drivability. I mean, if you look, and

---

**420**

1  I'm sure you obviously have studied the variety of red dots and

2  black dots on JD Powers and Consumer Report (sic), you would

3  notice that there's quite an expansive criteria by which

4  customer loyalty is measured in repeat customers.

5  Q. Okay. But --

6  A. One of the first things we did was, again, I said earlier

7  in my testimony, we improved 400 line items to improve the

8  interior, the quality and the perception. Last year we

9  reduced -- we had the lowest warranty cost in the history of

10  the company, and we had the lowest recalls of any of the

11  manufacturers in the U.S.

12  Q. And, sir, as part of this transaction, you're telling

13  everyone who owns a current Chrysler car, and I've heard the

14  figure ten million Chrysler cars out on the roads, including

15  people who buy it today, that if they have a problem that's not

16  covered under warranty, if they get injured, if there's

17  something not covered by warranty --

18  A. No, I didn't think I said warranty.

19  Q. Oh, okay. I'm saying that's not covered by warranty.

20  A. No, I believe warranty is covered.

21  Q. Oh, I realize that.

22  A. Warranty costs are covered, going forward.

23  Q. I recognize -- the hour's late; I'll try to be a little

24  clearer.

25  A. Sorry.

---

**421**

1  Q. And I'll try to be as simple as I can. There are millions

2  of Chrysler cars on the roads of the United States right now,

3  and those are owned by people who are your best potential

4  customers for New Chrysler?

5  A. Yes.

6  Q. And if you tell them all that if they're injured at this

7  point they have no recompense against Chrysler, and once that

8  information gets out, is that going to cause the value of their

9  cars to fall, in your opinion, given all of your experience in

10  the auto industry?

11  A. Well, there's -- again, you'd have to make some

12  assumptions. I mean, that is a potential outcome. A number of

13  those cars are second and third owners of those vehicles. So I

14  don't know. I mean, it would have to trade off against some of

15  the other criteria as to whether that is enough of a negative

16  that might prevent a consumer from buying that vehicle.

17  Q. Okay. And if people decide that, if they get injured or

18  they have a problem that is not covered by the warranty, that

19  nobody stands behind a car because the assets have been sold

20  free and clear under 363 --

21  A. Yeah, I believe we --

22  MR. ARMSTRONG: Objection.

23  I'm sorry.

24  THE WITNESS: I'm sorry.

25  MR. ARMSTRONG: Objection. Foundation and

---

misstatement of the record. Counsel keeps using the word
"warranty".

MR. NEALEY: I said not covered by warranty. And if
I can finish my question, Your Honor.

MR. ARMSTRONG: Oh, I apologize. I thought --

MR. NEALEY: Yeah, no, I was not done. Thank you.

BY MR. NEALEY:

Q. Sir, you have millions of customers who own vehicles right
now made by Chrysler. And when those customers find out that
their vehicles may be worth less because if there is a problem
with the vehicle, or an injury, something that is not covered
by the warranty which is being assumed, is that going to make
those people less likely to buy cars when they want to buy a
new car from NewCo?

A. Well, I think I've answered it three times that
potentially that could have an impact against the other
criterias, that, you know, consumers might be willing to take
that risk if it has a very attractive price on it.

Q. Meaning, if it's cheaper, they might be willing to take
the risk of no one standing behind the car, right, sir?

A. If it has a market competitive price, they might be
willing to trade that off. If it has a lower annual operating
cost, if it has higher miles per gallon, that would be an
individual consumer decision.

Q. Okay. And, sir, if I understand all the testimony that I

422

---

heard, the cars that are going to be made by NewCo over the
next couple years are going to be the exact same cars made by
Chrysler in the past, right?

A. No, that's not exactly correct. Part of this certainly is
the new government regulation to achieve 35.5 miles per gallon.

Q. Let me -- I want to make my question clearer, which is, in
the next year and a half --

MR. ARMSTRONG: Your Honor, can the witness please
finish his answer? It was an open-ended question.

MR. NEALEY: I apologize.

If you want to finish your answer --

THE COURT: Complete your answer, please.

THE WITNESS: I'm done.

THE COURT: Thank you.

MR. NEALEY: Okay. I'm trying to save us all a
little bit of time.

BY MR. NEALEY:

Q. In the next eighteen months, before there's any new
product, over the next eighteen months, all of the vehicles
that are going to be made by NewCo are exactly the same
vehicles made by -- I could call it OldCo or Chrysler, right?

A. To a certain degree, but there will be the ability to
influence those vehicles in the short term with modifications
and technology from Fiat.

Q. Okay. So -- but basically the platforms, the basic

423

---

systems, over the next eighteen months at least, are going to
remain the same?

A. Fundamentally.

Q. Okay. So if Chrysler isn't willing to stand behind -- and
by that I mean NewCo -- injured customers and people who have
things that are not covered by the warranty on the old cars,
doesn't that send a signal to the market that the cars from
NewCo you should also avoid?

A. Well, again, it goes back to -- sorry to be redundant,
Your Honor, but it goes back to an individual consumer decision
on the attributes and features that are important to them.

Q. But to ask my question again, because I don't think you
answered it, it does send a signal to the market that those
vehicles are not safe because they're the same cars that
Chrysler and NewCo will not stand behind, right?

MR. ARMSTRONG: Objection, Your Honor. That's five
times now.

THE COURT: Well, he's introduced a new clause.

A. Now, you said "safe", and there's no deterioration; matter
of fact, there's improvements ongoing in the product in the
vehicle safety area: new crash tests, new roof crush. You
used the word "safety".

Q. Okay. And if the vehicles are safe, why won't Chrysler
stand behind the same vehicle made and sold today as the
vehicle sold two weeks from now?

424

---

A. That was just a decision that was made, among many
decisions, as part of the sale transaction.

Q. And I take it that no study was done to see how that was
going to affect the brand equity or the willingness of people
to purchase vehicles?

A. I can't attest that there was a study done.

Q. Okay. And meaning that you're unaware of any study being
done?

A. Yes.

Q. Okay. And, of course, for anyone who's going to purchase
a car from the New Chrysler, safety and resale value are going
to be two core criteria they're going to be looking for, right?

A. Safety criteria, annual operating expense, drivability,
durability, customer preference, family fit, aesthetics.

Q. Okay.

MR. NEALEY: No further questions.

THE WITNESS: Thank you.

MR. NEALEY: Thank you very much.

THE COURT: Thank you. Redirect. I think that's
what we're up to.

MR. ARMSTRONG: No redirect, Your Honor.

THE COURT: Mr. Mayer, Mr. Bienenstock, I believe,
Mr. Bromley?

MR. MAYER: Your Honor, thanks to our discussions, I
have no need for redirect.

425

```
 1          THE COURT:  That's very good.  Mr. Bienenstock?
 2          MR. BIENENSTOCK:  Thank you, Your Honor.
 3   REDIRECT EXAMINATION
 4   BY MR. BIENENSTOCK:
 5      Q.  Good evening, Mr. Nardelli.  My name is Martin Bienenstock
 6   of Dewey & LeBoeuf.  We represent Chrysler Financial, which I
 7   think you referred to during cross-examination as FinCo?
 8      A.  Yes, sir.
 9      Q.  You have no knowledge, do you, sir, whether Chrysler
10   Financial is working on -- for instance, is making new loans as
11   we sit here today?
12      A.  I don't know about today.  But my understanding is that
13   FinCo was continuing to support us through this transitional
14   period, as GMAC was coming up.
15      Q.  Right.  And you have no knowledge whether FinCo is working
16   on different types of M&A transactions that would continue its
17   business in various forms, do you?
18      A.  No.
19      Q.  And you have no knowledge whether FinCo might simply
20   continue as it is, providing financing for another
21   manufacturer, do you?
22      A.  No, I have no knowledge of that.
23      Q.  So therefore, Mr. Nardelli, when during cross-examination
24   you observed, at one point you said FinCo would dissolve, that
25   was simply a guess or an assumption you were making without
                                                              426
```

```
 1   personal knowledge.  Is that correct?
 2      A.  Sorry, I should have been more clear.  It was no longer --
 3   it was going to phase out of supporting Chrysler, would have
 4   been a more accurate --
 5      Q.  And that's all you meant?
 6      A.  -- yes, sir.
 7          MR. BIENENSTOCK:  No further questions, Your Honor.
 8          THE WITNESS:  Sorry.
 9          THE COURT:  Thank you.  Any recross of Mr.
10   Bienenstock's redirect?
11          MR. LAURIA:  No, Your Honor.
12          THE COURT:  I just wanted to give you an opportunity.
13          MR. LAURIA:  I was trying to come up with something.
14          THE COURT:  I know you tried hard.  You may step
15   down.  Thank you.
16          THE WITNESS:  Thank you.
17          THE COURT:  Who is the next witness?
18          MR. CULLEN:  Peter Grady, Your Honor.
19          THE COURT:  How long do you think his direct will
20   take?
21          MR. CULLEN:  Mr. Orr is going to -- half an hour to
22   forty minutes, one is told.
23          THE COURT:  All right.  And I assume he's going to be
24   cross examined?  Is that -- would that be correct?
25          MS. BROWN:  Yes, Your Honor.
                                                              427
```

```
 1          THE COURT:  And who is saying yes?  I heard one yes.
 2          MS. BROWN:  I was, Your Honor.  Amy Brown.
 3          THE COURT:  Oh, this is primarily someone testifying
 4   about dealerships.
 5          MR. LERNER:  Yes, Your Honor.  The cross-examination
 6   of Mr. Grady will take many hours.
 7          THE COURT:  Many hours?
 8          MR. ORR:  Your Honor, if I may -- if I may speak to
 9   this issue?
10          THE COURT:  Go ahead.
11          MR. ORR:  Mr. Grady is going to be put up at this
12   process for the sale hearing to support some of the company's
13   business decisions and value.  The dealer core, this witness
14   here today, will have an opportunity to make whatever points
15   they choose they want to make at the June 3rd rejection
16   hearing.  And I would hope that to the extent we're putting him
17   up for a limited purpose on direct, that they would choose not
18   to try to get two bites of the apple by trying to address their
19   dealer issues today, and then coming back on June 3rd and doing
20   it again.
21          So we're putting him up for a limited purpose.  I
22   don't know for the limited purpose we're putting him up why
23   cross would take many hours.
24          THE COURT:  Mr. Lerner?
25          MR. LERNER:  Your Honor, the debtors have to
                                                              428
```

```
 1   establish, among other things, a sound business purpose for the
 2   363 sale.  One of the core parts of the transaction is the
 3   assumption of only a part of their agreements.  We're entitled
 4   to elicit testimony related to the business purpose.  We will
 5   limit our questioning as much as we can, but without knowing
 6   exactly what Mr. Grady will testify to, we're unable, at this
 7   point, to limit what it is that we may ask.  And we understand
 8   that there also is a rejection hearing.  But there are, for the
 9   reasons that we argue in our papers, reasons related to
10   rejection that we believe impact the sale.  So it's not
11   confined simply to the rejection option.
12          THE COURT:  I'm not quite -- what are the -- if the
13   transaction -- what would happen if the transaction closes, if
14   it were approved and then closes after the rejection hearing,
15   and the debtors' requests to reject the dealerships were
16   denied?  So if the dealer -- do you understand the question I'm
17   asking?
18          MR. ORR:  I understand the question, Your Honor.
19          THE COURT:  So we have a sale hearing that -- the
20   Court hasn't reviewed and certainly, by that, hasn't
21   approved it.  But even if it were approved and you have a
22   rejection hearing on June 3rd, if any/all/some of the
23   dealerships were not rejected as a result of the Court's order,
24   what would happen to those dealerships?  Are they then assumed
25   and assigned?
                                                              429
```

|  |  |
|---|---|
| 1   MR. ORR: Judge, we strongly believe that those<br>2   dealerships only have agreements with OldCo. Those dealers<br>3   were -- if the rejection was not approved, those agreements<br>4   remain with OldCo. There is no --<br>5   THE COURT: So --<br>6   MR. ORR: -- law that we're aware of that can force -<br>7   -<br>8   THE COURT: -- okay.<br>9   MR. ORR: -- NewCo to take them.<br>10   THE COURT: No, I understand that force thing, but<br>11   I'm just trying to understand the language in the sale --<br>12   MR. ORR: Yes.<br>13   THE COURT: -- the sale motion itself. To the extent<br>14   the debtor has moved to reject these contracts on these<br>15   dealerships, and whether they're assumed or not, NewCo -- if<br>16   the sale to NewCo is approved, it only includes those<br>17   dealerships that were not on the rejection list?<br>18   MR. ORR: Yes. Only those that are on the assumption<br>19   notice, for which there have been no --<br>20   THE COURT: Assumption notice.<br>21   MR. ORR: -- objections filed.<br>22   THE COURT: All right. Now I understand the dynamics<br>23   of it.<br>24   MR. ORR: Okay.<br>25   MR. LERNER: And, Your Honor, this is precisely why<br><br>430 | 1   THE COURT: Well, the testimony with respect to the<br>2   dealers is whether the debtor has exercised -- you have your<br>3   legal arguments and your objection to the sale and the sub rosa<br>4   plan you raise. And the rest is the debtor's business<br>5   judgment.<br>6   MR. LERNER: Correct. And we believe that this<br>7   witness, frankly, through his deposition, was the witness who<br>8   was most directly involved with the decision as to assumption<br>9   and rejection. So if the debtors are not intending to offer<br>10   him with respect to all of the issues with rejection, then<br>11   we're being left without an adequate opportunity to explore the<br>12   issues that are relevant for rejection and sale orders.<br>13   THE COURT: The relevance for the -- see that's --<br>14   the relevant issue for the sale is the debtors' -- the business<br>15   judgment of the debtors to sell substantially all its assets.<br>16   And you're challenging the debtors' business judgment that it's<br>17   not selling all its dealerships and only selling a portion of<br>18   its dealerships and the business judgment to make that<br>19   determination. I can't imagine how that could take hours.<br>20   MR. LERNER: Your Honor, all I'm suggesting -- I<br>21   don't know how long it will take -- all I'm suggesting is that<br>22   we should not be limited with respect to that issue. And if we<br>23   go through cross-examination, if the Court thinks we have<br>24   wandered afield, we understand that the Court will --<br>25   MR. ORR: Your Honor --<br><br>432 |
| 1   we believe that the sale motion, if approved without the<br>2   rejection issues having been heard -- and it's why we asked for<br>3   a continuance, to among other things, have both motions heard<br>4   in the same day, it may moot out the dealers' rejection<br>5   arguments. And we also believe that that's why the rejection<br>6   issues are relevant to the sale hearing.<br>7   THE COURT: It wouldn't necessarily moot out the<br>8   argument.<br>9   MR. LERNER: Effectively, it leaves the dealers,<br>10   potentially, without any relief. So we believe that the<br>11   assumption and rejection issues should properly be dealt with<br>12   by the Court in conjunction with the sale motion.<br>13   THE COURT: Well, Mr. Lerner, I disagree with your<br>14   analysis in one regard. And that is, under the terms as I just<br>15   understood, whether the sale hearing and a rejection hearing<br>16   were done at the same time, if the sale hearing were approved<br>17   and a rejection hearing request by the debtor was denied, the<br>18   consequences would be the same. You're really, again, coming<br>19   back to what many people are coming back to, is leverage and<br>20   negotiation and not legal issues within the context of the<br>21   bankruptcy.<br>22   MR. LERNER: Your Honor, I understand that. But then<br>23   it's improper for the debtors to seek to limit our ability to<br>24   elicit testimony that supports our position with respect to the<br>25   sale. They can't have it both ways. They can't --<br><br>431 | 1   MR. LERNER: -- tell us that. And we'll proceed<br>2   accordingly.<br>3   MR. ORR: -- Your Honor, if I may? The Federal Rules<br>4   of Evidence limit the scope of cross. It's cross to what I<br>5   bring out on direct. And if in our opinion, we feel the issues<br>6   necessary to disclose business judgment decisions for this<br>7   hearing are sufficient, that's what limits the scope of cross.<br>8   THE COURT: That is also an overlay. Then I guess<br>9   we'll start it and see where it ends up.<br>10   MR. ORR: Okay.<br>11   THE COURT: And just before I take a break for a few<br>12   minutes, how many more witnesses does the debtor intend to<br>13   call?<br>14   MR. CULLEN: These are the witnesses that we intend<br>15   to call. We have certain deposition designations, and we have<br>16   things that we're going to deal with the other issue here. But<br>17   these are all the witnesses we want to call. I know Mr. Lauria<br>18   continues to want to call Mr. Kolka.<br>19   THE COURT: Well, he is going to call him. So let's<br>20   stop this. I said it yesterday.<br>21   MR. CULLEN: Yes, I understand.<br>22   THE COURT: He's calling -- he needs to be available.<br>23   All right.<br>24   MR. CULLEN: I've got him available.<br>25   THE COURT: Fine. When will he be available?<br><br>433 |

MR. CULLEN: He's waiting for this part -- we're going to put on Mr. Grady. I thought that the dealers had witnesses of their own in their case-in-chief. I don't know when Mr. Lauria plans to put on his case. He's going to be available for Mr. Lauria's case.

THE COURT: Mr. Lauria, have you talked to any of the objectors about who's going after the debtor puts on their case?

MR. LAURIA: No, Your Honor. We have assumed that we're going to cross examine Mr. Kolka before his declaration goes into the record for purposes of this hearing. So whether we do it first or we do it last really doesn't matter, Your Honor.

THE COURT: All right. How many witnesses are you calling? I know you had a list.

MR. KURTZ: I don't think -- at this point, Your Honor, we don't intend to call any witness. We intend to put in some deposition designations. We're trying to work through some document issues with the debtors' counsel. We'd submit some documents. And I think that's all we would do.

THE COURT: Good. And the dealers?

MR. LERNER: Your Honor, we have three witnesses, each of which the direct is approximately twenty minutes.

THE COURT: All right. Why don't we get at least the direct testimony tonight done for the witness on the dealership

434

and maybe start the cross-examination. Because we really have to finish these witnesses by tomorrow. Otherwise we're going to be here Saturday. I mean, it just has to come to an end. Yes?

MS. BALL: Your Honor, I apologize for the interruption. The debtor has been requested to share with the Court. There's been a resolution of all the Workmen's Comp objections that we had from a number of state authorities. And they would ask the Court's indulgence to read the resolution or to ask a representative of New Chrysler to read the resolution into the record, because they are unable to be here tomorrow or Saturday. I don't think it will take very long. But it is --

THE COURT: All right. We still need to take a fifteen-minute break.

MS. BALL: Thank you, Your Honor.

THE COURT: All right. Thank you.

MR. LERNER: Thank you, Your Honor.

(Recess from 9:00 p.m. to 9:14 p.m.)

THE COURT: Please be seated. Mr. Bienenstock, yes?

MR. BIENENSTOCK: Your Honor, just before the recess, if Your Honor was taking a count of additional witnesses.

THE COURT: Oh, I forgot that you had mentioned --

MR. BIENENSTOCK: I just wanted to remind the Court that we're still trying to resolve this with the debtor. But if we don't we do have a witness that would probably take

435

twenty minutes.

THE COURT: All right.

MR. BIENENSTOCK: Thank you.

MS. FELDSTEIN: And, Your Honor, I think in Ms. Ball's absence, the State Attorney General from the State of Michigan, among other states, is physically in the courtroom, and has been for two days. And I think we can resolve the objections and have them withdrawn if I am permitted to read something into the record for a moment. I'm sorry, it's Hydee Feldstein from Sullivan & Cromwell on behalf of Fiat and the purchaser.

THE COURT: Well, do we have counsel -- the right counsel from the debtor here to listen to what is being said?

UNIDENTIFIED ATTORNEY: Yes, Your Honor.

THE COURT: All right.

MS. FELDSTEIN: Your Honor, I'm authorized to affirm to the Court and to the State Attorney General that NewCo will comply with Workers' Compensation laws and any applicable self-insurance requirements, including as referenced in the binding term sheets agreed upon between May 27, 2009 and the closing date, in all applicable jurisdictions in which NewCo has employees after closing.

MS. CHECK-UPSHAW (ph.): Good evening, Your Honor. My name is Susan Check-Upshaw. I am here on behalf of Attorney General Mike Cox who represents the Michigan Workers'

436

Compensation Agency. Your Honor, Michigan needed to file this objection when the pleadings did not reflect that either Chrysler or the yet-to-be-named purchaser would commit to the Workers' Compensation statutory obligations as employers in Michigan. We wanted to assure that the Michigan workers of Chrysler and New Car Co. and Michigan's other self-insurance employers, received the benefits they were entitled to under the Michigan Workers' Compensation Act.

Moreover, Michigan wants to promote a seamless transition to assure that these obligations will be met, considering the time -- the expedited time constraints and depending upon if this Court were to approve the proposed sale order. And if New Car Co. starts to operate as soon as we hear in these proceedings that it intends to do in Michigan, we wanted to be prepared.

Michigan's objections -- we agree that Michigan's objections can be withdrawn because of three actions that had been taken in these last few weeks. Number one, Chrysler is paying its Workers' Compensation obligations in Michigan, and is committed to pay such obligations until such time that Chrysler no longer operates as an employer in Michigan. New Car Co. has agreed to an amendment to the master transaction agreement to reflect New Car Co.'s agreement to meet its Michigan statutory obligations. And finally, New Car Co. entered a binding term sheet reflecting its agreement to act as

437

VERITEXT REPORTING COMPANY

212-267-6868                                                  516-608-2400

**438**

1  a self-insured employer while operating in Michigan, and comply
2  with the statutory obligations associated with that status.
3  And with that, Your Honor, we will withdraw
4  Michigan's objections on this matter.
5  THE COURT: All right. Thank you.
6  MS. CHECK-UPSHAW: Thank you, Your Honor.
7  THE COURT: Anyone else wish to be heard on this
8  matter? All right. Mr. Lauria?
9  MR. LAURIA: Thank you, Your Honor.
10  THE COURT: You're welcome.
11  MR. ZAKIA: Your Honor, if I may, before we get
12  started? It's our understanding that the only thing that's
13  going to be done this evening is the direct examination of Mr.
14  Grady. As a consequence, Mr. Kurtz and I would like to ask
15  permission to be excused.
16  MR. CULLEN: Your Honor, there's one other thing that
17  we'd like to do. We'd like to move in the deposition
18  designations and get some of the document work done so that
19  part of the case is done. We were going to --
20  MR. KURTZ: Your Honor, I thought we would be
21  stipulating to this and we would address it not while our
22  witness is sitting on the stand. I'm happy to sit here and
23  work through that, but I was under the impression that we might
24  want to move through the evidence before hearing a stip on what
25  will amount to the introduction of designations as exhibits.

**439**

1  MR. CULLEN: Okay. That's all right, Your Honor. I
2  just wanted to be sure I got it done before we rested. If we
3  do that tomorrow --
4  THE COURT: All right. We'll do that, I guess very
5  early -- we're going to start at 9:00 tomorrow.
6  MR. CULLEN: Okay.
7  THE COURT: So we'll get by -- and what I didn't ask
8  you, Mr. Lauria -- and you are certainly more than welcome to
9  leave -- I wish I could leave. But in all seriousness, how
10  long do you believe the cross-examination of Mr. Kolka may be
11  tomorrow?
12  MR. LAURIA: I'm trying to work that out --
13  THE COURT: Because there's something --
14  MR. LAURIA: -- but I think it's probably between a
15  half hour and forty-five minutes.
16  THE COURT: And then it's the effort by the debtor to
17  move in the deposition and whatever argument you make about
18  that?
19  MR. LAURIA: I --
20  THE COURT: Or is that part of this stipulation?
21  MR. LAURIA: -- I think after we get him crossed,
22  Your Honor, I don't think we're going to have a problem with
23  moving his affidavit.
24  THE COURT: Oh, all right. I understand. When I
25  heard you say before the deposition was in, I wasn't sure.

**440**

1  MR. LAURIA: We just said we were filing --
2  THE COURT: I understand. That's fine.
3  MR. CULLEN: That's helpful, Your Honor. I
4  appreciate that.
5  THE COURT: All right. So we'll get started at 9:00
6  tomorrow morning, deal with the stipulation, address the
7  witnesses and then --
8  MR. CULLEN: We are going to move other depositions
9  in as well, Your Honor.
10  THE COURT: All right. Well --
11  MR. CULLEN: -- designations.
12  THE COURT: -- hopefully, we'll get it all done by
13  9:30 and then start with the witnesses.
14  MR. CULLEN: All right.
15  THE COURT: All right. Thank you.
16  MR. CULLEN: Thank you.
17  THE COURT: Mr. Orr?
18  MR. ORR: Thank you, Your Honor. Your Honor, I take
19  it Mr. Grady is still under oath?
20  THE COURT: Yes. Yes. He was sworn in one other
21  time.
22  MR. ORR: Your Honor, there is one housekeeping
23  matter, if you don't mind. I'd like to take care of an
24  additional one. And just like to -- if we can confirm that
25  the cure objections are reserved for the cure hearing, then

**441**

1  many objecting parties regarding cure can leave as well.
2  THE COURT: All right. Any cure objections are
3  reserved for the cure hearing.
4  MR. ORR: Thank you, Your Honor.
5  THE COURT: Okay.
6  MR. ORR: Your Honor, apparently Fiat's counsel wants
7  to read something in the record about this as well tomorrow
8  morning. They're just not here right now.
9  Just the messenger, Your Honor. Did you have an
10  administrative matter, sir?
11  MR. COUSINS: Yes, I do. I want to withdraw an
12  objection.
13  THE COURT: Would you just go to a microphone,
14  please?
15  MR. COUSINS: Thank you very much.
16  THE COURT: And just state your name for the record?
17  MR. COUSINS: Thank you very much, Your Honor. My
18  name is Steven Cousins with Armstrong Teasdale, counsel for the
19  County of St. Louis, for the taxing authority. Your Honor,
20  we've been negotiating with counsel for the debtor and the
21  language that they have agreed to include in that proposed
22  order makes it clear that the equipment and the personalty
23  (sic) leased at the Fenton plant in Missouri, subject to
24  2004/2005 bond transactions are not affected by the sale -- the
25  language makes it quite clear to that effect. We also had a

**442**

1   concern about whether or not taxes would be paid for the year
2   2009. And the language that's been included now makes that
3   clear. So we would like to withdraw our objection to the sale
4   and thank you -- thank the debtor very much for its cooperation
5   that it's shown throughout this entire process.
6       THE COURT: All right, thank you.
7       MR. COUSINS: Thank you.
8   DIRECT EXAMINATION
9   BY MR. ORR:
10  Q. Sir, would you please state your name for the record?
11  A. Peter Grady.
12  Q. And, Mr. Grady, you previously gave a declaration in this
13  case, I believe two, actually: one on April 30th and one on
14  May 13th?
15  A. That's correct.
16  Q. Do you recall those declarations?
17  A. Yes, I do.
18      MR. ORR: Your Honor, may I approach?
19      THE COURT: Yes.
20  (Pause)
21      THE COURT: Thank you.
22  Q. Mr. Grady, if you would, please, just take a moment and
23  confirm that those are true and correct copies of the
24  declarations that you've previously given in this action?
25  A. Yes, they are.

**443**

1   Q. Okay. Now, do you swear and affirm to the matters as
2   attested to therein as still true and accurate?
3   A. I do.
4      MR. ORR: Your Honor, I would move those into
5   evidence.
6      THE COURT: Any objections to the declarations being
7   admitted into evidence subject to cross-examination of the
8   witness?
9      MS. BROWN: No, Your Honor.
10     THE COURT: All right. They are so admitted.
11  (Debtors' exhibit, declaration of Mr. Grady, was hereby
12  received into evidence as of this date.)
13     MR. ZAKIA: Your Honor, we have no objection to this
14  particular witness' declaration, but the failure to object to
15  these would be without prejudice to our objections to all the
16  other witnesses, if that's acceptable to the Court?
17     THE COURT: Yes, that's fine.
18     MR. ZAKIA: Thank you.
19  Q. Now, Mr. Grady, you previously testified that you're a
20  director of dealer operations for Chrysler?
21  A. That's correct.
22  Q. And as director of dealer operations, are you also
23  responsible for handling the dealer network?
24  A. Yes, I am.
25  Q. What is dealer network rationalization?

**444**

1   A. Network rationalization is the process by which we have a
2   plan, which we call Project Genesis, to rationalize or reduce
3   the number of dealers and consolidate all of our brands under
4   one roof.
5   Q. Why is that important to the company?
6   A. Well, it's very important, because the consolidation
7   under -- of one brand -- of all brands under one roof gives us
8   the opportunity to have a more profitable dealer network.
9   Q. Prior to bankruptcy, how did the company conduct dealer
10  network rationalization?
11  A. Prior to bankruptcy we encouraged -- dealer by dealer, we
12  encouraged dealers to work together to -- for consolidation
13  through buy/sells and other network actions.
14  Q. Where there costs associated with that process?
15  A. Yes.
16  Q. What were those costs, generally speaking?
17  A. Well, generally, if the two dealers were able to agree
18  then one dealer would have a buy/sell and purchase the assets
19  of the other. Many times we would get involved, not just with
20  the encouragement, but we would also have some expense that we
21  would contribute to the transaction to help defray costs of
22  facilities or renovations and things of that nature.
23  Q. On an annual basis, what did that expense amount to?
24  A. On an annual basis, it varied depending on the amount of
25  network activity. But in my declaration, I had said that it

**445**

1   was approximately 200 million dollars that we spent since the
2   beginning of Project Genesis.
3   Q. Does the debtor have that kind of money now to do dealer
4   network rationalization?
5   A. No, we do not.
6   Q. Sir, is it your business judgment that going forward with
7   this 363 transaction, it is necessary to pass on a rationalized
8   dealer network?
9   A. Absolutely.
10  Q. Why is that?
11  A. The -- currently, the network is under some pretty
12  significant distress. And in 2008 the network average dealer
13  actually lost 3,000 dollars for the entire calendar year.
14  That's something that is unacceptable for our dealer network,
15  in that the investment required by the dealer requires a
16  return. Also, a profitable dealer is able to invest in his
17  people, invest in the market, invest in his facilities, in
18  order to energetically promote our products.
19     MR. ORR: Your Honor, I just have one other
20  housekeeping matter. I forgot before I started to ask that we
21  had invoked the sequestration rule. I just wanted to confirm
22  whether any dealer witnesses were still in the room?
23     MR. LERNER: I don't see any, Your Honor.
24     THE COURT: Are there any witnesses?
25     MR. LERNER: Your Honor, actually, they may be in the

1 overflow room. I don't know.
2 THE COURT: Well, someone needs to find out. I'm
3 going to announce it. If there are any witnesses in the
4 overflow rooms or -- either overflow room, they need to leave.
5 And counsel for the affected dealers will show them where they
6 can locate themselves during this testimony.
7 MS. BROWN: Your Honor, we were under the
8 understanding that you had not invoked the sequestration rule,
9 that White & Case did on behalf of your witnesses. But you
10 never approached us about invoking the sequestration rule. But
11 we're happy to have the witnesses leave the overflow room if
12 they're in there.
13 MR. ORR: Your Honor, I'm sorry if I wasn't clear.
14 We had invoked that as a matter of course in these matters --
15 in these proceedings --
16 THE COURT: Well --
17 MR. ORR: -- and we would stand by that.
18 THE COURT: -- whatever, we'll just do it now.
19 MR. ORR: Thank you, Your Honor. Your Honor, if you
20 don't mind, maybe we could take a minute or two just to confirm
21 that they have in fact left the room?
22 THE COURT: I thought someone went to do that?
23 MR. ORR: Yes.
24 THE COURT: Well, all right.
25 (Pause)

446

1 MR. ORR: I think that's all right.
2 BY MR. ORR:
3 Q. Mr. Grady we were talking about dealer network
4 rationalization?
5 A. Yes.
6 Q. Now, is the debtor also proposing in these actions to
7 assume a certain number of dealers?
8 A. Yes.
9 Q. How many dealers?
10 A. 2,392.
11 Q. Approximately what percentage of the dealer core does that
12 represent?
13 A. That's approximately seventy-five percent of the existing
14 dealer network.
15 Q. Why is it important for the assumed dealers to be part of
16 a rationalized dealer network?
17 A. Well, the assumed dealers are -- they're, in effect, our
18 strongest dealers. They provide us the -- a best opportunity
19 to have a consolidated Chrysler, Jeep and Dodge network that
20 can provide good value to the new company.
21 Q. Now much has been made about the decision of the debtor to
22 reject approximately twenty-five percent of the dealer network.
23 Is that correct?
24 A. That's correct.
25 Q. Some of these dealers may or may not be profitable. Is

447

1 that correct?
2 A. That's correct.
3 Q. As part of dealer network rationalization this is an
4 overall strategic plan for the benefit of the company?
5 A. Yes. This has been a plan that has been ongoing for
6 several years.
7 Q. So is it correct to say that the company's not looking at
8 this as any individual dealer, but looking at this as an
9 overall value both to the company and to the dealer network?
10 A. Yeah, that's correct.
11 MS. BROWN: Objection, leading.
12 THE COURT: It is leading.
13 MR. ORR: Okay.
14 THE COURT: All right?
15 MR. ORR: That's fine, Your Honor. I'll move on.
16 Q. Mr. Grady, has the company taken any steps to assist even
17 the rejected dealers in this process?
18 A. Yes. What we've -- we've taken several steps to assist
19 the rejected dealers. Primary among those has been an effort
20 to redistribute the inventory that each one of the rejected
21 dealers has.
22 Q. Please explain to me what you mean by redistribute the
23 inventory?
24 A. Redistribution is our -- we have eight business centers
25 around the country, and those eight business centers have a

448

1 field force that on behalf of each of the rejected dealers,
2 once we get their permission to do so, we have begun to solicit
3 the current assumed dealers, the ones we're assigning to the
4 new company, to take that inventory from the rejected dealers
5 as soon as the transaction is complete.
6 Q. Are there financial arrangements in place to assist in
7 that process?
8 A. Yes. The process is set up so that the -- all of the
9 financial transactions will happen between the two floor plan
10 sources.
11 Q. Sir, in your opinion, is this in the best interest of the
12 debtors' estates to rationalize the dealer network?
13 A. Yes, absolutely.
14 MR. ORR: No further questions, Your Honor. I pass
15 the witness.
16 THE COURT: All right.
17 (Pause)
18 MS. BROWN: Your Honor, Amy Brown on behalf of the
19 Committee of Chrysler Affected Dealers.
20 CROSS-EXAMINATION
21 BY MS. BROWN:
22 Q. Good evening, Mr. Grady.
23 A. Good evening.
24 Q. The 789 dealers whose dealership agreements Chrysler seeks
25 to reject are sources of revenue for Chrysler, aren't they?

449

**450**

1  A. Yes, they are a source of revenue.
2  Q. And --
3  A. They're also a source of cost.
4  Q. -- the 789 dealers whose dealership agreements Chrysler
5  seeks to reject represent fourteen percent of Chrysler's sales
6  last year, correct?
7  A. That's correct.
8  Q. And whether it's called Project Genesis or its
9  predecessor, Project Alpha, the process of consolidating the
10  Jeep, Chrysler and Dodge brands under one roof has been
11  underway since the early 2000s, correct?
12  A. That is correct.
13  Q. And between 2001 and the present, the number of Chrysler
14  dealerships has declined, right?
15  A. Yes, it has.
16  Q. And during that time period, the number of cars sold by
17  Chrysler has also declined, correct?
18  A. Yeah, that's correct. It's a factor of the economy and
19  economic environment.
20  Q. It's a yes or no answer.
21  A. Okay.
22  Q. And Chrysler lost market share during that time, didn't
23  it?
24  A. Yes.
25  Q. Yet, in evaluating the impact of the loss of revenue from

**451**

1  the 789 dealers, the worst-case scenario predicted by Chrysler
2  was that it would recover a hundred percent of the lost sales
3  in twelve months, correct?
4  A. Yes.
5  Q. And these lost sales, Chrysler anticipates, will be
6  recovered by the retained dealers, right?
7  A. That's correct, because what we have is a higher
8  performing group of dealers.
9  Q. Of the retained dealers, Chrysler itself has categorized
10  over twenty percent of these dealers as financially distressed,
11  right?
12  A. That's correct.
13  Q. Which means that over twenty percent of the retained
14  dealers have had significant losses at their dealerships,
15  correct?
16  A. That is one of the elements.
17  Q. And it's these dealers that Chrysler anticipates are going
18  to go out and recover the fourteen percent of the sales in just
19  twelve months, right?
20  A. Many of those dealers are already performing at a pretty
21  high level, even though they are under some financial duress.
22  Q. But twenty percent of them are financially distressed,
23  correct?
24  A. Yes.
25  Q. And many of the dealers that Chrysler is seeking to reject

**452**

1  their dealership agreements are also performing at high levels,
2  correct?
3  A. Some of them are.
4     MS. BROWN: Your Honor, may I approach the witness?
5     THE COURT: Go ahead.
6  (Pause)
7  Q. Mr. Grady, I've handed you a document that we're going to
8  designate Dealer Committee Exhibit 2. Do you recognize this
9  document?
10  A. Yes, I do.
11  Q. And what is this document?
12  A. This document is a worksheet that we used in the planning
13  and deliberations, all the discussions that we did in order to
14  prepare the list of assumed dealers.
15  Q. And this spreadsheet identifies each of Chrysler's dealers
16  and the factors that Chrysler considered in its determination
17  of whether to assume or reject the dealership agreement,
18  correct?
19  A. This provides a snapshot of many of the factors that the
20  dealers used -- that the dealers have.
21  Q. And that were used by your team in determining whether to
22  assume or reject the dealership agreement, correct?
23  A. Right. Not complete, but it is part of it.
24  Q. And what is missing from this spreadsheet?
25  A. Well, what this spreadsheet does not convey is the first

**453**

1  part of the analysis that we did on each one of these
2  situations, which was to look at each market and try to
3  determine the sales potential of each market.
4  Q. And where is that information conveyed?
5  A. That information is readily available on maps that we have
6  available to us.
7     MR. ORR: Objection, Your Honor. I did want to
8  confirm with my partner who defended the deposition. I believe
9  this information -- this exhibit contains confidential
10  information. And while we're willing to allow some inquiry
11  into it, we are going to want to put in place safeguards for
12  purposes of the record with regard to this data.
13     MS. BROWN: We don't have any objection to that.
14     MR. ORR: We would ask that it be filed under seal,
15  then, subsequently, Your Honor.
16     THE COURT: All right.
17     MS. BROWN: Your Honor, may I approach the witness?
18     THE COURT: Go ahead.
19  Q. Mr. Grady, do you recognize this document?
20  A. Yes, I do.
21  Q. And what is this document?
22  A. This is a network -- U.S. dealer network review.
23  Q. And if you would turn to page 6, please?
24  A. Okay.
25  Q. And can you tell me what page 6 is, please?

| | |
|---|---|
| 1   A. Page 6 is a map of the Pittsburgh Metro market. | 1   A. No, this is one input, one source of information into the |
| 2   Q. And is this an example of the first part of your analysis | 2   entire process. |
| 3   that you just testified about? | 3   Q. And if you can turn back to the spreadsheet now. Is there |
| 4   A. Yes, that's correct. | 4   any other information that is not -- other than the maps that |
| 5   Q. And what exactly is the information conveyed on this | 5   we just discussed, is there any other information that the |
| 6   document? | 6   debtor considered in reaching its decision that's not included |
| 7   MR. ORR: Objection, Your Honor. On the same basis. | 7   on this spreadsheet? |
| 8   This is another confidential document. We will allow them some | 8   A. Well, part of the process was a recommendation by each one |
| 9   inquiry, but we will want to protect the source, Your Honor. | 9   of the eight business centers who provided their recommendation |
| 10   THE COURT: I'm not sure what the objection is to. | 10   as to what the market actions. Subsequent to that, we had |
| 11   MR. ORR: The objection is, Your Honor, as part of | 11   significant amounts of discussion about not only these |
| 12   the discovery process and depositions, we had entered into a | 12   different factors -- because this was a multifactor test that |
| 13   series with any party that wanted to participate, into a series | 13   we used, but it was also to understand, again, beginning with |
| 14   of confidentiality agreements regarding the data. We allowed | 14   the market, how many dealers we did in fact need in that market |
| 15   the parties to inquire about it, and we don't mind having an | 15   in order to cover the market and provide enough of a sales |
| 16   inquiry here, but some of this data is proprietary to the | 16   opportunity. |
| 17   debtor going forward regarding market analysis. And what we | 17   Q. And neither the recommendations made by the business |
| 18   would not want to see happen is that this data make its way | 18   center managers nor the discussions are contained within any |
| 19   into the public domain. | 19   writing, correct? |
| 20   So we're trying to be cooperative here with the | 20   A. That's correct. |
| 21   inquisitor, the dealer committee, so they have an opportunity | 21   Q. Looking at the spreadsheet and the heading titles. I just |
| 22   to inquire as to the business judgment of the debtor and the | 22   want to ask you a couple of questions about some of the heading |
| 23   analysis that they went through, which you will see is quite | 23   titles. The very far left column, that identifies the business |
| 24   fulsome. But we do want to protect this data from getting out | 24   center where the dealership is located, correct? |
| 25   there. | 25   A. That's correct. |
| 454 | 456 |
| 1   MS. BROWN: I object Mr. Orr's testifying as to what | 1   Q. And then if you look about four columns over, it says |
| 2   analysis the debtor did. | 2   "sales locality description." What is that? |
| 3   THE COURT: Well, let's move on. I mean, come on. | 3   A. Oh, the sales locality description is the -- depending on |
| 4   Let's focus on the issue. The issue is confidentiality. How | 4   the market type, it is a descriptor that tells us what is the |
| 5   are you going to use this? It was provided to you and it's | 5   location, the market in which the dealer is operating. |
| 6   strictly confidential. So what you're going to have to do is | 6   Q. And then if you look about three columns over, there's a |
| 7   examine this witness without making specific references, I | 7   heading entitled "12/2008 percentage of MSR." What does that |
| 8   imagine, to certain data here. | 8   represent? |
| 9   MS. BROWN: Your Honor, and I don't intend to do | 9   A. Percent MSR is the percent of the minimum sales |
| 10   that. I just want to make the record as to what the debtor did | 10   responsibility that the dealer achieved. Minimum sales |
| 11   in its purported analysis. | 11   responsibility being an index where a hundred -- a hundred |
| 12   THE COURT: That's fine. Okay. | 12   percent, is considered average. And that meets the agreement |
| 13   MR. ORR: Your Honor, we can go on and on about what | 13   that we have with the dealer to attain his proper sales |
| 14   it is. But as long as the inquiry is generally speaking and | 14   achievement. |
| 15   the data is kept out of the record, I think we can live with | 15   Q. And the column next to that is "12/2008 sales"? |
| 16   it. | 16   A. Yes. That's actual sales. |
| 17   THE COURT: All right. | 17   Q. What does -- that's actual sales? |
| 18   BY MS. BROWN: | 18   A. Yes. |
| 19   Q. Mr. Grady, generally, this map shows locations in | 19   Q. For 2008? |
| 20   Pittsburgh and the various dealerships that are located in | 20   A. Correct. |
| 21   Pittsburgh, correct? | 21   Q. And then "2009 adjusted sales"? |
| 22   A. Yeah, that's correct. | 22   A. That's annualized sales. And those annualized sales are |
| 23   Q. But there's no comparison on these maps as between the | 23   annualized through the month of March. |
| 24   dealerships in Chrysler's network in the Pittsburgh area, | 24   Q. And if you go over to the second yellow column, it says |
| 25   correct? | 25   "final rejection indication." What does that column convey? |
| 455 | 457 |

1　　A.　That's the column that indicates the dealers that would
2　be -- that we would be proposing for rejection of their
3　contracts.
4　　Q.　And next to that is a comments column?
5　　A.　Yes.
6　　Q.　Correct?
7　　A.　Yes.
8　　Q.　And in terms of just some of the general comments that are
9　made, what does "add line to facing dealer" mean?
10　　A.　The add line to facing dealer means that in -- if that's
11　the comment, then that means that we would be, for example, if
12　we're choosing to -- proposing to reject a Chrysler Jeep
13　contract, then we would be trying to pick up the lost sales
14　pretty quickly, we need representation in the market.　So our
15　intention would be to go to the Dodge dealer who we have
16　selected to be assumed by the new company and appoint him as
17　the Chrysler, Jeep and Dodge dealer in that marketplace.
18　　Q.　And then what does "excess point" mean?
19　　A.　Excess point means that -- that's a pretty good
20　description the way it is.　It's a location where we don't feel
21　that we need a dealer any longer.　It's excess in the
22　marketplace.
23　　Q.　And "third party candidate"?
24　　A.　Third party candidate is when we do the comparative
25　analysis between all of the dealers in the marketplace,

458

1　sometimes the choices that we have among the existing dealers
2　are insufficient in their performance, and so we're choosing to
3　search for a third party to be the representative in that
4　market.
5　　Q.　So you actually anticipate on expanding the dealer
6　network?
7　　A.　No.　We don't anticipate.　We anticipate in that market to
8　reject the contracts, probably of both the Chrysler, Jeep and
9　the Dodge dealer, and then seek a single candidate, third party
10　to come in, invest in brand new facilities and be properly
11　capitalized and be our representative in that market.
12　　Q.　And I should have been clearer in my question.　Once
13　you -- if you're successful in rejecting the 789 dealership
14　agreements that Chrysler is seeking to reject, then you would
15　go out and identify new candidates and expand the dealer body,
16　correct?
17　　A.　We wouldn't be necessarily expanding the dealer body.　We
18　would be rejecting the contract of two, and then reappointing,
19　or I should say appointing, one third-party candidate.　So the
20　net effect would be a reduction in the dealer count, and it
21　would be a consolidation of Chrysler, Jeep and Dodge all
22　together in one dealership.
23　　Q.　So but in terms of -- Chrysler has moved to assume certain
24　contracts, correct?
25　　A.　Correct.

459

1　　Q.　And reject certain contracts, correct?
2　　A.　That's correct.
3　　Q.　And if it's successful in assuming the contracts it wants
4　and rejecting the contracts it does not want, it would then go
5　out into the market and expand to additional locations with new
6　dealers.
7　　A.　No.　Your use of the word expand is incorrect.　That's not
8　what we're trying to do.
9　　Q.　How many points have you identified third-party candidates
10　for?
11　　A.　I don't have that.　I'd have to count them up.　I don't
12　know that number.
13　　Q.　But all that information would be contained in the
14　comments?
15　　A.　I believe most of it would, yes.
16　　Q.　If you keep looking to the right, do you see the red,
17　yellow and green columns?
18　　A.　Yes.
19　　Q.　Can you explain what -- I think the first one is "overall
20　trend RVG (sic)"?
21　　A.　Yeah, that's an internal tracking that we do, a
22　measurement to try to understand the dealer's financial
23　capabilities, both in his earnings, on what's happened with his
24　net earnings on a monthly and a year-over-year basis, and then
25　also the other overall status is his current working capital

460

1　and overall capitalization position.
2　　Q.　And green would be the best, yellow average and red
3　unacceptable?
4　　A.　Yeah, red -- yeah, that's correct.
5　　Q.　And then what's "overall status RVG (sic)" mean, which is
6　the column next to it?
7　　A.　Well, that's the one I just explained as the working
8　capital and overall financial position.
9　　Q.　And again, you used the red, green, yellow?
10　　A.　Yeah, that's what RYG means, is red, yellow, green.　And
11　those -- you know, again, these are things that we use
12　internally by our business management department.　They're used
13　to track the financial health of our dealers.
14　　Q.　And the next column I'd like to ask about is "financial
15　status".　Do you see that column?
16　　A.　Yes.
17　　Q.　And what does "health" -- or one of the comments is
18　"healthy and stable."　What does that mean?
19　　A.　Well healthy and stable just means that the -- according
20　to our business management department, they've categorized that
21　particular dealer who says "healthy and stable" that he's not
22　on a serious trend, although we probably should be keeping an
23　eye on him.　He's -- one of the other categories is healthy and
24　growing, which means that there's solid profitability and
25　there's also some growth in his working capital and net worth.

461

1 Q. And then there's also -- what does "distressed" mean?
2 A. Distressed means that the dealer has a number of elements
3 such as his earnings trend has been negative for a significant
4 amount of time. Also his working capital is below or
5 dangerously starting to breach his working capital guide
6 levels.
7 Q. And you testified that the dealers that Chrysler is
8 seeking to assume are the strongest dealers, correct?
9 A. They are our strongest performers. There are a number of
10 different factors. In other words, we've looked at this and we
11 deliberated on which of the dealers that we would want to
12 recommend going forward for assignment and assumption. That
13 was one of the elements.
14 Q. But earlier in your testimony on direct you testified that
15 the dealers' contracts that you are seeking to assume are the
16 strongest dealers, correct?
17 A. Yeah, strongest in performance, strongest in location,
18 strongest in financial as well.
19 Q. And some of these dealers have a minimum sales
20 responsibility score of less than a hundred percent, correct?
21 A. Yes, some of them do.
22 Q. And some of them are even less than fifty percent,
23 correct?
24 A. I don't know about that. Possibly.
25 Q. And I think you had testified that over twenty percent of

462

1 the contracts you're seeking to assume are categorized as
2 financially distressed, correct?
3 A. That could be, yes.
4 Q. I think it was, yes, before, correct?
5 A. Oh, okay.
6 Q. So in looking at Exhibit 2, there's no one factor that
7 determines whether the dealer will be assumed or rejected,
8 correct?
9 A. That's correct.
10 Q. And there are dealers that Chrysler is seeking to reject
11 that are financially healthy and growing, right?
12 A. Yes, some of them are.
13 Q. There are dealers that Chrysler is seeking to reject that
14 are overall trending green -- categorized green on the chart,
15 right?
16 A. For their earnings, yes, or their working capital, yes.
17 Q. And sometimes both?
18 A. And sometimes both.
19 Q. And likewise, there are dealers on the spreadsheet that
20 Chrysler is seeking to assume their contract even though they
21 are not trending -- their working capital or their overall
22 financial trend is not green?
23 A. Yes. That's the essence of a multifactor test, is when
24 you look at a number of different factors and try to determine
25 which are the best dealers that you think will go forward on

463

1 your network.
2 Q. And in looking at this chart, though, we can't tell the
3 weight that's given to any particular factor for any specific
4 dealer, can we?
5 A. No, because there was no particular weight applied except
6 for in the -- in our discussions and in our business judgment,
7 what we decided to try to move forward on the contracts that
8 would be assigned.
9 Q. But your business judgment isn't reflected on Exhibit 2,
10 is it?
11 A. Exhibit 2 is a spreadsheet of factors and elements --
12 Q. It's a yes or no question. It's a yes or no question.
13 You said that the decision was based on your business judgment.
14 And looking at Exhibit 2, I can't see your business judgment,
15 can I?
16 A. No, because one of the elements --
17 Q. No good -- it was a yes or no. Chrysler has not sought
18 to quantify any direct expenses that would be saved by
19 rejecting the 789 dealership agreements that it is seeking to
20 reject, correct?
21 A. That's not entirely correct, no.
22 Q. And what cost -- what direct expenses has Chrysler
23 quantified?
24 A. Well, we've -- as I testified in the direct and it's in my
25 declaration as well, we do have a cost of consolidating the

464

1 market of Project Genesis that we've already incurred. And we
2 would expect that we would have that cost again to do this
3 consolidation that we're proposing.
4 Q. And that cost going forw -- you're going to have that cost
5 going forward regardless, correct?
6 A. It'll be mitigated quite a bit by rejecting these 789
7 contracts.
8 Q. But in many cases, you're seeking to consolidate different
9 dealers, correct?
10 A. In some cases we'll be consolidated different dealers, but
11 most of what we're doing is when we reject the contracts, it'll
12 allow us to award the franchise, whether it's Chrysler, Jeep or
13 Dodge, to the facing dealer who we've chosen to assign to the
14 new company.
15 Q. And would you financially assist that facing dealer in
16 renovating and adding the new franchise?
17 A. At this point, no, because we don't have the money to do
18 it.
19 Q. And so you wouldn't have done it even if you don't reject
20 the dealers?
21 A. Say that again?
22 Q. You wouldn't have incurred that cost then, even if you
23 don't reject the dealers?
24 A. Not in the initial term until we -- until the new company
25 was up and running.

465

**Page 466**

1  Q. What about --
2      MS. BROWN: -- strike that.
3  Q. Chrysler's recommendation which was shared with the U.S.
4  Treasury was to repurchase the inventory of the rejected
5  dealers, correct?
6  A. That is correct.
7  Q. And one of the ramifications of not repurchasing the
8  inventory that Chrysler identified is the risk of devaluing the
9  inventory of the assigned dealers, correct?
10 A. That is correct.
11 Q. But Chrysler did not agree to purchase the inventory from
12 the dealers it is seeking to reject, did it?
13 A. Well, that's not entirely accurate.
14 Q. It agreed to purchase the inventory from the dealers it's
15 seeking to reject?
16 A. Our recommendation was not granted.
17 Q. You're not repurchasing the inventory from the dealers
18 you're seeking to reject, correct?
19 A. No, we're not. We're redistributing the product, as I
20 had --
21 Q. A yes or no question, please. Under this redistribution
22 plan that you described in your direct testimony, the retained
23 dealers are not obligated to purchase the inventory of the
24 rejected dealers, are they?
25 A. No they're not.

**Page 467**

1  Q. And the program does not cover all cars, does it?
2  A. The program does cover all of the cars -- will attempt to
3  redistribute all of the cars, trucks, minivans, whatever, that
4  each one of the dealers has.
5  Q. It doesn't cover cars that have more than 125 miles, does
6  it?
7  A. No, you're correct.
8  Q. So then it doesn't cover all the cars, does it?
9  A. No.
10 Q. And as of today, you do not have commitments from the
11 retained dealers to purchase all of the inventory of the
12 rejected dealers, do you?
13 A. No, we've just only recently begun soliciting the retained
14 dealers.
15 Q. It's a yes or no question. Are you aware that Chrysler
16 has placed money in a special purpose vehicle to backstop
17 losses associated with GMAC's financing to the retained
18 dealers?
19 A. Can you repeat that?
20 Q. Are you aware that Chrysler has placed money in a special
21 purpose vehicle to backstop losses associated with GMAC's
22 financing to the retained dealers?
23 A. No, I'm not aware of that. I thought the U.S. Treasury
24 would have provided that backstop as part of the financing.
25 Q. I'm sorry, can you explain?

**Page 468**

1  A. I said I thought that --
2      MR. ORR: Objection, Your Honor.
3      THE COURT: What's your objection?
4      MR. ORR: It's the same objection I made before, Your
5  Honor. We can discuss generally what the terms and facts that
6  are provided by the various agreements in place, but we cannot
7  get into the details due to the overlapping third party
8  confidentially agreements.
9      THE COURT: All right.
10 Q. Where did you get this understanding about financing from
11 U.S. Treasury?
12 A. Just in the public news reports.
13 Q. And can you tell me what your understanding is, then?
14 A. Just my understanding was that I had -- I had seen that
15 there was a certain amount of money that was provided.
16 Q. And do you know what that amount of money was?
17 A. I don't recall the exact number.
18 Q. Do you know generally?
19 A. Over 100 million dollars.
20 Q. In early 2009, Chrysler urged all of its dealers to take
21 on more inventory, didn't it?
22 A. Yes, that's an ongoing business.
23 Q. And in fact, James Press had a call with the dealers in
24 February of 2009 regarding the inventory, correct?
25 A. Mr. Press had many calls with the dealers.

**Page 469**

1  Q. On February 5, 2009, did Mr. Press have a call with the
2  dealers regarding taking on additional inventory?
3  A. He probably did, yes. I can't argue that.
4  Q. Did you participate in that call?
5  A. No, I did not.
6  Q. And are you aware of efforts by business center managers
7  to encourage and pressure dealers to take on additional
8  inventory in January and February so that Chrysler would meet
9  its February and March production numbers?
10 A. Yeah. They're a sales organization, so they would
11 naturally be encouraging the dealers to purchase vehicles.
12 Q. And are you aware that, in fact, over seventy percent took
13 on the additional inventory that they were requested to take
14 on?
15 A. I don't know what that number is.
16 Q. Are you aware that a significant number of dealers in the
17 winter of 2009 took on more inventory than they needed, at the
18 request of Chrysler?
19 A. I know that we were able to solicit what our production
20 plan was during that period of time in order to meet the
21 business plan.
22 Q. And Chrysler is now seeking to reject many of the dealers
23 who took on this additional inventory earlier this year,
24 correct?
25 A. That's correct.

Q. And Chrysler has not agreed to repurchase this inventory, correct?

A. That's correct. We've agreed to redistribute.

Q. There's no guarantee that the inventory will be redistributed, is there?

A. No.

Q. The decision to seek rejection of the 789 dealership agreements was not at the insistence of Fiat, was it?

A. No, it was not.

Q. And Fiat did not participate in identifying the number of dealership agreements to seek rejection of, correct?

A. That's correct.

Q. And Fiat did not participate in the selection of any dealership agreements to reject, correct?

A. That's correct.

Q. Prior to filing for bankruptcy, there was no plan by Chrysler to terminate the dealership agreements of 789 dealers by June of this year, there?

A. Prior to the bankruptcy filing we were doing a lot of analysis and scenarios, but there -- you know, there clearly was not going to -- there couldn't be a plan under the state franchise laws for us to go ahead and terminate. We can only do that under the bankruptcy.

Q. And why couldn't there be a plan to terminate under the state franchise laws?

470

A. Well, because the cost would be well beyond what Chrysler had available to it in funds in order to get legal fees and everything else that is associated with trying to pursue it through state courts.

Q. And why would the cost be high?

A. Because of how long it takes to litigate.

Q. And there are notice and protest rights for dealers, correct?

A. That's correct.

Q. The debtors have been paying and expect to pay all pre-closing obligations owed to dealers, right?

A. That's correct.

Q. As a result, there would be no cure amounts to be paid in connection with the assumption of all 780 dealers the debtors seek to reject, correct?

A. I believe so. I'm not sure, though. If you could repeat that?

Q. As a result of paying all of the pre-closing obligations owed to the dealers, there would be no cure amounts to be paid in connection with the assumption of all 789 dealers the debtors seek to reject --

MR. ORR: Objection, Your Honor. Calls for a legal conclusion.

THE COURT: Yes.

MS. BROWN: I'm just asking for his understanding and

471

the business judgment he applied.

MR. ORR: The term cure is a legal term. It's a term of art in bankruptcy, Your Honor.

THE COURT: Right. Well, first of all, your question poses that since there's nothing due and owing under these contracts, it would cost nothing to assume them?

MS. BROWN: Correct.

THE COURT: What is the relevance of that?

MS. BROWN: In the fact that they're saying -- the debtors are arguing that in their business judgment, they're doing this to reduce costs and to narrow their dealer body and lower their costs. And this isn't a cost that they would have.

THE COURT: To the extent -- I'm not sure there aren't any cure costs, assuming cure is a term of art in bankruptcy. But you can ask if -- I just don't know how he's going to answer that.

BY MS. BROWN:

Q. Is it your understanding that if the debtors assume these contracts, there will be no additional pre-closing obligations that they would have to pay?

A. If the new company were to assume -- I mean, forgive me, I'm having trouble following your question.

Q. If the debtors assume these contracts and they've already agreed to pay all of the pre-closing obligations, there's no cost associated with assuming these contracts in terms of

472

obligations owed to the 789 dealers, correct?

A. Well, all I can say is that, you know, we've already committed to paying all the incentives and warranty claims that the 789 as well as the 2,392 are going to incur during bankruptcy. And I believe -- it's my understanding that we've secured the funding to do so and the Court's approval to do that.

Q. To the extent there are any cost savings associated with rejecting these 789 dealers, those cost savings are going to be saved by New Chrysler, not the debtors, correct?

A. Yeah, the savings of the new retained network going forward --

Q. It's a yes or no. Yes or no?

A. Yeah, they will be by New Chrysler.

Q. In connection with the debtors' analysis of its business purpose in deciding which dealer agreements to seek to assume or reject, did the debtors consider the amount of the rejection damage claims that would be incurred?

A. No, we did not.

Q. And in connection with the debtors' analysis of its business purpose in deciding which dealer agreements to seek to assume or reject, did the rejection damage claims -- did the fact that the rejection damage claims may constitute administrative expense claims factor into the debtors' analysis?

473

```
 1        MR. ORR:  Objection, Your Honor.  Same objection as
 2   the previous one.
 3        THE COURT:  Right.  You're really asking him for a
 4   legal conclusion of the administrative --
 5   Q.   In connect -- Mr. Grady, in connection with the debtors'
 6   analysis of its business purpose in deciding which dealer
 7   agreements to seek to assume or reject, did the debtor ever
 8   look at how the claims could be characterized for purposes of
 9   damage claims or non-damage claims in bankruptcy?
10        MR. ORR:  Objection, Your Honor.
11        THE COURT:  You can ask him if he looked at it.
12   A.   No, we didn't look at any claims like that and never
13   contemplated that.
14   Q.   You never looked at how the claims would be treated by the
15   bankruptcy court?
16   A.   No.
17   Q.   And in connection with the debtors' analysis of its
18   business purpose in deciding which dealer agreements to seek to
19   assume or reject, did the debtors consider the harm to the
20   employees of the dealers and the communities served by the
21   dealers?
22   A.   That's not a simple yes or no answer.  The consider --
23   Q.   It's a yes or no question.  You either considered it or
24   you didn't.
25   A.   -- we considered everything on behalf of trying to

                                                          474
```

```
 1   transfer a robust dealer network to the new company.
 2   Q.   And so the harm to the employees, the dealers and the
 3   communities was outweighed, in your mind, by transferring what
 4   you considered to be a robust dealer network to New Chrysler?
 5        MR. ORR:  Objection.  Mischaracterizes the witness'
 6   testimony, Your Honor.
 7        THE COURT:  He can answer that.
 8   A.   No, we did not -- we did not contemplate what the impact
 9   on employment would be with the various rejected dealers for
10   various reasons.  One of them being, if we consolidate -- if we
11   reject a Dodge agreement and we consolidate that Dodge into a
12   Chrysler Jeep, the business expansion may be able to take on
13   some of those employees, if not all of them.
14   Q.   Did you do any analysis to see whether that was going to
15   happen?
16   A.   No, we did not.
17   Q.   Did any of the dealerships which you are testifying are
18   going to expand, did they agree to take on additional
19   employees?
20   A.   No, because we did not approach them on this yet.
21   Q.   So these dealerships are --
22        MS. BROWN:  Strike that.
23   Q.   These dealers don't even know that you're expecting that
24   they're going to expand and renovate their facilities, and that
25   you're not going to pay for any of this?

                                                          475
```

```
 1   A.   They're in the process of learning that now.  And there's
 2   an expectation that if your business is going to increase
 3   dramatically, that you will expand your business, including
 4   taking on more employees, taking on qualified technicians to
 5   service the product.
 6   Q.   How can dealers, twenty percent of which are considered
 7   financially distressed, go out now and take on additional
 8   employees, renovations, add a franchise?  You never looked at
 9   the possibility of that actually being achieved by these
10   dealers, did you?
11   A.   Yeah, we looked at -- we looked at the entire dealer
12   network to see what is possible in each one of the markets for
13   our representation.
14   Q.   But you didn't even talk to the dealers that you are
15   expecting are going to expand, correct?
16   A.   That's correct.
17   Q.   Can you identify any benefit at all to Old Chrysler's
18   estate as compared with New Chrysler, as a result of rejecting
19   the 789 dealer agreements?
20   A.   I think the benefit of rejecting the contracts is to -- to
21   the new company, who is -- that's part of the asset sale from
22   the new companies -- from the old company to the new company.
23   So part of the requirement is the transfer of the robust dealer
24   network.  And that's part of the, presumably, the sale price
25   and the value that the new company is paying, if you will, for

                                                          476
```

```
 1   the assets.
 2   Q.   But Fiat did not require the rejection of the 789
 3   agreements, did it?
 4   A.   No.  But Fiat did encourage and buys into a restructuring
 5   of the dealer network which includes rationalization.
 6   Q.   And this was not done at their insistence, though, was it?
 7   A.   It was not done at their insistence, but it was part of
 8   what we looked at as an opportunity --
 9   Q.   It's a yes or no question.
10   A.   -- it's an opportunity to accelerate Genesis.
11        MS. BROWN:  I move to strike the rest of his answer.
12        THE COURT:  It's granted.  Go ahead.
13        MS. BROWN:  Your Honor, I'd like to move Dealer
14   Committee Exhibit 2 and 3, which were shown and identified by
15   Mr. Grady into evidence.  And I understand that the debtor
16   would like them filed under seal.
17        THE COURT:  All right.
18        MR. ORR:  Actually, Your Honor, we object to having
19   them moved into evidence.  We allowed them to be identified,
20   but they are subject to a confidentiality agreement that
21   provides for advisors' eyes-only information.  We allowed the
22   inquirer some latitude here today, Your Honor, so they could --
23        THE COURT:  You've got -- wait a minute.  You're
24   talking too fast.
25        MR. ORR:  I'm sorry.

                                                          477
```

THE COURT: And you're not talking into a microphone These are authentic documents. Is that correct?

MR. ORR: Yes, that is correct.

THE COURT: You don't want them shared with anyone else?

MR. ORR: That is correct.

THE COURT: All right. So you want them under seal but not only that, you're objecting to their admission on what grounds?

MR. ORR: Your Honor, I'm objecting on the grounds that they are confidential for advisors' eyes-only. That was the agreement that we had with regard to this confidential information. And we have not waived that agreement.

MS. BROWN: Can I respond, Your Honor?

THE COURT: No. Not yet. Wait a minute. But I'm not quite sure and understand what your objection is. If they're admitted under seal, there's no one going to see them other than me and my staff. So what -- I'm not quite sure as to what the issue is?

MR. ORR: Well, if you're admitting them under seal, Your Honor, as with some of the other provisions that we've done, then I think we might be okay with that. The problem that we have is we do have an agreement for advisors' eyes-only that we do want to stand by. And what we are concerned about is that we have a series of dealers who are going to be coming

478

in here and making objections. If we have an operating agreement that these documents remain under seal, only for your eyes and for others, perhaps that's something we can live with.

(Affected Dealers' Committee's Exhibit 2, spreadsheet on dealership performance, was hereby received into evidence under seal as of this date.)

(Affected Dealers' Committee's Exhibit 3, dealer network review, was hereby received into evidence under seal as of this date.)

MR. SUNSHINE: Your Honor, may I be heard? I represent a dealer. Would you let me come up to the microphone?

THE COURT: Yes.

MR. SUNSHINE: Thank you, Your Honor. My name is Donald M. Sunshine. I represent a dealer in Arkansas who has been -- received a notice of termination. The name of the dealer is Crane C.D.J. LLC. And I find this very disturbing that I, on behalf of my client, based on what's now being discussed, will be deprived of the ability to review documents which are germane to its objection. In fact, I am very upset about the entire proceedings before this Court, because various motions have been made without notice to my client, way before they receive the notice of rejection, including motions that would relieve officers and directors of responsibility --

THE COURT: Just a minute, sir.

479

MR. SUNSHINE: -- and many --

THE COURT: Just a minute, sir. Excuse me. If I start to speak, have the courtesy to stop. That's the protocol. All right? What you're talking about is incomplete information. There's been no motion to relieve people of any liability, to my knowledge, that an order has been entered in that regard.

MR. SUNSHINE: Well, I've been told by --

THE COURT: You shouldn't even be --

MR. SUNSHINE: -- counsel sitting to my left that such a motion was made and the time to object has already passed.

THE COURT: That may be.

MR. SUNSHINE: But let's not depart from the issue in question at the present time. I have a dealer who's being wrongfully terminated, in my opinion; cut off from any damages. If the sale is approved, his objection to the rejection will be moot, based on what Your Honor said about an hour ago. And Chrysler will be successful in cutting off the rights, if any, that my client has under state law and otherwise. And now I'm told that because of a confidentiality agreement between other parties, I'm not even going to be able to see these documents, because they're going to be under seal. And I object.

THE COURT: All right, well --

MR. SUNSHINE: Thank you, Your Honor.

480

THE COURT: -- not at all.

MR. SUNSHINE: Yes, Your Honor.

THE COURT: All right. First of all, these documents under seal at this point have been introduced because of confidentiality concerns. Counsel who's been using them has apparently signed a confidentiality agreement, I assume.

MS. BROWN: Yes, Your Honor.

THE COURT: All right. And I don't know if you'd consider signing the agreement or not, which addresses one issue.

MR. SUNSHINE: I would consider signing the agreement if I knew what was in the agreement and what I'm signing away. I have not seen the document.

THE COURT: Sir?

MR. SUNSHINE: I'm an attorney at law. I think I'm entitled to know what I'm signing a confidentiality agreement in regard to.

THE COURT: I don't know if you ever signed a confidentiality agreement, but to my knowledge, the agreement gets signed first, and then you get an opportunity to see the document.

MR. SUNSHINE: Right now, I don't know exactly what's in the document. I guess, Your Honor, on reflection I will sign the confidentiality agreement.

THE COURT: All right. What these -- I'm not so sure

481

in the first place. These documents are being introduced or at
least being used to demonstrate what procedures the debtor went
through to make a determination as to what dealers would be on
the list to be rejected. That's the analysis. The criticism
of whether their business judgment has been exercised or not
and those issues, seem to have been made on the record already,
as counsel has brought the witness through the points of what
she believes raises the issue about the business judgment.

And all these documents show are the factors that
were considered and how particular dealerships fell on either
side of the ledger according to these factors. That's what
these documents are. And another one is a network review of, I
guess, the debtors' view of the sales and opportunities in
certain geographical areas.

MR. SUNSHINE: I still have a problem, Your Honor,
because how am I going to know whether someone in Chrysler
doesn't like my client. My client recently, I am told, found a
new facility to expand. He has all three brands. How do I
know that a deal hasn't been made with somebody else who's more
friendly with Chrysler, unless I get into some documents and
see the factors that were involved? And frankly, I think that
this procedure with the short time frameworks and the lack of
knowledge, has deprived my client of due process and all the
rights that it should have to be protected by this Court.

THE COURT: All right, well, if you want to see the

482

documents, at this point, you enter into a confidentiality
agreement, I think the -- then you can see the documents.

MR. SUNSHINE: All right. Who is going to give me
that confidentiality agreement?

THE COURT: You'll have to --

MR. SUNSHINE: And when will I get it?

MR. ORR: Your Honor, if I may? I will give the
gentleman my card and he can correspond directly with me.

MR. ORR: That's going to be difficult, Your Honor.
Because we're going to go till ten-what. We start 9:00 in the
morning. I'd like that document to be produced here in court
tomorrow so I can sign it before we start at 9:00, and then
produce copies of these documents. Is that agreeable?

MR. ORR: Your Honor, that's fine. We'll have a
confidentiality agreement here.

MR. SUNSHINE: Thank you, Your Honor.

THE COURT: You're welcome.

MS. BROWN: Your Honor, can I just address a couple
housekeeping matters?

THE COURT: Go ahead.

MS. BROWN: I realize that I do not believe that I
moved in Dealers' Committee Exhibit 1, which I used with Mr.
Nardelli. And I'd just like to move that into evidence.

THE COURT: All right.

MS. BROWN: Dealers' Committee Exhibit 1 was the

483

e-mail.

MR. CULLEN: I don't mean to break the Court's rule,
but Mr. Armstrong is gone. So I'll just take a quick look. I
can deal with it in the morning. I find it unlikely that I'll
have an objection.

THE COURT: All right. Would you describe what it
is?

MS. BROWN: It's the e-mail from Mr. -- it's from Mr.
Press to --

THE COURT: Oh, I know what it is. It's the e-mails
from the Mid --

MS. BROWN: Yes.

THE COURT: -- Mid-Atlantic region --

MS. BROWN: Yes.

THE COURT: -- to encourage them to purchase cars?

MS. BROWN: Exactly. Exactly.

MR. CULLEN: No objection, Your Honor. No objection
I just didn't remember what the document was.

THE COURT: All right. I have it here. Do you want
to look at it? Here it is.

MR. CULLEN: Can I approach, Your Honor?

THE COURT: Yes.

MR. CULLEN: No objection, Your Honor. Thank you.

THE COURT: All right. So admitted. So I is
admitted. 2 and 3, at least for now are under seal subject to

484

confidentiality agreements.

(Affected Dealers' Committee Exhibit 1, e-mail from Mr. Press,
was hereby received into evidence as of this date.)

MS. BROWN: Thank you, Your Honor.

THE COURT: All right. Thank you.

MR. BELLAVIA: Your Honor, Leonard Bellavia, Bellavia
Gentile & Associates on behalf of thirty-one of the affected
dealers we filed objections for.

CROSS-EXAMINATION

BY MR. BELLAVIA:

Q. Mr. Grady, good evening.

A. Good evening.

Q. We met the other day, did we not?

A. Yes, we did?

Q. At a deposition?

A. Yes.

Q. Now, you understand, you're here today in part to discuss
whether the sale of the assets to New Chrysler are in the best
interests of the estate, given the fact that the transfer will
include approximately 2,400 dealerships as opposed to 3,200
dealerships, correct?

A. That's correct.

Q. As a preliminary matter, the president of the company, Jim
Press, has a long history with Toyota Motor Corporation, does
he not?

485

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

**486**

1    A. Yes, he did.
2    Q. He worked both with Toyota and its Lexus brand?
3    A. Yes.
4    Q. And to a large extent, a lot of what the domestic
5    manufacturers, and in particular Chrysler, are attempting to
6    accomplish, is to model their dealer network after the imports,
7    because they're much smaller, right?
8    A. We're attempting to model the network because it seems to
9    be pretty successful and a pretty good model.
10   Q. Okay. And the imports -- the mainstream imports, by the
11   way, are Toyota, Honda and Nissan. Is that right?
12   A. Correct.
13   Q. And you do, in your role of your position, follow the
14   progress, the success of all of the competitors of yours,
15   including the imports?
16   A. Yes, to a degree.
17   Q. And inasmuch as you're involved in dealer placement and
18   dealer operations, you look to see how the dealerization is
19   done with respect to other manufacturers?
20   A. Yes.
21   Q. And you're aware that Toyota, as successful as it has been
22   in this country, is suffering just like every other
23   manufacturer right now?
24   A. Yeah, I mean, everybody is when the annual selling rate
25   goes from 17 million to below 10 million. Everyone's going to

**487**

1    suffer.
2    Q. Indeed, this is probably one of the worst automotive
3    markets in memory. Is that fair to say.
4    A. I think that's fair to say.
5    Q. In fact, Toyota has lost 8 billion dollars just in the
6    last three months, right?
7    A. I don't know what the number is, but.
8    Q. But it wouldn't surprise you to know, like everyone else,
9    they're losing a lot of money?
10   A. It wouldn't surprise me. No.
11   Q. So to the extent that manufacturers are having problems
12   right now, is it fair to say it's not in large part due to the
13   number of dealers that they have but rather it's a product of
14   the economy?
15   A. It's definitely a product of the economy at this moment in
16   time.
17   Q. And if things are as bad as they have been over the past
18   year, this is not the time that a manufacturer wants to cut
19   revenues, right?
20   A. That's correct. You want to grow revenue.
21   Q. Right. And in connection with the bankruptcy process, one
22   of the things that Chrysler has been focusing on to a large
23   extent is reducing expenses, not revenues?
24   A. That's correct.
25   Q. Right? And Chrysler does not sell its products directly

**488**

1    to the public?
2    A. That's correct. All through the dealers.
3    Q. Right? And in fact, the dealers represent the only source
4    of revenue to Chrysler?
5    A. Largely, yes.
6    Q. Right? I mean, there's a small percentage, I understand,
7    of products you sell directly to the government?
8    A. That's right.
9    Q. But by and large?
10   A. Everything else is delivered through the dealers.
11   Q. So the dealers, for all practical purposes, are your
12   customers?
13   A. That's correct.
14   Q. So in connection with a reorganization, particularly in
15   the context of a bankruptcy, one of the objectives should be to
16   save money. Fair?
17   A. One of the objectives is to save cash and another reduce
18   expenses.
19   Q. I agree. But certainly not eliminate your customers. Do
20   you agree with that?
21   A. Certainly to not eliminate revenue.
22   Q. Well, in fact, the reduction of twenty-five percent of the
23   dealer body represents a fourteen percent diminution in your
24   revenue, doesn't it?
25   A. In the immediate near term, yes.

**489**

1    Q. Even in good times, that would not be a recommended course
2    of strategy, would it?
3    A. It depends on how quickly you can recover it. And your
4    anticipation, like at our case, is that with Project Genesis,
5    once we're able to consolidate all of our brands under one
6    roof, we'll get a growth that will exceed that.
7    Q. In fact, I believe you testified the other day that your
8    expectation or Chrysler's expectation is that even in the face
9    of this market, you expect to start regaining the lost sales
10   within three months?
11   A. I said we would begin to regain the lost sales in 90 to
12   120 days.
13   Q. Right. And if I remember --
14   A. And twelve months following --
15   Q. -- I apologize.
16   A. -- recover that.
17   Q. And in fact, you felt that you would recover 100 percent
18   of the lost revenue within a year?
19   A. Yes, within a year. At the end of 2010. We feel very
20   confident we're going to be able to recover that.
21   Q. Did you take into consideration any variables as to the
22   volatile state of the economy and what impact that might have
23   on your projection?
24   A. We, as part of our projection, we used a steady state for
25   the current industry performance.

Q. Do you think it's rather ambitious, in this economic climate, to expect that Chrysler is going to recoup one hundred percent of its lost revenue within twelve months?

A. No, I really don't, because of the dealers that we're rejecting, they perform at a minimum sales responsibility level, that is, at 73 percent, which is well below average. And the dealers that we're retaining are performing at 122 percent of their minimum sales responsibility. So the performance of the retained dealers far exceeds anything that the other dealers as a group perform at.

Q. Now, you didn't have the benefit of any historical data as to how you could recapture this market share, because there has never been a similar circumstance in the automotive industry, has there?

A. No, there hasn't.

Q. Where a manufacturer would eliminate twenty-five percent of its customers within a matter of two or three weeks, right?

A. That's correct.

Q. Have you factored in the impact that might have on Chrysler customers, consumers?

A. We took into consideration when we did the analysis of our lost sales, is that there's going to be a certain element of the rejected dealers' lines that will be added rapidly into the retained dealers. So they would be able to recover sales pretty quickly. And then subsequent to that there's a timing

490

of lines being added in. So that the customers would have Chrysler, Jeep and Dodge outlets to shop at.

Q. But Mr. Grady, didn't you testify that before you could give a Dodge point, as an example, to a Chrysler Jeep dealer, that that dealer may have to refurbish it, expand it? He may have to improve it in some way?

A. He may. And some are ready to go right now.

Q. So you're prepared to go to the assumed dealers in the worst economy in fifty years and ask them to build new showrooms so they can accommodate the new lines?

A. Yes.

Q. Have you proposed that to a single dealer yet in this country?

A. Yes, we have.

Q. And what kind of response have you gotten?

THE COURT: Slow down. Slow down. Ask the questions. Just slow it down.

MR. BELLAVIA: I'm sorry, Your Honor.

Q. What type of a response have you gotten in the face of a request to a dealer in this economy to expand his facility?

A. We already have had many dealers across the country who have committed to us that they will be expanding their facilities, putting the necessary imaging on the front of the building. They'll be also expanding service where necessary, in order to take on the incremental business. They recognize

491

that there's incremental business.

Q. Now, is that true with respect to the dealers on the previous exhibit that had been noted to be financially deficient but were nonetheless assumed?

A. But not all of those dealers would be expected, until they're able to cure their -- they would have to cure their facility as well as cure their working capital position. They would not get the add line until that time.

Q. All right. So if I understand your testimony, there may be some inherent delays in the process of repositioning some of these franchises from the rejected dealers to the assumed dealers?

A. That's right. We factored that in.

Q. And do you have any -- have you done an analysis yet of precisely the delay that may be occasioned by these relocations of the franchises?

A. Well, in some of the cases, the repositioning, as you call it, if for example, the Dodge into the Chrysler Jeep dealer, may take as long as twelve to eighteen months, depending on the scope of the facility renovation. Some of them may be as quick as 90 to 120 days if there is some very simple renovations that are required.

Q. So how many circumstances are there, if you know, where dealers who are going to be receiving franchises from the rejected dealers, need to undertake facility upgrades or

492

reconstruction?

A. I don't have the number off the top of my --

Q. But certainly, part of Project Genesis is to put the right line makes in the right locations with the right dealers in the right facilities, right?

A. That's correct.

Q. And the right facilities, you're going to stand by that demand that dealers have suitable facilities to accommodate all three line --

A. Yes.

Q. -- makes under one roof?

A. That is correct.

Q. So part and parcel of the Project Genesis program is that dealers conform with the image for the showrooms?

A. That's correct.

Q. And most dealers are going to have to do substantial renovation to accommodate that goal, aren't they?

A. I don't know about most. But it will be a substantial number that will have to do the renovations.

Q. So the expectation that you testified to earlier that Chrysler, even though it's going to be losing fourteen percent of its revenues immediately, and that it expects to recapture a hundred percent within twelve months, really doesn't apply to those dealers that need to undertake facility renovations, does it?

493

1  A. No. That's correct.

2  Q. Except --

3  A. But the lost sales will also be picked up by not just the

4  dealers who are picking up the additional lines, but by giving

5  enough elbow room into the other dealers who are remaining, who

6  are currently Chrysler, Jeep and Dodge. They should be able to

7  absorb it in the market as well.

8  Q. Well, doesn't that presume -- when you say absorb, do you

9  mean that the lost business will absorbed by neighboring

10  dealers?

11  A. Yes.

12  Q. But doesn't --

13  A. The entire network will be able to overcome the lost

14  sales. Those fourteen percent lost sales will be overcome by

15  the entire dealer network, not just on a one-to-one basis.

16  Q. Aren't the customers a component of this goal? Don't you

17  need to have the customers buy the cars for that to happen?

18  A. Yes.

19  Q. Have you considered the apprehension that is going to be

20  created by virtue of consumers seeing 789 dealers go out of

21  business over the next couple of weeks?

22  A. Well, we believe that if we've communicated with the

23  customers, the owners out there, they want to do business and

24  shop at dealers that have all the lines under one roof, and

25  they want to move forward with a dealer who's investing in the

494

1  market.

2  Q. Mr. Grady, would you concede that the public right now is

3  very confused about what's going on in the automobile industry,

4  particularly as it relates to Chrysler and General Motors?

5  A. Yes.

6  Q. So to expect that these consumers are going to come back

7  within ninety days, some of them, and all of them are going to

8  come back within a year, isn't that wishful thinking?

9  A. No, I don't believe so.

10  Q. Isn't it a risk?

11  A. There's certainly a risk.

12  Q. Is this really the economic climate to be undertaking that

13  type of a risk?

14  A. This is the opportunity that's presented us at this moment

15  in time.

16  Q. But you understand there are certain standards that have

17  to be met in order to successfully accomplish this, given

18  certain rules of the Court and the 363 sale?

19  A. I'm not familiar with all those.

20  Q. All right. But you do understand that you need to

21  establish that the proposed transaction meets a certain test,

22  that it be in the best interest of the estate?

23  A. Yes.

24  Q. But isn't this initiative really designed to serve the

25  best interests, not of the estate, but of the purchaser?

495

1  A. Well, if it benefits the purchaser, who's paying a price

2  for the assets of the estate, I would assume that that would

3  meet that test.

4  Q. So if this --

5  A. So if we're delivering a dealer network that the

6  purchaser, the new company, wants to have, and is believing it

7  to be the proper network, then that's part of the value that

8  was negotiated between all the parties.

9  Q. Mr. Grady, were you present yesterday for Mr. Altavilla's

10  testimony?

11  A. No, I was not.

12  Q. Were you present for Mr. Nardelli's testimony?

13     THE COURT: He wasn't present.

14     MR. BELLAVIA: All right.

15     THE COURT: He wasn't supposed to be present for

16  anyone's testimony.

17     MR. BELLAVI: That's correct. I apologize.

18  Q. The fact is, Mr. Grady, Fiat didn't demand and didn't

19  require 789 dealers to be rejected, did it?

20  A. No, not that number. They never said what kind of a

21  number they were looking for, whether it was 1 or 1,000.

22  Q. Well, they never demanded that any single dealer be

23  rejected in this transaction, did it?

24  A. I'm only aware of that we were taking the opportunity to

25  accelerate Project Genesis as a result of the bankruptcy. And

496

1  Fiat and their dealer development people, who were advised of

2  the process, signed off on the process. They agreed with it.

3  And they actually have used, you know, similar factors when

4  they've done their own restructuring over in Europe and maybe

5  some of the other countries around the world that they do

6  business in.

7  Q. Mr. Grady, Jim Press, when he came over from Toyota,

8  impacted the way Chrysler does business with respect to the

9  dealer network, didn't he?

10  A. Could you explain further?

11  Q. Sure. He espoused the virtues of the Toyota dealership

12  model to Chrysler, didn't he?

13  A. Well, he talked about the benefits. I mean, you would

14  expect that from somebody who'd spent his entire career with

15  Toyota, and seeing the benefits and the success Toyota has, I

16  think that was part of the reason why Mr. Press was brought on

17  board with Chrysler.

18  Q. Does Toyota enjoy good success with respect to customer

19  satisfaction?

20  A. I believe so, yes.

21  Q. And does Honda?

22  A. I believe so, yes.

23  Q. And --

24  A. They have a reputation for it.

25  Q. -- how about Nissan?

497

**498**

1     A. I believe so.

2     Q. And does Chrysler aspire to enjoy the same customer

3 satisfaction scores that those three manufacturers have?

4     A. Yes, we do.

5         MR. BELLAVIA: Your Honor, may I approach the

6 witness, please?

7         THE COURT: Go ahead. Thank you.

8         MR. ORR: Your Honor?

9         THE COURT: Yes.

10        MR. ORR: Thank you.

11     Q. Mr. Grady, can we start by asking you to identify the name

12 J.D. Power and Associates?

13     A. Yes. They're a firm that does research on sales and

14 customer satisfaction for many industries, not just cars.

15     Q. Okay. And they're highly respected in the industry?

16     A. Yes.

17     Q. By both manufacturers, dealers and consumers?

18     A. Yes.

19     Q. Can you identify the document that I just -- if you take a

20 look at page 3, I'm sorry, of the document that I just handed

21 to you?

22     A. Okay.

23     Q. Do you see that?

24     A. Yes.

25     Q. Please read the title of the document?

**499**

1     A. Well, this is the 2008 sales satisfaction index.

2     Q. Now, before -- I'm going to address this next question to

3 your specific actions. Before the dealers in this case had

4 received rejection notices from Chrysler, did you undertake to

5 find out what the 2008 J.D. Power and Associates sales

6 satisfaction index was for last year, for '08?

7     A. No, we did not.

8     Q. But you testified a moment ago that one of the reasons for

9 the Project Genesis initiative is to reduce the number of

10 dealers so that each dealership would have a better -- what's

11 the term, throughput? You used the term throughput at your

12 deposition?

13     A. Yes.

14     Q. What is throughput?

15     A. Dealerships with greater throughput, which is annual sales

16 through the dealership.

17     Q. And if I understood your testimony correctly, the idea is

18 that if there are less dealers and they're more profitable,

19 then they can, I believe to use your term, can afford to

20 enhance the consumer experience at the dealership. Is that

21 right?

22     A. That's correct.

23     Q. And what does that mean "to enhance the consumer

24 experience"?

25     A. Well, that's to -- when the customer purchases a vehicle,

**500**

1 he wants a pleasing environment. He wants a number of

2 different things that would -- for example, he would like to

3 have all the technicians trained, have enough capacity in the

4 service department so that there's a convenience level that's

5 involved with the customer being able to have his car serviced

6 within his required amount of time --

7     Q. All right, so --

8     A. -- things of that nature.

9     Q. -- consistent with that, would it be fair to say that

10 Chrysler wants to reduce the number of dealers so that the

11 dealers' customers can enjoy a better sales satisfaction

12 experience?

13     A. We're looking to consolidated all of the brands so that

14 the dealer can make the investment in the facilities in order

15 to provide that experience.

16     Q. Just as Honda, Toyota and Nissan have done, correct?

17     A. That's correct.

18     Q. Because you'd like to aspire to achieve the same results

19 that Honda, Toyota and Nissan has done?

20     A. The same customer satisfaction.

21     Q. And that was one of the driving forces behind the decision

22 to reject the contracts of twenty-five percent of Chrysler's

23 dealers, correct?

24     A. That's one of the driving factors behind Project Genesis.

25     Q. All right. Well, let's take a look at this document, if

**501**

1 you would? Do you see in the center of the page, sir, a darker

2 colored bar reflecting industry average?

3     A. Yes.

4     Q. Now, is that the exhibit?

5     A. Sorry, no.

6     Q. Okay.

7     A. That was the previous exhibits.

8     Q. All right. We don't need that anymore.

9     A. We don't need those.

10     Q. You testified a few moments ago, before I handed you the

11 document, that one of the purposes of this rejection is so that

12 Chrysler can accomplish the successful sales satisfaction

13 results of Honda, Toyota and Nissan, right? Do you remember

14 that?

15     A. Actually, I said customer satisfaction.

16     Q. Okay.

17     A. Which is a little bit different of a service measure than

18 a sales -- sales satisfaction is a measure of the sales

19 transaction as opposed to customer satisfaction, which is a

20 measure of the service experience.

21     Q. All right. So we should not count this at all, then?

22     A. No, go ahead.

23     Q. Okay.

24     A. I'm just trying to draw the distinction between the --

25     Q. All right.

212-267-6868  VERITEXT REPORTING COMPANY  516-608-2400

**502**

1  A.  -- different terms.
2  Q.  I take it you looked at the document just now, didn't you?
3  A.  Well, yeah.  I mean, you're asking me to look at it.  I'm
4  looking at it.
5  Q.  Okay, well, let's see what you found.
6  A.  Okay.
7  Q.  Sir, where does Honda appear on this document which
8  reflects the 2008 sales satisfaction index study?
9  A.  A score of 852.
10  Q.  Well, is that above or below industry average?
11  A.  That's below industry average.
12  Q.  And where does Toyota stand on this chart?
13  A.  Even with Honda.
14  Q.  Still below industry average?
15  A.  Yes.
16  Q.  And where does Nissan stand?
17  A.  Below industry average.
18  Q.  Way below, right?
19  A.  That's correct.
20  Q.  In fact, it's the second from the bottom just above
21  Mitsubishi?
22  A.  Um-hum.
23  Q.  And tell us, if you would, Mr. Grady, where Chrysler is?
24  A.  Chrysler sales satisfaction is just above.
25  Q.  Well, it's more than just above, right?

**503**

1  A.  It's 866.  It's only 9 points over the industry average.
2  Q.  So really, if you look at this chart, Honda, Toyota and
3  Nissan should take a page from Chrysler's book, shouldn't it?
4  A.  Well, down at the bottom, there's also Dodge and Jeep,
5  which are the other two brands that are being measured, and
6  they're down near the bottom just above Nissan, but well below
7  Toyota and Honda.
8  Q.  Okay.  But aren't you happy?  You work for Chrysler,
9  right?
10  A.  Well --
11  Q.  You did very well last year?
12  A.  No, I'm not happy.  It should be higher and I would like
13  to have Dodge and Jeep above industry average as well.
14  Q.  Sure.  But in view of the fact that you just testified
15  that one of the reasons that Chrysler is rejecting almost 800
16  dealers is because it wants to aspire to achieve the same
17  success as Honda, Toyota and Nissan -- right?
18  A.  Yes, that's one of the elements.
19  Q.  And in the worst year of Chrysler's eighty-something year
20  history, it's still doing better than the three imports, right?
21  A.  One of the brands.
22  Q.  All right.
23  A.  One of the three brands.
24  Q.  Fair enough.  Fair enough.  Now, how about the other
25  company that's also suffering and may be here soon.  Let's see

**504**

1  how they did last year in comparison to Honda, Toyota and
2  Nissan, the manufacturers with very low number of dealerships.
3  General Motors has even more dealerships than Chrysler, doesn't
4  it?
5        MR. ORR:  Your Honor?  We're getting far afield of
6  direct.
7        THE COURT:  Um --
8        MR. BELLAVIA:  May I be heard, Your Honor?
9        THE COURT:  Go ahead.
10        MR. BELLAVIA:  Your Honor, I think this is central to
11  what the testimony was on direct, and that is that this
12  initiative is supportive of their motion that this is in the
13  best interests.  Obviously, this testimony is to draw the
14  distinction between what's best for this manufacturer and what
15  is not.  They obviously are following a model that we would
16  suggest is way in the wrong direction.  I think it's relevant
17  that we be permitted to point this out to the Court.
18        THE COURT:  Go ahead.
19  Q.  At the top of the list, sir, do you see Cadillac?
20  A.  Yes.
21  Q.  Look down.  Is Buick above average?
22  A.  Buick is above average.
23  Q.  How about Saturn?
24  A.  They are also.
25  Q.  Pontiac?

**505**

1  A.  Yes.
2  Q.  Chevrolet?
3  A.  Yes.
4  Q.  Ford?
5  A.  Yes.
6  Q.  GMC Truck?
7  A.  Yes.
8  Q.  Chrysler?  We already talked about Chrysler.
9  A.  We already talked about that.
10  Q.  Okay.  So does that surprise you, sir, that the domestics
11  with such an excess of dealers are doing so much better than
12  the manufacturers that everybody praises?
13  A.  No, it really doesn't.  Because this is just one element
14  of it.  And this is just the sales satisfaction piece of the
15  total experience, correct?
16  Q.  Well, have the dealers, since they got these rejection
17  notices, contacted you, Mr. Grady?
18  A.  Some have, yes.
19  Q.  And many have expressed their displeasure with the
20  decision that Chrysler made?
21  A.  Yes.
22  Q.  And hasn't there been a common refrain to the effect that
23  the dealer network does not cost Chrysler, or any manufacturer
24  for that matter, any additional expense or any meaningful
25  expense?

**Page 506**

1   A. Yeah, that's an assertion that I keep hearing.
2   Q. It's commonly, regularly debated, particularly lately,
3   correct?
4   A. That's correct.
5   Q. And that's because the dealers maintain that there is no
6   additional expense to having extra dealers. Even if these 789
7   dealers were surplus, the point is, in their mind, as they've
8   expressed to you, it doesn't cost you anything, right?
9   A. Well, but that's not entirely true.
10   Q. Well --
11   A. I mean, the cost to Chrysler is -- there's a number of
12   different costs. One of the costs that we articulated back in
13   January of 2008 when we announced to the dealers that
14   Genesis -- the reason behind Genesis was that we were going to
15   eliminate overlapping models as part of the ongoing product
16   plan. So for us, part of the cost is we can save money by not
17   having duplicate minivans or duplicate D-segment cars.
18   Q. Mr. Grady, wouldn't it be fair to analogize dealers as
19   passengers on an airplane, where it doesn't cost any more to
20   fly a hundred passengers than it does seventy-five?
21   A. I don't know if I follow that analogy --
22   Q. All right.
23   A. -- or agree with it.
24   Q. Well, this isn't similar to closing company stores like
25   Circuit City or Starbucks where the manufacturer or the parent

**Page 507**

1   owns the individual retail outlets, right? This is much
2   different?
3   A. This is different, yes.
4   Q. Your dealers are private capital dealers?
5   A. That's right.
6   Q. And they pay for their own transportation of the vehicles
7   from your manufacturing plants to the dealership property,
8   right?
9   A. They contribute to that, yes.
10   Q. Well, they don't contribute, they pay all of it, right?
11   A. Well, not necessarily.
12   Q. Isn't it right on your invoice?
13   A. It is on the invoice. There is a transportation charge.
14   But that doesn't necessarily mean that every last cent of it is
15   collected.
16   Q. Oh, so you have some bad debts from the dealers on
17   transportation charges?
18   A. No. But we have some excess costs in transportation
19   sometimes.
20   Q. So if I understand you correctly, you're not charging the
21   dealers the entirety of the transportation charges?
22   A. I don't believe so, no.
23   Q. You're discounting the charge?
24   A. It's a normalized cost.
25   Q. So you're not willing to admit that the dealers pay for

**Page 508**

1   the transportation?
2   A. Dealers pay for transportation.
3   Q. Okay. How about their advertising? Don't they pay their
4   own advertising?
5   A. They do pay for advertising in their markets.
6   Q. And they pay their own mortgages?
7   A. That's correct.
8   Q. Or rent?
9   A. Right.
10   Q. And they pay their employees?
11   A. That's right.
12   Q. And the brochures that -- you weren't here. Do they pay
13   for their own brochures?
14   A. They pay for brochures.
15   Q. Okay. So to the extent there was any testimony to suggest
16   that it cost the manufacturer to print brochures, they sell
17   those brochures to the dealers, don't they?
18   A. Yes.
19   Q. Is there anything you can think of, Mr. Grady, that
20   actually reflects and expense to the dealers? Meaningful
21   expense, I don't mean postage. Any meaningful expenses that
22   the manufacturer incurs to keep dealers on board?
23   A. Well, there's costs that's involved with monitoring the
24   dealer network. It's -- we have a field force out there. We
25   have eight business centers with the employees. We have

**Page 509**

1   systems that are used, our Dealer Connect system is an expense.
2   There's auditing that happens. We have a team of auditors that
3   tries to keep an eye on warranty expense that the dealers are
4   spending on behalf.
5   Q. Don't all of those expenses, Mr. Grady, pale in comparison
6   to the revenue that these dealers bring into Chrysler?
7   A. Again, the assertion that it's a simple debits and credits
8   is missing the point on what Project Genesis is. Project
9   Genesis is to combine all the lines under one roof so that we
10   can gain the efficiencies of -- first of all, the dealer gain
11   the efficiencies of increased throughput, and so he can gain
12   the revenue. But it's also so that we can eliminate the
13   overlapping models that we have and streamline our product
14   development costs.
15   Q. But isn't it bad for the customer? Isn't it bad for the
16   customer to have less dealerships?
17   A. No. I mean, it's not necessarily -- why would it be bad
18   for the customer?
19   Q. Well, you shouldn't ask me a question. I might answer it.
20   Let's talk about my Starbucks example. If there are a
21   million --
22        THE COURT: Well, before you do it.
23        MR. BELLAVIA: Yes?
24        THE COURT: How much further?
25        MR. BELLAVIA: Oh, boy. Can I give the Court a

1 commitment of fifteen minutes and no longer?
2    THE COURT: Well, how many other parties wish to
3 cross examine this witness? I assume that no one spoke up,
4 because I didn't hear anyone. I can't hear you.
5    MR. BELLAVIA: They're going to yield their time to
6 me, they said. No, I can stick with the fifteen minutes, Your
7 Honor.
8    THE COURT: All right. Then we'll -- I'm going to
9 need a couple minute break to make some arrangements for
10 things. But I think if we could wrap -- and then after that we
11 have redirect?
12    MR. ORR: Just very briefly, Your Honor.
13    THE COURT: Maybe we can finish by 11:30. I'll
14 return by 11:00, and we'll aim to finish by 11:30.
15    (Recess from 10:55 p.m. to 11:00 p.m.)
16    THE COURT: Please be seated. Sorry. I just wanted
17 to straighten out one thing I realized as left the bench. The
18 gentleman who appeared earlier from, I believe, his client was
19 a dealership in Arkansas?
20    MR. SUNSHINE: That's me, Your Honor. Donald
21 Sunshine.
22    THE COURT: I just want to clarify. If we conclude
23 this tonight, it doesn't change that you signed a
24 confidentiality agreement and you get the document. But --
25    MR. SUNSHINE: I'll have a better chance to stand up

510

1 suggested by Your Honor. I will need five minutes.
2    THE COURT: Five minutes to do what?
3    MR. SUNSHINE: With the witness, to ask him some
4 questions.
5    THE COURT: All right.
6    MR. ORR: Your Honor, may I speak just for the
7 record?
8    THE COURT: Go ahead.
9    MR. ORR: We had e-mailed the gentleman's co-counsel,
10 I believe, documents including the depos and a protective
11 order. So we will bring a hard copy for him as well. But I
12 believe he may actually have the documents back at his office.
13    THE COURT: I can't hear what you're saying.
14    MR. ORR: I believe he may actually have the
15 documents back in his office. We e-mailed them to them earlier
16 today.
17    MR. SUNSHINE: That's not my office. That's in
18 Arkansas. My office is in New York. And there's no way,
19 staying here till 11:30 and being here at 9 in the morning that
20 I'm going to be able to get those from Arkansas. I do
21 appreciate the courtesy.
22    MR. ORR: Okay. Okay, Your Honor.
23    THE COURT: All right. Go ahead.
24 BY MR. BELLAVIA:
25    Q. Okay. Mr. Grady, I believe we left off, we were talking

512

1 in court and raise appropriate objections --
2    THE COURT: All right.
3    MR. SUNSHINE: -- and to understand what happened.
4    THE COURT: Okay. I'm just letting you know.
5 Because if we conclude tonight, this witness won't be here
6 tomorrow.
7    MR. SUNSHINE: I don't care so much about examining
8 -
9    THE COURT: All right. No, I just --
10    MR. SUNSHINE: -- the witness, because --
11    THE COURT: No, you don't have to explain.
12    MR. SUNSHINE: -- can do it. It's another instance
13 of a proceeding being railroaded through without due notice,
14 due process --
15    THE COURT: That argument -- sir --
16    MR. SUNSHINE: -- to represent --
17    THE COURT: -- excuse me.
18    MR. SUNSHINE: -- my client.
19    THE COURT: Excuse me. You can make that argument
20 tomorrow at the appropriate time.
21    MR. SUNSHINE: Thank you, Your Honor.
22    THE COURT: I extended the courtesy to you to ask you
23 the question. So don't turn it into a platform to make an
24 argument that should be properly made at the right time.
25    MR. SUNSHINE: I think will take that opportunity as

511

1 about the reduction -- the proposed reduction in the number of
2 dealers. And I think actually you asked me a question. But
3 I'll move on. I'll ask you a different question. I believe I
4 said to you that, wouldn't it be true that a reduction in the
5 number of dealers actually would negatively impact the customer
6 experience. Remember? And you said no, it wouldn't?
7    A. That's correct.
8    Q. Let me ask you this. Can you tell me if you accept or
9 reject this proposition, that if there -- I'll use an example.
10 If there were a million people that wanted Starbucks in the
11 morning and there were 100 stores versus 1,000 stores,
12 wouldn't -- if there were 1,000 stores, wouldn't those people
13 potentially get better service because the lines would be
14 shorter?
15    A. If the Starbucks stores were located in the proper places,
16 they were big enough, had enough people -- trained people in
17 order to make the coffee that they wanted, then they would get.
18 But if the incremental 900 stores were just located in the
19 wrong spots and didn't have trained people, I would argue that
20 there'd be higher dissatisfaction caused by those incremental
21 stores.
22    Q. Fair enough. Then, can you tell us why Toyota, Nissan and
23 Honda, then have below average scores? Do you know?
24    A. Well, again, these are sales satisfaction scores, not
25 customer satisfaction.

513

VERITEXT REPORTING COMPANY

**Page 514**

1    Q.  Well, aren't the customers the ones that complete those
2    questionnaires?
3    A.  Yes.  But different processes.
4    Q.  You mean different questions?
5    A.  Well, yeah, they are different questions.
6    Q.  Okay.  But they're still a reflection of the customer
7    experience, aren't they?
8    A.  They're a reflection of the customer sales experience.
9    It's one element of it.
10   Q.  It's a sales satisfaction index, but it's a customer
11   satisfaction rating, right?
12   A.  Yeah, with customer satisfaction with the sales process.
13   Q.  So in your view, as long as a fewer number of outlets are
14   located correctly, it doesn't really matter with respect to
15   customer satisfaction?
16   A.  Yeah, I mean, on page 1 of your exhibit, the first bullet
17   point actually says "enhanced dealership facilities and an
18   improved new vehicle delivery process help raise overall
19   customer satisfaction scores."
20   Q.  In any event, Mr. Grady, this analysis was not reviewed by
21   you before the rejection decision-making process was
22   undertaken, right?
23   A.  That's correct.
24   Q.  Now that you've seen it, do you wish you had looked at it?
25   A.  It would have been another input.

**Page 515**

1    Q.  Well, might it not have impacted the overall initiative to
2    reduce the number of dealers if you found out that Chrysler was
3    actually -- Chrysler the model, not Chrysler the company --
4    Chrysler model at least, was doing better than the three that
5    you're aspiring to accomplish?
6    A.  No, this wouldn't have --
7    Q.  It wouldn't have impacted you at all?
8    A.  -- been an impact.
9    Q.  Okay.  You used a term before, MSR.  What does that mean?
10   A.  Minimum sales responsibility.
11   Q.  Who sets that minimum sales responsibility?
12   A.  The minimum sales responsibility is the average market
13   share that is -- the market share that's attained in the state
14   in which the dealer is operating.  And he has to attain that
15   market share as part of the dealer agreement.
16   Q.  Is that similar to planning volume?
17   A.  No.
18   Q.  Planning volume is a number of units that a manufacturer
19   expects him to sell?
20   A.  Planning volume is the number of units that we're
21   expecting to build, and that is then allocated out to the
22   dealers based on market size.
23   Q.  Then this --
24   A.  So at the beginning of the year, we do expect that to be a
25   sales goal.  Minimum sales responsibility is predicated on

**Page 516**

1    what's actually happening in the market place.
2    Q.  I see.  Why is Chrysler even undertaking this exercise?
3        MR. BELLAVIA:  Withdrawn.
4    Q.  Do you acknowledge, Mr. Grady, that many of the 789
5    dealers that received rejection notices have been in the
6    Chrysler family, in many cases, for three generations and some
7    four generations?  You're aware of that?
8    A.  Yes.
9    Q.  So I would assume, even though you haven't been with the
10   company that long, that you took very seriously the impact of
11   taking away businesses from people who'd been around that long?
12   A.  This -- this whole process was not taken lightly.
13   Q.  But -- I'm sorry.
14   A.  But all in the specter of what's happening with Chrysler
15   in total and the bankruptcy filing, and all 3,181 dealers that
16   we have, plus all of the employees, that was taken into
17   consideration as well.
18   Q.  But whether it helps or it hurts, wouldn't you agree that
19   the outcome of the project will either help or hurt not
20   Chrysler, the existing Chrysler, but New Chrysler?
21   A.  That's correct.  It helps the New Chrysler with a better
22   dealer network, a higher performing dealer network which on the
23   old company has the value built in on the transaction.
24   Q.  Didn't you find it odd that you were being asked to
25   undertake this type of a project not for Chrysler but for the

**Page 517**

1    potential buyer of Chrysler?
2    A.  You've got to remember that this an acceleration of
3    Project Genesis.  So this isn't -- this isn't something that
4    was a separate -- complete separate project.  This was the
5    normal course of business for us.  We've been given the
6    opportunity in the framework of bankruptcy to reject some
7    contracts and accelerate Genesis.
8    Q.  At whose request was this done?
9    A.  At whose request what was done?
10   Q.  The rejection?  The idea to reject all these dealers?
11   A.  Well, it's after consultation with our attorneys.  And we
12   had an opportunity to restructure the network.
13   Q.  Was this brought up in connection with any meetings -- I
14   believe you testified that you attended some meetings with the
15   Treasury Department?
16   A.  I was on some conference calls and one meeting with the
17   U.S. Treasury -- the auto task force.
18   Q.  Now, did they insist that this process be carried out?
19   A.  What they insisted was that we restructure our business in
20   total back in December or February when we originally put forth
21   our viability plan.
22   Q.  Well, my question goes to the more specific point of
23   whether or not the task force instructed Chrysler in your
24   presence to reduce the number of dealers --
25   A.  No.

Q. -- immediately in this Chapter 11 proceeding?

A. No, they didn't -- they didn't instruct us to reduce in my presence.

Q. But you don't know what happened in any other meetings?

A. No, I don't. It's part of our viability plan is to reduce the dealer -- the dealer count and restructure the entire dealer network.

Q. Well, Chrysler's been very successful doing that over the past, haven't they?

A. Not meeting our targets and goals.

Q. Well, in --

A. We are making progress.

Q. -- in your declaration you pointed out that from the mid 1960s, I believe you said, and through now, Chrysler went from 6,500 dealers to a little bit over 3,100 dealers. Do you remember that?

A. In total number, yes.

Q. In total. So that's over fifty percent reduction over that long period of time, right?

A. That's correct.

Q. And I believe you also said that from 2001 through 2009 another twenty-five percent -- not another, but twenty-five percent was reduced from 2001 to 2009?

A. That sounds close, yeah.

Q. So, by the way, from 2001 through 2009, did Chrysler sales

518

go up or down?

A. They went down.

Q. All right. So to that extent, that program really didn't work if the goal was to reduce the number of dealers and get higher sales. In those eight years, it didn't work, did it?

A. Well, there's two different things at work here. One is, is what's happened in the marketplace with the economy, more recently; but also the dealer count reduction was not necessarily a consolidation of the brands, which is what, again, what we're accomplishing with Project Genesis. So we've had a number of success stories with dealers who have consolidated Chrysler, Jeep and Dodge and have accomplished Project Genesis, and it's benefited the corporation.

Q. For whatever reason, Mr. Grady, from '01 to '09, Chrysler did not recapture those sales, did they?

A. No.

Q. Yet, in the worst economy in fifty years or more, you expect to recapture the sales from further downsizing by no less than one hundred percent. That's your testimony, right?

A. Right. As I said before, the reason is, is because we're going to have a higher performing group of dealers that we're retaining.

Q. If you were to continue --

MR. BELLAVIA: Strike that.

Q. If you weren't rejecting the dealers, there's nothing

519

stopping New Chrysler from continuing the Project Genesis initiative, right?

A. That's correct.

Q. If they so chose to follow the program that Old Chrysler implemented, they're free to do that if they see fit, right?

A. That's correct.

Q. And there's no reason to think they wouldn't have enjoyed the same success that you've achieved since 2001 through 2009, right?

A. We would hope to achieve our plan.

Q. Okay. So they weren't barred from doing that?

A. No.

Q. You just thought it would be a good idea to accelerate it?

A. Well, as I testified earlier, if we accelerate it, we also -- we would expect to not spend the similar 200 million dollars that we had already spent on Project Genesis through consolidations.

Q. Is it your opinion, Mr. Grady, that if you proceed -- if New Chrysler proceeds with the 789 dealers in their dealer network that they're not viable economically going forward?

A. Restate that. I'm not --

Q. Sure. Assuming you're doing this in furtherance of Project Genesis as you said?

A. Right.

Q. Is it your belief that if New Chrysler does not get rid of

520

these approximately 800 dealers, that that's going to present a real problem for them in terms of their success going forward?

A. Yeah, there's a -- there's definitely an element that says that if the dealer network does not get restructured, that it could have a significant impact on the amount of money we're spending on product development; unable to eliminate overlapping models, things of that nature.

Q. You testified the other day, didn't you, that you read the viability plan that was submitted to the U.S. government in February?

A. Yes.

Q. Now, Mr. Grady, if you read that plan and you felt, as you just testify that you feel, why didn't you speak up in view of the absence of any reference in that viability plan to the need to immediately get rid of 789 dealers?

A. Well, because at that time, the possibility of taking this action under bankruptcy proceedings was not contemplated.

Q. Well, that was going to be a proposed structured resolution outside of bankruptcy, right? At that time, you didn't know for sure that --

A. That's correct.

Q. -- there would be a filing?

A. The viability plan was as a standalone company.

Q. Okay. So as a standalone company, are you telling us that it would have been okay to continue with the 789 dealers?

521

**522**

1     A.  Well, would have been -- we would have had to continue
2 with the Project Genesis plan as best we could.
3     Q.  Well, my question is, there was no mention in the
4 viability plan of the immediate need to get rid of twenty-five
5 percent of your dealers, was there?
6     A.  No, there wasn't.
7     Q.  Yet, suddenly today in your testimony, it's necessary so
8 that New Chrysler can become economically viable?
9     A.  Well, things have changed since then, as relative to our
10 financial position.  We had made some assumptions with our
11 viability plan early on which included our ability to continue
12 the Project Genesis and all the funding that went along with
13 it.
14     Q.  Mr. Grady, over the past few weeks, haven't you had to
15 defend allegations by the Chrysler dealers that this was an
16 arbitrary, unfair, retaliatory process?
17     A.  Yes.
18     Q.  You heard that, right?
19     A.  Yes.
20     Q.  That this was political?  You've heard that?
21     A.  Yep.
22     Q.  You've heard that dealers are claiming that this was an
23 opportunity to retaliate?  You've heard that?
24     A.  I've heard that.
25     Q.  You heard it was a popularity contest?

522

---

1     A.  I've heard that.  I don't agree with any of it.
2     Q.  Okay.
3     MR. BELLAVIA:  May I approach the witness, Your
4 Honor?
5     THE COURT:  Go ahead.  I assume you're drawing to a
6 close?
7     MR. BELLAVIA:  I am, Your Honor.
8     THE COURT:  Okay.  Thank you.
9     MR. ORR:  Your Honor?
10     THE COURT:  Yes.
11     MR. ORR:  I'm going to object to these on the basis
12 of relevance.
13     THE COURT:  What is the relevance of these documents?
14     MR. BELLAVIA:  Your Honor, these are e-mails in which
15 the witness has either written, received or -- well, been cc'd
16 on, relating to the rejection process.
17     MR. ORR:  Yes, Your Honor.
18     THE COURT:  I can't hear you.  Go ahead.
19     MR. ORR:  Yes.  That's precisely right, Your Honor.
20 They speak to rejection, not assumption or the sale.  I don't
21 think they're relevant to this process.
22     THE COURT:  I understand the distinction you're
23 drawing, but I think they probably address the feelings of
24 people with respect to issues raised in the testimony that
25 we've been hearing.  So I'll overrule the relevancy objection.

523

---

1 Go ahead.
2     MR. BELLAVIA:  Thank you, Your Honor.
3 BY MR. BELLAVIA:
4     Q.  Mr. Grady, would you take a look at the one -- the multi-
5 page one.  It says Jessica Montoya's name at the top?
6     A.  Yes.
7     Q.  Okay.  Very generally, before I call your attention to the
8 language in here, there are -- without asking you about
9 specific legal points, you recognize that there are franchise
10 laws that protect dealers in all fifty states.  Is that right?
11     A.  That's correct.
12     Q.  And dealers have certain rights under those statutes to,
13 in some cases, object to the relocation or the addition of a
14 point in a market area?
15     A.  Yes.
16     Q.  And oftentimes dealers use their rights, invoke their
17 rights, correct?
18     A.  That's correct.
19     Q.  Let's take a look at the first exhibit.  Can you tell us
20 what this is, who sent it, who received it?
21     A.  This is an e-mail from Jessica Montoya from our Washington
22 office with a copy to Dena Ellis Rutchkind (ph.), who is also
23 in our Washington affairs office, with a copy to John Bozzella
24 from our Washington office and Phil Scroggin, who is our
25 northeast business center manager.  I'm not on the copy.

524

---

1     Q.  Is that your -- under the cc, doesn't it say Peter M.
2 Grady?
3     A.  Further down.  But not the final reply.
4     Q.  All right.  But you've seen this before, right?
5     A.  Yes.
6     Q.  Would you -- I'm going to just, for the sake of
7 expedience, I'm just going to read a portion of it and ask you
8 a question, okay?
9     A.  Okay.
10     Q.  It says, "John and Dena, I spoke with Phil Scroggin." Who
11 is Phil Scroggin?
12     A.  As I said, he's our northeast business center manager.
13     Q.  Okay.  "At our New York business center on this just now.
14 This is going to be a tough one.  His dealerships are
15 performing fine, I take it, Rhode Island and Massachusetts, and
16 he has a good score card." All right.  That's the end of the
17 first sentence.  What is the subject of this e-mail, next to
18 the subject line?
19     A.  Senator Reed Dealer Inquiry.
20     Q.  All right, that's a United States Senator?
21     A.  I presume so, yes.
22     Q.  Of Rhode Island?  Okay.  And this is in reference to which
23 dealership, which Chrysler dealership?
24     A.  It's in reference to Tarbox.
25     Q.  All right.  And Tarbox has two dealerships, does he not?

525

---

```
 1    A.   That's right.
 2    Q.   One in Massachusetts and one in Rhode Island?
 3    A.   That's correct.
 4    Q.   And Mr. Tarbox interposed a protest objection to either a
 5    relocation or an add point, didn't he?
 6    A.   Yes.
 7    Q.   He did.  And he won that case, didn't he?
 8    A.   No, he didn't win the case.  We withdrew the action.
 9    Q.   So in response to his protest, you decided not to go
10    forward with the market activity?
11    A.   That's correct.
12    Q.   It wasn't that he won the case and you withdrew his
13    request for attorneys' fees?
14    A.   I don't know specifically what it was.  It was when I was
15    just joining the group, so --
16    Q.   Is what I just said, does that refresh your recollection
17    that he won the case and what was withdrawn was the request for
18    attorneys' fees?
19    A.   I don't think the case every went --
20    Q.   Okay.
21    A.   -- to the dealer board.
22    Q.   Okay.  Would you read the next sentence into the record?
23    A.   "He is a belligerent combative dealer who litigates and
24    protests any new Jeep franchises in Provo, Rhode Island area.
25    The management made decision to cut him.  He has not operated
                                                                    526
```

```
 1    in good faith.
 2    Q.   All right.  So without going into the details of this
 3    case, Mr. Grady, you would agree that the decision to reject a
 4    dealer should only be on the merits?
 5    A.   Yeah, like this one was.
 6    Q.   This one was on the merits?  Is it one of the criteria
 7    that a belligerent combative dealer should not stay with the
 8    dealer network?
 9    A.   Well, I can't speak to what was here, but I can tell you
10    that the decision to reject was based on the fact that Mr.
11    Tarbox in Rhode Island is a Jeep only dealer with a high
12    performing Chrysler Dodge dealer facing him.
13    Q.   So wouldn't you expect an e-mail about whether he should
14    stay or go to reflect exactly what you just said instead of
15    that he's a belligerent combative dealer?
16    A.   I would expect that.
17    Q.   But that's not what this says, does it?
18    A.   No.
19    Q.   Let's take a look at the other one.  Which dealership does
20    this e-mail pertain to?
21    A.   Eagle.
22    Q.   Where is Eagle?
23    A.   On Long Island.
24    Q.   Okay.  And what's the date of this e-mail?
25    A.   May 6th.
                                                                    527
```

```
 1    Q.   Would you -- and this is an e-mail from William Dusett
 2    (ph.) to Phil Scroggin, right?
 3    A.   Right.
 4    Q.   And it starts out by saying, "Just talked with Pete" --
 5    that's you, right?
 6    A.   I would assume so, yes.
 7    Q.   Do you remember getting this e-mail?
 8    A.   I didn't get this e-mail.
 9    Q.   Okay.
10    A.   I didn't see it until my deposition on Monday.
11    Q.   Okay.  "Just talked with Pete."  All right.  Why don't you
12    read the rest?
13    A.   "He simply said that the dealer has to go, too litigious,
14    etcetera.  It's not a performance issue."
15    Q.   Well, dealers have millions of dollars invested in their
16    facilities, don't they typically?
17    A.   Yes.
18    Q.   Do you think any dealer should be on the rejection list
19    because he's too litigious?
20    A.   Well, I don't know if that's necessarily the criteria that
21    was used here.
22    Q.   Well --
23    A.   He's -- I can't characterize.  I don't know how Mr. Dusett
24    would characterize our conversation.  But in this particular
25    instance, Eagle Auto Mall is a competitive dual in a market on
                                                                    528
```

```
 1    Long Island where we have a facing Dodge dealer who's been with
 2    us a long time, also a good performing exclusive dealership.
 3    Q.   Okay.  And all those reasons you just said are valid
 4    reasons, right?
 5    A.   I believe so, yes.
 6    Q.   But that's not what this e-mail says, right?  It says
 7    "It's not a performance issue."
 8    A.   Well, yeah --
 9    Q.   Right?
10    A.   -- I mean, that's what this e-mail says.
11    Q.   All right.  Now, I believe in your declaration you said
12    that fifty percent of the dealer network accounts for ninety
13    percent of sales?
14    A.   I believe that's correct, yes.
15    Q.   Right?  Yet many of the dealers in that fifty percent that
16    produce ninety percent of the sales were rejected?  Right?
17    A.   Could be.
18    Q.   And correspondingly, the other fifty percent that only
19    produce ten percent of the sales, many of them were assumed,
20    right?
21    A.   Could be.  I mean, without looking at the detail.  I mean,
22    I get the math.
23    Q.   We looked at the detail pretty extensively the other day,
24    didn't we?
25    A.   Yeah.
                                                                    529
```

Q. Five hours, six hours?

A. Seven.

Q. Seven?

A. But who's counting?

THE COURT: I am. Are you almost concluded?

MR. BELLAVIA: I have just one more area, Judge. Two minutes.

THE COURT: Area?

MR. BELLAVIA: Well, two minutes. I promise.

THE COURT: Okay.

Q. If you'd look at page 12 of your declaration? I'm sorry, the amended declaration. I believe you have it in front of you?

A. I don't have it any longer.

Q. All right.

A. I have it. Page 12?

Q. Please? Of the second declaration, okay? It's paragraph 30.

A. Yes.

Q. And just before we talk about the sentence I'm going to call your attention to. Do you recall in your declaration you indicated that Chrysler felt it was urgent to let the dealers know where they stood, both the assumed dealers and the rejected dealers? Right?

A. Correct.

530

Q. And the reason for that was you didn't want the assumed dealers not to continue doing business as usual and investing in their business, right?

A. Yeah. There's quite a bit of value in certainty.

Q. So because if dealers were kind of unaware of where they stood, they might precipitously do things against the interests of Chrysler?

A. That's correct.

Q. And in paragraph 30 you said, in connection with that concern, "The best" -- this is from your declaration, right -- "The best dealers with the best facilities and locations are being approached regularly by other OEMs." What does OEM mean?

A. That's a manufacturer.

Q. All right. So you testified the other day that import manufacturers, upon hearing of the news that dealers were going to be rejected, before they were even rejected, were reaching out to Chrysler dealers to try and take over their facilities?

A. That's correct.

Q. So the markets that you are proposing potentially to abandon in the rejection process, your competition was already attempting to cannibalize these abandoned markets, right?

A. We're not abandoning the markets.

Q. Well, some markets you are, right?

A. In most of the cases, we're looking for a consolidation of Chrysler, Jeep and Dodge in the same market. So we're not

531

abandoning the market, we're merely putting the lines all together into one dealership facility.

Q. Mr. Grady, many of these 800 -- approximately 800 dealers are going to go out of business, right?

A. I don't agree with that.

Q. No?

A. Almost half of them are dualed with competitive lines right now. So their business will continue on.

Q. And --

A. Over eighty percent of them do far more used cars than new cars. So I would assume that they'll continue doing the used car business.

Q. You'll assume they'll continue doing used cars?

A. Yep.

Q. Don't you need a floor plan to do used cars?

A. Possibly, yeah.

Q. Well, do you know any of the 800 dealers who are being welcomed by their floor plan lenders anymore?

A. Well, I mean, it's right now with Chrysler financial exiting the market. That opens up an opportunity for other lenders to step in. I mean, it's a credit decision that a lender, a bank or someone else would have to take on.

Q. Mr. Grady, in your declaration, aren't you saying that your competition is seeking to seize upon these turnkey facilities that will soon be ready in the event these

532

dealerships close? Isn't that the import of what you wrote here?

A. The import of what I wrote is the fact they're approaching all of them, whether it's the rejected or the assumed dealers.

Q. So the natural offshoot of that might necessarily be that not only are you closing these dealerships and potentially losing these customers, but you're teeing up the facilities so the competition can open them up, right?

A. In some of the cases, that would be true.

Q. Okay. Wouldn't that have a negative impact on your forecast that you're going to recapture one hundred percent of the market share in twelve months. That works against it, doesn't it?

A. No, because we're not abandoning these markets as you were asserting. We're not abandoning the markets, we're consolidating the lines.

Q. Well, if you close a dealership in a rural market, which is happening in many cases, right?

A. Yes.

Q. Those customers have to drive, in these rural communities, a very long distance to get to the next Chrysler dealer, right?

A. Right.

Q. So you can't assure anyone that those customers are going to stay loyal to the Chrysler brand, can you?

A. I can only assure that the customers will go to wherever a

533

1  dealer will provide them the convenience that they desire.

2  Q. Well --

3  A. And convenience is not just drive time. Convenience is

4  the ability to get the service -- the car serviced properly, to

5  get it serviced on time, and provide some of the other

6  conveniences.

7  Q. But you can't guarantee that a hundred percent, as you

8  said earlier, especially in those rural areas, are going to

9  stay loyal to Chrysler. Especially if those customers have to

10  drive more than a half an hour to the next dealership, right?

11  A. Well, but you're also ignoring the fact that we would hope

12  that a stronger dealer network would be able to conquest new

13  customers from the other brands.

14  Q. Mr. Grady, it's a risk isn't it? We could debate this all

15  night. It's a risk, right?

16  A. We can debate it. It is a risk.

17  Q. And this is not the economy to take those risks, right?

18  A. I don't agree.

19  Q. But you're doing this as a courtesy to the buyer?

20  MR. BELLAVIA: I have no further questions, Your

21  Honor.

22  THE COURT: Thank you. Any further cross? All

23  right, come forward, please.

24  MR. SUNSHINE: I'll repeat, I'm Donald M. Sunshine.

25  I'm co-counsel with the Davidson law firm to a Little Rock,

1  Arkansas dealership. The name of that dealership is Crane

2  C.D.J. LLC.

3  CROSS-EXAMINATION

4  BY MR. SUNSHINE:

5  Q. Are you familiar with that dealership?

6  A. No, I'm not.

7  Q. Is that dealership in your charts, the charts that you

8  produced earlier that I can't see right now?

9  A. If that dealership is an active dealership, it's in the

10  charts.

11  Q. It's in the charts.

12  MR. SUNSHINE: Can I ask somebody to give the witness

13  those charts so he can locate the line and items in regard --

14  THE COURT: He has it in front of him.

15  MR. SUNSHINE: -- to my client?

16  THE WITNESS: If you can help me and tell me, in

17  Little Rock, Arkansas? That's where they're located?

18  Q. That's right. Crane C.D.J. LLC, Little Rock, Arkansas.

19  A. Okay, I see them.

20  Q. All right. Now, before you go into the lines, is Crane

21  C.D.J. LLC, the only Chrysler Jeep Dodge dealer in Little Rock?

22  A. No.

23  Q. And who are the other dealers?

24  A. Frank Fletcher Dodge, Chrysler Jeep and Landers Chrysler,

25  Dodge Jeep. And they're all in the Little Rock sales locality.

1  Q. And are they being rejected also?

2  A. No, they're not.

3  Q. Are those dealers handling only one line such as Jeep, or

4  do any of them handle more than one line of vehicles?

5  A. No, they don't.

6  Q. Do you have any information as to the request made to

7  Crane C.D.J. to erect a new facility in Little Rock, Arkansas?

8  A. I'm not aware of that. I would need more information.

9  Q. Was that put in your chart as one of the items that might

10  be considered in rejecting them?

11  A. That we've had discussions with the dealer about possibly

12  building a facility?

13  Q. I am so advised that my client has already committed

14  100,000 dollars at the end of last year in an effort to have a

15  new facility.

16  A. I'm not aware of that commitment, so this is different

17  information. It would have been part of the discussion out of

18  the recommendation from the southwest business center.

19  Q. Shouldn't the southwest business center advise you so you

20  can make an intelligent business decision?

21  A. Yeah, that was -- part of the discussion was they made a

22  recommendation and then we would have the discussion over time

23  about each one of these markets.

24  Q. Now, who in the southwest business center made the

25  recommendation?

1  A. That comes from our business center manager.

2  Q. Who is he?

3  A. Todd Stewart.

4  Q. Bob Stewart?

5  A. Todd.

6  Q. Todd. How do you rate the performance of Crane C.D.J.

7  LLC?

8  A. Poor.

9  Q. Why?

10  A. Fifty-three percent of the minimum sales responsibility,

11  so forty-seven points below the average index and the

12  requirement of the dealer agreement.

13  Q. Have you considered the relationship that this dealer, in

14  fact it would also apply to others, has with customers, which

15  is based upon long-term friendship and service and customer

16  relationships in regard to future sales by any dealership,

17  including this one?

18  A. Well, our business center would consider all of those

19  customer satisfaction issues in the marketplace.

20  Q. Have you considered another dealer in the area to take

21  over the business of Crane C.D.J. LLC?

22  A. You know, again, I can't answer that. It says that we

23  were going to replace with a third party. So no one individual

24  is identified on these charts other than we think we stand a

25  better chance with another dealer in that marketplace.

**538**

1     Q. I believe that you stated that it was important that the

2 dealership have all three brands, and yet you're remaining with

3 other dealers that we just read off your charts, who only carry

4 one brand. Do you think that the fact that there's competitors

5 in a specific brand near my client have affected his ability to

6 sell vehicles?

7     A. No, that's part of the minimum sales responsibility

8 calculation, where there's a fair share of the responsibility

9 throughout the entire metropolitan market.

10     Q. Have the other dealers that you mentioned satisfied their

11 sales responsibility?

12     A. Yes. Landers is 317 percent and Frank Fletcher is 101

13 percent.

14     Q. Are you aware of any conflicts or dispute between the

15 management of Crane C.D.J. LLC with you or any other Chrysler

16 employee?

17     A. None that I'm aware of.

18        MR. SUNSHINE: Thank you, Your Honor.

19        THE COURT: You're welcome. Any redirect.

20        MR. ORR: Yes, briefly, Your Honor.

21 REDIRECT EXAMINATION

22 BY MR. ORR:

23     Q. Mr. Grady, did you show the assumption list to Fiat?

24     A. Yes.

25     Q. Did you discuss with them the methodology behind that

**539**

1 list?

2     A. Yes.

3     Q. Did they agree with it?

4     A. Yes, they did.

5     Q. Would they have done this deal without doing the

6 assumption and rejection?

7     A. My understanding is that they would not have done it.

8     Q. Much was made during the cross-examination of the J.D.

9 Power study. Can you explain the difference between the SSI

10 and the CSI, that is the sales satisfaction index and the

11 consumer satisfaction index?

12     A. Yeah. The sales satisfaction index is -- J.D. Power does

13 a survey of recent purchasers during a specified period of

14 time. Customer satisfaction, or CSI, is based on the service

15 experience. And they do that over an extended period of time

16 within so many months of and years of ownership.

17     Q. How much would it have cost to fully implement Project

18 Genesis?

19     A. We're anticipating that it would probably cost in excess

20 of 400 million dollars to do it from this day forward.

21     Q. That is outside of bankruptcy?

22     A. That's outside of bankruptcy.

23     Q. And that is 400 million dollars you would not have to

24 incur inside of bankruptcy?

25     A. We assume that probably it'd be closer to about 200

**540**

1 million dollars.

2     Q. Mr. Grady, are these the only factors you used in making

3 decisions regarding assumption and rejection?

4     A. No.

5     Q. There are other factors that go into the decisions that

6 aren't listed on this document. Is that true?

7     A. That's right. As I stated earlier, we have maps that we

8 use to reference. But more than anything, we need to

9 understand how large the market opportunity really is for the

10 dealer network and size our network accordingly.

11     Q. In your opinion, is it necessary to rationalize the dealer

12 network so that the remaining dealer network can be viable and

13 go forward as a going concern?

14     A. Yes --

15        MS. BROWN: Objection, leading.

16        THE COURT: It is --

17        MR. ORR: I'll rephrase, Your Honor.

18        THE COURT: Go ahead.

19        MR. ORR: Your Honor, I'll close. Thank you, Mr.

20 Grady.

21        THE COURT: Any recross?

22        MR. BELLAVIA: Your Honor, if I may, I neglected to

23 move those three exhibits into evidence. I'd request that at

24 this time.

25        MR. ORR: Same objection, Your Honor. Same

**541**

1 objection, Your Honor. And we'd request the same requirement

2 that they be filed under seal. Except for the --

3        THE COURT: Wait a minute. Which three exhibits?

4 We're talking about the e-mails?

5        MR. ORR: No.

6        THE COURT: So --

7        MR. BELLAVIA: It's the two e-mails and the J.D.

8 Power survey.

9        MR. ORR: Actually, Your Honor, we are talking the

10 e-mails, not the J.D. Power survey.

11        THE COURT: I'm losing track of what you're saying.

12 You're talking about you want the e-mails under seal?

13        MR. ORR: Yes, Your Honor.

14        THE COURT: But they've been publicly --

15        MR. ORR: They were produced pursuant to an agreement

16 for professionals' eyes only. To the extent they contain

17 information regarding dealers, Your Honor, that's all we're

18 trying to protect.

19        THE COURT: All right.

20        MR. ORR: The J.D. Power document is public.

21        MR. BELLAVIA: That's fine with me, Your Honor.

22        THE COURT: All right. Mr. Lerner?

23 (Affected Dealers' Committee's exhibit, two e-mails, were

24 hereby received into evidence under seal as of this date.)

25 (Affected Dealers' Committee's exhibit, J.D. Power survey, was

1    hereby received into evidence as of this date.)

2        MR. LERNER:  No further cross.

3        THE COURT:  All right.  Thank you, you may step down.

4    We'll begin again at 9:00 tomorrow.  And I assume we'll be

5    dealing with Mr. Lerner -- I think we'll begin with -- probably

6    straighten out the deposition and then turn to your witnesses?

7        MR. LERNER:  Well, we're happy to --

8        THE COURT:  Either that way or Mr. Lauria was going

9    to go forward with --

10       MR. LERNER:  We'll talk to Mr. Lauria.  We had

11   actually asked him, for the convenience of the dealer witnesses

12   who have been here for many days, if we could actually go out

13   of order with our dealer witnesses.  I don't know if the debtor

14   has any issue with that.  But I also heard Mr. Lauria say that

15   his cross was only about forty-five minutes.  If we can get the

16   dealer witnesses on in the morning, as early as possible --

17       THE COURT:  Oh, when I began, I was just talking

18   about the procedures of what they were going to do with the

19   deposition, then expecting to turn to you, and then Mr. Lauria

20   last with Mr. Kolka.

21       MR. LERNER:  Okay.

22       THE COURT:  But you can make whatever arrangements --

23       MR. LERNER:  We'll work out the order, Your Honor.

24       THE COURT:  -- you want with them.

25       MR. LERNER:  Thank you.

---

1        MR. CULLEN:  That was -- that's what I thought was

2    going to happen.  And I'm just trying to arrange Mr. Kolka's

3    morning schedule.  I told him he was going to come here after

4    those three witnesses, if that's all right.  He'll probably be

5    here at 10:00.

6        THE COURT:  He needs to be -- at least by 10:00.

7        MR. CULLEN:  Okay.  Thank you, Your Honor.

8        (Whereupon these proceedings were concluded at 11:42 p.m.)

---

2                    I N D E X

4                 T E S T I M O N Y

| WITNESS | EXAM BY | PAGE | LINE |
|---|---|---|---|
| James Chapman | Mr. Stewart | 28 | 15 |
| James Chapman | Mr. Kurtz | 59 | 21 |
| James Chapman | Mr. Mayer | 90 | 2 |
| James Chapman | Mr. Barkasy | 92 | 10 |
| James Chapman | Mr. Seabolt | 93 | 3 |
| James Chapman | Mr. Stewart | 93 | 22 |
| James Chapman | Mr. Kurtz | 108 | 4 |
| David Curson | Mr. Bromley | 119 | 22 |
| David Curson | Mr. Zakia | 144 | 12 |
| David Curson | Mr. Lerner | 162 | 13 |
| David Curson | Ms. Ball | 169 | 23 |
| David Curson | Mr. Bromley | 172 | 16 |
| Robert Nardelli | Mr. Armstrong | 174 | 14 |
| Robert Nardelli | Mr. Lauria | 216 | 20 |
| Robert Nardelli | Ms. Brown | 358 | 12 |
| Robert Nardelli | Mr. McRory | 388 | 7 |
| Robert Nardelli | Mr. Snyder | 392 | 14 |
| Robert Nardelli | Mr. Bressler | 401 | 23 |
| Robert Nardelli | Mr. Esserman | 407 | 6 |
| Robert Nardelli | Mr. Neely | 416 | 9 |

544

---

            I N D E X, cont'd

             T E S T I M O N Y

| WITNESS | EXAM BY | PAGE | LINE |
|---|---|---|---|
| Robert Nardelli | Mr. Bienenstock | 426 | 7 |
| Peter Grady | Mr. Orr | 442 | 12 |
| Peter Grady | Ms. Brown | 449 | 24 |
| Peter Grady | Mr. Bellavia | 485 | 13 |
| Peter Grady | Mr. Sunshine | 535 | 7 |
| Peter Grady | Mr. Orr | 539 | 1 |

             E X H I B I T S

| DEBTORS' | DESCRIPTION | ID. | EVID |
|---|---|---|---|
| 35 | Exhibits B, C, D and E within Debtors' | 28 | 46 |
|  | Exhibit 35 relating to PBGC settlement |  |  |
| 36 | Declaration of Mr. Chapman | 37 | 39 |
| 14 | Presentation made by Greenhill & Co. |  | 54 |
|  | to board of managers of Chrysler |  |  |
| 13 | Fairness opinion of Greenhill & Co. |  | 57 |
| 33 | Declaration of Mr. Nardelli | 215 |  |
| 38 | Minutes of board meeting dated | 216 |  |
|  | April 30, 2009 |  |  |
|  | Declaration of Mr. Grady | 443 |  |

545

VERITEXT REPORTING COMPANY

212-267-6868                                                516-608-2400

```
 1
 2                I N D E X, cont'd
 3
 4                   E X H I B I T S
 5   PENSIONERS' DESCRIPTION                    ID.  EVID.
 6   11      Document prepared by UAW for       152  154
 7           distribution to its membership relating
 8           to CBA entered into with Chrysler dated
 9           April 2009
10
11   AFFECTED    DESCRIPTION                    ID.  EVID.
12   DEALERS'
13   *2      Spreadsheet on dealership performance    479
14   *3      Dealer network review                    479
15   1       E-mail from Mr. Press to Messrs.         485
16           Nardelli and LaSorda
17   *       Two e-mails                              542
18           J.D. Power survey                        542
19
20
21
22
23
24
25
                                                     546
```

```
 1
 2              C E R T I F I C A T I O N
 3
 4   I, Lisa Bar-Leib, certify that the foregoing transcript is a
 5   true and accurate record of the proceedings.
 6
 7   _____
 8   LISA BAR-LEIB
 9   AAERT Certified Transcriber (CET**D-486)
10
11   Veritext LLC
12   200 Old Country Road
13   Suite 580
14   Mineola, NY 11501
15
16   Date:  June 1, 2009
17
18
19
20
21
22
23
24
25
                                                     548
```

```
 1
 2                I N D E X, cont'd
 3
 4                   R U L I N G S
 5   DESCRIPTION                         PAGE   LINE
 6   Debtors' motion seeking entry of final order     26    20
 7   re utility companies granted as modified
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                     547
```

# A

**AAERT** 548:9
**abandon** 531:20
**abandoned** 531:21
**abandoning** 531:22
532:1 533:14,15
**abbreviation** 40:19
**ABELSON** 9:18
**abide** 50:12
**abided** 50:7
**abiding** 307:24
**ability** 41:10 59:4 61:7
129:8,18 138:25
179:11,21 185:1
188:17 191:8 195:25
208:8,17,17 209:7
296:24 304:22 315:17
329:6 343:5 391:20
423:22 431:23 479:19
522:11 534:4 538:5
**able** 63:21 113:3 185:21
188:3,12 196:7 200:10
200:11 209:7 211:25
213:7 233:9 273:11,16
273:18 274:8 276:15
280:5,15 290:21
295:13 296:18 301:24
311:14 337:14 344:23
347:12,15 348:9 367:6
373:25 388:22 389:8
399:10 405:21 419:10
444:17 445:16 469:19
475:12 480:22 489:5
489:20 490:24 492:6
494:6,13 500:5 512:20
534:12
**abnormal** 207:14
**absence** 49:23 165:16
436:5 521:14
**absent** 129:18 146:23
165:19,20 167:23
180:17
**absolutely** 31:19 58:11
65:22 95:5 105:13,21
106:19 145:10 159:14
172:4 205:16 321:14
400:17 415:17 445:9

449:13
**absorb** 494:7,8
**absorbed** 494:9
**abuse** 115:12
**accelerate** 368:17 390:5
390:21 398:5,19,22
477:10 496:25 517:7
520:13,14
**accelerating** 392:5
**acceleration** 390:23
517:2
**accept** 82:23 101:21
133:12 150:21 204:19
376:22 513:8
**acceptable** 129:13 135:4
148:3 222:5 338:1,20
353:9 443:16
**accepted** 102:21 157:17
312:7 335:14 348:11
415:5,10
**accepting** 107:13 223:18
341:18,18
**access** 33:12 39:15
185:23 228:15 358:19
**accident** 405:8,21,22
406:4
**accommodate** 491:10
493:8,17
**accommodating** 177:20
**accomplish** 63:21 123:15
132:1 142:5,6 144:19
287:7 486:6 495:17
501:12 515:5
**accomplished** 352:15
519:12
**accomplishing** 263:2
519:10
**account** 2:6 352:15
**accounts** 83:10 104:13
529:12
**accuracy** 109:23 110:14
110:15
**accurate** 85:13 152:24
153:9 155:1 156:7
214:13 254:6,12 303:8
427:4 443:2 466:13
548:5
**accurately** 153:6

**achieve** 62:4 200:11
364:8,22 365:22 423:5
500:18 503:16 520:10
**achieved** 233:19,21
457:10 476:9 520:8
**achievement** 457:14
**achieving** 316:8 367:10
**acknowledge** 516:4
**acknowledged** 299:2
310:14 331:12,13
**acquired** 41:7
**acquiring** 67:15
**acquisition** 29:15 41:14
179:6 250:3,4 262:5
329:15,16
**acquisitions** 175:22
**act** 280:19 281:1 299:6
437:8,25
**action** 202:3 347:17
415:24 442:24 521:17
526:8
**actions** 38:6,7 44:5,5
187:15 193:25 437:17
444:13 447:6 456:10
499:3
**active** 121:12,21 122:9
131:4 303:15 535:9
**actively** 123:14 227:12
**actives** 121:14 122:16
137:16,18,25
**activity** 444:25 526:10
**actual** 90:25 143:23
152:19 180:25 266:1
457:16,17
**actuals** 325:5
**ad** 12:3 92:8 401:18
**ADAM** 5:9
**add** 223:25 331:4 346:23
458:9,10 476:8 492:8
526:5
**added** 343:25 490:23
491:1
**addendum** 155:7 168:22
**adding** 465:16
**addition** 31:20 34:22
47:5 68:19 110:22
255:23 282:9 302:25
303:3 323:15 343:7

363:11,14 524:13
**additional** 2:9 26:12
107:3 188:10 190:5
206:13 223:16,24
224:14 301:17 305:15
321:12 322:9 375:5,14
375:23 376:13 435:21
440:24 460:5 469:2,7
469:13,23 472:19
475:18 476:7 494:4
505:24 506:6
**address** 28:20 135:5
180:22 186:19 289:21
357:2 391:13 428:18
438:21 440:6 483:18
499:2 523:23
**addressed** 25:18 331:7
**addresses** 481:9
**adds** 263:4
**adequacy** 107:1
**adequate** 25:25 26:5,12
26:14 60:7 61:11,14
63:14 66:19,21 99:24
104:23 377:13 432:11
**Adequately** 2:7
**adhering** 183:14
**adjacent** 362:3,13
**adjusted** 181:24 457:21
**adjustment** 98:16 187:21
**administration** 122:14
125:1 189:23 190:7
192:18
**administrative** 441:10
473:24 474:4
**administratively** 164:4
**admissibility** 50:4
**admissible** 49:23 50:10
51:9 74:18,19
**admission** 52:11 214:17
478:8
**admit** 76:1 507:25
**admitted** 39:1 46:7
50:15,16 51:20 52:3,5
52:6,9 54:23 57:3
117:17 154:8 160:9
443:7,10 478:17
484:24,25
**admitting** 478:20

adopt 126:12,23,23
138:8 147:12
advance 41:4 198:16
272:5 337:24 349:25
advanced 262:10,11
366:19
advancing 126:14
advantage 33:13 274:7
advantaged 124:1
advertising 325:7 363:2
364:24 508:3,4,5
advice 247:17 297:16
300:3,6 303:18,20,21
303:22
advise 35:1 118:6 230:22
231:7 536:19
advised 84:7 204:3 497:1
536:13
advising 288:19
advisor 61:20 62:4,18
88:18 230:20 238:5
288:17,18 296:2 415:4
415:9
advisors 33:4 77:23 78:7
213:18 289:3 294:7
477:21 478:11,23
advisory 244:11
advocate 404:11
Advocates 416:1
advocating 406:10
aesthetics 425:14
affair 244:5
affairs 101:13 524:23
affect 42:13 400:16
425:4
affidavit 85:19 302:11
439:23
affiliate 90:16,22
affiliates 90:16
affirm 436:16 443:1
afford 158:21 287:12
499:19
afield 331:3 432:24
504:5
afternoon 119:5 144:14
162:9,14,15 169:24,25
173:4 174:5,6,15,16
216:21,22 417:5

Agency 437:1
agent 12:19 101:6
102:16,19 202:11,21
203:15 204:9,10 211:1
218:15 286:11
aggressive 182:7,25
183:22 184:1 187:15
194:16,16 201:1 341:9
404:1
aggressively 195:23
ago 40:15 43:11 48:25
73:24 76:4 83:14 98:5
192:12 216:25 238:3
248:20 261:23 278:8
342:9 398:24 405:19
406:3 480:18 499:8
501:10
agree 43:14 46:22 59:7
65:13 83:14,20 88:8
89:5,14 110:21,25
111:1 161:15 170:19
189:9 195:11 207:4
218:6 290:23 292:2,10
296:5,14 297:3,4
301:16 319:3 359:12
361:18 382:16,19
393:17 394:11 416:18
419:13 437:16 444:17
466:11 475:18 488:19
488:20 506:23 516:18
523:1 527:3 532:5
534:18 539:3
agreeable 389:5 483:13
agreed 25:24 26:8 27:16
43:2 60:23 92:1 110:25
129:23 132:15 142:16
166:10 188:21 205:19
221:24 250:5 299:22
301:18 308:11 327:9
327:11,25 349:17
354:3 383:7 393:17
436:20 437:22 441:21
466:14 470:1,3 472:24
497:2
agreeing 129:25 197:23
212:4,5 251:5 378:25
agreement 43:18 44:12
44:19 45:5,18 46:1

64:3 122:11,12 125:12
125:22 126:16,18,19,21
127:1,1,6,6,11,15,18,21
127:23 128:6,17
130:18,18 131:9,11,15
131:19,19,20 132:8,10
132:13,14,17,23,25
133:3,3,5,7,12,14
134:24 135:4 137:8,11
137:16,24 138:4,8,12
139:16,25 140:3,3,16
140:19,19,22,23 141:10
141:19,22 142:9,16
143:6,20,24 146:24
147:8,12,16,21,22
148:3,6,15 150:20,21
150:25 151:1,6,15,19
153:20 155:8,12 156:3
156:9 158:3,4,11 161:9
161:21,24 166:8,21
167:8,11,24 168:10,11
168:23 169:2,12
170:18,21,24 172:18
198:22 209:16 211:25
212:2 239:23 240:1
245:20 247:5,7,9,13,21
259:21,23 307:16,24
331:7 340:1,4 366:9
368:24 378:10 384:17
384:18 388:22 389:5
390:15 391:12 394:11
395:21 406:5 410:12
411:22 437:23,23,25
452:17,22 457:12
475:11 477:20 478:12
478:13,23 479:2
480:21 481:6,9,11,12
481:16,19,19,24 483:2
483:4,15 510:24
515:15 537:12 541:15
agreements 26:5 103:1
105:5 124:2 125:7,11
125:20 126:1 130:12
130:17,19,23 131:3,13
132:4 135:17 137:20
140:5 141:11,17 144:1
144:21 145:20,24
245:21 249:25 250:2

309:2 349:11 359:6,13
360:5,25 361:20
363:23 364:3,17
365:23 366:16 367:4
367:25 368:8,19
372:20 381:23 384:21
384:22 387:9 389:4
429:3 430:2,3 449:24
450:4 452:1 454:14
459:14 464:19 468:6,8
470:8,11,14,17 473:16
473:21 474:7,18
476:19 477:3 485:1
agrees 382:11
agricultural 136:3
ahead 29:12 37:4 41:4
49:17 53:3 77:17 92:24
104:5 119:3 138:16
144:9 150:4 151:25
160:17 161:13 164:19
172:14 197:12 214:24
216:8 242:22 243:16
261:16 266:15 283:12
290:2 298:2 342:13
352:11 358:1 362:12
377:21 379:3 410:8
428:10 452:5 453:18
470:22 477:12 483:20
498:7 501:22 504:9,18
512:8,23 523:5,18
524:1 540:18
aim 358:25 359:5 510:14
air 389:6
airplane 506:19
AK 19:11
al 1:8 11:4,19 14:4 18:3
134:6 135:24
Alan 119:17
ALBERT 4:15
Alfredo 192:5
alive 351:12
ALLARD 6:11
allegation 414:18
allegations 50:12 522:15
alleged 363:13
alliance 61:16,20 62:5,20
62:23 63:2,5 190:20
191:14,17 194:14

195:21 196:18 213:5
267:2,3,5 269:19 272:9
295:5,10,25 296:11,12
297:1,2 389:10,12,21
389:23
**alliances** 193:18
**allocated** 515:21
**allocation** 334:19,23
376:4,21,24 380:1
381:13
**allocations** 376:22 381:8
**allow** 63:11 106:17
129:25 205:20 211:2
241:6 242:17 273:11
356:9 391:20 453:10
454:8 465:12
**allowable** 332:15
**allowed** 68:9 106:21
266:10 368:17 454:14
477:19,21
**allows** 337:21
**all-in** 124:4
**aloud** 248:9
**Alpha** 450:9
**Alpine** 28:21
**Altavilla's** 496:9
**Altering** 2:4
**alternate** 383:3
**alternative** 99:16 107:13
150:22 207:9 271:22
271:24 276:9 282:10
295:7 296:1 316:7,10
337:8 387:11
**alternatives** 58:4 65:19
65:21 237:5 271:21
273:4 296:8,20 305:9
316:11,16 317:6 337:8
344:19
**altogether** 30:1
**Altos** 346:25
**ambitious** 490:1
**Amen** 253:3
**amend** 164:9
**amended** 143:19 163:14
163:17 530:12
**amendment** 290:18,19
290:21,23 437:22
**American** 390:9 401:25

**Americans** 121:17
**Americas** 5:4 9:12,13
11:20 13:4 16:6 22:13
**amount** 84:17 92:15
101:1 102:11,22 159:2
159:2,4 171:24 175:19
177:14 178:16 181:5
199:25 206:4 213:17
256:7 259:1 267:25
302:1,3,23 306:2,6
308:2,3 309:10 323:6
365:17 373:16 384:4
396:19 438:25 444:23
444:24 462:4 468:15
468:16 473:17 500:6
521:5
**amounts** 456:11 471:13
471:19
**amplified** 331:24
**Amy** 13:16 358:2,6 428:2
449:18
**analogize** 506:18
**analogy** 506:21
**analyses** 78:20 79:19
82:10,12,13
**analysis** 50:20 51:5,7,8
52:7,14,16,23 56:3
75:17 77:1 79:17 81:5
81:9,12,15 82:2,7,15,17
82:19,21 83:3 84:5
92:15,17 95:20 98:3,17
109:22 110:3,7 119:22
189:10 191:9 198:17
199:4,21,25 200:11,22
201:2,4,9 202:7 203:5
203:6,13,13,23 204:5
204:12,17,19 207:25
208:16,24 274:20
341:9 391:25 393:4
399:5,9 401:3 431:14
453:1 454:2,17,23
455:2,11 458:25
470:20 473:15,20,25
474:6,17 475:14 482:4
490:21 492:14 514:20
**analysts** 231:16
**analytics** 59:9 105:17
**analyze** 58:9 82:7,12,15

**analyzed** 82:17
**and/or** 33:4 272:9
316:14
**Angeles** 14:23 17:8
**Anna** 135:22
**announce** 238:4 446:3
**announced** 135:18
194:12 233:5 238:3
271:7 300:18 383:1
415:7 506:13
**announcement** 272:3,5,7
**announcements** 25:3
**annual** 30:11 104:12
176:15 419:23 422:22
425:13 444:23,24
486:24 499:15
**annualized** 457:22,22,23
**answer** 51:12 62:10
65:22 68:10 75:12
76:15 80:16 98:22,22
112:8 120:9 141:13
150:16 172:10 222:6
225:24 226:12,15,16
234:7 242:1 243:8
249:4,21 250:12,13
252:11 254:6 265:13
271:23 273:9 276:21
280:21,22 281:10
292:17 295:14,15
306:2,15,17 310:23
315:13 320:24 333:25
334:1,13,21,22 336:12
336:14 338:25 351:23
357:23 359:9,10 368:4
371:18 375:1 377:19
385:24 396:1,16
398:11 403:6,12
405:10 406:6 411:16
419:20 423:9,11,12
450:20 472:16 474:22
475:7 477:11 509:19
537:22
**answered** 203:12 243:11
282:16 320:21 342:24
352:10 360:2 422:15
424:13
**answering** 150:13
189:13

**answers** 249:14 357:7
**Answer's** 75:7
**anticipate** 173:22 459:5
459:7,7
**anticipates** 451:5,17
**anticipating** 279:8
539:19
**anticipation** 489:4
**anti-trust** 236:5
**anti-union** 141:8
**Antoine** 18:5
**anxious** 227:10
**anxiously** 332:16
**anybody** 50:1 117:3
145:23 146:7 200:21
272:18,19 273:5 299:7
311:17 411:5
**anymore** 331:4 501:8
532:18
**anyone's** 496:16
**anyway** 87:2 95:9 112:21
**any/all/some** 429:22
**apologize** 44:6 385:25
394:1 422:5 423:10
435:5 489:15 496:17
**apparent** 254:10
**apparently** 199:24
255:12 349:13 441:6
481:6
**appeal** 123:2
**appear** 255:2 291:1
502:7
**appearance** 25:24 94:19
**appearances** 134:8
**appeared** 280:7 510:18
**appears** 43:12 45:5
63:10 65:9 73:12
381:10
**apple** 428:18
**apples** 332:4,4
**apples-to-apples** 321:7
**applicable** 436:18,21
**application** 236:7,8,10
**applications** 123:2
**applied** 189:6 464:5
472:1
**apply** 189:5 208:19
239:25 240:10 493:23

537:14
**appoint** 458:16
**appointed** 124:13,21
**appointing** 459:19
**appreciate** 69:10 75:14
146:10 147:24 158:8
159:1 212:12 440:4
512:21
**apprehension** 494:19
**apprentice** 124:13,14
**apprenticeship** 124:9
**apprised** 36:7
**approach** 37:1 46:19
49:16 57:17 59:17 96:9
107:2 120:1 151:24
188:22 197:11 209:25
214:3 295:10 296:14
296:15,16 298:1 327:5
327:7 372:19 377:20
442:18 452:4 453:17
475:20 484:21 498:5
523:3
**approached** 188:20
349:1 446:10 531:12
**approaching** 533:3
**appropriate** 56:11 82:8
102:7 118:4 139:4,5
310:20 367:7 511:1,20
**approval** 47:1 126:19
138:4 143:19 184:11
233:25 234:2,3,10,12
234:14 235:20,24,25
236:3,5 251:2 290:19
293:1 473:6
**approvals** 233:18 234:11
236:3,12
**approve** 47:17 166:12
184:6,7,11 253:18
261:18 291:7 319:20
319:22 413:22 437:12
**approved** 26:3,18 84:13
84:20 96:20 97:7
180:14 281:25 282:11
306:6 315:22 317:14
335:24 384:21 386:22
411:1 412:20,21 413:5
413:18 429:14,21,21
430:3,16 431:1,16

480:17
**approving** 2:15,17
329:21 412:19
**approximately** 101:3
121:17,21,23 122:4
232:15 263:8,9 373:17
389:11,16,17 396:20
407:20 434:23 445:1
447:11,13,22 485:20
521:1 532:3
**April** 37:19 38:8 40:15
42:23 47:20 49:10
53:13 54:10 55:7 59:1
103:19 108:8 140:2
152:7 153:21,22
154:12 166:7 194:24
195:1,1,4 196:6,6,7
197:15,20 198:20
199:16 202:14,14
203:19 210:18 216:4
222:22 225:14 226:19
233:5 236:16,21,22,24
237:10 242:19 253:4
287:18 296:3 337:2,2
395:20 397:24 442:13
545:23 546:9
**aptly** 69:12
**AR** 15:10
**arbitrary** 522:16
**area** 46:24 57:7 288:24
315:18 368:7,11
380:23 412:25 424:21
455:24 524:14 526:24
530:6,8 537:20
**areas** 131:9 482:14 534:8
**ARENT** 6:19 7:2
**argue** 331:15 385:7
429:9 469:3 513:19
**argued** 413:13
**arguing** 67:1 472:10
**argument** 101:18 114:7
114:8,9 224:17 310:20
331:16,19 332:7 431:8
439:17 511:15,19,24
**argumentative** 58:20
381:25
**arguments** 50:11 332:10
332:15,16 431:5 432:3

**Arkansas** 479:15 510:19
512:18,20 535:1,17,18
536:7
**Armstrong** 3:10 7:10
174:5,7,14 197:11
201:14,21 202:5 214:3
214:6,16 215:2,19
216:6,17 221:2,4 235:3
235:10 242:10 249:5,7
264:3,5 265:11 266:8
283:9 289:8,10,16,24
298:1 304:6,8 320:4,6
320:12 334:20 341:23
341:25 342:10 354:22
363:8 377:24 378:8,16
378:21,25 379:4
381:24 384:7,13,16,20
385:6,25 405:24 409:4
412:7 413:8,11,14
418:10 419:18 421:22
421:25 422:5 423:8
424:16 425:21 441:18
484:3 544:18
**ARNALL** 17:13
**ARNOLD** 7:18
**Aronson** 114:20
**arrange** 280:5 543:2
**arranged** 124:9 383:24
**arrangement** 42:5
286:25 383:25 415:16
**arrangements** 239:1
449:6 510:9 542:22
**arrive** 166:21
**arrived** 385:12
**art** 472:3,14
**ARTHUR** 1:21
**article** 263:11,13
**articles** 419:15
**articulated** 385:11
506:12
**asbestos** 414:11,12,16,19
**asbestos-related** 407:8
**ascribed** 82:8 83:7
110:21
**aside** 65:21
**asked** 32:24 44:14,15
47:16 64:2 66:24 83:4
90:7 94:24 95:17 97:18

98:13 99:4 100:19
101:11 102:2,4,11
103:6 106:16 107:9
108:6,15 109:21,25
110:2,5 111:4 113:10
113:18 114:13 115:22
117:7 124:20,23 130:4
141:6 147:13 158:21
166:12 195:13,14,15
201:4 203:5 207:23
211:1,9 212:11 217:10
218:7 220:19,19
231:14,17 232:6,9,13
235:14,14 241:21
250:5 251:8 254:3,5
277:16 278:15,15,19
282:14 296:19,19
297:13 306:13 339:16
342:24 344:17 352:10
352:10 360:1 362:7,10
362:13 376:9,14,22
377:5 382:17 389:25
391:11 398:15 413:6
413:22 414:4 431:2
513:2 516:24 542:11
**asking** 66:13,14,14 74:3
74:8,11,13,22 87:12,17
87:20 111:9 150:2
158:18 159:6 164:21
202:6 211:10 218:9
221:17 225:21 226:1
228:19 229:7,8,10,12
229:15,22 230:11
240:15 242:15 243:3,3
243:6,8,10 245:9
247:14 248:24 265:13
270:11 276:8 278:16
279:13 286:4,8,8
289:13 298:18 303:22
320:17,18 322:20
327:23 333:7,15,16
338:15 340:19,21
341:4 342:24 356:2
366:1 382:10 387:23
396:8 406:8 409:17,19
409:20 410:4,6 419:2
429:17 471:25 474:3
498:11 502:3 524:8

asks 240:14
aspects 153:20 163:1
244:18 245:7,13,15
Aspen 187:3 346:20,23
aspirational 136:24
aspire 498:2 500:18
503:16
aspiring 515:5
assemble 211:18
assembled 59:16
assembling 190:23
assert 91:20 414:15
asserted 138:19
asserting 533:15
assertion 506:1 509:7
assess 181:12 347:3
assessed 179:24
assessment 178:4 179:1
331:1
assessments 53:21
asset 82:23 345:9 476:21
assets 2:16,19 47:2 61:22
62:5,19 63:22,24,24,25
64:1,2,3,4,7,11 65:15
66:3 67:15 82:9 83:15
83:17,21 85:14,16
86:16 99:15 200:6,7,8
205:22,23,23 259:24
261:19,23,25 262:3
265:23 266:1 267:4,16
270:3,14 271:17 273:7
274:2,5 275:15 295:4
295:24 312:21,23
323:1,4,9,10,12,17
337:21,22 343:11,12,13
343:13 351:20 391:6
403:14 421:19 432:15
444:18 477:1 485:18
496:2
assign 465:13
assigned 122:25 125:2
136:12 429:25 464:8
466:9
assigning 449:3
assignment 2:21 288:21
462:12
assimilation 178:15
assist 122:25 123:6

297:13 448:16,18
449:6 465:15
assistance 75:14 188:20
371:14 395:1
assistant 120:24 124:24
136:13
associated 274:11 299:4
363:25 364:2,24
369:11 370:12 385:4
438:2 444:14 467:17
467:21 471:3 472:25
473:8
Associates 8:2 485:7
498:12 499:5
association 155:8 168:22
416:1
assume 61:8 96:4 101:19
103:14,21 111:1
149:21 187:22 263:15
303:14 319:5 331:8
348:7 353:7 354:20
364:10 365:8 369:13
396:8 412:11,21
427:23 447:7 452:17
452:22 459:23 462:8
462:15 463:1,20 472:6
472:18,21,23 473:16,22
474:7,19 481:6 496:2
510:3 516:9 523:5
528:6 532:11,13
539:25 542:4
assumed 26:2,2 307:20
346:5 422:12 429:24
430:15 434:9 447:15
447:17 449:3 452:14
458:16 463:7 491:8
492:4,11 529:19
530:23 531:1 533:4
assumes 224:11 333:20
352:6 412:7
assuming 26:3 61:11
76:16 85:18 113:20
225:1 349:12 359:24
360:1 365:9,19 396:6
460:3 472:14,25
520:22
assumption 2:21 229:10
348:5,16 426:25 429:3

430:18,20 431:11
432:8 462:12 471:14
471:20 523:20 538:23
539:6 540:3
assumptions 110:16
198:19 225:5 321:3,12
321:19 322:8 421:12
522:10
assurance 2:9 25:25 26:5
26:12,14
assure 50:21 323:12
377:2 437:5,10 533:23
533:25
Assured 2:7
Atlanta 4:6 17:17
Atlantic 20:14
attached 215:7,8 381:5
attacking 141:9
attain 347:15 457:13
515:14
attained 515:13
attempt 173:11 287:10
294:2 404:10 467:2
attempted 404:4
attempting 486:5,8
531:21
attended 31:24 380:3
517:14
attending 69:23 198:3
attention 44:25 54:4
87:1 99:8 154:14
156:16 209:20 236:15
524:7 530:21
attest 367:8 425:6
attested 214:12 443:2
attorney 23:11,13 436:5
436:14,17,24 481:15
attorneys 3:4,13 4:3 5:3
6:12,20 7:3,11,19 8:3
8:10,18 9:3,12 10:3,13
11:3,19 12:3,12,19
13:3,10 14:3,12,21
15:3,10,19 16:3,13
17:3,14 18:3,12 19:3
19:11 20:2,3,13 21:3
21:12 22:3 23:3,12
24:3,11 517:11 526:13
526:18

Attorney's 5:12
attract 57:25
attractive 422:18
attributed 176:3 324:23
attributes 416:19 417:1
417:3 424:11
audit 30:6,7,7,9 31:14,16
36:17 104:16 114:11
auditing 115:3,5,8 509:2
auditors 30:10 104:8,11
104:20 114:15,15,17
509:2
August 174:24 175:14
177:17 178:1 179:18
179:22,22 191:18
212:11 230:14 231:22
231:23 232:25 374:9
AUSA 5:17,18 23:17
AUST 6:8
authentic 478:2
authenticated 73:22
authorities 435:8
authority 182:17 253:18
441:19
authorization 147:13,17
authorized 91:22 260:24
261:17 436:16
authorizing 2:18,21
28:11
auto 8:10,18 10:3,4,13
94:16 119:6,7,19,20
121:10 124:6 134:14
177:16 178:13 181:14
181:25 182:12 184:13
192:18,19 196:2 204:4
212:14 219:8,9 232:25
258:22 270:7,20,23
272:6,25 273:5 274:7
275:2,9 280:8,13,18,19
281:1,2 282:2 283:15
284:3 288:24 289:1
337:4 370:21 371:1,8,9
371:13 372:19 375:3
415:24,25 421:10
517:17 528:25
automakers 125:17
automatic 235:15
automobile 417:10 495:3

**automotive** 18:12 20:3,3
85:7 487:2 490:13
**availability** 402:16
**available** 25:4,4 173:19
273:4 281:8 338:18
363:24 376:16 377:14
433:22,24,25 434:5
453:5,6 471:2
**Avenger** 72:4
**avenue** 3:14 5:4 7:4 9:6
9:13 10:6 11:20 12:13
12:20 13:4 16:6 19:4
20:14 21:5 22:13
208:20 344:20
**average** 360:20,23
364:25 418:3 445:12
457:12 461:2 490:6
501:2 502:10,11,14,17
503:1,13 504:21,22
513:23 515:12 537:11
**avoid** 207:9 213:13
227:7 353:3 361:7
388:22 424:8
**avoiding** 350:1
**await** 332:16
**award** 465:12
**awarded** 189:23 278:23
**awards** 71:10
**aware** 51:9,10 61:16,19
61:23 62:18 64:3,5
70:18 74:12,16 77:22
78:1 81:4,8,23 82:1,3,5
84:11,14,18 87:19
88:12,16,19 102:5,7,16
110:13 111:5,9 115:4,4
116:8,13,16,22,25
149:11,22 159:11
170:12,15,18,25 171:2
197:9 217:7,11 218:18
218:20 220:11 221:12
221:24 224:4 227:16
227:17 236:8 239:16
239:22,23,23 240:6
241:2,8 245:23 246:17
262:21 279:16 280:7
280:10,17,23,25 281:4
305:18 324:22 325:14
333:6,14 335:8 339:20

359:16 364:4,10,15
367:15 381:17 383:25
387:1 394:2 396:4
408:17 409:13 410:7
410:11,12,17 411:11,13
411:19 414:11,14,17,18
430:6 467:15,20,23
469:6,12,16 486:21
496:24 516:7 536:8,16
538:14,17
**awareness** 216:25 236:9
**awful** 302:6
**axle** 141:1
**axles** 209:14
**a.m** 119:2,2 222:17

---

### B

**B** 1:20 2:6,16,20 4:8
11:23 24:16 43:4,7,9
45:20 46:8,11 545:13
545:15 546:4
**BABETTE** 8:22
**back** 44:12 45:6 51:7,13
59:6 81:13,19 85:19
88:25 96:16 99:1
113:19 115:14,16,19
121:6 122:20 126:21
147:18 168:15 172:5
174:1 175:14 181:20
184:11,16,23 185:15
186:21 187:19 188:6,8
192:15,17,22,23 194:15
194:20 195:10,13,17
200:4,25 212:1 213:6
217:14 227:23 230:13
237:9 241:17 249:25
251:5,7 252:18 255:14
275:21 277:24 283:3,8
284:15 290:20 293:10
294:12 301:14,15
305:16 306:5,8 308:21
312:21 315:9 328:2
330:16 340:21 344:18
344:18 345:19,21
346:24 356:24 363:18
374:22 381:22 382:9
382:22 387:22 388:8
406:21 409:4 411:6

417:6 419:14 424:9,10
428:19 431:19,19
456:3 495:6,8 506:12
512:12,15 517:20
**backdrop** 164:24
**background** 200:23
295:13 407:12
**backstop** 384:1 385:19
467:16,21,24
**backup** 56:13
**backward** 326:16
**back-and-forth** 310:7
**bad** 487:17 507:16
509:15,15,17
**balance** 35:21 116:9,23
128:3 182:24 191:10
213:12 317:22,23
335:1,4 353:11,12
369:9,12 375:6 376:16
**balances** 39:17
**balance-sheet** 298:14
**Ball** 3:8 25:12 169:21,23
170:1 244:14,15,23
435:5,15 544:16
**Ball's** 436:5
**Baltimore** 9:7
**band** 135:8
**bank** 12:19 18:3 101:6
112:2 203:15 211:1,17
218:15 285:23,24
286:8 290:9,19 315:4
532:22
**banking** 33:4 48:24
170:6 208:23
**bankrupt** 418:8
**bankruptcy** 1:2,13,22
2:3,13,14 30:25 57:18
57:20 63:7,8,20 64:13
64:23 66:3,16,19 67:6
108:9 128:24 160:13
164:24 190:22 195:1
197:1 203:10 204:15
204:25 205:3 206:12
211:14 213:21 257:4
262:15 271:20 273:14
274:1 275:19 279:1,3,9
281:21 284:12 300:11
302:2 304:2 332:14

337:19,21 360:18
366:15,17 367:3 368:9
368:13,15,16,16,24
375:9 388:9,20,22,24
389:9,10 390:1 393:13
393:20,23 394:6,13
395:10,11,15 397:20
398:20,21,22,23 405:20
406:4 418:18 431:21
444:9,11 470:16,19,23
472:3,15 473:5 474:9
474:15 487:21 488:15
496:25 516:15 517:6
521:17,19 539:21,22,24
**banks** 40:8 88:8 202:6,11
202:21 204:9,10 211:1
211:9 286:22 287:14
290:6,20,22 316:14
337:12 339:3 341:18
348:23 370:10
**bank's** 88:16 89:1,14
**bar** 501:2
**bargain** 123:8
**bargaining** 122:11,12
123:6,7,20 124:17
125:7,10,17,22,24
126:3 127:4,11,18,21
127:23 128:6 129:17
130:11,16,23 131:9
132:4,11,17,23,25
133:3 135:4,12,16
137:3,8,20,23 138:4
139:16,20 140:5
141:17,19,22 142:8,16
143:6,20 144:1,16,24
148:5,15 151:14
157:17 165:14 167:7
167:24 168:10 169:12
172:17 303:16,16
**Barkasy** 12:9 92:7,7,11
92:22 544:9
**barred** 520:11
**Barry** 12:8 401:17
**BARTLETT** 12:18
**Bar-Leib** 2:25 548:4,8
**base** 70:17 73:3,7 164:4
351:16 417:11
**based** 55:19 59:9 98:20

182:14 212:21 229:15
231:20 288:24 301:15
311:3 328:10 335:13
347:19 348:5,16
349:11,11 368:2
404:23 464:13 479:18
480:18 515:22 527:10
537:15 539:14
**bases** 150:8 213:16
**basic** 304:23 423:25
**basically** 83:10 135:7
176:18 179:11 180:9
186:16 189:15 200:10
239:20 262:4 284:6
286:16 310:2 311:13
315:16 334:24 339:23
343:11 391:19 423:25
**basis** 51:22 52:25 63:13
80:11,22 85:13 96:16
97:8 101:25 103:17
138:20 176:14 190:19
209:17 321:7,15,17,18
322:18 335:4 368:20
373:20 398:24 444:23
444:24 454:7 460:24
494:15 523:11
**BASSEL** 21:11,17
**Bates** 155:5
**Battery** 10:16
**BCG** 288:13,15
**bear** 274:3,4,8
**beating** 184:3
**Beaver** 18:13 21:13
**becoming** 254:10 374:2
**bed** 116:25 300:2
**began** 42:21 542:17
**beginning** 175:23,24
231:23 337:2 409:8
445:2 456:13 515:24
**begun** 449:2 467:13
**behalf** 38:21 59:24 92:25
119:6 162:10 165:13
209:22 358:7 415:23
436:10,24 446:9 449:1
449:18 474:25 479:18
485:7 509:4
**belief** 52:20 520:25
**believe** 26:10 37:10 39:7

45:2 46:9 49:23 53:5
70:21,24 90:4 94:1,5
95:2,18,19 97:14,17
98:13 99:7 102:4,11,16
104:2 132:12 136:4
137:16 138:10 145:15
160:19 161:17 162:25
163:14 165:15 189:11
193:12 208:1 216:23
236:17 241:12,13,14,18
246:21 248:6 268:2
272:4 285:20 290:17
290:22 293:9 295:3,5
295:23,24 296:11
307:5,13 309:11 310:8
314:21 317:18,20
322:20 329:4 341:20
342:18,20 355:2,2,12
367:18 370:4,21,25
385:20 386:12,22
388:19 392:18 394:21
395:22 396:10,12,13
397:6 402:7 406:16,21
412:10 413:4,6 414:6
420:20 421:21 425:22
429:10 430:1 431:1,5
431:10 432:6 439:10
442:13 453:8 460:15
471:16 473:5 483:21
489:7 494:22 495:9
497:20,22 498:1
499:19 507:22 510:18
512:10,12,14,25 513:3
517:14 518:14,21
529:5,11,14 530:12
538:1
**believed** 118:14 132:12
134:24 139:24 143:12
193:15 320:1 322:13
387:11 396:2
**believes** 160:11 235:20
364:8 482:8
**believing** 496:6
**BELLAVI** 496:17
**Bellavia** 8:2,7 485:6,6,6
485:10 491:18 496:14
498:5 504:8,10 509:23
509:25 510:5 512:24

516:3 519:24 523:3,7
523:14 524:2,3 530:6,9
534:20 540:22 541:7
541:21 545:9
**Bellembert** 20:13
**belligerent** 526:23 527:7
527:15
**Belvedere** 208:4 346:4
**bench** 230:21 510:17
**benchmarks** 263:3
**bend** 29:10 229:21
**beneficiary** 168:22
**benefit** 11:12 28:12
40:19 42:12 45:11
99:14 107:20 140:1
155:7 171:6 186:4
213:10 239:18 258:25
359:1,5,13 448:4
476:17,20 490:11
**benefited** 519:13
**benefiting** 358:23
**benefits** 122:18,19
127:24 128:16 129:12
130:5 137:12,19 138:5
138:13 140:4 141:20
143:8 151:1 157:16
158:15,25 159:3,12
167:23 168:11 192:9
239:17 303:12,15
392:25 393:23 437:7
496:1 497:13,15
**Benz** 186:6
**Bernstein** 7:23 10:12
415:23
**best** 46:18 61:21 62:4,19
70:3,5 82:10 204:21
207:9 213:1,1,12,22
214:14 233:7 262:23
274:5,24 295:3,6,23
296:1 304:22 334:4,14
387:11 421:3 447:18
449:11 461:2 463:25
485:18 495:22,25
504:13,14 522:2
531:10,11,11
**better** 29:9 98:7 123:25
177:18 186:21 211:3
296:12 297:1 312:7

348:3,10 354:10 357:2
357:5 396:1 499:10
500:11 503:20 505:11
510:25 513:13 515:4
516:21 537:25
**beyond** 69:11 114:24
115:17 213:6 330:18
471:1
**Bidder** 2:15
**Bidding** 2:15
**Bienen** 352:5
**Bienenstock** 9:16 329:12
329:14,23 330:6,7,9,11
330:13,14,15 333:19
351:22,24 352:1,6
354:17 355:1,7,8,17,25
356:6,12,23,25 425:22
426:1,2,4,5 427:7
435:19,20,23 436:3
545:6
**Bienenstock's** 427:10
**big** 18:13 21:13 94:16
123:7,9,17 124:3 125:7
125:8,17,21 126:3
141:16,21 142:16
146:17 162:18 165:1
169:15 170:10 171:20
280:10,12 513:16
**bigger** 182:2 351:6
**biggest** 388:25,25 393:16
**billion** 41:11 42:11 43:16
43:24 44:2,7 47:7 61:5
63:16 65:16 70:17,18
73:8,8,13,17,19,20
75:19,21,22 76:1,2
77:24 78:3,9 79:13,16
80:7,19,24,24,25 81:2
84:2,8 95:20 96:2,12
96:25 97:6,23,24 101:3
108:11,12 116:9 118:8
118:15 154:18,20
156:18,21,22 161:25
162:3,5 168:4 171:23
172:6 181:10 184:15
184:16 185:16 186:22
186:25 188:3,7,13
189:6,14,24 190:3
199:14,15,23 210:9

211:17 212:2 217:13
218:3 221:7 222:10
223:5,8,18,20,23,25
224:1,14 229:12
256:10,12,23,25 257:5
257:5,6 259:4,10 262:9
262:11,13 276:24
277:8,12 278:16
281:25 282:2,10,11
292:20 302:4,21
303:11 305:14,14,19
306:14 308:5,12,19,22
309:11 310:17 312:6
313:14,17,18,22 314:1
314:5,8,13,16,22 315:5
315:12,23 316:8,22,24
317:19 318:2,25 319:4
320:2,3 321:12 322:9
322:14,21 323:4
325:17,21,25 326:6
327:4,19 332:9,9
335:12,14,19 336:5
339:4,6,13,24,25 340:7
340:11,16,20 341:9,19
342:22 343:3,24
345:10,10 348:10
350:21 353:8 393:18
403:13 487:5
**billions** 111:14 112:17
229:18 349:8
**billion-eight** 325:6
**billion-five** 325:5
**binder** 69:1 114:18
**binding** 43:10 436:19
437:25
**Biscayne** 16:18
**bit** 29:10 34:9 39:19
93:21 121:7 123:21
130:9 178:7 191:1
192:22 193:2 292:5
347:1 409:9 423:16
465:6 501:17 518:15
531:4
**bites** 428:18
**black** 420:2
**blank** 215:15,25 297:22
297:23
**blazing** 213:9

**bleeding** 149:9
**blend** 131:5
**blessed** 181:14
**block** 316:22
**blogging** 419:15
**Bloom** 87:2,4,6 88:7,14
88:24 192:21 202:10
202:18 219:15 222:16
226:18 248:6 250:5,23
252:1 253:25 254:15
268:9 269:11 284:22
286:23 294:14 322:6
339:17,22
**Blue** 231:13
**blue-collar** 401:25
**Blvd** 14:6
**BMW** 186:6
**board** 28:23 29:1,1,14
30:1,3,17 31:5,6,9,24
31:24 32:6,7,11,11,14
32:16,24,24 33:5,6
34:3,16,17,23 35:18
36:10,11,19,22 37:11
37:14,18 38:7 39:21,24
40:2,14 43:3 44:18,21
47:12,16 48:10,15,21
49:7,11 50:7,17,17
51:8,21,24,25 52:5,13
53:6,16 54:9,25 55:3,7
55:8,21 57:2,8,13 58:4
58:9,16,23,25 59:6,9
60:1,5,18,20 62:2,2,17
64:5 67:19 68:2,7,13
70:14 74:16,20 76:17
76:23 78:13,15,18 79:2
79:16,19 81:5,9 82:4
84:4,7,24 85:21 89:11
91:2 92:18 93:10,14
98:21 99:9 101:24
102:6 104:19 105:18
105:18 106:17,25
117:11 118:6 138:8,11
139:22 147:11 169:7
169:11,13,15,17 175:8
177:3,4,5,12,14,19
184:5,6,11 192:7,20
197:2,8,15,19 198:16
199:1 201:15 204:2,24

205:19 212:24 213:19
215:3 216:4 229:19
236:16,20,24 237:10
245:1,3 311:20,20
317:8,13,14 319:12,14
361:14 407:14 408:3
408:15,16 411:2 414:6
497:17 508:22 526:21
545:19,22
**boards** 30:19 48:3
169:14 407:12,15,18,22
408:1
**board's** 50:11,12 58:18
60:5 88:23 100:11,12
100:15 244:24,25
**Bob** 48:24 227:5 255:13
255:14 287:22 537:4
**BODMAN** 18:2
**body** 371:1,7 374:7,10
391:18 459:15,17
472:11 488:23
**bond** 441:24
**bonus** 408:18
**bonuses** 408:16
**book** 103:7 208:25
218:21 260:20 322:19
503:3
**books** 128:4,24 129:5,7
129:10,18,21 405:3
**borders** 69:16
**borrower** 113:22
**borrower's** 114:3
**Bosch** 24:11
**Boston** 20:15 288:16
296:19
**bottom** 69:4 70:2,2 73:5
184:21 198:6 219:13
219:14 246:5,6 255:1
266:16 278:18 302:20
315:1 346:11 502:20
503:4,6
**bought** 83:18 324:19
405:19 406:3 417:5
**Boulevard** 16:18
**boutique** 48:24
**Bowling** 1:14
**box** 166:15 346:9
**boy** 298:20 509:25

**Bozzella** 524:23
**Bradley** 49:13 53:5
55:23
**brakes** 414:16
**Brampton** 208:6
**branch** 350:10
**brand** 70:21 128:12
180:19 207:6 208:12
367:9 391:23 425:4
444:7 459:10 486:2
533:24 538:4,5
**brands** 178:13 182:22
208:1,8 444:3,7 450:10
482:18 489:5 500:13
503:5,21,23 519:9
534:13 538:2
**breach** 462:5
**break** 34:9 119:1 147:24
173:2 182:1 283:3
296:24 354:24 356:11
357:11 433:11 435:14
484:2 510:9
**breaking** 296:9 347:3
**breakup** 70:10 73:20
75:18 79:4 344:21
345:2
**Bressler** 12:8 401:17,18
401:21 406:1,9,17,20
407:1 414:4 544:23
**Brian** 6:9 114:20
**bridge** 130:18,24 210:21
225:3
**brief** 25:15 34:17
**briefly** 122:21 160:16
510:12 538:20
**bright** 407:7
**bring** 51:6,16 73:16
115:16,18 126:21
140:14 150:17 267:16
296:22 433:5 509:6
512:11
**bringing** 51:8 130:9
289:2 353:16 389:11
389:21
**broad** 15:4 190:17 207:7
**broaden** 193:23
**broader** 349:25
**broadest** 212:25 288:23

305:12 371:16
**Broadway** 6:22 11:6
15:20
**brochures** 363:3 508:12
508:13,14,16,17
**Brog** 11:18 388:2
**broke** 144:20
**broken** 191:3 343:11
**BROMBERG** 14:11
**Bromley** 8:14 119:4,5,6
119:13,15 120:1,12
136:24 139:3 144:5
147:1 149:25 150:2
160:4,6 172:4,13,16,21
310:6 356:13,23
425:23 544:13,17
**brothers** 124:8
**brought** 32:16 43:3
131:13 136:17 137:21
146:9 175:18 201:1
202:2 208:23 236:14
288:23 387:25 402:22
482:7 497:16 517:13
**Brown** 13:16 19:10
354:14,16 358:2,2,6,6
358:10,17 362:5,9
363:12,20 370:13
374:12 377:20 378:3
378:14,19 379:5 382:3
382:12,14 384:18
385:2,7,14 387:16
427:25 428:2,2 443:9
446:7 448:11 449:18
449:18,21 452:4
453:13,17 455:1,9,18
466:2 471:25 472:7,9
472:17 475:22 477:11
477:13 478:14 481:7
483:18,21,25 484:8,12
484:14,16 485:4
540:15 544:20 545:8
**Bryan** 14:14
**Bs** 180:6 229:21
**budget** 300:25 301:1,5
305:11,17 306:7
386:17
**BUELL** 8:15
**Buhl** 6:13

**Buick** 504:21,22
**build** 185:4 301:25
400:21 409:9 491:9
515:21
**building** 6:13 9:5 21:4
202:10,18 301:8
491:24 536:12
**built** 516:23
**bullet** 302:20 303:10
514:16
**bullshit** 290:9
**burden** 375:11 393:5
**burdens** 392:25
**burn** 185:15 186:17,19
188:7 277:5 278:14
**burned** 185:16
**burning** 276:23 277:7
**BUSH** 18:11
**business** 32:7 33:11,20
61:2 78:25 123:4 132:6
141:7 154:3 178:24
179:2 181:13 185:17
185:18,18 186:12
191:3,4 193:22 201:16
205:5 206:14,21
207:13 212:7,10,13,20
213:1,1 231:18 232:8
253:17 276:4 277:22
278:4 322:23 323:4,12
323:18 324:3,7 341:21
342:1,4,18 343:6,15,18
345:21 346:17,19
371:17,19 379:12,18,21
379:22 380:16,19,22,22
387:12 397:10 399:19
416:8 417:10 426:17
428:13 429:1,4 432:4
432:14,16,18 433:6
445:6 448:24,25
454:22 456:9,17,23
461:12,20 464:6,9,13
464:14 468:22 469:6
469:21 472:1,10
473:15,21 474:6,18
475:12 476:2,3 482:5,8
491:25 492:1 494:9,21
494:23 497:6,8 508:25
517:5,19 524:25

525:12,13 531:2,3
532:4,8,12 536:18,19
536:20,24 537:1,18,21
**businesses** 178:24
516:11
**businessman** 323:22
**businessman's** 265:13
**buy** 100:2 185:23 209:10
209:16,18 324:13
328:3,10,14,24 417:11
417:20 419:16 420:15
422:13,13 494:17
**buyer** 186:4 209:7
273:13 517:1 534:19
**buyers** 209:1,2
**buying** 297:2 421:16
**buys** 324:10 419:3 477:4
**buy/sell** 444:18
**buy/sells** 444:13

**C**

**C** 2:8,23 3:2 5:9 25:1
45:14,17,20 46:8,11
545:15 548:2,2
**CA** 10:18 14:23 17:8
**Cabraser** 10:12 415:23
**Cadillac** 504:19
**cafe** 192:10
**calculate** 159:6
**calculated** 365:18
**calculation** 264:9 538:8
**calculations** 154:24
**calendar** 445:13
**Caliber** 345:23 346:2,12
346:24
**Calibers** 376:19
**call** 69:13 76:25 90:17
91:10 99:18 115:10
119:7 126:4 147:14
177:22 178:15 180:6
206:18 211:2 217:11
218:11,14 248:14,17
265:16,18,19 272:15,18
272:21 290:7 309:3
344:21 353:24 375:23
376:6 423:21 433:13
433:15,17,18,19 434:17
444:2 468:23 469:1,4

492:17 524:7 530:21
**called** 45:3,14 132:13
135:7 140:17 190:11
190:14 202:9 231:15
259:24 260:2,4,12,14
262:2 288:12 298:25
328:16,19 357:10
366:19 396:6 450:8
**calling** 46:18 150:25
433:22 434:15
**calls** 103:9 210:25
265:11 405:24 419:18
468:25 471:22 517:16
**Canada** 15:19 262:25
263:9,21 264:16
**Canadian** 258:22 390:11
**cancel** 248:17
**candidate** 458:23,24
459:9,19
**candidates** 459:15 460:9
**cannibalize** 531:21
**capabilities** 460:23
**capacity** 95:12 186:25
230:24 239:11 244:11
246:16 397:10 500:3
**capital** 39:16 54:9 58:1
66:12 176:17 184:7
325:4 460:25 461:8,25
462:4,5 463:16,21
492:7 507:4
**capitalization** 461:1
**capitalized** 459:11
**Capstone** 84:11 199:20
201:1 204:12 219:11
297:13,15,16 298:11
299:16
**Capstone's** 198:17 199:3
204:17
**car** 71:20 94:24 108:18
108:20 109:12,16
110:22 111:2 178:8,9
185:23 186:3 188:19
309:9 346:3 347:10,11
416:20 417:11 419:4
420:13 421:19 422:14
422:20 425:11 437:6
437:13,22,23,24 500:5
532:12 534:4

**Caravan/Town** 72:8
**card** 483:8 525:16
**care** 25:22 126:10 128:1
128:10,15,23 130:1,5,6
137:15,15,17 138:1,5
146:24 147:9,22 148:4
149:8 150:20,24 151:7
157:23,24 158:1,2,10
168:6 248:18 303:12
303:15 315:17,17
357:17 440:23 511:7
**career** 48:7,8 125:6
178:6 326:13 497:14
**careful** 52:15 317:11
319:14
**carefully** 80:3 163:16
**CAROLE** 13:7
**CAROLINE** 7:8
**carried** 307:13 517:18
**carry** 26:8 128:15
189:15 369:14 389:14
538:3
**carrying** 128:23 129:10
**cars** 67:22,24 68:1,2,3,5
68:19,24 260:12,17
301:8 416:9,11,15,19
416:25 417:2,5,7
419:16,17 420:14
421:2,9,13 422:13
423:1,2 424:6,7,14
450:16 467:1,2,3,5,8
484:15 494:17 498:14
506:17 532:10,11,13,15
**case** 1:4 11:4 14:4 16:2
16:12 17:2 30:10 34:15
34:22 38:21 43:12
48:14 59:23 63:10 65:9
70:17 73:3,7 74:17
91:19 92:4 95:8 97:18
114:9 120:16 135:20
136:1,1,3 144:8 153:15
164:23 173:4 255:2
283:19 284:9 298:24
300:11,17 302:2
333:16 434:4,5,8
438:19 442:13 446:9
489:4 499:3 526:7,8,12
526:17,19 527:3

**cases** 366:4,4,8,8 465:8
465:10 492:17 516:6
524:13 531:24 533:9
533:18
**CASEY** 13:18
**case-in** 115:10
**case-in-chief** 434:3
**cash** 36:6,7,10,12,20
39:12,16,22,24 40:3,6
47:7 65:1,18,24 66:9
85:22 86:12,16 88:14
89:17 97:4,4 99:9,24
100:7,12,16 107:1,12
112:23 128:25 184:15
185:11,16,19 186:15,17
186:19 187:12 200:5
200:11 205:20,25
206:1,7,15,18,23
211:17,22 217:13
267:16 268:20 269:7,8
269:11,13 276:15,17,19
276:20,23 277:5,7,14
278:14,19 305:23
308:12 312:6,21 317:1
318:13 321:13,16,18
322:5,5,9,18 323:2,14
335:19,20 337:22
339:7,8,9,25 340:11
341:19 343:23 345:13
348:10 353:8 375:19
393:18 488:17
**cashed** 168:15
**cast** 127:8
**cataclysmic** 205:8 351:8
**categories** 274:21 316:20
461:23
**categorized** 451:9
461:20 463:1,14
**CATHELL** 9:9
**cause** 78:4 81:17 138:22
421:8
**caused** 58:23 161:10
181:7 388:23 405:8
513:20
**causes** 126:14 351:6
**causing** 416:19
**CAW** 195:14 258:22
**CBA** 152:6 154:11

162:19 163:1 165:18
165:21 546:8
**CBAs** 125:10
**cc** 220:6 525:1
**cc'd** 523:15
**CDJ** 15:10
**cease** 220:9
**CECCOTTI** 8:22
**cent** 507:14
**center** 10:5,13,15 16:16
19:12 24:12 208:10
379:12,19,21 380:19
415:24 456:18,24
469:6 501:1 524:25
525:12,13 536:18,19,24
537:1,18
**centered** 144:23
**centers** 379:22 380:16,22
448:24,25 456:9
508:25
**central** 131:11 504:10
**cents** 332:13
**Century** 14:22
**CEO** 69:15 174:22 175:7
175:17 177:11 198:24
220:23 232:4 299:1
408:9 416:14
**CEOs** 94:15
**Cerberus** 29:15,21,22
41:7 42:5,25 43:23
44:3,5,8,10,11,13,14,18
70:11 90:8,11,21,22
91:10,19 93:7,12 179:7
188:2,14 195:24
230:18,19 231:1,5,8,10
231:15,21,22 232:1,11
232:18 238:5,6,11,14
239:2,3,8,10,13,14,16
240:7,25 241:8,15,17
241:22 245:5,7 246:1
246:14,19 247:10,12,18
247:22,25 248:13
249:1 250:3 259:3
313:18 409:25 410:13
411:21 412:11 415:1,3
415:9
**certain** 2:21,23 8:3 12:12
38:6 45:10 47:2 63:24

64:1 90:7,10 95:9
102:5 111:3 135:17
137:17 138:12 139:19
145:3 153:20 162:25
198:19 205:25 207:10
207:11 245:7,13
259:12,14 269:4 274:8
331:24 357:22 378:10
385:4 414:5 423:22
433:15 447:7 455:8
459:23 460:1 468:15
482:14 490:22 495:16
495:18,21 524:12
**certainly** 50:10 51:9,13
71:14 74:17 79:5 86:8
87:4 96:6 97:23 99:22
108:22 111:13 137:5
139:9,12 177:7,17,20
179:21 180:5 186:4
193:12 194:1,6,10
196:9 204:18 234:12
265:20 279:6 291:21
304:2 317:24 338:2
362:13 363:10 368:16
371:16,19 372:3
388:21 393:22,22
397:13,15 405:4 415:6
419:23 423:4 429:20
439:8 488:19,21 493:3
495:11
**certainty** 335:20 365:11
531:4
**Certified** 548:9
**certify** 548:4
**CET** 548:9
**cetera** 25:8 192:21
193:21 208:15 209:9
211:5 299:6 371:5
**CFO** 36:9 302:14
**chain** 225:19 253:11
255:1 351:5
**chair** 175:8
**chairman** 36:17 104:16
174:22 175:7,10,12,13
176:11,12 408:9
**chairperson** 30:6
**challenge** 50:6 51:18
52:2 128:5

challenged 201:16 212:7
**Challenger** 71:21 72:6
  208:7
challenges 178:23
challenging 432:16
**Chambers** 5:14
chance 289:11 510:25
  537:25
change 41:22 42:6,7
  127:23,25 260:9
  290:21 296:25 321:5
  337:5,5 389:25 510:23
changed 118:11,12,17
  127:7 321:3 393:9,11
  522:9
changes 38:11 127:6
  155:11,15,19 161:8
changing 272:25
**Chapman** 27:9,10,12,16
  28:17,21 33:7 34:15,22
  37:3,6,8 38:11,15 39:2
  39:4 40:13 46:13,24
  57:7 59:23 77:22 90:4
  92:12 93:5 94:2 108:6
  114:11 115:10 116:22
  544:6,7,8,9,10,11,12
  545:17
**Chapter** 63:11 172:19
  205:18,19 216:24
  217:2 227:8 236:17,25
  275:3,10 283:19 284:9
  300:17 337:9,9 518:1
characterization 118:1
  382:10,11
characterize 42:1 157:12
  257:15 528:23,24
characterized 401:24
  474:8
characterizing 81:14
  117:20 237:10 242:10
charge 117:8 344:6,7
  507:13,23
**Charger** 71:23 208:7
charges 507:17,21
charging 507:20
chart 30:12 463:14 464:2
  502:12 503:2 536:9
charter 184:7 193:16

charts 535:7,7,10,11,13
  537:24 538:3
**Chase** 12:19 217:16
  218:16 370:9
cheaper 422:19
check 103:4
**Check-Upshaw** 436:23
  436:24 438:6
**Cherokee** 70:25 71:3
**Cherry** 191:20 193:19
cherry-pick 296:13
**Chevrolet** 505:2
**Chicago** 23:6
chief 115:11 176:9 244:4
**China** 191:21
choice 58:18 142:2,2,3
  242:18 338:6
choices 237:3,11 459:1
choose 395:8 428:15,17
choosing 230:9 276:9
  458:12 459:2
chose 107:23 163:16
  237:15,17,18 520:4
chosen 465:13
**CHRISTINE** 20:17
**Chrysler** 1:8 7:19 9:12
  11:4 12:3 13:10 14:4
  28:24 30:22 31:5 33:8
  35:24 36:5 39:8,22
  40:6,8 41:7,9,14 42:16
  46:25 47:3,6,6,10
  48:16 50:18 54:25 57:8
  57:13,19 60:15,25 61:6
  61:10,21 62:7,19,22
  63:2,5,7,11,23 64:9,16
  65:14,15 66:5,16,18,22
  66:25 67:6,8,10,10,12
  67:14,15,16,21,22 68:1
  68:17,19,20,21 70:11
  70:17,19 73:4 75:18,22
  78:7,23 79:4 85:10,13
  88:18 90:6,7,10,23
  91:5,7,20,22,25 92:9,16
  95:2,3,8 98:8 100:8
  102:25 104:11 108:15
  108:18,20 112:23
  113:5,24 114:4,16
  115:8 116:25 118:14

121:19,22,24 123:18
125:19 126:6 127:11
129:15,16,20 130:12,16
130:25 131:17,23
132:9,14 133:3,25
134:1,3,4,16 135:3,25
135:25 136:12 140:4
140:18 141:23 142:23
144:2 145:13,15,23
146:2,5 147:22 148:20
149:1,9,12,16,17,18
151:9 152:7 154:12,21
154:22 157:4 158:11
158:13,18,19,21 159:2
159:12,21 162:11,17
166:2,2,7,9,20 168:3,4
169:17 170:1,12,15,19
170:21,23,25 171:6,12
171:21 172:19 174:20
174:23,25 175:6,17,19
177:6 178:1,8 185:11
189:2,5 202:24 207:1
208:7 209:16,18
212:23 213:14 230:14
232:2,3,5,6,10,16 239:7
240:7 242:9,11,14,25
246:20,21,23,25 248:13
248:23,25 249:25
253:23 257:7 259:23
259:25 260:2,4,6,10,11
260:13,14 262:2 265:2
265:9,22 266:6,20,23
267:14,16 269:2,20
280:5 284:1 286:22
288:2 296:9,13,18,22
296:23 297:5 313:3
325:2,10 339:3 340:8
342:1,2,6 343:2,10
344:22 346:17,19
348:3 349:1 350:11
351:12,15 356:7,10
358:8,23 359:6,14,20
359:22 361:11 362:20
363:21 364:1,7,21
365:14,21 366:15
367:16,21 368:23
370:5,9,11,14 371:1
372:9 373:14 374:4

375:4,4,13 376:10,14
377:9,10,15 379:22
380:2,8,21 381:9,14,18
381:20,21 382:4,9,16
383:6,25 384:23 385:3
385:18,21 386:4,9,14
386:23 387:2,10
388:20,23 389:9,11,17
389:21,22 390:2,4,17
390:23,25 391:14,18
392:4 393:1,5 394:20
394:24 395:8,9 397:7,8
398:12 399:1,20 400:9
400:14,16 401:9,19
402:3,8,8,11,18,20,21
403:19 404:15,20,22,24
405:3,6,8,19 406:23,23
407:13 409:14 411:2
414:7,11,15,16,19
415:2 416:8,11,15
417:4,5,7,14,18,19,20
418:6,7,18,23 419:1,3,5
419:6,11,13 420:13,14
421:2,4,7 422:9 423:3
423:21 424:4,15,23
425:11 426:6,9 427:3
435:10 437:3,6,18,21
443:20 447:19 449:19
449:24,25 450:4,10,13
450:17,22 451:1,5,9,17
451:25 452:16 458:12
458:17 459:8,14,21,23
462:7 463:10,13,20
464:17,22 465:12
466:8,11 467:15,20
468:20 469:8,18,22
470:1,17 471:1 473:10
473:14 475:4,12
476:18 480:19 482:16
482:20 485:18 486:5
487:22,25 488:4 490:2
490:20 491:2,4 492:18
493:21 494:6 495:4
497:8,12,17 498:2
499:4 500:10 501:12
502:23,24 503:8,15
504:3 505:8,8,20,23
506:11 509:6 515:2,3,3

515:4 516:2,6,14,20,20
516:20,21,25 517:1,23
518:14,25 519:12,14
520:1,4,19,25 522:8,15
525:23 527:12 530:22
531:7,17,25 532:19
533:21,24 534:9
535:21,24,24 538:15
545:19 546:8
**Chryslers** 260:12
**Chrysler's** 29:14 39:11
39:14 61:19 62:1,3,5
62:18 64:7 73:20 85:14
85:16 89:16 118:5
121:19 125:14 128:3
133:14 134:15 154:17
155:24 166:22 169:7
204:24 260:25 261:18
266:18 271:17 273:7
303:10 341:20 342:1,4
342:18 359:17 360:24
361:3 369:9,12,25
371:14 374:7,13,19
376:8 381:21 382:6,21
382:22 399:23 450:5
452:15 455:24 466:3
476:17 489:8 500:22
503:3,19 518:8
**Chrysler-Daimler**
248:19 250:16 253:19
254:4
**Cincinnati** 13:13
**Circuit** 506:25
**circumstance** 327:15
490:13
**circumstances** 33:3
35:20,23 48:13 61:4,9
61:25 69:11 492:23
**Citi** 202:20 290:8,10
**Citizen** 416:1
**City** 506:25
**claim** 171:13,20,22 310:1
310:3 336:2 378:13
418:5
**claimants** 92:13,19
402:18 404:7,8,12
416:2
**claimed** 206:25

**claiming** 522:22
**claims** 2:20 91:7,9,11,17
91:17,18,19,20,23 92:2
92:16 93:6,11,15
258:12,13 305:20,23
306:12,21 394:15,20,21
394:23 404:15,21,24
405:2 414:5,8,12
418:18 473:3,18,22,23
473:24 474:8,9,9,12,14
**clarification** 52:4 92:5
138:15 147:25 249:3
357:4 409:6,15
**clarified** 251:7
**clarify** 50:14 144:14
145:17 154:20 158:8
216:7,13,14 217:14
249:2 320:12 510:22
**class** 11:3 14:3 333:3,4,5
333:10,12,12
**classes** 35:22
**clause** 142:17 424:18
**clean** 25:6
**cleanup** 274:9
**clear** 2:20 46:17 81:22
121:14 138:22 146:11
148:23 151:5 156:7
159:7,11 161:16 190:6
190:7 193:7 196:19
224:21 227:6 321:14
329:3,20 331:10 356:3
378:12 393:12 394:15
412:10,23 413:17
418:7 419:2,12 421:20
427:2 441:22,25 442:3
446:13
**cleared** 254:2
**clearer** 420:24 423:6
459:12
**clearly** 136:19 139:23
150:24 153:6 167:16
201:23 255:21 470:20
**Cleary** 8:9 119:6
**clerk** 37:1 119:9,11
**client** 164:4 479:18,22
480:20 482:17,17,23
510:18 511:18 535:15
536:13 538:5

**clients** 217:20
**climate** 490:2 495:12
**close** 73:19 75:18,22 76:1
76:7,12 171:23 181:11
187:1,2,5 196:14
233:16,24,25 234:9,11
234:17 322:19 341:17
350:12 360:14 372:1
388:15 406:25 518:24
523:6 533:1,17 540:19
**closed** 26:3 84:21 238:18
273:19 341:10,12
**closely** 39:24 47:12,15
361:22 383:9
**closer** 29:6,7 174:8 233:8
270:5 539:25
**closes** 238:19 260:3
408:15 429:13,14
**closest** 128:18
**closing** 9:7 233:19
235:16 331:21 349:12
436:20,22 471:11
506:24 533:6
**closure** 398:19
**clouds** 181:17 183:19
**Coax** 231:15
**COBB** 24:7
**cocktail** 207:20
**code** 2:3,13 54:9 368:17
**coerced** 207:1
**coercion** 207:12
**coffee** 513:17
**COHEN** 8:17 21:2
**Coke** 408:2,10
**collateral** 64:15,24 66:4
66:17,22,24 67:7
**colleagues** 69:15 378:9
**collect** 405:21 406:5
**collected** 507:15
**collectibility** 83:12
**collective** 122:11,12
123:6,7 125:7,10,17,21
125:24 127:10,18,20,23
128:5 130:11,16,23
131:9 132:4,17,23,25
133:3 135:3,16 137:3,7
137:20,23 138:4
139:16,20 140:5

141:17,19,22 142:8,16
143:6,20 144:1,16,23
148:5,15 151:14
163:21 167:7,24
168:10 169:12 172:17
**collectively** 145:2 189:3
**college** 33:20
**colored** 501:2
**Columbus** 24:5
**column** 313:16 456:23
457:15,24,25 458:1,4
461:6,14,15
**columns** 457:1,6 460:17
**combative** 526:23 527:7
527:15
**combination** 295:5,25
315:7 386:4,7
**combine** 509:9
**combined** 180:9
**combining** 296:23
**come** 26:23 32:19,24
34:17 35:24 36:12
37:10 41:17 42:17 43:1
47:16 48:15 53:9 55:2
87:24 102:25 104:7,10
121:6 124:20 129:6
140:2 156:12 170:2
174:1 176:19 179:25
194:14 195:24 196:19
207:8 211:20 222:5,14
273:11 283:3 325:10
330:16 332:5 336:19
386:10 427:13 435:3
455:3 459:10 479:11
495:6,8 534:23 543:3
**Comerica** 18:3
**comes** 76:6 122:24 186:1
332:14 537:1
**comfort** 240:21,22
**comfortability** 150:15
**comfortable** 79:7 80:23
105:16 143:11 150:13
209:15 243:18 250:14
347:13
**Comfort's** 143:12
**coming** 159:12,13 182:4
192:19 262:14 337:20
426:14 428:19 431:18

431:19 478:25
**Commander** 70:25
**commenced** 300:17
411:24
**commencement** 38:25
**commend** 245:3
**commendable** 69:13
**commensurate** 317:25
**comment** 26:20 74:9
87:12 116:20 204:12
254:4 289:23 458:11
**commented** 204:16
**comments** 289:19 308:21
356:6,15 458:4,8
460:14 461:17
**Commerce** 188:24
279:19 281:23
**commit** 437:3
**commitment** 122:7
166:16 170:9 179:20
196:11 212:12 281:18
510:1 536:16
**commitments** 179:12,21
206:18 467:10
**committed** 380:1,2 381:8
381:12,12,14 437:20
473:3 491:22 536:13
**committee** 5:3 12:3
13:10 14:12 25:22 26:7
30:6,7,8 31:14,16
36:17 45:24 49:4 90:1
104:16 114:11 124:17
124:19 126:20 127:4
162:10,16 163:18,18,19
163:20,23 164:1,1
170:3,6 357:19 358:7
368:21 378:4 379:6
382:15 401:18 407:6
449:19 452:8 454:21
477:14 483:22,25
485:2
**committees** 30:3,5 31:24
190:12
**committee's** 30:9 164:16
378:5 479:4,7 541:23
541:25
**common** 209:13 316:25
505:22

**commonality** 209:13
**commonly** 506:2
**communicate** 220:25
221:15 380:24
**communicated** 156:15
161:22 220:4 398:4
494:22
**communicating** 206:22
**communication** 221:12
221:16,18,24
**communications** 17:14
235:7 304:10 381:1
**communities** 212:14
213:16 360:12 474:20
475:3 533:20
**community** 212:15 360:8
**Comp** 435:7
**compact** 180:6 191:23
208:5
**companies** 2:9 30:24
94:16 107:16 123:10
123:15 126:8,14
129:23 130:7,19 132:1
132:2,5 169:14 188:20
230:25 231:1,3,4,7,13
239:6 247:24 280:8,13
280:19 281:2 370:3
383:24 386:5,6 408:1
408:12 476:22 547:7
**company** 6:20 9:3 19:3
22:3 32:20 35:15 36:14
36:20 39:15,25 40:11
43:15,17 47:3 48:22,23
49:6 56:10 57:17,19,25
58:5,7 61:1 63:13
66:19 67:15 70:7 83:16
83:17,21 85:3,21 86:2
89:4 93:1 99:9 101:15
104:23 105:16 106:25
107:3 117:9 118:7
124:12,18 126:15,16
128:1,21 129:9 143:13
148:21 160:12 161:11
165:7 169:12 175:9,15
178:2,8,9 188:15
198:10,11,21,23 199:19
200:18 204:6 205:4,6
205:12 206:24 207:23

219:21,25 220:23
227:7 233:3,6,12 238:2
247:6 249:20 250:18
257:8 259:24 260:2
262:1 266:19,20,24
267:11 269:21 270:3
270:14,25 273:7,8
274:8,23 276:16
281:16 283:18 286:24
292:7 300:12 301:8
308:20 309:13,21,25
311:24 312:2,3 317:19
317:20,24 320:1
322:10,13,20,23,24
324:10,13 325:22
326:9,15,17,20 327:16
328:3,4,9 329:6 330:25
331:11 334:16,22
336:5 337:14 338:19
342:15 347:2 375:20
377:10 380:10 400:22
406:22 407:18,22
420:10 444:5,9 447:20
448:4,9,16 449:4
458:16 465:14,24
472:21 475:1 476:21
476:22,22,25 485:23
496:6 503:25 506:24
515:3 516:10,23
521:23,24
**company's** 32:12 33:11
36:6,7 40:3 58:10,17
59:1 85:2 95:12 100:15
104:8 106:17 108:8
204:3,11 292:2 295:9
313:13 428:12 448:7
**comparability** 224:12
**comparable** 58:14 97:6
322:18
**comparative** 321:15
458:24
**compare** 99:20 320:17
**compared** 321:7 351:8
476:18
**comparison** 374:23
455:23 504:1 509:5
**Compass** 70:24 71:5
109:1,5,7 208:6 346:4

**compensate** 316:24
**compensated** 362:1
**compensation** 238:13
415:16 436:18 437:1,4
437:8,19
**competent** 113:16 114:1
139:9
**competing** 123:23
321:10,23
**competition** 531:20
532:24 533:8
**competitive** 123:24
130:19 131:3,14
133:13 135:6,11
170:22,24 422:21
528:25 532:7
**competitors** 486:14
538:4
**complete** 51:2 63:12
131:18 233:13 238:7
266:2 345:21 363:18
423:12 449:5 452:23
514:1 517:4
**completed** 126:24
131:16 152:18 233:4
412:4 415:2
**completely** 89:3,6,10
329:18
**completeness** 90:13
**completes** 238:10
**completion** 238:4 408:22
**complex** 141:2 185:18
212:20
**complied** 131:14,19
332:11
**comply** 135:13 368:25
436:18 438:1
**component** 143:13 257:9
257:16,21,24 258:9
494:16
**components** 18:12
132:24 137:10 258:20
**comport** 204:6,13
**compound** 419:19
**comprehensive** 52:23
**concede** 495:2
**concept** 90:22 91:12
189:1 275:15 340:22

**concern** 78:22,24 89:1
104:11,14,22,24 143:5
143:8 280:10,12,14
281:7,13 298:24
312:20 321:6 336:22
341:21 342:19,21
343:2,9,22,23 344:1
442:1 531:10 540:13
**concerned** 88:21 104:23
137:8 304:8,19 321:21
375:19 478:24
**concerning** 146:23
151:18
**concerns** 112:18 331:8
481:5
**concession** 130:1,3
142:19 155:15,18,20
158:22,24 161:4
315:19 392:5
**concessionary** 195:18
**concessions** 131:10,13
132:3,5,16,19,22 157:8
157:15,15,19,20,22
158:1,2,23 161:5,7
194:1,3 195:11 196:4
196:20 201:1 207:11
213:6,9 257:23 258:7
258:19,24,25,25,25
301:17 338:21
**conclude** 322:3 340:6,15
340:19 510:22 511:5
**concluded** 60:1 81:4,8
82:1 198:18 408:19
530:5 543:8
**conclusion** 35:12 56:6
73:2 109:12 116:8
194:8,10 265:12
325:16 405:25 406:7
413:5 471:23 474:4
**conclusions** 77:23
179:25 418:15
**concurrently** 211:11
**condition** 43:19,20,21,22
44:7 67:9 113:17 114:3
393:20,25 394:2 407:8
**conditions** 107:8,11,14
107:17 301:16,17
**conduct** 52:3 284:7

444:9
**conducted** 78:2 165:18
297:10 355:15
**conference** 69:14 217:11
239:4 248:14 375:23
517:16
**confidante** 139:23
**confidence** 177:13,14
181:21
**confident** 489:20
**confidential** 378:15,17
453:9 454:8 455:6
478:11,12
**confidentiality** 378:9,13
454:14 455:4 477:20
480:21 481:5,6,16,19
481:24 483:1,4,15
485:1 510:24
**confidentially** 468:8
**configuration** 83:19
**confined** 429:11
**confirm** 78:11 80:6
114:19 160:7 268:2
307:14,22 413:7
440:24 442:23 445:21
446:20 453:8
**conflicts** 4:11 538:14
**conform** 493:14
**confused** 261:9,14
301:12 495:3
**Congress** 94:12,21
277:15 280:8
**congressional** 190:10
194:4
**conjunction** 30:9 37:20
431:12
**connect** 474:5 509:1
**Connecticut** 7:4 23:11
23:12 28:22
**connection** 2:22 42:18
66:3 119:23 122:16
132:16 133:23 135:18
137:7 140:12 142:8,22
143:5 151:17 152:12
155:19 156:16 159:1,8
159:11 167:5 190:3
241:9 247:12 297:13
310:14 330:22 368:15

387:1 409:1,13 410:4
411:1 412:24 413:22
413:23 414:19 471:14
471:20 473:15,20
474:5,17 487:21
488:14 517:13 531:9
**Connor** 208:20
**conquest** 534:12
**conscience** 254:9
**consensus** 211:19
**consent** 26:6 169:8
217:23 218:1,10
**consented** 88:10
**consents** 111:4 112:5,6
**consequence** 63:15
239:17 241:3 438:14
**consequences** 149:12,23
151:10 431:18
**conservative** 81:6,24
182:8,9 184:1 321:8,25
322:11
**consider** 58:4 108:20
164:5 191:25 205:12
251:1 332:2 402:11
411:23 412:19 473:17
474:19,22 481:9,11
537:18
**considerable** 282:5
**consideration** 47:24
48:12,14 56:8 65:18
108:21 123:13 157:8
187:22 198:20 213:13
322:2 332:12 334:17
350:4 351:1 387:10
390:18 411:22 413:2
489:21 490:21 516:17
**considered** 51:11,14,25
52:5 101:23 109:3
147:8 150:10,25 317:8
452:16 456:6 457:12
474:23,25 475:4 476:6
482:10 494:19 536:10
537:13,20
**considering** 58:6 181:2
282:17 317:12 366:15
437:11
**consistent** 51:19 56:13
56:15 123:9 192:13

193:16 391:22 500:9
**consistently** 58:5
**consolidate** 444:3 465:8
475:10,11 489:5
**consolidated** 233:11
248:12 447:19 465:10
500:13 519:12
**consolidating** 450:9
464:25 533:16
**consolidation** 390:4
391:23 444:6,12
459:21 465:3 519:9
531:24
**consolidations** 520:17
**constant** 322:8
**constantly** 145:4 355:11
**constituencies** 34:12
58:10
**constituents** 34:7 59:11
101:16 194:20 213:23
358:23 361:14
**constituent's** 258:7
**constitute** 473:23
**constituted** 105:4
**constitution** 126:21
**constitutional** 123:1,2
**constitutionally** 152:20
**constraints** 282:7 329:17
437:11
**Construction** 16:5,15
17:5
**consultant** 136:18
**consultants** 33:4 129:18
289:2
**consultation** 26:6 517:11
**consulting** 239:11
288:16 296:19
**consumer** 92:9 180:18
181:21 185:20 401:19
416:1,24 420:2 421:16
422:24 424:10 499:20
499:23 539:11
**consumers** 185:22 402:7
415:24,25 416:16
422:17 490:20 494:20
495:6 498:17
**consuming** 329:18
**consummate** 63:9

347:12
**consumption** 206:23
**contact** 33:7 104:20
**contacted** 211:11 505:17
**contain** 541:16
**contained** 52:7 214:13
456:18 460:13
**contains** 453:9
**contemplate** 475:8
**contemplated** 41:21,23
53:21 268:23 269:19
368:2 394:5 396:14,20
474:13 521:17
**contemplates** 64:6
**contemporaneous** 97:2
**contend** 200:18
**content** 51:17 52:6,6
90:15
**contents** 73:24
**contest** 522:25
**contested** 160:9
**context** 165:22 167:12
167:14 224:23 243:14
265:16 275:16 284:9
284:12 286:7,12 290:2
293:3,15 294:10
295:16 296:10 300:4
301:4 340:1 431:20
488:15
**contexts** 324:3
**contingency** 281:18
**contingent** 258:1,3,8,11
258:19 387:13 400:11
414:8
**continuance** 431:3
**continue** 67:21 68:4,24
75:15 77:15 104:24
129:10 158:1 193:21
209:18 229:6,9 233:3
242:21 277:1,2,3,4
295:3,5,23,24 402:16
426:16,20 519:23
521:25 522:1,11 531:2
532:8,11,13
**continued** 61:1 79:20
82:14 95:10 116:11
188:7 200:7 276:25
278:14,14 301:2

389:13
**continues** 433:18
**continuing** 187:2 204:9
253:19 301:20 426:13
520:1
**continuity** 175:19
**continuous** 281:22
**continuously** 195:19
197:3
**contract** 26:1,2 122:14
123:9 126:7 257:18
458:13 459:18 463:20
**contracted** 347:8
**contracting** 163:6
**contractor** 230:20
**contracts** 2:22 124:4,17
125:13,15 126:4
430:14 458:3 459:8,24
460:1,3,4 462:15 463:1
464:7 465:7,11 472:6
472:19,23,25 476:20
500:22 517:7
**contractual** 308:23
**contractually** 152:21
309:15
**contrary** 374:15
**contribute** 222:8 336:9
444:21 507:9,10
**contributed** 163:20,22
**contribution** 45:18
268:21 269:12,14
309:24 310:3 324:23
325:11,17 332:1 335:7
335:9
**contributions** 343:8
**control** 41:22 42:6,7
290:10
**cont'd** 545:2 546:2 547:2
**convene** 197:1
**convenience** 43:7 500:4
534:1,3,3 542:11
**conveniences** 534:6
**convention** 125:24
**conversation** 87:18
217:19,22,25 218:9
225:11 227:5 228:4
294:2,8 327:24 348:12
528:24

**conversations** 247:17
286:14 395:13,14
397:22 398:1
**conversion** 168:2
**convert** 196:11 309:18
**converted** 309:1
**convey** 153:10 159:24
326:9 329:4 339:22
452:25 457:25
**conveyed** 298:25 299:1
453:4 454:5
**convince** 279:5
**cooks** 255:21
**cooperation** 442:4
**cooperative** 454:20
**coordinator** 124:14
**copied** 222:16 248:6
250:21
**copies** 442:23 483:13
**copy** 28:4,7 43:10 45:18
46:1 55:10 120:3
377:23 512:11 524:22
524:23,25
**core** 83:15,16,21 416:25
417:3,6 425:12 428:13
429:2 447:11
**Corker** 196:13
**corner** 166:15
**Corp** 124:10
**corporate** 30:19 44:15
90:9 91:4
**corporation** 11:12 28:12
34:7,10,12 35:11,19
40:20 44:17 50:22 93:6
175:18 414:15 485:24
519:13
**corporations** 30:17
**correct** 29:2,23 33:23
34:11,19,25 35:2 40:21
41:16,25 42:8,9 47:4,8
47:11 48:8 53:7 54:12
56:2,4 57:21,23 60:3
62:23 63:6 64:12 65:3
65:6 66:1 67:17 73:11
73:17 74:24 77:13
78:23 79:1 86:4,7,10
86:14,18,21 90:8,10,11
91:13 93:8,9 94:23

95:1,7,15,22 96:1,3
97:10,25 98:1,2,4
100:4,6 102:17,24
104:9,18,21,25 106:8
107:24 109:19 110:9
110:18 111:23 113:2,7
114:17 116:7 121:16
123:19 128:4 130:8
133:22 145:5,8,10,16
145:20,21 146:14,21
148:7,13,22 151:15,16
152:13,16,21 153:1,4
153:16,23 155:13,22
156:10 158:17 160:11
162:2,20 163:4,8,10,17
166:12 167:18 171:19
173:17 190:1,5 191:25
195:2 196:4,5 197:5
199:7,17 202:7 204:25
206:10 208:21 217:3
217:17,18 219:16
221:12 222:11 227:8
227:11 228:1 230:14
232:2,17,20 236:25
237:1,4,14,15,20
240:15,20 241:14,23
242:2,4,7,9 244:1
255:15,18,24 259:21
262:19 263:5,6,7,22
265:6 266:7,21,24
268:24 269:2,3,5,6,7,8
269:9,21,22,25 271:25
276:11 277:14,15,22
279:11 283:20 284:3
284:10,24 285:5
287:19 288:7,13 292:8
292:11,12,20 293:2,6
293:22,24 294:5,6
295:10 297:11,14
302:14 303:19 304:17
304:21 305:11,20
308:13,18 309:14,22
313:19,24 314:3,6,8,16
314:19 316:16,21
317:1,2 319:10,12,15
319:20,24,25 320:3
322:14,25 323:19,22
324:4,11,17,20 325:18

327:4 328:22 334:18
335:11 336:6,7 342:22
343:3,6,9,16,17,21
345:2,14 347:3 348:18
348:23 349:4,6,14
350:14,24 351:14
354:4 359:3,15,18
360:2,5,15,18,21 361:3
361:17 365:19 366:22
367:1,23 368:9 369:4,6
370:22 371:2,15
372:22 374:8,20
376:10,14,23 377:4,16
379:7,10,12,19,22
380:16 381:3 383:7,16
383:17,19 385:5,16,19
386:24,25 388:16
389:11,18,19,23,24
392:16,20,23 393:2,9
393:14,21 394:24
395:2,18,23 397:1,4,5
399:2 402:1 403:18
405:5,17,18 406:24
407:16 409:11 410:5
411:18 414:9 415:13
416:8,12,13 417:7
423:4 427:1,24 432:6
442:15,23 443:21
447:23,24 448:1,2,7,10
450:6,7,11,12,17,18
451:3,7,12,15,23 452:2
452:18,22 454:4
455:21,22,25 456:19,20
456:24,25 457:20
458:6 459:16,24,25
460:1,2 461:4 462:8,16
462:20,23 463:2,4,8,9
464:20,21 465:5,9
466:5,6,9,10,18 467:7
468:24 469:24,25
470:2,3,11,12,14,15
471:8,9,12,15 472:7
473:1,10 476:15,16
478:2,3,6 485:21,22
486:12 487:20,24
488:2,13 490:18 493:6
493:12,15 494:1
496:17 499:22 500:16

500:17,23 502:19
505:15 506:3,4 508:7
513:7 514:23 516:21
518:20 520:3,6 521:21
524:11,17,18 526:3,11
529:14 530:25 531:8
531:18
**corrections** 38:12
**correctly** 48:6 58:16
  221:7 274:6 361:15
  499:17 507:20 514:14
**correlation** 181:23
**correspond** 483:8
**correspondingly** 529:18
**Corrine** 3:8 170:1
**Corrupt** 299:6
**corruption** 298:23,25
  299:5
**CORSE** 16:23
**cost** 123:25 124:2,4
  126:11 131:10 183:3
  187:10,14 195:9
  273:24 274:3,4 277:9
  301:2 325:1,8 337:15
  363:22,25 364:2,5,8,16
  364:21 365:15,22
  368:12,12 370:12,15
  391:17 419:24 420:9
  422:23 450:3 464:22
  464:25 465:2,4,4,22
  471:1,5 472:6,12,25
  473:8,9 505:23 506:8
  506:11,16,19 507:24
  508:16 539:17,19
**costing** 146:6 373:14
**COSTON** 13:18
**costs** 123:23 135:11
  186:21 274:11,12,16,17
  277:12 301:3 315:17
  373:8 385:8 391:14
  402:15 420:22 444:14
  444:16,21 472:11,12,14
  506:12,12 507:18
  508:23 509:14
**cost-cutting** 183:21
**cost-sharing** 383:11,21
**Council** 7:19 140:18
**counsel** 4:11 25:22 32:13

33:3 34:17 37:20 45:24
49:21 51:2 54:16 74:7
74:10 75:9 79:23,25
83:13 87:5,16,23 89:25
92:5 102:13 108:15
120:25 126:5,6,12
136:17 152:1 165:25
201:13 213:19 216:13
219:9 234:24,25 235:1
235:2,8,21 236:20
244:4,21 246:14,18,19
246:23,25 247:2,9,16
247:18,19,20 248:1
252:13 279:7 280:22
281:21 289:11,20
304:2,4,11 320:15
331:16 333:21 342:8
378:11 379:3 387:19
387:25 413:6 414:23
422:1 434:19 436:12
436:13 441:6,18,20
446:5 480:10 481:5
482:7
**counseled** 187:24
**counsels** 126:5,21
**counsel's** 117:15 266:8
  385:23
**count** 435:21 459:20
  460:11 501:21 518:6
  519:8
**counterparts** 398:16
**counting** 252:19,20
  253:1 530:4
**countless** 199:11
**countries** 298:23 497:5
**country** 8:4 72:8 121:9
  186:9 192:13 211:4
  212:14 213:16 368:22
  448:25 486:22 491:13
  491:21 548:12
**County** 7:11 441:19
**couple** 25:3 81:13 93:5
  98:5 100:18 104:7
  144:15 187:7,8 192:5
  192:12 193:6 210:9
  215:5 217:5,15 283:1
  289:17 398:24 423:2
  456:22 483:18 494:21

510:9
**course** 28:14 53:1 109:23
  110:10,15 123:12
  125:6 154:3 177:11,17
  185:3 188:12 190:9
  305:10 339:18 347:17
  418:22 419:1 425:10
  446:14 489:1 517:5
**court** 1:2,13 25:2,13,20
  26:16,19,23 27:1,3,5,12
  27:19,24 28:8,14 29:5
  29:10,12 37:4 38:16,19
  38:23 41:1,24 45:22
  46:5,7,10 47:1 49:17
  49:20,24 50:14,23 51:7
  51:10,18 52:8,20,23
  53:2 54:19,22 56:20,22
  57:1 58:21 59:14,17,18
  59:20 62:13,15 67:3
  68:10 74:6,9,19,22,25
  75:3,9,16 76:14,18,25
  77:3,7,11,13,17,20
  80:12,14,16 81:13,17
  81:20 83:14 87:15 88:5
  89:22 92:6,24 93:19
  98:15,19 101:11,18
  102:1,9 103:8,13,18,21
  103:24 104:2,5 108:2
  111:25 112:3,8 113:20
  114:2,7 115:1,7,12,21
  115:24 116:3,14,18,20
  117:20,24 118:1,24
  119:3,12,16 120:2,15
  120:19 136:23 138:15
  138:16 139:2,7 144:6,9
  144:11 147:3,5 150:1,4
  150:15 151:25 152:3
  154:8 160:5,17,22
  161:1,13 163:22 164:9
  164:11,19 166:11
  169:20 172:1,5,8,12,14
  172:22,24 173:2,8,15
  173:19,22 174:1,4,10
  197:1,12 201:11,13,20
  201:22 202:2 214:4,19
  214:23 215:10,18
  216:2,8,10,13,16,18
  221:3,11 224:10,18,20

225:1,7,17,23 226:15
235:11,18 236:1
237:22 242:17 243:10
243:16 249:6,9,14,17
261:3,6,8,10 264:4,8,12
264:14,17,23 265:15
266:12,15 276:21
280:22 281:13 282:16
282:19,23 283:2,7,10
283:12 289:9,21,22,25
298:2 310:11,22 320:5
320:11,16,20 329:13,16
329:17 330:1,4,6,8,10
330:12,14,16 331:3,6
331:17,20,22 332:18,20
332:23 333:25 334:21
336:13,16 338:6,10
341:24 342:3,5,7,11
344:7,12 351:25 352:4
352:9,18,21,25 353:2
354:8,12,15,19,23
355:6,15,18,22 356:4,9
356:15,18,20,22 357:1
357:15,18,24 358:3,5
358:15,18 362:7,12
363:10,16 377:21
378:1,24 379:2 382:1,8
382:13 384:11,20,24
385:9,24 386:3 387:18
387:21 388:11,13
392:9 401:16 406:2,7
406:14,18 407:2
408:22 409:6,15,18,20
409:23 410:8,15
411:23 412:9,17 413:1
413:12,15,20,24 414:2
415:20 416:3 418:12
418:15 419:20 423:12
423:14 424:18 425:19
425:22 426:1 427:9,12
427:14,17,19,23 428:1
428:3,7,10,24 429:12
429:19,20 430:5,8,10
430:13,20,22 431:7,12
431:13 432:1,13,23,24
433:8,11,19,22,25
434:6,14,21,24 435:7
435:13,16,19,22,23

436:2,12,15,17 437:12
438:5,7,10 439:4,7,13
439:16,20,24 440:2,5
440:10,12,15,17,20
441:2,5,13,16 442:6,19
442:21 443:6,10,16,17
445:24 446:2,16,18,22
446:24 448:12,14
449:16 452:5 453:16
453:18 454:10 455:3
455:12,17 468:3,9
471:24 472:4,8,13
474:3,11,15 475:7
477:12,17,23 478:1,4,7
478:15 479:13,21,25
480:2,9,13,24 481:1,3,8
481:14,18,25 482:24,25
483:5,11,17,20,24
484:6,10,13,15,19,22
484:24 485:5 491:16
495:18 496:13,15
498:7,9 504:7,9,17,18
509:22,24,25 510:2,8
510:13,16,22 511:1,2,4
511:9,11,15,17,19,22
512:2,5,8,13,23 523:5,8
523:10,13,18,22 530:5
530:8,10 534:22
535:14 538:19 540:16
540:18,21 541:3,6,11
541:14,19,22 542:3,8
542:17,22,24 543:6
courtesy 480:3 511:22
  512:21 534:19
courtroom 436:6
courts 261:18 471:4
Court's 429:23 435:9
  473:6 484:2
Cousins 7:16 441:11,15
  441:17,18 442:7
cover 46:25 116:2
  266:17 356:4,6 456:15
  467:1,2,5,8
covered 44:6 179:17
  420:16,17,19,20,22
  421:18 422:3,11 424:6
covering 237:21
Cox 436:25

co-counsel 512:9 534:25
co-pays 130:4
Crane 479:17 535:1,18
  535:20 536:7 537:6,21
  538:15
crash 419:24 424:21
create 126:5 128:20
  290:11
created 84:5 128:21
  385:15,17 494:20
credibility 51:23
credit 103:1 187:16
  370:10 532:21
creditor 14:13 35:22
  91:11,17,17,23 92:2
  314:11 315:3 334:8
creditors 5:3 15:11
  25:21 26:7 34:8,13
  45:24 86:6 90:1,6 91:5
  91:6,6,8,9,18,20 102:12
  333:3,10,11 334:6,9
  358:24 361:12 403:5,7
  403:8,9 407:6
credits 509:7
criteria 252:25 308:24
  349:7 368:3 376:17
  416:21 419:23 420:3
  421:15 425:12,13
  527:6 528:20
criterias 422:17
critical 180:4 301:22
critically 192:10
criticism 209:19 482:4
criticized 81:19,23
  207:16
Cromwell 14:20 15:2
  436:10
cross 59:16 93:24 95:19
  99:4 102:2,5 115:22
  173:10,16 355:13
  358:4 427:24 428:23
  433:4,4,7 434:10 510:3
  534:22 542:2,15
crossed 439:21
cross-examination 59:14
  59:21 75:15 90:2 92:10
  93:3 100:19 105:8
  144:6,12 162:12

169:22 216:19 283:13
  355:3 358:5,9 388:4
  392:11 401:20 407:3
  416:6 426:7,23 428:5
  432:23 435:1 439:10
  443:7 449:20 485:9
  535:3 539:8
cross-examine 89:23
Cruiser 346:24
crush 424:21
Cs 180:6
CSI 539:10,14
CT 23:15
CULLEN 3:17 27:8
  173:5,9,25 216:7,9,12
  216:14 427:18,21
  433:14,21,24 434:1
  438:16 439:1,6 440:3,8
  440:11,14,16 484:2,17
  484:21,23 543:1,7
cure 440:25,25 441:1,2,3
  471:13,19 472:2,14,14
  492:6,6,7
Curious 253:14,16
current 127:17 188:9
  199:13,15 317:24
  331:10 342:4,15
  346:19 367:3 391:14
  417:4,9,20 420:13
  449:3 460:25 489:25
currently 234:14 315:11
  372:10,12 400:7
  407:12 445:11 494:6
Curson 8:10 27:17 119:7
  119:17,18,23 120:3,13
  120:18,20 124:6
  130:10 137:3 139:14
  142:22 144:14 151:13
  152:9 154:14 162:6,14
  164:21 169:24 170:2
  171:5,25 172:17
  544:13,14,15,16,17
curt 252:2
customary 105:11 117:8
  117:8 380:20
customer 180:20 186:6
  193:24 370:2 417:10
  417:15 420:4 425:14

497:18 498:2,14
499:25 500:5,20
501:15,19 509:15,16,18
513:5,25 514:6,8,10,12
514:15,19 537:15,19
539:14
**customers** 180:17 186:1
186:2,2,8 377:14
401:24 417:20 418:24
420:4 421:4 422:8,9
424:5 488:12,19
490:17,20 491:1
494:16,17,23 500:11
514:1 533:7,20,23,25
534:9,13 537:14
**cut** 315:15 359:19
480:16 487:18 526:25
**cutting** 187:11 396:2
480:19
**Czar** 192:18
**C.D.J** 479:17 535:2,18
535:21 536:7 537:6,21
538:15

**D**

**D** 2:9 3:18 13:15 20:17
22:9 25:1 45:3,4,20
46:8,11 544:2 545:2,15
546:2 547:2
**daily** 36:10,11,18 40:1
107:1 206:18
**Daimler** 29:21,22 41:7
41:11,14 42:11,25
43:14,16 44:2,5,6,7,13
44:19 45:10,12 90:8,11
90:14,15,15,17,20
91:10,19 93:8,15
129:15,17 175:18
178:11 179:7 188:14
240:7 245:17,18,25
246:22 248:12,14,15,23
248:25 249:25 250:4
253:24 292:25 313:18
409:25 410:13 411:21
412:11
**DaimlerChrysler** 169:13
**Dakota** 71:12,14,15
**DALE** 9:9

**Dallas** 14:16
**damage** 414:15,18
473:18,22,23 474:9
**damaged** 351:5
**damages** 480:16
**Dan** 120:25 136:17
**dangerously** 462:5
**darker** 501:1
**DARREN** 19:7
**DARRYL** 17:19
**data** 453:12 454:14,16
454:18,24 455:8,15
490:11
**date** 26:9 28:2 32:2 37:7
39:3 46:12 55:1 57:6
85:8 132:11 152:8
154:13 174:25 177:18
202:16 215:1 216:5
252:21 254:23 255:10
268:10,11 269:23
270:5,21 271:4,11
280:1 302:2 366:23
371:6 378:7 379:14
397:21 436:21 443:12
479:6,9 485:3 527:24
541:24 542:1 548:16
**dated** 54:10 55:7 70:15
94:2 152:7 153:21
154:12 216:4 287:18
545:22 546:8
**dates** 103:10 278:13
**Dave** 119:7
**David** 8:10 12:23 114:20
119:17 120:13 544:13
544:14,15,16,17
**Davidson** 534:25
**DAVIS** 6:8 19:2
**day** 3:3,12 4:2 36:19
60:20 98:11 108:8
114:9 118:17 137:18
180:15 272:8 279:7
302:12 305:6 413:10
413:11,12 431:4
485:13 489:7 521:8
529:23 531:14 539:20
**days** 26:11 41:24 83:14
117:10 123:14 144:3
192:6 194:13,15,21,23

195:19 205:10,10
252:19,20,21 253:1
272:10 300:19 301:1
376:16 388:8 389:16
406:4 436:7 489:12
492:21 495:7 542:12
**day-to-day** 179:9
**DC** 3:15 7:5,21 11:14
192:12 248:18
**deadline** 252:24 300:15
412:13
**deal** 25:7 52:11 63:9,12
101:17 110:11 129:16
131:18 134:7 163:2
207:2 211:3 217:2,23
218:1,10 238:17,19
246:15 256:4,5 257:24
259:1 262:18 263:23
265:7 268:22,23 273:1
291:15 293:1,17 312:9
330:22 337:25 340:4
347:12 348:7 350:12
353:10 388:18 389:5
389:20 390:18 392:19
393:13,20 394:5,12,14
396:14 414:7 433:16
440:6 482:19 484:4
539:5
**dealer** 7:19 195:10
212:15 275:4,11
306:20 360:8 363:1
364:20,22,24 366:18,21
368:21,25 369:8,11,21
369:23 371:1,7,24
373:2,9,11 374:2,7,10
378:3 379:6 382:15
383:3 387:24 390:4,7,9
390:11,13,22 391:14,18
395:15,23 396:3,5,11
398:3 399:6,7 400:3
428:13,19 429:16
443:20,22,23,25 444:8
444:9,11,11,18 445:3,8
445:12,14,15,16,22
447:3,11,14,16,22
448:3,8,9 449:12 452:8
453:22 454:21 457:5
457:10,13 458:9,10,15

458:17,21 459:5,9,15
459:17,20 461:21
462:2 463:7 464:4
465:13,15 472:11
473:16,21 474:6,18
475:1,4 476:11,19,23
477:5,13 479:7,11,15
479:17 480:15 486:6
486:17,18 488:23
491:4,5,12,20 492:18
494:15,25 496:5,22
497:1,9 500:14 505:23
508:24 509:1,10
515:14,15 516:22,22
518:6,6,7 519:8 520:19
521:4 525:19 526:21
526:23 527:4,7,8,11,12
527:15 528:13,18
529:1,12 533:21 534:1
534:12 535:21 536:11
537:12,13,20,25 540:10
540:11,12 542:11,13,16
546:14
**dealerization** 486:18
**dealers** 8:3 12:12 13:10
162:11,17 163:19
176:6 186:13 191:7
193:23 196:9 205:6
213:14,15 257:24
258:19 275:1 358:8,24
359:6,13,16,19,22,25
360:10,11,11,17,20
361:6,9,10,10,17,20,22
362:2,3,9,13,16,17,18
362:20 363:4,6,23
364:6,9,18,22 365:1,16
365:18,23 366:3,7,11
367:4,8,16,19,21 368:2
368:19,22 369:6,14,24
370:4,7,16 371:14,17
371:20,21,22,23 372:4
372:9,11,12,20 373:21
373:23,23 374:1,11
375:5,11,14,23 376:1,3
376:9,13,22 377:9,12
377:16 378:5 379:19
380:1,1,3,3,9,13,23,24
381:7,12,12,15,17,20

381:22 382:4,6,15,20
382:25 383:14 384:1
385:16 386:20 389:12
389:14,17,21,22 390:18
391:20 392:6,15 393:5
396:15,19,23,25 397:1
397:13,16,19 398:7,13
399:6 400:6,15 430:2
431:4,9 432:2 434:2,21
444:3,12,17 446:5
447:7,9,15,17,18,25
448:17,19,21 449:1,3,4
449:19,24 450:4 451:1
451:6,8,9,10,14,17,20
451:25 452:14,15,20,20
456:14 458:1,25 459:1
460:6 461:13 462:7,8
462:11,15,16,19 463:10
463:13,19,25 465:9,10
465:20,23 466:5,9,12
466:14,17,23,24 467:4
467:11,12,14,18,22
468:20,23,25 469:2,7
469:11,16,22 470:17
471:7,11,14,19,20
473:1,9 474:20,21
475:2,9,23 476:6,10,14
478:25 479:4,7 482:3
483:22,25 485:2,8
487:13 488:2,3,10,11
490:4,7,9,10,23,24
491:8,21 492:2,5,11,12
492:24,25 493:4,8,14
493:16,24 494:4,5,10
494:20,24 496:19
498:17 499:3,10,18
500:10,11,23 503:16
505:11,16 506:5,6,7,13
506:18 507:4,4,16,21
507:25 508:2,17,20,22
509:3,6 513:2,5 515:2
515:22 516:5,15
517:10,24 518:15,15
519:4,11,21,25 520:19
521:1,15,25 522:5,15
522:22 524:10,12,16
528:15 529:15 530:22
530:23,24 531:2,5,11

531:15,17 532:3,17
533:4 535:23 536:3
538:3,10 541:17,23,25
546:12
**dealership** 359:6,13
360:5,25 361:20
362:24 363:23 364:17
365:23 366:16 367:4,7
367:24 368:8,18,24
369:3 372:20 374:4,6,6
376:20 381:22 399:23
434:25 449:24 450:4
452:1,17,22 456:24
459:13,22 464:19
470:7,11,14,17 479:5
497:11 499:10,16,20
507:7 510:19 514:17
525:23,23 527:19
529:2 532:2 533:17
534:10 535:1,1,5,7,9,9
537:16 538:2 546:13
**dealerships** 360:14
362:15 364:3 366:10
367:9 376:17 379:25
399:8 428:4 429:15,23
429:24 430:2,15,17
432:17,18 450:14
451:14 455:20,24
475:17,21 482:10
485:20,21 499:15
504:2,3 509:16 525:14
525:25 533:1,6
**dealer's** 460:22
**dealing** 149:6 258:1,8,19
275:1 542:5
**dealings** 94:21
**deals** 142:9 230:23
326:13
**dealt** 53:6 177:12 249:22
254:13 357:5 414:5
431:11
**death** 185:8
**debate** 128:16 534:14,16
**debated** 506:2
**debits** 509:7
**DEBORAH** 6:17 8:15
**debt** 101:1 102:22 181:9
191:8,9 250:17 259:4,7

286:25 287:4,9,11,12
313:14 314:10,11,15
315:12 316:12,15,19
317:1,19 318:25 320:2
322:14,21 323:5
332:10 337:15 338:20
338:23 339:8 343:24
353:11
**debtor** 235:14 300:25
430:14 431:17 432:2
433:12 434:7 435:6,24
436:13 439:16 441:20
442:4 445:3 447:6,21
454:17,22 455:2,10
456:6 474:7 477:15
482:2 542:13
**debtors** 1:10 2:2,2,6,12
2:12,16,19 3:4,13 4:3
27:13 28:1,10 37:2,9
37:22 38:15 39:2 43:5
45:1,20 49:15 54:4,7
55:17 56:1,18 83:13
214:7,25 216:4 316:23
358:13 391:2 413:6
428:25 429:15 431:23
432:9,14,15,16 434:19
443:11 449:12 471:10
471:14,21 472:10,18,23
473:10,15,17,20,24
474:5,17,19 482:13
545:14,15 547:6
**Debtors-in-Possession**
3:4,13 4:3
**debtor's** 37:6 46:11
54:24 57:5 173:4 432:4
**debtor-in-possession**
196:22
**debts** 35:15 507:16
**December** 34:15 36:3
144:4 170:4 179:18,22
182:24 278:15,21
280:2 281:17 517:20
**decide** 58:23 421:17
**decided** 62:22,24 63:1
189:3 204:24,24
260:10 368:13 464:7
526:9
**deciding** 473:16,21

474:6,18
**decision** 60:5 147:10
196:25 197:8,23 205:2
211:18,23 212:22
213:1,2,12,22 236:17
236:25 289:3 290:10
327:18 333:14 340:12
360:25 361:7 373:9
422:24 424:10 425:1
432:8 447:21 456:6
464:13 470:7 500:21
505:20 526:25 527:3
527:10 532:21 536:20
**decisions** 150:11 176:19
183:8,9 186:23 372:2
373:2,3,6,12 425:2
428:13 433:6 540:3,5
**decision-making** 514:21
**deck** 317:13
**declaration** 37:3,6,17
38:4,10,15 39:2 79:21
79:22,23,25 80:17
82:16 95:16 97:21 99:5
119:24 120:4,10,13
133:19,20 138:23
214:11,17,25 215:6,8
215:11 260:19,24
261:6,17 275:21
277:25 297:10 347:21
358:14 359:3 434:10
442:12 443:11,14
444:25 464:25 518:13
529:11 530:11,12,17,21
531:10 532:23 545:17
545:21,24
**declarations** 38:25
214:21 442:16,24
443:6
**declare** 44:23
**declined** 450:14,17
**declining** 374:7,10
**decommissioned** 205:23
**decrease** 374:21
**decreased** 374:19
**deemed** 41:22 164:5
194:11,12 200:24
**default** 103:1,9,14 105:5
**defaults** 184:25

**defect** 402:22 405:8
**defend** 522:15
**defended** 453:8
**Defense** 28:9
**deficient** 492:4
**defined** 171:5
**definitely** 147:11 487:15
521:3
**definitive** 108:19 109:6
**defray** 444:21
**degree** 33:7,20 254:18,20
259:12,14 374:16
423:22 486:16
**delay** 36:25 248:10
492:15
**delays** 492:10
**delegate** 126:2
**deliberated** 462:11
**deliberations** 48:10
452:13
**deliver** 48:16 49:6,11
55:3 150:19 158:7
179:11,21 391:8
**delivered** 323:2 488:10
**delivering** 53:17 330:24
496:5
**delivery** 157:22 158:24
514:18
**Delmarva** 22:3
**Delmarva/Pepco** 25:21
**demand** 187:5 493:8
496:18
**demanded** 130:18
496:22
**demands** 111:22 350:18
350:19
**demographics** 185:25
**demonstrate** 482:2
**demonstrating** 62:6
**Dempsey** 13:9 162:10
**Dena** 524:22 525:10
**denied** 164:3 429:16
431:17
**deny** 160:8
**DEO** 281:25
**depart** 480:14
**department** 5:11 6:2
65:2,5,14 66:16 67:5

69:20,24 87:3,6 88:22
111:22 112:13 124:23
136:12 153:19 159:18
229:16 281:24 282:11
404:23 461:12,20
500:4 517:15
**depend** 61:7 334:2,2,13
**depended** 380:10
**depending** 35:20 61:4
113:11 327:15 437:12
444:24 457:3 492:19
**depends** 67:19 108:10
109:23 110:15 259:15
307:3,3 328:5,10 329:5
329:5 350:16 380:5
489:3
**depos** 512:10
**deposition** 120:6,10
161:19 173:10,13
432:7 433:15 434:18
438:17 439:17,25
453:8 485:15 499:12
528:10 542:6,19
**depositions** 440:8 454:12
**deposits** 26:6
**Depot** 230:16 232:19,21
408:2,6
**deprived** 479:19 482:23
**derivative** 91:12,19
**derivatively** 91:14
**derive** 324:11
**derived** 325:15
**describe** 41:5 69:12
122:21 123:21 130:14
130:22 134:22 166:11
177:12 242:20 244:17
245:5,9 265:9 484:6
**described** 76:6 83:8
168:18 208:19 296:16
466:22
**describes** 70:16
**describing** 37:17 54:12
249:13
**description** 457:2,3
458:20 545:14 546:5
546:11 547:5
**descriptor** 457:4
**desig** 383:2

**designate** 169:7,11 452:8
**designated** 26:2 173:13
**designates** 169:15
**designation** 383:3
**designations** 173:10
433:15 434:18 438:18
438:25 440:11
**designed** 495:24
**desire** 534:1
**desires** 131:22
**desist** 220:9
**desperate** 112:23
**desperately** 210:20,22
211:21
**detail** 52:18 118:6 311:8
529:21,23
**detailed** 52:15,21 54:12
190:8
**details** 410:23 468:7
527:2
**deter** 343:4
**deteriorated** 374:16
**deterioration** 374:25
424:19
**determination** 36:5
44:16,21 57:15 59:3
101:24 102:19 108:19
109:6,15,20 118:12
197:4 202:25 335:6
353:7 432:19 452:16
482:3
**determine** 58:12 68:3
161:4,5,7 367:6 453:3
463:24
**determined** 39:8 44:18
58:17 60:14 129:22
179:11 311:3 343:4
373:1 374:5
**determines** 67:19 463:7
**determining** 2:6,8 85:14
101:23 325:5 452:21
**Detroit** 6:15 10:5,8 18:6
21:6 141:1 170:10
182:13 189:2 193:5
288:25
**devaluing** 466:8
**devastating** 360:10
405:7

**develop** 123:11 124:2
126:7,9,11 178:6
181:15 190:20 193:18
325:2,8
**developed** 100:10 131:8
179:6
**developing** 104:12
122:25 247:20
**development** 15:19
146:6 176:17 497:1
509:14 521:6
**developments** 47:13
**deviation** 184:10
**Dewey** 9:11 426:6
**de-merger** 178:21 180:8
180:10
**dialogue** 69:16 192:20
192:22 221:20 227:14
227:16 245:2
**dialogues** 195:22
**Diamond** 112:14
**dictate** 113:3
**dictated** 65:2,10 66:2
113:6 207:2
**died** 407:7
**difference** 224:5 230:3,8
230:9 242:5 278:13
539:9
**different** 35:22 91:16
105:12 109:1 121:9
124:19 141:12 144:18
144:20 145:5 149:24
157:12,12 161:11
177:23 181:15 185:25
190:14,14 191:2,2
210:10 231:16 243:13
307:6,6 324:3 335:22
343:24 344:19 371:25
393:1 426:16 456:12
462:10 463:24 465:8
465:10 500:2 501:17
502:1 506:12 507:2,3
513:3 514:3,4,5 519:6
536:16
**differently** 340:15
**difficult** 111:21 112:11
128:7 132:11 483:9
**difficulties** 85:3 185:11

**difficulty** 209:15
**diligence** 53:19 181:5
297:11,14,17 298:8
311:9,15 396:5 398:2
**diligently** 66:11 78:5
106:25
**diluted** 241:18
**diminution** 488:23
**dip** 181:21 196:22
256:25 259:12,19
300:25 301:5 305:13
305:17 306:7 335:13
335:16 336:1,9 349:12
349:16 386:11,13,15,17
403:15
**dire** 62:1 114:4 129:22
206:22
**direct** 28:15 44:25 54:4
66:16 67:5 74:9 87:1
91:17,23 92:1 119:14
121:1 144:15 145:13
148:2,14 150:6 154:14
155:14 156:16 158:23
162:18 174:13 242:13
289:23 355:20 362:21
362:23 398:12 414:6
427:19 428:17 433:5
434:23,25 438:13
442:8 462:14 464:18
464:22,24 466:22
504:6,11
**directed** 67:3 99:8 145:4
287:13
**direction** 88:21 91:2
175:8,9 176:13 196:1
504:16
**directions** 176:18
**directly** 120:21,22
137:19 173:6 199:2
239:14 282:9 336:14
371:14 432:8 483:8
487:25 488:7
**director** 36:17 49:13
91:13 119:21 122:20
125:2 386:23 408:11
443:20,22
**directors** 29:2 31:21
34:23 35:4 37:12 48:11

50:17 78:13,16,18
117:11 169:7,11 177:3
177:4,5 213:19 387:10
406:15 411:3 479:24
**disadvantaged** 321:18
**disadvantaging** 322:1
**disagree** 307:18 431:13
**disappointing** 194:10
**discharge** 70:4,5 86:11
**disciplines** 191:2,12
**disclose** 433:6
**disclosed** 408:22
**disclosure** 116:23 299:25
**discontinue** 95:9 108:16
108:18 221:15,17
238:1 292:25
**discontinued** 109:13,17
**Discontinuing** 2:5
**discounted** 96:16
**discounting** 507:23
**discovered** 305:16
**discovery** 454:12
**Discriminating** 2:5
**discuss** 173:12 251:21
290:7 468:5 485:17
538:25
**discussed** 38:18 54:17
59:1 106:25 108:23
111:2,3 120:17 139:22
146:13 284:9 353:14
370:25 371:7 378:11
392:4 408:15 411:19
415:16 456:5 479:19
**discussing** 220:15 251:19
296:7
**discussion** 54:9 55:23
73:24 192:17 199:6,10
203:21,22 206:2
209:23 211:12 238:17
238:20 248:21 249:11
251:6 267:8,20,25
274:10,16 275:2,9,18
282:5 286:16 287:14
293:4,20 295:6,16,25
298:8 300:23 371:9,11
395:3 409:24 410:6,15
456:11 536:17,21,22
**discussions** 42:21,24

92:18 109:4,10 130:6
145:12,17 170:25
189:10 193:3 199:11
200:20,21,24 201:3
207:7,20 210:4,13
239:9 245:16,18
267:18,21,22 269:15
271:9 272:25 273:3
281:22,23 282:1,4
286:10,17,20 288:12
291:23 292:25 300:12
300:14,16 301:5
311:16 315:8 335:1
336:23 337:13 339:19
339:23 347:5,9 368:10
371:3 391:19 393:10
395:6 397:18 398:15
403:21,24 404:1,7,10
404:11,16 409:23
425:24 452:13 456:18
464:6 536:11
**dislocation** 42:16
**disorderly** 99:18
**displeasure** 505:19
**dispute** 161:16 538:14
**dissatisfaction** 513:20
**dissolve** 241:7 426:24
**distance** 533:21
**distinction** 91:12 501:24
504:14 523:22
**Distinguishing** 91:21
**distraction** 181:7
**distress** 107:17 445:12
**distressed** 451:10,22
462:1,2 463:2 476:7
**distributed** 151:18 153:2
153:14 198:16
**distribution** 152:6,11
154:11 220:5 265:19
299:17 343:24 546:7
**district** 1:3 5:13 83:14
**disturbing** 479:17
**Division** 11:5 14:5
**divulge** 235:7 304:10
**DLA** 9:2
**document** 37:21,25 43:5
50:10 69:4 73:23 74:2
74:5 78:14 90:25 99:7

120:3 152:5,10,15,24
153:2,5,6,13,14,17,21
153:24 154:10,15
155:4,10 156:7,14
157:7 159:25 160:7,15
161:4,20,23 162:1
166:1,14 189:11
197:14,16 203:17
208:24 214:8 215:3,14
215:16,20,23,24 221:4
221:5 225:13 236:19
240:9 297:18 298:20
344:3,14 366:2 378:3
378:14,20 379:14
410:22 411:7 434:19
438:18 452:7,9,11,12
453:19,21 454:6,8
481:13,21,23 483:11
484:18 498:19,20,25
500:25 501:11 502:2,7
510:24 540:6 541:20
546:6
**documentation** 142:24
143:1
**documents** 28:13 46:4
49:14 131:24 160:14
204:10 378:22 379:1
385:10 392:2 434:20
478:2 479:2,19 480:22
481:3 482:1,9,12,20
483:1,2,13 512:10,12
512:15 523:13
**Dodge** 11:19 71:8,12,20
71:23,25 72:2,4 207:18
208:5 260:16 374:4
380:2 381:14 388:3
447:19 450:10 458:15
458:17 459:9,21
465:13 475:11,11
491:2,4 492:18 494:6
503:4,13 519:12
527:12 529:1 531:25
535:21,24,25
**DOE** 314:5 315:20,21,24
**doing** 44:8 64:13 190:23
195:5 254:1 276:2
277:21 278:2 279:4
281:19 282:14,15

284:9 296:10 297:1
305:12 328:16,19
345:5 428:19 465:11
470:19 472:11 503:20
505:11 515:4 518:8
520:11,22 531:2
532:11,13 534:19
539:5
**dollar** 41:11 42:11 44:2
84:12 154:20 156:18
156:21 161:25 168:4
172:6 188:3 212:2
218:3 223:9,19,20
229:12 259:10 286:4
308:12,19,22 314:1,5
328:8,8,9 332:9,13
335:8 336:4 339:25
348:10 393:18
**dollars** 43:16,24 44:8
47:7 63:16 65:17 77:24
78:3,7,9 79:13,16 80:7
80:19 84:19 95:20
96:25 97:6,23,24
108:12 110:11 111:14
112:17 118:5,8,15
154:18 162:3,5 181:10
184:15,16 185:17
186:22 187:14 188:13
189:6,14,24 199:14,15
206:5 209:4,8,10,25
210:9 211:19 217:13
219:22 220:22 221:9
222:2,7,7,11 223:6,13
223:21 224:14 229:18
256:10 257:5,5 259:4
262:9,12,13 276:24
277:8,12 281:25
290:21 292:20 305:19
309:12 310:18 312:6
313:14 315:6,12,21
317:19 318:3 319:1,4
320:2,3 321:13 322:9
322:14,21 323:5
324:14,15,20 325:18,21
325:25 326:6 327:4,19
328:3 332:9 335:13,14
335:19 336:6 339:5,6
339:13,24 340:7,11,16

340:20 341:19 342:22
343:3,24 350:21 353:8
376:4,4 384:5,5 403:13
445:1,13 468:19 487:5
520:16 528:15 536:14
539:20,23 540:1
**domain** 454:19
**domestic** 486:4
**domestics** 505:10
**domino** 351:16
**Donald** 15:16 479:15
510:20 534:24
**door** 51:8,13
**doors** 188:17
**dots** 420:1,2
**dotted** 168:10
**doubt** 77:18 149:14
**DOWD** 7:7
**downsize** 373:22
**downsizing** 519:18
**downward** 184:12,13,24
277:1
**DOYLE** 14:2
**dozen** 125:12 162:24
416:21
**do-ability** 207:25
**draft** 72:21,23,25 74:18
75:21 76:19,21,22,25
77:12 79:3,22,25 105:8
142:24 143:1
**drafting** 79:23
**drafts** 105:11 410:19
**dramatically** 476:3
**draw** 188:3,7,12 501:24
504:13
**drawing** 77:3 192:7
523:5,23
**drivability** 419:25
425:13
**drive** 22:5 23:4 533:20
534:3,10
**driving** 500:21,24
**drop** 117:9 346:5
**dropped** 117:13,20
**dual** 528:25
**dualed** 532:7
**due** 35:16 181:5 268:21
297:10 298:8 311:9,15

315:25 316:2 396:5
398:2 468:7 472:5
482:23 487:12 511:13
511:14
**duly** 27:20 119:10
174:12
**duplicate** 506:17,17
**durability** 180:16 425:14
**durable** 83:15,16,19,20
**Durango** 187:4 346:20
346:23
**Durango/Aspen** 71:17
**duress** 451:21
**Dusett** 528:1,23
**duties** 34:18 35:1,18 50:7
50:13 51:19,21 86:6
88:23 89:4 121:6
122:21,23 303:18,23
304:15,20 310:15,21
330:22 332:7 333:1,2
333:10,17 340:22,25
**duty** 33:16 34:2,5 86:9
86:12 304:23 305:1
341:6
**duty's** 33:23
**DX** 215:11
**dynamics** 430:22
**D-segment** 506:17
**D-486** 548:9
**D.C** 134:23
**d/b/a** 9:4

**E**

**e** 1:20,20 3:2,2 11:16
12:8 16:21 21:8 25:1,1
45:7,7,8,20 46:8,11
69:4 88:19 251:22
544:2,4 545:2,4,13,15
546:2,4 547:2 548:2
**Eagle** 527:21,22 528:25
**earlier** 25:20,24 26:14
39:4 48:8 54:17 120:18
132:12 140:14 181:3
222:9 237:2 249:1
251:5 276:8,25 283:15
283:22 286:15 294:21
308:21 339:2 360:7
369:16 370:21,25

375:18 388:9,14
389:13 409:23 418:4
420:6 462:14 469:23
493:20 510:18 512:15
520:14 534:8 535:8
540:7
**early** 27:6 39:9 124:11
162:19 182:19 189:12
200:23 439:5 450:11
468:20 522:11 542:16
**earn** 326:16
**earned** 326:18
**earnings** 460:23,24
462:3 463:16
**easier** 273:12 358:18
**easily** 219:22 221:9
294:15
**East** 3:5 13:11 14:22
24:4
**Eberspaecher** 21:12
**EBITDA** 318:8,18
326:14
**economic** 116:24 119:21
211:4 300:1 450:19
490:1 495:12
**economically** 353:8
520:20 522:8
**economics** 268:22
**economy** 149:22 184:13
184:24 205:9 212:13
350:1 351:4 450:18
487:14,15 489:22
491:9,20 519:7,17
534:17
**EDC** 15:19
**edited** 80:2
**educate** 33:10
**EDWARD** 11:10
**effect** 42:13 113:19
296:25 309:24 441:25
447:17 459:20 505:22
**effecting** 275:10 283:16
**effective** 175:15
**Effectively** 431:9
**effects** 161:8 360:11
**efficiencies** 509:10,11
**efficient** 205:21 374:5
**effort** 50:1 141:10

164:16 191:2 218:18
229:4,5,9 280:17,25
286:19 363:21 364:1
364:21 365:15,22
370:11,14 383:3,6
439:16 448:19 536:14
**efforts** 69:10 108:7 145:5
195:5 209:21 217:1
361:2,5 364:16 469:6
**eight** 154:18,20 315:22
325:17,21,25 326:2,3
326:24 327:20,20
343:24 379:21 380:16
448:24,25 456:9
508:25 519:5
**eighteen** 374:23 399:21
400:2 401:3 423:18,19
424:1 492:19
**eighty** 143:18 179:7
232:3 246:1 263:25
264:1 370:7 532:10
**eighty-five** 263:4 264:2,7
264:20
**eighty-something** 503:19
**either** 29:6 93:7 103:20
126:25 127:4,8 129:9
133:16 159:10 169:14
184:22 205:3 213:5
237:3 240:16 265:5
316:25 321:18 350:24
357:16 363:18 370:7
373:11 395:19 437:2
446:4 474:23 482:10
516:19 523:15 526:4
542:8
**elbow** 494:5
**elected** 66:19 69:15,19
94:9,10,12,14,18
122:13 124:16,16
140:15 238:3 336:9
376:25 377:4,7
**Electric** 9:3 232:24
**element** 256:5 259:5
490:22 505:13 514:9
521:3
**elements** 161:6,12 251:8
256:3 341:16 372:25
451:16 462:2,13

464:11,16 503:18
**eleventh** 217:8 218:4
293:19,20
**elicit** 355:4 429:4 431:24
344:9 488:19,21
490:16 506:15 509:12
521:6
**eliminated** 182:19,22,23
**elimination** 109:3
366:24 368:12
**eliminations** 346:13,14
**Ellis** 524:22
**ELLMAN** 4:8
**Elm** 23:14
**Embarcadero** 10:15
**emerge** 338:14 375:8
**emergence** 262:14
**emerging** 260:1
**empathetic** 69:14
**employ** 205:7 360:20
362:4,14
**employed** 122:2
**employee** 155:7 168:22
373:12 386:23 538:16
**employees** 34:8 122:2,4
186:16,24 205:6
213:14,14 299:3
358:24 360:12,21,24
361:1,5,8,10,11,16,19
362:9,18 400:8,13,14
436:22 474:20 475:2
475:13,19 476:4,8
508:10,25 516:16
**employer** 437:21 438:1
**employers** 122:19
123:23 437:4,7
**employment** 238:2
239:11 415:1,3,10
475:9
**encompass** 162:22
**encompassed** 166:24
371:22
**encountered** 305:14
**encourage** 469:7 477:4
484:15
**encouraged** 444:11,12
**encouragement** 444:20

**encouraging** 469:11
**Encumbrances** 2:20
**ended** 186:25 187:4
**endorse** 137:16
**endorsed** 320:19
**endorsing** 320:19 321:1
321:2
**ends** 406:18 433:9
**end-of-month** 300:15
**energetically** 445:18
**Energies** 9:4
**energy** 26:13 213:17
282:12 392:19
**engage** 123:14 126:13
131:25 142:7 279:6
331:16 347:2
**engaged** 39:23 131:12
134:9 135:12,14
177:23 317:11
**engagement** 192:2
311:14
**engine** 209:14 269:17
325:9
**engineering** 208:10
244:4 325:3
**engineers** 208:11,13
**engines** 209:18
**ENGLISH** 7:8 11:2
**enhance** 337:11 499:20
499:23
**enhanced** 514:17
**enjoy** 171:5 497:18
498:2 500:11
**enjoyed** 372:3 520:7
**enjoys** 372:2
**ensued** 335:1
**ensure** 82:8 85:22 86:15
99:10 129:7
**enter** 47:1 67:6 91:22
483:1
**entered** 35:25 36:5 39:8
41:11 63:5 145:14
152:6 154:11 192:20
341:16 347:7 437:25
454:12 480:6 546:8
**entering** 58:3 207:1
402:10
**enterprise** 73:5,6,7

311:17 318:2 319:4
323:13 372:25
**enters** 35:19
**entire** 77:1 173:13
178:23 189:12 196:14
209:8,11 289:12,14
325:2 389:7 403:4
442:5 445:13 456:2
476:11 479:21 494:13
494:15 497:14 518:6
538:9
**entirely** 259:19 289:20
464:21 466:13 506:9
**entirety** 334:15 337:20
507:21
**entities** 25:21 90:9,16,22
91:7 93:7,8,16
**entitled** 54:8 76:12 155:7
156:2 166:2,15 197:15
406:4 429:3 437:7
457:7 481:16
**entitlement** 239:20
**entity** 35:15 40:10 59:5
60:16 67:12 93:2
165:14
**entrance** 183:3
**entrusted** 312:23
**entry** 25:17 28:11 547:6
**environment** 239:5,6
317:24 327:16 334:3
450:19 500:1
**environmental** 258:16
274:9,13,15
**envisioned** 269:24
270:12
**envisioning** 316:19
**equate** 400:5
**equipment** 441:22
**equitable** 200:13 250:6
**equity** 165:6,14 166:9
196:11 209:25 210:10
239:19 245:21,24
249:19,23 250:8,17
251:6 265:19 267:5,7
267:11,13,17,19,23,25
268:1,21 269:20
308:19 309:1,18,21,25
310:3,5,18 311:1,5,6,18

VERITEXT REPORTING COMPANY

317:22,23 320:3
324:15 325:22,23
327:3 328:4 330:25
335:20 411:22 425:4
**equivalent** 29:1 325:11
**erect** 536:7
**Eric** 12:16 392:13
**ERIN** 15:24
**erode** 79:20 82:14
**ER&D** 325:3
**especially** 329:17 534:8
534:9
**espoused** 497:11
**ESQ** 3:8,9,10,17,18 4:8
4:15,16,17 5:7,8,9 6:9
6:17,25 7:7,8,16,23 8:7
8:14,15,22 9:9,16,17,18
10:10,20 11:10,16,23
11:24 12:8,9,16,23,24
13:7,15,16,17,18,19
14:9,18,25 15:7,16,24
16:9,10,21,22,23 17:10
17:19 18:8,17 19:7,17
20:9,17 21:8,17 22:9
22:16 23:8 24:7
**essence** 463:23
**essentially** 403:17
405:16
**Esserman** 14:11,18
407:4,5 409:8,17,19,22
410:3,9,10 412:15,23
413:17,21 414:1,3,25
415:19 544:24
**establish** 114:2 139:18
288:9 429:1 495:21
**established** 2:10 117:13
131:1,3
**establishing** 2:8 101:12
**establishment** 201:25
**estate** 64:18 65:24 66:9
66:23 100:1 106:22
107:12,21 391:2 418:8
418:18 476:18 485:19
495:22,25 496:2
**estates** 449:12
**estate's** 89:15
**estimate** 191:11 263:24
282:20,23

**et** 1:8 11:4,19 14:4 18:3
25:8 192:21 193:20
208:15 209:9 211:4
299:6 371:5
**etcetera** 177:17 194:4
251:7 267:12 273:17
273:20 277:5,11
528:14
**Europe** 497:4
**euros** 116:9
**evaluate** 81:12 322:18
**evaluated** 321:15,17
**evaluating** 450:25
**evaluation** 51:1 300:5
334:22 340:18
**evaporated** 187:9
**eve** 217:2
**evening** 223:11 228:18
272:6 340:9 358:6,11
358:12 388:6,7 389:7
392:13,15 401:17,22,23
416:2,3 426:5 436:23
438:13 449:22,23
485:11,12
**event** 26:1 44:24 84:12
87:21 105:4 405:7
514:20 532:25
**events** 216:23
**everybody** 152:18
189:12 244:6 353:17
486:24 505:12
**Everyone's** 486:25
**EVID** 545:14 546:5,11
**evidence** 38:10,14 39:3
45:19 46:2,12,15 50:2
51:15 52:12 54:15 55:1
56:18,19 57:6 73:22
87:10,19 113:20
115:14 120:13 154:7
154:13 160:9 195:12
195:25 214:17 215:1,4
215:21 216:3,5 224:12
333:21 352:7 412:8
433:4 438:24 443:5,7
443:12 477:15,19
479:5,8 483:23 485:3
540:23 541:24 542:1
**evident** 161:14

**evidentiary** 216:9
**evolved** 270:22
**exact** 90:14 194:18
210:25 236:11 270:21
280:1 285:22 302:3
306:15 366:23 372:6
373:16 376:3,15 377:5
384:4 423:2 468:17
**exactly** 52:22 68:6 149:8
167:14 198:1 202:16
228:13 242:2 291:8
307:23 346:6 386:13
387:8 395:19 423:4,20
429:6 454:5 481:22
484:16,16 527:14
**EXAM** 544:5 545:5
**examination** 27:23 28:15
46:19 52:18 59:17
93:22,25 119:14
144:15 145:13 155:14
158:23 162:18 172:15
174:13 355:11,14
356:5 426:3 438:13
442:8 538:21
**examine** 173:16 434:10
455:7 510:3
**examined** 74:1 427:24
**examining** 87:22 511:7
**example** 167:18 182:23
185:20 195:8,9 208:4
233:23 234:4 244:19
273:17 307:8 324:13
325:2,5,8 347:10
350:19,20 361:23
454:2 458:11 491:4
492:18 500:2 509:20
513:9
**exceed** 154:18 489:6
**exceeded** 181:8
**exceeds** 342:22 490:9
**Excellent** 49:5
**exception** 50:25
**excess** 343:3 458:18,19
458:21 505:11 507:18
539:19
**exchange** 161:7 166:8
189:11 245:21 267:11
267:17 293:16 310:2

312:21 335:7 408:4
**excitement** 178:10
**exciting** 178:7
**exclamation** 251:22,25
252:3 253:3
**exclusive** 529:2
**exclusively** 144:3
**excuse** 25:2 49:20 74:7
160:5 163:12 185:5
289:8 363:10 384:7,15
396:8 480:2 511:17,19
**excused** 438:15
**execute** 329:6
**executed** 394:3 410:4
**execution** 43:10 45:18
300:16
**executive** 120:24 124:24
136:13 138:7 350:9
**executives** 230:21
**Executory** 2:21
**exercise** 264:6 276:4
277:22 278:3 325:16
344:17 347:2 516:2
**exercised** 432:2 482:5
**exercising** 341:7
**exhausted** 213:17
**exhibit** 27:21 28:1,4,9,10
28:14 37:2,2,6,9,9,22
38:6,15 39:2 43:4,5,7,9
45:1,3,4,7,7,8,14,17,20
46:8,11,15,16 54:4,7,17
54:24 55:17 56:1,18
57:5 69:3 70:10 78:12
86:25 87:9 152:2,5,10
154:7,10 164:7 165:25
166:1 197:16 214:7,25
215:12,14 216:4
358:13,15,17,19 378:4
378:5,12 379:6 381:20
382:15,20 443:11
452:8 453:9 463:6
464:9,11,14 477:14
479:4,7 483:22,25
485:2 492:3 501:4
514:16 524:19 541:23
541:25 545:16
**exhibits** 45:20 46:11
49:15 59:16 438:25

501:7 540:23 541:3
545:15
**exist** 401:6,7 410:21
**existed** 401:10
**existence** 127:12 386:1
**existing** 41:8 447:13
459:1 516:20
**exit** 183:2 196:23 257:7
262:13
**exiting** 257:4 532:20
**expand** 374:3 459:15
460:5,7 475:18,24
476:3,15 482:18 491:5
491:20
**expanding** 459:5,17
491:22,24
**expansion** 475:12
**expansive** 420:3
**expect** 68:6,8,15,16,25
98:24 233:12,14,16
234:16 349:14 465:2
471:10 489:9 490:2
495:6 497:14 515:24
519:18 520:15 527:13
527:16
**expectation** 68:13
234:18 408:18 476:2
489:8,8 493:20
**expected** 154:18 349:16
349:17 492:5
**expecting** 475:23 476:15
515:21 542:19
**expects** 493:22 515:19
**expedience** 525:7
**expedited** 437:11
**expeditious** 115:19,21
**expended** 259:15
**expenditure** 184:8
**expenditures** 123:5
176:17 206:19 325:4
**expense** 363:5 369:15
425:13 444:20,23
473:24 505:24,25
506:6 508:20,21 509:1
509:3
**expenses** 362:21,23
363:3,13,14 464:18,22
487:23 488:18 508:21

509:5
**experience** 55:19 97:16
105:10 107:16 118:3
141:16 142:15 164:25
175:19 176:7 177:16
203:7 231:20 240:16
240:18 265:16 347:19
397:6 421:9 499:20,24
500:12,15 501:20
505:15 513:6 514:7,8
539:15
**experienced** 323:22
**experiences** 34:3 325:10
325:15
**experiencing** 211:6,6
**expert** 33:3 51:13,14,15
51:16,16 76:11 81:11
369:1
**expertise** 50:21 165:8
**experts** 50:19 51:6,6
52:14 59:10 129:6,9
152:19 311:4 325:12
325:14
**expire** 126:4
**expires** 143:24
**explain** 127:5 252:10
275:6,7 376:2 448:22
460:19 467:25 497:10
511:11 539:9
**explained** 140:18,22
250:19 276:8 293:15
461:7
**explaining** 138:20
167:14
**explanation** 193:6
252:13
**explanatory** 127:2
**explore** 161:11 267:10
432:11
**explored** 330:17
**exploring** 344:20
**Export** 15:19
**exposure** 414:16,19
**express** 313:13
**expressed** 170:9 203:12
209:1 505:19 506:8
**expressing** 311:22
**expressly** 390:15

**extend** 388:11
**extended** 217:12 511:22
539:15
**extensive** 34:3 58:5
178:16 189:10 208:25
259:1 366:9 399:24
**extensively** 529:23
**extent** 56:17,22 57:1
65:15 84:19 138:18,20
139:7 357:6 386:1
428:16 430:13 472:13
473:8 486:4 487:11,23
508:15 519:3 541:16
**external** 30:10 114:17
129:5
**extra** 28:7 390:18 506:6
**extraordinary** 142:19
155:15,18
**Extreme** 47:15
**extremely** 37:16 39:23
177:19 321:8 419:19
**eye** 461:23 509:3
**eyes** 479:3 541:16
**eyes-only** 477:21 478:11
478:23
**e-mail** 36:18,20 55:12
87:24 88:1,3,5,7 93:24
94:1 106:10 114:19,22
116:5,15,20 211:9
219:4,12 220:23
222:15 224:8,24
225:14,19 226:11,18
228:7 230:12 246:5
248:4,5,5,9 249:12
253:7,10 255:1,10,12
255:14,17 284:17
285:5 286:3 287:18,22
288:6,10 289:5,12,15
290:17 291:12 293:10
293:11,15 294:14,25,25
298:3 299:15 378:5
379:6,9 484:1,8 485:2
524:21 525:17 527:13
527:20,24 528:1,7,8
529:6,10 546:15
**e-mailed** 512:9,15
**e-mails** 228:15,17 291:6
484:10 523:14 541:4,7

541:10,12,23 546:17
**E.D** 11:5 14:5

**F**

**F** 1:20 3:17 548:2
**face** 112:12 113:23 134:4
489:8 491:19
**faced** 113:24
**facilitate** 275:11
**facilities** 64:4 208:9
212:17 273:19 274:21
368:6 444:22 445:17
459:10 475:24 491:23
493:5,7,8 500:14
514:17 528:16 531:11
531:17 532:25 533:7
**facility** 43:25 63:23
64:25 66:5 187:4,5
208:6,20,22 209:11
482:18 491:5,20 492:7
492:20,25 493:24
532:2 536:7,12,15
**facing** 37:14 38:7 458:9
458:10 465:13,15
527:12 529:1
**fact** 48:3 49:6 55:3 61:25
64:6 65:10 67:25 76:6
88:24 97:19,24 100:20
113:20 114:5 139:11
146:16 159:1 167:2
192:11 193:2 197:25
200:4 205:17,25
207:25 212:21,22
220:17 222:10 224:11
229:11 271:20 274:23
277:13 279:16 280:7
280:17 293:5 325:12
328:11 335:13 336:4
345:15 350:5,9 351:2
352:23 365:7 367:15
375:22 376:18 383:11
406:25 417:9,14,23
424:20 446:21 456:14
468:23 469:12 472:9
473:23 479:20 485:19
487:5 488:3,22 489:7
489:17 496:18 502:20
503:14 527:10 533:3

534:11 537:14 538:4
**factor** 350:3 450:18
  463:6 464:3 473:24
**factored** 490:19 492:13
**factories** 186:14,15,16
  187:2 277:2,10 301:24
  323:11 371:4 372:1
  375:17,17
**factors** 452:16,19 456:12
  462:10 463:24 464:11
  482:9,11,21 497:3
  500:24 540:2,5
**factory** 209:8
**facts** 33:10 35:20,23
  48:13 150:12 261:20
  297:8 352:6 412:7
  468:5
**factual** 116:16 331:15
**fails** 142:3
**failure** 50:12 443:14
**fair** 42:1,3 50:22 56:8,9
  84:17 85:6,9,11,12
  95:3 96:4 97:3 101:20
  102:3,11 105:20
  109:11 125:16 129:25
  132:2 133:4 164:14
  165:4,16 177:24,25
  183:17 198:22 200:13
  258:11 265:9 282:25
  285:10 291:22 292:1
  294:9 317:8,18 324:6
  334:16 337:10 345:9
  349:24 364:7 371:13
  390:17 487:3,4,12
  488:16 500:9 503:24
  503:24 506:18 513:22
  538:8
**fairly** 184:14 350:10
  403:18
**fairness** 47:21,23,24 48:1
  48:7,10,16 49:7,22
  51:2,4,5 52:1,7 53:7
  55:3,10,19,25 56:5,7,24
  57:5,9 72:22 74:17,19
  76:11 78:12 79:3 81:11
  100:19 101:12,14,24
  102:20 105:8,11 117:7
  117:10,17 198:11

311:15,21 312:21
  545:20
**faith** 50:8 52:24,25 527:1
**fall** 29:16 31:6 99:18,21
  99:23 109:22 280:8
  295:6 296:1 421:9
**falling** 187:18
**falloff** 277:9
**familiar** 40:16 47:21
  48:1,2 91:12 92:3
  125:16 127:20 180:7
  189:25 197:16 250:2
  259:20 266:4 307:15
  308:6,7 407:9 409:10
  495:19 535:5
**families** 186:24
**family** 425:14 516:6
**far** 37:15 61:25 95:12
  260:7 301:18 304:1
  313:16 331:3 334:3
  349:8 408:21 413:1
  456:23 490:9 504:5
  532:10
**fared** 348:3
**fashion** 35:16
**fast** 160:13 184:21 209:4
  209:5 477:24
**fate** 285:17 286:1
**favor** 143:17
**feasible** 208:2,18
**features** 164:22 424:11
**February** 57:16 98:3,4,8
  99:2 103:19,22 130:21
  131:2 132:7,11 133:2
  133:23 134:25 170:16
  170:20 190:1,8 194:2
  266:4 267:24 269:18
  270:12 276:17,20,24
  292:7 320:8,19 321:2
  322:13,15 375:13,22
  380:1,5,10 381:8,12,13
  382:5 392:23,24
  468:24 469:1,8,9
  517:20 521:10
**federal** 133:15 433:3
**fee** 84:12,15 286:4,6,8,8
**feedback** 176:25
**feel** 213:16 250:14

252:12 364:12 433:5
  458:20 489:19 521:13
**feelings** 523:23
**fees** 290:21 408:21 471:2
  526:13,18
**FEINSTEIN** 14:2
**Feldman** 87:2,5,6 88:7
  88:14,25 219:4,7,8,15
  225:12 226:4,19 227:5
  254:19,21 255:2,13,23
  255:25 284:23 285:5
  291:5 294:14
**Feldstein** 14:25 436:4,10
  436:16
**fell** 110:2 184:21,22
  400:21 401:1 482:10
**felt** 181:25 182:16
  189:22 193:25 205:19
  207:7 253:22 273:9
  278:17 312:5 335:6
  347:12 374:1 489:17
  521:12 530:22
**Fenton** 441:23
**fewer** 397:13,14 514:13
**Fiat** 14:21 15:3 42:1,4,7
  42:14,18 47:9,10,13
  48:17 57:12,12 58:3,4
  58:14,17,24 59:4,7
  62:23 63:2,5,9,12 68:7
  68:13 96:20 97:7 115:5
  116:8 117:5 135:2,3,18
  135:18,21,24 136:6
  146:4 154:22 165:16
  165:19,23 166:8,9,11
  166:16,20 167:5,8
  171:3,9 191:15,16,25
  192:2 193:19 194:14
  195:23 196:17,20
  198:22 202:21,24
  210:24 213:5 233:8
  241:5 247:11 260:11
  261:19,25 262:3,4,6,8
  262:10,16,18 263:1,7
  263:20 264:14 265:5
  265:20,21 267:2,4,6,8
  267:13 268:18,20,20,24
  269:11,15,19,20,24
  270:3,14 271:17 272:9

273:7 283:18,25
  286:22 297:11 298:9
  298:13,18,22 299:1,7
  300:5 311:9 312:22
  323:15,17 324:23
  325:17 326:20 327:21
  329:9 335:1 339:3
  343:8 389:5,10,20,22
  390:13 391:12 393:10
  393:13,20,20 394:4,19
  395:1,7,23 396:2,10
  398:3,6,16 404:2,17
  409:11 411:2 423:24
  436:10 470:8,10,13
  477:2,4 496:18 497:1
  538:23
**Fiat's** 154:16 325:11
  329:14 441:6
**FICA** 185:21 186:1
**fiduciaries** 89:16
**fiduciary** 33:15,23 34:2
  34:5,18 35:1,18 50:7
  51:19 53:1 70:4,5 86:5
  86:9,12,15 88:23 89:4
  177:5 303:18,20,23
  304:15,20,23 310:15,21
  330:22 332:7,12 333:1
  333:2,10,17 334:3,10
  340:22,24 341:6,7
  353:17
**field** 18:4 375:9 376:21
  449:1 508:24
**fields** 121:9
**fifteen** 30:2 32:9,10
  283:2 389:16 510:1,6
**fifteen-minute** 435:14
**fifth** 17:6 24:12 289:4
  290:6
**fifties** 417:23
**fifty** 32:3 146:15 178:9
  196:10 209:1 231:12
  263:24 281:25 282:2,8
  282:11 308:25 315:21
  327:3,19 360:20,22
  462:22 491:9 518:18
  519:17 524:10 529:12
  529:15,18
**fifty-five** 32:3 157:3

159:20 168:3,7 262:24 263:4,6,12,22 264:1,2,6 264:17,20 265:3
**fifty-one** 290:8,22
**Fifty-three** 537:10
**fifty-two** 381:17 382:20
**figure** 82:22 100:10 285:8 418:2 420:14
**file** 28:14 63:7,8,20 66:16,19 172:19 197:1 197:4 204:24 205:3 206:6 210:23 236:17 236:25 279:3 355:6,22 355:23,23 360:17 388:20,23 437:1
**filed** 45:24 57:16 163:14 164:7 222:12 223:2 279:1 300:12 355:8,25 368:14 387:2 389:9,17 412:10 414:12,14 430:21 453:14 477:16 485:8 541:2
**filing** 63:11 108:9 164:24 195:1 206:12 212:8 216:24 217:2 227:7 242:21,21 271:20 368:9,15 388:9 390:1 393:21 440:1 470:16 470:19 516:15 521:22
**final** 2:4,17 25:17 26:17 46:1 82:15 90:24,25 117:10 123:14 150:25 152:17,22,23 153:12 156:14 158:7 339:25 340:10 389:3,5 395:20 395:21 457:25 525:3 547:6
**finalization** 234:4
**finalized** 124:5 412:22
**finally** 45:13 85:20 99:8 129:20 212:6 389:8 437:24
**finance** 59:3 78:25 89:10 170:3 177:16 350:23 370:3 386:4,6
**financed** 61:8 67:12
**financial** 9:12 16:16 19:12 30:11 49:4 50:22

61:19 62:3,18 77:23 78:7 85:12 88:18 104:12 113:16,17 114:3 129:19 163:20 163:22 176:10 178:3 178:20 179:15 184:25 195:16 198:22 206:14 286:5 292:19 349:1 356:7,10 370:5,9 374:3 376:1 377:1 384:23 426:6,10 449:6,9 451:21 460:22 461:8 461:13,14 462:18 463:22 522:10 532:19
**financially** 211:3 451:10 451:22 463:2,11 465:15 476:7 492:3
**financials** 105:1
**financing** 43:17 60:4,7,9 60:11,13,15,23 61:7,11 61:14,15 62:7 63:14 64:18,21 65:1,4,7 66:20,21 67:9 85:18 113:10,12 118:12 188:1 241:6 256:5,7,14 256:20,25 257:3,7,12 257:14 258:18 259:12 259:19 262:13 280:19 281:7,18 348:22 349:12,17,20,22 386:13 426:20 467:17,22,24 468:10
**FinCo** 240:25 241:2,4,5 241:7 369:23 386:7 426:7,13,15,19,24
**find** 74:16 75:1 135:23 150:8,10 202:17 218:19 219:22 221:9 221:20,21 224:8 230:9 294:8,15 337:20 353:9 363:19 365:25 422:9 446:2 479:17 484:4 499:5 516:24
**findings** 118:7
**fine** 27:24 159:10 216:6 243:19 355:17 363:15 411:14 433:25 440:2 443:17 448:15 455:12

483:14 525:15 541:21
**finish** 46:24 74:7 80:14 87:14 249:7 342:23 362:11,12 394:1 422:4 423:9,11 435:2 510:13 510:14
**finished** 199:3 354:8,11
**firm** 35:3,5 86:5,8 92:7 106:7 208:23 246:11 498:13 534:25
**first** 21:4 25:9 26:13 28:19 34:6,9 36:22 38:20 40:15 50:1,3,24 53:14,15 58:18 60:13 61:12 63:22 64:14,20 64:24 65:16,19,19,22 66:4,10,17 67:7 69:4,9 71:2 80:14,18 93:24 96:22 97:6,11 99:13 100:20 101:2,6 102:17 103:1 104:2 105:5 111:5,6 114:9 124:6,14 129:6 130:3,21 131:12 131:21,23 140:16 142:2 144:14 147:11 154:15 155:17 156:16 159:17 160:3 166:6,7 166:18 170:12 174:11 178:8 179:5 180:12 181:9,10 183:25 184:3 184:12,16 185:13,14 188:9,19 189:7,14,15 190:18 191:4 192:2 194:21 196:15 198:6 199:7,16 200:21 201:7 204:16 207:22 208:8 210:12 211:11 212:17 213:7,20 217:15 218:1 221:23 225:12 235:4 242:17 249:24 251:6 251:19 254:21 256:9 256:10,23 259:10,11 260:22 261:1,1,21 262:12 268:15 270:17 270:19 271:13,22,24 276:22,24 277:4 283:15,24 284:17,21 285:4 286:25 287:4,9

287:10 293:25 297:21 302:11 312:6 313:17 315:4,19 316:14 318:17 335:10,14,17 336:1,6,9,20,23 337:4 338:19,23 339:3,4,14 339:21 340:2,6,11,20 341:6,18 345:13,16,16 348:1,15 349:10,15 350:20 351:19 352:7 352:17,18,22,23 354:7 361:12 367:20 368:8 372:16 373:22 388:15 388:18 393:16 397:18 397:22 403:7,13 404:4 404:14 407:11 411:22 420:6 434:12 452:25 454:2 460:19 472:4 481:3,20 482:1 509:10 514:16 524:19 525:17
**first-hand** 141:11
**first-lien** 199:12,13 201:3,5 204:3,11 206:2 206:9,13,22 209:22,24 210:1,3,15 217:10,12 217:16,23 218:6,10,12 218:19 221:6 223:18 250:8 257:6
**FISH** 6:11,17
**fit** 425:14 520:5
**FITZSIMMONS** 23:17
**five** 41:11 122:4 125:13 177:20 263:3,25 314:13 315:5 316:8,22 316:24 319:5,6 326:2,3 332:20 354:17,20 355:12 357:14 424:16 512:1,2 530:1
**five-star** 419:24
**fixed** 183:3 186:21 187:14
**FL** 16:19
**flat** 186:20
**flavor** 175:5
**fleets** 68:14
**Fletcher** 535:24 538:12
**flew** 192:1,3
**flexibility** 245:3

**flexible** 239:4
**flip** 253:7 254:24 255:4
  268:4 287:16 299:20
  319:17
**flipped** 184:22
**flipping** 316:5
**floor** 15:21 18:4 20:6
  369:17,18 449:9
  532:15,18
**floor-planned** 369:21
**floor-planning** 370:8,15
  375:12
**flow** 185:11 195:7
  318:13 321:13,16,18
  322:5,5
**fly** 506:20
**focus** 66:13 67:23 180:19
  215:11 455:4
**focused** 41:9 145:11
  179:19
**focusing** 130:21 487:22
**folded** 133:14
**FOLEY** 10:2
**folks** 207:23
**follow** 28:8 39:24 47:12
  149:12 227:19 486:13
  506:21 520:4
**followed** 27:17 151:10
  419:21
**following** 80:17 175:20
  472:22 489:14 504:15
**follow-up** 339:16
**Fong** 379:9,12,18,24
**force** 128:24 134:14
  192:19 196:2 204:4
  219:8,9 270:7,20,24
  272:7,25 273:5 274:7
  275:2,4,9 283:15 284:3
  289:1 337:4 370:22
  371:1,8,10,14 372:19
  375:3 430:6,10 449:1
  508:24 517:17,23
**forced** 148:20 149:1
  277:1
**forces** 500:21
**forcing** 149:1
**Ford** 18:4 19:3 69:15
  123:17 124:8,12,18,23

126:6 128:21 129:7,14
  130:16 131:12,13,16
  144:2 149:6 189:2
  351:5,17 374:17
  417:23 505:4
**Ford's** 125:14
**forecast** 191:5 533:11
**forecasting** 183:16
**forego** 349:18
**foregoing** 548:4
**foreign** 131:4,6 135:7
  299:5
**foremost** 34:6,10
**forge** 194:13
**forging** 395:20
**forgive** 43:18 259:3
  472:21
**forgiven** 259:11,13,16,18
**forgiveness** 44:7 316:19
**forgiving** 44:2 315:11
**forgot** 435:22 445:20
**form** 2:17 26:17 62:23
  63:2 65:10 90:24 98:16
  159:19 160:1,2 212:25
  213:5 222:3 267:2
  271:10 272:9 305:8
  333:20 370:8 382:9
  411:20,25
**forma** 179:6,8,10,14,15
  232:7 322:7
**formal** 36:9 176:16
  222:3
**formality** 239:3
**formalized** 176:20
**formally** 211:10
**formed** 48:24 202:3
**former** 169:17
**forming** 270:25
**forms** 426:17
**formulate** 179:1
**forth** 58:14 131:15
  134:25 175:22 177:9
  187:6 192:17,22
  233:23 249:25 250:8
  261:20 305:7 309:4
  316:7 348:9 392:25
  402:16 412:12,21
  413:3 517:20

**fortunately** 188:2 212:23
**forty** 139:4 326:5,6
  327:19 354:19 374:16
  374:17,25 427:22
**forty-eight** 401:1
**forty-five** 439:15 542:15
**forty-seven** 537:11
**Forty-six** 101:5
**forw** 465:4
**forward** 41:13 44:23
  83:20 109:9 179:23
  180:21 184:21 189:25
  202:25 209:4,5,17
  253:4 268:4 272:10
  287:16 292:24 307:14
  326:14 335:21 342:17
  343:5,6 364:4 378:20
  391:6,7 393:1 396:13
  420:22 445:6 454:17
  462:12 463:25 464:7
  465:5 473:12 494:25
  520:20 521:2 526:10
  534:23 539:20 540:13
  542:9
**forwarded** 131:24
  255:17
**forwarding** 379:9
**forward-going** 369:14
**found** 43:6 88:7 97:22
  99:6 107:16 188:16
  482:17 502:5 515:2
**foundation** 50:4 53:2
  76:8,8 87:9,22 88:2,4
  98:12,15 101:22 112:1
  201:25 225:20 320:6
  381:25 382:1,3 421:25
**four** 100:25 120:24
  122:1,1 125:13,20,24
  143:25 162:23 175:16
  183:11 189:14,24
  190:3 195:13 202:11
  202:21 256:10,12,23
  257:6 259:10 265:10
  276:24 286:22 292:23
  316:7 335:12 339:2
  349:15 363:15 457:1
  516:7
**fourteen** 396:22 397:3,7

450:5 451:18 488:23
  493:21 494:14
**fourth** 13:11 86:24
  154:16 176:8
**FOX** 6:19 7:2
**fractional** 297:1
**fractionalizing** 296:12
**frame** 49:10 59:1 130:22
  271:18 356:10
**framework** 517:6
**frameworks** 482:22
**franchise** 70:8 369:1
  380:5 465:12,16
  470:22,25 476:8 524:9
**franchises** 492:11,16,24
  526:24
**Francisco** 10:18
**Frank** 4:16 25:15 535:24
  538:12
**Frankel** 5:2 89:25
**frankly** 385:10 432:7
  482:21
**FRED** 11:23
**free** 2:19 99:18,21,23
  318:13,17 356:3
  394:14,19 418:6 419:2
  419:12 421:20 520:5
**freedom** 33:7
**frequency** 177:21
**frequent** 37:11 40:9
  245:2
**Friday** 238:19
**friendly** 482:20
**friends** 419:14
**friendship** 537:15
**front** 28:4 94:3 120:3
  411:10 491:23 530:12
  535:14
**FROST** 19:10
**FT** 20:3,3
**fulfill** 51:21
**full** 28:19,21 33:9,12
  52:23 61:5 116:23
  119:16 122:15 174:7
  174:17 299:25 305:23
  306:3,14 345:13
  352:19,22 353:1,4,6
**fully** 50:18 52:13 349:16

539:17
**fulsome** 53:19 454:24
**function** 176:11 177:4,18
**functional** 177:1 183:12
**functions** 115:3
**fund** 16:3,5,13,15 17:3,5
42:12 44:24 86:12
88:15,24 89:17 157:24
158:12,13 196:17
197:23 219:23 262:14
282:12 294:16 309:13
309:15 337:20 340:13
385:15,17 386:9,14,19
**fundamentally** 50:5
424:3
**funded** 168:6 273:13
385:18
**funders** 107:5
**funding** 107:6 113:1
156:3 158:6,12 159:2,4
159:5 169:3 189:1
196:22,23 197:23
258:6 281:2 353:25
384:1 403:15 473:6
522:12
**funds** 42:16 45:11 63:4
101:16 111:7,12,14
112:12,18 188:10
189:1 262:4,6,8 278:15
280:5 316:1,3 321:24
337:24 338:18 344:22
344:23 385:20 471:2
**furlough** 186:16,23
277:2,10
**furloughed** 186:24
**furnished** 28:3
**further** 26:20 45:6 77:15
89:21 91:11 92:22
93:18 118:23,24 162:7
169:19 193:6 216:17
229:22 273:16,17
316:15 387:16 392:8
407:1 412:25 425:16
427:7 449:14 497:10
509:24 519:18 525:3
534:20,22 542:2
**furtherance** 520:22
**futile** 229:4,5,9,23 230:1

230:3,6,8,9,11
**future** 2:7 41:10 156:3
169:3 180:1 181:17
240:17 328:6 329:6
380:2 381:14 418:24
419:2 537:16
**futures** 137:19

## G

**G** 25:1 547:4
**GA** 17:17
**gain** 290:11 509:10,10,11
**gallon** 422:23 423:5
**gap** 210:21 223:12 225:3
**gaps** 182:15 191:22
**GARRISON** 22:12
**Gary** 120:24 136:12
**Gas** 9:4 26:8
**gears** 130:9
**geez** 277:7
**general** 23:13 32:13
40:16 43:1,13 44:20
61:25 120:25 125:14
126:5 128:22 129:7,15
130:16,25 131:17,23
136:11,16 149:4 167:9
175:3 203:21 232:24
296:10,11,23 297:5
322:7 351:5 414:18,23
436:5,17,25 458:8
495:4 504:3
**generally** 32:20 33:3
41:5 90:6,17 235:23
409:10 444:16,17
455:14,19 468:5,18
524:7
**GENERAL'S** 23:11
**generate** 186:15 200:5
321:12 322:8 344:22
**generated** 398:10
**generates** 185:19
**generation** 195:13
200:11 375:18
**generations** 516:6,7
**Genesis** 366:20,21,25
367:5,11 374:2 391:22
396:6 398:4,17,22
399:24 444:2 445:2

450:8 465:1 477:10
489:4 493:3,13 496:25
499:9 500:24 506:14
506:14 509:8,9 517:3,7
519:10,13 520:1,16,23
522:2,12 539:18
**Genovese** 11:18 388:2
**Gentile** 8:2 485:7
**gentleman** 176:1 483:8
510:18
**gentleman's** 512:9
**genuinely** 351:14
**Geoffrey** 3:9 27:9
**geographic** 380:23
**geographical** 482:14
**Georgia** 4:6
**German** 93:2
**germane** 479:20
**Germany** 234:4
**Getrag** 93:1,2
**Gettelfinger** 120:21,23
121:25 125:1 136:16
139:23 170:2,5,9
**Gettelfinger's** 136:13
**getting** 33:25 60:4,7 65:1
67:9 91:14 115:17
185:23 196:3 201:8
239:22 240:20 241:8
247:17 253:4 255:21
257:23 259:9 279:22
282:10 283:9 289:10
293:17 297:16 306:12
306:16 310:16 330:25
332:9,13 333:3,5,6,11
333:12,21,21 334:8,9
338:10 374:11 393:16
454:24 504:5 528:7
**give** 28:6,19 44:17,18
49:14 53:24 65:7 90:8
90:10 105:19 113:19
127:8 147:16 156:6
173:3 175:5 178:2
188:9 195:4 202:8
213:24 254:6,6 279:5
282:23 297:8 306:2,17
320:25 323:25 357:18
387:21 395:25 397:21
427:12 483:3,7 491:4

509:25 535:12
**given** 32:11 42:15,15
55:10 57:10 91:2
132:16,19 154:21
194:2 229:17 327:9
329:17 349:7 376:22
408:25 409:14 410:7
411:2,13,25 412:24
421:9 442:24 464:3
485:19 495:17 517:5
**gives** 147:17 397:13
444:7
**giving** 143:9 250:14
294:17 335:4 389:22
494:4
**Glenn** 16:9 38:21 59:23
**global** 240:6 251:5,10
**Gluck** 11:18 388:2
**GM** 61:17,20 62:5,7,20
69:15 123:17 144:2
189:2 295:6,10,25
351:16 374:17
**GMAC** 241:5,6,11,13,16
241:22 383:9,10 384:1
384:10,22,23 385:16
386:8 426:14
**GMAC's** 467:17,21
**GMC** 505:6
**go** 29:12 37:4 41:4,13
42:6,10 45:6 49:17
51:22 52:18 53:2 57:20
59:6 73:13 74:15 77:17
81:13,19 83:19 91:3
92:24 95:16 97:17
103:6 104:5 105:11
106:18 112:20,21
119:3 122:20 125:22
126:15,19 129:6 137:6
138:16 140:24 141:6
144:9 147:14,18 150:4
151:25 152:20 160:17
161:13 164:19 172:14
178:16 183:6,12,13
184:10 186:10 188:15
189:3 194:20 195:9,13
197:12 200:25 205:18
206:1 208:13,17 209:2
211:5,14 213:6,21

214:24 215:17 216:8
222:18 223:20,21
225:11 230:13 239:1
242:22 243:16 244:6
248:4 250:20 256:3
261:16 262:12 264:9
266:14,15 275:21
277:24 282:21 283:12
284:15 285:16 290:2
293:10 294:12,23
297:19,21,21 298:2
301:1 303:9 305:5
306:5,8 311:14 317:16
318:14 328:2,11,14,22
328:25 329:7 342:13
347:21 352:11 354:3
358:1 361:9 362:12
363:4,18 374:22
377:21 379:3 385:10
394:13 403:14 406:21
410:8 411:6 418:7,7
419:5,6,10,12 428:10
432:23 441:13 451:18
452:5 453:18 455:13
457:24 458:15 459:15
460:4 463:25 470:22
476:7 477:12 483:10
483:20 491:7,8 494:20
498:7 501:22 504:9,18
512:8,23 519:1 523:5
523:18 524:1 526:9
527:14 528:13 532:4
533:25 535:20 540:5
540:13,18 542:9,12
**goal** 493:17 494:16
515:25 519:4
**goals** 123:16 518:10
**goes** 32:6 40:16 50:7
101:12 166:10 257:5
424:9,10 434:11
486:25 517:22
**going** 25:14 37:10 38:10
40:13 67:23 68:1,3,24
74:15 75:1 76:7,17
78:22,24 86:25 89:7
90:14,20,21 91:10,11
91:16,17 104:11,22,24
109:9 110:10 112:1

117:14 118:25 135:5
156:13,13 158:10,19
160:14 171:8 172:5,19
173:5,9,11,11,22
174:10 178:2,14,23
179:23 181:6 182:1,6
183:7,16 185:2,10
188:22 189:25 194:18
194:20 196:21,21,23,23
199:9 200:25 201:8
202:24 209:2,17
210:10 211:7 214:20
217:8 225:8 229:20
233:3 234:9,9,10,20
235:14 237:9 238:1,6
238:16,19,20 239:16
242:17 243:7,8 244:7,9
252:7 262:16,17,22
263:16,20,21,22 269:1
269:18 271:10,21
272:10 273:10 274:17
278:18 280:11 282:4
282:13,21 283:1,2
286:11,12 287:7 289:5
290:6 291:3 293:13
295:1 304:7 305:2,9,23
307:6 308:9,13 312:18
315:9 323:4,14 328:11
328:14 331:3 332:6
334:17 335:21 336:23
337:19 340:10,14,21
341:21 342:16,19,21
343:2,5,6,9,15,18,21,23
346:5 356:2,4,6 360:14
364:4 385:13 390:20
391:7 393:1 395:8
397:19 398:13 400:6
409:14,20 411:25
416:11 417:6 418:19
419:16 420:22 421:8
422:12 423:1,2,20
424:1 425:4,10,11,12
427:3,21,23 428:11
433:16,19 434:2,4,7,10
435:2 438:13,19 439:5
439:22 440:8 445:6
446:3 451:17 452:7
453:11 454:17 455:5,6

462:12 465:4,4,5
470:21 472:16 473:4,9
473:11 475:14,18,24,25
476:2,15 478:17,25
480:22,23 482:16
483:3,9,10 486:25
489:20 490:2,22
492:24 493:7,16,21
494:19 495:3,6,7 499:2
506:14 510:5,8 512:20
519:21 520:20 521:1,2
521:18 523:11 525:6,7
525:14 527:2 530:20
531:15 532:4 533:11
533:23 534:8 537:23
540:13 542:8,18 543:2
543:3
**going-concern** 312:9,10
312:17
**GOLDEN** 17:13
**Goldman** 202:20 311:13
**GONZALEZ** 1:21
**good** 25:14 27:11,12
28:17,18 50:8 52:24,25
59:23,25 90:4,5 119:5
143:12 144:14 162:9
162:14,15 169:24,25
174:5,6,15,16 177:7
208:24,25 213:22
216:21,22 254:2,9
255:22 304:4 337:21
358:6,11,12 388:6,7
392:13 397:6 401:17
401:22,23 416:2,3
426:1,5 434:21 436:23
447:20 449:22,23
458:19 464:17 485:11
485:12 486:9 489:1
497:18 520:13 525:16
527:1 529:2
**Gordon** 20:2 35:5
**GORSICH** 17:10
**gotten** 98:7,7,9 177:18
256:22 293:1 312:16
312:19 491:15,19
**Gottlieb** 8:9 119:6
**GOULSTON** 20:12
**government** 40:23 57:15

58:1 59:3 60:8,10,12
60:14,17,23 61:8,13
62:22,24 63:1,4,7
65:23,25 66:2,10 67:13
107:7,9,22 113:12
130:17 131:2,22 132:8
133:12,15,17,18 134:11
135:1 136:8 145:23
146:16 171:17 188:20
188:22 189:9,19 190:4
191:24 192:24 196:17
207:1 225:18 241:12
241:13 242:1,3 244:5
256:4,7 257:4,12,14
258:18 262:25 266:22
273:13 274:15 308:25
313:21 314:24 315:4
316:14 340:13 349:1
349:25 350:14 351:11
386:10,14,19 390:9,11
392:22 403:15 423:5
488:7 521:9
**government's** 118:11
133:20 192:24 194:8
197:23 225:10
**graduated** 124:13
**Grady** 27:18 173:7
427:18 428:6,11 429:6
434:2 438:14 440:19
442:11,12,22 443:11,19
447:3 448:16 449:22
452:7 453:19 455:19
474:5 477:15 485:11
491:3 495:2 496:9,18
497:7 498:11 502:23
505:17 506:18 508:19
509:5 512:25 514:20
516:4 519:14 520:18
521:12 522:14 524:4
525:2 527:3 532:3,23
534:14 538:23 540:2
540:20 545:7,8,9,10,11
545:24
**grand** 24:14 70:25 71:3
314:8
**grant** 26:20
**granted** 236:10 466:16
477:12 547:7

**granting** 2:23 267:10
**grass** 186:3
**grassroots** 401:25
**Gray** 24:4
**great** 25:7 128:16 255:7
351:4 392:18
**greater** 59:11 95:12
499:15
**green** 1:14 35:6,7 460:17
461:2,9,10 463:14,14
463:22
**Greene** 11:18 388:2
**Greenhill** 48:22,23,24,25
49:3,6,11,22,24 50:21
51:1 52:18 53:6,16,24
54:18,24 55:3,4 56:13
57:5,9 73:25 75:17,21
76:19 77:22 78:1,22
79:3 81:4,8,17,18,23
82:1 105:10,18 106:4,6
118:14 198:7,9,10,12
198:14,17 311:11,12,14
311:17,19,22 545:18,20
**Greenhill's** 54:12 55:17
73:2 118:11
**Greenwich** 28:22
**GREGORY** 17:13
**grew** 305:14
**grievance** 122:14
**Griswold** 6:14
**Gross** 73:5
**ground** 329:20 418:11
**grounds** 38:17,18 180:15
215:6 310:10 478:9,10
**group** 102:17 123:25
125:19 135:12 136:7
136:10 164:12,12
257:7 259:25 260:4,10
260:11 261:19 262:2,3
288:16 289:2 290:9,11
333:10 345:5 417:6
451:8 490:10 519:21
526:15
**groups** 144:20 149:24
223:17 260:13 314:11
315:3,6 404:11
**grow** 24:16 263:2 265:8
373:25,25 487:20

**growing** 321:9,11 461:24
463:11
**grown** 212:11 268:1,2
**growth** 187:23 328:7
461:25 489:6
**guarantee** 383:18,20
470:4 534:7
**guaranteeing** 45:12
**guaranty** 11:12 28:12
40:20 41:11 42:6,11
45:8,9,10
**guess** 30:2 46:2 160:6
202:8 251:21 252:9
253:11 286:5 291:8
293:13 307:22 312:18
318:9 319:8 341:10,16
350:22 361:18 373:19
426:25 433:8 439:4
481:23 482:13
**guidance** 110:5
**guide** 462:5
**guidelines** 194:6
**guise** 129:17
**gut** 183:8 186:23 211:7
**gut-wrenching** 372:2
373:6
**guy** 182:5 284:22,23
285:4
**guys** 181:1 195:5 197:4
197:22
**G.Z** 9:17

**H**

**H** 545:13 546:4
**half** 32:3 43:24 44:2 84:8
108:11 121:12 149:7
159:19 180:22 183:25
184:3,12 185:13,14,15
186:17,21 188:6
224:14 277:13 283:4
309:18,19,20,25 310:2
315:16 331:10 336:23
423:7 427:21 439:15
532:7 534:10
**HAMILTON** 8:9
**hand** 100:8 119:9 211:22
**handed** 152:9 197:14
377:23 452:7 498:20

501:10
**handle** 251:17 291:19
536:4
**handling** 122:14 216:13
291:18 443:23 536:3
**hands** 256:2
**happen** 32:23 60:25
139:5 171:8,12 185:7
244:3 262:19 302:1
429:13,24 449:9
454:18 475:15 494:17
543:2
**happened** 53:14 55:8
67:9 98:20 110:11
138:24 141:23 167:15
168:5 211:24 252:23
274:10 278:24 460:23
511:3 518:4 519:7
**happening** 66:15 143:20
184:18 241:2 387:14
516:1,14 533:18
**happens** 35:17 509:2
**happy** 107:11 164:5
252:9 255:23 271:12
297:18 298:21 299:12
438:22 446:11 503:8
503:12 542:7
**hard** 186:3 212:12
312:11 375:6 383:10
417:17 427:14 512:11
**HARDIN** 23:2
**hardships** 143:9
**harm** 350:1 351:4
474:19 475:2
**Harman** 6:21
**Harrison** 12:2 92:8
401:18
**Hartford** 23:15
**hat** 325:3
**hay** 266:9
**head** 118:22 150:10
244:5
**heading** 169:2 199:3
456:21,22 457:7
**headquarters** 181:5
192:5
**heads** 183:12
**health** 126:10 128:1,10

128:15,23 129:25
130:5,6 137:15,17
146:24 147:8,22 148:4
149:7 150:20,24 151:6
157:22,24 158:1,2,10
168:6 178:3 303:12,15
315:17 461:13,17
**healthy** 461:18,19,21,23
463:11
**hear** 62:8 87:16 116:1
192:14 198:25 202:24
228:3 270:19 298:13
332:15 338:17 339:18
437:13 510:4,4 512:13
523:18
**heard** 25:24 26:19,20
33:15 35:9 49:1 74:22
75:2 115:23 131:21
134:14 149:11 154:8
171:3 192:23 210:11
227:23 230:22 264:11
271:13 283:24 291:9
326:22 331:20 337:4
342:12 360:22 396:22
410:2 413:9,12 420:13
423:1 428:1 431:2,3
438:7 439:25 479:10
504:8 522:18,20,22,23
522:24,25 523:1
542:14
**hearing** 2:2,12,17 25:18
26:9 28:11 38:25
298:18,22 299:7
385:12 411:24 413:23
428:12,16 429:8,14,19
429:22 431:6,15,15,16
431:17 433:7 434:11
438:24 440:25 441:3
506:1 523:25 531:15
**hearings** 190:10 194:5
**hearsay** 38:17 50:2,9,25
87:20 201:12
**heartland** 186:8
**heat** 291:7,10,13,14,20
**Heimann** 10:12 415:23
**held** 124:22 165:7
171:17 178:9 202:17
321:11 375:22

**help** 30:13 191:12
219:22 230:22 231:19
252:13 262:14 264:13
271:6 275:3 281:21
294:16 311:15 320:12
325:12 338:5 362:2,7,9
362:16 372:19 376:1
383:5 444:21 514:18
516:19 535:16
**helped** 381:20 382:16
**helpful** 329:25 384:11
440:3
**helping** 251:16 267:12
325:14
**helps** 516:18,21
**He'll** 543:4
**hide** 164:14
**high** 70:17 73:13,17
75:21 77:24 79:12,15
80:7 84:1 96:2,11
97:11 98:10 106:24
118:7 298:13,19 302:6
345:10 351:11,12
352:15 416:20 451:21
452:1 471:5 527:11
**higher** 76:23 97:14 98:20
99:22 135:9 200:1,19
321:21,22 374:2
391:21 399:8 401:9,13
422:23 451:7 503:12
513:20 516:22 519:5
519:21
**highest** 96:4
**highlighted** 282:7
**highly** 176:6 498:15
**high-risk** 298:23
**hire** 311:4 325:12 362:17
**hired** 34:23 35:3 50:19
124:12 129:6,18 176:1
176:1 311:12
**hiring** 311:11
**historic** 325:4
**historical** 325:15 490:11
**history** 192:1 420:9
485:24 503:20
**hit** 200:10
**hoc** 12:3 92:8 401:18
**hold** 167:18 182:14

230:19 235:3 332:20
357:5 365:24
**holders** 181:9
**holding** 26:11
**Holdings** 18:12 22:4
**holdout** 223:16
**holdouts** 223:19,22,24
**holes** 180:3,4
**holidays** 189:13
**Holiefield** 136:11
**Holland** 135:20 136:1,2
136:3
**Home** 230:16 232:19,21
408:2,6
**homes** 402:5
**HON** 1:21
**Honda** 131:6 486:11
497:21 500:16,19
501:13 502:7,13 503:2
503:7,17 504:1 513:23
**honest** 228:7 271:4
**honestly** 181:8 182:18
184:12
**HONIGMAN** 21:2
**Honor** 25:11,14,17 26:4
27:4,8,11,15,21 28:3,9
29:13 38:14,17 40:24
45:19,23 46:9,14 49:16
49:19 50:3,17,24 52:4
52:24 54:16 56:18,25
58:19 59:13,15,15
62:11 67:1 73:21 74:3
74:14 75:14 76:3,10
77:1,8,18 87:8,10,13,23
87:25 88:3 89:21,24
92:4,23,25 93:18,21
101:14 112:4 113:14
113:15,25 114:5,24
115:6,9,13 116:11
117:12,17 118:9 119:5
119:13 120:1,12,14
136:25 138:14 139:3
144:5,7,7,10 147:1
149:25 150:3,3,5,14
152:1 154:6 160:4,18
160:24 161:15 162:7,9
163:15,16,25 164:17
169:19,21 172:21,23

173:5,25 197:11
201:10,14,23 214:16,20
215:5,19 216:7 221:2
224:9,16,19 225:4,16
225:21 226:13 235:4
235:13,22 242:10,12
243:7 249:5,21 250:8
254:11 257:5 261:9,14
264:3 265:11 266:8
267:10 269:16 281:10
281:24 282:13,22,25
286:16 289:8,13,19
296:13,25 298:1 304:6
309:4 310:6,6,9,13
320:4,9,13,15 329:12
329:22,25 330:20
331:9 332:17,22
333:19,23 334:20
336:12 338:3 339:1
341:23 344:10 352:3
352:23 354:10,14,17,18
355:1,8,19 356:12,13
356:14,17,25 357:10
358:6 359:11 361:24
362:5,11 363:8,17
377:20,24 378:8,14,22
381:24 382:12 384:7
384:13,15,19 385:7,25
388:1 401:17 405:24
406:1,9 409:4 410:5
411:11 412:2,7,15
413:8 414:25 415:22
416:2 418:10 419:18
419:23 422:4 423:8
424:10,16 425:21,24
426:2 427:7,11,18,25
428:2,5,8,25 429:18
430:25 431:22 432:20
432:25 433:3 434:9,13
434:17,22 435:5,15,17
435:20,21 436:4,14,16
436:23 437:1 438:3,6,9
438:11,16,20 439:1,22
440:3,9,18,18,22 441:4
441:6,9,17,19 442:18
443:4,9,13 445:19,23
445:25 446:7,13,19,19
448:15 449:14,18

452:4 453:7,15,17
454:7,9,11 455:9,13
468:2,5 471:22 472:3
474:1,10 475:6 477:13
477:18,22 478:10,14,21
479:10,14 480:18,25
481:2,7,23 482:15
483:7,9,14,16,18
484:17,21,23 485:4,6
491:18 498:5,8 504:5,8
504:10 510:7,12,20
511:21 512:1,6,22
523:4,7,9,14,17,19
524:2 534:21 538:18
538:20 540:17,19,22,25
541:1,9,13,17,21
542:23 543:7
**honored** 306:25
**hope** 6:8 100:12 150:17
294:17 323:20 428:16
520:10 534:11
**hopeful** 211:21
**hopefully** 234:19 440:12
**hoping** 388:21
**horizon** 178:4 181:18
183:19
**hose** 193:20
**host** 244:3 329:7 363:3
363:13,14
**hour** 217:8 218:4 228:22
283:4 293:19,20 309:3
427:21 439:15 480:18
534:10
**hourly** 122:4 196:12
307:12,13 373:3
**hours** 144:3 183:11
191:11 211:18 283:1
392:18 428:6,7,23
432:19 530:1,1
**hour's** 420:23
**house** 170:5 190:12
280:18,25 281:5 282:1
282:4
**housekeeping** 440:22
445:20 483:19
**housing** 181:20 184:24
**hovering** 374:17
**Howard** 20:5

**how'd** 181:1
**How's** 29:11
**huge** 128:15,23 129:1
130:3 146:3 258:24
**Hughes** 20:5
**human** 176:17
**hundred** 149:5 242:6
263:16,17 324:14,15
325:23 332:13 333:4,5
333:6,11 451:2 457:11
457:11 462:20 490:2
493:23 506:20 519:19
533:11 534:7
**hundreds** 190:25 191:12
**hurdle** 388:25
**hurdles** 389:2 393:16
**hurt** 516:19
**hurts** 516:18
**husband** 407:7
**hy** 333:25
**Hydee** 14:25 436:9
**Hyland** 357:11
**hypothetical** 333:23
334:1,12 396:18
**hypothetically** 114:2
334:2

**I**

**Iacocca** 187:24 307:9
**IAN** 16:10
**Icabelli** 134:6 135:24
145:14
**iconic** 178:13 207:5
**ID** 545:14 546:5,11
**idea** 78:14 89:9 128:20
171:20 173:3 175:5
178:2 195:5 280:6
306:4,16 368:8,9 403:3
404:18,24 405:2
499:17 517:10 520:13
**ideas** 219:23 222:4
294:16
**identification** 28:2,9
37:7,8 152:2,8,10
378:7
**identified** 157:6 164:6,15
368:6 386:12 460:9
466:8 477:14,19

537:24
**identifies** 157:2 164:8
452:15 456:23
**identify** 38:20 109:2
249:14,17 459:15
476:17 498:11,19
**identifying** 470:10
**identity** 178:12
**idle** 186:15 200:6 273:18
274:20 277:1,9 301:10
**idled** 187:1
**idling** 187:4
**ignoring** 534:11
**II** 2:18 20:3 187:19
**IL** 23:6
**illusion** 290:11
**image** 180:16,16 493:14
**imagine** 182:5 205:5
432:19 455:8
**imaging** 491:23
**immaterial** 329:19
**immediate** 96:18 488:25
522:4
**immediately** 182:18
185:22 216:24 238:8
299:3 493:22 518:1
521:15
**impact** 137:19 205:8
211:4 276:9 351:16
361:13 422:16 429:10
450:25 475:8 489:22
490:19 513:5 515:8
516:10 521:5 533:10
**impacted** 186:10 360:24
497:8 515:1,7
**impacting** 205:6 213:14
**imparted** 75:12 76:14
**impartial** 29:20 47:25
48:12 57:10 105:23
106:1,3
**impartiality** 106:5
**implement** 179:2,11,24
182:25 539:17
**implementation** 184:2
**implemented** 187:10
390:20 520:5
**implementing** 183:20
**implements** 136:4

**implied** 73:6 324:11
**import** 531:14 533:1,3
**importance** 48:9 212:13
258:6 330:21
**important** 37:14,16
44:22 61:24 76:17
136:21 137:13,25
140:20 150:22 152:23
168:7,8 192:10 227:7
256:5 257:9,13,16,18
257:21,24 258:2,5,9
259:3,5,7 291:17
350:14,15 397:15,16
402:4,8 411:23 414:7
417:10 418:2 424:11
444:5,6 447:15 538:1
**imports** 486:6,10,10,15
503:20
**imposed** 107:9
**impression** 46:3 173:15
229:8 286:9 438:23
**improper** 242:13 431:23
**improve** 417:17 420:7
491:6
**improved** 420:7 514:18
**improvements** 424:20
**inaccurate** 155:2
**inactive** 303:15
**inadmissible** 50:2
**inappropriate** 289:20
**inasmuch** 486:17
**incentive** 363:2 365:14
365:15,17 369:13
375:25 376:1 377:1
**incentives** 473:3
**Incidentally** 70:21
**include** 83:21 165:12
441:21 485:20
**included** 250:17 381:18
382:21 442:2 456:6
522:11
**includes** 90:15 258:12
299:15 430:16 477:5
**including** 49:22 65:19,22
66:10 110:8 123:2
181:9 196:20 315:3
354:24 358:24 420:14
436:19 476:3 479:23

486:15 512:10 537:17
**income** 191:10
**income-generating**
343:18
**incomplete** 480:4
**inconsistent** 89:3,6,11
**incorrect** 367:7 460:7
**increase** 193:23 211:22
417:19 476:2
**increased** 222:10 305:17
509:11
**increasing** 374:13
**incremental** 224:14
491:25 492:1 513:18
513:20
**incur** 364:5 473:4 539:24
**incurred** 465:1,22
473:18
**incurs** 508:22
**indebtedness** 43:23
**indemnification** 240:17
**independence** 105:25
178:10,11 193:17
**independent** 29:17,19,22
29:24,25 31:21 34:23
35:4 47:25 51:25 62:2
62:12,17 64:5 82:4,13
84:24 178:8 201:9
213:18 230:20
**independently** 82:11
**index** 457:11 499:1,6
502:8 514:10 537:11
539:10,11,12
**Indiana** 16:3,4,4,13,14
16:14 17:3,4,4 38:22
59:24 120:17 121:25
141:3 144:8 200:16
206:25 209:20 215:19
**indicate** 85:17 251:25
**indicated** 204:9,10
219:21 227:6 261:19
277:8 349:6 390:15
530:22
**indicates** 229:22 458:1
**indication** 234:3,20,23
457:25
**indicators** 181:16,23
**indices** 181:16

**individual** 126:25 127:2
422:24 424:10 448:8
507:1 537:23
**individuals** 177:1,15
186:9 192:19
**induce** 316:14
**inducement** 211:23
**indulgence** 435:9
**industries** 6:20 24:3
181:15 498:14
**industry** 85:7 124:7
177:16,16 178:13
181:14 184:14 185:1
187:17,18,24 191:5,5
204:4 205:8 212:14
232:25 276:25 278:18
282:2 288:25 322:1
327:16 390:5 417:15
421:10 489:25 490:13
495:3 498:15 501:2
502:10,11,14,17 503:1
503:13
**inference** 77:3 295:17,19
**influence** 423:23
**influences** 141:8,8
**inform** 155:11
**information** 50:8 74:17
102:8 150:9 151:18
153:9 177:24 189:13
201:17 206:13,15,15,16
235:19 378:10 384:22
384:24 385:13 419:13
421:8 453:4,5,9,10
454:5 456:1,4,5 460:13
477:21 478:13 480:5
536:6,8,17 541:17
**informed** 50:18 52:13,13
85:21 99:9 204:2
235:21 272:6,12
286:19
**informing** 32:15
**inherent** 492:10
**initial** 166:9 209:23
262:21 263:1 286:15
292:19 465:24
**initialed** 132:14
**initially** 140:14 191:25
263:4,20

**initiated** 129:14 170:25
**initiative** 368:11 495:24
499:9 504:12 515:1
520:2
**initiatives** 366:17
**injured** 418:5 419:9,10
420:16 421:6,17 424:5
**injuries** 402:21 405:7,7
418:23 419:3
**injury** 414:14 419:4
422:11
**input** 105:23 248:13
456:1 514:25
**inquire** 76:24 454:15,22
**inquired** 66:11
**inquirer** 477:22
**inquiry** 296:8 453:10
454:9,16 455:14
525:19
**inquisitor** 454:21
**inside** 45:20 539:24
**insist** 517:18
**insisted** 517:19
**insistence** 470:8 477:6,7
**insolvency** 35:9,11,14,19
35:25 36:5 39:5 86:3
304:16
**instance** 68:5 419:3
426:10 511:12 528:25
**institutions** 113:17
207:15
**instruct** 518:2
**instructed** 253:22 254:1
309:16 517:23
**instrument** 383:23
385:18
**instrumentality** 40:22
**insufficient** 459:2
**insurance** 436:19
**intact** 171:10
**integral** 242:8
**integrity** 70:8
**intellect** 213:18
**intellectual** 209:9 343:25
**intelligent** 536:20
**intend** 50:4 52:17 108:18
210:12 433:12,14
434:17,17 455:9

**intended** 242:20 267:5
**intending** 116:1 432:9
**intends** 437:14
**intense** 135:12 166:19
**intensely** 167:5
**intent** 141:12 153:5
191:19
**intention** 108:15 128:3
458:15
**intentions** 210:2
**interconnectedness**
208:19
**interdependencies**
212:20
**interest** 64:15 103:10
118:13 149:24 168:9,9
172:8 209:2,21 241:16
241:22 270:4,14 277:3
331:11 332:1,2,3
351:11 356:8 391:11
394:15 404:11 449:11
495:22
**interested** 29:21 39:21
232:9 347:11 351:15
**interestingly** 183:25
**interests** 2:20 163:21
352:15 394:20 402:11
485:19 495:25 504:13
531:6
**interface** 145:6
**interfaced** 145:3,6
**interim** 2:3 25:18 26:13
**interior** 420:8
**internal** 73:20 79:4
123:2,3 129:3 460:21
**internally** 131:8 145:7
461:12
**international** 6:12 11:3
14:3 124:18,20 126:9
127:5 138:7,10 153:19
233:23 347:10
**internet** 141:8
**interpose** 163:12
**interposed** 526:4
**interpret** 229:7,24
230:12
**interpretation** 227:1,2,4
348:19

**interrupt** 27:23
**interruption** 435:6
**interviewed** 94:16
**intimacy** 233:8
**intimately** 242:24 243:4
243:6,13,13
**introduce** 50:1 191:24
**introduced** 398:7 424:18
481:4 482:1
**introducing** 189:1
**introduction** 399:18
438:25
**inures** 105:25
**invade** 304:7
**inventory** 361:23 369:17
375:5,6,7,9,12,14,24
376:9,12,14,16,19
377:12,13,13,15 380:9
380:14 382:5 383:7,11
383:13,16,18 385:4
386:15,20 448:20,23
449:4 466:4,8,9,11,14
466:17,23 467:11
468:21,24 469:2,8,13
469:17,23 470:1,4
**invest** 207:5 271:17
445:16,17,17 459:10
**invested** 528:15
**investigation** 93:11,15
**investing** 273:8 283:25
494:25 531:2
**investment** 33:4 48:24
154:17 166:16 208:23
246:20 267:13 269:19
269:21 283:18 326:20
327:21 328:8 350:10
445:15 500:14
**investments** 116:23
299:25
**invited** 33:4 53:16
**invoice** 507:12,13
**Invoices** 2:6
**invoke** 524:16
**invoked** 445:21 446:8,14
**invoking** 446:10
**involve** 165:6 383:21
**involved** 31:2 41:8 124:6
125:6,11 127:10,14,17

128:19 130:9,10 132:6
134:20 136:15,19
140:10 141:17 144:1
152:19 155:24 165:5
167:21 191:12 227:12
227:14 242:14,24
243:1,2,4,5,6,12,13,17
243:19,21,22,24 244:11
244:12,17,18,19,21,25
245:1,6,7,8,10,13,16
246:21 247:10 250:7
254:21 286:14 297:15
312:19 367:21 370:4
371:11,12 386:17
387:9 432:8 444:19
482:21 486:17 500:5
508:23
**involvement** 124:15
130:14 134:22,24
144:23 145:1 165:9
244:19
**involvements** 130:22
**involves** 47:9
**in-possession** 301:1
**irrelevant** 329:19
**irrespective** 88:9
**irritating** 112:18
**Island** 525:15,22 526:2
526:24 527:11,23
529:1
**issuance** 105:3
**issue** 41:18,20 51:24
83:12 104:10 128:11
146:13 158:6 188:15
235:17 253:18 296:24
310:8 330:17 331:15
351:8 353:3 356:14
357:7 390:2 416:22
428:9 432:14,22
433:16 455:4,4 478:19
480:14 481:10 482:8
528:14 529:7 542:14
**issued** 105:1,2 369:3
376:24
**issues** 104:22 123:11
134:8 135:5 139:19,22
139:24 145:3 163:2
176:18 177:8 178:23

180:22 248:12,16,22
249:23 250:7 253:23
259:1 274:22 292:3
305:7 331:24 356:1
357:2,22 428:19 431:2
431:6,11,20 432:10,12
433:5 434:19 482:6
523:24 537:19
**issuing** 52:1
**Italy** 192:2,2
**item** 25:22 26:7 390:15
394:12
**items** 83:22 127:6 180:14
369:21 420:7 535:13
536:9
**it'd** 370:17 539:25
**it'll** 260:4 357:18 465:6
465:11
**IV** 20:4
**i.e** 399:6

## J

**J** 1:21 7:7 9:16 11:10
12:16 16:10
**James** 6:25 8:14 28:21
119:5 468:23 544:6,7,8
544:9,10,11,12
**Jamie** 112:14
**January** 103:19,22
124:22 130:12,21
133:23 170:13 189:12
256:13 276:25 278:23
375:13 469:8 506:13
**Jason** 16:22 23:8 120:16
144:7
**JD** 180:18 416:18 420:2
**Jeannette** 5:17 225:18
**jeep** 68:5,15 70:21
108:21,24 109:2
207:17 260:16 296:21
374:4 380:2 381:15
447:19 450:10 458:12
458:17 459:8,21
465:12 475:12 491:2,4
492:18 494:6 503:4,13
519:12 526:24 527:11
531:25 535:21,24,25
536:3

**jeeps** 83:17,21 208:5
**JEFFREY** 4:8
**Jessica** 524:5,21
**Jim** 27:9 176:2,2,5 195:9
364:11 365:24 371:9
379:7 380:4 398:15
485:23 497:7
**Jimmy** 285:16,19,20,21
**JJF** 7:3
**job** 69:13 124:21 186:22
231:13
**jobs** 149:19 154:17 348:8
350:1 351:3 400:6,7,8
400:14,15,20
**John** 15:7 524:23 525:10
**join** 29:14 174:23
**joined** 36:10,11,19
191:18
**joining** 526:15
**joint** 265:10,17
**Jones** 3:3,12 4:2 279:7
**journey** 59:2 72:17
**JPM** 111:11 113:8 290:8
290:8,9
**JPMorgan** 12:19 101:8
107:4 111:13,18
112:15 202:19 203:15
217:16 218:16 285:20
285:21 286:10,16
**JR** 3:17
**JUDD** 24:10
**judge** 1:22 46:6 51:13
54:21 56:21 77:14
98:14 103:4 108:3
114:10 208:10 213:8
213:20 214:3 344:5
385:6 430:1 530:6
**judgment** 35:24 39:10
66:6,8,14 139:8 201:16
205:5 212:7 213:2
276:4 277:22 278:4
387:12 432:5,15,16,18
433:6 445:6 454:22
464:6,9,13,14 472:1,10
482:5,8
**JUDY** 9:17
**July** 185:9 231:22
232:13,18 239:15

**jump** 183:7
**jumps** 346:6
**June** 26:9 185:9 192:4
367:12 368:19 406:16
406:18,19 410:2
428:15,19 429:22
470:18 548:16
**junior** 335:10,13,15
336:1,3,4,5
**jurisdictionally** 108:11
**jurisdictions** 436:21
**JUSTICE** 5:11 6:2
**JV** 299:25
**JVs** 116:23
**J.D** 498:12 499:5 539:8
539:12 541:7,10,20,25
546:18

## K

**K** 9:9 11:13 17:10 18:17
**keep** 36:7 115:17 123:4
123:10 132:1 188:17
243:8 252:7 276:16
286:19 301:23 304:9
338:18 375:16,20,20
388:8 400:14,15 416:5
460:16 506:1 508:22
509:3
**keeping** 287:8 371:16,19
461:22
**keeps** 422:1
**kept** 106:23 145:2 245:1
322:8 400:20 455:15
**Kevyn** 3:18 37:1
**key** 146:4,4,5 254:13
256:3 294:7
**KG** 93:2
**KGF** 23:3
**KIMBERLY** 11:16
**kind** 100:12 125:22
182:14 196:9 207:19
209:25 213:8 239:11
265:10 323:13 327:7
355:3 403:1,4 409:16
419:11 445:3 491:15
496:20 531:5
**kinds** 113:23
**kitchen** 255:21

**KL** 35:5 106:4
**KLEIN** 11:2 19:7
**knew** 84:14 141:12 149:4
149:6 153:25 180:2,18
180:19 182:15 183:18
287:11 373:22 481:12
**know** 25:19 36:4 41:2
47:9 49:3 54:11 61:24
62:3,24,24 67:23 68:2
68:6,18 70:1 71:14
72:6 76:18 77:7,9,10
77:11,12 78:6 89:8
91:13,24,25 102:19
103:11,19,20 105:3
111:11,17,18,19 115:12
118:16,18 121:24
122:3 129:5,19 139:21
157:11,13,14 159:9
160:20 165:8,19,24
167:19,22,22 168:5,7
168:14,16 169:10
170:8 171:22,24,24
172:8,10,10,11,19
177:1,18 178:5,17,17
179:20 180:8,14 186:3
186:5,8,20 187:24,25
188:4 191:3 193:5,18
193:24 195:12,15
196:9 200:4,12,20
204:15 205:5 206:17
207:19,20,22 208:16
209:1,17,23 210:9
211:22 212:12 213:8
215:22,23,24 219:5,18
226:9,23 227:23
228:19,20,21,25 229:10
230:5 236:7,11,15,19
239:3,4,25 240:5,10,12
241:15,17 245:19,20,22
245:25 246:9,17 247:4
248:2 250:11 253:24
254:5 255:25 260:7
262:1,1 263:11 264:5
271:4,9 272:19 280:1
281:16 285:12,19,21,22
285:25 288:21 289:14
289:16,25 291:8 295:2
295:22 298:4,11

299:11 300:18 302:8
302:12 304:2,4,8 305:1
305:4,5 306:10,13,15
306:18 308:2 309:5,10
311:2,9,9 312:18,19
316:17 320:10 321:1
326:14,15,21 327:17
330:20 338:22,24
339:14,22,24 340:17
341:14 343:10 350:25
351:2,15,17 355:20
359:10 364:13 365:7
365:21 366:1,8,14,14
367:6 368:1,4,5 369:19
370:19 371:5,20 372:6
372:9,14,15 373:1,14
373:16,17 374:9,16
376:15,15 377:5,7
380:17,18,19 383:4
384:11 385:8 386:16
386:16 387:8,22
390:14 394:12 396:16
396:16 397:18 398:8
398:10 401:7,10 403:6
404:19 405:4,10 406:6
407:8 408:21 410:21
410:22 411:6,8 412:6
413:1 414:22,23 416:4
417:24,25 418:3,5
419:1,11 421:14
422:17 426:12 427:14
428:22 432:21 433:17
434:3,15 446:1 460:12
461:11 462:24 468:16
468:18 469:15,19
470:20 472:15 473:2
475:23 481:8,16,18,22
482:16,19 484:10
487:7,8 492:23 493:18
497:3 506:21 511:4
513:23 518:4 521:20
526:14 528:20,23
530:23 532:17 537:22
542:13
**knowing** 390:1 429:5
**knowledge** 40:7 52:8
78:17 84:22 93:10
100:24 101:9 103:16

109:6,14 165:9 175:19
214:14 220:3 224:4
231:20 259:17 262:23
263:12 272:23 275:20
284:5 336:22 387:15
392:7 393:6,8 396:2
404:22 408:14,24
413:24 426:9,15,19,22
427:1 480:6 481:19
482:23
**knowledgeable** 127:3
416:15
**known** 28:12 29:17 47:3
399:19
**knows** 386:1
**Kokomo** 26:8 141:1,3,8
141:15
**Kolka** 106:10,12,13
173:13,16 176:9
195:15 243:20 302:11
302:12 306:9 405:4
414:22 433:18 434:10
439:10 542:20
**Kolka's** 543:2
**KPMG** 30:10 104:8,22
114:13,15 115:2,25
116:1,20,22
**KPMG's** 105:3 115:4,7
116:8
**Kramer** 5:2 89:25
**Kurtz** 16:9 28:3 35:12
38:17,21,21 40:24 46:5
46:6,14,21 49:19,21
50:23,24 51:12 52:4
54:20 56:21 58:19
59:15,19,22,23 68:12
74:3,7,11,15,21,24 75:1
75:4,5,14 76:10,16,22
77:1,5,8,12,14 80:15
81:13,16,18,21 87:10
87:13,16,23 88:3,6
89:21 98:12,16 101:10
101:14,22 102:4,14
108:3,5 112:4,10
113:21 114:5,10 115:2
115:9,13,23,25 116:4
116:17,19,21 117:4,17
117:23,25 118:23

434:16 438:14,20
544:7,12
**KY** 19:15
**KYLA** 18:17

---

**L**

**L** 6:17 7:23 8:14 13:16
14:18 15:7 174:18
547:4
**LA** 5:18
**labor** 121:8 123:23,24,25
124:2,4 125:25 130:19
131:3,18 133:12
134:15 146:6 170:19
170:21,24 191:8
257:18
**lack** 112:1 482:22
**Laddin** 17:19 25:24
**ladies** 135:20
**lag** 183:7
**laid** 88:2 373:4
**Landers** 535:24 538:12
**Landry** 380:4 398:12
**language** 430:11 441:21
441:25 442:2 524:8
**LARDNER** 10:2
**large** 30:22 169:2 171:22
171:24 202:11,21
212:16 213:15 288:25
290:11 330:23 350:10
380:23 486:4 487:12
487:22 488:9 540:9
**largely** 322:24 488:5
**larger** 140:20
**largest** 265:2 330:24
**Las** 20:7
**LaSorda** 134:8 175:16
195:12 243:23,24
248:18 252:8,17
293:11 347:9,9 378:6
379:7 546:16
**LaSorda's** 249:12
**Lastly** 106:9
**late** 47:20 49:10 184:5
192:3 278:9 416:4
420:23
**lately** 506:2
**latitude** 477:22

**launch** 72:7 325:6
**Lauria** 16:21 173:12,16
  173:18,21 201:10,12,23
  214:18,19,20 215:5,13
  215:22 216:15,18,20
  221:8,11 224:16,24
  225:4,8,9,21 229:21
  235:11,13,22 236:2
  242:12,23 243:7 249:9
  249:16 261:3,5,7,9,14
  264:8,10,13,15,18,25
  265:1,13 266:13,14
  281:12 282:13,18,20,21
  282:25 283:5,12,14
  289:13,19 290:4,5
  304:7,14 310:11,13,25
  320:9,14,18,23 329:22
  329:24 330:1,3,5,17,20
  331:5,9,18,21 332:17
  332:19,22,24 333:23
  335:3 336:11,18 338:5
  338:8 342:4,6,7,14
  344:9 351:23 352:2,20
  352:23 353:1,5 354:10
  354:25 355:1,19
  357:19 427:11,13
  433:17 434:4,6,9 438:8
  438:9 439:8,12,14,19
  439:21 440:1 542:8,10
  542:14,19 544:19
**Lauria's** 329:23 355:13
  357:23 434:5
**law** 20:2 21:11 35:3,5
  92:7 106:6 246:11
  281:4 430:6 480:20
  481:15 534:25
**laws** 368:25 369:2
  436:18 470:22,25
  524:10
**lawsuits** 414:14
**lawyer** 33:18 34:24 35:3
  143:3 156:11
**lawyers** 136:18 200:16
**lay** 50:4 53:2 277:10
  361:1 372:1
**layoffs** 149:15
**Lazard** 136:18 347:8
**lead** 61:19 62:3,18

126:15 195:16 203:15
  248:21
**leaders** 380:22
**leadership** 69:10 140:7
  140:15,15,17 141:18
  150:7 166:19,25
**leading** 40:24 58:19,21
  187:16 448:11,12
  540:15
**leaner** 273:11,15
**leap** 285:12
**learn** 33:10 34:1
**learned** 74:13 380:4
**learning** 300:12 476:1
**leased** 441:23
**Leases** 2:22
**leave** 25:6 87:7 88:13,14
  88:25 89:16 92:4 193:2
  233:12 273:18,21
  274:15,23 439:9,9
  441:1 446:4,11
**leaves** 431:9
**leaving** 50:8 52:14 57:7
  89:9 238:4 274:2
  404:14,21 415:8
**LeBoeuf** 9:11 426:6
**led** 134:6 347:9
**ledge** 218:21
**ledger** 482:11
**Lee** 3:10 187:24 285:20
  307:8
**Lee's** 285:21
**left** 25:7,8 65:16 73:5
  88:24 102:16 142:5
  217:5 274:17 342:9
  353:11 395:17 403:10
  403:17 405:16 432:11
  446:21 456:23 480:10
  510:17 512:25
**left-hand** 318:5,15
**legal** 33:23 35:12 219:9
  235:1 247:17 265:12
  331:16,19 405:25
  406:7 418:15 431:20
  432:3 471:2,22 472:2
  474:4 524:9
**legally** 405:11
**legitimate** 290:25

**LEINWALD** 11:18
**Leinwand** 388:2
**lend** 189:9 213:3
**lender** 112:19 196:16,17
  337:20 354:1,4 532:22
**lenders** 63:16 64:14
  65:16,19 66:11,18
  80:19 86:9 88:10 96:22
  97:7 100:20,21,23
  101:2,7 102:17,20
  103:2 105:5 111:5,6
  184:17 188:9 196:15
  199:7,12,14,16 200:21
  201:3,5 204:3,11,16
  206:2,9,13,22 207:4
  209:22,24 210:1,15
  211:12 217:10,12,16,23
  218:1,6,10,12,19 221:6
  223:18 257:6 262:12
  277:4 286:11 293:18
  293:23,25 308:9,11
  312:6 313:17 315:4,8
  315:19 335:14,17
  336:2,6,9,20 337:25
  339:4,14,21 340:2,7,11
  340:15,20 341:6,18
  345:13,16 350:20
  351:19 352:8,17,19,22
  352:24 353:23 358:25
  388:16,19 393:17
  404:5 532:18,21
**lending** 207:15 385:15
  386:11
**length** 95:2 325:3
**lengthy** 163:6 281:23
**lent** 229:17 336:5
**Leonard** 8:7 485:6
**Lerner** 13:15 162:9,10
  162:13 163:13,16,25
  164:10,14,20 169:19
  428:5,24,25 430:25
  431:9,13,22 432:6,20
  433:1 434:22 435:17
  445:23,25 541:22
  542:2,5,7,10,21,23,25
  544:15
**lesser** 254:18
**letter** 191:19 268:8,8,10

269:23 270:13 309:17
  319:19 320:22 321:4
  321:19 322:19 369:3
  379:18 380:18 381:5
  389:15
**letters** 368:1 380:15
**letting** 291:19 378:22
  511:4
**let's** 27:5 34:9 41:3 53:14
  61:8 79:21 95:16,18
  103:6 130:21 190:24
  202:13 209:4 215:11
  215:14 216:10 217:14
  225:11 230:13 250:20
  252:7 253:7 256:9
  263:15 268:4 277:24
  291:2 292:5 293:8,10
  293:17 294:12,23
  295:12,19,20 297:19,21
  297:21 299:13 300:9
  307:5 308:15 317:16
  318:4 322:19 326:24
  328:2 330:16 332:18
  335:24 344:24 356:20
  408:25 433:19 455:3,4
  480:14 500:25 502:5
  503:25 509:20 524:19
  527:19
**level** 85:22 99:10,24
  100:16 104:19 129:12
  137:17 138:12 139:25
  140:4 143:8 150:15
  157:16 158:14 167:23
  168:11 177:1,13
  181:15,24 182:4
  195:17,18 205:20,25
  206:1 211:6 239:3
  287:12,12 321:19
  322:10,11 377:3
  451:21 490:6 500:4
**levels** 158:9,12,14 159:7
  184:8 187:19 375:7
  452:1 462:6
**leverage** 142:4 147:17
  151:2,2,4,5,8 208:11
  290:12 431:19
**Levin** 5:2 89:25
**Lewis** 12:2 92:8

**Lexington** 12:20 19:4,12
19:15
**Lexus** 486:2
**liabilities** 47:2,6 240:17
258:2,3,9,11,16,20
273:17 274:9 298:14
298:19 301:19 309:9
345:15 369:11 395:4,8
395:12,16 403:16
414:8
**liability** 41:8 129:10
273:24 274:21 308:1
309:10,20 316:8 369:8
369:10,10,14,15 402:24
404:15,21,24 405:2
480:6
**liberty** 8:11 70:24 71:5
109:1,5,7 385:22
**Lieff** 10:12 415:23
**lien** 43:16 61:12 63:23
64:14,24 65:16 66:5,10
66:18 67:7 80:18 96:22
97:6 100:20 101:2,6
102:17 103:1,25 105:5
111:5,6 181:9 184:16
188:9,12,13 196:15
199:7,16 200:21
204:16 210:13 211:12
218:1 239:20 245:22
245:24 249:24 251:6
259:4,6 262:12 277:4
286:25 287:4,9 293:25
312:6 313:17,21 315:4
315:8,19 316:14
335:10,14,17 336:2,6,9
336:20 338:19,23
339:4,14,21 340:2,6,11
340:20 341:6,18
345:13,16 350:20
352:17,19,22,24 353:23
354:1,3,4 361:12,12
388:15,18 393:16
403:7,13 404:4 411:22
**lienholders** 60:13 61:12
64:20 65:20,22 104:2
**liens** 2:20 394:15
**life** 122:7 322:6
**lifeline** 188:4

**light** 22:3 139:4 276:3
278:2
**lightly** 516:12
**likelihood** 141:24
**likewise** 463:19
**limit** 245:22 283:3
356:15 429:5,7 431:23
433:4
**limitations** 198:19
**limited** 10:13 54:16
113:5 415:23 428:17
428:21,22 432:22
**limits** 433:7
**Linda** 135:22
**line** 68:16,17 87:1 102:9
102:10,13 160:23
161:1 168:9,10 178:22
179:25 180:1,3,14
191:9,9,22 201:25
208:8,9 220:6 235:6
345:16 346:3,5 347:7
394:12 420:7 458:9,10
492:8 493:4,9 525:18
535:13 536:3,4 544:5
545:5 547:5
**lines** 67:18,20 83:8 94:25
95:3,9 108:16,18,20
109:12,16 110:22
111:2 207:17 296:22
345:21 346:17,19
347:6,11 490:23 491:1
491:10 494:4,24 509:9
513:13 532:1,7 533:16
535:20
**lineup** 180:3 192:6
**linger** 183:7
**linked** 44:4 406:15
**Links** 231:13
**liquidat** 343:11
**liquidate** 205:4,12 237:3
237:12,17,18 274:5,24
278:25 350:23
**liquidated** 348:3 403:11
**liquidating** 58:7 205:5
213:13
**liquidation** 58:12,13
59:8 78:19,20 79:1,12
79:15,18 80:6 81:5,9

81:12,14,24 82:2,7,12
82:15 83:25 84:1,4,7
85:22 86:13,17 88:15
88:24 89:10,17,19
95:20,23 96:5,15 98:11
98:17 99:10,13,14,17
99:19,21,23,25 100:9
106:22 107:15 109:24
109:25 110:3,14
148:20 149:1,12,20,24
151:9 161:10 171:12
171:21 190:22 198:17
199:3,22 200:15,18,22
201:2,4,9 202:7 203:2
203:5,6,8,9,22 204:5,12
204:17,19 205:21
206:1 207:9 211:3
242:19 276:9 312:7
341:9,11 348:8 361:8
403:14
**liquidity** 36:6,8,10 39:16
40:11 58:1 59:2 70:7
78:25 89:10 104:24
106:17,23 107:3,22
108:6,7,8 109:22,23,24
129:8 185:1,23 188:16
188:17 301:24 374:3
375:19
**Lisa** 2:25 548:4,8
**list** 124:12 178:23 196:14
208:25 244:6 248:12
248:15 345:21 363:5
363:11,18 381:5,8,17
398:13 430:17 434:15
452:14 482:4 504:19
528:18 538:23 539:1
**listed** 164:7 301:22
363:15 379:25 382:15
540:6
**listen** 436:13
**listening** 69:16
**listing** 355:9
**litigate** 471:6
**litigates** 526:23
**litigation** 44:12 84:5
**litigious** 528:13,19
**little** 15:10 29:8 34:9
39:19 40:15 88:14

93:21 121:7 123:21
130:9 161:13 175:5,5
178:7 191:1 250:25,25
252:1 253:25 292:5
301:12 310:7 323:23
347:1 354:22 409:9
420:23 423:16 501:17
518:15 534:25 535:17
535:18,21,25 536:7
**LIU** 9:17
**live** 28:21 455:15 479:3
**livelihood** 350:16
**lives** 137:19 402:4
**living** 126:11
**LLC** 1:8 6:12 9:4,12
11:4 14:2,4 15:10
19:10 20:3,4,13 24:11
28:24 47:6 174:20
177:6 253:23 257:7
260:4,10 262:2 267:16
269:2 325:2 388:3
404:22 479:17 535:2
535:18,21 537:7,21
538:15 548:11
**LLP** 4:10 5:2 6:19 7:10
7:18 8:2,9,17 9:2,11
10:2,12 12:2,11,18
13:2 14:20 15:2 16:2
16:12 17:2,13 18:2
21:2 22:12 23:2 24:2
24:10
**loan** 43:18 44:2,3 63:4
130:18,18 131:15,19,20
132:13 170:12,15,18
171:1 185:20 186:11
197:24,25 239:20
277:16 279:11,13
280:15 314:5 315:20
315:21,24 349:13
386:15
**loans** 43:14 60:25 61:9
61:10 66:18 67:7
128:25 130:25 132:1
159:18 250:8 251:6
335:10 349:14,25
350:6 384:1 385:19
426:10
**LOBELLO** 11:10

**local** 124:16 126:4,12,12
126:22 127:3 140:15
363:1 370:10
**locality** 457:2,3 535:25
**locals** 127:8 140:20,21
140:24
**locate** 446:6 535:13
**located** 136:4 455:20
456:24 513:15,18
514:14 535:17
**location** 135:9 141:1
457:5 458:20 462:17
**locations** 127:5 135:10
141:2 455:19 460:5
493:4 531:11
**logical** 195:7
**logistically** 46:14
**logos** 178:13
**LOI** 191:19
**long** 40:11 54:11 97:1
132:11 137:14 142:11
148:18 160:19 187:25
195:12 231:21 232:21
282:21 303:9 344:5,5
356:9 358:23 399:14
399:16 412:23 427:19
432:21 435:12 439:10
455:14 471:6 485:24
492:19 514:13 516:10
516:11 518:19 527:23
529:1,2 533:21
**longer** 35:15 157:23,24
158:3 173:23 180:10
185:20 427:2 437:21
458:21 510:1 530:14
**Longwinded** 70:3
**long-term** 166:22 266:18
313:3 537:15
**look** 45:13 50:19 79:22
82:24 83:2,5 95:16
135:23 154:15 156:2
159:15,16 181:12,22
183:13 184:23 187:13
190:19,20,22 191:4
197:21 199:6 203:21
207:24 210:11 212:10
212:25 222:15 231:3
231:14,17 232:6,6,7

252:21 253:10 258:6
268:1,14 271:12
275:24 284:17 287:4
289:4,18 291:2 295:19
295:20 296:19,20
297:18 298:3,21
299:12,13,23 300:9
302:9,16 307:22 313:1
314:25 315:1 318:5
322:19 324:7 326:9
338:13 344:4,18,24
345:23 346:3,7 347:24
364:4 370:17 394:10
395:25 398:16 419:25
453:2 457:1,6 463:24
474:8,12 484:3,20
486:18 498:20 500:25
502:3 503:2 504:21
524:4,19 527:19
530:11
**looked** 55:16 56:3 76:19
82:21 83:3,15,16 179:9
179:9 180:2,5,11,11,17
191:7,7,7,8 195:20
201:2 207:21,22,23
228:9 231:11 263:11
274:21,22 287:2 311:8
322:4 325:1,8 347:14
347:18 368:11 371:4
372:24 390:1 399:5
410:23 462:10 474:11
474:14 476:8,11,11
477:8 502:2 514:24
529:23
**looking** 79:17 97:5 98:11
132:3,5 181:23 182:17
185:3 199:9 212:19
222:4,18 228:17 249:4
253:4 254:8 285:13
296:8,21 313:16 315:5
315:7 316:22,24
318:13 319:23 322:5,6
337:7 338:22 344:19
357:4 358:13,21
425:12 448:7,8 456:21
460:16 463:6 464:2,14
496:21 500:13 502:4
529:21 531:24

**looks** 106:10,12,12
222:17 227:23 287:22
345:24 346:2 368:21
379:15 380:17
**Los** 14:23 17:8
**lose** 303:11
**losing** 487:9 493:21
533:7 541:11
**loss** 348:8 383:12 450:25
**losses** 385:4 451:14
467:17,21
**lost** 149:19 307:9,10,11
351:3 400:6 445:13
450:22 451:2,5 458:13
487:5 489:9,11,18
490:3,22 494:3,9,13,14
**lot** 84:16 141:7 149:11
176:14 178:10 181:6,6
181:7 182:6,12,12
189:11 192:17 193:15
194:4 209:13 237:21
243:1 251:12 256:2
300:14 303:17 325:15
326:13 328:16,19
332:15 361:14 367:8,9
392:15 393:11 419:4
470:19 486:4 487:9
**loud** 160:7,14 260:23
285:15 289:6 299:24
**louder** 330:1
**Louis** 7:11,14 187:5
273:19 441:19
**Louisiana** 3:14
**low** 73:16,19 75:8,17,18
96:2,11 97:12 345:10
504:2
**lower** 78:21 79:2,5,8,9
79:10,11 80:22 84:1
95:24 97:23 98:20,25
99:1 200:1 422:22
472:12
**lowest** 420:9,10
**loyal** 175:20 533:24
534:9
**loyalty** 180:20 420:4
**lunch** 173:3,6
**LYNCH** 20:17
**Lyon** 24:13

**L.L.P** 13:9

**M**

**M** 5:7 6:25 8:15 15:16
16:9,23 20:9 23:8
479:15 525:1 534:24
544:4 545:4
**MA** 20:15
**MACK** 12:23
**MAFA** 384:10,23
**magnitude** 84:14
**mail** 69:5 88:20 251:23
**Main** 19:13
**mainstream** 486:10
**maintain** 70:8 107:1
108:7,7 131:11 188:17
391:14,18 506:5
**maintained** 100:13
**maintaining** 193:17
**major** 16:4,14 17:4
128:10,10 143:5,8
181:22 213:6,10 339:3
**majority** 111:5 145:4
147:15 218:6 223:18
241:18 242:3,5 290:23
323:11 377:7 401:24
**making** 157:9,19 213:1
225:4 272:7 281:20
282:9 289:3 294:10
295:19 301:7 312:20
351:12 383:3,6 426:10
426:25 455:7 479:1
518:12 540:2
**Mall** 528:25
**Man** 196:8
**manage** 229:18
**management** 7:3 86:19
88:17 100:10 201:18
205:11 212:24 229:19
258:25 303:16 312:19
319:14 461:12,20
526:25 538:15
**manager** 29:17,19,24
178:15 379:12 524:25
525:12 537:1
**managers** 28:23 29:1,14
29:25 47:12 48:15
50:17 54:25 57:8,13

58:16 197:2,15 201:15 204:24 456:18 469:6 545:19
**managing** 49:13
**mandate** 30:9 118:11,17 196:10
**mandates** 194:4
**Mango** 110:6
**manner** 2:18 176:20
**manufactured** 208:20
**manufacturer** 191:20 213:10 321:10,25 362:25 426:21 486:23 487:18 490:16 504:14 505:23 506:25 508:16 508:22 515:18 531:13
**manufacturers** 182:13 189:2 190:11 193:20 309:9 347:10 351:17 374:24 420:11 486:5 486:19 487:11 498:3 498:17 504:2 505:12 531:15
**manufacturing** 93:1 121:10 212:17 507:7
**Manzo** 61:20 78:19,20 81:16 82:25 84:18 106:11,12,13 110:7,16 110:21 199:18,19,21 204:2 219:5,10,11,14 219:21 220:1,14,20,24 221:8,15 222:1,16 223:13 224:7 225:2 226:18 227:5,19 228:4 244:11,12 253:10 255:2,13 284:19 287:18,22 288:3,7,10 290:24 294:7,22,25 296:2,11
**Manzo's** 81:23 82:2 225:11 285:4 289:5 294:14
**map** 454:1 455:19
**maps** 453:5 455:23 456:4 540:7
**Marbury** 9:5
**March** 42:23 48:20 60:19 103:19,22

134:19 192:23 195:4 202:14 255:11 268:11 269:23 270:6,9,13,15 271:3 272:4 273:2 275:13 319:19 320:1 320:18 321:1 322:16 322:17,20 370:22 371:2 375:3,13 380:5 380:10 382:5 393:9,11 393:12 395:18,20 397:24 457:23 469:9
**Marchionne** 299:1
**Marine** 124:10
**mark** 13:19 349:21 378:3
**marked** 27:22 28:2,4,9 37:1,2,7,8,9 49:15 69:3 70:9 86:25 152:2,7,9 197:16 214:7 378:6,15
**market** 12:4 42:15 79:20 82:14 95:13 200:8 208:18 278:14 347:19 349:19,21 373:25 374:13,15,18,19 391:21 400:21 422:21 424:7 424:13 445:17 450:22 453:2,3 454:1,17 456:10,14,14,15 457:4 457:5 458:14 459:4,7 459:11 460:5 465:1 489:9 490:12 494:7 495:1 515:12,13,15,22 516:1 524:14 526:10 528:25 531:25 532:1 532:20 533:12,17 538:9 540:9
**marketing** 176:6 325:7 364:11 365:5 368:7 369:16 371:5 399:10 399:12
**marketplace** 458:17,22 458:25 519:7 537:19 537:25
**markets** 363:1 476:12 487:3 508:5 531:19,21 531:22,23 533:14,15 536:23
**marking** 378:16

**marries** 260:11
**Martin** 9:16 426:5
**MARY** 7:7
**Mason** 120:25 136:12
**mass** 213:15 366:15
**Massachusetts** 525:15 526:2
**massive** 212:16
**master** 198:21 247:5,7 247:12,20 259:20 307:15,24 389:4 391:12 394:11,11 437:22
**MASUMOTO** 6:9
**match** 375:15
**matches** 183:2
**material** 115:20 116:2 198:15 258:20
**materials** 32:17,19,21 49:22 54:8,10 55:16,20 59:10 151:22 319:15 331:13
**math** 162:4 212:19 264:21 326:12 327:5 327:10,11,25 329:1,23 529:22
**Matt** 219:4 226:23,24 227:5 255:13,14 285:16 291:6 294:18 294:22
**matter** 1:6 40:16 43:13 192:11 216:9 219:25 424:19 434:12 438:4,8 440:23 441:10 445:20 446:14 485:23 490:17 505:24 514:14
**matters** 32:16 37:14 41:2 101:7 115:14 138:19 170:1 177:6 202:4 253:17 443:1 446:14 483:19
**Matthew** 22:16 23:17 226:4 254:19
**maximize** 58:9 61:21 62:19 66:8 89:18 99:15 233:9 295:4,23 304:24 305:10
**maximizing** 295:10

340:23
**maximum** 62:4
**Mayco** 6:12
**Mayer** 5:7 45:23,23 89:23,24,25 90:3 92:4 357:9,10,16,21 425:22 425:24 544:8
**May/June** 267:20
**ma'am** 359:2,4 364:14
**MCCARTHY** 22:2
**MCDOWELL** 18:8
**McLean** 22:7
**McRory** 11:24 388:1,1,5 388:12 392:8 544:21
**MD** 9:7
**mean** 34:5 82:11 89:9 90:14 91:6 104:19 112:21 115:15 116:14 138:6 149:10 157:18 158:9 160:11 164:6 167:25 168:1 171:18 179:14 182:21 185:8 185:17 186:2 187:8,16 187:18 191:11,18 192:17 205:7,13,16 207:13 210:22 222:6 226:2,9,14,17,18 228:19 229:25 239:11 244:3,5 246:15 251:3 260:7 263:12 267:3,7 273:15 276:7 284:11 286:13 291:11,17 304:1 308:2 315:5,15 326:11 327:17 328:10 329:7 331:4,6 334:21 337:17 363:3 369:18 372:1 378:23 382:9 385:12 393:22 399:4 401:5 406:7 412:14 415:6 419:23,25 421:12,14 424:5 435:3 448:22 455:3 458:9,18 461:5,18 462:1 472:21 484:2 486:24 488:6 494:9 497:13 499:23 502:3 506:11 507:14 508:21 509:17 514:4 514:16 515:9 529:10

529:21,21 531:12
532:19,21
**meaning** 34:1 35:14
57:19 95:14 165:20
180:4 182:8 422:19
425:7
**meaningful** 505:24
508:20,21
**meanings** 141:12
**means** 63:8 65:10 186:24
227:1 251:4 276:15
291:8 315:16 349:22
451:13 458:10,11,19
461:10,19,24 462:2
**meant** 153:2 225:3
226:25 259:15 427:5
**measure** 501:17,18,20
**measured** 420:4 503:5
**measurement** 460:22
**mechanic** 407:7
**mechanics** 356:2
**mechanism** 384:2 386:2
**mechanisms** 183:21
187:11
**medical** 127:24 137:12
138:5 141:20
**meet** 35:15 52:16 131:1
159:20 183:11 192:10
196:12 245:3 252:25
437:23 469:8,20 496:3
**meeting** 34:16 36:22
55:7,8,21 60:20 62:6
107:1 133:13 140:17
146:2,3,7,8,17,18
183:13 184:3 197:9,15
197:19 198:4,5,16,25
202:9 204:18 211:10
216:4 236:20,24
237:11 248:17 286:21
309:2 339:2 370:24
380:4 517:16 518:10
545:22
**meetings** 31:10,12,16,18
31:20,23,25 32:3,4,10
32:11,25 37:11 40:2,14
92:18 127:2 145:11
146:1,12,15 177:21
244:8,10,13,15 291:22

311:20 517:13,14
518:4
**meets** 457:12 495:21
**meltdown** 184:25
**member** 14:12 28:23
32:14 51:8 60:18 62:2
62:2,17 64:5 82:4
84:25 98:22 138:10
148:24 169:7,11
178:16 219:8,11
285:24 407:6 411:2
414:6
**members** 30:1 32:7,11
32:24 34:17 35:18
51:21 74:20 121:11
122:5,6,6,8,8,9 126:1
126:25 141:14 147:9
147:14 148:5 151:18
152:11 153:3 155:11
156:6,15 157:23
158:25 159:3,25
161:22 162:1 163:14
163:15,17,19 164:6
167:4,14 171:5 176:15
176:20 194:11 224:13
224:15 408:16
**membership** 122:15
126:25 128:13 133:1,8
133:19 137:21 138:9
138:11 139:8,19 140:7
140:22 141:7,18
147:12,15 148:10
151:15 152:6 154:11
172:18 315:17 331:13
546:7
**memorandum** 191:19
309:17
**memory** 204:7,13 487:3
**mention** 191:15 522:3
**mentioned** 31:14 43:11
103:8 122:5 123:17,20
135:17 136:1,14 138:3
143:15 146:3,6 160:2
175:11 191:16,16
206:14 236:16 257:23
268:20 269:11 278:16
281:20 297:10 301:7
347:20 369:16 374:24

375:18 382:25 383:21
389:13 435:22 538:10
**Mercedes** 186:5
**merely** 532:1
**mergers** 175:21
**Meridian** 10:4
**merits** 527:4,6
**mesothelioma** 407:8,9
**message** 166:2 252:2
253:11 290:12
**messenger** 441:9
**Messrs** 378:6 546:15
**met** 53:9 90:4 132:12,15
134:25 158:19 181:8
192:4,5 194:1 196:9
197:5 236:16 317:8
348:15 370:21 437:10
485:13 495:17
**method** 326:7 330:18,18
330:19
**methodology** 327:12,13
538:25
**metrics** 183:14 184:4
**Metro** 454:1
**metropolitan** 7:12 538:9
**MEYER** 11:2
**Mfg** 10:3
**MI** 6:15 10:8 18:6,15
21:6,15 24:14
**Miami** 16:19
**mic** 174:9
**Mich** 11:5 14:5
**MICHAEL** 7:23
**Michigan** 248:18 436:6
436:25 437:1,5,5,8,9,14
437:19,21,24 438:1
**Michigan's** 437:6,16,16
438:4
**microphone** 29:6 342:8
388:11 441:13 478:1
479:12
**mid** 47:20 484:11 518:13
**middle** 96:7 202:13
209:5 277:7
**mid-Atlantic** 379:18,21
484:13
**mid-November** 280:8
**mid-term** 143:21,23

**Mike** 436:25
**miles** 422:23 423:5 467:5
**mill** 368:1
**MILLER** 21:2
**million** 78:7 80:19 84:12
84:19 96:11 100:11
101:5 110:11 118:5
121:13,17 149:7
150:23 162:4 182:5,7
185:2 206:5 209:4,8,10
211:19 219:22 220:21
221:9 222:2,7,7 223:13
223:14,16,21 224:6,8
225:2 226:17 259:12
286:4 290:21 294:15
315:21 341:11 397:10
400:21 420:14 445:1
468:19 486:25,25
509:21 513:10 520:15
539:20,23 540:1
**millions** 405:5 421:1
422:8 528:15
**mind** 100:7 131:14
240:24 304:9 440:23
446:20 454:15 475:3
506:7
**minds** 112:2
**Mineola** 8:5 548:14
**Mine's** 297:22
**minimum** 457:9,10
462:19 490:5,8 515:10
515:11,12,25 537:10
538:7
**minivan** 72:8 296:21
**minivans** 83:18,22 187:6
467:3 506:17
**mini-type** 180:6
**minor** 103:9
**minus** 345:15
**minute** 31:6 62:13,15
74:6 76:4 87:15 119:1
121:6 201:20 216:10
219:12 220:18 249:6
280:22 283:3 330:4,8
331:17,17 352:4
446:20 477:23 478:15
479:25 480:2 510:9
541:3

**minutes** 27:6 73:24
197:9,19,21 204:23
215:3,7 216:4,24
236:20 245:1 248:20
332:21 354:15 355:12
357:14 398:24 427:22
433:12 434:23 436:1
439:15 510:1,6 512:1,2
530:7,9 542:15 545:22
**mischaracterizes** 147:2
221:4 475:5
**misconceptions** 193:8
**mislead** 146:7
**misrepresent** 271:11
**missed** 32:4 82:24 83:1,2
83:5 355:4
**missing** 345:24,25 346:1
346:2 452:24 509:8
**Missouri** 441:23
**misspoke** 384:19
**misstatement** 422:1
**misunderstanding** 193:8
**misunderstood** 231:12
**mitigated** 465:6
**Mitsubishi** 193:20
502:21
**mix** 347:1 376:20
**mixed** 208:4
**MO** 7:14
**model** 68:14 212:19
486:6,8,9 497:12
504:15 515:3,4
**models** 506:15 509:13
521:7
**modest** 212:4 374:21
**modification** 143:22,23
163:10
**modifications** 165:17,21
167:3,16 170:19
423:23
**modified** 26:21 316:10
317:1 547:7
**modify** 163:1
**modules** 191:4
**moment** 37:10 43:11
217:14 261:23 278:8
298:3 308:16 377:24
436:9 442:22 487:15

495:14 499:8
**moments** 501:10
**Monday** 120:6 183:11
238:10,20 248:16,17
406:21 528:10
**monetary** 240:23
**money** 40:8 64:22 84:16
84:17 88:24,25 97:1
111:19 113:18 114:6
118:5 157:25 159:12
196:21,22 209:22
210:3,13 211:22 213:3
262:10,16,17,18 279:5
281:17,25 282:5,6,8
315:9 322:3 335:12,13
335:17,18 336:10
353:10,16,22 386:9,10
403:10 404:20 418:8
418:19 419:6 445:3
465:17 467:16,20
468:15,16 487:9
488:16 506:16 521:5
**monitor** 39:14
**monitoring** 39:11 85:21
99:9 508:23
**month** 40:15 170:7
231:24 232:15 238:3
380:13 457:23
**monthly** 103:12,13
460:24
**months** 37:15,18 38:7
39:14,21 40:5,10 47:13
98:5 143:25 166:21
167:6 177:21 187:7,8
399:22 400:2 401:3
419:5 423:18,19 424:1
451:3,19 487:6 489:10
489:14 490:3 492:19
493:23 533:12 539:16
**Montoya** 524:21
**Montoya's** 524:5
**moot** 431:4,7 480:18
**Mopar** 72:19,19
**morally** 211:3
**Mores** 89:24
**Morgan** 111:11 113:8
202:19
**morning** 25:10,14 26:24

27:11,12 28:17,18
59:23,25 90:4,5 263:14
440:6 441:8 483:11
484:4 512:19 513:11
542:16 543:3
**MORTE** 5:18
**mortgage** 184:25
**mortgages** 508:6
**motion** 2:2,12 25:9,16
26:18 28:11 66:17
84:13,19 237:22 387:2
387:5,6 389:17 406:14
410:2 412:10,12 413:3
413:13,19,20 430:13
431:1,12 480:5,11
504:12 547:6
**motions** 413:9 431:3
479:22,23
**Motor** 19:3 124:12,18
128:21 485:24
**Motors** 61:25 125:14
126:5 128:22 129:7,15
130:16,25 131:17,23
149:4 167:9 296:10,11
296:23 297:6 322:7
351:5 495:4 504:3
**move** 29:6,6 35:21 38:14
44:23 45:2,19 52:11
54:15 56:18 66:5,21,22
66:24 67:7 75:13 76:9
120:12 160:13 173:9
173:11 214:16 215:3
225:8 270:5 282:13
283:4 292:24 332:18
362:5 377:2 406:9
438:17,24 439:17
440:8 443:4 448:15
455:3 464:7 477:11,13
483:23 494:25 513:3
540:23
**moved** 46:2 52:12 56:17
180:21 195:23 215:21
299:3 430:14 459:23
477:19 483:22
**Moves** 16:5,15 17:5
**moving** 186:13 305:5
309:8 372:17 439:23
**MSA** 367:10

**MSR** 457:7,9 515:9
**Mt** 14:6
**MTA** 384:23 405:5
**multi** 524:4
**multifactor** 456:12
463:23
**multiple** 108:25 208:14
208:14 318:20 319:5
**multiply** 324:7
**multitude** 125:15
**M&A** 426:16

**N**

**N** 3:2 7:16 16:22 21:11
21:17 25:1 544:2,4
545:2,4 546:2 547:2,4
548:2
**Naftalis** 5:2 89:25
**name** 28:19,21 40:16
91:18 119:16 136:1
167:9 174:7,17 176:2
199:20 260:1,8,9
298:12 357:13 392:13
407:5 426:5 436:24
441:16,18 442:10
479:14,16 498:11
524:5 535:1
**named** 136:18 163:23
**nameplates** 182:19,22
187:3
**names** 109:1 135:22,23
**Nar** 393:24
**Nardelli** 27:17 60:20
69:7 85:21 99:8 173:6
174:5,6,18 197:14
201:15 202:6 203:19
209:19 212:6 214:25
216:21 217:20 235:7
249:7 299:23 304:9
358:11 359:12 360:7
361:2,15 363:12,21
377:23 378:6 379:6
382:3 385:3,15 388:6
391:13 392:13 393:12
396:8 397:15 400:1
401:2,22 407:5 414:4
426:5,23 483:23
544:18,19,20,21,22,23

544:24,25 545:6,21
546:16
**Nardelli's** 362:6 496:12
**narrow** 356:10 472:11
**NATH** 13:2
**national** 7:19 21:4
124:17 125:12,20
126:5,12 127:4 140:18
415:25
**natural** 533:5
**naturally** 469:11
**nature** 41:5 105:15
189:20 195:6 206:15
207:2 444:22 500:8
521:7
**Nealey** 10:20 415:22,22
416:4,7 418:14,16
422:3,6,7 423:10,15,17
425:16,18
**near** 488:25 503:6 538:5
**necessarily** 150:11 431:7
459:17 507:11,14
509:17 519:9 528:20
533:5
**necessary** 85:23 99:11
132:1 143:13 235:19
357:22 385:1 388:19
433:6 445:7 491:23,24
522:7 540:11
**need** 27:21 42:17 51:6
62:22 74:5 86:12,15
87:21 88:13 99:24
187:11 190:7,8 195:9
206:1 233:8 234:17
249:3 264:9 274:23
279:8 285:7 290:7,22
295:13 322:3 331:23
351:12 354:24 357:22
381:21 409:6,15 417:1
418:17 425:25 435:13
446:4 456:14 458:14
458:21 492:25 493:24
494:17 495:20 501:8,9
510:9 512:1 521:14
522:4 532:15 536:8
540:8
**needed** 58:1 113:18
114:6 137:6 142:5

205:20 269:13 290:19
338:18 373:22 382:4
437:1 469:17
**needs** 224:22 289:14
310:15 331:24 352:16
433:22 446:2 543:6
**Neely** 544:25
**negative** 149:11,23
317:22,23 361:13
421:15 462:3 533:10
**negatively** 253:25 513:5
**neglected** 540:22
**negotiate** 122:17,19
129:20,23 147:19
167:20 217:16 229:17
250:6 251:8 353:2
**negotiated** 89:8 90:24
131:17 137:1 141:13
146:8 157:24 165:21
165:22 167:6 213:11
240:8 262:23 308:23
308:23 309:8 361:25
410:13,17 412:5,16,18
496:8
**negotiates** 124:17
**negotiating** 60:10,12
125:7,9,21 126:20
133:24 135:24 144:20
147:18 149:4 150:19
151:2 165:13 210:2
229:6,9 247:6,11
355:11 441:20
**negotiation** 61:2,4 63:17
63:19 91:1 113:24
123:10,15 124:20
126:19 127:10 137:7
162:19 163:1 164:22
164:24 165:5,6 167:21
229:22 241:4 290:11
309:11 431:20
**negotiations** 123:12,14
126:7,13,15 129:24
130:11,15,23 131:12,25
132:3 133:24 134:6,9
134:12,16,20 137:9
142:6 144:17,24
145:14,18,23 155:20
162:21 164:23 165:9

165:11 166:19 207:7
217:7 242:9,24 243:21
244:20,22 245:6,14
254:15 287:8 291:18
291:19 293:18 334:24
336:20 337:11 339:19
351:1 403:19
**neighboring** 494:9
**neither** 456:17
**net** 80:11,22 97:22
459:20 460:24 461:25
**network** 195:10,15
275:11 366:19,21
369:8,12 371:24 373:2
373:9 391:15 395:15
395:23 396:3,11 399:6
399:23 400:3 443:23
443:25 444:1,8,10,13
444:25 445:4,8,11,12
445:14 447:3,14,16,19
447:22 448:3,9 449:12
453:22,22 455:24
459:6 464:1 473:11
475:1,4 476:12,24
477:5 479:7 482:12
486:6,8 494:13,15
496:5,7 497:9 505:23
508:24 516:22,22
517:12 518:7 520:20
521:4 527:8 529:12
534:12 540:10,10,12,12
546:14
**NEUREITER** 11:16
**never** 74:1,2,25 76:5,5
76:23 78:14 79:5 88:19
105:1,2 108:19 109:11
109:15 116:5 136:9
141:21 142:18 203:7
203:10 209:6 217:19
220:4 263:11 264:11
274:10,16 275:18
300:6 347:12,17
348:12 371:13 408:5
410:24 446:10 474:12
474:14 476:8 490:13
496:20,22
**nevertheless** 137:25
**NEVILLE** 13:7

**new** 1:3,15,15 3:6 4:13
5:5,13,15 6:6,23 8:12
8:20 9:14 11:8,21
12:14,21 13:5 15:5,14
15:22 16:7 19:5 22:14
47:3,6 61:6,10 63:23
64:9,15 65:15 66:5,18
66:22,25 67:8,10,12,12
67:21,25 68:13,20 72:7
84:4 125:1 127:6,8
128:12 129:6 135:20
136:1,2,3 142:8,23
148:15 154:17 156:17
156:19 157:11,23
168:4 172:6 178:15
181:13 182:5 190:6
192:18 224:18 231:13
232:8 233:7 257:18
259:25 260:1 265:2,9
270:3 273:7 274:23
281:18 290:18 301:16
301:16 305:5 308:19
309:21,25 311:24
323:12 325:2,3,6,8,9
326:20 337:14 342:1
343:12 364:5 386:23
391:17 395:8 397:8
408:3 416:11 417:7,11
417:19,20 418:7 419:4
419:5,11 421:4 422:14
423:5,18 424:18,21,21
425:11 426:10 435:10
437:6,13,21,23,24
447:20 449:4 458:16
459:10,15 460:5
465:14,16,24 472:21
473:10,11,14 475:1,4
476:18,21,22,22,25
482:18 485:18 491:9
491:10 496:6 512:18
514:18 516:20,21
520:1,19,25 522:8
525:13 526:24 532:10
534:12 536:7,15
**Newark** 187:4 273:20
**NewCarCo** 259:24
261:24 262:10,14,22
265:23 322:24 323:5

**NewCo** 48:14 257:7
260:7 262:1 270:25
271:17 274:4 275:16
283:17,25,25 306:24
307:21 311:3,6 312:13
312:17,18 324:23
325:11 343:5,6,16,19
391:1,4,11 394:22
395:4 404:21 406:5
422:14 423:1,20 424:5
424:8,15 430:9,15,16
436:17,21
**news** 468:12 531:15
**nice** 118:16,18
**night** 222:12,25 223:1
228:9 248:17 534:15
**nine** 116:9 162:3,4,5
184:15 185:4 321:12
322:8 400:22
**ninety** 495:7 529:12,16
**Ninth** 20:6
**Nissan** 131:5 167:9
193:19 267:9,21 309:4
486:11 497:25 500:16
500:19 501:13 502:16
503:3,6,17 504:2
513:22
**Nitro** 346:12,24
**NOALL** 20:9
**nods** 118:22
**non** 293:17,20 303:15
**noncash** 269:21
**nonconsenting** 218:18
**nondebtor** 356:1
**nonearning** 200:6
**nonprofit** 407:14
**nonrecoverable** 307:11
**non-binding** 195:24
**non-damage** 474:9
**non-stop** 189:13
**Nope** 114:23 117:2
**NORCROSS** 24:10
**normal** 178:24,24
380:21 517:5
**normalized** 507:24
**normally** 123:13 126:15
134:7
**Norris** 28:21

**northeast** 524:25 525:12
**northern** 135:8,8
**note** 120:18 156:18,21,22
160:2 161:25 168:4,18
172:6,9 253:24 270:1
308:19 309:20 310:18
315:1 332:1,2 381:10
**noted** 198:16 305:21
492:3
**notes** 30:16 39:19 103:4
239:20 245:22,24
249:19
**notice** 2:18 32:11,12,18
83:7,10 245:4 272:5
299:22 420:3 430:19
430:20 471:7 479:16
479:22,23 511:13
**notices** 499:4 505:17
516:5
**notification** 273:3 337:1
**notion** 34:1 398:7
**notwithstanding** 40:9
88:22
**November** 36:3 37:18
38:8 59:1 94:2 182:14
182:24 278:15,21
280:2 373:6
**no-strike** 142:11,17
**number** 58:6 70:10 78:8
78:12 82:13 83:24
86:25 94:5,5 95:19,23
95:24 96:5,5 97:3,12
97:12,15,15,19,22 99:1
100:7,20 109:4 124:11
124:16 149:11 152:19
154:21,21,23,24 155:1
155:5 177:15,21
181:25 185:22 191:11
203:8 212:3,4 215:6
233:22 292:2 298:23
302:4,5,6,9 303:6,7
305:5 308:6,7 313:1
324:8 325:20 331:14
347:24 348:20 363:24
364:25 370:18 371:20
372:6,17 374:21
376:15 377:6 380:23
387:23 398:7 417:24

421:12 435:8 437:18
444:3 447:7 450:13,16
460:12 462:2,9 463:24
468:17 469:15,16
470:10 487:7,13 493:2
493:19 496:20,21
499:9 500:1,10 504:2
506:11 513:1,5 514:13
515:2,18,20 517:24
518:17 519:4,11
**numbered** 43:6 45:2,13
**numbers** 74:12,12,23
75:2,7,11 76:5 78:21
78:21 82:23 96:10
98:10 156:12 181:22
224:5 327:9 345:12
365:13 382:5 469:9
**numerous** 124:22 191:16
291:22
**NV** 20:7
**NW** 7:4,20 11:13 17:15
24:13
**NY** 3:6 4:13 5:5,15 6:6
6:23 8:5,12,20 9:14
11:8,21 12:14,21 13:5
15:5,14,22 16:7 19:5
22:14 548:14
**N.E** 4:4
**N.W** 3:14

---

# O

**O** 1:20 25:1 544:4 545:4
548:2
**oath** 38:4 440:19
**Obama** 192:12 194:12
**object** 38:17 88:1 101:22
138:21,25 201:10
202:1 215:5 443:14
455:1 477:18 480:11
480:23 523:11 524:13
**objected** 54:17 350:22
**objecting** 15:10 100:23
385:23 441:1 478:8,10
**objection** 25:23 35:12
38:20 40:25 46:6 49:25
50:9 56:21 58:19 62:11
62:15 73:21 76:3 87:8
98:12 101:10 111:24

111:25 113:14,25
116:12 117:12 118:9
120:17 138:17 147:1
149:25 150:1 154:8
160:4,5,6 163:13
201:11 214:21,23
221:2,3 224:9,10
225:16,17 226:13,15
235:4,5 237:25 242:10
249:5,6 264:5 265:11
266:8 289:20,23 310:6
310:10 320:4,5,10,14
329:12,13,14,20,24,25
333:19,20 334:20
341:23,24 348:16
351:22 352:1,2,5 353:3
353:4 355:6,22,23
363:8 378:11 381:24
384:8 385:6,11 405:24
409:4 412:7,13,22
413:16 418:10 419:18
421:22,25 424:16
432:3 437:2 441:12
442:3 443:13 448:11
453:7,13 454:7,10,11
468:2,3,4 471:22 474:1
474:1,10 475:5 478:16
479:20 480:17 484:5
484:17,17,23 523:25
526:4 540:15,25 541:1
**objections** 25:18 26:4
38:16 41:3 45:22 54:19
54:20 56:20 77:16
115:17 242:12 342:11
348:5,6 355:10,25
430:21 435:8 436:8
437:16,17 438:4
440:25 441:2 443:6,15
479:1 485:8 511:1
**objective** 248:16 289:16
**objectives** 179:16 194:2
488:15,17
**objector** 355:2 357:6
**objectors** 10:14 50:11
206:25 348:2,12,13,18
357:3 415:24 434:7
**objector's** 50:6 101:4
**obligated** 304:4 309:13

309:15 362:17 466:23
**obligation** 34:6 35:21
41:10 61:6 89:16
127:25 128:23 129:1
157:21 158:19 301:14
303:13 308:22,23
314:1 331:10 391:2
**obligations** 30:12 70:4,6
116:9 128:2 129:4
130:1,7,7 142:23
155:25 156:4 157:10
158:1 168:2 169:3
301:20 304:3 305:15
306:20,21,23 307:2,7
307:20,20 308:15
332:12 437:4,10,19,20
437:24 438:2 471:11
471:18 472:19,24
473:1
**obligatory** 301:3
**observations** 115:5
**observed** 426:24
**obsessing** 221:9
**obtain** 92:1,1 107:2
139:24
**obtained** 112:7 170:12
248:13
**obtaining** 171:1 190:3
**obvious** 332:8
**obviously** 46:25 57:11
176:14 184:5 188:14
189:25 220:12 234:1
271:19 280:10 287:1
315:18 375:17 420:1
504:13,15
**occasioned** 492:15
**occasions** 190:11 279:24
**occur** 134:18 148:25
233:19 235:17
**occurred** 40:14 279:25
389:10
**October** 70:15 344:18
345:22
**odd** 516:24
**OEM** 531:12
**OEMs** 531:12
**offer** 38:10 102:21 151:1
154:6 199:13,15 210:7

210:8 211:15,16,22,22
212:2 217:12 218:3
220:2,18 223:5,12,19
224:2 227:25 228:1,2
228:21 229:11,12
339:4 340:10 379:24
415:5 432:9
**offered** 40:8 46:4 51:3
56:8 138:18 154:22
160:24 201:14 214:22
390:17 415:3
**offering** 40:6 138:22
139:6 209:10 220:21
**offers** 147:21 209:6
217:7 341:17
**office** 5:12 6:3 21:11
23:11,13 125:3 164:2
175:9,11,13 176:11,12
217:1 238:24 272:19
512:12,15,17,18 524:22
524:23,24
**officer** 176:10 386:23
406:15
**officers** 387:10 479:24
**offices** 124:16
**official** 5:3 90:1 164:1
**officially** 415:12
**officials** 69:15,19 94:9,9
94:14,18 106:16
**offset** 403:15
**offshoot** 533:5
**off-balance-sheet** 298:19
**Off-sheet** 299:25
**oftentimes** 524:16
**Oh** 13:13 24:5 26:25
100:18 103:6 105:13
111:9 132:24 161:3
220:8 222:20 239:12
241:21 253:18 261:10
261:15 303:24 304:12
306:13 318:14 330:13
338:6 346:7,12 370:1
388:12 420:19,21
422:5 428:3 435:22
439:24 457:3 463:5
484:10 507:16 509:25
542:17
**okay** 26:25 28:23 29:1,4

29:17,22 30:13,15 32:1
32:14,19,21,23 33:6,15
33:25 34:4,9,15 35:9
36:11,23 37:21 39:18
41:15,17 42:4,7,13,21
42:24 43:1,4,23 44:1,6
44:14,16,20,25 45:6,9
46:2,2,21 47:5,9,12
48:3 49:1,6,14 51:12
53:23 54:11 55:13,22
55:25 56:16 57:4,11
60:14 63:1 64:5,11,22
65:23 66:2 68:12,19
69:24 71:5,15,17,20
75:4 78:6,15 79:7,12
79:21,24 80:3 82:22
83:5 87:5 90:10,20
91:2,21 94:6,12,24
95:11,14 96:7,10,17
97:5 99:7,20 100:7,12
100:18 101:1,9 102:14
104:14,16,25 105:3,7
105:10,22 106:6,9
107:2,5,20,23 109:11
109:21 112:16 115:9
116:17,19,21 118:13,18
118:22 143:5 145:22
146:10,15 147:4,24
148:8,14,19,23 149:15
149:19,22 151:13,24
152:14 153:17,21
154:3,20 155:6,10,14
155:19,23 156:2,11,15
156:24 157:2,6 158:5
158:16,22 159:6,15,24
162:21,25 163:5,9
164:10 165:4,11,16
166:5,14,18,24 167:2
167:12,16,20 168:16,21
168:24 169:2,4,5,10,16
169:18 172:5,12
174:15 175:11 176:22
178:1 179:17 181:11
182:11 185:13,15
190:3 196:25 197:9,14
198:3,6,24 199:2,6,18
199:24 200:3 202:6,15
203:12,16,18,19,20,24

204:2,9,15,23 208:13
213:24 214:6 216:12
216:17 219:1,3,20
224:5 226:20,24
228:24 235:9 240:4
242:5 246:4,8 248:18
250:22 252:14,15
253:8 254:25 256:4,18
258:23 259:16 260:2
260:15,21 261:17
263:16,18 264:23
265:20,22 266:6,19
268:5,13,19 269:18
270:10 273:2 275:8,21
275:23 278:2 280:24
282:25 283:8 284:13
285:3,9 287:17 288:5
289:7 290:17 291:4
292:5,6 293:8,20
294:13,24 295:21,22
297:20 298:5,7,8
299:14,14,15,19,21
300:10 302:10 304:12
308:17 309:19 313:2,7
313:12 314:15,25
315:14 316:5 317:17
318:17 319:3 322:16
324:13,22 326:25
327:1,2 332:23 333:8
334:8 335:23 338:7,15
338:25 340:14 341:7
341:14 342:21 343:1,2
344:11,13 345:19
346:12,12 347:23,23,25
348:1 354:4,6 358:20
379:4 391:17 392:3
393:19 394:8,23
395:13 396:13,17
397:12,15,25 398:6,9
398:12 399:12,21
400:5,24 401:9,12
407:11,15,22 408:1,3,6
408:10,12 410:9,19
413:17 414:1,11,24
415:10,12,15,18 416:14
416:18,23 417:4,9,16
417:18,23,25 418:4,14
418:14,22 419:1,9

420:5,19 421:17
422:25 423:15,25
424:4,23 425:7,10,15
430:8,24 433:10 439:1
439:6 441:5 443:1
448:13 450:21 453:24
455:12 463:5 478:22
486:10 498:15,22
501:6,16,23 502:5,6
503:8 505:10 508:3,15
511:4 512:22,22,25
514:6 515:9 520:11
521:24,25 523:2,8
524:7 525:8,9,13,22
526:20,22 527:24
528:9,11 529:3 530:10
530:17 533:10 535:19
542:21 543:7
**old** 8:4 67:10,14,15
68:21 158:12 168:3
312:2,3 342:1,6 343:11
343:13 394:20,24
395:9 397:7 404:15
418:18 419:6,12 424:6
476:17,22 516:23
520:4 548:12
**OldCo** 48:14 89:18
257:6 273:18 274:4,24
274:25 275:15 312:17
337:22 402:25 403:5,9
403:10,12 405:14,16
423:21 430:2,4
**omnibus** 26:9
**once** 39:18 97:14 126:18
254:1 300:17 380:2
415:1 419:13 421:7
449:2 459:12 489:5
**ones** 111:3 128:18
233:23 346:1 389:2
395:9 449:3 514:1
**one-half** 159:25 160:2
**one-on-one** 272:21
**one-to-one** 494:15
**ongoing** 195:22 239:8
303:14 312:22 323:13
368:20 369:15 424:20
448:5 468:22 506:15
**open** 33:9,12 65:18

188:18 218:21 221:20
245:2 253:23 305:6
375:17,17 410:5 533:8
**opened** 129:21 228:7
**opens** 532:20
**open-ended** 423:9
**operate** 67:16 437:13
**operated** 405:20 526:25
**operates** 437:21
**operating** 131:6 176:15
184:6,6 189:22 190:8
195:17 231:18 232:7
249:23 253:23 274:22
343:13,15 369:15
419:23 422:22 425:13
438:1 457:5 479:1
515:14
**operation** 371:4
**operational** 175:8,21
176:13 178:22 231:15
248:22 274:22
**operations** 129:1 131:5,6
154:17 179:9 195:13
233:9 244:5 443:20,22
486:18
**opinion** 47:21,23,24
48:10,16 49:7,12,22,23
51:2,14,15,15 53:7,17
55:4,11,25 56:5,24
57:5,9 61:20 71:4,16
71:19 72:22 74:18,19
78:12 79:3 105:8,19
112:11 117:8,10,18
138:9,19 176:23,24,24
198:7,11,14,18 199:25
202:3 311:15,21
312:21 421:9 433:5
449:11 480:16 520:18
540:11 545:20
**opinions** 48:1,7 55:20
76:11 81:11 105:11
312:16
**opportunities** 398:17,18
482:13
**opportunity** 173:16
211:21 263:2 267:10
355:4 357:3 368:12
383:13 390:5,21 396:7

398:4 413:15 415:6
427:12 428:14 432:11
444:8 447:18 454:21
456:16 477:8,10
481:20 495:14 496:24
511:25 517:6,12
522:23 532:20 540:9
**opposed** 52:16 260:10
282:6 290:23 337:19
374:6 398:23 485:20
501:19
**opposite** 99:16 378:17
**Opt** 2:10
**optics** 268:22
**optimal** 100:2
**opting** 59:7
**option** 58:9 59:5 338:13
376:24 429:11
**options** 57:14 58:6,7,17
66:14 181:4 237:10
**order** 2:14,18 25:17
26:13,17,22,23 28:11
63:20 64:22 66:17,21
67:6 86:11 92:13,20
100:8 128:12 131:1,25
144:19 147:14 186:13
186:14 235:15 305:19
377:10 417:1,18,19
429:23 437:13 441:22
445:18 452:13 456:15
469:20 471:2 480:6
491:25 495:17 500:14
512:11 513:17 542:13
542:23 547:6
**orderly** 85:22 86:13
99:10,13,17,20,22,25
100:8 106:21 205:21
**orders** 2:4 432:12
**organization** 121:8
123:5 175:20 176:8
207:24 213:3 364:11
365:5 469:10
**organized** 46:20 195:7
**original** 157:13 193:16
212:1 215:16 267:8
269:15
**originally** 115:24 189:6
241:17 349:16 389:20

517:20
**Orr** 3:18 164:17 427:21
428:8,11 429:18 430:1
430:6,9,12,18,21,24
432:25 433:3,10
440:17,18,22 441:4,6
442:9,18 443:4 445:19
446:13,17,19,23 447:1
447:2 448:13,15
449:14 453:7,14 454:7
454:11 455:13 468:2,4
471:22 472:2 474:1,10
475:5 477:18,25 478:3
478:6,10,20 483:7,9,14
498:8,10 504:5 510:12
512:6,9,14,22 523:9,11
523:17,19 538:20,22
540:17,19,25 541:5,9
541:13,15,20 545:7,11
**Orr's** 455:1
**Oswald** 4:16 25:11,14,15
26:22,25 27:2,4
**ought** 116:1 215:17
331:18
**outcome** 165:6,12
421:12 516:19
**outgrowth** 367:5
**outlets** 491:2 507:1
514:13
**outlining** 284:6
**outright** 316:19
**outside** 34:17 50:19
104:8 136:18 141:7
213:18 244:21 279:7
280:9,13 281:21
368:24 389:10 398:21
398:23 521:19 539:21
539:22
**outstanding** 61:10 101:1
301:20 302:1 303:13
305:20
**outweighed** 475:3
**overall** 125:25 133:21
177:5 184:7 187:14
194:5 211:4 212:13
246:15 300:4 347:14
368:10 448:4,9 460:19
460:25 461:1,5,8

463:14,21 514:18
515:1
**overcome** 389:1 393:16
494:13,14
**overcoming** 187:11
**overflow** 446:1,4,4,11
**overlapping** 468:7
506:15 509:13 521:7
**overlay** 433:8
**overpaying** 329:9
**overreaction** 256:1
**overrule** 214:23 523:25
**overruled** 38:19 54:22
62:16 120:19 226:16
**oversee** 123:3,8
**overseeing** 152:15
**oversight** 176:13
**oversized** 400:22
**overstated** 347:18
**overwhelming** 102:22
**over-dealered** 390:2
399:1,20 400:23,24
**owe** 304:15 369:13
**owed** 302:1 310:17
313:17,18 331:10
333:4,12 334:8,10
335:17 336:6 471:11
471:19 473:1
**owing** 472:5
**owned** 135:21 136:5
242:1 402:21 421:3
**owner** 188:2 232:1,1
406:3
**owners** 179:8 195:24
239:9 402:11,18 405:6
405:19 417:4,9 421:13
494:23
**ownership** 241:15,18,22
241:25 242:3 262:21
265:19 539:16
**owns** 241:11,13 420:13
507:1

**P**

**P** 3:2,2 10:20 11:24
13:18 25:1 124:24
**PA** 12:6 14:7
**Pacifica** 182:22

**page** 37:24 69:4 70:16
72:25 73:1 99:6 154:15
155:4,10 159:16 166:7
166:14 168:21 172:5
198:6 203:16,17
215:15,15,25 216:3
231:13 246:6,7 250:21
255:4,5 260:19 261:4
266:17 268:12 275:25
284:17 287:24 294:25
299:20 302:16,19,20
305:21 313:6,8,13
315:1 316:5,7 317:16
318:1,9,10,15 344:24
345:19 347:24 358:21
379:16 453:23,25
454:1 498:20 501:1
503:3 514:16 524:5
530:11,16 544:5 545:5
547:5
**pages** 54:11,13 166:6
203:17 319:23
**paid** 78:7 168:14 184:16
305:23 306:3,12,14,16
307:21 315:9 334:8,9
335:19 353:4,6 408:16
408:21 442:1 471:13
471:19
**PAIGE** 18:11
**painful** 213:19
**pale** 509:5
**Pantaleo** 12:24 113:14
113:15,25 356:16,17,19
**PANTALOS** 224:9,11
224:19
**paper** 208:16 263:14
347:14
**papered** 26:7,10
**papers** 28:1,10 50:6
413:25 429:9
**paragraph** 69:9 70:2
80:5 82:16 85:20 95:18
97:17 99:4,6 154:16
156:17,24 159:16,24
160:3 166:5 169:5,6
260:23 261:1,2,8
268:14,15,19 275:24
277:24 289:5,14 290:6

295:2,4 347:24 348:20
358:14,21 530:17
531:9
**paragraphs** 95:17
**parcel** 493:13
**pardon** 73:1 79:14
328:18 352:20
**parent** 93:1 506:25
**Park** 14:22
**Parkway** 20:5
**parochial** 126:8
**parse** 230:3
**part** 32:17 43:17 44:19
46:16 51:2 52:2 53:21
64:3 88:3 130:1 139:10
142:20 155:15,21,24
164:12,12 165:4,5,8
170:19 175:2,17 179:6
180:7,9 186:22 189:12
194:5,19 198:25
203:16 209:12 231:14
233:10,11 240:6
249:22 250:16,19
251:9 256:2,9,14,20
257:19 262:13 273:9
275:19 287:6 303:14
305:4,4 306:6 309:16
312:18 315:19 330:23
332:9 333:14 335:19
337:11 350:3 367:11
368:10 371:24 384:18
386:11,15 390:18,19
391:7 398:2 399:18
406:10 410:12 411:21
412:2 413:18 416:14
420:12 423:4 425:2
429:3 434:1 438:19
439:20 447:15 448:3
452:23 453:1 454:2,11
456:8 467:24 476:21
476:23,24 477:7
485:17 487:12 489:24
493:3,13 496:7 497:16
506:15,16 515:15
518:5 536:17,21 538:7
**partial** 301:18
**participate** 92:18 126:1
145:22 170:23 231:14

**participated** 125:14
128:8 145:19 146:12
146:20 151:21 162:18
165:12 244:12,15
286:22 376:3
**participating** 136:8
380:3 381:11
**participation** 165:19
267:6,7
**particular** 35:5 45:25
80:9,18 99:5 101:16
107:4 123:11 131:9
132:14 134:1,3 140:24
163:1 164:22 166:11
167:3 206:20 216:25
246:15 290:1 370:23
443:14 461:21 464:3,5
482:10 486:5 528:24
**particularly** 42:15 58:25
123:7 140:12 273:10
488:14 495:4 506:2
**parties** 25:5 29:21 33:12
38:24 42:24 90:18
93:12 107:4 145:12
146:13 254:13 265:10
295:7 296:1 347:5
387:23 412:12 441:1
454:15 480:22 496:8
510:2
**parties-in** 391:10
**partner** 27:9 35:6 116:25
117:5 135:2,5 194:14
195:21 299:8,9,10
300:2 312:22 453:8
**partners** 191:17
**partnership** 166:8,21
**parts** 44:25 48:8 195:16
291:18 302:24,25
303:4,6 429:2
**party** 39:15 47:25 52:1
57:10 60:9 62:6 66:10
87:18 91:8 101:20
105:23 164:25 339:21
347:7 454:13 458:23
458:24 459:3,9 468:7

**participated** 355:20 376:25,25
377:1,4,7,9 454:13
469:4 470:10,13

537:23
**Pasquale** 14:13 407:7
**pass** 144:5 280:18 281:1
  445:7 449:14
**passed** 128:17 281:5
  412:13 480:12
**passengers** 506:19,20
**passion** 212:12
**pat** 88:8
**path** 212:7
**Patricia** 14:12 407:6
**Patriot** 70:25 71:5 208:6
  346:4
**pattern** 123:8,8,20
  126:10,16 129:17
  131:16,17,18 178:7
**patterned** 123:11
**PAUL** 22:12
**Paulson** 279:17,20
**pause** 36:24 114:21
  162:8 197:13 213:25
  214:2,5 218:23 219:2
  219:17,19 225:25
  229:2 246:3 253:9
  255:3,6 282:3 283:11
  285:2 290:16 298:6
  313:11 336:17 344:2
  354:9 378:2 442:20
  446:25 449:17 452:6
**pay** 87:7 88:15 130:4
  135:9 209:7,20 257:6
  277:3,4 301:20 325:21
  326:9,17 345:13
  350:20 352:18,21
  366:3,4,7 369:20,20
  383:14 403:13 405:17
  437:20 471:10 472:20
  472:24 475:25 507:6
  507:10,25 508:2,3,5,6
  508:10,12,14
**payables** 302:24
**paying** 301:12 369:23
  375:11 437:19 471:10
  471:18 473:3 476:25
  496:1
**payment** 2:7 47:7 96:21
  103:10 128:13 129:11
  155:25 157:9,13,16

301:18 308:12 353:1
**payments** 103:10,13,14
  103:18 104:1,3 277:3
  301:2,4,7 304:1,3
  305:15 363:2 365:14
  365:16,17 369:13
**PAYNE** 14:2,9
**pays** 404:24
**PBGC** 13:3 28:1,12
  40:17,19 41:2,6,8,12
  42:5,25 44:22,23 45:5
  45:11,12 171:18
  409:25 545:16
**peace** 240:23
**Peachtree** 4:4
**PEASE** 24:2
**penalties** 299:4
**pending** 92:15
**Penn** 4:12
**penny** 315:14,15
**pension** 11:12 16:4,14
  17:4 28:12 40:19 41:8
  42:12,16 44:24 171:6
  171:16,17 307:2,4,7,9
  307:10,12,13,19,20
  308:1
**Pensioner** 69:3 86:25
**Pensioners** 38:22 59:24
  70:10 120:17 144:8
  152:2,5,10 154:7,10
  166:1 200:16 206:25
  209:20 215:20 546:5
**pentastar** 178:12
**people** 30:16 32:23 33:7
  40:5 69:24 83:18 90:17
  91:14 120:22 128:11
  134:7,7 150:23 153:17
  153:24 166:24 181:6
  187:23,25 190:25
  191:2,12 201:24
  207:20 209:9 219:5
  243:1,3 244:3,7,9
  247:16 277:10,10
  295:1 328:10,16,19
  350:15 353:22 354:24
  371:25 373:4,5 400:13
  400:20 403:2 416:19
  417:5,6,11 418:17,22

419:9,9,16 420:15
421:3,17 422:13 424:5
425:4 431:19 445:17
480:5 497:1 513:10,12
513:16,16,19 516:11
523:24
**people's** 402:4
**Pepco** 22:3
**percent** 143:18 146:15
  157:3 159:21 166:9
  168:3,7 179:8 196:10
  232:3 241:19,21 242:6
  246:1,1 262:24 263:1,3
  263:8,10,17 264:14,16
  267:22 268:3,21,23
  269:1,16 290:8,22
  308:19,21,25 324:13,14
  324:19,19 325:22,23,25
  328:3,9 329:10 333:4,5
  333:6,11 359:17 370:7
  374:16,17,18,23,25
  376:8,11,13 377:4
  396:21,22,24 397:1,1,2
  397:3,3,7,9 401:1
  417:15 447:13,22
  450:5 451:2,10,13,18
  451:22 457:9,9,12
  462:20,22,25 469:12
  476:6 488:22,23
  489:17 490:3,6,8,16
  493:21,23 494:14
  500:22 518:18,22,23
  519:19 522:5 529:12
  529:13,15,16,18,19
  532:10 533:11 534:7
  537:10 538:12,13
**percentage** 128:18
  263:24 264:6,9 324:10
  326:10,14 366:13
  417:20 447:11 457:7
  488:6
**percentages** 143:16
  264:10,18
**perception** 420:8
**perfected** 61:12
**perfectly** 118:4
**perform** 82:18,20 117:9
  203:13 305:1 340:24

343:5 490:5,10
**performance** 11:19 85:2
  85:12,17 159:4 180:25
  233:11 310:14,21
  311:3 331:1 333:1,2,9
  333:17 341:6 367:10
  368:1,3,22 369:3 388:2
  389:15 419:25 459:2
  462:17 479:5 489:25
  490:9 528:14 529:7
  537:6 546:13
**performed** 51:6 70:11
  78:8,19 110:16 203:6
**performers** 368:6 462:9
**performing** 98:16 118:5
  184:14 304:19 330:22
  451:8,20 452:1 490:7
  516:22 519:21 525:15
  527:12 529:2
**period** 32:18 58:5 137:4
  163:6 179:17,18,18
  185:5,10 194:23
  206:17 236:10 279:8
  280:1 336:24,25 337:3
  337:7 366:23 367:1
  369:4 390:20 426:14
  450:16 469:20 518:19
  539:13,15
**periodic** 103:10
**permanently** 187:1
**permission** 147:16
  438:15 449:2
**permit** 41:12 65:14
  281:1
**permitted** 169:11 436:8
  504:17
**Permitting** 2:9
**person** 134:3 152:23
  153:12 164:15 176:8
  178:24 240:15,19
  272:14 306:18 353:9
  392:10
**personal** 138:9 144:23
  145:1 146:24 147:5
  203:7 379:24 414:14
  427:1
**personally** 110:11
  145:12,18,22 146:12,19

151:21 153:12 165:12
193:10 211:5 279:23
348:2
**personalty** 441:22
**perspective** 56:7 64:17
260:5 334:10
**pertain** 527:20
**Pete** 528:4,11
**Peter** 12:24 113:15 379:9
379:12 427:18 442:11
525:1 545:7,8,9,10,11
**petition** 63:20
**ph** 35:5 134:6 176:2
188:25 285:20 357:11
436:23 524:22 528:2
**phase** 427:3
**phases** 395:20
**Phil** 9:18 524:24 525:10
525:11 528:2
**Philadelphia** 12:6
**philosophy** 123:22
**Phoenix** 325:9
**phone** 272:15,18
**phrase** 352:21
**physically** 436:6
**pick** 141:5 212:21 241:6
305:10 359:25 383:10
395:7 458:13
**picked** 494:3
**picking** 347:11 494:4
**piece** 142:4 219:23
294:16 505:14
**pieces** 152:19 297:5
**PIK** 316:17
**Pinnacle** 22:5
**PIPER** 9:2
**Pittsburgh** 14:7 454:1
455:20,21,24
**place** 50:24 57:8 61:3,5
66:17 127:11 147:20
175:14 179:8 181:9
192:18 196:13 197:19
199:11 206:2 210:4,5
210:14,14 235:20
250:3 270:15 281:24
286:18 287:14 293:16
295:17 299:5 357:7
361:25 366:18,25

369:5 384:2 404:16
412:3 449:6 453:11
468:6 482:1 516:1
**placed** 37:9 214:6 326:20
467:16,20
**placement** 486:17
**places** 513:15
**plan** 27:15 57:16 58:2
80:9,18 95:10 131:2
133:14,21 134:15
170:16,20 171:6,8,11
171:17 176:15,16
182:14 183:15 184:1,2
184:4,6,7,14 189:20,21
189:22 190:1,5,8,13,18
190:21,24 191:3
192:14,16,25 193:6,8,9
193:13 194:9,12,16
195:20 200:24 202:24
203:1 205:4,15 206:14
213:4 233:17 237:3,6
237:12,15,19,23,25
238:12 252:24 266:18
266:19,23 270:8,12
272:8,10 281:21 292:7
292:13 308:25 313:3
314:23 320:19 321:2,8
321:15 322:9 323:20
367:5,15,24 368:17,18
390:6,19 391:8 392:16
392:19,22,25 398:3,22
432:4 444:2 448:4,5
449:9 466:22 469:20
469:21 470:16,21,24
506:16 517:21 518:5
520:10 521:9,12,14,23
522:2,4,11 532:15,18
**planning** 95:8 279:8
281:18 369:17,18
452:12 515:16,18,20
**plans** 179:2 182:25
231:18 232:7 329:6
366:19 367:3 434:4
**plant** 124:14 208:5
209:11 441:23
**plants** 121:24 122:3
274:12 301:10 507:7
**platform** 193:24 208:11

325:2 511:23
**platforms** 108:25 109:5
166:10 180:4,5 208:14
267:15 269:5,16
423:25
**played** 130:15 242:8
**player** 167:8
**players** 146:4,5,5
**Plaza** 4:12 8:11
**pleading** 45:25 164:7
**pleadings** 302:12 355:8
437:2
**please** 25:2,6 59:18
62:10,15 87:14 119:16
120:2 123:20 134:22
155:4 168:21 174:4
211:13 213:24 217:24
218:22 222:19,21
234:23 235:3,7 246:2
250:24 251:15 253:7
253:13 254:24 261:11
266:22 280:24 283:7,8
287:3,16 290:15 291:2
310:24 322:18 336:14
344:4 347:21 352:2
356:22 377:25 378:4
379:16 388:11 394:1
423:8,12 435:19
441:14 442:10,22
448:22 453:23,25
466:21 498:6,25
510:16 530:17 534:23
**pleasing** 500:1
**PLIFKA** 14:11
**PLLC** 7:2 18:11 22:2
**plus** 168:4 184:15 223:25
516:16
**point** 34:23 50:22 52:10
52:19 66:8 104:20
138:14 139:17 147:16
151:2 160:19,22 161:1
161:17 173:12 185:12
189:8 198:23 200:1
201:5 203:10 212:21
218:2,5 228:6,6 229:13
245:12 251:22,25
252:3 253:3 266:6
268:1 270:1,2,11,11

278:12 279:4 281:19
299:23 302:20 310:19
316:18 321:7 336:19
338:8 350:22 373:19
385:12 392:3 399:14
409:16 413:16 421:7
426:24 429:7 434:16
458:18,19 465:17
481:4 483:1 491:4
504:17 506:7 509:8
514:17 517:22 524:14
526:5
**pointed** 95:19 518:13
**points** 100:19 128:18
144:15 192:21 217:9
299:22 357:4 428:14
460:9 482:7 503:1
524:9 537:11
**Police** 16:4,14 17:4
**policy** 299:5
**political** 116:24 300:1
350:10 522:20
**POLK** 19:2
**pond** 351:6
**Pontiac** 504:25
**poor** 368:6 537:8
**popularity** 522:25
**population** 187:21,22
**PORTER** 7:18
**portfolio** 231:11 239:5
296:13
**portion** 45:10 145:19,24
168:2,19 257:11
259:10 306:6 307:11
344:22 432:17 525:7
**portions** 140:18 144:21
296:23 343:7
**poses** 472:5
**position** 36:20 39:12,14
39:24 40:3 64:20 98:21
111:21 113:9,12
119:20 122:20 125:2,8
139:7 148:24 154:25
188:9 219:24 220:2,21
229:20 230:19 260:8
290:24 301:23 329:6
337:15 348:14 351:19
352:8,17 373:24

406:23 408:6 431:24
461:1,8 486:13 492:7
522:10
**positioned** 70:4 328:24
**positioning** 328:21
**positions** 124:22 292:2
**Possession** 2:2,12
**possibility** 85:22 99:10
142:1 283:16 284:7
334:7 476:9 521:16
**possible** 27:25 57:22
86:13 88:13 91:5,9
173:24 188:20 199:22
344:20 400:13 476:12
542:16
**possibly** 254:6 282:10
462:24 532:16 536:11
**postage** 508:21
**pot** 403:4
**potential** 44:5,12 61:16
93:11 107:5 110:14
191:17 193:20 194:14
195:22 209:1 273:12
312:22 337:5 351:16
421:3,12 453:3 517:1
**potentially** 296:9 422:16
431:10 513:13 531:19
533:6
**power** 9:3 22:3 100:15
498:12 499:5 539:9,12
541:8,10,20,25 546:18
**Powers** 180:18 416:18
420:2
**powertrain** 192:9 209:12
209:14 269:17
**powertrains** 208:14
**PR** 153:19
**practical** 488:11
**practice** 31:9 32:15
288:25 299:6 380:21
**praises** 505:12
**pre** 471:10
**precarious** 276:3,10,13
276:15 277:17,20
278:2,6,9
**precedent** 394:2
**precipitates** 115:18
**precipitously** 531:6

**precise** 384:21
**precisely** 51:4 418:23
430:25 492:15 523:19
**predecessor** 450:9
**predicated** 515:25
**predicted** 451:1
**preference** 425:14
**preferred** 57:13 60:6
193:10 316:10,25
**prejudice** 443:15
**preliminary** 41:1 485:23
**premature** 87:23 88:1
**preparation** 151:21
152:15
**prepare** 123:6 153:5
398:13 452:14
**prepared** 37:17 40:11
55:23 90:10 106:17
112:16 148:25 151:8
152:5,11,14 153:17,22
153:24 154:10 204:5
271:20 279:3,4 437:15
491:8 546:6
**preparing** 126:3 152:19
392:19
**Prepetition** 2:6
**presence** 298:23 517:24
518:3
**present** 53:16 78:1 80:11
80:22 96:16 97:3,8,22
123:12 126:22 131:1
133:1 140:16 141:11
147:12 148:9 177:3
184:5 190:12,21
198:24 211:2 332:3
398:17,18 450:13
480:15 496:9,12,13,15
521:1
**presentation** 27:14 53:25
54:3,8,18,24 55:16
139:10 198:15,18,25
200:14 311:20 312:5
545:18
**presentations** 193:7
**presented** 48:13 59:9
70:14 79:2,15,19 81:5
83:3 84:4 102:6 126:23
138:8 139:8 148:11

184:4 194:15 200:13
201:4 203:4 209:24
317:13 345:11 353:20
390:5,21 495:14
**presenting** 27:10 173:4
177:1
**present-day** 320:7
**preserve** 25:25 63:14
64:18 66:23 100:1
106:22
**preserving** 350:1
**president** 120:21,22
121:1 122:23 123:4,13
124:23 125:1,4 136:11
136:13,16,16 139:22
170:2,5,8 175:17
192:12 194:11 229:17
270:7 271:7 272:3,7
485:23
**Presidential** 204:4
**presidents** 120:24
**press** 176:2 195:9 243:25
294:8 364:11 366:19
371:9 375:22 376:6
378:5 379:7 380:4
398:15 419:15 468:23
468:25 469:1 484:9
485:2,24 497:7,16
546:15
**pressure** 184:12,13,24
469:7
**pressures** 113:23
**pressuring** 375:4
**presumably** 416:11
476:24
**presume** 357:20 494:8
525:21
**Presutti** 246:9 248:5
**pretty** 115:13 126:8
134:9 161:14 175:3
182:25 185:18 189:22
205:19 226:8 239:4
288:25 323:22 351:11
351:12 366:9 399:19
445:11 451:20 458:14
458:19 486:9,9 490:25
529:23
**prevail** 150:23

**prevent** 421:16
**previous** 158:4 176:2
249:15 284:5 410:6
474:2 492:3 501:7
**previously** 26:17 49:14
86:25 102:2 110:25
207:23 215:2 249:12
249:16 410:15 442:12
442:24 443:19
**pre-announced** 415:7
**pre-assumes** 78:24
**pre-closing** 471:18
472:19,24
**pre-debt** 73:9
**pre-existing** 157:9
**price** 15:18 324:7,11
328:22 422:18,21
476:24 496:1
**pricing** 182:16 191:6
321:19 322:12
**primarily** 44:4 121:9
122:23 124:22 175:16
179:19 428:3
**primary** 51:16 246:18
247:9 258:6 448:19
**principal** 104:20
**principally** 243:17
**principles** 131:11
**print** 508:16
**prior** 38:24 107:16
127:11 130:6 132:3,10
165:4 175:17 189:23
203:10 204:15 205:10
205:10 206:12 230:16
230:18 242:1 366:15
366:17 367:3,12
368:19 389:20 390:3
411:24 414:4 444:9,11
470:16,19
**prioritization** 334:5
**priority** 40:4 335:10
**private** 339:16 407:22
507:4
**privately** 178:9
**privilege** 115:12 304:7
**pro** 179:5,8,10,13,15
221:7 223:20,23 232:7
322:7

**proactive** 183:20
**probably** 26:10 71:2,16
71:19 72:5,20 178:6
186:9 192:3 202:13
233:24 245:22 256:1,4
279:2 312:19 324:2
342:11 345:7 358:18
380:15 386:12 399:18
399:18 416:21 435:25
439:14 459:8 461:22
469:3 487:2 523:23
539:19,25 542:5 543:4
**problem** 51:5 88:16 89:1
89:14,15 209:12
221:20,22 227:11
330:2 337:23 378:16
420:15 421:18 422:10
439:22 478:22 482:15
521:2
**problems** 355:9 487:11
**procedure** 123:3 482:22
**procedures** 2:8,10,15,23
482:2 542:18
**proceed** 49:19,21 59:19
60:2,15 89:7 115:20
119:1,12 144:8 378:19
433:1 520:18
**proceeded** 216:24
**proceeding** 45:25 119:23
173:3 393:14 395:15
397:20 511:13 518:1
**proceedings** 30:25
437:14 446:15 479:21
521:17 543:8 548:5
**proceeds** 520:19
**process** 31:3 41:4 53:16
105:15 106:1,5 122:12
123:15 125:17,22
126:17,24 127:2
128:17 129:14 138:7
140:13,21 148:18
152:12 178:15,17
182:20 197:3,22
198:12 201:8 204:6
205:17 233:6 303:18
303:25 304:5,20
317:11 319:15 361:9
361:13 390:3 428:12

442:5 444:1,14 448:17
449:7,8 450:9 454:12
456:2,8 476:1 482:23
487:21 492:10 497:2,2
511:14 514:12,18,21
516:12 517:18 522:16
523:16,21 531:20
**processes** 514:3
**produce** 67:22 68:24
208:5,6,7 483:13
529:16,19
**produced** 72:14 76:19
78:2,8 95:14 346:3
483:11 535:8 541:15
**product** 67:18,20 72:7
108:24 109:2 166:10
166:16 176:17 178:22
179:25 180:1,3,4,13,20
182:15 191:22 192:6
193:18,22 207:17
267:15 296:21 343:25
402:24 404:15,21,24
405:2 423:19 424:20
466:19 476:5 487:13
487:15 506:15 509:13
521:6
**production** 95:12 208:4
380:10 469:9,19
**productions** 380:6
**products** 108:21 178:3
191:6 233:10 267:11
445:18 487:25 488:7
**professionals** 541:16
**profitability** 183:11
400:16 461:24
**profitable** 373:24 391:22
396:3 397:14 399:6
444:8 445:16 447:25
499:18
**profits** 399:23 400:3
**program** 124:13 366:25
367:11 375:25,25
376:3 391:22 392:6
396:5 398:17,23,25
399:25 467:1,2 493:13
519:3 520:4
**programs** 122:25
**progress** 137:5 375:11

486:14 518:12
**progresses** 123:10
**progressing** 336:21
**Prohibiting** 2:4
**project** 54:8 366:21
403:1,4 444:2 445:2
450:8,9 465:1 489:4
493:3,13 496:25 499:9
500:24 509:8,8 516:19
516:25 517:3,4 519:10
519:13 520:1,16,23
522:2,12 539:17
**projected** 80:9,18
**projection** 489:23,24
**projections** 179:14,23
181:1 182:9
**projects** 119:21 122:21
125:2
**prominent** 125:8 130:15
**promise** 530:9
**promised** 415:1
**promote** 437:9 445:18
**proper** 32:12 457:13
496:7 513:15
**properly** 229:19 355:3
431:11 459:10 511:24
534:4
**property** 209:9 343:25
507:7
**proportion** 376:20
**proposal** 65:4 126:10,11
126:11 203:8 210:12
220:11,14,20,24 221:5
221:10 222:4,10
224:13 267:1,2 271:8
290:18 317:9,12
319:20,22
**proposals** 123:9 126:7,9
176:20 177:9 266:25
**propose** 139:13
**proposed** 92:13,19
165:17,20,20,23 171:8
194:1 196:16 198:21
266:19,23 283:16
284:8 353:13 359:5
405:5 418:6 437:12
441:21 491:12 495:21
513:1 521:18

**proposing** 269:4 317:22
322:17 447:6 458:2,12
465:3 531:19
**proposition** 52:13 513:9
**proprietary** 454:16
**prospect** 374:2
**prospective** 44:11
**protect** 205:22 361:3,5
361:16,19 402:17,23
454:9,24 524:10
541:18
**protected** 229:19 482:24
**protection** 63:8,8 227:8
**Protections** 2:15
**protective** 512:10
**protest** 471:7 526:4,9
**protests** 526:24
**protocol** 480:4
**prove** 117:15 245:1
**provide** 40:11 60:9,15,23
61:13,15 63:15 64:21
66:11,21 85:13 113:10
118:12 129:12 131:10
137:17 138:12 139:25
141:19 158:14 170:21
170:23 175:7,8 176:25
196:22,23 198:10
250:1 252:13 257:4
267:15 288:24 311:4
315:9 332:6 349:6,10
349:20 363:1,19
364:19 366:5,5,9 387:2
399:10,12 447:18,20
456:15 500:15 534:1,5
**provided** 32:12,17 42:11
47:24 48:13,14 53:19
59:11 66:9 81:9 82:10
82:13 107:22 110:7
113:4 117:11 143:8
157:25 158:3,3,10
159:3 167:23 188:4
199:21 201:17,17
257:1 262:4,6 280:19
349:8,12 376:1 455:5
456:9 467:24 468:6,15
**provider** 105:16
**provides** 48:12 150:20
168:11 176:12 452:19

477:21
**providing** 128:15 150:23
189:13 219:9 262:18
281:1 334:14 426:20
**proving** 180:15
**provision** 142:9,10,11
**provisions** 478:21
**Provo** 526:24
**PT** 346:24
**public** 350:5 404:11
407:18 416:1 419:14
454:19 468:12 488:1
495:2 541:20
**publicized** 94:19
**publicly** 188:14 398:4
541:14
**public's** 260:5
**pull** 174:8 181:20 188:3
311:13
**pulled** 188:6 229:11
**purchase** 44:12 246:21
262:5,6,8 402:3,4
416:19 425:5,10
444:18 466:11,14,23
467:11 469:11 484:15
**purchased** 402:7
**purchaser** 14:21 15:3
436:11 437:3 495:25
496:1,6
**purchasers** 539:13
**purchases** 499:25
**purchasing** 250:1 394:19
**purely** 167:17
**purport** 91:22
**purported** 455:11
**purpose** 50:16 52:3
64:13,17,22 155:10
156:6 159:24 191:21
201:16 202:23 280:9
280:14 311:11 383:22
428:17,21,22 429:1,4
467:16,21 473:16,21
474:6,18
**purposes** 26:11 52:9
54:16,16,23 144:20
198:18 202:3 327:24
349:25 434:11 453:12
474:8 488:11 501:11

**pursuant** 2:3,13 198:21
305:23 307:19 384:9
384:17 541:15
**pursue** 58:24 102:13
117:14 237:3,11
347:20 418:17 471:3
**pursued** 102:10 347:17
**pursuing** 212:7 278:11
292:13,14
**push** 115:14
**pushback** 182:6
**pushing** 377:13
**put** 27:15,16,17 28:4
43:6 49:21 58:14 65:21
96:7 103:7 111:21
127:11 128:1 152:17
168:10 175:13 176:14
176:15 177:9 181:4,9
182:14,24 190:4
191:13 194:21 195:19
196:21 208:24,24
209:3 210:25 211:15
211:16 213:7 214:11
216:3 223:5,8 229:20
250:3 252:21 269:4
272:10 289:11 297:5
300:4,25 303:7 312:11
319:6 323:2 335:9,12
337:14,21 353:9
357:13 372:25 383:25
395:14 398:25 406:23
412:20 418:13 428:11
434:2,4,17 453:11
493:3 517:20 536:9
**puts** 434:7
**putting** 173:6 192:18
208:11 259:2 269:8
301:4 319:15 323:3,9
323:10,11,15,15,17
353:8 387:11 428:16
428:21,22 491:23
532:1
**P.C** 6:11 11:2,18 14:11
15:9,18 20:12
**p.m** 174:3,3 283:6,6
356:21,21 435:18,18
510:15,15 543:8

**Q**

**Quackenbush** 114:20
298:11
**qualification** 105:4
**qualified** 476:4
**qualify** 185:21 186:11
**qualitative** 179:16
**quality** 180:12,13,16,20
420:8
**quantifiable** 391:24
**quantified** 364:8 464:23
**quantify** 363:21 364:1
364:16,21 365:15,22
370:11,15 373:8
464:18
**quantitative** 179:16
**quarter** 189:15 201:7
297:5 367:20 372:16
**quarterly** 30:11
**question** 45:23 46:4
50:10 51:1 62:8,9,10
62:16 66:13 67:4,4
68:11 74:4,11 75:8,10
76:6,8 77:5,8 80:1,14
80:23 98:18,19,22,23
101:12 103:8,9 110:24
115:6 116:3 117:21
133:6 135:6 136:23
137:10 138:2 145:11
148:1 150:14,16
161:18 172:2,3,11
189:17 203:12 217:6
218:7,8 221:11 224:11
224:22,22 225:24
226:16 231:12 237:6
242:17 247:19 249:10
250:13 252:11,12
258:8 271:23 274:14
275:5,8 276:22 280:21
280:24 282:3 285:3
290:1,3 292:15 295:14
300:20,21 310:23,24
320:20 333:7,15,20
334:12,22 336:14
338:15 340:14 341:4
342:16,24,25 344:8
351:23,24 352:6,9,12

357:23 364:1 367:21
368:14 375:1 382:2,8
382:12 385:24 396:10
398:11 400:1,5 402:19
402:20 403:6,12 410:5
418:12 419:21 422:4
423:6,9 424:12 429:16
429:18 459:12 464:12
464:12 466:21 467:15
472:4,22 474:23 477:9
480:15 499:2 509:19
511:23 513:2,3 517:22
522:3 525:8
**questioned** 76:4 78:4
**questioner** 414:4
**questioning** 102:10,10
102:13 160:23 161:2
202:1 235:6 242:22
429:5
**questionnaires** 514:2
**questions** 26:16 32:6
40:13 75:13 81:14,21
83:4 87:24 89:21 92:22
93:5,18 98:13 107:8
108:6,16 109:21,25
111:4 114:13 115:2,7
115:25 117:7 118:23
120:9 140:19,22
141:13 156:13 162:7
172:13 177:7 181:6,16
189:13 216:17 225:5
235:5,23 243:8 344:9
356:13 357:7,12,21,25
387:16,19,24 392:8
407:1,11 412:25
425:16 427:7 449:14
456:22 491:17 512:4
514:4,5 534:20
**queue** 357:13
**quick** 45:1 154:15 484:3
492:20
**quickly** 160:13 180:12
180:15 187:7 205:19
342:12 395:22 458:14
489:3 490:25
**quite** 32:22 48:2 51:10
136:19 181:8 182:17
184:12 192:22 193:2

208:25 242:14 244:9
357:12 385:9 420:3
429:12 441:25 454:23
465:6 478:16,18 531:4
**quiz** 90:14
**quote** 99:7 171:22

## R

**R** 1:20 3:2 14:25 22:16
25:1 547:4 548:2
**railroaded** 511:13
**railroads** 213:15
**rainbow** 147:20
**raise** 49:25 119:9 413:16
432:4 511:1 514:18
**raised** 49:24 52:2 54:17
54:21 76:4 298:24
353:3 368:9,15 523:24
**raises** 482:8
**raising** 39:21
**RALPH** 18:8
**Ram** 71:8
**ramifications** 466:7
**ran** 149:1 151:9
**range** 84:8 95:25 96:8,11
96:17 97:6,9,11 109:22
110:2 199:22 207:7
327:20 360:22
**ranges** 96:14 97:5
**rapidly** 490:23
**Rapids** 24:14
**rare** 115:13
**rata** 221:8 223:20,23
**rate** 181:25 183:2,3
185:4,8 196:12 283:1
369:23 370:2 383:15
400:22 486:24 537:6
**rates** 135:9,11 188:8
369:21 417:15
**ratification** 122:12 127:9
127:14,17 128:17,18
133:8,16,16 138:7,11
139:16,21,25 140:8,13
140:17,20 143:14,16,19
151:14,17 152:12
167:4 172:18
**ratified** 128:6 141:23,24
148:12 151:15

**ratify** 127:1,1 137:16
140:23 148:5
**rating** 419:24 514:11
**ratings** 419:24,25
**rationale** 211:2
**rationalization** 366:18
366:24 390:22,22,24
392:5 396:5 398:3,25
399:22 400:3 443:25
444:1,10 445:4 447:4
448:3 477:5
**rationalize** 444:2 449:12
540:11
**rationalized** 366:22
395:24 445:7 447:16
**rationalizing** 395:14
**RATNER** 4:17
**Rattner** 192:21 202:10
202:18 204:3 254:17
268:9 269:11 272:13
272:22 284:22 286:23
291:6 322:6 339:17,22
**reach** 36:4 126:18 132:8
217:2,10 220:17 293:1
362:3,13 389:8 394:8
404:4
**reached** 26:5 77:23
108:19 109:6,12,20
132:10 133:2 140:3
151:6 166:8 176:5
205:25 206:20 309:2
339:20 349:11
**reaches** 126:20
**reaching** 60:13 193:17
456:6 531:16
**react** 139:10,11,19
**reacted** 138:24 253:25
**reacting** 251:10
**reaction** 192:24 207:3,18
225:10,12 226:8
271:13,15
**read** 56:1 80:3 83:13
88:5 159:17 160:10
161:20 198:13 214:11
219:12 220:13 223:17
223:17,19 225:22,23
226:5 228:7,20,25,25
230:11 248:9 250:23

251:15 253:13 260:22
261:11 263:13 268:15
284:25 285:14 286:3
288:8 289:5,12,14
290:6,15 291:3,11,11
293:13 295:1 299:24
315:2 321:6 348:1
410:24 435:9,10 436:8
441:7 498:25 521:8,12
525:7 526:22 528:12
538:3
**readily** 453:5
**reading** 87:24 88:1,3
160:7,14 261:12
290:12 316:9 352:13
**ready** 203:7 491:7
532:25
**real** 181:17 186:17
205:13,13 521:2
**realistic** 326:7 347:16
**realistically** 235:16
**reality** 150:18 151:4,5
167:10 168:5 205:16
347:15,19
**realize** 86:16 150:19
239:17 345:2,3,4
391:20 420:21 483:21
**realized** 326:18 390:25
510:17
**realizing** 85:4
**really** 41:4 116:18
139:12 150:16 176:3
176:25 177:15,18
178:7,11,23 180:18
182:6 183:6 185:7,7
188:13,16 209:6,20
212:11 224:21,25
233:8 242:15 253:16
258:6 265:10 270:18
291:7 296:25 304:4
311:8 320:14 321:17
329:5 331:15,18 372:4
390:25 431:18 434:12
435:1 474:3 490:4
493:23 495:12,24
503:2 505:13 514:14
519:3 540:9
**reappointing** 459:18

**reason** 50:5 68:23 88:7
97:14 158:9 280:4
307:18 340:21 349:19
349:21 352:14 497:16
506:14 519:14,20
520:7 531:1
**reasonable** 277:22,23
314:18 319:8
**reasons** 141:14 193:15
429:9,9 475:10 499:8
503:15 529:3,4
**rebut** 50:11
**recall** 60:24 70:13,15,15
70:20 72:24 84:3,6,10
103:25 105:6 108:14
108:16 109:10 135:22
140:25 143:16 192:1,4
194:18 202:19 208:25
209:3 228:20,20
254:22 270:5 271:4,9
271:13,18,22,24 272:24
278:16 280:20 284:11
286:9 290:12,14 295:7
295:17 296:17 297:16
298:18,22,24 299:7
300:3,7,11,23 302:1
311:8,10,11,22 312:1
346:6 370:6 371:12
374:21 384:3 386:13
390:14 394:10 395:19
398:11 399:14 400:9
442:16 468:17 530:21
**recalls** 420:10
**recant** 256:19
**recapture** 490:12 493:22
519:15,18 533:11
**receivable** 83:10
**receive** 46:1 47:7 84:11
84:18,20 110:11 157:3
159:20,25 197:25
269:20 292:22 316:1
392:4 479:23
**received** 39:3 46:12
54:25 57:6 72:7 104:3
111:11,19 112:12
113:17 131:24 154:12
159:19 160:1 161:6,23
189:14 192:24 197:22

198:20 215:1,9 216:5
256:10,12,13,25 276:24
291:12 300:6 303:17
303:22 316:3 437:7
443:12 479:5,8,16
485:3 499:4 516:5
523:15 524:20 541:24
542:1
**receives** 112:17
**receiving** 102:12 156:7
157:8 165:14 300:3
308:18 310:18 408:18
492:24
**recess** 119:2 174:3 283:6
356:21 435:18,20
510:15
**recipients** 101:16 111:6
113:9 114:6
**recogni** 325:19
**recognition** 379:25
**recognize** 214:8 268:5
298:12 313:17 325:19
344:3,14 420:23 452:8
453:19 491:25 524:9
**recognized** 330:23
**recollection** 42:23
204:22 217:9 227:21
248:21 253:21 263:23
270:16 281:6 286:3
298:20 302:23 311:19
312:5 526:16
**recommend** 139:15
151:8 462:12
**recommendation** 138:21
139:17 146:25 147:6
148:4 456:8,9 466:3,16
536:18,22,25
**recommendations** 150:6
150:8 456:17
**recommended** 138:3,11
147:9,11,23 148:9
149:9 209:24 292:8
317:5 489:1
**recommending** 143:6
**recompense** 421:7
**reconstruction** 493:1
**reconvene** 174:2
**record** 37:5 41:3 46:8,15

46:23 81:22 101:13
116:18 120:18 163:15
164:17 174:8,17
198:13 211:9 224:21
224:24 250:15 310:20
327:8 331:14,23,24
412:10 422:1 434:11
435:11 436:9 441:7,16
442:10 453:12 455:10
455:15 482:6 512:7
526:22 548:5
**records** 135:23 177:8
331:23
**record's** 412:23
**recoup** 490:2
**recoupments** 356:1
**recourse** 405:6,11,14
418:23
**recover** 305:9 451:2,18
489:3,16,17,20 490:24
**recovered** 451:6
**recovery** 58:13 59:11
80:9,18 99:15 199:23
200:14 305:11 340:23
403:1,4
**recross** 108:2 118:24
172:22 357:6,16 427:9
540:21
**RECROSS-EXAMIN...**
108:4
**recruited** 176:1
**red** 420:1 460:16 461:2,4
461:9,10
**redirect** 93:20,22 114:25
115:1 172:2,15 354:21
355:16,21 357:2,6,15
357:16,18 425:19,21,25
426:3 427:10 510:11
538:19,21
**redistribute** 383:13
448:20,22 467:3 470:3
**redistributed** 384:6
470:5
**redistributing** 362:2
466:19
**redistribution** 325:7
448:24 466:21
**redrafted** 80:2

**reduce** 95:14 131:10
275:3 287:11 316:15
397:7 444:2 472:11
488:17 499:9 500:10
515:2 517:24 518:2,5
519:4
**reduced** 84:5 391:24
396:11,20 420:9
518:23
**reducing** 275:11 371:1,7
375:11 398:7 401:4
487:23
**reduction** 390:7,9,11,13
400:19 459:20 488:22
513:1,1,4 518:18 519:8
**reductions** 183:6 316:8
**redundant** 295:2,22
368:6 424:9
**Reed** 525:19
**reestablish** 180:16,19,20
**reestablishing** 178:12
**refer** 69:19 90:20,21
91:16,17 158:2 165:25
253:19 254:3 299:7
**reference** 106:15 172:6
252:20 283:21 285:10
291:9 302:21 303:12
521:14 525:22,24
540:8
**referenced** 131:21
321:16 339:2 371:6
436:19
**references** 303:10 455:7
**referencing** 240:1,2,3
303:6 370:23
**referred** 158:24 242:18
248:25 249:11 426:7
**referring** 28:13 43:5
94:14,15 158:22
215:10 225:13,14
226:9,11 269:10
276:14 284:23 285:20
285:25 286:6 290:14
341:15 402:24 409:25
410:1,3
**refers** 285:5
**reflect** 153:6 167:2
197:21 313:21 314:1,5

437:2,23 527:14
**reflected** 75:17 78:22
79:3 319:3,23 330:23
464:9
**reflecting** 167:10 437:25
501:2
**reflection** 481:23 514:6,8
**reflects** 346:15 502:8
508:20
**refrain** 505:22
**refresh** 302:23 313:9
526:16
**refurbish** 491:5
**refused** 61:13 129:17,20
383:5
**Refusing** 2:4
**regain** 178:11 489:11
**regaining** 489:9
**regard** 47:13 69:13
138:19 145:11 150:6
161:2 247:3 431:14
453:12 478:12 480:7
481:17 535:13 537:16
**regarded** 176:6
**regarding** 242:25 247:1
249:19 267:18 287:8
291:10,23 298:9
300:13 303:23 311:17
311:23 312:16 331:24
372:19 375:23 393:10
399:22 441:1 454:14
454:17 468:24 469:2
540:3 541:17
**regardless** 151:9 268:16
465:5
**regards** 247:1 270:25
**region** 484:13
**regrettably** 285:17 286:2
**regular** 31:10,16 222:23
381:1
**regularly** 143:21 380:25
506:2 531:12
**regulation** 423:5
**regulatory** 233:18,25
234:2,10,11,12,14
235:20,24,25 236:3,5
236:12
**reimburse** 366:11,13

**reintroduced** 192:11
**reiterate** 54:20 392:3
**reject** 59:4 140:23
  162:17 359:7,14 360:4
  360:5 361:6,21 367:4
  367:17,22 369:25
  372:5,21 373:9,20
  381:18,22 382:6,21
  389:17 429:15 430:14
  447:22 449:25 450:5
  451:25 452:17,22
  458:12 459:8,14 460:1
  463:10,13 464:20
  465:11,19,23 466:12,15
  466:18 469:22 470:14
  471:15,21 473:17,22
  474:7,19 475:11
  500:22 513:9 517:6,10
  527:3,10
**rejected** 134:14 314:17
  314:23 317:4 322:10
  353:13,22 360:11
  362:2,18 386:20
  396:15,23 397:20
  398:13 400:15 429:23
  448:17,19,20 449:1,4
  463:7 466:4,24 467:12
  475:9 482:4 490:23
  492:11,25 496:19,23
  529:16 530:24 531:16
  531:16 533:4 536:1
**rejecting** 359:19 360:10
  362:20 363:22 364:2,9
  364:17,22 365:16,23
  368:8 392:6 459:13,18
  460:4 464:19 465:6
  473:9 476:18,20 490:5
  503:15 519:25 536:10
**rejection** 127:9 133:17
  428:15 429:8,10,11,14
  429:22 430:3,17 431:2
  431:4,5,11,15,17 432:9
  432:10,12 457:25
  458:2 470:7,11 473:17
  473:22,23 477:2
  479:23 480:17 499:4
  501:11 505:16 514:21
  516:5 517:10 523:16

  523:20 528:18 531:20
  539:6 540:3
**relate** 177:6
**related** 2:23,23 41:8 83:4
  143:6 145:19 251:10
  274:13 298:25 334:25
  363:22 370:15 408:12
  429:4,9
**relates** 41:21 53:20
  68:14 109:4 137:12
  248:1 378:10,22
  403:25 495:4
**relating** 28:1,10 130:23
  135:16 142:24 143:1
  152:6 154:11 235:5,8
  523:16 545:16 546:7
**relationship** 29:20 44:1
  176:5 239:8 537:13
**relationships** 537:16
**relative** 44:22 45:25
  61:11 178:21,22 180:3
  185:1 194:1 209:25
  212:20 282:3 296:6
  300:15 373:3 522:9
**relatively** 181:13 245:4
**release** 43:22 44:14,15
  44:16,17,18 90:24 91:3
  91:21,23 92:1 93:6
  240:14,16,19,20 387:5
  406:13,15 411:4
  413:22
**released** 90:17
**releases** 90:7,11 91:4
  206:19 239:22,24,24,25
  240:4,8,10 241:8 387:3
  387:8,13 406:11
  408:25,25 409:7,13,16
  409:16,23,24 410:1,1,3
  410:6,7,11,14,16,19,24
  411:1,13,19,25 412:1
  412:12,16,24 413:2,17
**releasing** 93:6
**relevance** 76:20,22
  101:10 235:6,12
  310:10,11 432:13
  472:8 523:12,13
**relevancy** 523:25
**relevant** 82:9 84:23

  101:11,20 115:1
  139:12,12 150:16
  164:5 227:3,4 235:17
  244:16 310:9 332:25
  333:2,9,16,17 412:19
  412:21 431:6 432:12
  432:14 504:16 523:21
**reliability** 180:16 415:25
**reliance** 57:8,10
**relied** 50:20 51:3 57:2,2
  74:20 76:20 86:22
  112:5
**relief** 2:23 26:20 235:14
  240:15 314:11 315:6
  356:2 431:10
**relieve** 479:24 480:5
**relinquished** 239:19
**relocation** 524:13 526:5
**relocations** 492:15
**rely** 52:25
**remain** 57:17,19 122:8
  171:10 377:10 424:2
  430:4 479:2
**remained** 61:9 175:3
**remaining** 337:22
  359:24 371:20 373:23
  374:1 388:18 391:20
  494:5 538:2 540:12
**remains** 403:16
**remedy** 299:4 369:4
**remember** 39:7 107:9
  108:22 198:3 203:19
  206:4 228:6,13 254:23
  270:17,21 286:7,7
  293:14,18 294:20,21
  302:3 304:9 325:19
  366:23 374:22 384:4
  397:22 484:18 489:13
  501:13 513:6 517:2
  518:16 528:7
**remind** 435:23
**Remington** 231:13
**remove** 77:18
**removed** 77:2,4 78:12
  127:25 161:9
**render** 176:23,24,24
**renegotiate** 135:14
**renegotiated** 158:11

**renegotiating** 144:1
**renegotiation** 143:21
**renovate** 475:24
**renovating** 465:16
**renovation** 492:20
  493:17
**renovations** 444:22
  476:8 492:21 493:19
  493:24
**rent** 508:8
**reopen** 134:15
**reorganization** 60:2
  65:14 67:10,14 265:22
  266:7 343:22 488:14
**reorganize** 160:12
  266:11 286:24
**reorganized** 266:6,9
  331:11
**reorganizing** 350:11
**repaid** 181:9 349:14,16
**repeat** 275:8 371:18
  420:4 467:19 471:16
  534:24
**repeatedly** 207:1 329:21
**repetitive** 387:25
**rephrase** 35:13 58:22
  62:9 113:21 382:12
  393:19 394:17 406:1
  540:17
**replace** 537:23
**replaced** 167:9
**replenished** 282:8
**reply** 525:3
**report** 36:10,20 51:22,22
  51:23,23,25 52:1 76:5
  79:5 120:20,21,22
  123:4 180:18 266:4,12
  266:14 267:24 299:15
  391:24 393:4 420:2
**reported** 60:18
**reporter** 37:8
**reports** 36:9,12 107:1
  121:1 404:23 416:22
  468:12
**repositioning** 492:10,17
**represent** 28:8 87:5 90:6
  91:8 121:10 126:22
  136:5 150:23 162:16

164:11 273:24 369:8
383:4 392:14 407:5
426:6 447:12 450:5
457:8 479:11,15 488:3
511:16
**representation** 122:16
264:23 458:14 476:13
**representative** 53:6
229:16 435:10 459:3
459:11
**representatives** 11:3
14:3 87:3 122:13
134:11 166:20 280:18
281:1 404:8
**represented** 34:7 121:20
121:22 122:2 135:23
135:25 146:16 247:6
247:12,24 359:17
**representing** 92:8
102:17 135:18 163:21
170:1 200:21
**represents** 57:1 96:17
101:6 102:22 121:8,17
163:13 215:6 436:25
488:23
**reps** 153:19
**repurchase** 383:7 386:14
386:19 466:4 470:1
**repurchasing** 377:15,17
383:8 466:7,17
**reputation** 49:3 497:24
**request** 26:1,12,14 27:16
100:11 164:2 189:7
196:1,13 204:11 211:8
260:25 261:18 280:11
282:9 286:6 292:19
345:5 431:17 469:18
491:20 517:8,9 526:13
526:17 536:6 540:23
541:1
**requested** 34:16 36:16
36:21 190:4 206:16
215:20 239:24 410:14
435:6 469:13
**requesting** 290:19
**requests** 2:8 40:9 135:13
207:10,14 315:22
429:15

**require** 194:19 477:2
496:19
**required** 52:25 96:15
107:17 132:24 133:4
170:15,18,21 194:3
222:6 236:12 244:18
304:1 314:10 334:14
396:10,12 445:15
492:22 500:6
**requirement** 159:18,20
170:22,23 395:23
476:23 537:12 541:1
**requirements** 130:24
135:3,17 183:2 436:19
**requires** 122:24 304:24
445:15
**resale** 416:20,25 425:11
**research** 134:7 498:13
**researching** 122:25
**reserved** 440:25 441:3
**reserves** 405:3
**residual** 89:18
**resist** 113:5
**resisting** 111:22
**resize** 185:17
**resizing** 187:17
**resolution** 220:17 227:11
250:7,17 338:19,22
339:20 389:8 435:7,9
435:10 521:19
**resolutions** 177:9
**resolve** 221:22 248:16,22
253:22 305:6 435:24
436:7
**resolved** 25:19 26:14
42:18 211:13 259:9
**resolving** 42:22 259:6
**resort** 348:25
**resource** 176:18
**respect** 25:23 26:4 27:7
38:24 43:14 48:17
58:12 93:5 120:9
122:17 125:19,21
127:24 130:11 132:4,7
132:19,22 133:5,20
137:9 140:4,5 141:16
142:1,23 145:6,24
146:24 147:8 148:4,23

149:10 151:6,7,13
157:9,20 159:15 161:3
180:1 182:9 194:8
196:25 235:15 246:19
297:11,17 310:7 331:2
350:6 351:19 352:7,16
357:21 364:9,22
365:15 370:16 371:14
372:20 382:19 383:16
385:15 400:2,8,24
412:11 413:1,3 431:24
432:1,10,22 486:19
492:2 497:8,18 514:14
523:24
**respected** 176:6 498:15
**respond** 116:15 160:17
160:18 202:8 210:12
226:2 290:1,1 320:10
357:3 478:14
**responded** 196:9 204:11
228:21 339:15
**responding** 288:6
**response** 62:14 100:10
195:12 210:11 212:8
225:22,24 226:4,21
227:20,24 228:3,5,24
250:20,23 251:12,15,18
251:20 252:1,7,17
253:1 255:20 294:14
294:19 296:7 491:15
491:19 526:9
**responses** 385:1
**responsibilities** 139:15
139:18 144:18,19
175:2,21 334:4 380:24
**responsibility** 152:17
177:6 205:22 212:24
341:7 391:8 416:14
457:10,11 462:20
479:24 490:5,8 515:10
515:11,12,25 537:10
538:7,8,11
**responsible** 123:1 152:15
160:10 205:24 443:23
**responsive** 67:3 195:25
225:14 300:21 304:13
**rest** 282:14 284:25
336:11,13 432:4

477:11 528:12
**restate** 62:16 67:4
221:11 418:12 520:21
**rested** 439:2
**restructure** 158:18,21
242:14 266:20,24
271:10 517:12,19
518:6
**restructured** 157:4
159:21 521:4
**Restructures** 156:3
169:3
**restructuring** 155:24
182:19 205:4 233:4
237:3,12,15,19,23,25
242:9,11,19,20,25
243:2,5 244:22 254:14
266:10,18,19,23 270:12
271:7 273:4,10,12,17
277:12 287:6,7 291:24
292:7,8,13 305:2 313:3
337:16 340:8 351:18
375:4 477:4 497:4
**resubmitted** 252:25
**result** 58:13 63:17,19
96:5 124:3 149:24
158:7 167:7 171:21
178:10,21 179:1 180:8
180:9 187:2 196:16
277:9 320:22 348:8,25
374:13 376:8 383:9
399:24 405:8 414:15
414:19 429:23 471:13
471:18 476:18 496:25
**resulted** 143:9 167:17
**resulting** 157:14
**results** 355:13 500:18
501:13
**RESUME** 283:13
**retail** 186:13 241:6
369:22 370:8 376:1
377:3,14 397:14 507:1
**retailing** 369:21
**retail/one** 375:16
**retain** 48:21 201:9
205:20 337:14
**retained** 48:16 52:13
105:18 198:10 199:19

219:11 281:20 288:20
362:17 372:8 384:1
385:16 451:6,9,13
466:22 467:11,13,17,22
473:11 490:9,24
**retaining** 106:4 490:7
519:22
**retaliate** 522:23
**retaliatory** 522:16
**retention** 417:15
**retired** 121:13,15 122:5
122:6,8 138:13 150:24
157:23 168:11
**retiree** 122:17,19 127:24
127:25 128:2,10,22
137:12,17,18 138:5
140:4 141:20 146:24
147:8 148:4 151:6
**retirees** 121:22 122:17
128:16 129:13 130:4
137:15,22,23 138:1
143:9 147:23 149:3,5,7
150:20 165:13 303:11
**retirement** 16:3,13 17:3
124:25
**return** 31:5 58:10 183:10
238:5 390:23 415:3,9
445:16 510:14
**returned** 124:11
**revenue** 195:8 359:19,22
359:25 360:2 375:17
396:24 449:25 450:1
450:25 487:20 488:4
488:21,24 489:18
490:3 509:6,12
**revenues** 487:19,23
493:22
**review** 30:10 47:24
48:12 53:19 55:13,20
59:10 81:12 129:18,21
176:17,20 177:6
178:20,25 189:23
206:18 368:21 453:22
479:8,19 482:12
546:14
**reviewed** 25:21 32:17
74:20 82:17,19,21
180:13 198:15 294:21

298:4 410:19 429:20
514:20
**reviewing** 55:15 58:17
**reviews** 231:19 232:8
**revisiting** 295:5,25
**Rhode** 525:15,22 526:2
526:24 527:11
**Richard** 12:9 92:7 246:9
**rid** 520:25 521:15 522:4
**RIFKIND** 22:12
**right** 25:2 26:20,23 27:3
27:5,12,19 29:9,12,13
35:7 37:4 38:19,23
46:7,10 47:3,7 50:14
50:23 54:22 56:22 57:1
59:14 60:5,6,8,16,18,19
61:6,10,13,14 63:2,5,9
63:16,19,23,25 64:11
64:16,25 65:5,8,11,23
65:25 66:5,22 67:11,14
67:16,18 69:17,20 70:9
72:21 73:8,10,14,20
75:1,19,22 78:16,19
79:13,16 80:17,19
81:20 85:4,17,25 86:3
86:6,9,13,17,20,22 87:3
87:15 88:5 89:3,4,7,11
89:14,14,17,19,22,23
91:5 92:6,24 93:19
94:17,20,24 95:16,21
96:18 98:3,17 102:23
103:18 104:5 105:7
106:9,15 107:12
108:13 109:15,17,24,25
110:3,6,8,12,17 111:2
111:14,15,19 112:3,23
113:1,3,6 114:13,18
116:3,6 117:23,25
118:10,18,24,25 119:3
119:9 120:19 127:12
129:11 130:7 133:21
139:2 144:6,17,21
145:9,25 146:16,19
148:6,17,21 149:2,8,10
149:13,17,24 150:16
151:11,19,22 152:3,12
152:25 153:3,6,15,22
154:1,21 155:25

157:10,21 158:12,13,20
159:3 160:3,16,22
161:13,18 162:1,19
163:3,6 164:19 168:4
169:6,20 172:1,24
173:8,19,21,22 174:1,4
174:10 175:23 182:3
183:5,16 184:9 186:7
187:20 192:14,15
193:4 194:24 197:7
200:9 201:13,22 202:2
203:3 209:19 214:19
214:23 215:18 216:3
218:21 220:9 221:13
221:23 222:1 224:7
225:7,23 230:13,17
232:4,19,23 234:15
235:11,18 236:1,18,22
237:13 238:8,13
241:11,15,20 242:6,8
243:16 245:5 246:2,19
246:23 248:4,7,9,19
249:9 250:20 251:3,20
252:7,17 253:10 254:3
254:13 255:1,10,20
256:3,24 257:15,18,23
258:1,8 259:20,24
260:5,19,22 261:4,10
262:21 263:7 264:14
264:15,25 265:5,9
267:4,18 268:4,12,23
270:2 272:24 273:5
274:17 275:1 277:6,20
278:8,9,22 279:10,13
279:14,16,22,25 280:4
280:12,17 281:4,7
282:18,20 283:5,7,10
283:12 285:7,14,25
288:6,12,21 289:4,25
290:4 291:2 292:5,19
292:24 294:3 295:9,12
297:7,13,25 298:13
299:13 300:16 301:8
302:4,5,7,12,14,16
303:17 305:18 306:20
307:2,10,15,16,25
308:8,15,22 309:13,24
310:4,22 311:4,16,22

312:2,16,24 313:6,16
313:16 314:10,18,21
316:18 317:3,16
318:19,21 319:6,17,19
320:11,16,20 322:13,23
323:3,7,16,21 324:6,10
325:16,21 326:24
327:19 328:24 329:2
330:16 332:17,18
334:16 335:8 336:1,8
336:13 337:3 338:10
338:22 339:10,12,18
340:25 341:12 342:3,5
343:18,21 344:14,24
345:6,9,12 346:1,14
347:2,21 348:20,25
349:9,13,24 350:9
351:7,13 352:9 353:12
353:21,23 354:19,23
356:9,22 357:1,24
358:1,15 359:7,14,20
360:8,12 363:16
364:19 372:12 377:10
378:1,24 379:2 380:11
380:21 382:1,13 384:3
384:24,25 385:24
386:3 387:18,21 392:9
401:14 406:2,8,9 410:8
412:9 413:14,15 414:2
416:16 417:12,16,21,23
418:9,12,19,24 419:7
421:2 422:8,20 423:3
423:21 424:15 425:12
426:15 427:23 430:22
433:23 434:14,24
435:13,16 436:2,12,15
438:5,8 439:1,4,24
440:5,10,14,15 441:2,8
442:6 443:10 446:24
447:1 448:14 449:16
450:14 451:6,11,19
452:23 453:16 455:17
460:16 463:11,15
468:9 471:11 472:4
474:3 477:17 478:7
480:4,24 481:3,8,22,25
482:25 483:3,24 484:6
484:19,24 485:5 486:7

486:11,23 487:6,12,19
487:21,25 488:3,6,8
489:13 490:17 491:7
492:9,13 493:3,4,4,5,5
493:7 495:2,20 496:14
499:21 500:7,25 501:8
501:13,21,25 502:18,25
503:9,17,20,22 506:8
506:22 507:1,5,8,10,12
508:9,11 510:8 511:2,9
511:24 512:5,23
514:11,22 518:19
519:3,19,20 520:2,5,9
520:24 521:19 522:18
523:19 524:10 525:4,4
525:16,20,25 526:1
527:2 528:2,3,5,11
529:4,6,9,11,15,16,20
530:15,24 531:3,10,14
531:21,23 532:4,8,19
533:8,18,21,22 534:10
534:15,17,23 535:8,18
535:20 540:7 541:19
541:22 542:3 543:4
**rights** 25:25 122:9,15
378:13 402:17,23
471:7 480:19 482:24
524:12,16,17
**right-hand** 35:21 166:15
318:14
**right-sized** 187:17
**rigor** 183:10
**RINGEL** 11:23
**ripples** 351:6
**risk** 116:24,24 149:1
151:9 300:1,1 335:20
350:23 385:4 404:23
422:18,20 466:8
495:10,11,13 534:14,15
534:16
**risks** 534:17
**risk-free** 350:24
**RLM** 288:2
**RLN43** 248:6
**RLN43@chrysler.com**
220:7
**road** 8:4 18:13 21:13
28:22 65:1 239:5

548:12
**roads** 420:14 421:2
**Robbins** 198:15
**Robert** 5:8 13:17 19:17
21:11,17 24:11 174:18
219:5,14 544:18,19,20
544:21,22,23,24,25
545:6
**Robins** 49:13 53:5,9,23
55:2,24
**Robinson** 11:18 388:2
**robust** 190:7 475:1,4
476:23
**Rock** 15:10 534:25
535:17,18,21,25 536:7
**ROGOFF** 5:9
**role** 30:7 36:17 122:22
124:25 130:15 136:20
139:11 151:7 175:7
242:8 244:24,25
486:13
**Rolls** 186:5
**Ron** 120:21 125:1 176:8
192:21 195:15 202:10
202:18 248:6,10,14
250:5,23 251:4,16
254:15 268:9 306:5,8,8
306:9,18
**Ronald** 17:10 302:11
**roof** 184:21 374:5 424:21
444:4,7 450:10 489:6
493:11 494:24 509:9
**room** 69:14 183:12
202:19,20,20,20 203:2
239:4 272:20 339:3
445:22 446:1,4,11,21
494:5
**rooms** 25:3 446:4
**roots** 186:3
**rosa** 432:3
**ROSENTHAL** 13:2
**rosy** 183:17
**Roth** 246:12,14,25 247:2
247:6,15
**rough** 263:24
**roughly** 30:2,21 31:25
32:9 54:13
**round** 213:7

**rounds** 229:17
**Routan** 72:13
**row** 419:14
**Royal** 14:6
**Royce** 186:5
**RSA** 384:23
**RTP** 183:10
**rubbish** 25:8
**RUEHLMANN** 13:19
**rule** 50:25 201:21 445:21
446:8,10 484:2
**ruled** 310:9
**rules** 2:14 216:11 433:3
495:18
**ruling** 38:23
**run** 67:19 128:25 175:15
186:14,14 193:21
253:17 277:14 350:22
363:3
**running** 232:9 252:9
276:15,17,19,20,23
281:17 293:5,14
338:19 465:25
**rural** 533:17,20 534:8
**Russell** 11:24 388:1
**Russia** 234:5
**Rutchkind** 524:22
**RVG** 460:20 461:5
**RYG** 461:10

S
**s** 3:2,9 17:19 19:7 24:7
25:1 437:23 544:4
545:4,13 546:4 547:4
**SABLE** 21:8
**Sachs** 202:20 311:13
**sacrifice** 194:19
**safe** 416:20 424:14,19,23
**safeguards** 453:11
**safety** 10:13 415:24,25
416:25 419:24 424:21
424:22 425:11,13
**sake** 90:13 525:6
**salaried** 373:5 400:19
**salary** 303:16 373:4
**sale** 2:16,17,19 26:3 31:3
64:6 66:16 67:6 84:13
88:9 92:13,20 100:24

164:25 165:17,20
167:12 212:8 235:15
242:11 261:18 265:20
265:21,23 266:1 270:3
270:13 271:16 275:3
275:11,16 277:21
278:11 283:17,25
312:25 335:24 340:3
355:9 356:3 358:22
359:5,12 386:22 387:1
387:5,6,13 402:10
403:20 406:10,16
408:19,23 409:1,11,13
410:4 411:1 412:3,3,25
413:2,5,5,13,22 415:2,2
418:6 419:2,11 425:2
428:12 429:2,10,19
430:11,13,16 431:1,6
431:12,15,16,25 432:3
432:12,14 437:12
441:24 442:3 476:21
476:24 480:17 485:18
495:18 523:20
**sales** 84:19 176:7 284:5
323:1,13 359:17
364:11 365:5 371:5
399:10,12 416:8 450:5
451:2,5,18 453:3
456:15 457:2,3,9,10,13
457:15,16,17,21,22,22
458:13 462:19 469:10
482:13 489:9,11 490:5
490:8,22,24 494:3,14
494:14 498:13 499:1,5
499:15 500:11 501:12
501:18,18,18 502:8,24
505:14 513:24 514:8
514:10,12 515:10,11,12
515:25,25 518:25
519:5,15,18 529:13,16
529:19 535:25 537:10
537:16 538:7,11
539:10,12
**salesmen** 362:15
**salvage** 206:24
**San** 10:18
**SANDER** 14:18
**Sanders** 13:9 162:10

358:7
**Sandy** 407:5
**SAR** 181:24 182:4,9
321:9,11,11,19,21
322:7,10,11
**SARTIN** 19:17
**sat** 146:1,2 169:13
384:11
**SATER** 24:2
**satisfaction** 497:19
498:3,14 499:1,6
500:11,20 501:12,15,18
501:19 502:8,24
505:14 513:24,25
514:10,11,12,15,19
537:19 539:10,11,12,14
**satisfactory** 41:12 133:5
**satisfied** 309:20,21
331:11 538:10
**satisfy** 55:17
**Saturday** 435:3,12
**Saturn** 504:23
**save** 296:18,22 331:18
362:20 370:15 371:17
372:4 423:15 488:16
488:17 506:16
**saved** 362:23 363:6
364:16 371:20,23
404:21 464:18 473:10
**saving** 207:5 351:15
**savings** 219:22 221:5,10
226:17 294:15 363:22
364:2,8,21 365:15,22
473:8,9,11
**saw** 26:23 76:5 83:25
116:5 181:17 183:18
184:13,13,23,23,24,25
184:25 185:1 200:8
203:7 263:11 277:13
291:6 393:22 396:6
398:3
**saying** 42:4 51:14 77:15
79:7 80:23 88:25
105:19 167:13 205:24
223:5,15 225:2 261:24
269:10 294:15 295:15
295:16 296:11 307:23
328:2 337:23 362:10

381:11 420:19 428:1
472:9 512:13 528:4
532:23 541:11
**says** 73:9 80:8,9 85:20
88:7,13 150:2 152:18
156:14,17,24 157:2
166:18 198:7 199:3
204:2 221:6,9 223:15
223:23 224:25,25
229:24 248:10 250:25
252:18 276:2 284:21
285:7 288:2 290:9,18
295:2 315:3 333:21
342:1 358:22 457:1,24
461:21 514:17 521:3
524:5 525:10 527:17
529:6,6,10 537:22
**scenario** 110:6,8 191:14
193:11 296:18 451:1
**scenarios** 105:12 190:15
190:23 210:11 393:1
470:20
**SCHECK** 22:16
**schedule** 27:13 128:13
129:11 157:16 413:6
543:3
**scheduled** 143:21 367:12
410:2
**Scheduling** 2:17
**SCHIFF** 23:2
**SCHMIDT** 5:8
**Schnader** 12:2 92:8
401:18
**school** 33:21
**Schulte** 246:12,14,25
247:2,6,15
**SCHWARTZ** 21:2
**scope** 114:25 116:12
138:21 139:14 288:23
433:4,7 492:20
**score** 462:20 502:9
525:16
**scores** 186:1 498:3
513:23,24 514:19
**Scott** 4:17 10:10,20
92:25 415:22
**Scroggin** 524:24 525:10
525:11 528:2

**Seabolt** 10:10 92:25,25
93:4,18 544:10
**seal** 384:9,16,22,24
385:10 453:14 477:16
478:7,17,20 479:2,6,8
480:23 481:4 484:25
541:2,12,24
**sealed** 285:17 286:1
**seamless** 437:9
**search** 188:1 459:3
**seasonally** 181:24
**seated** 25:2 119:3 174:4
283:7 356:22 435:19
510:16
**seats** 169:14
**Sebring** 72:2 108:22,24
**Sebring/Avenger** 347:11
**second** 29:5 43:16 68:10
80:12 96:10,17 97:9,11
103:25 116:14 156:2
156:24 159:16 169:2
179:13 180:22 185:24
186:17 188:12,13
190:19 208:9 212:18
213:24 215:10 226:15
229:17 233:24 235:3
239:20 245:21,24
253:11,13 259:4 261:3
264:4 267:1,2 268:4
275:22 276:2,21
277:13 294:25 303:9
320:16 329:20 330:1
342:7 345:19 351:25
354:3 358:3 361:12
377:25 379:16 402:3
406:14 421:13 457:24
502:20 530:17
**secondary** 233:22 234:2
**secondly** 235:6
**Secretary** 188:23,24,25
279:18,19,20 280:13
281:22,23
**section** 2:3 31:2 117:10
156:2,6,17 157:2 221:8
231:15 283:19 303:10
307:19 402:10
**sections** 2:13 154:1,15
**sector** 329:5

**secure** 166:21 191:21
311:14
**secured** 60:25 61:6,9,10
63:16,22 64:24 66:4,17
67:7 86:9 88:10 102:12
205:23 210:3,13 234:3
279:7 286:11 334:4
337:25 340:15 358:25
388:18 473:6
**security** 63:22 64:14
**see** 43:7 45:14 69:4 73:2
77:15 82:24 83:1,6
85:23 96:12 99:11
103:5 147:25 148:25
154:18 156:4,18,23
157:1,4 159:21,23
166:16,22 168:13,25
169:8 181:20,21,21
186:16 198:3,6 199:2
200:1 202:13 203:22
207:11 209:4 210:21
214:18 220:8,12
221:14,25 222:20
231:19 255:9 256:9
271:18 277:17 279:11
283:1 291:5 298:15
302:20 318:4,4,5,8,17
318:18 321:6 330:19
340:6 345:23 346:21
358:22 359:1 365:25
380:6 381:5 400:11
413:24,25 425:3
432:13 433:9 445:23
454:18,23 460:16
461:15 464:14 475:14
476:12 478:17 480:22
481:20 482:21,25
483:2 486:18 498:23
501:1 502:5 503:25
504:19 516:2 520:5
528:10 535:8,19
**seeing** 399:14 494:20
497:15
**seek** 402:17 431:23
459:9 470:7,11 471:15
471:21 473:16,21
474:7,18
**seeking** 47:1 50:15

162:17 167:4 212:8
359:6,14 360:4 361:6
361:21 367:17,22
369:25 371:14 372:5
372:21 373:20 381:18
381:22 382:6,21
451:25 459:14 462:8
462:15 463:1,10,13,20
464:19 465:8 466:12
466:15,18 469:22
532:24 547:6
**seeks** 387:2 449:24 450:5
**seen** 48:3 70:12 72:23
73:23 74:1,1,2,22,25
75:7,11 78:14 79:6
83:25 87:11 88:19
92:15,17 114:22
215:22,24 313:8 348:6
348:13 365:13 366:2
391:13,17 392:2 400:4
401:5 468:14 481:13
514:24 525:4
**Segal** 4:10,10 12:2 25:16
25:16 92:8
**segment** 328:6
**segments** 274:22 296:9
297:2
**seize** 532:24
**selected** 63:24 458:16
**selection** 470:13
**self** 436:18
**self-insurance** 437:6
**self-insured** 438:1
**self-serving** 187:16
323:23
**sell** 68:1,2,3,5,8,15,16
100:2 200:7 208:8,18
267:3 344:22 416:9,11
416:15 417:2,7 432:15
487:25 488:7 508:16
515:19 538:6
**selling** 68:19 200:6
259:23 261:24 262:3
296:9 326:15 347:6
432:17,17 486:24
**Senate** 170:3 190:12
194:7
**Senator** 196:13 525:19

525:20
**send** 127:3 380:20 424:7
424:13
**sending** 379:18
**senior** 60:25 61:6,9,10
63:15 86:9,19 88:10,17
102:12 148:24 285:23
285:24 308:9,11 333:5
333:12 335:16 336:1
337:25 351:19 352:17
**sense** 305:12 356:3
371:16
**sent** 211:9 226:18 268:9
290:18 294:22 368:2
379:15 380:15,18
524:20
**sentence** 85:20 87:1 99:6
99:7 154:16 166:18
249:8 253:13 260:22
261:2,11,21 268:15
276:2 277:24 284:21
285:4,7,14 348:1
525:17 526:22 530:20
**sentences** 159:17 169:6
291:2 295:20 358:22
**separate** 25:19 71:13
122:1 126:6 144:17
247:25 406:17 413:9
413:19,20 517:4,4
**separating** 208:1
**separation** 178:11 179:6
**September** 143:24
**sequence** 216:23 225:11
**sequestration** 445:21
446:8,10
**Sergio** 192:4 298:25
299:1
**series** 210:8 454:13,13
478:25
**serious** 135:2 461:22
**seriously** 129:19 516:10
**seriousness** 439:9
**serve** 30:5,6 407:12,14
495:24
**served** 30:16,20 31:6
48:4 124:24 176:9
182:18 184:2 213:23
407:15 474:20

**service** 41:10 191:9
209:16 249:25 273:25
287:11,12 303:1
314:11 316:8 317:19
320:2 322:14,21 323:4
362:25 364:15,16
366:9,11 402:16
408:12 476:5 491:24
500:4 501:17,20
513:13 534:4 537:15
539:14
**serviceable** 313:14
**serviced** 41:13 500:5
534:4,5
**services** 2:5 7:3 9:12
302:24 303:4
**serving** 26:13 124:19
**session** 53:14,15 125:9
126:3 136:10 202:17
339:16
**sessions** 53:12 124:20
125:12 136:7 189:11
**set** 79:17 127:2 131:15
131:16 134:25 178:14
182:18 192:2 261:20
316:7 349:7 392:25
412:12 413:3 449:8
**setoffs** 351:4
**sets** 125:25 215:7 515:11
**setting** 184:1
**settle** 126:16 251:19,21
**settled** 134:25
**settlement** 28:1,13 40:17
41:6 43:2,13,17 44:1
45:5 46:1 218:19
239:23 240:1,6,7
245:20 248:19,24
249:11,12,15,19,22
250:6,16 251:5,10
253:20 254:4 257:15
257:19,21 258:18
292:25 294:8 308:24
387:9 410:12,22
411:21 413:16 545:16
**settlements** 413:4
**settling** 251:1
**seven** 121:1 144:3
163:15,17 185:16

189:6 277:11 278:16
292:20 530:2,3
**seventeen** 84:12 182:4
185:2 286:4 290:20
400:21
**seventy** 264:17 376:8,11
376:13 377:4 469:12
**seventy-five** 370:7
447:13 506:20
**severance** 87:7 88:15
**severely** 69:14 186:10
**SEYFERTH** 18:11
**SEYMOUR** 24:2
**shady** 116:25 117:5
299:8,9,10 300:2
**shape** 254:2
**share** 95:13 166:10
182:15 191:6 203:13
206:12,13,14 263:9
374:1,13,15,18,19,25
386:1 391:21 435:6
450:22 490:12 515:13
515:13,15 533:12
538:8
**shared** 76:23 199:24
204:5 206:9 221:7
223:16,23,24 224:13,15
466:3 478:4
**shareholder** 265:2
**shareholders** 34:8,13
35:22
**shares** 188:15 263:16,20
324:8
**sharing** 385:20
**sheet** 35:22 43:3,10
116:9,23 128:3 191:10
195:24,25 196:20
210:24 233:11 317:22
317:23 353:11,12
369:9,12 394:3 437:25
**sheets** 436:20
**Sherrick** 120:25 136:17
**shifting** 130:9
**shop** 491:2 494:24
**short** 245:4 388:8 416:5
423:23 482:22
**shorten** 235:15
**shorter** 251:12 513:14

**shortly** 29:15 36:21
171:1 300:11
**short-sellers** 328:17,20
**shot** 294:17
**shoulder** 207:6,6
**show** 51:3,5 52:5 53:24
177:9 201:17 300:8
369:10 399:5,9 446:5
482:9 538:23
**showed** 40:5 56:14 166:1
215:2 320:7
**showing** 50:16
**shown** 93:24 105:8 106:9
161:4 442:5 477:14
**showrooms** 491:10
493:14
**shows** 455:19
**shut** 294:9
**shutdown** 274:12
**sic** 111:11 113:8 156:18
416:18 420:2 441:23
460:20 461:5
**side** 35:21 50:9 52:14
71:20 73:10 87:16
101:21 144:24,24
182:8,9 193:22 195:8,9
318:5,14,15 352:16
482:11
**sides** 195:8
**sign** 119:24 152:21 168:9
223:22 251:9 481:24
483:12
**signal** 424:7,13
**signature** 38:2 215:15,23
215:25 216:2
**signatures** 216:1
**signed** 153:13 191:20
214:12 215:16 481:6
481:18,20 497:2
510:23
**significant** 156:25
159:17 212:3 236:15
292:2 298:22 323:6
341:21 342:19 343:7
445:12 451:14 456:11
462:3 469:16 521:5
**significantly** 95:24
194:19 343:23 399:7

**signing** 481:9,11,12,16
**sign-off** 152:17,22,23
153:13 156:14
**Siller** 12:11 392:14
**SILVER** 20:2
**SILVERBRAND** 16:10
**similar** 90:21 113:23
123:22 124:3,4 129:21
267:9,21 361:1 380:15
380:18,20 490:13
497:3 506:24 515:16
520:15
**SIMON** 8:17
**simple** 147:10 185:18
212:19 338:15,16
421:1 474:22 492:21
509:7
**simplicity** 186:12
**simply** 58:7 74:3,8,11
128:14 138:20 278:11
426:19,25 429:11
528:13
**Simpson** 12:18 113:15
**simultaneously** 137:2
**sincerely** 69:9 70:3
**single** 127:3 160:8
164:15 212:21 217:19
217:22,25 218:9 367:9
459:9 491:12 496:22
**single-brand** 374:6
**single-dimension** 327:17
**sir** 30:23 62:8 66:13
68:13 75:6 80:23 93:10
93:14 146:10 147:23
153:11 154:2,5,19
155:9 156:1,11 158:8
161:19 172:7 203:11
204:14 210:17 214:9
214:15 220:19 221:14
227:5,9,15 229:3
230:12 238:9 240:13
248:24 250:12 253:6
254:16,23 261:1 268:6
270:9 276:5 279:21
285:24 289:24 297:24
298:16 301:9 302:3,13
302:15 309:23 315:24
319:7 320:24 321:23

323:6 326:23 333:15
336:15 341:13 344:15
350:13 353:18,22
416:12,16 418:17
419:1 420:12 422:8,20
422:25 426:8,9 427:6
441:10 442:10 445:6
449:11 479:25 480:2
481:14 501:1 502:7
504:19 505:10 511:15
**sit** 77:20 114:11 154:25
231:18 232:8 426:11
438:22
**sitting** 69:14 160:13
364:13 365:11 372:9
438:22 480:10
**situation** 42:18 69:12
98:7 150:18 169:10
188:16 220:4 276:3,10
276:13 277:17 278:3,6
278:9 281:16 328:7
334:3,13 369:4 399:15
399:17
**situations** 453:2
**six** 108:12 142:13,14,16
177:20 183:11 185:16
232:22 257:5 262:9,12
277:8,11 314:5 321:13
405:19 406:3 419:4
530:1
**sixteen** 182:4
**sixty** 205:10 231:12
300:19 301:1
**sixty-eight** 263:8 264:19
264:21
**sixty-six** 265:3
**six-speed** 325:9
**size** 515:22 540:10
**skill** 362:14
**skills** 231:17
**slightly** 340:14
**slippery** 112:20
**slope** 112:20
**SLOTT** 15:9
**slow** 30:14 39:18 80:12
491:16,16,17
**small** 135:12,16 136:7,10
191:23 208:5 212:4

241:24,25 488:6
**smaller** 180:5,6 389:2
391:18 486:7
**Smith** 9:6
**snapshot** 452:19
**Snyder** 12:16 392:12,13
394:18 400:12 401:15
544:22
**social** 349:25
**sold** 207:17 261:24
275:15 380:6 383:2,18
421:19 424:24,25
450:16
**sole** 63:13 191:21 358:25
**solicit** 449:2 469:19
**solicitation** 331:12
**soliciting** 467:13
**solicitous** 177:23
**solid** 461:24
**solution** 60:6 221:20
224:8 353:9
**solutions** 221:21 222:5
**solve** 330:2
**solvent** 276:16 301:23
315:16 375:21
**somebody** 84:24 112:12
112:17 127:3 184:22
240:14 324:10 326:9
419:3 482:19 497:14
535:12
**someplace** 419:4
**SONNENSCHEIN** 13:2
**soon** 124:10 134:19
437:13 449:5 503:25
532:25
**sorry** 36:25 63:22 64:2
69:22 73:3 81:18 83:16
103:6 109:7,24 116:5
134:2 150:3 156:20
157:19 166:7 189:18
202:16 204:1 219:14
220:8,12 226:2 235:10
236:24 248:10,24
254:12 261:1,2,15,16
261:22 264:2,2 270:9
280:24 283:21 293:11
297:8,21 303:5 304:12
330:15 338:3,9,16

341:15 357:10 362:11
371:18 377:24 378:21
384:7,13,17,19 393:7
420:25 421:23,24
424:9 427:2,8 436:9
446:13 467:25 477:25
491:18 498:20 501:5
510:16 516:13 530:11
**sort** 91:8 126:14 178:2,4
179:2 189:20 316:25
378:9,17
**sorts** 149:23
**sought** 52:8 368:23
373:8 464:17
**sound** 221:19 224:7
229:4 255:22 302:4
308:6 429:1
**soundness** 51:23
**sounds** 308:22 518:24
**source** 107:6 112:25
188:1 353:24 359:19
359:22 360:2 450:1,3
454:9 456:1 488:3
**sources** 348:23 449:10
449:25
**south** 16:18 18:5 23:4
187:5
**southern** 1:3 5:13 11:5
14:5 135:10
**southwest** 536:18,19,24
**so-called** 230:21
**SPA** 262:3
**speak** 30:13 118:20
143:22 219:24 279:23
428:8 480:3 512:6
521:13 523:20 527:9
**speaker** 49:13 194:6
354:18 358:4 384:9,15
387:20 413:10
**speaking** 219:21 242:12
352:2 444:16 455:14
**speaks** 160:15
**special** 31:12,18,20
119:21 122:21,24
125:2 280:18 383:22
467:16,20
**specialization** 288:24
**specialized** 153:20

**specialty** 362:24 363:22
364:2,9 366:3,5
**specific** 61:23 64:4 126:7
144:21 263:3 371:6,6
385:1 394:12 397:21
409:7 414:17 455:7
464:3 499:3 517:22
524:9 538:5
**specifically** 36:16 108:14
165:22 167:4 183:21
189:5 202:9 203:4
274:14 306:14 358:14
372:14,19 414:13
526:14
**specifics** 33:25 60:24
84:3 111:18
**specified** 539:13
**specify** 342:3
**specter** 516:14
**speculate** 112:14 291:9
331:6 348:2
**speculating** 348:17
**speculation** 112:2 150:2
419:19
**speed** 283:4 291:6
**speeding** 398:25
**spelled** 190:14
**spend** 118:4 178:15
222:2 520:15
**spending** 509:4 521:6
**spent** 192:5 259:19 277:8
344:12 445:1 497:14
520:16
**spiffs** 363:2
**spiral** 185:8 277:1
**spite** 184:12
**split** 262:25
**spoke** 39:4,11 140:14,16
190:4 191:14 268:17
268:19 269:10 279:18
279:18,22 510:3
525:10
**spots** 513:19
**spouses** 303:11
**spreadsheet** 452:15,24
452:25 456:3,7,21
463:19 464:11 479:4
546:13

**Sprinter** 346:25
**Square** 7:12
**squarely** 291:5
**Squire** 13:9 162:10
358:7
**SRZ** 246:11,12
**SSI** 539:9
**St** 7:11,14 187:5 273:19
441:19
**sta** 296:4
**stable** 461:18,19,21
**staff** 124:21 134:6
176:15,21 178:16
180:12 194:11 478:18
**stage** 150:17 192:3
411:20 412:18
**stake** 165:6 166:9 268:21
268:24 269:1 308:19
**stakeholder** 332:8
**stakeholders** 151:11
304:16,24 305:2,9,15
310:15 330:24,25
332:8,13 334:18
340:24
**stand** 27:13 57:15,17,19
58:2 59:4 60:2,6,15,22
61:1,2 98:17 119:8
164:11 178:21,22
283:8 356:18,19 424:4
424:15,24 438:22
446:17 478:24 493:7
502:12,16 510:25
537:24
**standalone** 190:19 193:9
193:13,25 194:12
213:4 237:6 266:7,20
266:24 270:8 271:7
292:8,13 521:23,24
**standard** 126:17 134:9
179:15 192:13
**standards** 52:17 125:25
132:13 192:10 495:16
**standing** 30:3 214:18
422:20
**standpoint** 107:20 173:4
200:12 211:4 332:14
387:24
**stands** 41:2 421:19

**standup** 183:13
**Stanley** 202:19
**Starbucks** 506:25 509:20
513:10,15
**start** 75:16 95:18 181:12
185:11 219:13 238:6
238:19,22 263:15
277:5,6 279:8 287:24
313:6 316:2 356:20
409:8 433:9 435:1
439:5 440:13 480:3
483:10,12 489:9
498:11
**started** 27:6 36:15 85:3
181:20,21,21 182:25
183:10 185:7,15
186:16 188:25 198:11
201:23 206:18 210:1
230:13 232:15 267:20
269:15 277:7 278:18
279:6 301:24 305:13
311:12 361:23 397:23
415:12 438:12 440:5
445:20
**starting** 181:20 185:9
239:1 248:15 321:9
462:5
**starts** 184:25 253:14
255:7 264:19 268:16
268:17 437:13 528:4
**state** 16:3,4,13,14 17:3,4
23:11,12 50:8 119:16
121:24 174:7,17
289:22 368:25 369:1
384:21 435:8 436:5,5
436:17 441:16 442:10
470:21,25 471:4
480:20 489:22,24
515:13
**stated** 54:23 130:25
160:8 199:23 286:15
293:3,5 538:1 540:7
**statement** 80:17 83:20
85:25 88:17 105:4
116:15,16 117:13
136:24 160:8 163:17
177:25 191:10 198:13
220:1 229:7,15 276:5

282:7 294:10 296:2,5,6 331:25 348:6,13,18

**statements** 30:11 87:19 106:15 286:5 350:6 351:2

**states** 1:2,13 5:12 6:3 28:22 40:22 41:9 65:2 65:5,13 66:15 67:5 87:3 88:22 107:7 130:20 131:7 135:21 136:8 146:16 164:3 176:4 196:2 199:12 210:5,15 211:11,16 217:1,12 220:16 222:14 224:3 236:6,13 240:8 241:5 245:17,19 254:14 257:2 263:9,21 264:15 270:7 286:10 286:18 287:13,14 291:23 296:17 300:13 300:23 305:17 321:24 334:24 335:2,5,9 336:20 340:2 349:1 379:24 395:4 404:17 421:2 436:6 524:10 525:20

**stating** 198:19 348:14

**status** 298:8 438:2 460:25 461:5,15

**statutes** 524:12

**statutory** 236:9 437:4,24 438:2

**stay** 233:6 235:15 337:22 395:4 402:25 527:7,14 533:24 534:9

**stayed** 61:3,5

**staying** 394:24 395:9 512:19

**stays** 351:12 356:10

**steadily** 174:25

**steady** 489:24

**Steele** 19:11

**STEEN** 8:9

**steering** 256:2

**STEMBER** 14:2

**step** 87:15 118:25 148:16 172:25 200:4 217:14 427:14 532:21 542:3

**Stephen** 13:15 16:23 24:16 124:24 162:9

**STEPP** 18:17

**stepped** 381:20 382:16

**steps** 51:19 147:19 448:16,18

**Steve** 35:6 192:21 202:10 202:18 254:17 268:9

**Steven** 7:16 380:4 441:18

**Stewart** 3:9 27:9,11,15 27:21,25 28:6,16 29:13 36:25 37:5 38:14 45:19 46:9,17,22 49:16 50:3 50:16 52:10,22,24 53:4 54:15 56:17,24 57:4 58:22 59:12 62:11,14 67:1 68:9 73:21 74:5 74:14 75:10 76:3 77:18 77:21 87:8,11,14,17,25 93:21,23 98:13,18 102:15 103:4 104:6 107:25 114:24 115:6 116:11 117:12,19 118:9 537:3,4 544:6,11

**stick** 115:10 216:10 510:6

**stip** 438:24

**stipulating** 438:21

**stipulation** 25:19 439:20 440:6

**stock** 156:25 157:3 159:17,19,21 160:1 167:18 168:3,18,19 188:15 316:10,25,25 324:7 328:10,24 334:17 408:3

**stone** 213:17

**stood** 84:11 530:23 531:6

**stop** 41:23 149:9 179:13 185:24 243:10 331:22 433:20 480:3

**stopping** 348:7 520:1

**stores** 506:24 513:11,11 513:12,15,18,21

**stories** 519:11

**storm** 181:17 183:19

**STORRS** 20:12

**straighten** 510:17 542:6

**straightforward** 46:23

**straights** 206:23

**strait** 114:4

**straits** 129:22

**strategic** 58:6 175:8 176:13,16,18 448:4

**strategically** 179:10

**strategies** 123:12 131:8

**strategy** 123:6 126:13 182:15 230:23 489:2

**streamline** 509:13

**streams** 195:8

**Street** 3:5 4:4 5:14 6:4 7:20 8:19 10:16 11:13 12:4 13:11 14:14 15:4 15:12 17:6,15 18:5 19:13 23:14 24:4,13

**strengthen** 358:22

**strictly** 455:6

**strike** 117:4 122:10,10 142:1,4,7,10 146:23,25 147:9,13,14,15,17,23 148:16,20,25 149:9,20 150:17,21,25 161:10 163:6 282:13 336:11 336:13 362:5 370:13 374:12 394:18 400:12 466:2 475:22 477:11 519:24

**strikes** 142:9

**stripping** 149:7

**strokes** 190:17

**strong** 226:8 299:5

**stronger** 534:12

**strongest** 447:18 462:8,9 462:16,17,18

**strongly** 181:25 193:12 430:1

**struck** 141:25

**structurally** 357:1

**structure** 157:13 163:25 175:13 273:1 274:7 275:19 285:8 316:12 337:5,10 357:24

**structured** 239:6 273:6 521:18

**structures** 285:13

**structuring** 271:16 283:24 403:20

**struggle** 70:3

**struggling** 70:5

**stub** 179:17

**studied** 420:1

**studies** 73:25 391:13,17 399:24 400:1 404:20

**study** 82:18,20 97:18,21 345:5,11 347:14,14 399:14,22 425:3,6,7 502:8 539:9

**stuff** 323:16

**STUTZMAN** 14:11

**sub** 432:3

**subject** 35:23 40:2 50:7 53:7 60:4,7 61:2 198:19 212:9 288:12 288:14 296:20 410:1 441:23 443:7 477:20 484:25 525:17,18

**subjects** 237:21

**submission** 132:7 194:3 194:21 308:25 309:16

**submit** 26:22 170:15 192:14 195:11 260:24 261:17 434:19

**submitted** 25:20 26:17 36:9 120:4 133:15 189:21,21 190:13 192:16 237:5 266:3 392:22 521:9

**submitting** 189:20

**subordinate** 354:7

**SUBs** 356:1

**subsequent** 124:15 225:19 456:10 490:25

**subsequently** 232:9 349:17 393:17 453:15

**subsidiaries** 90:23 91:6

**subsidiary** 135:21 136:5

**subsidize** 369:22

**subsidized** 370:2

**subsidizing** 369:24

**substance** 52:15 397:25

**substantial** 72:11 111:6 111:19 130:4 493:16 493:18

substantially 2:16,19
63:25 64:2,7,11 79:2,7
79:10 80:24 259:23
271:16 305:22 323:3
342:21 343:3 352:24
432:15
subvented 369:20,23
370:2
subvention 370:17
success 84:12,15 176:4
195:23 200:7 350:14
350:15 486:14 497:15
497:18 503:17 519:11
520:8 521:2
successful 95:4,6 128:12
205:18 408:22 459:13
460:3 480:19 486:9,21
501:12 518:8
successfully 350:11
361:25 417:1 495:17
suddenly 522:7
sued 91:14
suffer 351:6 405:7 487:1
suffered 402:21
suffering 486:22 503:25
sufficient 86:12,16 89:17
158:12 345:13 433:7
suggest 117:3 191:24
274:15 318:1 321:22
324:14 325:22 328:4
411:7 504:16 508:15
suggested 129:11 512:1
suggesting 220:20 274:7
284:4 295:18 321:23
432:20,21
suggestion 129:2
suggestions 145:3
suggests 73:15 223:13
suit 91:13 402:22
suitable 493:8
Suite 4:5 6:5 7:13 10:7
10:17 11:7 12:5 13:12
14:15 15:13 16:17 17:7
17:16 18:14 19:14
21:14 22:6 23:5 548:13
suitor 135:2 167:10
Sullivan 6:25 14:20 15:2
436:10

sum 397:25
summarize 256:9
summarized 194:5
summarizing 37:17
summary 38:6 152:22
345:1
summoned 134:23
Sunday 248:14
Sunshine 15:9,9,16
479:10,14,15 480:1,8
480:10,14,25 481:2,11
481:15,22 482:15
483:3,6,16 510:20,21
510:25 511:3,7,10,12
511:16,18,21,25 512:3
512:17 534:24,24
535:4,12,15 538:18
545:10
SUOZZI 11:2
Superior 6:20
supplement 193:22
supplied 78:13,18
supplier 195:15 212:16
258:24 351:16 373:12
suppliers 149:22 191:7
205:7 213:15 277:3
301:3,7,13,15,21,22
302:2,6 303:1,1,7
358:25 361:11
supply 351:4 362:25
support 52:12 58:1
163:20,23 164:13
188:4 189:4 220:14,20
220:21,24,25 260:24
261:18 282:2 290:9
302:11 349:2 355:5
357:19 363:1 364:20
364:23,25 369:16,21
370:8 374:3 377:1
426:13 428:12
supported 162:16 163:13
163:18 220:16
supporting 164:16
193:12 363:4 427:3
supportive 177:20
220:17 504:12
supports 431:24
suppose 335:24

supposed 163:23 215:25
496:15
sure 50:18 81:21 105:19
106:2,5,23 110:24
115:3 117:12 123:8
133:11 136:19,21
152:20 153:8,15
157:18 161:20 172:4
177:7 183:1,14 202:16
210:24 211:8 212:25
217:6 221:17 226:1,9
233:9 234:6 237:13,21
238:23 244:7 246:15
247:14,23 252:12,16
254:25 258:5,17,22
268:8 270:20,23 274:6
274:19,20 281:20
284:25 285:1,16 289:1
290:13 294:10,21
303:7,8,17 305:13
307:23 312:20 313:9
313:10 317:11 321:14
321:25 322:4 327:5
332:1,15 334:4,12,14
337:17 339:24 341:3
344:20 350:3,25
351:12,14 352:12
357:11 363:17,24
364:24 365:2,17,21
369:5,10 370:1 376:11
377:12 378:17,19
381:2,4 383:12,23
384:3,3,6 385:22 387:8
389:3,4 391:5,12
398:10 402:15,19
403:12,25 405:11,13,13
411:20 412:13 420:1
439:2,25 454:10
471:16 472:13 478:16
478:18 481:25 497:11
503:14 520:22 521:20
surface 316:11
surmount 50:9
surplus 506:7
surprise 487:8,10 505:10
surprised 250:25 251:1
252:1 253:25
surreal 69:16

surrendered 239:19
survey 539:13 541:8,10
541:25 546:18
survive 129:9,12 143:13
417:19
survived 417:18
surviving 303:11
Susan 436:24
sustainability 134:15
swear 174:11 443:1
swipe 208:12
switch 184:23
sworn 27:20 38:4 80:6
119:10 174:12 440:20
syndicate 224:13,15
synergies 73:10 233:10
system 126:2 140:16
369:20 405:13 509:1
systems 424:1 509:1

## T

T 5:8 7:8 10:10 14:9
544:4,4 545:4,4,13
546:4 548:2,2
tab 43:6 45:2,2,7,13 69:1
70:9 72:21 79:21 86:24
93:25,25 94:4,5 103:6
105:7 106:9 114:19
218:22,24,25 246:2
253:7 254:24 260:20
266:16 268:4,5 275:24
284:15 287:16,20,20
293:10,11 294:12,23
297:19,21 299:13
300:9 302:9,17 313:1
319:17 344:3 347:22
table 126:19 135:24
181:4 199:13 211:15
211:16,20 212:1 218:3
223:6,9,12 224:2 225:2
227:25 228:22 229:11
341:17 342:9 351:10
352:16 353:16
tabs 287:8
tactic 337:11
take 29:5 30:16 63:21,22
66:4 67:7 101:16
107:17,22 113:13

118:25 124:2 126:24
128:4 133:16 135:11
137:15 139:15 140:7
147:15 173:2 183:3,23
187:3,11 195:15
207:24 210:4,5,14,14
217:14 219:12 231:14
232:6 235:20 248:18
253:4 264:23 271:11
283:2,8 286:17 287:14
289:4,17 296:14,19
298:3 300:9 313:1
314:25 315:1,17 338:6
344:4,5 352:24 354:23
356:11 374:4 375:5,14
376:10,14,18 377:12
380:9,14 381:8,9 382:4
387:22 388:8 397:9
398:16 412:3 422:17
422:19 425:3 427:20
428:6,23 430:9 432:19
432:21 433:11 435:12
435:13,25 440:18,23
442:22 446:20 449:4
468:20 469:7,13
475:12,18 476:7 484:3
489:21 491:25 492:19
498:19 500:25 502:2
503:3 511:25 524:4,19
525:15 527:19 531:17
532:22 534:17 537:20
**taken** 33:13 38:7 133:7
133:11 138:1,5 141:18
160:19 172:18 197:8
227:25 437:18 448:16
448:18 516:12,16
**takes** 25:22 27:13 187:22
344:6 357:7 416:15
471:6
**talented** 289:2
**talk** 53:14 85:2,3 146:22
192:8 195:10 207:21
210:16 215:14 218:11
293:17 307:5 308:15
329:22 332:4 383:6
403:7 408:25 476:14
509:20 530:20 542:10
**talked** 32:10 57:11 73:25

86:2 137:5 149:16
188:8 191:22 192:12
193:18,19,19,19 203:2
279:17 301:15 305:18
434:6 497:13 505:8,9
528:4,11
**talking** 41:24 95:25
137:4 149:7 153:25
161:8,22 187:19 195:6
215:11,13 226:3,6,21
228:1 235:23,25 236:4
237:19 248:20 249:1
249:16 293:18 294:19
315:11 320:14 329:25
330:1 331:22 342:15
375:3 396:24 403:7,9
409:7 447:3 477:24
478:1 480:4 512:25
541:4,9,12 542:17
**talks** 221:5,5
**tantamount** 59:2 355:10
**TARA** 5:18
**Tarbox** 525:24,25 526:4
527:11
**target** 124:1 134:25
209:2 314:15 320:9
**targeted** 135:7
**targeting** 206:5
**targets** 130:25 131:1,15
131:20 181:8 518:10
**TARP** 101:16 111:6,12
111:14,18,19 112:12,18
113:8,17 114:5 188:25
189:1 279:13 280:5,9
280:14 282:6,7,9
293:18,21
**task** 128:15 134:14
192:19 196:2 204:4
219:8,9 270:7,20,23
272:6,25 273:5 274:7
275:2,9 283:15 284:3
289:1 337:4 370:22
371:1,8,10,13 372:19
375:3 517:17,23
**tax** 213:16 301:3 305:15
**taxes** 277:4 442:1
**taxing** 441:19
**taxpayer** 315:9

**taxpayers** 358:24 401:25
**Teachers** 16:3,13 17:3
**team** 69:10 110:20
135:14,16 136:14,15,17
137:1,3,4 144:16,16,18
157:17 181:2,11
187:16 196:3 205:11
210:22 211:6 212:6,24
229:18,18 231:16
233:7 255:24 299:22
344:17 365:25 399:10
399:12 452:21 509:2
**teams** 144:17
**Teasdale** 7:10 441:18
**tech** 208:10
**technicians** 362:14 476:4
500:3
**technologies** 233:10
**technology** 192:8,9
209:16 250:1 267:12
267:15 269:4,17 328:6
343:25 423:24
**teeing** 533:7
**telephonic** 198:5
**TELEPHONICALLY**
13:18,19 16:10,23
17:11,20 18:9,18 19:8
19:18 20:10,18 21:9,18
22:10,17 23:9,18 24:8
24:17
**tell** 31:23 33:2 34:4
42:21 44:20 45:3,7,17
47:23 48:9 53:18 54:7
84:24 97:21 104:22
112:4,5 121:7 155:1
188:19 190:17 191:1
199:9 203:4 205:2
209:21 210:18 213:8
213:20 220:9 222:1
227:22 230:8 231:10
234:23 240:4 243:10
253:16,20,21 264:8
266:16 273:5 284:22
324:25 344:16 346:1
350:17 392:2 421:6
433:1 453:25 464:2
468:13 502:23 513:8
513:22 524:19 527:9

535:16
**telling** 129:7 200:3
229:20 240:3 353:2
420:12 521:24
**tells** 457:4
**ten** 30:19 84:18 110:11
116:9 171:23 185:4
209:8,10 241:19,21
262:25 263:5,6,13,21
264:16,20 309:11
310:17 324:13,14
325:17 326:24 327:3
327:20,20 343:24
354:18 420:14 529:19
**tend** 181:15 243:13
**tends** 35:21
**tens** 111:14 153:3 360:23
400:5,7,8
**tentative** 126:18,20
132:8,10 133:2,7,14
140:3,23 156:3 169:2
**ten-what** 483:10
**term** 33:15,23 34:1,4
35:9,14 40:11 43:3,10
47:21 65:12 90:15
130:24 137:14 183:18
195:24,25 196:20
210:24 230:22 233:11
242:20,21 266:9 285:4
358:23 394:3,11 399:1
423:23 436:20 437:25
465:24 472:2,2,2,14
488:25 499:11,11,19
515:9
**terminal** 318:2,6,7,25
319:3 320:3 321:17
**terminate** 360:4 367:16
367:24 368:18,24
373:11 470:17,22,24
**terminated** 171:12
367:12,19 372:16
396:15 397:19 398:14
480:16
**terminating** 108:20
363:6
**termination** 44:24
366:16 479:16
**terminology** 157:14

341:25
**terms** 26:5 27:13 32:15
33:6 36:16 43:1 44:20
55:15 91:2 101:13
107:8,11,13,17 111:22
113:3,4,6,13,13,24
127:20 130:17 131:15
131:19 132:13,15
133:13 146:8 151:18
155:11 156:9 157:11
161:24 178:3 207:2
210:2 301:16,16
335:10 389:6 431:14
458:8 459:23 468:5
472:25 502:1 521:2
**Terrible** 351:7
**terrorist-like** 229:21
**test** 105:12 124:9,10
292:5 419:24 456:12
463:23 495:21 496:3
**tested** 208:23
**testified** 37:11 39:7 53:5
60:1 72:22 76:10 82:16
83:24 90:7 112:22,25
144:15 145:13,18
146:23 148:2,14
151:14 155:14 159:13
161:5 162:17,25 170:3
216:23,25 222:9 237:2
237:11 242:13 261:23
278:8 280:8 283:15,22
310:17 323:21 330:21
360:7 361:2 363:12
365:2 370:21,25 382:4
386:22 388:9,14
391:10 392:18 393:15
395:22 398:24 401:2
414:6 443:19 454:3
462:7,14,25 464:24
489:7 493:20 499:8
501:10 503:14 517:14
520:14 521:8 531:14
**testify** 51:7,16 113:16
114:1 120:6 138:25
139:9 150:5 160:25
170:5 201:24 365:11
429:6 491:3 521:13
**testifying** 428:3 455:1

475:17
**testimony** 49:24 69:21
69:23 76:20 80:6 94:15
138:17,22,23 146:11,23
147:2,3 161:12 170:8
237:9 294:22 331:9
335:16 355:4 361:15
362:6 372:18 375:18
384:16 385:3 392:15
398:6 399:21 400:9
412:15 415:15 418:4
420:7 422:25 429:4
431:24 432:1 434:25
446:6 462:14 466:22
475:6 492:9 496:10,12
496:16 499:17 504:11
504:13 508:15 519:19
522:7 523:24
**testing** 333:24
**tests** 424:21
**Thacher** 12:18 113:15
**thank** 27:4,5 29:13 46:7
49:18 54:22 59:12,18
77:20 89:22,24 92:6
93:19 98:24 107:25
108:1 118:25 119:11
119:13 120:2,19
144:10 146:10,22
152:1,4 154:9 162:6
169:20 171:25 172:12
172:21,24,25 173:1
174:1 235:3 242:23
288:3 297:9 330:16
332:17,19,22 336:16
343:21 354:12 356:12
377:22 387:17,18
388:13 401:15,16
406:2 407:2 415:19,20
416:4 422:6 423:14
425:17,18,19 426:2
427:9,15,16 435:15,16
435:17 436:3 438:5,6,9
440:15,16,18 441:4,15
441:17 442:4,4,6,7,21
443:18 446:19 479:14
480:25 483:16 484:23
485:4,5 498:7,10
511:21 523:8 524:2

534:22 538:18 540:19
542:3,25 543:7
**thankfully** 350:8
**thanks** 252:9 293:13
379:25 425:24
**Thanksgiving** 373:5
**that'd** 405:20
**theory** 391:24
**thereof** 2:18 200:19
**Therewith** 2:22
**they'd** 65:7
**thin** 81:9 82:2
**thing** 59:6 76:4 107:12
107:21 122:24 187:25
210:22 211:13 214:1
240:22 245:20 338:24
339:20 351:7 367:18
430:10 438:12,16
510:17
**things** 46:3 83:19 87:20
100:2,5,18 104:7 105:7
123:5 128:13 139:19
141:9,13 157:7 163:5,9
180:12 181:7 183:1
195:6 200:5 201:24
206:15,19,23 207:2,11
207:20 213:13 217:5
217:15 235:13 251:19
267:19 271:19 287:1
329:7,19 350:1 355:13
393:9,11 417:1 420:6
424:6 429:1 431:3
433:16 444:22 461:11
487:17,22 500:2,8
510:10 519:6 521:7
522:9 531:6
**think** 25:9,20,23 27:6
36:14 39:20 41:2 43:4
43:6 45:13,20 50:9
51:24 76:3,12 77:14
81:17 84:23 87:21,25
93:25,25 95:17 98:10
98:18,21 99:7 102:1
104:17 108:12,25
110:23 112:8,17,22
114:19,24 116:5
117:14,15 118:4,10,11
137:21 139:3,12

143:15 148:8,14
149:15 155:14,17
156:8 160:15 161:14
162:18 171:23 173:9
173:11,13 176:3 177:8
177:19,25 178:5,7,9
180:13 181:2 182:6,17
183:18,25 184:23
185:16,19 186:9
187:13,15 193:15
194:11 202:16 204:21
205:8,24 206:16,19
207:22 209:6 212:23
213:12,22 215:7
216:14 220:5 221:21
221:24 222:3,4 223:15
223:15 224:16,21
226:11 227:2 228:11
229:8 232:22 233:5
234:15 235:17,18,19
236:14 240:23 242:13
242:18 244:25 245:2
247:23,25,25 252:2
254:2 255:21 257:13
258:5 260:9,10,11,12
262:11 264:18,19
269:13 271:3,6,18
277:11 282:16,19
288:23 289:1,19,22
290:20,24 291:14
294:17 295:19 300:21
301:17 305:4 306:19
310:13,15 323:21
325:14 326:8 327:7,11
328:5,11,14 329:9,25
331:2,3,14,18 332:11
332:25 333:1,9 334:25
337:7 340:22 342:23
349:19,21 350:25
351:14 354:20 355:3
357:1,4,22 358:18
363:8 365:24 367:18
369:19 370:6,6 371:3
372:6,6,15 374:24
375:10,18 385:12,23
386:7 387:15 390:19
391:7 392:1 393:15,22
394:7 395:3 396:4

398:2,15 399:5 403:10
403:18 404:1,16 405:4
406:7,11,14 409:6
411:23 412:2,2 414:10
420:18 422:15 424:12
425:19 426:7 427:19
434:16,20 435:12
436:4,7 439:14,21,22
447:1 455:15 460:19
462:25 463:4,25
476:20 478:22 481:15
482:21 483:2 487:4
490:1 497:16 504:10
504:16 508:19 510:10
511:25 513:2 520:7
523:21,23 526:19
528:18 537:24 538:4
542:5

**thinking** 279:6 303:6
316:13 495:8

**thinks** 76:12 139:9
240:19 432:23

**third** 12:13 24:12 39:15
47:25 57:10 71:2 91:8
105:23 145:12 146:12
166:5 169:5 190:21
195:13 212:18 255:4,5
259:6 268:19 295:2
313:21 315:8,18 347:5
347:7 353:23 354:1,4
421:13 458:23,24
459:3,9 468:7 537:23

**third-party** 459:19 460:9

**thirteen** 178:6 185:3

**thirty** 176:3 194:13,15
194:21,23 195:19
205:10 268:3 272:10
300:19 301:1 354:14
354:15 374:25

**thirty-day** 336:23,25

**thirty-eight** 207:13
213:20 324:1,2 397:9

**thirty-five** 263:2,13
265:5,8 268:3,21,23
269:1 323:25

**thirty-one** 392:14 485:7

**Thomas** 3:17 5:7 16:21
89:24

**thorough** 55:18 189:23
319:15

**thought** 27:22 46:18
56:11 62:4,18 76:7
81:18 83:18 102:3,7
116:1 131:18 142:6
175:14 193:21 200:10
200:13 203:9 233:7
237:25 251:4,16 254:1
261:12 269:9 273:6
274:11 278:18 280:4
314:18 319:8 324:2
341:4 345:1,3,4,7
348:9 353:15,19
404:14 414:7 422:5
434:2 438:20 446:22
467:23 468:1 520:13
543:1

**thoughtful** 52:15

**thousand** 122:4 149:5

**thousands** 153:3 348:8
351:3 360:24 400:6,7,8

**threat** 205:14

**three** 78:7 94:15,16
100:25 118:5 123:7,9
123:10,17 124:3 125:7
125:8,17,21 126:3,13
141:16,21 142:16
162:19,23 165:1
169:15 170:10 176:16
181:10 184:16 186:21
189:2 190:10,14,14
217:19 237:5 263:2
271:21 315:6 384:21
384:22 422:15 434:22
437:17 457:6 482:18
487:6 489:10 490:17
493:9 498:3 503:20,23
515:4 516:6 538:2
540:23 541:3 543:4

**throughput** 499:11,11
499:14,15 509:11

**throw** 289:17

**tied** 132:23 290:17

**tier** 212:17,18,18

**ties** 290:20

**TIFFANY** 24:7

**tight** 29:8

**till** 115:23 234:10 336:5
483:10 512:19

**time** 31:9 32:23,23 35:24
39:12 41:3,11,17 42:17
43:1 47:16 48:15 49:10
50:1 53:9,23,23 55:2
55:10 58:6,25,25 66:8
85:19 86:2 96:15 99:14
100:2,3 102:25 104:7
104:10 107:2 115:16
129:3,15 130:3,22
131:21,23 134:23
135:13 140:2 143:25
145:4 146:9 147:13
148:21 160:18 163:7
170:2 172:17 173:12
174:2 176:9 177:11
178:3,8,16 179:17
185:6,10 188:23,24
189:8 192:18 193:11
193:17 194:23 195:20
195:22 196:17 200:1
200:22 204:15 206:16
206:20 207:22 210:7,8
210:19,25,25 211:13
212:21 213:21 214:18
218:2 222:21,23,23
223:4,7,8,10 225:6
236:11 237:2 238:3
239:13,14 242:15
245:12 254:21 264:6
267:22,24 270:21
271:3 272:24 273:2
275:13 277:18,20
278:12 279:7,20
281:24 282:1,21
283:24 285:18 286:2,9
310:20 315:13 316:18
325:3 326:14 329:17
336:19 337:3 341:10
344:6,7,12 348:15
354:2 357:18 366:24
367:1 373:11 380:12
385:11,11 387:22
389:1 390:3,21 392:19
393:5 397:7,18 404:14
412:20,20 413:9 415:8
423:16 431:16 437:11

437:11,20 440:21
450:16,22 462:4
469:20 480:11,15
482:22 487:16,18
492:8 495:15 500:6
510:5 511:20,24
518:19 521:16,19
529:2 534:3,5 536:22
539:14,15 540:24

**timeframe** 185:9 192:4
202:14 267:21 278:21
397:24

**timely** 35:16 103:17

**times** 48:7 134:10 161:24
177:23 178:6 187:23
254:5 326:2,3 422:15
424:17 444:19 489:1

**timing** 222:15 300:13,14
301:6 490:25

**Timken** 6:20

**tired** 338:11

**Titan** 71:12,12,14

**title** 174:21 285:21,22
498:25

**titles** 456:21,23

**today** 25:5,15,15,20
27:14 46:25 49:25
154:25 160:14 168:16
237:20,22 290:14
296:7 328:16,19
335:16 336:5 343:10
364:13 365:11 372:9
378:15 394:5,14
396:14 409:11,24
413:23 419:4 420:15
424:24 426:11,12
428:14,19 467:10
477:22 485:17 512:16
522:7

**Todd** 19:10 21:8 537:3,5
537:6

**Togut** 4:10,15 25:12,13
25:16

**told** 60:17,20 62:25 63:1
63:4,7 89:11 104:14,17
117:5 129:1,9 131:24
135:1,10 143:10
196:10 201:24 203:6

210:1 211:8,17 215:19
217:15,17 264:10
285:16 286:17 292:25
307:18 308:5 342:8
405:14 427:22 480:8
480:21 482:17 543:3
**Tom** 45:23 134:8 175:16
175:17,18 191:17,20
192:1 195:12 248:18
248:21 250:2,5 252:9
293:13
**tomorrow** 233:15,16,16
234:19,21 238:10
248:15 290:7 291:7
435:2,11 439:3,5,11
440:6 441:7 483:12
511:6,20 542:4
**tonight** 173:20 434:25
510:23 511:5
**tooling** 209:9 325:4
**tools** 362:24 363:22
364:2,5,9 366:3,4,5
**top** 225:13 228:24
230:13 287:24,25
325:3,6 346:25 416:19
493:2 504:19 524:5
**topic** 177:2 235:23
268:17,20 270:17
332:18
**TORF** 23:8
**tort** 14:13 92:12,15,19
258:12,13 402:18
404:7,8,12 405:13
414:5,8 416:2 418:5
**total** 101:1 112:2 121:1
127:7 161:23 180:3
264:20 296:10,12
297:1 313:14 314:8
360:13 366:12 391:16
505:15 516:15 517:20
518:17,18
**totality** 356:3
**Totally** 301:11
**toto** 307:5
**touched** 212:15,16 360:8
**tough** 183:9 188:16
373:2,3,9,12 525:14
**Tower** 10:3

**town** 213:10
**Toyota** 131:5 176:3,4
309:4 399:7 485:24
486:2,11,21 487:5
497:7,11,15,15,18
500:16,19 501:13
502:12 503:2,7,17
504:1 513:22
**track** 123:4,10 145:2
461:13 541:11
**tracking** 195:18 460:21
**tractors** 136:3
**TRACY** 6:8
**trade** 305:20 306:12
421:14 422:22
**traded** 188:15
**trades** 362:14
**Trading** 23:3
**tradition** 137:14 150:22
**traditional** 182:1 186:3
348:23 349:22 401:25
**traffic** 193:24
**trail** 213:9 246:5
**trained** 500:3 513:16,19
**training** 362:25 364:15
364:17 366:7,9,11
369:16
**tranche** 189:14 256:10
259:11 349:10
**trans** 412:3
**transaction** 41:13,13,21
41:23 42:2,4,7,14,19
44:23 47:5,9,14,17,25
48:17 50:19,21 51:4
53:20 56:7 57:12,12,12
58:3,4,14,15,18,24,24
59:4,7 63:21 65:11
84:20 88:11 96:20 97:7
101:21 165:17,23
166:11 167:3,5,17
168:2,17,17,20 171:9
198:22 233:16 235:8
238:7,10,12 239:17
241:3,9 247:5,7,13,21
256:8,15,17,21 257:10
257:16 258:9,21
259:21 260:3 269:19
269:24 270:2,12

271:16 273:6 275:10
275:19 277:21 278:11
283:16,19,25 284:5,6,7
286:6 296:7 300:13,17
305:24 307:15,24
308:10 310:16 312:11
312:23,25 315:10
323:1,1,13 329:15
335:18 341:10,12,15,16
351:3 352:7,14 355:5,9
357:20 369:22 383:10
389:4 391:12 394:11
402:10 408:15 409:1,2
409:10 413:18 415:8
420:12 425:2 429:2,13
429:13 437:22 444:21
445:7 449:5 495:21
496:23 501:19 516:23
**transactions** 47:1 198:21
329:8 426:16 441:24
449:9
**transaction's** 233:13
266:2
**Transcribed** 2:25
**Transcriber** 548:9
**transcript** 329:18 548:4
**transfer** 47:2 63:23 64:6
64:24 129:3,4 273:7
323:8 384:5 395:5
475:1 476:23 485:19
**transferred** 64:4,15
65:15 66:3 130:1
171:16 306:24 322:24
395:12
**transferring** 47:6 391:6
394:21 475:3
**transition** 233:7 386:7
437:10
**transitional** 426:13
**transmission** 10:3 93:1
325:9,9
**transmissions** 208:14
209:14
**transparency** 127:7
141:10 177:8
**transparent** 116:10
156:8 245:2 254:12
**transplant** 135:9,10

196:12 309:3
**transplants** 130:19 131:4
131:14 135:7,8 170:24
**transportation** 213:15
507:6,13,17,18,21
508:1,2
**transporters** 212:18
**trauma** 181:3
**travel** 228:15
**Traxis** 231:13
**Treasurer** 279:18
**treasury** 47:10 64:23
65:2,5,13 66:15 67:5
69:19,24 87:3,6 88:22
94:9,22 106:16 111:22
112:12,25 113:3,6,23
116:24 146:4 159:18
170:13,16 188:23,25
196:2 199:12 202:10
202:17 210:5,15
211:11,16 217:1,12
219:4 220:16 222:10
222:14 223:5,8 224:3
226:5 227:24 228:21
229:16 240:8 241:5
244:4 245:17,19
252:25 254:14 257:2
262:24 263:9,21
264:16 277:16 279:5
279:10,20 280:13
281:22 286:10,18
287:15 288:20,22
291:10,16,23 292:1,10
292:20 295:1 296:17
300:13,24 305:17
319:19,20 321:24
334:25 335:2,5,9 336:4
336:21 337:23 338:17
340:2 350:6,9 395:4,7
397:19 403:20 404:17
466:4 467:23 468:11
517:15,17
**Treasury's** 259:6
**Treasury/Chrysler**
300:2
**treated** 92:13,19 306:22
474:14
**treatment** 286:25

treatments 307:6
tremendous 57:10
 127:25 147:17 175:18
 175:20 176:5 177:14
 177:15 181:4 184:24
 342:16 375:10
tremendously 142:7
trend 460:20 461:22
 462:3 463:22
trending 463:14,21
trepidation 211:7
tried 137:15 164:14
 287:10 294:7 376:19
 427:14
tries 509:3
trouble 129:19 185:23
 472:22
troubling 89:2,12
Troy 18:15 21:15
truck 68:16,17 71:8,10
 296:21 346:21 505:6
trucks 83:17,21 467:3
true 74:21 100:21 114:10
 121:18 137:22 142:10
 144:22,25 149:3
 152:24 153:7 160:11
 165:24 214:13 243:20
 286:24 341:20 342:18
 349:15 393:19 402:6
 403:19 442:23 443:2
 492:2 506:9 513:4
 533:9 540:6 548:5
trust 16:4,14 17:4 128:14
 331:25
Trustee 6:3 164:3
truth 52:6,6 129:8
 138:18 150:11 153:6
 201:15 202:4
truthful 38:6 85:25
try 25:6 62:10 66:13
 82:22 107:2 124:2
 127:7 139:18 147:18
 149:9 175:15 180:22
 186:18,18 200:7
 208:10,18 210:18
 211:2,13 222:5 223:22
 225:7 227:7 229:20
 250:5 253:22 273:25

274:24 291:14 294:2
 297:4 310:18 316:11
 335:22 361:2,7 362:3
 362:14 363:18 369:4
 375:6 377:12 387:23
 387:24 397:14 416:5
 420:23 421:1 428:18
 453:2 460:22 463:24
 464:7 531:17
trying 28:6,7 30:16
 69:11 77:5,8 108:22
 115:15,16 135:13,14
 150:7,10 153:9 160:11
 161:3,5,11 185:17
 186:10 187:17 191:21
 193:7 195:19 200:5
 206:24 207:8 210:23
 217:10 218:8,11
 221:19,21,23 224:8,19
 225:5 227:12 235:16
 242:14 247:15 248:22
 249:2 254:5,11 255:25
 256:19 260:7 264:13
 270:1 290:10 292:24
 296:13 297:8 298:15
 304:12 305:6 316:13
 329:3 330:25 334:4,7
 337:19 338:13 344:9
 357:11 362:16 369:22
 372:25 375:15,15,20,20
 376:16 390:4 391:5
 423:15 427:13 428:18
 430:11 434:18 435:24
 439:12 454:20 458:13
 460:8 471:3 474:25
 501:24 541:18 543:2
Turin 192:4
turn 37:24 43:4 69:1
 70:9,16 72:21,25 79:21
 80:5 85:19 86:24
 114:18 155:4 166:14
 168:21 203:16,17
 218:22 246:2,5 260:19
 268:12 271:22 291:7
 291:13 344:3 345:19
 379:16 453:23 456:3
 511:23 542:6,19
turned 57:22 213:17

271:24 291:14,19
 315:22 321:16 341:8
turning 184:20 291:10
 381:21 382:9,22
turnkey 532:24
Twelfth 7:20
twelve 185:3 263:10
 264:19,21 451:3,19
 489:14 490:3 492:19
 493:23 533:12
twenty 30:21,22,24
 31:25 73:24 166:9
 179:7 263:1,5,6,7,20
 264:14,19,20,22 265:5
 265:7 267:22 269:16
 325:21,25 329:9
 434:23 436:1 451:10
 451:13,22 462:25
 476:6
twenty-eight 318:2,25
 319:4
twenty-five 282:1,8,10
 315:21 360:22,23
 396:20 397:1,2 447:22
 488:22 490:16 500:22
 518:22,22 522:4
twenty-nine 54:13,14
twenty-seven 32:2
twenty-six 252:19,20,21
 253:1
twice 117:14
TWL7@chrysler.com
 248:6
two 29:25 41:24 47:7
 53:12 55:20 63:16
 65:16 71:2,13 83:14
 91:16,21 96:14,25 97:6
 97:23 105:7 124:8,19
 126:17 128:18 135:20
 141:5,6 144:17 145:4
 146:1,9,12,19 154:14
 157:6,7 159:17 161:6
 161:24 169:5 172:13
 176:25 188:2,7,13
 190:9,11 193:16
 199:14,15 208:5
 211:17,18 212:1 215:7
 217:9 218:3 221:7

223:18,20,23,25 224:5
 228:22 237:2,11 257:5
 259:3 262:11 270:8
 278:13 279:24 291:2
 295:20 308:12 312:6
 335:14,19 339:25
 340:7,10,16,20 341:18
 342:22 343:3 348:10
 350:20 355:8 358:21
 393:18 403:13 406:4
 407:21 408:1 416:18
 416:21 424:25 425:12
 428:18 436:7 442:13
 444:17 446:20 449:9
 459:18 490:17 503:5
 519:6 525:25 530:6,9
 541:7,23 546:17
two-fold 202:23
TX 14:16
type 186:6 327:16 457:4
 491:19 495:13 516:25
types 91:16 123:5 141:9
 231:17 329:7 426:16
typical 186:1
typically 528:16

**U**

U 547:4
UAW 11:4 14:4 68:21,23
 119:22 120:12,20
 121:7,7,8,11,17,20,22
 122:2,5,6,8,15,17 123:1
 123:3,22 124:15 125:4
 125:22 126:1 131:21
 132:8 133:24 134:15
 136:10,11 137:13
 139:4 140:3,7 142:15
 142:15,20 143:10
 144:17 145:7 146:2,5
 148:24 149:17 151:3,8
 151:17 152:5,11 153:2
 153:8,18,24 154:4,10
 155:16,21 156:6
 158:18 160:25 161:6
 162:1 164:23 165:7,12
 165:13 166:2,2,18,25
 169:7,10 170:9,19,22
 171:1,5 190:11 194:3

195:14 196:11,12
244:20 257:15 258:18
262:24 263:8,22 265:4
307:19 309:2 331:7,12
334:25 356:16 390:7
403:24 546:6
**UAW's** 27:16 122:16
154:23
**UAW-represented**
149:18
**UAW-50** 155:5
**UAW/VEBA** 315:4
**Uh** 394:16
**Uh-huh** 178:19 194:17
229:14 263:19
**ultimate** 63:17,19 194:8
197:4
**ultimately** 26:2 59:2
62:6 78:13 105:16,25
128:24 143:10,15
189:2 190:13 204:23
297:4
**Um** 504:7
**Um-hum** 502:22
**unable** 294:5 348:22
429:6 435:11 521:6
**unacceptable** 271:8
445:14 461:3
**unaffiliated** 91:6,8
**unauthorized** 220:1
**unaware** 110:10 425:7
531:5
**unbelievable** 187:23
**uncertain** 210:2
**unclear** 70:7 71:7 72:12
72:16,18
**uncustomary** 380:12
**underfunded** 42:16
307:20 308:1
**underlined** 318:6
**underlying** 161:21
**underneath** 199:24
**understand** 26:9 34:4
48:6 58:16 63:20 75:11
77:14 87:2 88:9 91:4
93:6 110:24 128:14
146:11 156:11,12
157:18 159:14 161:21

168:1,17,19 208:16
211:10 218:8 221:1,7
224:20,21,22 225:6
230:5,6 234:6,8 235:16
240:4 241:24 247:15
247:19 249:17 274:6
308:11 310:19 329:1
331:1 333:18 334:5,10
335:18 337:17 360:14
360:17,20 361:15
363:13 369:1,2 374:1
378:8,19 382:8 384:13
384:20 385:3 394:14
394:17,19,23 395:1
396:19 401:2 403:14
412:17 413:8 415:15
418:17 422:25 429:7
429:16,18 430:10,11,22
431:22 432:24 433:21
439:24 440:2 456:13
460:22 477:15 478:16
485:17 488:6 492:9
495:16,20 507:20
511:3 523:22 540:9
**understanding** 33:24
35:13,17 38:24 44:4,15
63:12,18 67:21,25 68:4
68:20 86:5,8,19 89:7
91:1 92:12 93:14 96:21
104:4,25 112:5,6
113:22 118:13 148:19
153:9 156:8 157:19
158:9 171:11,15
191:19 211:15 218:5
223:10 239:18 241:4
259:11 265:7,15
284:11 304:15,23
305:22 306:21,23
307:3,8,25 308:9,14
309:17,19 326:19
337:13 339:9 340:3,9
340:22 341:5 351:18
366:5 368:23 380:8
381:7 385:17 386:2
394:4,9 395:6,11
418:20 419:8 426:12
438:12 446:8 468:10
468:13,14 471:25

472:18 473:5 539:7
**understood** 86:11 222:9
225:6 228:22 251:9
336:19 372:18 418:4
431:15 499:17
**undertake** 68:14 492:25
493:24 499:4 516:25
**undertaken** 55:19 93:10
93:14 514:22
**undertaking** 53:22
495:12 516:2
**undertook** 53:17,20
**underway** 450:11
**unduly** 160:19
**unemployment** 181:22
**Unexpired** 2:22
**unfair** 522:16
**unfettered** 282:24
**unfolded** 303:19,25
**unfortunately** 57:25
107:19 186:22 190:21
205:1,13 211:25 212:4
212:23 251:4 277:10
359:8 361:9,13 371:25
373:1
**UNIDENTIFIED**
354:18 358:4 384:9,15
387:20 413:10 436:14
**union** 11:4 14:4 124:16
124:18,21 126:4,9
127:3,5 128:10 130:2
138:10 141:18 146:25
150:6 151:15 155:11
159:25 309:9,17
**unions** 126:12,22 370:10
**union's** 128:20 142:2
**unique** 69:11 163:2,5,9
164:21 167:17 185:25
**unit** 187:14 303:16,16
**United** 1:2,13 5:12 6:3
8:10,18 28:22 40:22
65:2,5,13 66:15 67:5
87:3 88:22 107:7 119:6
119:7,19,20 130:20
131:6 135:21 136:8
146:15 164:2 176:4
196:2 199:12 210:5,14
211:11,16 217:1,11

220:16 222:14 224:3
236:6,13 240:8 241:5
245:17,19 254:14
257:2 263:9,21 264:15
270:7 286:10,18
287:13,14 291:23
296:17 300:13,23
305:17 321:24 334:24
335:2,4,9 336:20 340:2
349:1 395:3 404:17
421:2 525:20
**units** 122:1 182:5,7
185:2 186:25 361:24
362:1 375:8,10 376:2
376:18 377:2 383:1
384:6 400:21 515:18
515:20
**universe** 107:5
**unknowledgeable**
128:11
**unprecedented** 185:8
187:15 188:8
**unprecedently** 187:18
**unprepared** 76:1
**unquestionably** 132:24
**unreasonable** 276:4
278:3
**unresolved** 25:17
**unruly** 290:11
**unsecured** 5:3 14:12
90:1 307:11 407:6
**unsigned** 215:14
**unusual** 117:24 118:2
**unwilling** 64:21
**unworkable** 164:4
**updated** 69:13 79:19
**upgrades** 492:25
**upper** 166:15
**upset** 479:20
**urged** 468:20
**urgent** 530:22
**urging** 319:20 375:13
376:8 377:9 380:8
381:9
**use** 126:17 141:8 151:8
157:14 181:16,25
242:21 243:12,13
264:20 265:3 266:9,10

266:12 321:21 326:24 327:5,23 337:5 342:8 455:5 460:7 461:11 499:19 513:9 524:16 540:8
**useful** 264:6
**UST** 252:9 288:12 291:7 293:2,14 296:2,14 340:10 350:24 403:21 410:13
**UST's** 350:18
**usual** 290:10 531:2
**usually** 240:14 326:15 328:14
**utilities** 2:4,7 25:9,16
**utility** 2:9 547:7
**utilized** 198:17
**U-54** 318:11,12
**U.K** 234:4
**U.S** 1:22 5:11 6:2 47:10 67:12 94:21 131:5 134:11 145:23 154:17 170:13,16 181:25 182:5 205:25 219:4 223:5,8 226:5 234:13 234:14 259:6 262:25 288:20,22 291:10,16 292:1,10,20 315:3 336:4 338:17 349:24 351:11 358:24 403:19 420:11 453:22 466:3 467:23 468:11 517:17 521:9

**V**

**v** 11:4 12:24 14:4 19:17
**VA** 22:7
**Vaguely** 91:15
**val** 318:7
**Valeo** 21:3
**valid** 529:3
**validate** 209:7
**valuable** 83:19 323:9,10 323:12,18
**valuation** 70:11 73:19 75:18 78:2,8,11 79:4 79:12,15 81:24 83:24 109:24,25 117:9 118:6

209:3 320:6,7,8 334:17 344:21
**valuations** 70:19 76:23 78:22 79:3 83:25 102:6
**value** 60:22 61:21 62:4 62:19 63:14 66:8,23 70:17,22 71:1,2,6,8,15 71:18,21,23,25 72:2,4,6 72:9,11,13,15,17,19 73:3,6,6,7,14,20 75:8 76:14 77:24 78:19,24 80:7,11,22 82:8,24 83:1,2,5,7,8,22 84:1,5,7 85:14 86:16 89:18 96:16,18 97:3,8,22 99:15 100:1 101:15 106:22 109:16,23 110:14,22 111:1 118:7 157:7 159:19 160:1 161:23,25 200:14,19,22 240:12,15,16,20,22 295:4,9,24 296:22 304:24 310:4,8,12,19 311:1,3,5,6,17,23 312:7 312:17 317:24 318:2,6 318:25 319:4 320:3 321:17,22 324:3,6,11 325:11 326:16,20 327:3 328:6 329:16 330:19,24 331:7,25 332:4 334:5,15 340:7 340:16,21,23 341:11,21 342:16,19,21 343:2 345:10 347:13 348:10 390:25 392:5 403:17 416:20 421:8 425:11 428:13 447:20 448:9 476:25 496:7 516:23 531:4
**values** 71:3 73:16 79:1 99:20 199:22 305:7 324:22,25 345:1 347:15,18 416:25
**vanishing** 200:8
**Vargas** 5:17 111:24 112:1 225:16,18,18 226:13
**variables** 489:21

**varied** 444:24
**variety** 181:14 210:10 244:12 344:19 420:1
**various** 48:7 53:21 79:18 90:15 94:24 144:21 145:24 150:8 192:20 230:23 258:7 285:13 295:1 296:20,21 305:9 305:15 324:3 337:8 368:22 372:25 426:17 455:20 468:6 475:9,10 479:21
**vast** 377:7
**VEBA** 128:1,11,12,20 129:3,3,5,5,11,23 130:6 132:19,22 133:5 135:14,15 136:15 137:1,4,9,12 142:22,23 143:7 144:16,24 145:19,24 146:1,3,6,8 146:13 155:12,17,20,25 156:3,24 157:3,7,9,11 157:13,19,20,23,25 158:14 159:16,19,20 160:1 161:6,24 163:2 163:10,11 165:18,22 167:16,18,21 168:1,3 169:3,6 196:10 257:21 303:13,14 308:15,18 309:5,25 310:8,17 314:1 315:15 316:15 331:25 334:25 403:25
**VEBAs** 128:21
**VEDDER** 15:18
**Vegas** 20:7
**vehicle** 70:24,25,25 71:17 168:6 325:6 329:15,16 376:5 383:22 386:9 402:22 405:9 406:3 414:20 417:9 418:6 421:16 422:11 424:21,24,25 467:16,21 499:25 514:18
**vehicles** 68:15 71:13 168:14 180:7,8 182:23 191:23 301:25 346:13 397:13,14 399:7,8

402:8,12,18,20,21 405:6,19 417:4 421:13 422:8,10 423:19,21,23 424:14,23 425:5 469:11 507:6 536:4 538:6
**venture** 265:10,17 373:18
**Veritext** 548:11
**Verizon** 17:14 25:23,25 26:1
**version** 27:1
**versus** 109:1,5,7 208:11 276:9 296:10 335:20 337:21 513:11
**viability** 131:2 133:14,21 166:22 190:1,13,24 193:9,13,23 194:12 200:24 203:1 266:3,18 270:8 313:4 322:2 337:14,15,17 380:5,9 391:9 392:16 517:21 518:5 521:9,14,23 522:4,11
**viable** 57:16 58:2 59:5 60:2 62:7 132:1 194:13 195:21 200:25 213:4 270:8 272:8 312:22 349:23 353:15,19,24 371:17,19 372:25 373:24 377:10 391:6 415:6 520:20 522:8 540:12
**vice** 120:24 136:11
**vice-chairman** 175:16
**victims** 12:3 92:9 401:19
**Vietnam** 124:11
**view** 50:22 88:23 98:21 101:13,19 112:8 116:22 139:5 151:7 155:19 198:23 201:5 247:15,18 256:4,20 295:9 305:8 310:4,12 311:1,5 313:13 322:1 348:4 402:3 482:13 503:14 514:13 521:13
**viewed** 98:10 256:14
**views** 311:23

**vigilant** 205:24
**Viper** 208:20 209:13
  347:8
**virtue** 494:20
**virtues** 497:11
**vision** 266:6
**visit** 140:24 320:22
**visited** 193:5
**visiting** 239:5
**volatile** 141:7 489:22
**Volkswagen** 72:14
**volume** 187:8,19 277:9
  361:23 373:25 391:21
  397:3,7,9 399:7,8
  400:22,23 401:1
  515:16,18,20
**voluminous** 32:21,22
**voluntary** 155:7 168:22
**VORYS** 24:2
**vote** 47:16 50:20 122:9
  122:10,10,13 126:25
  137:23 138:12 140:23
  141:18 147:15 177:10
  290:7,14
**voted** 65:24 137:22
**votes** 127:8
**voting** 143:16

**W**

**Wachovia** 16:16
**Wacker** 23:4
**wage** 126:10 258:25
**wages** 309:3
**wait** 68:10 97:1 117:19
  117:19 192:14,16
  216:10 234:10 330:10
  330:12 331:17,17
  352:25,25 477:23
  478:15 541:3
**waited** 133:18
**waiting** 133:13 236:9
  434:1
**waive** 44:11
**waived** 103:25 478:13
**waiver** 286:4 378:21,22
  378:25
**waiving** 378:12,18
**wall** 183:13

**wandered** 432:24
**want** 46:17,22 51:5,15
  76:24 77:10 105:22,24
  113:19 126:10 144:14
  145:17 146:7 148:23
  154:20 156:16 157:18
  158:8 159:7,10 161:16
  161:20 172:2 193:1,2
  200:19 207:20 213:22
  219:12 221:6,7 223:23
  224:21 226:1 237:12
  243:12 256:3 271:11
  273:21 275:21,24
  288:9 306:17 307:14
  310:18 320:14 321:18
  322:9 326:15,17 329:3
  331:23 332:7 352:12
  355:11 357:13 363:11
  363:13 373:18,18
  378:12,17 382:10
  387:22 388:8 392:3
  418:24 419:16 422:13
  423:6,11 428:15
  433:17,18 438:24
  441:11 453:7,11 454:9
  454:18,24 455:10
  456:22 460:4 462:11
  478:4,7,24 482:25
  484:19 487:20 494:23
  494:25 510:22 531:1
  541:12 542:24
**wanted** 62:3,17 64:23
  78:6 82:5 84:24 105:23
  128:22 129:4,16
  180:15 183:6 196:13
  202:24 207:10 210:22
  211:5,8 235:24 267:9
  267:13 289:1 290:20
  291:21 296:14 300:18
  316:11 319:22 321:13
  321:14,25 322:4
  337:24 355:4 356:18
  356:19 402:15 427:12
  435:23 437:5,15 439:2
  445:21 454:13 510:16
  513:10,17
**wants** 153:8 173:12,16
  240:19 326:15 437:9

**441**:6 460:3 487:18
  496:6 500:1,1,10
  503:16
**War** 187:19
**WARDEN** 15:7
**WARDWELL** 19:2
**WARNER** 24:10
**warranty** 306:20,23
  402:15 420:9,16,17,18
  420:19,20,22 421:18
  422:2,3,12 424:6 473:3
  509:3
**washed** 83:11
**Washington** 3:15 7:5,21
  11:14 134:23 135:1
  190:10 202:9 210:23
  228:13 524:21,23,24
**wasn't** 78:15 94:21
  115:23 116:1 128:14
  133:11 138:4,22 147:3
  147:5 157:15,25 167:8
  183:16 187:11 194:16
  203:6 207:21 225:19
  251:12 257:14 322:1
  337:23 353:16 364:10
  375:5,14 376:7 439:25
  446:13 496:13,15
  522:6 526:12
**waste** 41:3
**way** 46:18,19 55:15 60:2
  61:21 62:4,19 65:7
  68:23 75:12 84:11 88:9
  89:12 91:3 102:25
  105:19 115:19 139:11
  148:2 155:1 158:18
  161:20 164:6 168:18
  175:3,15 179:14
  184:22 185:2 189:19
  190:24 208:1 212:3
  225:10 234:15 249:21
  263:12 284:7 291:1
  295:3,23 315:8,20
  316:11 324:6,12 326:8
  335:22 337:13 340:3,5
  347:18 357:5 374:22
  395:7 400:20 402:14
  408:13 417:6 419:11
  454:18 458:20 479:22

**486**:11 491:6 497:8
  502:18 504:16 512:18
  518:25 542:8
**ways** 176:25 187:13
  316:7,13 324:3 431:25
**wearing** 39:20
**WeBridge** 21:3
**websites** 141:9
**Wednesday** 32:2 222:22
  226:19 373:5
**week** 26:15 120:7 144:3
  238:21 285:17 286:1
  355:9
**weekend** 238:16 248:15
**weeks** 192:12 405:19
  406:3 424:25 437:18
  490:17 494:21 522:14
**weight** 464:3,5
**WEISS** 8:17 22:12
**welcome** 144:11 173:2
  332:20 438:10 439:8
  483:17 538:19
**welcomed** 532:18
**went** 65:23 84:1 102:25
  124:10 140:21 141:10
  141:14 147:25 161:19
  162:23 178:20 181:5
  182:24 185:22 186:20
  186:20 187:6 188:8
  191:10 192:6,6 195:17
  196:14 198:12 205:16
  206:17 208:22 212:1
  226:6,21 232:18 251:7
  274:20 277:15 279:10
  294:19 301:14 305:16
  319:14 339:19,23
  371:13 383:8 392:19
  446:22 454:23 482:2
  518:14 519:2 522:12
  526:19
**weren't** 68:24 102:6
  135:4 148:11 167:21
  196:21,23,23 244:7
  255:23 287:8 316:2
  508:12 519:25 520:11
**West** 8:19 10:15 15:12
  17:6 18:13 19:13 21:13
**we'll** 26:10,22 28:13 45:1

115:9,9,10 174:2 216:2
233:23 234:12,19
283:3,4 288:9 354:20
433:1,9 439:4,7 440:5
440:12 446:18 465:10
483:14 489:6 510:8,14
542:4,4,5,10,23
**we're** 28:6,7 46:25 95:25
102:9,10 115:15,16
118:25 126:3 139:6
147:18 149:6 160:11
160:13 164:1 173:3,5,9
173:10,11 185:3 186:8
186:12 187:19 200:10
210:12,13 221:1 228:1
228:3 237:19,21
255:21 263:15 270:9
283:1,2,9 296:7 301:9
303:9 307:24 315:8,11
323:10,10 329:17
338:10 354:19 357:12
358:5 361:22 362:15
377:17 378:12,18
406:16 409:4,10
412:18 417:17 418:3
425:20 428:16,21,22
429:3,6 430:6 432:11
433:16 434:1,10,18
435:2,24 439:5,22
446:11 449:3 452:7
453:10 454:20 458:12
459:2 460:8 465:3,11
466:19,19 483:10
486:8 489:5,20 490:4,7
496:5 500:13 504:5
515:20 519:10,20,21
521:5 531:22,24,25
532:1 533:14,15,15
539:19 541:4,17 542:7
**we've** 25:24 27:16 32:10
41:24 45:24 57:11
134:9 149:10 164:6,15
177:21 190:9 214:6,7
214:21 215:7,22,24
229:17 235:4,23
258:18 263:20,21,22
301:18 304:10 327:7
355:10 361:1 362:3,10

362:13 374:17 375:10
377:11 409:23 412:15
441:20 448:18,18
462:10 464:24 465:1
465:13 467:13 470:3
473:2,5 478:21 494:22
517:5 519:10 523:25
536:11
**WHARTON** 22:12
**What'd** 179:4
**wheel** 256:2
**whichever** 79:17
**White** 16:2,12 17:2 22:2
22:9 38:21 59:23
120:16 144:8 446:9
**Whitehall** 6:4
**whoa** 117:19
**wholesale** 186:13,14
241:7 375:16 376:2,18
380:5,10 382:5 383:14
383:14
**wholly** 135:21 136:5
**who've** 417:5
**Wilk** 12:11 392:14
**William** 14:9 20:9 22:9
528:1
**willing** 101:21 196:17
204:18 207:5 213:3
309:18 310:2 340:13
352:24 422:17,19,22
424:4 453:10 507:25
**willingness** 101:15 245:3
425:4
**win** 526:8
**winding** 331:16
**window** 228:22
**wings** 149:3
**wins** 142:4
**winter** 469:17
**wiped** 313:18
**Wisconsin** 9:3,4 136:4
**wisest** 107:21
**wish** 26:19 38:12 89:22
387:19 438:7 439:9
510:2 514:24
**wishful** 495:8
**withdraw** 46:4 438:3
441:11 442:3

**withdrawn** 436:8 437:17
516:3 526:17
**withdrew** 198:12 526:8
526:12
**witness** 27:7,8,13,20
28:5 29:8,11 49:16,18
49:22 51:14,19,21
52:20 57:2 59:17 67:2
67:3 73:22 74:12 76:10
77:5,9 87:11,17,18,19
87:20,21 89:23 98:24
101:19 102:2,4 103:12
103:16,20,23,25 104:4
112:4 113:15,16,25
114:8 115:4,15,19
116:3,14 119:1,10
144:5 150:5,13 160:7
160:20,20,24 161:5,8
172:7,10,24 173:1
174:12 201:19,23
214:7 215:2 216:13
224:22 225:6,6,19,21
225:23 226:16 235:9
235:20,24 242:13,18
243:7 249:14,18
266:11 281:10,15
283:8,8 289:11,25
290:1 304:12 310:13
320:7,17 329:21
330:17,21 332:5,11
333:25 334:23 336:15
338:3,7,9,12,25 355:14
356:7 359:10 362:11
363:17 377:20 382:10
384:19,25 387:17
406:8 410:7 411:11
419:20,22 421:24
423:8,13 425:17 427:8
427:16,17 428:13
432:7,7 434:17,25
435:25 438:22 443:8
443:14 449:15 452:4
453:17 455:7 475:5
482:7 498:6 510:3
511:5,10 512:3 523:3
523:15 535:12,16
544:5 545:5
**witnesses** 27:14 115:16

331:14 410:6 433:12
433:14,17 434:3,14,22
435:2,21 440:7,13
443:16 445:22,24
446:3,9,11 542:6,11,13
542:16 543:4
**witness's** 310:12
**woefully** 180:17
**WOLF** 13:17
**women** 362:15
**won** 71:10 526:7,12,17
**Woodward** 10:6 21:5
**word** 143:12 156:8 230:6
243:12,18 266:10
267:3 340:10 422:1
424:22 460:7
**words** 69:11 79:24 80:1
80:2 85:16 109:9
159:15 163:16 193:23
194:18 245:25 289:17
296:22 344:21 462:10
**work** 30:9 33:6 37:18
53:17 54:12 55:15,17
82:22 110:16 115:8
117:9 119:18,19
153:17 170:9 174:19
190:23,24 195:7,7,10
195:14,14 212:13
231:1,4 232:18 238:20
238:22 239:2 246:17
248:14 256:1 284:6,22
285:13 294:18 380:13
380:13 406:21 434:18
438:18,23 439:12
444:12 503:8 519:4,5,6
542:23
**worked** 79:23,25 104:12
124:8 135:20 174:25
188:22,23 189:12
199:19 230:18,24
232:19,25 238:13
239:13,14 246:11
327:7 362:3 406:22
486:2
**workers** 8:10,18 119:7,7
119:19,20 121:8,10,10
121:12,13,19,21 122:7
138:13 149:15,16,17,18

150:24 153:8 166:3
168:12 171:13 258:22
303:10 307:12,13
361:3 436:18,25 437:4
437:5,8,19
**workforce** 68:21,24
131:4 136:5 373:4,4
**working** 125:3 136:14
175:9 176:14 186:3
191:17 196:3 205:17
207:6 208:13 238:11
239:7 247:4,4 304:5
312:11 361:22 375:6
377:11 383:9,10 389:7
417:17 426:10,15
460:25 461:7,25 462:4
462:5 463:16,21 492:7
**workings** 123:3
**Workmen's** 435:7
**works** 533:12
**worksheet** 452:12
**world** 187:19 282:15
497:5
**worried** 391:4
**worse** 98:7,9 187:21
278:14
**worst** 85:6,9 186:22
417:14 487:2 491:9
503:19 519:17
**worst-case** 451:1
**worth** 85:16 118:14
280:6 294:17 317:20
324:15 325:17,23
328:4,5 422:10 461:25
**Worthington** 24:3
**wouldn't** 72:7 96:6
110:21 112:11,14
113:8,11 129:2 138:3
148:11 159:9 167:9
182:16 193:1,1 209:17
210:16 217:16 256:16
256:22 257:13 274:2
280:14 286:12 292:4
306:17 308:7 325:24
329:3 349:19 350:23
351:13 357:12 373:18
373:18 400:16 431:7
459:17 465:19,22

487:8,10 506:18 513:4
513:6,12,12 515:6,7
516:18 520:7 527:13
533:10
**wound** 184:18
**Wrangler** 110:23
**wrap** 57:11 210:24
510:10
**wrenching** 183:8 186:23
211:7
**write** 79:24 161:21
**writing** 54:2 456:19
**written** 48:7 159:15
523:15
**wrong** 118:10 147:25
306:17 318:9 339:11
504:16 513:19
**wrongfully** 480:16
**wrote** 69:17 80:1 153:25
154:1 533:1,3
**w]e** 294:15

---
**X**
---
**x** 1:5,11 380:23 544:2
545:2,13 546:2,4 547:2

---
**Y**
---
**Y** 544:4 545:4
**yeah** 29:8 32:9 43:3 48:8
52:10 62:10 65:12 73:7
73:10 75:25 82:15
112:10 113:11 116:17
136:22 154:23 166:4
167:22 169:1 177:25
178:5 179:15,19
182:12 183:18 186:2
188:2,21 190:6 197:6
202:8 203:24,25
205:13 209:12 220:8
221:21 225:1 227:12
230:7 231:11 243:5
251:16,24 253:12
256:22 261:12 263:23
272:23 274:14 287:1
288:3,3 291:17 295:16
297:21 298:17 300:22
301:5,22 303:5 304:22
307:11 309:15 310:2

310:11 314:4 316:9,17
318:11,22,24 319:11,13
323:23 326:1,7,11,13
327:5,22 328:13
338:12,16,25 346:10,12
346:18 348:19 350:8
354:16 355:25 371:19
371:24 375:15,25
379:17 380:22 384:2
385:20 394:7 395:11
395:16 396:9 397:17
410:12 411:9,15,17
414:10 415:3 416:21
419:22 421:21 422:6
448:10 450:18 455:22
460:21 461:4,4,10
462:17 469:10 473:11
473:14 476:11 486:24
502:3 506:1 514:5,12
514:16 518:24 521:13
527:5 529:8,25 531:4
532:16 536:21 539:12
**year** 31:23 32:2,3 85:6,8
85:9 98:8 142:17
176:16 181:3,10 182:1
182:2 183:2,17 184:5
185:2 209:5 346:24
359:17 367:20 375:22
404:25 420:8 423:7
442:1 445:13 450:6
469:23 470:18 487:18
489:18,19 495:8 499:6
503:11,19,19 504:1
515:24 536:14
**years** 30:19 41:12 48:25
125:13,25 139:4
142:13,14 162:23,24
176:3 178:9 207:14
213:20 232:22 321:13
323:25 324:2 423:2
448:6 491:9 519:5,17
539:16
**year-over-year** 460:24
**yellow** 457:24 460:17
461:2,9,10
**Yep** 35:8 94:6 522:21
532:14
**yesterday** 25:4 38:18,19

38:23 49:25 70:10
310:7,8 433:20 496:9
**yes-or-no** 320:24 359:9
**yet-to-be-named** 437:3
**yield** 510:5
**Yokich** 124:24
**York** 1:3,15,15 3:6 4:13
5:5,13,15 6:6,23 8:12
8:20 9:14 11:8,21
12:14,21 13:5 15:5,14
15:22 16:7 19:5 22:14
129:6 232:8 408:3
419:4 512:18 525:13

---
**Z**
---
**Zabel** 246:12,14 247:16
**Zakia** 16:22 120:14,16
120:16 138:14,17
144:7,7,10,13 147:4
150:3,5 151:24 152:1,4
154:6,9 160:16,18,24
161:3,15 162:7 163:12
172:23 438:11 443:13
443:18 544:14
**ZAVALKOFF-BABEJ**
15:24
**zero** 106:18 241:20
**zone** 35:9,11,14,19,25
36:5 39:4,8 86:3
304:16

---
**0**
---
**01** 519:14
**02110** 20:15
**06106** 23:15
**07** 41:15 175:14 177:17
179:22 183:6 191:18
200:6 241:17 374:9,10
399:18
**07-cv-14310** 11:4 14:4
**08** 183:7,8 209:5 267:21
277:8,9,13 278:21
499:6
**08s** 383:12 384:3
**09** 41:18 189:16 201:7
256:13 519:14
**09s** 383:12 384:4
**09-50002** 1:4

**1**

**1** 79:21 299:23 302:9,17
378:4,5 379:6 381:20
382:15,20 483:22,25
484:24 485:2 496:21
514:16 545:11 546:15
548:16
**1,000** 376:4 496:21
513:11,12
**1.2** 186:25 318:13
**1.3** 186:25 397:10
**1.5** 43:16 44:7
**1.7** 199:23 341:9
**1.72** 97:24 99:1
**1/31** 379:15
**1:15** 174:3
**10** 86:25 99:6 253:7
268:11 293:10 308:22
319:19 324:19 325:24
328:3,8,8 374:18
486:25 544:9
**10th** 269:23 270:9,13
273:2 320:1,18 321:1
322:16,17,20
**10.1** 321:9
**10.5** 321:10
**10.6** 374:18
**10.8** 374:18
**10:00** 1:18 173:23 543:5
543:6
**10:44** 222:24 227:17
**10:55** 510:15
**100** 209:3 324:19 468:19
489:17 513:11
**100,000** 536:14
**1000** 12:4
**10001** 15:14
**10004** 6:6 15:5
**10006** 8:12
**10007** 5:15
**10017** 3:6 12:14,21 19:5
**10018** 11:8
**10019** 6:23 9:14 15:22
22:14
**10020** 13:5
**10036** 5:5 8:20 16:7
**1007** 14:6

**101** 538:12
**10105** 11:21
**10119** 4:13
**105** 2:13
**1050** 7:4
**108** 544:12
**11** 63:11 152:2,5,10
154:7,10 166:1 172:19
205:18 216:24 217:2
227:8 236:17,25 275:3
275:11 283:19 284:9
287:16,20 300:17
337:9 518:1 546:6
**11:00** 222:24 228:10,11
510:14,15
**11:30** 510:13,14 512:19
**11:42** 119:2 543:8
**11:59** 119:2
**111** 24:13
**1115** 22:6
**11501** 8:5 548:14
**1155** 16:6
**1177** 5:4
**119** 544:13
**12** 530:11,16 544:14,20
545:7
**12.6** 73:3 321:9
**12/2008** 457:7,15
**120** 383:5 489:12 492:21
**1200** 11:13
**122** 490:7
**1221** 13:4
**125** 15:4 362:1 467:5
**1285** 22:13
**13** 56:1,18,23 57:5 69:3
218:22,24,25 294:12
544:15 545:9,20
**13th** 442:14
**1301** 9:13
**1345** 11:20
**1350** 11:6
**14** 28:21 49:15 54:4,7,17
54:24 55:17 359:17
544:13,18,22 545:18
**14th** 296:3 389:16
**14.6** 73:3
**140,000** 205:7 361:8
**1420** 4:4

**144** 544:14
**15** 49:15 344:3 358:14,21
544:6
**15,000** 361:25 383:2
**15.5** 182:7,14
**150** 15:12 209:4 231:16
367:19 372:16
**152** 546:6
**15223** 14:7
**154** 546:6
**16** 182:13 294:23 313:6
544:17
**16.5** 182:13
**16.7** 182:13
**16.8** 321:11
**162** 544:15
**1633** 15:20
**1675** 6:22
**169** 544:16
**17** 98:8 170:16 190:1
316:5 486:25
**17th** 17:15 131:2 132:7
132:11 170:20 190:8
194:2 255:11 266:4
267:24 269:18 270:12
276:18,20,24 292:7
320:8,19 321:2 322:13
322:15 392:24
**17.2** 70:17 73:20 75:19
**171** 17:15
**172** 544:17
**174** 544:18
**1751** 22:5
**18th** 26:9
**18.8** 73:16,19 75:18
**18:00** 223:11
**1888** 14:22
**19** 299:13
**19.6** 73:3,8
**19.9** 245:25
**1900** 17:7
**1901** 18:5
**19103** 12:6
**1960s** 518:14
**1968** 124:9
**1970** 124:12
**1973** 124:15
**1980s** 162:19

**1982** 125:9
**1984** 124:19
**1985** 124:22
**1999** 124:23 125:3

**2**

**2** 43:6 70:9 103:6 260:19
260:23 261:2,4,8
266:16 275:25 299:20
299:23 313:1,18 315:1
332:9 345:19 452:8
463:6 464:9,11,14
477:14 479:4 484:25
544:8 546:13
**2,000** 384:5
**2,392** 447:10 473:4
**2,400** 389:22 485:20
**2.06(r)** 307:19
**2.25** 222:10 223:5,8
224:12 225:1,3 228:1
229:12
**2.250** 211:17 217:13
224:4 228:2
**2.5** 224:1 225:3
**2.6** 80:8,11,24 84:2 96:12
97:12
**2:15** 174:2
**2:18** 174:3
**20** 324:19 328:3,8 544:19
547:6
**200** 8:4 16:18 324:20
328:4,9 445:1 520:15
539:25 548:12
**2000s** 450:11
**20001** 3:15
**20004** 7:21
**20005** 11:14
**2001** 374:7,19 450:13
518:21,23,25 520:8
**2002** 2:14 124:25,25
**20036** 7:5
**2004** 128:21
**2004/2005** 441:24
**2005** 129:14
**2007** 29:16 31:7 41:7
42:5 44:12 127:13,20
128:5 129:20,23
143:23 155:17 157:25

163:1 174:24 178:1
179:5,18,18 180:23
181:11,12 184:5
230:14 233:1 308:24
309:8
**2008** 31:23,25,25 34:16
36:3 37:12,15,18 38:8
39:9 85:4,5,6,9,13,17
94:2 104:25 170:4
182:17 183:3,17,23,25
184:18 185:9,14,15
186:17,20 188:6,21
278:9 295:6 296:1
345:22 445:12 457:19
499:1,5 502:8 506:13
**2009** 1:17 32:1 37:12,15
37:19 38:8 39:9 40:15
60:19 130:10,12 133:2
140:2 152:7 153:21,22
154:12 166:7 170:13
170:16 190:1 197:16
197:20 198:20 216:5
267:24 268:11 370:22
371:2 392:23 393:9
395:18 436:20 442:2
457:21 468:20,24
469:1,17 518:21,23,25
520:8 545:23 546:9
548:16
**201** 21:13
**2010** 489:19
**2011** 143:24 316:2
366:22
**2015** 142:12
**2016** 318:8,13,18 320:7
322:7
**2019** 163:14,17,24 164:9
164:18
**21** 297:19,21 544:7
**21.5** 73:3,8
**2100** 6:5 17:16
**21209** 9:7
**215** 545:21
**216** 544:19 545:22
**22** 80:5 82:16 95:17,18
544:11
**22.8** 313:14 314:15,23
317:19 320:2 322:14

322:21 323:4
**22:00** 223:12
**22:44** 222:22 226:19
**22:46** 225:15 294:22
**2200** 14:15
**221** 13:11
**22102** 22:7
**222** 3:5
**2290** 21:4
**23** 544:16,23
**2323** 14:14
**233** 23:4
**24** 85:20 95:18 99:4
300:9 545:8
**25** 76:7
**25th** 15:12
**25.4** 73:17 75:21 76:2,13
77:24 78:2,8 81:2
118:7,15
**25.7** 70:18 75:22 76:1,12
345:10
**250** 19:13 211:19 212:1
219:22 221:9 222:7
223:13 224:6,8 226:14
226:17 294:15
**26** 76:7 547:6
**26,000** 121:21 137:25
149:15
**2600** 6:13 7:13
**27** 436:20
**27.4** 80:25
**27.8** 314:8,22
**270,000** 375:10
**2700** 10:7
**275** 10:16
**28** 1:17 320:3 544:6
545:15
**2800** 19:14
**29** 225:14
**29th** 60:19 196:6 222:20
222:22 226:19 227:17
228:9,12,18 236:16,23
340:9 389:7
**2900** 13:12

---
**3**
---
**3** 45:14 70:16 72:21
103:6 105:7 260:20

268:12,14 275:24,24
277:24 299:23,23
302:16,19,20 305:21
344:24 347:22,24
358:15,17,19 477:14
479:7 484:25 498:20
544:10 546:14
**3rd** 428:15,19 429:22
**3,000** 205:6 371:17,20,22
372:4,7,11,12 445:13
**3,100** 518:15
**3,181** 516:15
**3,200** 389:12,21 485:20
**3,600** 372:7
**3.16** 307:19
**3.2** 79:12,16 80:7,19,24
95:20 96:2
**3.5** 308:5
**3:54** 222:17
**30** 197:15,20 198:20
216:4 236:21 530:18
531:9 545:23
**30th** 54:10 55:7 108:8
134:19 195:1,4,4 196:7
199:16 203:19 210:18
236:22,24 237:10
242:19 252:22,23,24
253:4 389:8 442:13
**30,000** 186:24,24
**300** 71:25 163:14 208:7
**300's** 376:19
**3000** 10:17
**3001** 18:13
**30309** 4:6
**30363** 17:17
**31** 396:23
**31st** 275:13
**317** 538:12
**32.8** 417:15 418:2
**33** 6:4 214:7,25 358:13
545:21
**330** 8:19
**33131** 16:19
**340** 162:16 163:19 164:4
164:8
**35** 28:1,10 43:6 45:1,20
46:8,11,15,16 545:15
545:16

**35B** 46:18
**35D** 46:18
**35,000** 361:1 371:25
**35.5** 423:5
**350,000** 149:3
**358** 544:20
**36** 37:2,6,10,22 38:6,15
39:2 361:24 545:17
**3600** 12:5
**363** 2:13 31:2 64:6 66:16
67:6 84:13,19 88:8,9
242:11 273:10 275:3
275:11,16 283:17,19
284:12 285:11,12
332:15 337:6,8,10,21
338:13 340:3 368:16
402:10 403:20 406:5
406:10,15 408:15
412:24 413:18 415:2
418:7 419:12 421:20
429:2 445:7 495:18
**365** 2:13
**366** 2:3
**37** 545:17
**38** 197:16 215:12,14
216:4 545:22
**388** 544:21
**39** 545:17
**392** 544:22
**3960** 20:5

---
**4**
---
**4** 45:2 78:12 106:9
121:12,14 166:14
180:14 210:25 299:23
544:12
**4,000** 383:1 384:5
**4-0** 73:2
**4.1** 305:13
**4.587** 156:19,20 161:25
172:6
**4.6** 168:4 308:18,21
**4.9** 256:25 259:12
**4.960** 305:14
**4/30** 222:17
**4/4** 252:21
**4:54** 283:6
**40** 72:25 73:2

**40,000** 361:24 383:1
**400** 20:14 375:8 420:7
   539:20,23
**401** 544:23
**40507** 19:15
**407** 544:24
**41st** 3:5
**416** 544:25
**42nd** 8:19
**425** 12:20
**426** 545:6
**43** 288:2
**43216** 24:5
**442** 545:7
**443** 545:24
**449** 545:8
**450** 19:4
**45202** 13:13
**46** 545:15
**47th** 15:21
**479** 546:13,14
**48084** 18:15 21:15
**48226** 6:15 10:8 18:6
   21:6
**485** 545:9 546:15
**4900** 16:17
**49503** 24:14

---
**5**
---

**5** 69:1 70:10 93:25 94:5
   203:17 314:22 347:24
   469:1
**5th** 287:18
**5,000** 373:4,5 400:19
**5.0** 318:23
**5.3** 302:4,21 305:19
   306:14 314:1
**5.6** 318:8,20
**5.87** 156:18
**5:00** 210:25
**5:15** 283:6
**50** 383:4
**500** 10:6 180:14 220:21
   222:2,7 223:14,16,21
   223:24,25 376:4
**500,000** 121:12,14,15
**501** 11:7
**503** 15:13

**51** 3:14
**52** 24:4
**535** 6:14 545:10
**539** 545:11
**54** 317:16 318:1,10
   545:18
**542** 546:17,18
**55** 23:14 308:19,21
**555** 7:20
**57** 545:20
**580** 548:13
**59** 544:7

---
**6**
---

**6** 114:19 268:4,5 319:17
   348:20 358:21 372:1
   453:23,25 454:1
   544:24
**6th** 18:4 527:25
**6,500** 518:15
**6.2** 73:13
**6.20** 185:21
**6.30** 185:21
**6.54** 97:12
**6.8** 73:13
**6.9** 61:5 101:3 313:17
   332:9 336:5 353:8
**6:00** 223:10
**6:57** 356:21
**60** 21:14
**60,000** 205:6 213:14
**600** 18:14
**600,000** 375:7
**6004** 2:14 235:14
**6006** 2:14
**606** 25:4
**60606** 23:6
**607** 25:4
**622** 25:4
**6225** 9:6
**63102** 7:14
**633** 17:6
**654** 96:11
**660** 21:5
**6600** 23:5
**675** 12:13

---
**7**
---

**7** 205:19 254:24 284:15
   337:9 372:1 544:21
   545:6,10
**7.60** 185:22
**7.80** 185:22
**7:15** 356:20,21
**700** 341:11
**73** 490:6
**750** 100:11 206:5 376:4
**75201** 14:16
**780** 471:14
**789** 359:6,13,16 360:25
   361:6,16,20,22 362:16
   362:20 363:6,23 364:3
   364:6,9,17,22 365:1,16
   365:23 367:4,5,16,21
   368:5,19 369:6,24
   370:16 371:22 372:5
   372:20 373:10 377:16
   381:18 382:21 383:1
   396:23 449:24 450:4
   451:1 459:13 464:19
   465:6 470:7,17 471:20
   473:1,4,9 476:19 477:2
   494:20 496:19 506:6
   516:4 520:19 521:15
   521:25

---
**8**
---

**8** 94:2 155:4 168:21
   172:5 325:24 372:1,1
   487:5
**8.5** 315:11
**80,000** 121:23
**800** 4:5 325:24 389:17
   392:6 503:15 521:1
   532:3,3,17
**852** 502:9
**86** 5:14
**866** 503:1
**89169** 20:7

---
**9**
---

**9** 246:2 293:11 503:1
   512:19 544:25
**9th** 367:13 368:19
   370:22
**9.1** 345:10

**9.6** 313:21
**9.8** 303:11
**9:00** 435:18 439:5 440:5
   483:10,12 542:4
**9:14** 435:18
**9:30** 440:13
**90** 489:11 492:21 544:8
**900** 24:12 513:18
**90067** 14:23
**90071** 17:8
**9019** 413:4
**92** 544:9
**929** 80:19 95:24 96:2
**93** 544:10,11
**94111** 10:18