Stephen Pidgeon
Leo Donofrio
Pidgeon & Donofrio GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: CHRYSLER, LLC, et al, | Case No. 10 CV 2493 |
| Debtor, | |
| | APPELLANTS' REPLY BRIEF |

### TABLE OF CONTENTS

**POINTS AND AUTHORITIES IN REPLY**      **PAGE**

Fiat Executive Alfredo Altavilla testified that Fiat did not insist upon Dealer rejections.    4

Appellees' Counsel committed fraud on the court concerning Alfredo Altavilla's testimony.    7

The dealer reduction methodology was irrelevant since no reduction was requested by Fiat.    9

Project Tiger was a 200 million dollar gift from Old Chrysler to New Chrysler.    11

The June 2, 2009 dealer exclusion letter from New Chrysler is irrelevant to Appellants' Administrative claims .    12

Old Chrysler's acceleration of dealer restructuring via Project Tiger involved a potential benefit for the first lien lenders.    15

Judge Gonzalez committed fraud on the court via Footnote 21 of the June 19, 2009 Rejection Opinion.    16

Appellees' Counsel's fraud on the court concerning Peter Grady's testimony.    18

APPELLANTS' REPLY BRIEF – 1

The elements of fraud on the court have been met.                    20

Appellants' fraud on the court motion was timely.                    22

The Business Judgment Standard was not satisfied by Old Chrysler.    22

Conclusion.                                                          23

APPELLANTS' REPLY BRIEF – 2

**PIDGEON & DONOFRIO GP**
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

## TABLE OF AUTHORITIES

| CASES | PAGE |
|---|---|
| *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 526, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984) | 14 |
| *In re Italian Cook Oil Corp.,* 190 F.2d 994, 996 (3rd Circ. 1951) | 14 |
| *In re Minges*, 602 F.2d 38 (2d Cir. 1979) | 15 |
| *Workman v. Bell,* 245 F.3d 849, 852 (6th Cir. 2001) | 20 |
| *Amstar Corp. v. Envirotech Corp*., 823 F.2d 1538, 1550 (Fed. Cir. 1987) | 21 |
| *Bulloch v. United States*, 721 F.2d 713, 718 (10th Cir. 1983) | 21 |
| *United States v. Beggerly*, 524 U.S. 38, 47, 118 S. Ct. 1862, 141 L. Ed. 2d 32 (1998) | 21 |
| *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), *overruled on other grounds by Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 97 S. Ct. 31, 50 L. Ed.2d 21 (1976) | 21, 22 |
| *In re Old Carco, LLC,* 423 B.R. 40 at 64 (Bankr. S.D.N.Y. 2009) | 22 |
| *Bowie v. Maddox*, No. 03-948, 2010 WL 45553, at * 2, ___ F.Supp. ___, ____ (D. D.C. 2010) | 22 |
| 11 U.S.C. § 503(b)(1)(A) (1982 ed.) | 14 |
| F.R.C.P. 60(b)(3) | 21, 22 |
| F.R.C.P. 60(c)(1) | 22 |
| F.R.C.P. 60(d)(3) | 21, 22 |

Appendix A – Memorandum in Support of Motion for Reconsideration

Appendix B – Debtor's Objection to Motion for Reconsideration

Appendix C – Response to Debtor's Objection

**PIDGEON & DONOFRIO GP**
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

## POINTS AND AUTHORITIES IN REPLY

### *Fiat Executive Alfredo Altavilla testified that Fiat did not insist upon Dealer rejections.*

Appellee erroneously contends on pg. 12 of their Appellate brief that Fiat would not have gone through with the purchase of Chrysler unless the dealership rejections were instituted as part of the transaction.   In support of this false contention, they state the following:

> "Another key witness was Fiat executive Mr. Alfredo Altavilla. Among other things, he testified regarding Fiat's desire for a dealer network restructuring. See, e.g., Hr'g Tr., May 27, 2009, at 350 (stating that the Fiat Transaction term sheet contained a "provision . . . calling for a restructuring of the existing dealer network"); 351 (stating that Fiat "requested a restructuring of the dealer network"); 352 (stating that "a restructure needs to occur")."

Appellees fail to mention that the term sheets discussed by Altavilla contemplated dealer restructuring under the pre-existing Project Genesis plan which involved negotiating with the dealers under the guidelines dictated by state law.    There was never an intention, with regard to the prior term sheets, that any dealers be immediately rejected as they were in the subsequent bankruptcy under Project Tiger.

Judge Gonzalez failed to even mention Project Tiger once in his Rejection Opinion where he erroneously discussed the dealership rejections as if they took place under Project Genesis.    But Project Genesis, a plan which incorporated negotiating with dealers under state law, was scrapped in favor of Project Tiger which improperly invoked the Bankruptcy Code to circumvent important state law dealership protections.   (See Appellants' Memorandum In Support of Motion for Reconsideration - Appendix A - at pgs. 29-30.)

Precise testimony on this issue was offered by Old Chrysler CEO and Chairman Robert Nardelli who specifically testified that Fiat did not request a reduction in the dealership network:

> Q. Do you have any knowledge that Fiat believed that cutting the dealer network would be profitable to them?

APPELLANTS' REPLY BRIEF – 4

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

A. I think that, again, they were aware of the -- in their due diligence, that we had a dealer rationalization program called Genesis. So I would be assuming that, if they saw an opportunity --

Q. Mr. Nardelli, excuse me, I'm not asking you to assume.

A. Yeah.

Q. The question is do you believe that Fiat required the dealer network to be reduced?

A. No, I don't believe they required it.

(Hr'g. Tr. May 28, 2009 at 396.)

CEO Nardelli also testified that right up until just hours before the bankruptcy plan was chosen, Old Chrysler was still working towards implementing the pre-petition term sheets and that in doing so they intended to transfer the entire dealership network to New Chrysler:

Q. Were there any terms still up in the air?

A. We were working through the entire evening the 29th up to the 30th, and we were finally able to reach resolution.

Q. Now, if Chrysler had not filed for bankruptcy and an alliance with Fiat occurred outside of bankruptcy, isn't it correct that Chrysler would have been bringing approximately 3,200 dealers into the alliance?

A. Yes. As I mentioned earlier, we would have continued to carry the dealers except for those that would have been on some performance letter...

Q. So prior to -- the deal originally with Fiat would have been Chrysler bringing in 3,200 dealers into the alliance; however, now Chrysler is giving only 2,400 dealers to the Fiat alliance; is that correct?

A. That's correct.

(Hr'g. Tr. May 28, 2009 at 389.)

The evidence is overwhelming that Fiat did not require Old Chrysler to complete or even begin a reduction of the dealership network prior to June 2, 2009.   And it's improper for Appellee's Counsel to imply that the pre-petition term sheets contemplated the havoc unleashed by Project Tiger.

APPELLANTS' REPLY BRIEF – 5

Appellants are not disputing that New Chrysler anticipated dealer restructuring at some point in time.   But the dealer restructuring contemplated by New Chrysler was similar to the restructuring accomplished by Project Genesis which took place under state law with protection for the dealers.    This is confirmed by Altavilla who testified as follows at the May 27, 2009 hearing:

> Q. With respect to the first term sheet, were any of the terms contained in that term sheet -- did they relate to the size of the dealer network?
>
> A. Not -- there was no specific number. There was just a provision that was calling for a restructuring of the existing dealer network.
>
> Q. And with respect to the second term sheet, was there any term regarding the size of the dealer network?
>
> A. No, there was, I would say, almost the same provision.
>
> Q. Did that restructuring refer to Chrysler's Genesis Project?
>
> A. Primar -- the Genesis Project was the primary source of the restructuring that we were envisaging to occur. That's correct.

Project Genesis respected state laws and dealer rights.    Neither the Alliance Viability Plan term sheets nor any faction of New Chrysler called for the outright rejection of dealer contracts.    Out of thin air, with no request from any party, Old Chrysler simply scrapped Project Genesis in favor of Project Tiger (See Appendix A at 29-30).    This gutting of dealer relationships was never contemplated by Fiat. Altavilla made this clear when he testified that Fiat had nothing to do with the 789 dealers being rejected and that Fiat was not seeking the rejection of any dealers:

> Q. You are aware that Chrysler has filed a motion seeking to reject the dealer agreements of twenty-five percent of its dealer body, correct?
>
> A. Yes.
>
> Q. And Fiat played no role in determining which dealer agreements Chrysler should seek to reject, correct?
>
> A. Correct.

APPELLANTS' REPLY BRIEF – 6

**PIDGEON & DONOFRIO GP**
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

Q. And Fiat did not determine the number of contracts that Chrysler should seek to reject, correct?

A. That's correct.

Q. And Fiat did not participate in the decision-making process with respect to each of the 789 dealers that Chrysler is seeking to reject, correct?

A. That's correct.

Q. And it's fair to say that **Chrysler is not seeking rejection of the 789 dealers at Fiat's insistence, right? [Emphasis added].**

A. **That's correct. [Emphasis added].**

(May 27, 2009 Hr'g. T. 335-336.)

Altavilla's testimony is unambiguous.    Yet, Appellee's Counsel has littered their briefs with falsehoods concerning Altavilla's testimony.    But when said Counsel had the chance to question Altavilla on redirect concerning the issue of whether Fiat was requesting dealer rejections, Counsel failed to ask the witness whether Fiat did, in fact, request dealer rejections as a condition of the sale transaction. Instead, said Counsel simply asked Fiat about the methodology used by Old Chrysler.    (See (May 27, 2009 Hr'g. Tr. at 342).

Appellee's had a shot at the big moment, a chance to have this key Fiat witness establish that Fiat requested dealer restructuring as a condition precedent to the sale closing, but instead of asking the witness straight on whether Fiat requested and/or insisted upon dealer rejections, Counsel clearly avoided direct confrontation on this issue.    Such avoidance is suspicious, and as shall be demonstrated below, it is a common theme.

### _Appellees' Counsel committed fraud on the court concerning Alfredo Altavilla's testimony._

Appellee's reply brief to this appeal fails to counter Appellants' allegation of fraud on the court by Appellee's Counsel concerning Altavilla's testimony, wherein said Counsel stated:

APPELLANTS' REPLY BRIEF – 7

"Further, the Dealer Rejection Opinion disproves the Movants' argument on the merits. *The Court's statements therein* [emphasis added] show that the Court did not conceal, mischaracterize or alter Mr. Altavilla's testimony and was fully aware of his statement that Fiat did not perceive a material difference in whether the dealership rejections occurred before or after the closing of the Fiat Transactions, as long as the network restructuring did, in fact, occur as part of the sale transaction."

(Debtor's Objection Memo at par. 44, pgs. 25-26, Appendix B).

This statement is fraudulent.   Appellee's Counsel improperly supplemented the record by alleging that Mr. Altavilla's testimony stated dealer restructuring needed to occur "as part of the sale transaction".   But nowhere does Altavilla say anything of the sort. This false assertion is an intentional fraud upon this Court.   Furthermore, this same lie was repeated by Counsel again on pg. 26, par. 45 of Appendix B:

"Mr. Altavilla's snippet of testimony on which Movants rely merely addressed the issue of timing — i.e., did the contract designations have to take place before or after closing. Mr. Altavilla testified that either was fine, as long as the restructuring was accomplished as part of the sale transaction."

Again, this is a blatant lie.   Tellingly, Counsel skipped over allegations of fraud on the court as to these specific false quotations in their appellate brief.

Having told the Bankruptcy Court on these two separate occasions that Altavilla "testified" restructuring had to be accomplished as part of the "sale transaction", Counsel still does not provide a single quotation thereto because no such statement was uttered by Altavilla.   Faced with testimony by this key witness which damages the appearance that Old Chrysler exercised good business judgment in rejecting the 789 dealership agreements, Counsel has simply chosen to lie.

Not only does Altavilla's testimony from pg. 352 make clear that restructuring could have occurred after the sale closed, his testimony just prior to that is even more exact on this issue:

**Q. And it's fair to say that Chrysler is not seeking rejection of the 789 dealers at Fiat's insistence, right?**

**A. That's correct.   [Emphasis added.]**

APPELLANTS' REPLY BRIEF – 8

(May 27, 2009 Hr'g. T. 335-336.)

It was fraud on the court for Counsel to state that Altavilla testified restructuring needed to occur "as part of the sale transaction."   These words never escaped from the witness's mouth and Counsel should never have represented to any Court that they did.

### *The dealer reduction methodology was irrelevant since no reduction was requested by Fiat.*

The methodology used to determine which dealers were to be rejected was irrelevant since Appellees had no sound business judgment incentive to use any methodology at all.   The only question relevant to the issue is whether the sale would have closed without the 789 dealers losing their contracts. And the single most relevant fact concerns whether Fiat made dealer restructuring a condition precedent to the sale closing.   And to that question, both Altavilla and Nardelli clearly established that Fiat did not request dealer restructuring and that Fiat had nothing to do with selecting any dealers for rejection.   Had Appellee's Counsel sought to rehabilitate these witnesses on this issue, they had their chance to do so, but instead they punted.

Altavilla also testified as follows:

> Q. Has Fiat ever done a financial or economic analysis of the cost of maintaining a dealer network, as Chrysler currently has, or a dealer network, as is proposed, which would be 800 dealers less?
>
> A. No, we have not.
>
> Q. Are you aware of any party-in-interest to this transaction that has prepared such a financial or economic analysis?
>
> A. Not to my knowledge.
>
> Q. Are you aware of what party-in-interest has required that Chrysler reduce its dealer network by approximately twenty-five percent?
>
> A. **This has been Chrysler's own determination**. **[Emphasis added].**

(Hr'g. Tr. May 27, 2009 at 350-351.)

APPELLANTS' REPLY BRIEF – 9

Since Fiat had not done due diligence as to the dealership network, and therefore had made no request for dealer restructuring to have been accelerated, Old Chrysler had no sound business judgment incentive to reject the 789 dealers.    Whether Fiat agreed with the methodology used by Old Chrysler is irrelevant.    Furthermore, Altavilla made it very clear that at the time Old Chrysler rejected the 789 dealers, Fiat had not done due diligence pertaining to information regarding    the profitability and financial condition of the dealership network:

> Q. And had the transaction with Chrysler closed under the first term sheet with the Genesis Project, had -- would that have been the primary vehicle for restructuring the dealer network?
>
> A. We didn't assume in the term sheet that this was the only criteria that would have been applied, but we -- as I said, we had a provision stating that a structuring was required. At that time, we had not due diligence extensively Chrysler (sic)so to determine whether or not the criteria or another would have been the right one.
>
> Q. Has Fiat ever done a financial or economic analysis of the cost of maintaining a dealer network, as Chrysler currently has, or a dealer network, as is proposed, which would be 800 dealers less?
>
> A. No, we have not.

(Hr'g. Tr. May 27, 2009 at 350-351).

Since Fiat had no knowledge of the profitability or financial condition of the dealership network, they couldn't make an informed decision as to which dealers were to be assigned to them.    Old Chrysler, in order to protect the assets of their estate and to insulate its creditors - which was their fiduciary duty as debtor in possession - should have assumed the entire dealership network so that when New Chrysler did eventually complete its due diligence, every dealer they wanted to work with would have been assumed by Old Chrysler and therefore available to New Chrysler.    Old Chrysler had absolutely no business incentive whatsoever to look forward for the new management and do new management's job of restructuring for them.

APPELLANTS' REPLY BRIEF – 10

So, without any insistence or request from Fiat or any faction of New Chrysler, Old Chrysler just

went ahead and gutted the dealership network of 789 dealers.    In doing, so, Old Chrysler subjected their

estate to the resulting financial burdens related to these contractual breaches.    This was exhibits terrible

business judgment since purchaser was willing - at the time the Master Transaction Agreement was

entered into straightv through to May 31st when the sale was authorized - to go through with the purchase

including the entire dealership network.

### *Project Tiger was a 200 million dollar gift from Old Chrysler to New Chrysler.*

Peter Grady indicated that a future restructuring would cost New Chrysler approximately 200

million dollars. (See Hr'g Tr. May 28, 2009 at 444-445 and 464-465).    Therefore, Debtor/Appellee

essentially gave away a 200 million dollar freebie to New Chrysler and that is simply bad business

judgment by any standard, especially in light of the potential for a one billion dollar claim against the

estate resulting therefrom. The size of this potential claim is so massive that ignoring it in favor of passing

on a 200 million dollar gift to New Chrysler not only fails to meet the business judgment standard, it

offends the business judgment standard.

Had the rejected dealership agreements been assumed by Old Chrysler at the same time as the rest

of the dealership network contracts, New Chrysler would have been required to do their own due

diligence in between the closing date and 30 days thereafter, in order to have availed themselves of the

window provided by the Purchase Agreement.    It was highly unlikely that dealership restructuring would

have been completed in the first month of New Chrysler's ownership since Peter Grady testified that

restructuring was a long and expensive process.    (Hr'g Tr. May 28, 2009 at 444-445.)

Therefore, [and there can be no other conclusion that] the testimony of Ceo Nardelli, Alfredo

Altavilla and Peter Grady establishes that Old Chrysler flew solo in taking on the burden of accelerated

restructuring under Project Tiger with no request to do so by the purchaser.    Furthermore, CEO Nardelli

APPELLANTS' REPLY BRIEF – 11

confirmed that Old Chrysler received no benefit or consideration for this effort:

> Q. What did Chrysler get in return for the acceleration of this rationalization?
>
> A. Chrysler didn't. It was really the value will be realized in NewCo.

(May 28, 2009 Hr'g Tr. at 390-391)

> Q. Okay. And I just want to reiterate -- ask another point   to what we discussed before that did Chrysler receive any concession or value for accelerating the rationalization program by rejecting almost 800 dealers?
>
> A. Not to my knowledge.

(May 28, 2009 Hr'g Tr. at 392.)

There had been no request from any faction of New Chrysler to reject the dealers until the June 2, 2009 Fiat exclusion letter.   This corroborates Altavilla's testimony from the May 27, 2009 hearing which states that it made no material difference to Fiat whether dealer restructuring took place before or after the sale closed.   (Additionally, regarding the debtor in possession funding given by the US Government, had the entire dealership network been assumed and assigned to New Chrysler, that funding would not have been effected.   (See Appendix A at pg. 20.))

### *The June 2, 2009 dealer exclusion letter from New Chrysler is irrelevant to Appellants' Administrative claims.*

The June 2, 2009 letter from New Chrysler to Old Chrysler which requested exclusion of the previously rejected dealers proves that up until two days *after* the sale had already been authorized (on May 31, 2009) and assumption of the majority of dealer contracts had been approved by the court, no faction of New Chrysler previously requested any of the rejected dealers be stripped of their contracts. Appellee's response to this appeal misstates the sequence of events on this matter at pg. 7 of their brief as follows:

> "By design, most, but not all, of the Debtors' dealer contracts were transferred to, and accepted by, New Chrysler as part of its purchase of substantially all of the Debtors' assets. The Appellants are former dealers whose agreements New Chrysler declined to

APPELLANTS' REPLY BRIEF – 12

accept; thus, these agreements were rejected by the Debtors."

Debtor's statement is chronologically backwards in that Old Chrysler - improperly and without good business judgment - first rejected Appellants' dealership agreements prior to the sale closing and *thus* on June 2, 2009, New Chrysler excluded those dealer agreements *after* the sale closed in order to save approximately 200 million dollars in restructuring costs, such savings having been handed to them as a gift by Old Chrysler.    (See Appendix A at 21-23). Opposing counsel has admitted there was no formal request by New Chrysler for dealer rejections in their appellate brief (pg. 21), stating:

> "While New Chrysler and the U.S. Government may not formally have "requested" the rejections, (a) New Chrysler's clear exclusion of the agreements from the Fiat Transaction made it clear that they would not be assumed and assigned to New Chrysler and (b) the U.S. and Canadian governments' funding of the Debtors' bankruptcy cases assumed that the rejections would occur."

First, while New Chrysler had the power to reject assignments of assumed contracts, New Chrysler did not have the power to dictate which contracts were assumed by Old Chrysler.    Old Chrysler, once they had petitioned for bankruptcy, had a fiduciary duty to protect the assets of the estate.    The dealership network was a valuable asset of the estate.    Whether New Chrysler would have accepted assignment of dealership contracts has no bearing on whether Old Chrysler should have preserved the entire dealership network prior to a clear instruction requesting specific rejections.    This is because without a previous request for such rejections, Old Chrysler could not have known which dealerships the purchaser was interested in keeping.    The proper business judgment, without such a request, required that the Debtor assume all dealership contracts in order to preserve that asset of the estate.

Later, if New Chrysler accepted assignment of all dealership contracts, then Old Chrysler's estate would not have faced one billion dollars in breach-of-contract potential.    Furthermore, had New Chrysler later sought to exclude certain dealership agreements which had been assumed by Old Chrysler, those dealership agreements would have been entitled to priority administrative claim status rather than

APPELLANTS' REPLY BRIEF – 13

general unsecured claim status.    Old Chrysler should not have had a preference as to which type of claim the rejected dealers were entitled to.

Appellants' Motion To Reconsider sought to have Court approval of the rejections overturned. Should that approval be retroactively reversed, an important issue will be *whether a failed rejection attempt requires retroactive assumption of the dealership contracts by Old Chrysler*. Appellants have not briefed this issue in full at this time.    However, it should be discussed briefly in order to elucidate possible ramifications should the Bankruptcy Court's approval under Section 365 of the Bankruptcy Code be reversed.

If the 789 dealers had their contracts assumed by Old Chrysler and assigned to New Chrysler, and then, after the closing of the transaction, New Chrysler sought to exclude certain dealers in the 30 day window provided to them by the Purchase Agreements, those dealers would have been entitled to an administrative claim as per the holding of the United States Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 526, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984) which stated,

> "Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*, *In re Italian Cook Oil Corp.*, 190 F.2d 994, 996 (3rd Circ. 1951), and the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate, 11 U.S.C. § 503(b)(1)(A) (1982 ed.)."

The Court in *Italian Cook Oil* further stated, "...[T]he trustee is given the right to adopt or reject an executory contract. He must do one or the other."    Therefore, if the Bankruptcy Court's approval under Section 365 is overturned, Old Chrysler should be required to retroactively assume the rejected dealership agreements and in that case such assumptions will provide Appellants with priority administrative claims against Old Chrysler's estate for damages rather than the unsecured claims they now possess.

Please note that this will have no effect on the rights of New Chrysler who cannot be forced to

APPELLANTS' REPLY BRIEF – 14

**PIDGEON & DONOFRIO GP**
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

give the rejected dealers back their dealerships.    However, the improperly rejected dealers would have administrative claims against the Debtor's estate dating back to when their dealerships should have been assumed by Old Chrysler along with the rest of the dealership network.

### *Old Chrysler's acceleration of dealer restructuring via Project Tiger involved a potential benefit for the first lien lenders.*

By anticipating that New Chrysler might exclude some dealership agreements in the future, Old Chrysler's acceleration of dealership rejections effectively stripped Appellant dealers from the benefit of administrative claim priority.    But the amount of the rejected dealer claims would have been the same regardless of whether they were accorded unsecured creditor status or administrative claim status. Prematurely rejecting the Appellants' contracts had the unique effect of insulating the first lien lenders from sharing the proceeds of the sale transaction with any rejected dealers who might have been previously assumed by Old Chrysler and later excluded by New Chrysler.    By rejecting the 789 dealers without any request by the purchaser, Old Chrysler effectively favored the first lien lenders.

Judge Mansfield's concurring opinion in *In re Minges*, 602 F.2d 38 (2d Cir. 1979), condemns such behavior:

> "As a representative of the bankruptcy court, which is a court of equity, the trustee should not play favorites between the lessee and secured creditors by manipulating the obligations affecting them, absent some significant benefit to the creditors generally. To do so would be inequitable."

In order to best protect their estate from the potential of massive dealer rejection claims, Old Chrysler had a fiduciary duty to assume the entire dealership network and assign it to New Chrysler right from the start.    This would have been the only possible course of action which had the potential to protect the Debtor's estate from massive dealer rejection claims. In the event New Chrysler might have accepted assignment of the entire dealership network - as was originally contemplated up until the wee hours of April 29, 2009 under the term sheets pertaining to the Alliance Viability Plan - there would have

APPELLANTS' REPLY BRIEF – 15

**PIDGEON & DONOFRIO GP**
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

been zero exposure to the Debtor's estate of any dealer rejection claims.    This is why assuming the entire dealership network was the only course of action allowed by the business judgment standard, whereas Appellee's chosen course of action was guaranteed to generate massive damage claims.

Assuming the entire dealership network also would have guaranteed that every dealer requested by New Chrysler - after the new company completed dealership due diligence - would have been available for assignment.

Had the 789 rejected dealers been assigned to New Chrysler at the same time as the assumed dealers, it's very possible that the Debtor's estate would have closed free and clear of dealer rejection claims.    Unfortunately, by prematurely rejecting the 789 dealers, Appellees guaranteed their estate would be burdened by dealer rejection claims.    This exhibited,, at the very least, terrible business judgment, while it also raises suspicion concerning preference for the first lien lenders.

### *Judge Gonzalez committed fraud on the court via Footnote 21 of the June 19, 2009 Rejection Opinion.*

Judge Gonzalez fraudulently tampered with the most crucial testimony in the case.    On pg. 352 of the May 27, 2009 hearing, Altavilla testified as follows:

> Q. If this transaction closes without an absolute requirement of a particular number of dealers that are being terminated, would Chrysler still go through with this deal -- I mean, rather, would Fiat still go through with this deal?
>
> A. The answer is that a restructure needs to occur. Whether it occurs before or after the closing of the deal is not a material difference.

The witness could not have been more forthcoming on this point.    Altavilla clearly and unambiguously told the Court that it made no material difference to Fiat whether dealer restructuring occurred before or after the sale closed.    Therefore, Appellee had no sound business judgment incentive to reject 789 dealers and subject the estate to 789 breach of contract claims.    The issue is truly that straighforward. Yet, Judge Gonzalez took candid testimony and filtered it through the infamous Footnote 21 in his June 19, 2009 Rejection Opinion, which fraudulently stated:

APPELLANTS' REPLY BRIEF – 16

"...Altavilla also responded affirmatively to a question regarding whether a dealership network needed to be restructured for the Fiat Transaction to close, stating that a 'restructuring needs to occur.'"

At no point in time did Altavilla ever indicate that dealer restructuring needed to take place for the sale to close.   Judge Gonzalez had no justification for including this in his Opinion.    It's clearly false.   Having had the chance to correct this falsehood in his Opinion on Reconsideration, Judge Gonzalez instead chose to stand by the Footnote 21.    By doing so, Judge Gonzalez elevated his fraud on the court from reckless disregard for the truth to intentional disregard for the truth.

Appellee's response brief to this appeal at 11-12 sought to rehabilitate Judge Gonzalez's Footnote 21 as follows:

"Thus, the degree to which Mr. Altavilla's testimony expressed indifference to the timing of the rejections (*i.e.*, "before or after the closing") simply was not important to the purpose of Footnote 21."

This is an absurd statement.    The words uttered by the witness were clear and unambiguous; it made no material difference to Fiat whether restructuring took place "before or after" the sale closed. This is clearly a time related response.    Counsel is not entitled to simply assign new meaning to words uttered by key witnesses when the actual recorded testimony hurts their case.    And that is exactly what this Court is being asked to accept by Counsel.

Moreover, said Counsel had the chance to rehabilitate this witness when the witness testified. As stated above, they punted.    Furthermore, the absurdity is continued at Footnote 11, pg. 12, of their appellate brief:

"Footnote 18, by contrast, involved an element of timing. Thus, Mr. Altavilla's testimony as to timing was relevant for footnote 18 and was quoted therein, whereas, in Footnote 21, it was irrelevant."

This makes no sense at all.    Obviously, both Footnotes 18 and 21 involve elements of timing.

Footnote 21 stated: "Altavilla also responded affirmatively to a question regarding whether a dealership

APPELLANTS' REPLY BRIEF – 17

network needed to be restructured for the Fiat Transaction to close, stating that a 'restructuring needs to

occur."   The timing is focused upon the date of the sale closing.    Therefore, Footnote 21 concerned the

most crucial time sensitive issue of the case.

### *Appellees' Counsel's fraud on the court concerning Peter Grady's testimony.*

Appellee's Counsel confronted Appellants' allegations on this issue as follows:

> "The Appellants also allege that the Debtors' counsel fabricated testimony of Mr. Grady.
> Br. at 18. But the cited testimony of Mr. Grady comes directly from the transcript and
> was not fabricated. A mere typographical error in the Debtors' citation to the testimony
> — arising from differing page numbering between the preliminary, electronic copy and
> the final, filed copy of the transcript — is the inncent [sic] explanation for what the
> Appellants would call 'a blatant lie.'   Br. at 17.

The Debtors cited to the following testimony of Mr. Grady:

> Debtors' counsel: Would [Fiat] have done this deal without doing the assumption
> and rejection?

> Mr. Grady: My understanding is that they would not have done it.

Hr'g Tr., May 28, 2009, at 539 (testimony of Peter M. Grady).

> Although the Debtors' cited to page 488 of the transcript for this excerpt (based on the
> page numbering of their electronic copy of the Transcript), this quotation actually occurs
> on page 539 of the filed transcript."

First, Appellee's Counsel failed to attach as an appendix to their brief the alleged "electronic

copy" they claim caused "a mere typographical error".   Second, Counsel's invocation of the testimony of

Peter Grady from pg. 539 of the official May 28th hearing transcript was not included in their original

Objection memo (Appendix B) regardless of whatever transcript they might have been using.   Their

appellate brief is the very first instance in which they have quoted this testimony.   Third, the testimony

quoted does not support their original allegation at all.   It is merely a general question and answer about

"assumption and rejection" generically.   Obviously, assumption and rejection of Old Chrysler's

multitude of executory contracts was necessary to a transaction of this size.

APPELLANTS' REPLY BRIEF – 18

PIDGEON & DONOFRIO GP
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

But Peter Grady was not asked on pg. 539 whether Fiat would have done the deal without rejection of the rejected dealership agreements.   Old Chrysler was a monolithic corporation with myriads of involved contracts.   Of course Fiat would not have done the deal without the ability to assume the contracts it desired while rejecting the contracts it did not desire.   The Q & A from pg. 539 simply affirms that Fiat required this generic ability to assume and reject executory contracts.   However, the question neither specifically mentions dealership contracts, nor does Peter Grady's answer pertain specifically to dealership contracts.

Furthermore, had Appellee's Counsel sought to ask Peter Grady a question specifically related to whether Fiat would have done the deal without Old Chrysler having rejected dealer contracts, then learned Counsel certainly had the ability and legal expertise to formulate such a question and ask the witness to answer it, but once again Counsel mysteriously punted.   Having not asked such a direct question of Peter Grady or of Alfredo Altavilla, Counsel now wishes to assign unintended meaning to various testimony such as the Q & A from pg. 539.

This calls for a re-examination of Appellee's Counsel's prior allegation as to Peter Grady's testimony in their Objection Memo (Appendix B at Footnote 23, pg. 18):

> "See...Tr. of May 28, 2009 Hr'g at... 488 (stating that, absent rejection of the rejected dealer agreements, Fiat would not have proceeded with the Fiat Transaction)."

Counsel has admitted that no such quotation appears on pg. 488, but as we've stated above, the Q & A from pg. 539 also does not mention "the rejected dealer agreements".   Furthermore, even though Appellee's Counsel failed to ask a direct question concerning whether Fiat requested or insisted upon rejection of any dealership agreements, Counsel for certain rejected dealers did ask Peter Grady the specific question on pg. 477:

> Q. But Fiat did not require the rejection of the 789 agreements, did it?

> A. No. But Fiat did encourage and buys into a restructuring of the dealer network which

APPELLANTS' REPLY BRIEF – 19

includes rationalization.

Q. And this was not done at their insistence, though, was it?

A. It was not done at their insistence, but it was part of what we looked at as an opportunity --

For Appellee's Counsel to have told the Bankruptcy Court and this Court that Peter Grady testified Fiat would not have done the deal "absent rejection of the rejected dealers" is fraudulent.   This is especially true in light of CEO Nardelli's clear, unambiguous response to the following question:

Q. The question is do you believe that Fiat required the dealer network to be reduced?

A. No, I don't believe they required it.

(Hr'g. Tr. May 28, 2009 at 396.)

### *The elements of fraud on the court have been met.*

"The elements of a 'fraud upon the court' are numerous. Fraud on the court is conduct: 1) on the part of an officer of the court; 2) that is directed to the judicial machinery itself; 3) that is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; 4) that is a positive averment or a concealment when one is under a duty to disclose; 5) that deceives the court."

*Workman v. Bell,* 245 F.3d 849, 852 (6th Cir. 2001).

Judge Gonzalez is an officer of the court who issued a positive averment in Footnote 21 of the June 19, 2009 Rejection Opinion.   The Footnote 21 averment initially exhibited a reckless disregard for the truth.   Judge Gonzalez changed the unambiguous testimony of Fiat executive Alfredo Altavilla. This change in testimony provided the only fact upon which the Court could hold that the rejection of the dealership agreements by Old Chrysler met the business judgment test.   The failure of Judge Gonzalez to correct himself in the published Opinion on Reconsideration elevates the fraud from reckless to intentional.

Appellee's Counsel have made a preposterous contention alleging that fraud on the court is only available as a remedy if the fraud was perpetrated by a party and not a judge.   They have also mistakenly

APPELLANTS' REPLY BRIEF – 20

cited to F.R.C.P. 60(b)(3) to support their clearly erroneous argument:

> "The very language of Civil Rule 60 confirms that only fraud by an opposing party is addressed by the rule. See Civil Rule 60(b)(3) (providing that the court may provide relief from final judgment 'based upon fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an *opposing party*') (emphasis added)."

Appellants have not brought a motion under 60(b)(3).    The applicable Rule is 60(d)(3) which concerns fraud on the court, a remedy available to counter fraudulent action of any officer of the court. A judge is an officer of the court and there exists numerous precedent supporting the obvious conclusion that judges are capable of fraud on the court:

> "It is thus fraud where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function--thus where the impartial functions of the court have been directly corrupted."

*Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1550 (Fed. Cir. 1987)(quoting *Bulloch v. United States*, 721 F.2d 713, 718 (10th Cir. 1983)).

Appellee's also contend erroneously that a court's own fact-finding can't result in fraud on the court:

> "...[A]lthough the very premise of this Appeal depends on it, the Appellants' Brief is devoid of any precedent showing that a court's own fact-finding can constitute "fraud" within the meaning of Civil Rule 60."

Appellants previously cited *United States v. Beggerly*, 524 U.S. 38, 47, 118 S. Ct. 1862, 141 L. Ed. 2d 32 (1998), which states that fraud on the court requires involvement by officers of the court which defiles the judicial machinery.    If a judge's opinion contains a fraudulent averment, then the court has been defrauded.

Additionally, the Supreme Court's holding in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), *overruled on other grounds by Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 97 S. Ct. 31, 50 L. Ed.2d 21 (1976), indicates that a court will be have been improperly influenced by the fraud if the court includes a reference to the fraud in its official opinion as a

APPELLANTS' REPLY BRIEF – 21

factor relied upon for its holding.

### *Appellants' fraud on the court motion was timely.*

Appellee's brief for this appeal contains a clearly erroneous statement as to the Bankruptcy

Court's Opinion on Reconsideration concerning the timeliness of Appellants' fraud on the court motion:

> "The Bankruptcy Court found that the Appellants' choice not to file a timely appeal of the Dealer Rejection Order...doomed their "fraud on the court" argument under Civil Rule 60(d), because the Appellants should have asserted that argument through appeal instead;"

This is completely false.    Judge Gonzalez stated exactly the opposite in the Opinion on

Reconsideration, *In re Old Carco, LLC,* 423 B.R. 40 at 64 (Bankr. S.D.N.Y. 2009):

> While Rule 60(c)(1) limits the time within which a motion under Rule 60(b)(3) must be made to one year, a claim based upon fraud on the court under Rule 60(d)(3) is intended "to protect the integrity of the judicial process" and, therefore, is not time-barred. *Bowie v. Maddox*, No. 03-948, 2010 WL 45553, at * 2, ___ F.Supp. ___, ____ (D. D.C. 2010)..."

There is no statute of limitations for fraud on the court.    To this issue, the United States Supreme

Court in *Hazel-Atlas Glass* stated:

> "But even if Hazel did not exercise the highest degree of diligence Hartford's fraud cannot be condoned for that reason alone... Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

*Hazel Atlas*, 322 U.S. at 246

### *The Business Judgment Standard was not satisfied by Old Chrysler.*

With regard to issues concerning Old Chrysler's duties under the business judgment standard,

Appellants also extensively rely upon the original Memorandum In Support of the Motion to Reconsider

(Appendix A).

APPELLANTS' REPLY BRIEF – 22

***Conclusion.***

      The fact that it made no "material difference" to New Chrysler whether restructuring took place before or after the sale closed was specifically testified to by Alfredo Altavilla on May 27, 2009.    It was this most crucial piece of testimony that was fraudulently tampered with by Judge Gonzalez in Footnote 21 of the Rejection Opinion.    Tampering with witness testimony should be recognized for what it is, fraud on the court, especially where that testimony concerns the single most important fact of the case.

      Appellants conclude by reiterating the following testimony by Alfredo Altavilla:

        Q. And it's fair to say that Chrysler is not seeking rejection of the 789 dealers at Fiat's insistence, right?

        A. That's correct.

(May 27, 2009 Hr'g. T. 335-336.)

      Accordingly, the Bankruptcy Court's approval of Appellee's rejection of Appellants' dealership contracts should be overturned.

      Respectfully submitted this 21st day of May, 2010.


   //Stephen Pidgeon// WSBA#25265      
         Stephen Pidgeon
         Leo Donofrio
         Pidgeon & Donofrio GP
         3002 Colby Avenue, Suite 306
         Everett, Washington 98201
         (425)605-4774 telephone
         (425)818-5371 facsimile

APPELLANTS' REPLY BRIEF – 23

**PIDGEON & DONOFRIO GP**
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774

APPELLANTS' REPLY BRIEF – 24

**PIDGEON & DONOFRIO GP**
3002 Colby Avenue, Suite 306
Everett, Washington 98201
(425)605-4774